## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| EDDIE GRANT, JR., JENNIFER HAMILTON; MICHAEL STIEFEL; CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; AND SECOND AMENDMENT FOUNDATION, INC., | |
| Plaintiffs, | CIV. NO. _____ |
| v. | |
| EDWARD M. LAMONT, JR., in his official capacity; JAMES ROVELLA, in his official capacity; PATRICK GRIFFIN, in his official capacity; MARGARET E. KELLY, in her official capacity; DAVID R. APPLEGATE, in his official capacity; JOSEPH T. CORRADINO, in his official capacity; SHARMESE L. WALCOTT, in her official capacity; DAVID R. SHANNON, in his official capacity; MICHAEL A. GAILOR, in his official capacity; CHRISTINE WATSON, in her official capacity; JOHN P. DOYLE, JR., in his official capacity, PAUL J. NARDUCCI, in his official capacity; PAUL J. FERENCEK, in his official capacity; MATTHEW C. GEDANSKY, in his official capacity, MAUREEN PLATT, in her official capacity; ANNE F. MAHONEY, in her official capacity, | SEPTEMBER 29, 2022 |
| | **COMPLAINT** |
| Defendants. | |

1.    This is an action under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202 for declaratory and injunctive relief challenging the constitutionality of Connecticut's statutory ban on so-called "assault weapons" which deprives law-abiding, responsible citizens of their Second Amendment and Fourteenth Amendment rights under the guise of providing a panacea for social problems that Connecticut remains unable to solve.

2.       Previous challenges to Connecticut's "assault weapon" ban have been unsuccessful, based primarily on the legal standard used in the Second Circuit in deciding Second Amendment cases, to wit: the "two-part test."

      a.   Under the first step, courts examined whether the arms at issue are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes." *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 254-55 (2d. Cir. 2015).

      b.   Under the second step, courts selected "a standard of scrutiny based on how close the law comes to the core of the Second Amendment right" and "the severity of the law's burden on the right." *Id.* at 258.

3.       In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022), the U.S. Supreme Court clarified the proper legal standard under which courts must analyze Second Amendment cases:

      a.   "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126.

      b.   "[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

4.       When correctly viewed under the Supreme Court's *Bruen* standard, it becomes apparent that Connecticut's "assault weapon" ban, and the Defendants' enforcement of same, cannot survive constitutional muster.

2

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, and 2201 as well as 42 U.S.C. § 1983. Venue is appropriate under 28 U.S.C. § 1391 because all of the parties are domiciled in Connecticut, and all of the factual events giving rise to the cause of action occurred in Connecticut.

## PARTIES

### *Plaintiff Eddie W. Grant, Jr.*

6.      Plaintiff Eddie W. Grant, Jr. ("Grant") is a natural person, a resident of Meriden, Connecticut, an adult over the age of 21, and a citizen of the United States. He has been the holder of a Connecticut pistol permit for over thirty years, and is legally eligible under federal and state law to acquire and possess firearms, ammunition, and magazines. Grant is a member and supporter of Plaintiff Connecticut Citizens Defense League, Inc. ("CCDL") and Plaintiff Second Amendment Foundation, Inc. ("SAF").

7.      Grant served twenty-one years as a uniformed Corrections Officer with the Connecticut Department of Corrections, at such facilities as Carl Robinson Prison, Webster Correctional Institution, Cheshire Correctional Institution, and Manson Youth Institution. Grant retired from the Department of Corrections in 2011.

8.      During his service with the Department of Corrections, Grant conducted armed transports of high-risk inmates, and was an armed Perimeter Officer carrying an AR-15-platform firearm.

9.      During his service with the Department of Corrections, Grant was trained and qualified by the State of Connecticut in the safe and effective use of AR 15-platform firearms.

10.     AR 15-platform firearms are among the firearms listed or described in Conn. Gen. Stat. § 53-202a and effectively "banned" by Conn. Gen. Stat. § 53-202c.

11.     Grant owns no firearms listed or described in Conn. Gen. Stat. § 53-202a because he is prohibited by Conn. Gen. Stat. § 53-202c from buying or possessing any such firearms. Grant would like to be able to lawfully purchase and possess one or more of the firearms listed or described in Conn. Gen. Stat. § 53-202a for defensive purposes.

12.     Grant's interest in acquiring such firearms for defensive purposes stems from his mother's accounts of her fight for civil rights in the Deep South. As a Black woman growing up in 1950s-60s Georgia, Grant's mother has recalled to him the church burnings and racially-motivated killings experienced by her family and friends. Grant understands that such attacks were repelled in large part by private ownership of defensive firearms.

13.     Grant feels that Conn. Gen. Stat. § 53-202a-c gives criminals and attackers a strong tactical advantage over him. He feels that criminals don't follow gun restrictions so they can possess and carry any type of so-called "assault weapon" they like. As a law-abiding person, Grant wants to be able to lawfully possess and defensively carry such firearms as well.

14.     Grant would like to purchase, sell, and possess one or more of the firearms listed or described in Conn. Gen. Stat. § 53-202a, but he is prohibited from doing so by Conn. Gen. Stat. § 53-202c and the risk that the Defendants will enforce Conn. Gen. Stat. § 53-202c against him.

### Plaintiff Jennifer Hamilton

15.     Plaintiff Jennifer Hamilton ("Hamilton") is a natural person, a resident of Enfield, Connecticut, an adult over the age of 21, and a citizen of the United States. Hamilton

is the holder of a pistol permit in Connecticut and Massachusetts, and is legally eligible under federal and state law to acquire and possess firearms, ammunition, and magazines. Hamilton is a member and supporter of Plaintiff CCDL and Plaintiff SAF.

16.     Hamilton is a petite 5'-2" tall woman, and relies on a defensive firearm instead of bodily strength to protect herself and her family from attack. Hamilton has been the victim of domestic violence, and carries a defensive firearm to protect herself and her family from further attack.

17.     Hamilton is a firearms instructor, teaching students of all skill levels, from their initial pistol permit class to personal defense and tactical firearms use. She is also a Nuisance Wildlife Control Operator trained and licensed by the Connecticut Department of Energy and Environmental Protection.

18.     Hamilton would like to be able to lawfully purchase one or more firearms listed or described in Conn. Gen. Stat. § 53-202a, likely an AR 15-platform firearm, because of its adaptability and effectiveness for defensive purposes. Hamilton would like to purchase and possess such firearm with a telescopic stock in order to adjust the firearm's length of pull to fit her specific body type and size. However, since Conn. Gen. Stat. § 53-202a(1)(E)(i) defines any such firearm as an "assault weapon," she is prohibited from doing so by Conn. Gen. Stat. § 53-202c.

19.     Hamilton would like to purchase, sell, and possess one or more of the firearms listed or described in Conn. Gen. Stat. § 53-202a, but she is prohibited from doing so by Conn. Gen. Stat. § 53-202c and the risk that the Defendants will enforce Conn. Gen. Stat. § 53-202c against her.

*Plaintiff Michael Stiefel*

20.      Michael Stiefel ("Stiefel") is a natural person, a resident of Montville, Connecticut, an adult over the age of 21, and a citizen of the United States. He has been the holder of a Connecticut pistol permit for over thirty years, and is legally eligible under federal and state law to acquire and possess firearms, ammunition, and magazines. Stiefel is a member and supporter of Plaintiff CCDL and Plaintiff SAF.

21.      Stiefel served twenty years as a uniformed Corrections Officer with the Connecticut Department of Corrections, during which time he conducted armed transports of high-risk inmates, and was an armed Perimeter Officer carrying an AR-15-platform firearm.

22.      During his service with the Department of Corrections, Stiefel was trained and qualified by the State of Connecticut in the safe and effective use of AR 15-platform firearms.

23.      AR 15-platform firearms are among the firearms listed or described in Conn. Gen. Stat. § 53-202a and effectively "banned" by Conn. Gen. Stat. § 53-202c.

24.      Stiefel retired from the Department of Corrections in 2010.

25.      Stiefel owns no firearms listed or described in Conn. Gen. Stat. § 53-202a because he is prohibited by Conn. Gen. Stat. § 53-202c from buying or possessing any such firearms. Stiefel would like to be able to lawfully purchase and possess one or more of the firearms listed or described in Conn. Gen. Stat. § 53-202a for defensive purposes.

26.      Stiefel would like to purchase, sell, and possess one or more of the firearms listed or described in Conn. Gen. Stat. § 53-202a, but he is prohibited from doing so by Conn. Gen. Stat. § 53-202c and the risk that the Defendants will enforce Conn. Gen. Stat. § 53-202c against him.

*Plaintiff Connecticut Citizens Defense League, Inc.*

27.    Plaintiff, Connecticut Citizens Defense League, Inc. ("CCDL") is a non-profit educational foundation, incorporated under the laws of Connecticut, with its principal place of business in Seymour, Connecticut. Its mission is to preserve the effectiveness of the Second Amendment through legislative and grassroots advocacy, outreach, education, research, publication, legal action, and programs focused on the constitutional right to keep and bear arms. CCDL has over 41,000 members and supporters nationwide, with more than ninety-five percent of its members and supporters being residents of Connecticut. CCDL represents its members and supporters – which include individuals seeking to exercise their right to acquire, possess, and carry firearms for personal protection. CCDL brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public.

28.    CCDL has expended and diverted resources otherwise reserved for different institutional functions and purposes, and is adversely and directly harmed by the illegal and unconstitutional actions of the Defendants as alleged herein. CCDL has diverted, and continues to divert, significant time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the laws complained of herein that would otherwise be used for educational outreach, public relations, and/or programmatic purposes.

29.    Among other diversions and threatened diversions, the Defendants' unconstitutional enforcement of the laws complained of herein has forced, or likely will force, CCDL to divert previously allocated funds, energies, and resources to the cause of this legal action. Rather than working on other educational, outreach, public relations, and/or

programmatic events and operations, CCDL's officers and Executive Board members have devoted, are continuing to devote, or are likely to devote, significant time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the laws complained of herein. CCDL, its officers, and its Executive Board members will be forced to continue diverting such time, money, effort, and resources from CCDL's normal educational, outreach, public relations, and/or programmatic events and operations so long as the Defendants' unconstitutional enforcement of the laws complained of herein persists.

30.    As to CCDL's representative capacity claims, there are common questions of law that substantially affect the rights, duties and liabilities of many of CCDL's members as well as potentially numerous similarly situated residents whose constitutional rights have been, and are continuing to be, infringed by the Defendants' unconstitutional enforcement of the laws complained of herein. The interests CCDL seeks to protect are germane to its purpose.

31.    Each of the individual Plaintiffs to this action – as described in the preceding paragraphs, are all members and supporters of CCDL.

### Plaintiff Second Amendment Foundation, Inc.

32.    Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit educational foundation incorporated under the laws of the State of Washington with its principal place of business in Bellevue, Washington. SAF seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. SAF has over 700,000 members and supporters nationwide, including many members in Connecticut.

33.    The purpose of SAF includes education, research, publishing, and legal action focusing on the constitutional right to privately own and possess firearms under the Second

8

Amendment, and the consequences of gun control. The Court's interpretation of the Second Amendment directly impacts SAF's organizational interests, as well as SAF's members and supporters in Connecticut, who enjoy exercising their Second Amendment rights. SAF brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public. Many of SAF's individual Connecticut members have been adversely and directly harmed and injured by Defendants' enforcement of the statutory prohibition on the sale, transfer and ownership of so-called "assault weapons."

34.     The interests SAF seeks to protect are germane to its purpose. Indeed, the Connecticut statutes challenged herein have denied, and will continue to deny responsible, law-abiding adults their fundamental, individual right to keep and bear arms enshrined under the Second and Fourteenth Amendments of the U.S. Constitution. Defendants' actions and failures alleged herein have caused SAF to dedicate resources that would otherwise be available for other purposes to protect the rights and property of its members, supporters, and the general public, including by and through this action. Each of the individual Plaintiffs to this action – as described in the preceding paragraphs – are members and supporters of SAF.

### Defendant Edward M. Lamont, Jr.

35.     The Defendant, Edward M. Lamont, Jr., ("Lamont") is the governor of Connecticut, and he is sued in his official capacity. In his role as Connecticut governor, Lamont is constitutionally required to "take care that the laws be faithfully executed," including the laws complained of herein. Conn. Const., Art. IV, § 12.

*Defendant James Rovella*

36.     The Defendant, James Rovella ("Rovella"), is the Commissioner of Connecticut's Department of Emergency Services and Public Protection ("DESPP"), and he is sued in his official capacity. In his role as the Commissioner, Rovella reports to Lamont and oversees the Connecticut State Police, which is responsible for investigating and initiating prosecutions under Connecticut law. *See* Conn. Gen. Stat. § 29-7. Additionally, DESPP possesses significant regulatory and administrative authority over Connecticut's "assault weapons" prohibitions. *See, e.g.*, Conn. Gen. Stat. § 53-202d.

*Defendant Patrick J. Griffin*

37.     The Defendant, Patrick J. Griffin ("Griffin"), is Connecticut's Chief State's Attorney and is sued in his official capacity. In his capacity as Chief State's Attorney and head of the Division of Criminal Justice, Defendant Griffin oversees all Connecticut prosecutors. Additionally, he wields power to sign warrants, charging documents, applications for grand jury investigations, and supervises all appellate, post-trial, and post-conviction proceedings for criminal matters in Connecticut. This authority extends to prosecuting individuals who violate Connecticut's "assault weapons" ban.

*Defendant Margaret E. Kelley*

38.     The Defendant, Margaret E. Kelley ("Kelly"), is Connecticut's State's Attorney for the Ansonia/Milford Judicial District and is sued in her official capacity. As a Connecticut State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). Her

responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### *Defendant David R. Applegate*

39.   The Defendant, David R. Applegate ("Applegate"), is Connecticut's State's Attorney for the Danbury Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### *Defendant Joseph T. Corradino*

40.   The Defendant, Joseph T. Corradino ("Corradino"), is Connecticut's State's Attorney for the Fairfield Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### *Defendant Sharmese L. Walcott*

41.   The Defendant, Sharmese L. Walcott ("Walcott"), is Connecticut's State's Attorney for the Hartford Judicial District and is sued in her official capacity. As a Connecticut State's Attorney, she is required to "diligently inquire after and make appropriate presentment

and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). Her responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### *Defendant David R. Shannon*

42.     The Defendant, David R. Shannon ("Shannon"), is Connecticut's State's Attorney for the Litchfield Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### *Defendant Michael A. Gailor*

43.     The Defendant, Michael A. Gailor ("Gailor"), is Connecticut's State's Attorney for the Middlesex Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### *Defendant Christine Watson*

44.     The Defendant, Christine Watson ("Watson"), is Connecticut's State's Attorney for the New Britain Judicial District and is sued in her official capacity. As a Connecticut State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). Her responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### *Defendant John P. Doyle, Jr.*

45.     The Defendant, John P. Doyle, Jr. ("Doyle"), is Connecticut's State's Attorney for the New Haven Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### *Defendant Paul J. Narducci*

46.     The Defendant, Paul J. Narducci ("Narducci"), is Connecticut's State's Attorney for the New London Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-

286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### Defendant Paul J. Ferencek

47.     The Defendant, Paul J. Ferencek ("Ferencek"), is Connecticut's State's Attorney for the Stamford Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### Defendant Matthew C. Gedansky

48.     The Defendant, Matthew C. Gedansky ("Gedansky"), is Connecticut's State's Attorney for the Tolland Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### Defendant Maureen Platt

49.     The Defendant, Maureen Platt ("Platt"), is Connecticut's State's Attorney for the Waterbury Judicial District and is sued in her official capacity. As a Connecticut State's Attorney, she is required to "diligently inquire after and make appropriate presentment and

14

complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). Her responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### *Defendant Anne F. Mahoney*

50.     The Defendant, Anne F. Mahoney ("Mahoney"), is Connecticut's State's Attorney for the Windham Judicial District and is sued in her official capacity. As a Connecticut State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). Her responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban.

### **FACTUAL ALLEGATIONS**

### *Connecticut's History Of "Assault Weapons" Regulation*

51.     Prior to 1993, Connecticut law did not prohibit the purchase, sale or possession of the firearms it now defines as "assault weapons."

52.     Firearms meeting the Connecticut law definition of "assault weapon" are referred to in the firearms industry as "modern sporting arms" or "modern sporting rifles" ("MSAs" or "MSRs"). For the purposes of this Complaint, the terms "MSA," "MSR," and "assault weapon" are used interchangeably.

53.     In 1993, Connecticut enacted legislation that banned "assault weapons" and criminalized their possession, defining "assault weapons" as firearms "capable of fully

automatic, semiautomatic or burst fire at the option of the user." 1993 Conn. Pub. Acts 93-306, § 1(a). The 1993 law also banned 67 specifically named semiautomatic firearm models.

54.    In 1994, the United States Congress enacted the Violent Crime Control and Law Enforcement Act of 1994 (the "Act"), which restricted the manufacture, transfer, and possession of certain "semiautomatic assault weapons." Like the Connecticut law, the Act designated particular firearm models – 18 models in all – as specifically banned, including the Colt AR-15 and other AR-15-platform firearms. The Act also created a two-feature test, which prohibited any semiautomatic firearm that bore at least two of the five so-called "military-style" physical features identified in the Act – e.g. a telescopic stock, a conspicuously protruding pistol grip, a bayonet mount, a flash suppressor, and a grenade launcher.

55.    The Act expired in 2004 per its sunset provision.

56.    In 2001, Connecticut amended its "assault weapon" ban to mirror the Act. 2001 Pub. Acts 01-103.

57.    In 2013, Connecticut responded to the Sandy Hook Elementary School tragedy by specifically criminalizing the possession of the Bushmaster Model XM15-E2S rifle used in that school shooting, and numerous other firearms it considered "assault weapons." Conn. Gen. Stat. § 53-202a.

### *Connecticut's Current Criminalization Of "Assault Weapons"*

58.    Conn. Gen. Stat. § 53-202c(a) makes it a Class D felony for any person within Connecticut's borders to possess an "assault weapon" as defined in Conn. Gen. Stat. § 53-202a. A violation of § 53-202c carries a mandatory one-year sentence of incarceration and a maximum of five years' incarceration. *See* Conn. Gen. Stat. § 53a-35a(8).

59.     Conn. Gen. Stat. § 53-202b(a)(1) makes it a Class C felony to distribute, transport, import, keep for sale, offer for sale, or gift an "assault weapon" within the state of Connecticut, save for very limited exceptions not relevant here. It imposes a mandatory two-year sentence of incarceration. *See* Conn. Gen. Stat. § 53-202b(a)(1). A Class C felony carries a maximum term of imprisonment of ten years' incarceration. Conn. Gen. Stat. § 53a-35a(7).

60.     Connecticut law permits individuals who lawfully possessed "assault weapons" on or prior to April 3, 2013 to continue to possess such "assault weapons" if they proved previous lawful ownership to the State Police, applied to the State Police for a certificate of possession of the "assault weapons" by January 1, 2014, and actually received that certificate. Conn. Gen. Stat. § 53-202d(a)(2). Their possession of the "assault weapon" is limited to narrowly defined places and for narrowly defined purposes which do not include self-defense outside of the home. Conn. Gen. Stat. § 53-202d(f).

61.     Connecticut takes a two-track approach to defining what an "assault weapon" is for purposes of criminalizing its possession, sale, and transfer. First, Connecticut criminalizes the possession, sale, or transfer of approximately 160 specifically named firearm models in four statutory subsections on the grounds that they are considered "assault weapons." *See generally* Conn. Gen. Stat. § 53-202a.

62.     Highlighting the randomness of the firearms named, the list of banned semiautomatic firearms in Conn. Gen. Stat. § 53-202a bizarrely includes the Remington Tactical Rifle Model 7615, which is not a semiautomatic firearm at all, but is a pump-action rifle. Conn. Gen. Stat. § 53-202a(1)(B).

63.     Second, Conn. Gen. Stat. § 53-202a provides general descriptive guidelines as to what also constitutes an "assault weapon:"

a.   "Any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user…." Conn. Gen. Stat. § 53-202a(1)(A)(i).

b.   "A part or combination of parts designed or intended to convert a firearm into an assault weapon" as defined further in the statutory definition of the statute. Conn. Gen. Stat. § 53-202a(1)(A)(ii).

c.   "A semiautomatic, centerfire rifle that has an ability to accept a detachable magazine and has at least one of the following: (I) A folding or telescoping stock; (II) Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing; (III) A forward pistol grip; (IV) A flash suppressor; or (V) A grenade launcher or flare launcher…." Conn. Gen. Stat. § 53-202a(1)(E)(i).

d.   "A semiautomatic, centerfire rifle that has a fixed magazine with the ability to accept more than ten rounds;" Conn. Gen. Stat. § 53-202a(1)(E)(ii).

e.   "A semiautomatic, centerfire rifle that has an overall length of less than thirty inches." Conn. Gen. Stat. § 53-202a(1)(E)(iii).

f. "A semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of the following: (I) An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip; (II) A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer; (III) A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel; or (IV) A second hand grip…. Conn. Gen. Stat. § 53-202a(1)(E)(iv).

g. "A semiautomatic pistol with a fixed magazine that has the ability to accept more than ten rounds;" Conn. Gen. Stat. § 53-202a(1)(E)(v).

h. "A semiautomatic shotgun that has both of the following: (I) A folding or telescoping stock; and (II) Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing…." Conn. Gen. Stat. § 53-202a(1)(E)(vi).

i. "A semiautomatic shotgun that has the ability to accept a detachable magazine." Conn. Gen. Stat. § 53-202a(1)(E)(vii).

j. "A shotgun with a revolving cylinder." Conn. Gen. Stat. § 53-202a(1)(E)(viii).

    k. "A part or combination of parts designed or intended to convert a firearm into an assault weapon… any combination of parts from which an assault weapon may be assembled if those parts are in the possession or under the control of the same person." Conn. Gen. Stat. § 53-202a(1)(F).

64.    The result of this statutory scheme is to criminalize the possession of not only many fully automatic, selective fire, and burst fire firearms, but it also criminalizes the possession of many ubiquitous semiautomatic firearms that are widely popular and commonly used for lawful purposes throughout the United States.

65.    An additional consequence of Connecticut's statutory scheme is that a conviction for the possession of an "assault weapon" is a felony conviction, rendering a person ineligible to ever again lawfully possess any firearm. *See e.g.*, 18 U.S.C. § 922(g)(1).

### *"Assault Weapons" are "Modern Sporting Arms," and Are in Common Use for Lawful Purposes Throughout the United States.*

66.    MSAs (Connecticut's "assault weapons") are widely popular and in common use throughout the United States for lawful purposes.

67.    The National Shooting Sports Foundation ("NSSF") – a firearms trade association based in Newtown, Connecticut – estimated in 2020 that 19,797,000 MSRs have been manufactured or imported into the United States based on the most available statistics compiled by federal authorities. *See* **Exhibit A – NSSF Report on Firearm Production In The U.S., p. 7**; *see also Miller v. Bonta*, 542 F.Supp.3d 1009, 1022 (S.D. Cal. 2021) (discussing evidence after a bench trial). The number of manufactured or imported MSRs has steadily increased in the United States over the years. *See* **Exhibit A, p. 7**.

68.     The NSSF further reports that approximately 48% of rifles produced in the United States were MSRs *Id.* at p. 7.

69.     The NSSF also conducted a survey that reported that 34% of buyers purchased an MSR a/k/a "assault rifle" for personal protection, 36% for target practice or informal shooting, and 29% for hunting. *Miller*, 542 F.Supp.3d at 1022 (referring to MSRs as "modern rifles").

70.     Further solidifying the statistical data, the NSSF reported that, in 2018, approximately 18,327,314 people participated nationally in target and sport shooting with MSRs. *Id.*

71.     In 2018, Americans bought twice as many MSRs as they did Ford-150s – the most popular pickup truck in America. *Id.* at 1022-1023.

72.     Courts have already recognized that firearms considered "assault weapons" under Connecticut law are in common use throughout the United States:

> a.   In 2015, the Second Circuit held that "[e]ven accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are 'in common use' as the term was used in *Heller.*" *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d. Cir. 2015).

> **b.**  In 2011, the D.C. Circuit held "that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend." *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

### *"Assault Weapons" are Typically Used for Lawful Purposes.*

73.    In 2019, a pregnant Florida woman used a single shot from a lawfully-owned AR-15-platform firearm to mortally wound one of the two home invaders who had already fired a shot and were pistol whipping her husband. **Exhibit B**.

74.    In March 2017, an Oklahoma man used a lawfully-owned AR-15-platform firearm to shoot three masked home invaders during a confrontation inside his father's home. **Exhibit C**.

75.    In April 2018, two men – one armed with a handgun and the other with an AR-15-platform firearm – were forced into a gunfight with three masked home invaders who attempted to use a police entrance tactic. **Exhibit D**. They were forced to fire approximately 30 shots in the confrontation and successfully repelled the intruders without harm to themselves. *Id.*

76.    In February 2018, a firearms instructor intervened with an AR-15-platform firearm in an argument outside his apartment when one of the participants threatened to use a knife and actually stabbed a person, successfully deterring the assailant from any further misconduct. **Exhibit E.**

77.    In November 2017, Stephen Willeford – a former firearms instructor – intervened with an AR-15-platform firearm in the deadliest mass shooting event in Texas history when Devin Kelley attacked a Baptist Church in Sutherland Springs, Texas. **Exhibit F**. After Kelley killed 26 people and wounded 26 others, Willeford realized what was happening and left the safety of his home to engage Kelley with his AR-15. *Id.* Willeford wounded Kelley twice in the shootout, forcing him to stop his massacre, and flee the scene.

*Id.* Willeford subsequently pursued him with a motorist's aid until Kelley committed suicide. *Id.*

### Connecticut Bans Common Features of Firearms Under Its Definition of "Assault Weapons" That Actually Render the Firearms Safer.

78.     Pistol grips are a longstanding historical feature of rifles that date back for centuries. Conn. Gen. Stat. § 53-202a(1)(E)(i) bans their use on semiautomatic, centerfire rifles with detachable magazines. Conn. Gen. Stat. § 53-202a(1)(E)(vi) bans their use on shotguns.

79.     The primary purpose of a pistol grip is to improve ergonomics, which, in turn, improves a firearm's accuracy by shaping the user's grip into a more natural and comfortable position. A pistol grip does not increase the danger of a firearm in any meaningful way, and it has been historically used for centuries and remains in common use today.

80.     Thumbhole stocks have a historical basis with custom stocks from the 1600s through the modern era employing similar concepts. Conn. Gen. Stat. § 53-202a(1)(E)(i) bans their use on semiautomatic centerfire rifles with detachable magazines. Conn. Gen. Stat. § 53-202a(1)(E)(vi) bans their use on shotguns.

81.     Like a pistol grip, the primary purpose of a thumbhole stock is to improve ergonomics and accuracy by shaping the user's grip in a natural and comfortable position. A thumbhole stock does not increase the danger of a firearm in any meaningful way, and it has been historically used for centuries and remains in common use today.

82.     Folding or telescopic stocks date back to at least the 1650-1700 period, and they reached more mainstream popularity in the 1700s and continue to be a common feature of firearms today. Conn. Gen. Stat. § 53-202a(1)(E)(i) bans their use on semiautomatic centerfire

rifles with detachable magazines. Conn. Gen. Stat. § 53-202a(1)(E)(vi) bans their use on shotguns.

83.     The primary purpose of a telescopic or folding stock is to adjust the length of a firearm to give the user more control over it based on their height and body type. More control over a firearm renders it safer to use and more accurate. Thus, a telescopic or folding stock does not increase the danger of a firearm in any meaningful way, and it has been historically used for centuries and remains in common use today.

84.     Forward pistol grips appeared on firearms as early as the 1860s and gradually became more popular for some firearms. Conn. Gen. Stat. § 53-202a(1)(E)(i) bans their use on semiautomatic centerfire rifles with detachable magazines.

85.     Like the other features previously discussed, a forward pistol grip or a vertical forend gives a user greater control of a firearm, which increases accuracy. Forward pistol grips also increase the accuracy of firearms when used in a prone position. They do not increase the danger of a firearm in any meaningful way, and they have been used for centuries and remain in common use today.

86.     Flash suppressors first appeared in the early 1900s as a combination of sound and flash suppressor. Conn. Gen. Stat. § 53-202a(1)(E)(i) bans their use on semiautomatic centerfire rifles with detachable magazines.

87.     The purpose of a flash suppressor is to divert the muzzle flash in ways that mitigate its profile – a feature that is nigh indispensable in low light shooting situations such as a home at night. A muzzle flash in a dark environment temporarily affects a user's vision, placing them at a momentary disadvantage to possible intruders. A flash suppressor enables a

user to retain full use of their visual faculties in dark environments, making their use of a firearm safer. It does not increase the danger of a firearm in any meaningful way, and it has been used for almost a century and remains in common use today.

88.     Rifles or other long guns under 30 inches in length date back to the 16th century and have remained popular ever since. Conn. Gen. Stat. § 53-202a(1)(E)(iii) criminalizes their possession.

89.     Rifles or long guns under 30 inches are particularly well-suited for home defense because they permit a user to more easily navigate doorways and corners. They additionally are more suited for smaller individuals or disabled users who require a rifle or other long gun that is lighter and easier to handle. A shorter long gun or rifle is no more deadly than any other firearm, and they have been used for centuries and remain in common use today.

90.     Shotguns with revolving cylinders date back to the early 1800s and have remained in common use since. In fact, virtually every early American revolver manufacturer offered a revolving shotgun model for purchase as well. Conn. Gen. Stat. § 53-202a(1)(E)(viii) and § 53-202c criminalizes the possession of shotguns with revolving cylinders.

91.     Most modern shotguns have the capacity to accept between 3 to 6 rounds in a tubular magazine. A revolving cylinder does not meaningfully increase the danger of a shotgun, and shotguns with revolving cylinders have existed in common usage since the advent of the revolver, and remain in common use today.

## COUNT ONE – 42 U.S.C. § 1983 CLAIM FOR VIOLATION OF SECOND AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS

92.     Paragraphs 1 through 91 are incorporated herein.

93.     The Second Amendment guarantees "the right of the people to keep and bear Arms." U.S. Const. Amend. II.

94.     The Fourteenth Amendment applies the Second Amendment to the states, including the Defendants. *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2137 (Jun. 23, 2022) ("Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second").

95.     On October 19, 2015, the Second Circuit affirmed this Court's decision upholding the constitutionality of Connecticut's laws prohibiting the possession of "semiautomatic assault weapons…." *See New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 343 (2d Cir. 2015). The U.S. Supreme Court denied the plaintiffs' petition for a writ of certiorari. *See Shew v. Malloy*, 136 S.Ct. 2486 (Mem) (Jun 20, 2016).

96.     The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022), however, strips *Cuomo* of its binding effect because it completely reshaped Second Amendment analysis in the United States. Courts have recognized the sea change as follows:

> a.  The U.S. Supreme Court summarily reversed and remanded a Fourth Circuit decision upholding Maryland's "assault weapons" ban for reconsideration in light of *Bruen. See Bianchi v. Frosh*, 142 S.Ct. 2898 (Mem) (Jun. 30, 2022).

    b.  The Ninth Circuit vacated, and remanded for reconsideration, a decision by a U.S. District Court for the Southern District of California striking down California's "assault weapons" ban in light of *Bruen* because *Bruen* employed a different method of analysis. *See Miller v. Bonta*, 2022 WL 3095986 (Aug. 1, 2022).

97.    The *Cuomo* analysis employed a two-step interest-balancing test akin to a burden-shifting analysis:

    a.  Under first step, courts examined whether the arms at issue are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes." *Cuomo*, 804 F.3d at 254-55.

    b.  The second step required courts to select a standard of scrutiny based on how close the law comes to the core of the Second Amendment right" and "the severity of the law's burden on the right." *Id.* at 258.

98.    *Cuomo*'s second step was remarkably malleable to being a public policy inquiry. As applied in *Cuomo*, the Second Circuit used two factors to inform the inquiry: home defense and the popularity of weapons compared to handguns. Based on the two competing factors, it applied intermediate scrutiny instead of strict scrutiny to the regulations at issue and held that they did not impose sufficiently severe burdens on fundamental constitutional rights because there were readily available alternatives such as handguns for home defense. *Id.* at 258-261.

99.    *Bruen* completely abolishes the quasi-public policy and scrutiny analyses. Its reshaping of the analysis starts and ends with two basic principles:

    a.  "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126.

    b.  "[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

100.    The Second Amendment's plain text covers the conduct that the Plaintiffs seek to engage in and that the Defendants criminalize: the keeping and bearing of commonly used firearms for personal defense and other lawful purposes.

101.    The firearms that the Plaintiffs seek to purchase, possess, and carry, but which are effectively banned by the statutory scheme challenged herein, do not fall within the "dangerous and unusual" category mentioned in *District of Columbia v. Heller*, 554 U.S. at 627.

102.    Instead, as the Plaintiffs show, analogous firearms have been developed and used for lawful purposes centuries. Such firearms came to the fore both prior to and after the adoption of the Second Amendment, and they were an integral part of personal use in America, especially in the American West, at the time that the Fourteenth Amendment was adopted to apply the Bill of Rights to the states.

103.    Neither the 1791 historical tradition at the time the Second Amendment was ratified, nor the 1868 historical tradition at the time that the Fourteenth Amendment applied the Bill of Rights against the states, contained any well-established prohibition on "assault weapons" or their historical equivalents. *See Bruen*, 142 S.Ct. at 2138 (acknowledging a scholarly debate over whether the 1791 historical tradition or the 1868 historical tradition controls the analysis).

104.     Conn. Gen. Stat. § 53-202c and its accompanying statutory provisions in Conn. Gen. Stat. §§ 53-202a-f and Conn. Gen. Stat. §§ 53-202h-j, violate the Plaintiffs rights under the Second and Fourteenth Amendments by criminalizing the possession and bearing of:

   a.   Common firearms – at least one of which has been for many years the single most popular rifle platform in the United States; and

   b.   Common firearm features that make them safer for all users, and more accessible to people with disabilities, including telescopic stocks, pistol grips, forward grips, etc.

105.     The Defendants' actions to enforce Conn. Gen. Stat. § 53-202c and its accompanying statutory provisions violate, and threaten to imminently violate, the legally protected interests, rights, privileges, or immunities secured to the Plaintiffs by the Second and Fourteenth Amendments of the United States Constitution.

106.     The relief sought herein would fairly redress the injuries the Plaintiffs claim.

107.     Without the declaratory and injunctive relief requested herein, the Plaintiffs will continue to suffer the violation of their legally protected interests, rights, privileges, or immunities secured to the Plaintiffs by the Second and Fourteenth Amendments of the United States Constitution.

**COUNT TWO – DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201-2202
CLAIM FOR VIOLATION OF SECOND AMENDMENT
AND FOURTEENTH AMENDMENT RIGHTS**

108.     Paragraphs 1 through 107 are incorporated herein.

109.    An actual, substantial, and concrete case and controversy exists between the parties on the constitutionality and enforceability of Conn. Gen. Stat. §§ 53-202a-f and Conn. Gen. Stat. §§ 53-202h-j;

110.    Without the declaratory and injunctive relief requested herein, the Plaintiffs will continue to suffer the violation of their legally protected interests, rights, privileges, or immunities secured to the Plaintiffs by the Second and Fourteenth Amendments of the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs seek the following relief:

A.    Pursuant to Counts One and Two, a declaratory judgment that Conn. Gen. Stat. §§ 53-202a-f and Conn. Gen. Stat. §§ 53-202h-j violate the Second Amendment to the United States Constitution;

B.    Pursuant to Counts One and Two, a permanent injunction barring the Defendants from enforcing Conn. Gen. Stat. §§ 53-202a-f and Conn. Gen. Stat. §§ 53-202h-j;

C.    Pursuant to Counts One and Two, costs and attorneys' fees;

D.    Any such other and further relief that the Court deems just and reasonable.

Dated: SEPTEMBER 29, 2022                    Respectfully submitted,

                                        *//s//   Doug Dubitsky*
                                        Doug Dubitsky, Esq.
                                        (ct21558)
                                        LAW OFFICES OF DOUG DUBITSKY
                                        P.O. Box 70
                                        North Windham, CT 06256
                                        Telephone: 860.933.9495
                                        Facsimile: 866.477.1120
                                        Email: doug@lawyer.com


                                        *//s//   Craig C. Fishbein*
                                        Craig C. Fishbein, Esq.
                                        (ct25142)
                                        FISHBEIN LAW FIRM, LLC
                                        100 South Main Street
                                        P.O. Box 363
                                        Wallingford, Connecticut 06492
                                        Telephone: 203.265.2895
                                        Facsimile: 203.294.1396
                                        E-mail: ccf@fishbeinlaw.com

                                        *//s//   Cameron L. Atkinson*
                                        Cameron L. Atkinson, Esq.
                                        (ct31219)
                                        ATKINSON LAW, LLC
                                        122 Litchfield Rd., Ste. 2
                                        P.O. Box 340
                                        Harwinton, CT 06791
                                        Telephone: 203.677.0782
                                        Email: catkinson@atkinsonlawfirm.com

                                        *Attorneys for the Plaintiffs*