## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| EDDIE GRANT, JR., JENNIFER HAMILTON; MICHAEL STIEFEL; CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; AND SECOND AMENDMENT FOUNDATION, INC., | CIV. NO. 3:22-cv-01223-JBA |
| Plaintiffs, | FEBRUARY 3, 2023 |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF** |
| EDWARD M. LAMONT, JR., in his official capacity; JAMES ROVELLA, in his official capacity; PATRICK GRIFFIN, in his official capacity; MARGARET E. KELLY, in her official capacity; DAVID R. APPLEGATE, in his official capacity; JOSEPH T. CORRADINO, in his official capacity; SHARMESE L. WALCOTT, in her official capacity; DAVID R. SHANNON, in his official capacity; MICHAEL A. GAILOR, in his official capacity; CHRISTIAN WATSON, in his official capacity; JOHN P. DOYLE, JR., in his official capacity, PAUL J. NARDUCCI, in his official capacity; PAUL J. FERENCEK, in his official capacity; MATTHEW C. GEDANSKY, in his official capacity, MAUREEN PLATT, in her official capacity; ANNE F. MAHONEY, in her official capacity, | **PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION** |
| Defendants. | |

The Plaintiffs respectfully submit this Memorandum of Law in support of their Emergency Motion for a Temporary Restraining Order and a Preliminary Injunction.

The Plaintiffs filed this action on September 29, 2022 seeking a declaratory judgment that Connecticut's "assault weapon" ban is unconstitutional and seeking a permanent injunction against enforcement of that ban. On Tuesday, January 31, 2023, the United States Justice Department, through the Bureau of Alcohol, Tobacco, Firearms, and Explosives

**ORAL ARGUMENT REQUESTED**

1

("ATF"), published a new rule in the Federal Register, effective immediately, redesignating a class of firearms known as "any other firearm" or simply "others" as either "rifles" or "short barreled rifles" depending on the barrel length. For most people in the United States who own "other" firearms with short barrels, the new ATF rule requires that they register the firearms with the ATF or replace the short barrel with a longer one. Those with "others" with barrels of sixteen inches or greater, need not do anything in response to the rule.

However, redesignating "others" as any type of rifle pushes them within the definition of "assault weapon" banned in Connecticut. "Others" were legal in Connecticut and did not fall under the "assault weapon" ban because they were neither "rifles," "shotguns," nor "pistols" – each of which (in the relevant configuration) falls within the definition of "assault weapon." Until January 31, 2023, Connecticut residents, including the Plaintiffs, lawfully owned and peaceably used tens of thousands of "others." Like all legal firearms purchased in Connecticut, each "other" was purchased with the express approval of the Connecticut Department of Emergency Services and Public Protection's ("DESPP") Special Licensing and Firearms Unit ("SLFU"). As of January 31, 2023, those tens of thousands of previously legal firearms are "assault weapons" – the simple possession of which is now a felony.

Each of the individual Plaintiffs and many members of both representative Plaintiffs currently own "others." The Plaintiffs did not address "others" in the Complaint or Amended Complaint because, until January 31, 2023, "others" were not within the definition of "assault weapon" and were not banned under Connecticut law. Thus, until January 31, 2023, "others" were not within the scope of this litigation. "Others," however, have now been redesignated by the new ATF rule to bring them with the definition of "assault weapon" under the statutory

2

scheme challenged in this action. Now, the Plaintiffs are at immediate risk of being arrested and prosecuted for possessing illegal "assault weapons" under the very laws that they have asked the Court to declare unconstitutional. This change in the law has now forced the Plaintiffs to seek emergency relief from the Court to protect them and others like them from arrest and prosecution under those laws.

Given the immediacy and severity of the danger, the Plaintiffs seek an emergency, *ex parte*, Temporary Restraining Order ordering the Defendants and their subordinates to refrain from enforcing Connecticut's "assault weapon" ban in regard to any firearm previously designated as an "other," and a Preliminary Injunction, upon an expedited opportunity for Defendants to be heard, enjoining the Defendants and their subordinates from enforcing Connecticut's "assault weapon" ban.

## FACTUAL BACKGROUND

### I.    Connecticut's Criminalization of "Assault Weapons"

Prior to 1993, Connecticut did not prohibit the purchase, sale, or possession of certain modern sporting rifles that it now classifies as "assault weapons." In 1993, it changed course, enacting legislation that banned "assault weapons" and criminalized their possession. 1993 Conn. Pub. Acts 93-306, § 1(a); *see also New York State Rifle and Pistol Ass'n v. Cuomo*, 804 F.3d 242, 248 (2d Cir. 2015) (discussing the history of Connecticut's assault weapons ban). The 1993 ban employed a two-track approach – banning 67 specifically named semiautomatic firearm models and firearms "capable of fully automatic, semiautomatic or burst fire at the option of the user." *Cuomo*, 804 F.3d at 248.

A year after Pub. Acts 93-306, the United States Congress enacted the Violent Crime Control and Law Enforcement Act of 1994, which purported to restrict the manufacture, transfer, and possession of certain "semiautomatic assault weapons." *Id.* The federal ban followed Connecticut's two-track approach to a limited extent, banning 18 specific firearms but introducing what became known as the "two-feature test." *Id.* The "two-feature test" banned "any semiautomatic firearm that contained at least two listed military-style features, including a telescoping stock, a conspicuously protruding pistol grip, a bayonet mount, a flash suppressor, and a grenade launcher." *Id.* The federal ban, however, contained a sunset clause that caused it to expire in 2004. *Id.*

The approaching expiration of the federal "assault weapons" ban inspired Connecticut to adopt its own equivalent of the federal ban in 2001, embracing the "two feature test" for the first time. 2001 Conn. Pub. Acts 01–130, § 1. In 2013, Connecticut expanded its criminalization of "assault weapons" broadly to create the statutory schem that the Plaintiffs now challenge - Conn. Gen. Stat. §§ 53-202a-f and Conn. Gen. Stat. §§ 53-202h-j.[1]

The law makes the possession of an "assault weapon" a Class D felony and prescribes a punishment of a mandatory one-year sentence of incarceration and a maximum of five years' incarceration. Conn. Gen. Stat. § 53-202c(a); *see also* Conn. Gen. Stat. § 53a-35a(8). It also makes the distribution, transportation, importation, stocking for sale, advertisement for sale, sale, or gifting of an "assault weapon" a Class C felony, which carries a mandatory two-year

---

[1] Conn. Gen. Stat. § 53-202g relates to reporting the loss or theft of a firearm and is not being challenged in this action.

sentence of incarceration and a maximum term of ten years' incarceration. Conn. Gen. Stat. §
53-202b(a)(1); *see also* Conn. Gen. Stat. § 53a-35a(7).

There is a limited "grandfathering" provision to the law, which allows individuals who
lawfully possessed "assault weapons" on or prior to April 3, 2013 to continue to possess them
if they proved previous lawful ownership to the Connecticut State Police, applied to the
Connecticut State Police for a certificate of possession of the "assault weapons" by January 1,
2014, and have actually received the certificate. Conn. Gen. Stat. § 53-202d(a)(2). The
"grandfathered" possession, however, is limited to narrowly defined places and for narrowly
defined purposes, which do not include self-defense outside of a home. Conn. Gen. Stat. §
53-202d(f).

Connecticut's two-track approach to defining "assault weapons" for purposes of
criminalizing their possession, sale, and transfer first criminalizes the possession, sale, or
transfer of approximately 160 specifically named firearm models in four statutory subsections.
*See generally* Conn. Gen. Stat. § 53-202a. Second, it criminalizes the possession, sale, and transfer
of all firearms that have certain features, which are classified in eleven categories. Conn. Gen.
Stat. § 53-202a; *see* Dkt. No. 13 – Amended Complaint.

Thus, the statutory scheme criminalizes countless ubiquitous semiautomatic firearms
that are widely popular and commonly used for lawful purposes in Connecticut and
throughout the United States. Additionally, a violation of the ban on "assault weapons"
saddles the average citizen with a felony conviction, rendering him/her ineligible to ever
lawfully possess a firearm again in his/her life. *See e.g.*, 18 U.S.C. § 922(g)(1).

## II.     Connecticut's "Others"

Connecticut supervises the commercial sale of firearms through the SLFU. Since 2013, the SLFU has routinely approved the commercial sale of "others." A firearm is considered an "other" because it does not meet the statutory definition of either "rifle," "shotgun," or "pistol" under Connecticut law. See Conn Gen Stat. Sec. 53a-3(16)-(18).

Despite being legal in Connecticut, "others" have drawn political ire because of their visual similarities to "assault rifles." The key distinction, however, is that "others" often use "pistol braces"[2] which gives them a similar visual appearance to "assault rifles." "Others," however, have not previously been categorized as "rifles" or "assault weapons" under Connecticut or federal law as shown by SLFU's systematic approval of their sale in Connecticut over the past decade.

On January 26, 2023, Defendant Lamont issued a press release indicating his intent to criminalize the possession of "others" in Connecticut. *See* **Exhibit A – Governor Lamont Announces 2023 Legislative Proposal, p. 2.**[3]

## III.    The Department of Justice's "Pistol Brace" Rule

After Congress defined what a "rifle" is in 18 U.S.C. § 921(a)(7), the Department of Justice included its statutory definition as a matter of course in 27 C.F.R. 479.11. On January 31, 2023, it amended 27 C.F.R. 479.11's definition of a "rifle" by publishing a final rule in the

---

[2] "Pistol braces" are firearm accessories usually attach to a person's forearm to provide greater stability. While their appearances resemble shoulder stocks, they are not intended to act as shoulder stocks.

[3]       Retrieved       from:       https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2023/01-2023/Governor-Lamont-Announces-2023-Legislative-Proposal-on-Mass-Shootings#:~:text=So%2Dcalled%20%E2%80%9Cother%E2%80%9D%20weapons,do%20not%20include%20all%20weapons.

Federal Register. *See* **Exhibit H - Factoring Criteria for Firearms With Attached "Stabilizing Braces."** This new final rule changes the definition of "rifle" to include "a weapon that is equipped with an accessory component, or other rearward attachment (*e.g.*, a 'stabilizing brace') that provides surface area that allows the weapon to be fired from the shoulder...." *Id.* at p. 92. In particular, the final rule specifically factors "whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or other rearward attachment that is necessary for the cycle of operations … ." *Id.*

The operative effect of this final rule is to immediately classify most Connecticut "others" as either "rifles" or "short-barreled rifles," which, in turn, renders them illegal under Connecticut's "assault weapons" ban. While in most other states, a person in possession of an "other" with a stabilizing brace would be legally entitled to retain the firearm as a "rifle" or, by registering it with ATF as a "short barreled rifle," in Connecticut, both designations bring the "other" into the category of banned "assault weapon."

In an online public information session the ATF gave on January 31, 2023, the Department of Justice confirmed that continued possession of "others" is likely in violation of Connecticut state law. During that information session, members of the public directly asked the ATF officials if they could follow the same steps as people from other states to register their "others" as "short barreled rifles" under the final rule so they can keep them. **Exhibit C – Affidavit of Holly Sullivan, ¶ 12**. ATF officials responded that ATF would not be accepting registrations from Connecticut residents because the ATF takes the position that their "others" are now illegal "assault weapons" under Connecticut law. *Id.* at ¶ 14. Connecticut officials have yet to weigh in. *Id.* at ¶ 14.

## IV.    Plaintiff Eddie W. Grant, Jr.

Plaintiff Eddie Grant, Jr. is a retired Connecticut Department of Corrections officer who maintains his permanent residence in Meriden, Connecticut. **Exhibit D – Affidavit of Eddie W. Grant, Jr.**, ¶ 3**.** He has held a Connecticut pistol permit for over 30 years, and he meets all of the legal qualifications under federal and state law to acquire and possess firearms, ammunition, and magazines. *Id.* at ¶ 5. He is also a member and supporter of both the Connecticut Citizens Defense League, Inc. ("CCDL") and the Second Amendment Foundation, Inc. ("SAF"). *Id.* at ¶ 6.

Grant served as a uniformed Corrections officer for twenty-one years, retiring in 2011. *Id.* at ¶ 7**.** During his service, the Department of Corrections assigned him to facilities such as Cheshire Correctional Institution (a Level 4 facility); Manson Youth Institution (a Level 4 facility); Carl Robinson Correctional Institution (a Level 3 facility); and Webster Correctional Institution (a Level 2 facility).[4] *Id.* at ¶ 7. Grant's responsibilities included conducting armed transports of high-risk inmates and acting as an armed Perimeter Officer. *Id.* at ¶ 8. These responsibilities required the State of Connecticut to train Grant on the safe and effective use of AR-15-platform firearms, which are currently banned by the statutes at issue in this lawsuit. *Id.* at ¶ 8. After receiving his training, the State of Connecticut required Grant to qualify annually as a safe and effective user of AR-15-platform firearms. *Id.* at ¶ 8**.** Grant repeatedly

---

[4] A facility's level designates what its security level is. Connecticut uses a five-level scheme with Level 1 being reserved for community release programs, Level 2 – minimum security, Level 3 – medium security, Level 4 – high security, and Level 5 – maximum security. *See* Conn. Gen. Assembly – Legislative Program Review and Investigations Committee, *Report: Factors Impacting Prison Overcrowding*, p. 16 (Dec. 2000). Retrieved from: https://www.cga.ct.gov/pri/archives/fipo/20001201FINAL_Full.pdf

qualified as a safe and effective user during his service with the Department of Corrections, and he carried and used AR-15-platform firearms during his service as a corrections officer. *Id.* at ¶ 8.

Grant seeks to lawfully purchase and possess an AR-15-platform firearm for defensive purposes. *Id.* at ¶ 9. Conn. Gen. Stat. §§ 53-202a and § 53-202c, however, prohibit him from purchasing or possessing an AR-15-platform firearm.

Grant's interest in lawfully purchasing and possessing an AR-15-platform firearm is no armchair interest. As an African-American, Grant is acutely conscious of the struggle that his parents, specifically his mother, faced growing up in 1950s-60s. *Id.* at ¶ 10. During the struggle for equality and civil rights in the Deep South, Grant's mother witnessed church burnings, and the racially motivated killings experienced by her family and friends were a concrete part of her life. *Id.* at ¶ 10. Grant's understanding that these racially motivated attacks were repelled in large part by the private ownership of effective defensive firearms as African-Americans bravely defended their lives and their right to equality under the rights guaranteed by the Constitution. *Id.* at ¶ 10.

In Grant's view, Conn. Gen. Stat. § 53-202a-c gives criminals and attackers a strong tactical advantage over him. *Id.* at ¶ 10. Criminals do not follow gun restrictions, placing him at a disadvantage to someone who possesses and carries any type of so-called "assault weapon" for malevolent purposes. As a law-abiding citizen, Grant wants, and intends, to lawfully purchase, possess, and defensively carry one or more of the firearms banned by Conn. Gen. Stat. §§ 53-202a and 53-202c. *Id.* at ¶ 12.

Grant also owns firearms that are Connecticut "others." *Id.* at ¶ 15. He wishes to keep these firearms that he lawfully purchased and possessed. *Id.* at ¶ 18.

## V.   Plaintiff Jennifer Hamilton

Plaintiff Jennifer Hamilton is a Nuisance Wildlife Control Operator trained and licensed by the Connecticut Department of Energy and Environmental Protection and a firearms instructor who teaches initial pistol permit classes, personal defense classes, and tactical firearms use classes. **Exhibit E – Affidavit of Jennifer Hamilton**, ¶ 8. She maintains her permanent residence in Enfield, Connecticut, and she holds pistol permits from Connecticut and Massachusetts. *Id.* at ¶¶ 3, 5. She meets all federal and state requirements to lawfully acquire and possess firearms, ammunition, and magazines. *Id.* at ¶ 5. She is also a member and supporter of CCDL and SAF. *Id.* at ¶ 6.

Hamilton is a petite, 5'-2" tall woman who relies on defensive firearms instead of bodily strength to protect herself and her family from threats and attack. *Id.* at ¶ 7. Because of her physical size, Hamilton prefers firearms that are smaller and more customizable to her physical build. *Id.* at ¶¶ 9-10. Thus, she seeks, and intends, to lawfully purchase one or more firearms prohibited in Conn. Gen. Stat. § 53-202a – likely an AR-15-platform firearm – because of their adaptability and effectiveness for defensive purposes. *Id.* at ¶ 12. Additionally, Hamilton seeks to purchase such a firearm with a telescopic stock in order to adjust the firearm's length of pull to fit her specific body type and size, which will, in turn, give her greater control over the firearm and improve her accuracy with it. *Id.* at ¶ 10.

Hamilton's interest in purchasing, possessing, and carrying an AR-15-platform firearm is not abstract. She has been the victim of domestic violence, and she depends on effective defensive firearms to protect herself and her family from further attacks. *Id.* at ¶ 7.

Conn. Gen. Stat. §§ 53-202a and 53-202c prohibit her from purchasing either an AR-15-platform firearm or a similar rifle with a telescopic stock because they classify both as being "assault weapons." In sum, Connecticut's "assault weapon" ban prohibits Hamilton from purchasing, possessing, or carrying a firearm that she can operate more safely, comfortably, and effectively.

Hamilton also owns firearms that are Connecticut "others." *Id.* at ¶ 15. She wishes to keep these firearms that she lawfully purchased and possessed. *Id.* at ¶ 18.

## VI.   Plaintiff Michael Stiefel

Plaintiff Michael Stiefel is a retired Connecticut Department of Corrections officer. **Exhibit F – Affidavit of Michael Stiefel**, ¶ 10. He has held a Connecticut pistol permit for over thirty years, and he meets all of the state and federal requirements to lawfully acquire, possess, and bear firearms, ammunition, and magazines. *Id.* at ¶ 5. Stiefel is a member and supporter of CCDL and SAF.

Stiefel served as a uniformed Department of Corrections Officer for approximately 20 years, retiring in 2010. *Id.* at ¶ 7. During his career with the Department of Corrections, he was responsible for conducting armed transports of high-risk inmates and served as an armed perimeter officer. *Id.* at ¶ 7. Like Plaintiff Grant, these responsibilities required the State of Connecticut to train Stiefel on the safe and effective use of AR-15-platform firearms, which are currently banned by the statutes at issue in this lawsuit. *Id.* at ¶ 8. After receiving his

training, the State of Connecticut required Stiefel to qualify annually as a safe and effective user of AR-15-platform firearms. *Id.* at ¶ 8.

Stiefel seeks, and intends, to lawfully purchase and possess an AR-15-platform firearm for defensive purposes. *Id.* at ¶ 12. Connecticut's "assault weapons" ban, however, prohibits him from purchasing or possessing an AR-15-platform firearm. Stiefel also currently owns firearms that have been previously classified as "others" in Connecticut. *Id.* at ¶ 15. He wishes to keep those firearms that he lawfully purchased and possesses. *Id.* at ¶ 18.

## LEGAL STANDARD

"The purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009). To obtain a temporary restraining order, "a party must demonstrate: (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) a sufficiently serious question going to the merits and a balance of hardships tipping decidedly in the moving party's favor." *Id.* Additionally, the moving party must show "that the public interest would not be disserved by the issuance of [the] injunction." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal quotation marks omitted). A temporary restraining order is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Reidy*, 447 F. Supp. 2d 472, 474 (D. Conn. 2007) (quoting *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005)) (internal quotation marks and citations omitted) (Arterton, J.).

The same substantive factors that govern the determination of a request for a temporary restraining order are virtually the same as those used to determine the merits of a motion for a preliminary injunction. *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992).

To show irreparable harm, the Plaintiffs must show that, absent a preliminary injunction, they will "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Whether there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Id.* at 118-19. Courts, however, will presume that a movant has established irreparable harm when the movant's claim involves the alleged deprivation of a constitutional right. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

## **ARGUMENT**

### I.   **Second Circuit Precedent Entitles the Plaintiffs to a Presumption of Irreparable Harm. In the Alternative, the Plaintiffs Satisfy the Test for Irreparable Harm.**

There is no question that the Plaintiffs are entitled to the presumption of irreparable harm. They claim a constitutional right to keep and bear modern sporting arms and "others" for the purposes of self-defense and allege that the challenged statutory scheme banning "assault weapons," and the new ATF rule bringing "others" within that scheme, puts the Defendants at imminent risk of being deemed felons for no fault of their own.

The Supreme Court has twice established that the Second Amendment's text protects the right to keep and bear arms in case of confrontation. *New York State Rifle & Pistol*

*Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2127 (Jun. 23, 2022); *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). *Bruen* solidifies *Heller*'s holding that the Second Amendment's protections are <u>not</u> limited "only to those arms in existence in the 18th century." *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582) (internal quotation marks and alterations omitted). Instead, "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 2132 (quoting *Heller*, 554 U.S. at 582) (internal quotation marks omitted); *see also Caetano v. Massachusetts*, 577 U.S. 411 (2016) (holding that the Second Amendment, *prima facie*, protects stun guns).  Thus, the Second Amendment presumptively protects the Plaintiffs' right to possess and bear modern sporting arms – including AR-15 platform firearms – and Connecticut "others" unless the Defendants "affirmatively prove that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.

The Defendants have never before carried their burden under the historical analysis mandated by *Bruen*, and they cannot do so now. Their enforcement of Connecticut's criminalization of the possession, carrying, and sale of modern sporting firearms deprives the Plaintiffs of their constitutional right to keep and bear "bearable arms." *Bruen* at 2132. Thus, the Plaintiffs are entitled to a presumption of irreparable harm based on their alleged deprivation of their constitutional rights. *Clapper*, 804 F.3d at 622.

The Plaintiffs clearly meet the standard for preliminary relief notwithstanding the presumption of irreparable harm. The Plaintiffs seek to obtain, possess, and bear modern sporting firearms for the purpose of self-defense. Every day that passes that they cannot do

so without facing criminal consequences is an injury that money cannot remedy. In fact, the Plaintiffs seek no monetary remedy, nor is such a remedy likely available to them. Declaratory and injunctive relief is their only available remedy. They should not be required to wait for it, especially in a case where the Defendants bear the burden of proving the constitutionality of their conduct, a burden the Defendants simply cannot meet.

Finally, the Plaintiffs also stand at imminent risk of irreparable harm due to the convoluted interaction between the challenged Connecticut statutory scheme and the ATF's new interpretation of federal law. ATF's new rule converted the Plaintiffs' lawfully- possessed Connecticut "others" into "rifles" or "short-barreled rifles" – each of which is banned in Connecticut under the challenged statutory scheme – and immediately and without warning, seismically shifted the status quo. This instantaneous conversion renders the Plaintiffs at risk of arrest, prosecution, and incarceration for possessing firearms that the Defendants previously indicated were perfectly legal in Connecticut. No relief could adequately remedy the harm that such unwarranted arrests and criminal prosecutions would impose on the Plaintiffs. The Plaintiffs need an immediate order restraining the Defendants from enforcing the "assault weapon" ban against them.

Not only does this drastic regulatory change pose a concrete and imminent risk of harm to the Plaintiffs, but it also upends the legal status quo under which the parties have been operating for the past ten years. Thus, there is good cause for the Court to find an emergency need to issue a temporary restraining order on an *ex parte* basis to preserve that status quo until the parties can be heard on the merits of a preliminary injunction.

## II.    The Plaintiffs Show a Likelihood of Success on the Merits, and Raise Serious Questions Going to the Merits Sufficient to Make a Fair Ground for Litigation.

Under the Supreme Court's newly clarified standard for reviewing claims of Second Amendment violations, the Plaintiffs easily surpass the threshold of showing a likelihood of success on the merits.  On June 23, 2022, the U.S. Supreme Court drastically reshaped Second Amendment jurisprudence in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022). *Bruen* abrogated the use of tiers of "means-end" scrutiny – e.g., rational basis, intermediate, and strict scrutiny – that American courts have habitually used to assess Second Amendment rights claims and replaced it with a textual and historical analysis. The reshaped analysis negates the use of the "means-end" scrutiny *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) and *Shew v. Malloy*, 994 F.Supp.2d 234 (D.Conn. 2014) used to uphold Connecticut's criminalization of "assault weapons," and it requires a fresh consideration of their ultimate conclusions under *Bruen*'s textual and historical analysis.[5]

While the Plaintiffs retain the initial burden to show either "likelihood of success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground for litigation" at this stage, *Bruen*'s textual and historical analysis shifts the burden to the Defendants to defend their criminalization of "assault weapons" and their infringement on the Plaintiffs' constitutional rights. Under the Supreme Court's new analytical framework, the Defendants are unable to satisfy that burden.

---

[5] The Supreme Court itself has summarily instructed lower courts to reconsider decisions upholding "assault weapons" bans in the wake of *Bruen. See Bianchi v. Frosh*, 142 S.Ct. 2898 (Mem) (Jun. 30, 2022) (reversing and remanding a Fourth Circuit decision upholding Maryland's "assault weapons" ban).

16

**A. *Bruen* replaces the Second Circuit's "two step" test with a textual and historical analysis under which the Defendants bear a heavy burden of proof.**

*Bruen* changed everything. Prior to *Bruen*, the Second Circuit used a "two-step" test.[6] *Cuomo*, 804 F.3d at 254. It first considered whether the challenged law "burdens conduct protected by the Second Amendment." *Id.* If the law did not implicate conduct that the Second Amendment protects, the law survived. *Id.* If, however, the law burdened conduct protected by the Second Amendment, courts then assessed the appropriate level of scrutiny to apply. *Id.*

At the first step of the test, courts examined whether the arms at issue are "in common use" and "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 254-55. In *Cuomo*, the Second Circuit ruled that "assault weapons" met both criterion *Id.* at 255-57.

Under the second step, pre-*Bruen* courts then assessed "how close the law comes to the core of the Second Amendment right" and "the severity of the law's burden on the right." *Id.* at 258. In *Cuomo*, the Second Circuit applied intermediate scrutiny and found that while New York and Connecticut's "assault weapons" bans did indeed burden the core of the Second Amendment's protections, alternatives to such firearms – namely handguns – remained available for home defense. *Id.* at 258-261. Thus, the Second Circuit found the burden on the Plaintiffs' core of the Second Amendment right insufficiently severe to strike down New York and Connecticut's "assault weapons" bans. *Id.* at 261.

---

[6] As noted by the Second Circuit, it was not alone in applying the "two step" test. *Cuomo*, 804 F.3d at 254 (noting that the Third, Fourth, Fifth, Six, Seventh, Ninth, Tenth, Eleventh, and D.C. Circuits also used the same general approach).

*Bruen* explicitly rejects the "two step" test and "means-end" scrutiny previously used in the Second Circuit as being inconsistent with *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010):

> Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context.

*Bruen*, 142 S.Ct. at 2127. Instead, *Bruen* holds that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* This, the Defendants cannot do.

*Bruen*'s analysis starts with the Second Amendment's text:[7] "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. The Supreme Court explained: "Heller's methodology centered on constitutional text and history. Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, Heller relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny." *Id.* at 2128-29. As *Bruen* indicates, the Second Amendment's text and history left "no doubt" that the "Second Amendment confers an individual right to keep and bear arms." *Id.* at 2127 (quoting *Heller*, 554 U.S. at 595) (internal quotation marks omitted).

---

[7] "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II.

*Bruen* confirmed *Heller*'s finding that it is "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons that the Second Amendment protects the possession and use of weapons that are in common use at the time." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627) (internal quotation marks omitted).

In the context of this action, *Bruen*'s test is straightforward. First, the Court must determine whether the right claimed by the Plaintiffs falls within the protections of the Second Amendment's text. Second, the Court must consider the "dangerous and unusual weapons" exception within the historical guidelines established by *Heller* and *Bruen*.

 There is absolutely no question that the Plaintiffs meet the first requirement. They claim a right to keep and bear modern sporting firearms for the purposes of self-defense. Both *Heller* and *Bruen* establish that the Second Amendment's text protects the individual right to keep and bear arms in case of confrontation. *Bruen*, 142 S.Ct. at 2127; *Heller*, 554 U.S. at 592. *Bruen* solidifies *Heller*'s holding that the Second Amendment's protections do not apply "only to those arms in existence in the 18th century." *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582) (internal quotation marks and alterations omitted). Instead, "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 2132 (quoting *Heller*, 554 U.S. at 582) (internal quotation marks omitted); *see also Caetano v. Massachusetts*, 577 U.S. 411 (2016) (holding that the Second Amendment, *prima facie*, protects stun guns).  In *Cuomo*, the Second Circuit determined that Connecticut's "assault weapons" ban did indeed burden the core of the Second Amendment's protections. *Cuomo* at 258-261. Thus, the Second Amendment presumptively protects the Plaintiffs' right to possess and bear modern sporting firearms --

including AR-15 platform firearms – and "others" unless the Defendants "affirmatively prove that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127. Again, this is a burden the Defendants cannot meet.

The now-deceased "means-end" scrutiny test purported to give courts the power to "make difficult empirical judgements about the cost and benefits of firearms restrictions…" – judgments that they are ill-suited to make "especially given their lack of expertise in the field." *Id.* at 2130 (quoting *City of Chicago v. McDonald*, 561 U.S. 742, 790-791 (2010)) (internal quotation marks and alterations markings omitted). *Bruen* now flatly forbids this type of interest balancing:

> If the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of "intermediate scrutiny" often defer to the determinations of legislatures. But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. The Second Amendment "is the very *product* of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller*, 554 U.S. at 635, 128 S.Ct. 2783. It is this balance—struck by the traditions of the American people— that demands our unqualified deference.

*Id.* at 2131 (emphasis in original).

Instead, *Bruen* requires courts to assess "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" through "reasoning by analogy – a commonplace task for any lawyer or judge." *Id.* at 2131, 2132. It contemplates two types of cases: straightforward cases, and "other cases implicating unprecedented societal concerns or dramatic technological changes." *Id.* at 2131-32.

*Bruen* describes the straightforward cases as follows:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131.

This case falls squarely within *Bruen*'s category of straightforward cases. Crimes perpetrated with firearms have existed since firearms were invented. But it was not until long after the Second Amendment was ratified that local governments began to ban whole categories of firearms from the people under the guise of crime prevention.  The Founders knew well of the misuse of firearms by criminals, but their regulation to address that societal problem was not to ban bearable arms from the public as Connecticut has done. To the contrary, the Founders' regulatory response – the Second Amendment – was to guaranty that every law-abiding person in the nation had the uninfringed right to keep and bear arms for their personal defense and the defense of others. There is no "distinctly similar historical regulation addressing that problem. . . ." *Id.* Thus, Connecticut's statutory scheme must fall.

But even viewing Connecticut's "assault weapon" ban under a more complex analysis, it has no "well-established and representative historical analogue" to save it. *Id.* at 2133.  When a court considers the more complex "modern regulations that were unimaginable at the founding," however, *Bruen* requires the Defendants to identify "a well-established and representative historical analogue…" to its modern regulations. *Id.* at 2133. To determine

whether the analogue is representative and "relevantly similar under the Second Amendment," *Bruen* provides courts with "at least two metrics" that "are [the] *central* considerations when engaging in an analogical inquiry" from *Heller* and *McDonald*: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33 (internal quotation marks and citations omitted) (emphasis in original).

The *Bruen* analysis requires that the historical inquiry must focus on the scope of the people's constitutional rights "they were understood to have *when the people adopted them.*" *Id.* at 2136 (internal quotation marks and citations omitted) (emphasis in original). The Supreme Court in *Bruen* cautioned courts to focus on common law practices that "prevailed up to the period immediately before and after the framing of the Constitution" and contemporary history in the immediate postenactment period. *Id.* at 2136-37 (internal quotation marks and citations omitted). In particular, *Bruen* cautions courts "against giving postenactment history more weight than it can rightly bear," and it describes mid-to-late 19th century evidence as confirmation of the original public meaning instead of being of independent significance. *Id.* at 2136-37.

*Bruen* closes its instructions on these more complex cases with two cautions to courts. First, it expressly forbids courts from entertaining or engaging in "independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 2133 n.7. Second, while *Bruen* does not require the Defendants to "identify... a historical *twin*" or "a dead ringer" as an historical analogue, it also does not permit courts to "uphold every modern law that remotely resembles a historical analogue... because doing so risks endorsing outliers that our ancestors would

never have accepted." *Id.* at 2133 (internal quotation marks, citations, and alteration marks omitted) (emphasis in original).

Here, there were simply no common law practice that "prevailed up to the period immediately before and after the framing of the Constitution" and contemporary history in the immediate postenactment period which is a "well-established and representative historical analogue" to Connecticut's ban on an entire category of bearable arms. *Id.* at 2136-37. Connecticut's "assault weapon" ban is unconstitutional.

### B. The modern sporting firearms banned by the Defendants are not "dangerous and unusual."

Because the firearms banned by the challenged statutory scheme, and "others" which have unexpectedly been drawn into that scheme, are each in common use for lawful purposes – both in Connecticut and nationwide – they cannot be found to be "dangerous and unusual." The "dangerous and unusual" exception to protection under the Second Amendment has its roots in *United States v. Miller*, 307 U.S. 174 (1939). *Miller* permitted the felony indictment of two men who transported a short-barreled shotgun across state lines without obtaining permission from, or registering it with, federal authorities. *Id.* at 175. The district court dismissed the indictment on the ground that the law violated the men's Second Amendment rights, and the government appealed. *Id.* at 176-77. The Supreme Court reversed the dismissal of the indictment on the grounds that there was no evidence that short-barreled shotguns had a reasonable relationship to "the preservation or efficiency of a well-regulated militia." *Id.* at 178. It reasoned that the Second Amendment protected the arms that were "of the kind in common use at the time" and which citizens would bring with them if called upon to serve in the militia. *Id.* at 179.

Since *Miller*, the Supreme Court has only once clarified the "dangerous and unusual" exception. *See Caetano v. Massachusetts*, 577 U.S. 411 (2016). In *Caetano*, the Court found "stun guns" were protected arms under the Second Amendment, and corrected two fatal errors that the Massachusetts Supreme Judicial Court made in labeling them as "dangerous and unusual" weapons. *Id.* The first was the Massachusetts court's erroneous conclusion that the Second Amendment did not protect weapons that "were not in common use at the time of the Second Amendment's enactment." *Id.* at 411-12 (reaffirming *Heller*'s statement that the Second Amendment "extends... to... arms... that were not in existence at the time of the founding") (internal quotation marks and citations omitted). The second was the Massachusetts court's erroneous conclusion that the Second Amendment did not protect "stun guns" because "nothing in the record [suggested] that [they] are readily adaptable to use in the military." *Id.* at 412 (reaffirming *Heller*'s rejection of that proposition) (internal quotation marks and citations omitted).

That a given class of firearms may be "dangerous" is irrelevant to a Second Amendment analysis if it is commonly used for lawful purposes. *Caetano* at 418, ("the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes.") (Alito, J. concurring). The most relevant statistic for finding electronic defense weapons are not "unusual" was that "hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States." *Id.* at 420 (Alito, J. concurring) (internal quotation marks, citations, and alteration marks omitted).

The Second Circuit has not exempted any class of firearms from Second Amendment protection under *Bruen's* "dangerous and unusual" analysis.[8] To the extent it addressed the issue in *Cuomo* concerning Connecticut's "assault weapons" ban, **the Second Circuit expressly held that,** even accepting most conservative statistical estimates presented by the parties and amici,[9] **"assault weapons" are in common use.** *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015). The Second Circuit relied on a conservative estimate that "assault weapons" constituted about two percent of the nation's firearms, or approximately seven million firearms. *Id.* at 255. On the basis of that estimate, **the Second Circuit held that "the assault weapons… at issue are 'in common use' as that term was used in *Heller*."** *Id.* at 255.

Despite the Supreme Court's revised standard set forth in *Bruen*, there is no question that the Second Circuit's holding that "assault weapons" are not "unusual" remains good law and is dispositive of this motion for a temporary restraining order and a preliminary injunction – and this entire case – since the Defendants bear the burden to prevail on both elements. A class of firearms cannot be "dangerous and unusual" if it is not unusual. Thus, as long as the Plaintiffs make a showing of common usage that at least approaches the two percent found in *Cuomo*, the Plaintiffs prevail on the merits.

---

[8] The Second Circuit did not fully engage with the "dangerous" element, which it classified as "typical possession." *Cuomo*, 804 F.3d at 256-57. Instead, it assumed *arguendo* that these "commonly used weapons and magazines are also typically possessed by law-abiding citizens for lawful purposes" – an approach used by the D.C. Circuit and the D.C. district court after the Supreme Court remanded *Heller*. *Id.* at 257.

[9] *Cuomo* was clear that the "unusual" element requires "an objective and largely statistical inquiry." *Id.* at 256.

In Connecticut and nationwide, both "assault weapons" and "others" are in common use for lawful purposes as defined by the Second Circuit. Any inquiry into whether modern sporting firearms are "unusual" begins with where they are legal. *Caetano*, 577 U.S. at 420 (2016) (Alito, J., concurring). Research reveals that only 9 states and the District of Columbia prohibit their possession.[10] The class of firearms subject to the challenged law are legal to freely buy, sell, and own in the remaining forty-one states. Thus, the overwhelming majority of the states recognize that modern sporting firearms are not "dangerous and unusual," and the few states such as Connecticut that prohibit their possession are outliers.

The second aspect of the "unusual" inquiry objectively examines the statistical data supporting whether modern sporting firearms are in "common use." *Cuomo*, 804 F.3d at 255-56. While there is no minimum threshold of common usage that the Plaintiffs need to show, they clearly surpass the "hundreds of thousands" finding that Justice Alito declared sufficient in his *Caetano* concurrence regarding stun guns. More importantly, they at least equal or surpass the threshold that the Second Circuit recognized as establishing "common usage." *Cuomo*, 804 F.3d at 255 (relying on the most conservative estimates and still finding that "assault weapons" were in common use). The most conservative estimate as to the popularly of a single model of modern sporting arm – the AR-15 – was "two percent of the nation's firearms" or

---

[10] California – *see* Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115; Connecticut – laws already discussed; Delaware – *see* Del. Code tit. 11, § 1466(a); Hawaii – *see* Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8; Illinois – *see* IL HB 5471, enacted January 10, 2023; Maryland – *see* Md. Code Ann., Crim. Law §§  4-301 – 4-306, Md. Code Ann., Pub. Safety § 5-101(r); Massachusetts – *see* Mass. Gen. Laws ch. 140, §§ 121, 122, 123, 131M; New Jersey – *see* N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13; New York – *see* N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10, 400.00(16-a); DC Code Ann. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c)

"approximately seven million guns." *Id.* at 255. Simply put, in the Second Circuit, two percent or more clearly equals common use.

Under an objective "unusual" inquiry, the Defendants' own data dooms their case. In a January 17, 2023 response to a Freedom of Information Act request, the SLFU declared that there are 1,306,867 firearms in the state weapons registry database. **Exhibit B**, **Affidavit of Ray Bevis, Jr.  ¶¶ 13, 14**.  In a January 10, 2020 response to a Freedom of Information Act request, the SLFU declared that there are 53,849 "assault weapons" registered in Connecticut. *Id.* at ¶¶ **7,** 15.  53,849 "assault weapons" is approximately 4.1% of the 1,306,867 firearms in the state weapons registry database, more than enough to show common use under Second Circuit precedent. *Id.* at ¶¶ **7,** 15.

In its January 17, 2023 response, SLFU also declared that, of those 1,306,867 firearms, there are 88,766 firearms in the state weapons registry database that are classified as "others." *Id.* at ¶¶ 13, 16. In other words, approximately 6.8 percent of Connecticut's registered firearms are "others," which, based on the ATF's new rule, have suddenly become "assault weapons" under Connecticut's ban. *Id.* at ¶¶ 13**,** 16. That is more than three times the percentage of firearms that *Cuomo* found to constitute "common use."

The Defendants fair no better when it comes to national data. According to production and import/export data ranging from 1991-2018 compiled and estimated by the National Shooting Sports Foundation ("NSSF") based on the ATF's Annual Firearms Manufacturing and Export Report ("AFMER"), there are approximately 254,752,987 firearms in circulation in the United States. **Exhibit G – Declaration of Salam Fatohi, ¶¶ 6-7, 12**. Approximately 24,446,000 of those firearms are modern sporting rifles. *Id.* at ¶ 17. In other words, an

estimated 10 percent of all firearms currently in circulation in the United States are modern sporting rifles, a.k.a. "assault rifles." *Id.* at pp. 2, 7. That is approximately five times the percentage of the same type of firearms that *Cuomo* found to constitute "common use."

Thus, there is absolutely no question that the firearms banned by the challenged statutory scheme as "assault weapons" are in common use both in Connecticut and nationally, as are "others" which have now been redefined as such. Therefore, both are protected by the Second Amendment and neither can be considered "dangerous and unusual."

## III.    The Balance of Hardships Decidedly Tips in Favor of the Plaintiffs.

Law-abiding citizens yesterday, potential felons today. The Plaintiffs woke up on January 31, 2023 to that new reality when the Department of Justice published the final "Pistol Brace" rule in the Federal Register, and the ATF announced that it considered all Connecticut "others" to be illegal under Connecticut law. The Plaintiffs are not alone. The law-abiding owners of over 80,000 firearms in Connecticut find themselves in the same frightening position: wondering whether they will receive a knock on their door and cuffs on their wrists for merely possessing the common firearms that the Defendants have assured them were legal.

Their dilemma is no abstraction. Connecticut law has succumbed to the political passions led by Defendant Lamont's near-daily anti-constitutional rhetoric in the press. Individuals who violate Connecticut's prohibition on the ownership of "assault weapons" can expect little mercy or sympathy in Connecticut's criminal justice system. The Plaintiffs, and tens of thousands of law-abiding Connecticut residents are at real and immediate risk of Defendants' enforcement actions.

The federal government's view that Connecticut residents such as the Plaintiffs, who own "others," are now violating Connecticut's prohibition on the possession of "assault weapons," geometrically increases risk to Plaintiffs and other lawful firearm owners across the state. While Connecticut officials have yet to weigh in on the impact of the federal rule turning "others" into "rifles" or "short barreled rifles," Connecticut law's close adherence to federal definitions of the categories of firearms strongly suggests Connecticut officials taking quick action against the Plaintiffs and other lawful firearms owners in direct violation of the constitutional rights protected by the Second, Fifth, Fourteenth and other Amendments.

Any balancing of the equities does not require the Plaintiffs to sit idly by and wait until the Defendants declare them felons to seek relief to protect their constitutional rights. Nor does any balancing of equities justify withholding immediate and preliminary relief from the Plaintiffs.

More broadly speaking, *Cuomo* already made the necessary findings regarding the common use of "assault weapons." *Cuomo*, 804 F.3d at 255-56. *Bruen*'s elimination of the second part of *Cuomo*'s analysis – the part that upheld Connecticut's "assault weapons" ban under the now-abrogated "two-part test" – did not change *Cuomo*'s findings on the first part of the test. As soon as the Supreme Court issued its decision in *Bruen*, the findings in *Cuomo* rendered Connecticut's "assault weapons" ban unconstitutional.

While the Court must *presume* in this case that the Plaintiffs will suffer irreparable harm, *Clapper*, 804 F.3d at 622, the harm that they are suffering is *actually* irreparable, and the Court should consider that in any balancing of the hardships. Every day that passes where the Plaintiffs cannot purchase, keep, and bear modern sporting firearms places them at a

disadvantage to violent criminals who have no regard for the law and who may target them. Every day that leaves the Plaintiffs under a cloud of uncertainty, not knowing if the Defendants will send forces knocking to enforce the "assault weapon" ban based on the federal government's new rule, is a day stripped from the Plaintiffs' peaceful enjoyment of their constitutional rights. Every day that passes is a day the Plaintiffs' ability to exercise their constitutional rights is lost forever. The Court should decline to leave them so vulnerable.

For these reasons, the Court should make two findings as to the question of balancing the hardships. First, it should find that the change in federal law has placed the Plaintiffs at the likely and extreme risk of being subject to the heavy burden of criminal prosecutions as felons under politically motivated Connecticut law with no prior notice and in violation of their Second Amendment rights. Second, the Court should find that the Plaintiffs are suffering irreparable harm through the ongoing deprivation of their constitutional rights and that, after the *Bruen* decision, *Cuomo* clearly establishes that Connecticut's "assault weapons" ban is unconstitutional.

## IV.    The Public Interest Will be Served by a Temporary Restraining Order and a Preliminary Injunction.

The Second Amendment is not a "second class right" and the Supreme Court has made it abundantly clear that lower courts shall no longer treat it as such. *McDonald,* 561 U.S. at 780. Courts can no longer interest balance away the people's Second Amendment rights. The Supreme Court stated in *Bruen* that "[t]he Second Amendment is the *very product* of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S.Ct. at 2131 (internal citations

and quotation marks omitted) (emphasis in original). Thus, it "demands" courts' "unqualified deference" to the Plaintiffs' Second Amendment rights. *Id.* at 2131.

The Defendants cannot shoehorn the commonly used firearms at issue in this action into the "dangerous and unusual" exception. The Second Circuit in *Cuomo* has already definitively settled that question. All that remains is for the Court to apply the *Bruen* standard and protect the Plaintiffs from ongoing, and imminent irreparable harm by issuing a temporary restraining order and a preliminary injunction.

Since the Plaintiffs have shown that the Defendants are highly unlikely to carry their burden in the face of *Bruen* and *Cuomo*, the Court's issuance of emergency injunctive relief would preserve the status quo, and protect and uphold the public interest articulated in the Second Amendment. At the same time, it would not disturb other Connecticut laws that, for example, screen who may purchase or possess a firearm. Thus, the public interest favors emergency relief in this case.

## **CONCLUSION**

For all of the aforementioned reasons, the Plaintiffs respectfully ask the Court to issue, on an emergency basis, an *ex parte*, Temporary Restraining Order ordering the Defendants, and those under them, to refrain from enforcing Connecticut's "assault weapon" ban in regard to any firearm previously designated as "any other firearm" or an "other," and a Preliminary Injunction, upon notice to all parties and an expedited opportunity to be heard, enjoining the Defendants and those under them from enforcing Connecticut's "assault weapon" ban pending full adjudication on the merits of the Plaintiffs' claims.

Dated: February 3, 2023

Respectfully submitted,

_//s//   Doug Dubitsky_
Doug Dubitsky, Esq.
(ct21558)
LAW OFFICES OF DOUG DUBITSKY
P.O. Box 70
North Windham, CT 06256
Telephone: 860.933.9495
Facsimile: 866.477.1120
Email: doug@lawyer.com

_//s//   Craig C. Fishbein_
Craig C. Fishbein, Esq.
(ct25142)
FISHBEIN LAW FIRM, LLC
100 South Main Street
P.O. Box 363
Wallingford, Connecticut 06492
Telephone: 203.265.2895
Facsimile: 203.294.1396
E-mail: ccf@fishbeinlaw.com

_//s//   Cameron L. Atkinson_
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Facsimile: 203.672.6551
Email: catkinson@atkinsonlawfirm.com

_Attorneys for the Plaintiff_

## <u>CERTIFICATION OF SERVICE</u>

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

<u>/s/ Cameron L. Atkinson /s/</u>