## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| EDDIE GRANT, JR., JENNIFER HAMILTON; MICHAEL STIEFEL; CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; AND SECOND AMENDMENT FOUNDATION, INC., | |
| Plaintiffs, | CIV. NO. 3:22-cv-01223-JBA |
| v. | |
| EDWARD M. LAMONT, JR., in his official capacity; JAMES ROVELLA, in his official capacity; PATRICK GRIFFIN, in his official capacity; MARGARET E. KELLY, in her official capacity; DAVID R. APPLEGATE, in his official capacity; JOSEPH T. CORRADINO, in his official capacity; SHARMESE L. WALCOTT, in her official capacity; DAVID R. SHANNON, in his official capacity; MICHAEL A. GAILOR, in his official capacity; CHRISTIAN WATSON, in his official capacity; JOHN P. DOYLE, JR., in his official capacity, PAUL J. NARDUCCI, in his official capacity; PAUL J. FERENCEK, in his official capacity; MATTHEW C. GEDANSKY, in his official capacity, MAUREEN PLATT, in her official capacity; ANNE F. MAHONEY, in her official capacity, | June 21, 2023 |
| | **SECOND AMENDED COMPLAINT** |
| Defendants. | |

1.    This is an action under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202 for declaratory and injunctive relief challenging the constitutionality of Connecticut's statutory ban on so-called "assault weapons" which deprives law-abiding, responsible citizens of their

Second Amendment and Fourteenth Amendment rights under the guise of providing a panacea for social problems that Connecticut remains unable to solve.

2.    Previous challenges to Connecticut's "assault weapon" ban have been unsuccessful, based primarily on the legal standard used in the Second Circuit in deciding Second Amendment cases, to wit: the "two-part test."

   a.   Under the first step, courts examined whether the arms at issue are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes." *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 254-55 (2d. Cir. 2015).

   b.   Under the second step, courts selected "a standard of scrutiny based on how close the law comes to the core of the Second Amendment right" and "the severity of the law's burden on the right." *Id.* at 258.

3.    In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022), the U.S. Supreme Court clarified the proper legal standard under which courts must analyze Second Amendment cases:

   a.   "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126.

   b.   "[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

2

4.      When correctly viewed under the Supreme Court's *Bruen* standard, it becomes apparent that Connecticut's "assault weapon" ban, and the Defendants' enforcement of same, cannot survive constitutional muster.

5.      After this action was filed on September 29, 2022, Connecticut expanded its definition of "assault weapons" to include an additional category of firearms which are commonly owned and used for lawful purposes. These firearms have traditionally been legally characterized as "any other firearm" or simply "others" because they are firearms that are neither a pistol, revolver, rifle, nor shotgun. *See* Conn. Public Act No. 23-53, § 23, pp. 48-49.[1]

4.6.    Under Conn. Public Act No. 23-53, the purchase of "others" is now banned with few exceptions, none of which are relevant here.

## JURISDICTION AND VENUE

5.7.    The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, and 2201 as well as 42 U.S.C. § 1983. Venue is appropriate under 28 U.S.C. § 1391 because all of the parties are domiciled in Connecticut, and all of the factual events giving rise to the cause of action occurred in Connecticut.

## PARTIES

### *Plaintiff Eddie W. Grant, Jr.*

6.8.    Plaintiff Eddie W. Grant, Jr. ("Grant") is a natural person, a resident of Meriden, Connecticut, an adult over the age of 21, and a citizen of the United States. He has been the

---

[1] For the Court's convenience, the Plaintiffs attach Conn. Public Act No. § 23-53 as **Exhibit G.**

holder of a Connecticut pistol permit for over thirty years, and is legally eligible under federal and state law to acquire and possess firearms, ammunition, and magazines. Grant is a member and supporter of Plaintiff Connecticut Citizens Defense League, Inc. ("CCDL") and Plaintiff Second Amendment Foundation, Inc. ("SAF").

7.9.    Grant served twenty-one years as a uniformed Corrections Officer with the Connecticut Department of Corrections, at facilities such as Carl Robinson Prison, Webster Correctional Institution, Cheshire Correctional Institution, and Manson Youth Institution. Grant retired from the Department of Corrections in 2011.

8.10.    During his service with the Department of Corrections, Grant conducted armed transports of high-risk inmates, and was an armed Perimeter Officer carrying an AR-15-platform firearm.

9.11.    During his service with the Department of Corrections, Grant was trained and qualified by the State of Connecticut in the safe and effective use of AR 15-platform firearms.

10.12.  AR 15-platform firearms are among the firearms listed or described in Conn. Gen. Stat. § 53-202a and effectively "banned" by Conn. Gen. Stat. § 53-202c.

13.    Grant owns no firearms listed or described in Conn. Gen. Stat. § 53-202a prior to its amendment by Conn. Public Act No. 23-53 because he is prohibited by Conn. Gen. Stat. § 53-202c from buying or possessing any such firearms. Grant would like to be able to lawfully purchase and possess one or more of the firearms listed or described in Conn. Gen. Stat. § 53-202a for defensive purposes.

11.14.  Grant also owns firearms that were previously classified as "others" (firearms that legally were not considered pistols, revolvers, shotguns, or rifles). He intends to acquire

4

more "others" in the future. Conn. Public Act No. 23-53, § 23 now prohibits him from lawfully purchasing any such firearms, and from lawfully possessing additional "others" other than those which that he already possesses.

12.15.  Grant's interest in acquiring such firearms for defensive purposes stems from his mother's accounts of her fight for civil rights in the Deep South. As a Black woman growing up in 1950s-60s Georgia, Grant's mother has recalled to him the church burnings and racially-motivated killings experienced by her family and friends. Grant understands that such attacks were repelled in large part by private ownership of defensive firearms.

13.16.  Grant feels that Conn. Gen. Stat. § 53-202a-c and the subsequent amendment by Conn. Public Act No. 23-53, § 23 gives criminals and attackers a strong tactical advantage over him. He feels that criminals don't follow gun restrictions so they can possess and carry any type of so-called "assault weapon" they like. As a law-abiding person, Grant wants to be able to lawfully possess and defensively carry such firearms as well.

14.17.  Grant would like to purchase, sell, and possess one or more of the firearms listed or described in Conn. Gen. Stat. § 53-202a and the subsequent amendment by Conn. Public Act No. 23-53, § 23, but he is prohibited from doing so by Conn. Gen. Stat. § 53-202c and the risk that the Defendants will enforce Conn. Gen. Stat. § 53-202c against him.

### *Plaintiff Jennifer Hamilton*

15.18.  Plaintiff Jennifer Hamilton ("Hamilton") is a natural person, a resident of Enfield, Connecticut, an adult over the age of 21, and a citizen of the United States. Hamilton is the holder of a pistol permit in Connecticut and Massachusetts, and is legally eligible under

5

federal and state law to acquire and possess firearms, ammunition, and magazines. Hamilton is a member and supporter of Plaintiff CCDL and Plaintiff SAF.

16.19. Hamilton is a petite 5'-2" tall woman, and relies on a defensive firearm instead of bodily strength to protect herself and her family from attack. Hamilton has been the victim of domestic violence, and carries a defensive firearm to protect herself and her family from further attack.

17.20. Hamilton is a firearms instructor, teaching students of all skill levels, from their initial pistol permit class to personal defense and tactical firearms use. She is also a Nuisance Wildlife Control Operator trained and licensed by the Connecticut Department of Energy and Environmental Protection.

18.21. Hamilton would like to be able to lawfully purchase one or more firearms listed or described in Conn. Gen. Stat. § 53-202a prior to its amendment by Conn. Public Act No. 23-53, § 23, likely an AR 15-platform firearm, because of its adaptability and effectiveness for defensive purposes. Hamilton would like to purchase and possess such a firearm with a telescopic stock in order to adjust the firearm's length of pull to fit her specific body type and size. However, since Conn. Gen. Stat. § 53-202a(1)(E)(i) defines any such firearm as an "assault weapon," she is prohibited from doing so by Conn. Gen. Stat. § 53-202c.

22. Hamilton would like to purchase, sell, and possess one or more of the firearms listed or described in Conn. Gen. Stat. § 53-202a prior to its amendment by Conn. Public Act No. 23-53, § 23, but she is prohibited from doing so by Conn. Gen. Stat. § 53-202c and the risk that the Defendants will enforce Conn. Gen. Stat. § 53-202c against her.

6

19. 23. Hamilton also owns firearms that were previously classified as "others" (firearms that legally were not considered pistols, revolvers, shotguns, or rifles). She intends to acquire more "others" in the future. Conn. Public Act No. 23-53, § 23 now prohibits her from lawfully purchasing any such firearms, and from lawfully possessing additional "others" other than those which that she already possesses.

*Plaintiff Michael Stiefel*

20. 24. Michael Stiefel ("Stiefel") is a natural person, a resident of Montville, Connecticut, an adult over the age of 21, and a citizen of the United States. He has been the holder of a Connecticut pistol permit for over thirty years, and is legally eligible under federal and state law to acquire and possess firearms, ammunition, and magazines. Stiefel is a member and supporter of Plaintiff CCDL and Plaintiff SAF.

21. 25. Stiefel served twenty years as a uniformed Corrections Officer with the Connecticut Department of Corrections, during which time he conducted armed transports of high-risk inmates, and was an armed Perimeter Officer carrying an AR-15-platform firearm.

22. 26. During his service with the Department of Corrections, Stiefel was trained and qualified by the State of Connecticut in the safe and effective use of AR 15-platform firearms.

23. 27. AR 15-platform firearms are among the firearms listed or described in Conn. Gen. Stat. § 53-202a and effectively "banned" by Conn. Gen. Stat. § 53-202c.

24. 28. Stiefel retired from the Department of Corrections in 2010.

29.    Stiefel owns no firearms listed or described in Conn. Gen. Stat. § 53-202a prior to its amendment by Conn. Public Act No. 23-53 because he is prohibited by Conn. Gen. Stat. § 53-202c from buying or possessing any such firearms. Stiefel would like to be able to lawfully

purchase and possess one or more of the firearms listed or described in Conn. Gen. Stat. § 53-202a for defensive purposes.

25.30.  Stiefel also owns firearms that were previously classified as "others" (firearms that legally were not considered pistols, revolvers, shotguns, or rifles). He intends to acquire more "others" in the future. Conn. Public Act No. 23-53, § 23 now prohibits him from lawfully purchasing any such firearms, and from lawfully possessing additional "others" other than those which that he already possesses.

26.31.  Stiefel would like to purchase, sell, and possess one or more of the firearms listed or described in Conn. Gen. Stat. § 53-202a, but he is prohibited from doing so by Conn. Gen. Stat. § 53-202c and the risk that the Defendants will enforce Conn. Gen. Stat. § 53-202c against him.

*Plaintiff Connecticut Citizens Defense League, Inc.*

27.32.  Plaintiff, Connecticut Citizens Defense League, Inc. ("CCDL") is a non-profit educational foundation, incorporated under the laws of Connecticut, with its principal place of business in Seymour, Connecticut. Its mission is to preserve the effectiveness of the Second Amendment through legislative and grassroots advocacy, outreach, education, research, publication, legal action, and programs focused on the constitutional right to keep and bear arms. CCDL has over 41,000 members and supporters nationwide, with more than ninety-five percent of its members and supporters being residents of Connecticut. CCDL represents its members and supporters – which include individuals seeking to exercise their right to acquire, possess, and carry firearms for personal protection. CCDL brings this action on behalf of

itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public.

28.33.  CCDL has expended and diverted resources otherwise reserved for different institutional functions and purposes, and is adversely and directly harmed by the illegal and unconstitutional actions of the Defendants as alleged herein. CCDL has diverted, and continues to divert, significant time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the laws complained of herein that would otherwise be used for educational outreach, public relations, and/or programmatic purposes.

29.34.  Among other diversions and threatened diversions, the Defendants' unconstitutional enforcement of the laws complained of herein has forced, or likely will force, CCDL to divert previously allocated funds, energies, and resources to the cause of this legal action. Rather than working on other educational, outreach, public relations, and/or programmatic events and operations, CCDL's officers and Executive Board members have devoted, are continuing to devote, or are likely to devote, significant time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the laws complained of herein. CCDL, its officers, and its Executive Board members will be forced to continue diverting such time, money, effort, and resources from CCDL's normal educational, outreach, public relations, and/or programmatic events and operations so long as the Defendants' unconstitutional enforcement of the laws complained of herein persists.

30.35.  As to CCDL's representative capacity claims, there are common questions of law that substantially affect the rights, duties and liabilities of many of CCDL's members as well as potentially numerous similarly situated residents whose constitutional rights have been,

9

and are continuing to be, infringed by the Defendants' unconstitutional enforcement of the laws complained of herein. The interests CCDL seeks to protect are germane to its purpose.

~~31.~~36.  Each of the individual Plaintiffs to this action – as described in the preceding paragraphs, are all members and supporters of CCDL.

### Plaintiff Second Amendment Foundation, Inc.

~~32.~~37.  Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit educational foundation incorporated under the laws of the State of Washington with its principal place of business in Bellevue, Washington. SAF seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. SAF has over 700,000 members and supporters nationwide, including many members in Connecticut.

~~33.~~38.  The purpose of SAF includes education, research, publishing, and legal action focusing on the constitutional right to privately own and possess firearms under the Second Amendment, and the consequences of gun control. The Court's interpretation of the Second Amendment directly impacts SAF's organizational interests, as well as SAF's members and supporters in Connecticut, who enjoy exercising their Second Amendment rights. SAF brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public. Many of SAF's individual Connecticut members have been adversely and directly harmed and injured by Defendants' enforcement of the statutory prohibition on the sale, transfer and ownership of so-called "assault weapons."

~~34.~~39.  The interests SAF seeks to protect are germane to its purpose. Indeed, the Connecticut statutes challenged herein have denied, and will continue to deny responsible,

10

law-abiding adults their fundamental, individual right to keep and bear arms enshrined under the Second and Fourteenth Amendments of the U.S. Constitution. Defendants' actions and failures alleged herein have caused SAF to dedicate resources that would otherwise be available for other purposes to protect the rights and property of its members, supporters, and the general public, including by and through this action. Each of the individual Plaintiffs to this action – as described in the preceding paragraphs – are members and supporters of SAF.

### *Defendant Edward M. Lamont, Jr.*

35.40.   The Defendant, Edward M. Lamont, Jr., ("Lamont") is the governor of Connecticut, and he is sued in his official capacity. In his role as Connecticut governor, Lamont is constitutionally required to "take care that the laws be faithfully executed," including the laws complained of herein. Conn. Const., Art. IV, § 12.

### *Defendant James Rovella*

36.41.  The Defendant, James Rovella ("Rovella"), is the Commissioner of Connecticut's Department of Emergency Services and Public Protection ("DESPP"), and he is sued in his official capacity. In his role as the Commissioner, Rovella reports to Lamont and oversees the Connecticut State Police, which is responsible for investigating and initiating prosecutions under Connecticut law. *See* Conn. Gen. Stat. § 29-7. Additionally, DESPP possesses significant regulatory and administrative authority over Connecticut's "assault weapons" prohibitions. *See, e.g.,* Conn. Gen. Stat. § 53-202d.

### *Defendant Patrick J. Griffin*

37.42.  The Defendant, Patrick J. Griffin ("Griffin"), is Connecticut's Chief State's Attorney and is sued in his official capacity. In his capacity as Chief State's Attorney and head of the Division of Criminal Justice, Defendant Griffin oversees all Connecticut prosecutors. Additionally, he wields power to sign warrants, charging documents, applications for grand jury investigations, and supervises all appellate, post-trial, and post-conviction proceedings for criminal matters in Connecticut. This authority extends to prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

### *Defendant Margaret E. Kelley*

38.43.  The Defendant, Margaret E. Kelley ("Kelly"), is Connecticut's State's Attorney for the Ansonia/Milford Judicial District and is sued in her official capacity. As a Connecticut State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the

12

jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). Her responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

### Defendant David R. Applegate

~~39.~~44.  The Defendant, David R. Applegate ("Applegate"), is Connecticut's State's Attorney for the Danbury Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

### Defendant Joseph T. Corradino

~~40.~~45.  The Defendant, Joseph T. Corradino ("Corradino"), is Connecticut's State's Attorney for the Fairfield Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

13

### Defendant Sharmese L. Walcott

~~41.~~46.  The Defendant, Sharmese L. Walcott ("Walcott"), is Connecticut's State's Attorney for the Hartford Judicial District and is sued in her official capacity. As a Connecticut State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). Her responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

### Defendant David R. Shannon

~~42.~~47.  The Defendant, David R. Shannon ("Shannon"), is Connecticut's State's Attorney for the Litchfield Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

### Defendant Michael A. Gailor

~~43.~~48.  The Defendant, Michael A. Gailor ("Gailor"), is Connecticut's State's Attorney for the Middlesex Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and

14

complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

15

### *Defendant Christian Watson*

44.49.  The Defendant, Christian Watson ("Watson"), is Connecticut's State's Attorney for the New Britain Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

### *Defendant John P. Doyle, Jr.*

45.50.  The Defendant, John P. Doyle, Jr. ("Doyle"), is Connecticut's State's Attorney for the New Haven Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

### *Defendant Paul J. Narducci*

46.51.  The Defendant, Paul J. Narducci ("Narducci"), is Connecticut's State's Attorney for the New London Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-

286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

### *Defendant Paul J. Ferencek*

47.52.  The Defendant, Paul J. Ferencek ("Ferencek"), is Connecticut's State's Attorney for the Stamford Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

### *Defendant Matthew C. Gedansky*

48.53.  The Defendant, Matthew C. Gedansky ("Gedansky"), is Connecticut's State's Attorney for the Tolland Judicial District and is sued in his official capacity. As a Connecticut State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). His responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

### *Defendant Maureen Platt*

49.54.  The Defendant, Maureen Platt ("Platt"), is Connecticut's State's Attorney for the Waterbury Judicial District and is sued in her official capacity. As a Connecticut State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). Her responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

### *Defendant Anne F. Mahoney*

50.55.  The Defendant, Anne F. Mahoney ("Mahoney"), is Connecticut's State's Attorney for the Windham Judicial District and is sued in her official capacity. As a Connecticut State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court in which the court may proceed." Conn. Gen. Stat. § 51-286(a). Her responsibilities and authority include prosecuting individuals who violate Connecticut's "assault weapons" ban, including the provisions amended and expanded by Conn. Public Act No. 23-53.

### **FACTUAL ALLEGATIONS**

### *Connecticut's History Of "Assault Weapons" Regulation*

51.56.  Prior to 1993, Connecticut law did not prohibit the purchase, sale or possession of the firearms it now defines as "assault weapons."

18

52.57.  Firearms meeting the Connecticut law definition of "assault weapon" are referred to in the firearms industry as "modern sporting arms" or "modern sporting rifles" ("MSAs" or "MSRs"). For the purposes of this Complaint, the terms "MSA," "MSR," and "assault weapon" are used interchangeably.

53.58.  In 1993, Connecticut enacted legislation that banned "assault weapons" and criminalized their possession, defining "assault weapons" as firearms "capable of fully automatic, semiautomatic or burst fire at the option of the user." 1993 Conn. Pub. Acts 93-306, § 1(a). The 1993 law also banned 67 specifically named semiautomatic firearm models.

54.59.  In 1994, the United States Congress enacted the Violent Crime Control and Law Enforcement Act of 1994 (the "Act"), which restricted the manufacture, transfer, and possession of certain "semiautomatic assault weapons." Like the Connecticut law, the Act designated particular firearm models – 18 models in all – as specifically banned, including the Colt AR-15 and other AR-15-platform firearms. The Act also created a two-feature test, which prohibited any semiautomatic firearm that bore at least two of the five so-called "military-style" physical features identified in the Act – e.g. a telescopic stock, a conspicuously protruding pistol grip, a bayonet mount, a flash suppressor, and a grenade launcher.

55.60.  The Act expired in 2004 per its sunset provision.

56.61.  In 2001, Connecticut amended its "assault weapon" ban to mirror the Act. 2001 Pub. Acts 01-103.

57.62.  In 2013, Connecticut responded to the Sandy Hook Elementary School tragedy by specifically criminalizing the possession of the Bushmaster Model XM15-E2S rifle used in

19

that school shooting, and numerous other firearms it considered "assault weapons." Conn. Gen. Stat. § 53-202a.

### *Connecticut's Current Criminalization Of "Assault Weapons"*

58.63.  Conn. Gen. Stat. § 53-202c(a) makes it a Class D felony for any person within Connecticut's borders to possess an "assault weapon" as defined in Conn. Gen. Stat. § 53-202a. A violation of § 53-202c carries a mandatory one-year sentence of incarceration and a maximum of five years' incarceration. *See* Conn. Gen. Stat. § 53a-35a(8).

59.64.  Conn. Gen. Stat. § 53-202b(a)(1) makes it a Class C felony to distribute, transport, import, keep for sale, offer for sale, or gift an "assault weapon" within the state of Connecticut, save for very limited exceptions not relevant here. It imposes a mandatory two-year sentence of incarceration. *See* Conn. Gen. Stat. § 53-202b(a)(1). A Class C felony carries a maximum term of imprisonment of ten years' incarceration. Conn. Gen. Stat. § 53a-35a(7).

60.65.  Connecticut law permits individuals who lawfully possessed "assault weapons" on or prior to April 3, 2013 to continue to possess such "assault weapons" if they proved previous lawful ownership to the State Police, applied to the State Police for a certificate of possession of the "assault weapons" by January 1, 2014, and actually received that certificate. Conn. Gen. Stat. § 53-202d(a)(2). Their possession of the "assault weapon" is limited to narrowly defined places and for narrowly defined purposes which do not include self-defense outside of the home. Conn. Gen. Stat. § 53-202d(f).

61.66.  Connecticut takes a two-track approach to defining what an "assault weapon" is for purposes of criminalizing its possession, sale, and transfer. First, Connecticut criminalizes the possession, sale, or transfer of approximately 160 specifically named firearm

20

models in four statutory subsections on the grounds that they are considered "assault weapons." *See generally* Conn. Gen. Stat. § 53-202a.

~~62.~~67.  Highlighting the randomness of the firearms named, the list of banned semiautomatic firearms in Conn. Gen. Stat. § 53-202a bizarrely includes the Remington Tactical Rifle Model 7615, which is not a semiautomatic firearm at all, but is a pump-action rifle. Conn. Gen. Stat. § 53-202a(1)(B).

~~63.~~68.  Second, Conn. Gen. Stat. § 53-202a provides general descriptive guidelines as to what also constitutes an "assault weapon:"

> a.  "Any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user…." Conn. Gen. Stat. § 53-202a(1)(A)(i).

> b.  "A part or combination of parts designed or intended to convert a firearm into an assault weapon" as defined further in the statutory definition of the statute. Conn. Gen. Stat. § 53-202a(1)(A)(ii).

> c.  "A semiautomatic, centerfire rifle that has an ability to accept a detachable magazine and has at least one of the following: (I) A folding or telescoping stock; (II) Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing; (III) A forward pistol grip; (IV) A flash

suppressor; or (V) A grenade launcher or flare launcher…." Conn. Gen. Stat. § 53-202a(1)(E)(i).

d. "A semiautomatic, centerfire rifle that has a fixed magazine with the ability to accept more than ten rounds;" Conn. Gen. Stat. § 53-202a(1)(E)(ii).

e. "A semiautomatic, centerfire rifle that has an overall length of less than thirty inches." Conn. Gen. Stat. § 53-202a(1)(E)(iii).

f. "A semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of the following: (I) An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip; (II) A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer; (III) A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel; or (IV) A second hand grip…. Conn. Gen. Stat. § 53-202a(1)(E)(iv).

g. "A semiautomatic pistol with a fixed magazine that has the ability to accept more than ten rounds;" Conn. Gen. Stat. § 53-202a(1)(E)(v).

h. "A semiautomatic shotgun that has both of the following: (I) A folding or telescoping stock; and (II) Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger

22

hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing…." Conn. Gen. Stat. § 53-202a(1)(E)(vi).

i.   "A semiautomatic shotgun that has the ability to accept a detachable magazine." Conn. Gen. Stat. § 53-202a(1)(E)(vii).

j.   "A shotgun with a revolving cylinder." Conn. Gen. Stat. § 53-202a(1)(E)(viii).

k.   "A part or combination of parts designed or intended to convert a firearm into an assault weapon… any combination of parts from which an assault weapon may be assembled if those parts are in the possession or under the control of the same person." Conn. Gen. Stat. § 53-202a(1)(F).

64.69.   The result of this statutory scheme is to criminalize the possession of not only many fully automatic, selective fire, and burst fire firearms, but it also criminalizes the possession of many ubiquitous semiautomatic firearms that are widely popular and commonly used for lawful purposes throughout the United States.

70.     An additional consequence of Connecticut's statutory scheme is that a conviction for the possession of an "assault weapon" is a felony conviction, rendering a person ineligible to ever again lawfully possess any firearm. *See e.g.*, 18 U.S.C. § 922(g)(1).

*Connecticut's Criminalization Of "Others"*

71.     Until the enactment of Conn. Public Act No. 23-53, Connecticut recognized the legality of firearms that did not meet the legal definitions for pistols, revolvers, rifles, or shotguns. These firearms colloquially became known as "others."

23

72.   Data from Connecticut's firearms registry shows that, as of January 2023, "others" constitute approximately 7% of firearms lawfully owned by Connecticut citizens.

73.   Conn. Public Act No. 23-53 – signed by Defendant Lamont and effective immediately on June 6, 2023 – added "others" to the legal definition of "assault weapons" and criminalized their possession for the first time in Connecticut history based on a "single feature" test.

74.   An "other" is now an illegal assault weapon under Connecticut law if it has at least one of the following features:

    a.   "Any grip of the weapon, including a pistol grip, a thumbhole stock or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing," Conn. Public Act No. 23-53, § 23(G)(i), p. 48;

    b.   "An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip." Conn. Public Act No. 23-53, § 23(G)(ii), p. 48;

    c.   "A fixed magazine with the ability to accept more than ten rounds," Conn. Public Act No. 23-53, § 23(G)(iii), p. 48;

    d.   "A flash suppressor or silencer, or a threaded barrel capable of accepting a flash suppressor or silencer," Conn. Public Act No. 23-53, § 23(G)(iv), p. 48;

e.  "A shroud that is attached to, or partially or completely encircles the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel," Conn. Public Act No. 23-53, § 23(G)(v), p. 48;

f.  "A second hand grip; or," Conn. Public Act No. 23-53, § 23(G)(vi), p. 48;

g.  "An arm brace or other stabilizing brace that could allow such firearm to be fired from the shoulder, with or without a strap designed to attach to an individual's arm." Conn. Public Act No. 23-53, § 23(g)(vii), p. 48.

75.  These statutory provisions criminalize the possession of many ubiquitous firearms that Connecticut residents chose as alternatives to Connecticut's early bans on the possession of "assault weapons."

76.  An additional consequence of Conn. Public Act No. 23-53's broadening of Connecticut's "assault weapons" ban to include "others" is that a conviction for the possession of an "other" is now a felony, rendering a person ineligible to ever possess a firearm again. *See, e.g.*, 18 U.S.C. § 922(g)(1).

65.

*"Assault Weapons" are "Modern Sporting Arms," and Are in Common Use for Lawful Purposes Throughout the United States.*

1.77.  MSAs (Connecticut's "assault weapons") are widely popular and in common use throughout the United States for lawful purposes.

2.78.  The National Shooting Sports Foundation ("NSSF") – a firearms trade association based in Newtown, Connecticut – estimated in 2020 that 19,797,000 MSRs have been manufactured or imported into the United States based on the

25

most available statistics compiled by federal authorities. *See* **Exhibit A – NSSF Report on Firearm Production In The U.S., p. 7**; *see also Miller v. Bonta*, 542 F.Supp.3d 1009, 1022 (S.D. Cal. 2021) (discussing evidence after a bench trial). The number of manufactured or imported MSRs has steadily increased in the United States over the years. *See* **Exhibit A, p. 7**.

3.79.    The NSSF further reports that approximately 48% of rifles produced in the United States were MSRs *Id.* at p. 7.

4.80.    The NSSF also conducted a survey that reported that 34% of buyers purchased an MSR a/k/a "assault rifle" for personal protection, 36% for target practice or informal shooting, and 29% for hunting. *Miller*, 542 F.Supp.3d at 1022 (referring to MSRs as "modern rifles").

5.81.    Further solidifying the statistical data, the NSSF reported that, in 2018, approximately 18,327,314 people participated nationally in target and sport shooting with MSRs. *Id.*

6.82.    In 2018, Americans bought twice as many MSRs as they did Ford-150s – the most popular pickup truck in America. *Id.* at 1022-1023.

7.83.    Courts have already recognized that firearms considered "assault weapons" under Connecticut law are in common use throughout the United States:

    a.b. In 2015, the Second Circuit held that "[e]ven accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are 'in common use' as the

26

term was used in *Heller.*" *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d. Cir. 2015).

b.i. In 2011, the D.C. Circuit held "that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend." *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

### *"Assault Weapons" are Typically Used for Lawful Purposes.*

8.84.        In 2019, a pregnant Florida woman used a single shot from a lawfully-owned AR-15-platform firearm to mortally wound one of the two home invaders who had already fired a shot and were pistol whipping her husband. **Exhibit B**.

9.85.        In March 2017, an Oklahoma man used a lawfully-owned AR-15-platform firearm to shoot three masked home invaders during a confrontation inside his father's home. **Exhibit C**.

10.86.       In April 2018, two men – one armed with a handgun and the other with an AR-15-platform firearm – were forced into a gunfight with three masked home invaders who attempted to use a police entrance tactic. **Exhibit D**. They were forced to fire approximately 30 shots in the confrontation and successfully repelled the intruders without harm to themselves. *Id.*

11.87.       In February 2018, a firearms instructor intervened with an AR-15-platform firearm in an argument outside his apartment when one of the participants threatened to use a knife and actually stabbed a person, successfully deterring the assailant from any further misconduct. **Exhibit E.**

12.88.       In November 2017, Stephen Willeford – a former firearms instructor – intervened with an AR-15-platform firearm in the deadliest mass shooting event in Texas history when Devin Kelley attacked a Baptist Church in Sutherland Springs, Texas. **Exhibit F**. After Kelley killed 26 people and wounded 26 others, Willeford realized what was happening and left the safety of his home to engage Kelley with his AR-15. *Id.* Willeford wounded Kelley twice in the shootout,

28

forcing him to stop his massacre, and flee the scene. *Id.* Willeford subsequently

pursued him with a motorist's aid until Kelley committed suicide. *Id.*

### *Connecticut Bans Common Features of Firearms Under Its Definition of "Assault Weapons" That Actually Render the Firearms Safer.*

~~13.~~89.  Pistol grips are a longstanding historical feature of rifles that date back for

centuries. Conn. Gen. Stat. § 53-202a(1)(E)(i) bans their use on semiautomatic, centerfire rifles

with detachable magazines. Conn. Gen. Stat. § 53-202a(1)(E)(vi) bans their use on shotguns.

~~14.~~90.  The primary purpose of a pistol grip is to improve ergonomics, which, in turn,

improves a firearm's accuracy by shaping the user's grip into a more natural and comfortable

position. A pistol grip does not increase the danger of a firearm in any meaningful way, and it

has been historically used for centuries and remains in common use today.

~~15.~~91.  Thumbhole stocks have a historical basis with custom stocks from the 1600s

through the modern era employing similar concepts. Conn. Gen. Stat. § 53-202a(1)(E)(i) bans

their use on semiautomatic centerfire rifles with detachable magazines. Conn. Gen. Stat. § 53-

202a(1)(E)(vi) bans their use on shotguns.

~~16.~~92.  Like a pistol grip, the primary purpose of a thumbhole stock is to improve

ergonomics and accuracy by shaping the user's grip in a natural and comfortable position. A

thumbhole stock does not increase the danger of a firearm in any meaningful way, and it has

been historically used for centuries and remains in common use today.

~~17.~~93.  Folding or telescopic stocks date back to at least the 1650-1700 period, and they

reached more mainstream popularity in the 1700s and continue to be a common feature of

firearms today. Conn. Gen. Stat. § 53-202a(1)(E)(i) bans their use on semiautomatic centerfire

rifles with detachable magazines. Conn. Gen. Stat. § 53-202a(1)(E)(vi) bans their use on shotguns.

18.94.  The primary purpose of a telescopic or folding stock is to adjust the length of a firearm to give the user more control over it based on their height and body type. More control over a firearm renders it safer to use and more accurate. Thus, a telescopic or folding stock does not increase the danger of a firearm in any meaningful way, and it has been historically used for centuries and remains in common use today.

19.95.  Forward pistol grips appeared on firearms as early as the 1860s and gradually became more popular for some firearms. Conn. Gen. Stat. § 53-202a(1)(E)(i) bans their use on semiautomatic centerfire rifles with detachable magazines.

20.96.  Like the other features previously discussed, a forward pistol grip or a vertical forend gives a user greater control of a firearm, which increases accuracy. Forward pistol grips also increase the accuracy of firearms when used in a prone position. They do not increase the danger of a firearm in any meaningful way, and they have been used for centuries and remain in common use today.

21.97.  Flash suppressors first appeared in the early 1900s as a combination of sound and flash suppressor. Conn. Gen. Stat. § 53-202a(1)(E)(i) bans their use on semiautomatic centerfire rifles with detachable magazines.

22.98.  The purpose of a flash suppressor is to divert the muzzle flash in ways that mitigate its profile – a feature that is nigh indispensable in low light shooting situations such as a home at night. A muzzle flash in a dark environment temporarily affects a user's vision, placing them at a momentary disadvantage to possible intruders. A flash suppressor enables a

30

user to retain full use of their visual faculties in dark environments, making their use of a firearm safer. It does not increase the danger of a firearm in any meaningful way, and it has been used for almost a century and remains in common use today.

23.99.   Rifles or other long guns under 30 inches in length date back to the 16th century and have remained popular ever since. Conn. Gen. Stat. § 53-202a(1)(E)(iii) criminalizes their possession.

24.100.        Rifles or long guns under 30 inches are particularly well-suited for home defense because they permit a user to more easily navigate doorways and corners. They additionally are more suited for smaller individuals or disabled users who require a rifle or other long gun that is lighter and easier to handle. A shorter long gun or rifle is no more deadly than any other firearm, and they have been used for centuries and remain in common use today.

25.101.        Shotguns with revolving cylinders date back to the early 1800s and have remained in common use since. In fact, virtually every early American revolver manufacturer offered a revolving shotgun model for purchase as well. Conn. Gen. Stat. § 53-202a(1)(E)(viii) and § 53-202c criminalizes the possession of shotguns with revolving cylinders.

26.102.        Most modern shotguns have the capacity to accept between 3 to 6 rounds in a tubular magazine. A revolving cylinder does not meaningfully increase the danger of a shotgun, and shotguns with revolving cylinders have existed in common usage since the advent of the revolver, and remain in common use today.

31

**COUNT ONE – 42 U.S.C. § 1983 CLAIM FOR VIOLATION OF SECOND AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS**

~~27.~~103.     Paragraphs 1 through ~~102~~91 are incorporated herein.

~~28.~~104.     The Second Amendment guarantees "the right of the people to keep and bear Arms." U.S. Const. Amend. II.

~~29.~~105.     The Fourteenth Amendment applies the Second Amendment to the states, including the Defendants. *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2137 (Jun. 23, 2022) ("Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second").

~~30.~~106.     On October 19, 2015, the Second Circuit affirmed this Court's decision upholding the constitutionality of Connecticut's laws prohibiting the possession of "semiautomatic assault weapons…." *See New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 343 (2d Cir. 2015). The U.S. Supreme Court denied the plaintiffs' petition for a writ of certiorari. *See Shew v. Malloy*, 136 S.Ct. 2486 (Mem) (Jun 20, 2016).

~~31.~~107.     The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022), however, strips *Cuomo* of its binding effect because it completely reshaped Second Amendment analysis in the United States. Courts have recognized the sea change as follows:

       a.  The U.S. Supreme Court summarily reversed and remanded a Fourth Circuit decision upholding Maryland's "assault weapons" ban for reconsideration in light of *Bruen. See Bianchi v. Frosh*, 142 S.Ct. 2898 (Mem) (Jun. 30, 2022).

32

    b. The Ninth Circuit vacated, and remanded for reconsideration, a decision by a U.S. District Court for the Southern District of California striking down California's "assault weapons" ban in light of *Bruen* because *Bruen* employed a different method of analysis. *See Miller v. Bonta*, 2022 WL 3095986 (Aug. 1, 2022).

32.108.    The *Cuomo* analysis employed a two-step interest-balancing test akin to a burden-shifting analysis:

    a. Under first step, courts examined whether the arms at issue are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes." *Cuomo*, 804 F.3d at 254-55.

    b. The second step required courts to select a standard of scrutiny based on how close the law comes to the core of the Second Amendment right" and "the severity of the law's burden on the right." *Id.* at 258.

33.109.    *Cuomo*'s second step was remarkably malleable to being a public policy inquiry. As applied in *Cuomo*, the Second Circuit used two factors to inform the inquiry: home defense and the popularity of weapons compared to handguns. Based on the two competing factors, it applied intermediate scrutiny instead of strict scrutiny to the regulations at issue and held that they did not impose sufficiently severe burdens on fundamental constitutional rights because there were readily available alternatives such as handguns for home defense. *Id.* at 258-261.

34.110.    *Bruen* completely abolishes the quasi-public policy and scrutiny analyses. Its reshaping of the analysis starts and ends with two basic principles:

a. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126.

b. "[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

35.111.    The Second Amendment's plain text covers the conduct that the Plaintiffs seek to engage in and that the Defendants criminalize: the keeping and bearing of commonly used firearms for personal defense and other lawful purposes.

36.112.    The firearms that the Plaintiffs seek to purchase, possess, and carry, but which are effectively banned by the statutory scheme challenged herein, do not fall within the "dangerous and unusual" category mentioned in *District of Columbia v. Heller*, 554 U.S. at 627.

37.113.    Instead, as the Plaintiffs show, analogous firearms have been developed and used for lawful purposes centuries. Such firearms came to the fore both prior to and after the adoption of the Second Amendment, and they were an integral part of personal use in America, especially in the American West, at the time that the Fourteenth Amendment was adopted to apply the Bill of Rights to the states.

38.114.    Neither the 1791 historical tradition at the time the Second Amendment was ratified, nor the 1868 historical tradition at the time that the Fourteenth Amendment applied the Bill of Rights against the states, contained any well-established prohibition on "assault weapons" or their historical equivalents. *See Bruen*, 142 S.Ct. at 2138 (acknowledging a scholarly debate over whether the 1791 historical tradition or the 1868 historical tradition controls the analysis).

34

39.115.      Conn. Gen. Stat. § 53-202c and its accompanying statutory provisions in Conn. Gen. Stat. §§ 53-202a-f and Conn. Gen. Stat. §§ 53-202h-j, and Conn. Public Act 23-53, § 23, violate the Plaintiffs rights under the Second and Fourteenth Amendments by criminalizing the possession and bearing of:

    a.  Common firearms – at least one of which has been for many years the single most popular rifle platform in the United States; and

    b.  Common firearm features that make them safer for all users, and more accessible to people with disabilities, including telescopic stocks, pistol grips, forward grips, etc.

40.116.      The Defendants' actions to enforce Conn. Gen. Stat. § 53-202c, and its accompanying statutory provisions, and Conn. Public Act 23-53, § 23 violate, and threaten to imminently violate, the legally protected interests, rights, privileges, or immunities secured to the Plaintiffs by the Second and Fourteenth Amendments of the United States Constitution.

41.117.      The relief sought herein would fairly redress the injuries the Plaintiffs claim.

42.118.      Without the declaratory and injunctive relief requested herein, the Plaintiffs will continue to suffer the violation of their legally protected interests, rights, privileges, or immunities secured to the Plaintiffs by the Second and Fourteenth Amendments of the United States Constitution.

## COUNT TWO – DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201-2202
## CLAIM FOR VIOLATION OF SECOND AMENDMENT
## AND FOURTEENTH AMENDMENT RIGHTS

43.119.      Paragraphs 1 through 11807 are incorporated herein.

44.120.    An actual, substantial, and concrete case and controversy exists between the parties on the constitutionality and enforceability of Conn. Gen. Stat. §§ 53-202a-f, and Conn. Gen. Stat. §§ 53-202h-j, and Conn. Public Act 23-53, § 23;

45.121.    Without the declaratory and injunctive relief requested herein, the Plaintiffs will continue to suffer the violation of their legally protected interests, rights, privileges, or immunities secured to the Plaintiffs by the Second and Fourteenth Amendments of the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs seek the following relief:

A.     Pursuant to Counts One and Two, a declaratory judgment that Conn. Gen. Stat. §§ 53-202a-f, and Conn. Gen. Stat. §§ 53-202h-j, and Conn. Public Act 23-53, § 23 violate the Second Amendment to the United States Constitution;

B.     Pursuant to Counts One and Two, a permanent injunction barring the Defendants from enforcing Conn. Gen. Stat. §§ 53-202a-f, and Conn. Gen. Stat. §§ 53-202h-j, and Conn. Public Act 23-53, § 23;

C.     Pursuant to Counts One and Two, costs and attorneys' fees;

D.     Any such other and further relief that the Court deems just and reasonable.

Dated: June 21, 2023                Respectfully submitted,

    *//s//   Doug Dubitsky*
Doug Dubitsky, Esq.
(ct21558)
LAW OFFICES OF DOUG DUBITSKY
P.O. Box 70
North Windham, CT 06256
Telephone: 860.933.9495
Facsimile: 866.477.1120
Email: doug@lawyer.com

    *//s//   Craig C. Fishbein*
Craig C. Fishbein, Esq.
(ct25142)
FISHBEIN LAW FIRM, LLC
100 South Main Street
P.O. Box 363
Wallingford, Connecticut 06492
Telephone: 203.265.2895
Facsimile: 203.294.1396
E-mail: ccf@fishbeinlaw.com

    *//s//   Cameron L. Atkinson*
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

*Attorneys for the Plaintiffs*

# Exhibit A



## INDUSTRY INTELLIGENCE REPORTS℠
### HELPING OUR MEMBERS MAKE INFORMED DECISIONS



# FIREARM PRODUCTION
## IN THE UNITED STATES
### WITH FIREARM IMPORT AND EXPORT DATA

**P**roviding a comprehensive overview of firearm production trends spanning a period of 28 years, this report is based primarily on the data sourced from the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF's) Annual Firearms Manufacturing and Export Reports (AFMER). Every effort has been made to provide accurate and updated information so the reader may keep this edition as a reliable resource for trend information. Production data is a leading indicator of industry performance; this is especially true when combined with other valuable sources of information.

This edition includes manufacturing trends for ammunition as sourced from Census Bureau's Annual Survey of Manufacturers (ASM) used for all years that fall between the fifth-year economic census reports. Import and export statistics for firearms compiled from the U.S. International Trade Commission (USITC) are presented in conjunction with the AFMER numbers to provide a more accurate picture of the historical production that has been made available to the U.S. market. These data sources, when used collectively, help to provide an overview of the firearm and ammunition manufacturing industries.

Information on production, imports, exports and other manufacturing variables are only a piece of a more complex puzzle of the firearm industry. Other factors outside of the manufacturing sector, such as the retail sector, the economy and frequently the political climate, must all be taken into consideration.  The limitation of the AFMER data is that it reflects historic trends; however, using the data in combination with other reports does provide a more complete picture of the industry. Firearm and ammunition production provide a very significant contribution to the national economy in terms of jobs, wages, and benefits. In addition, capital expenditures on materials (energy, equipment, fuels) help boost local economies.

### KEY FINDINGS

- The average annual production of firearms in the U.S. was 5,400,893 for the last quarter century.

- Total firearm production reported in the 2018 AFMER was 7,948,473 – an increase of 0.6% over 2017 reported figures.

- Long guns totaled 3,441,297 and accounted for 43.3% of total 2018 U.S. firearm production. Of that, rifles totaled 2,905,178 (84.4% of long gun production) and shotguns totaled 536,119 (15.6%).

  **\* See back for all Key Findings**



**NSSF**®
*The Firearm Industry Trade Association*

**INDUSTRY INTELLIGENCE REPORTS**

# U.S. Firearm Production (1991 – 2018)

| Year | Pistols | Revolvers | Total Handguns | Rifles | Shotguns | Total Long Guns | Production Total (a) | % Change in Total Production Year over Year |
|------|---------|-----------|----------------|--------|----------|-----------------|----------------------|---------------------------------------------|
| 1991 | 1,378,252 | 456,966 | 1,835,218 | 883,482 | 828,426 | 1,711,908 | 3,547,126 | -7.8% |
| 1992 | 1,669,537 | 469,413 | 2,138,950 | 1,001,708 | 1,018,204 | 2,019,912 | 4,158,862 | 17.2% |
| 1993 | 2,093,362 | 562,292 | 2,655,654 | 1,173,694 | 1,148,939 | 2,322,633 | 4,978,287 | 19.7% |
| 1994 | 2,004,298 | 586,450 | 2,590,748 | 1,316,607 | 1,254,924 | 2,571,531 | 5,162,279 | 3.7% |
| 1995 | 1,195,284 | 527,664 | 1,722,948 | 1,441,120 | 1,176,958 | 2,618,078 | 4,341,026 | -15.9% |
| 1996 | 987,528 | 498,944 | 1,486,472 | 1,424,315 | 925,732 | 2,350,047 | 3,836,519 | -11.6% |
| 1997 | 1,036,077 | 370,428 | 1,406,505 | 1,251,341 | 915,978 | 2,167,319 | 3,573,824 | -6.8% |
| 1998 | 960,365 | 324,390 | 1,284,755 | 1,345,899 | 1,036,520 | 2,382,419 | 3,667,174 | 2.6% |
| 1999 | 995,446 | 335,784 | 1,331,230 | 1,569,685 | 1,106,995 | 2,676,680 | 4,007,910 | 9.3% |
| 2000 | 962,901 | 318,960 | 1,281,861 | 1,583,042 | 898,442 | 2,481,484 | 3,763,345 | -6.1% |
| 2001 | 626,836 | 320,143 | 946,979 | 1,284,554 | 679,813 | 1,964,367 | 2,911,346 | -22.6% |
| 2002 | 741,514 | 347,070 | 1,088,584 | 1,515,286 | 741,325 | 2,256,611 | 3,345,195 | 14.9% |
| 2003 | 811,660 | 309,364 | 1,121,024 | 1,430,324 | 726,078 | 2,156,402 | 3,277,426 | -2.0% |
| 2004 | 728,511 | 294,099 | 1,022,610 | 1,325,138 | 731,769 | 2,056,907 | 3,079,517 | -6.0% |
| 2005 | 803,425 | 274,205 | 1,077,630 | 1,431,372 | 709,313 | 2,140,685 | 3,218,315 | 4.5% |
| 2006 | 1,021,260 | 382,069 | 1,403,329 | 1,496,505 | 714,618 | 2,211,123 | 3,614,452 | 12.3% |
| 2007 | 1,219,664 | 391,334 | 1,610,998 | 1,610,923 | 645,231 | 2,256,154 | 3,867,152 | 7.0% |
| 2008 | 1,387,271 | 431,753 | 1,819,024 | 1,746,139 | 630,710 | 2,376,849 | 4,195,873 | 8.5% |
| 2009 | 1,868,268 | 547,547 | 2,415,815 | 2,253,103 | 752,699 | 3,005,802 | 5,421,617 | 29.2% |
| 2010 | 2,087,577 | 558,927 | 2,646,504 | 1,830,556 | 743,378 | 2,573,934 | 5,220,438 | -3.7% |
| 2011 | 2,464,255 | 572,857 | 3,037,112 | 2,305,854 | 862,401 | 3,168,255 | 6,205,367 | 18.9% |
| 2012 | 3,311,081 | 667,357 | 3,978,438 | 3,109,940 | 949,010 | 4,058,950 | 8,037,388 | 29.5% |
| 2013 | 4,314,550 | 725,282 | 5,039,832 | 3,996,673 | 1,203,072 | 5,199,745 | 10,239,577 | 27.4% |
| 2014 | 3,602,577 | 744,047 | 4,346,624 | 3,379,009 | 935,411 | 4,314,420 | 8,661,044 | -15.4% |
| 2015 | 3,553,035 | 884,578 | 4,437,613 | 3,701,443 | 777,273 | 4,478,716 | 8,916,329 | 2.9% |
| 2016 | 4,705,930 | 856,288 | 5,562,218 | 4,198,692 | 848,615 | 5,047,307 | 10,609,525 | 19.0% |
| 2017 | 3,691,006 | 720,917 | 4,411,923 | 2,821,945 | 667,350 | 3,489,295 | 7,901,218 | -25.5% |
| 2018 | 3,842,344 | 664,832 | 4,507,176 | 2,905,178 | 536,119 | 3,441,297 | 7,948,473 | 0.6% |
| **TOTALS** | **54,063,814** | **14,143,960** | **68,207,774** | **55,333,527** | **24,165,303** | **79,498,830** | **147,706,604** | |

Source: Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Annual Firearms Manufacturing and Export Report (AFMER).
NOTE: Data is in total units and represents the number of firearms *manufactured and disposed of in commerce during the calendar year.
* Totals include firearms sold for export and law enforcement, but not military sales.
(a): Does not include AFMER MISC firearms category which includes items such as: pen guns and starter guns. Also adjusted to exclude/include, as noted:
From 2011 – 2018 several adjustments were made to the data in this chart due to omissions in the AFMER report (i.e.: figures for long guns manufactured by
Savage Arms were omitted from the 2017 AFMER), duplication of production due to parts manufactured by machine shops (i.e.: parts reported by machine
shop in addition to being reported by the firearm manufacturer resulting in double-counting) and adjustments to the miscellaneous category (i.e: Aero Precision).



**INDUSTRY** INTELLIGENCE REPORTS

# U.S. Firearm Production (1994 – 2018)

## ANNUAL AVERAGES

| Years | Pistols | Revolvers | Total Handguns | Rifles | Shotguns | Total Long Guns | Production Total |
|---|---|---|---|---|---|---|---|
| 25 YR (1994 to 2018) | 1,956,907 | 506,212 | **2,463,118** | 2,090,986 | 846,789 | **2,937,775** | **5,400,893** |
| 20 YR (1999 to 2018) | 2,136,956 | 517,371 | **2,654,326** | 2,274,768 | 792,981 | **3,067,749** | **5,722,075** |
| 15 YR (2004 to 2018) | 2,573,384 | 581,073 | **3,154,456** | 2,540,831 | 780,465 | **3,321,296** | **6,475,752** |
| 10 YR (2009 to 2018) | 3,344,062 | 694,263 | **4,038,326** | 3,050,239 | 827,533 | **3,877,772** | **7,916,098** |
| 5 YR (2014 to 2018) | 3,878,978 | 774,132 | **4,653,111** | 3,401,253 | 752,954 | **4,154,207** | **8,807,318** |

Source: Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Annual Firearms Manufacturing and Export Report (AFMER). Data is in total units and represents the number of firearms "manufactured and disposed of in commerce during the calendar year." Totals include firearms sold for export and law enforcement, but not military sales.

2019 Interim data prepared July 7, 2020. The interim report indicates preliminary data for which the following number of units were reported as manufactured by the manufacturer. This interim AFMER report represents firearms (including separate frames or receivers, actions or barreled actions) manufactured and disposed of in commerce during the calendar year.

| Year | Pistols | Revolvers | Total Handguns | Rifles | Shotguns | Total Long-Guns | Production Total |
|---|---|---|---|---|---|---|---|
| **MANUFACTURED** | | | | | | | |
| 2019 Interim | 3,035,719 | 579,263 | **3,614,982** | 1,951,898 | 480,444 | **2,432,342** | **6,047,324** |

The full 2019 report is expected to be available approximately February 2021. Look for it at www.atf.gov.



# U.S. Firearm Production (1991 – 2018)

## Handguns



## Total Production



## Long Guns



### 2018 Production At A Glance



85.2% Pistols · 14.8% Revolvers

| Pistols by Caliber | | |
|---|---|---|
| To .22 | 417,805 | 10.9% |
| To .25 | 25,370 | 0.7% |
| To .32 | 30,306 | 0.8% |
| To .380 | 760,044 | 19.8% |
| To 9mm | 2,062,010 | 53.7% |
| To .50 | 546,809 | 14.2% |
| | 3,842,344 | 100.0% |

| Revolver by Caliber | | |
|---|---|---|
| To .22 | 271,553 | 40.8% |
| To .32 | 1,100 | 0.2% |
| To .357 M | 113,394 | 17.1% |
| To .38 Sp | 199,028 | 29.9% |
| To .44 M | 42,434 | 6.4% |
| To .50 | 37,323 | 5.6% |
| | 664,832 | 100.0% |

NOTE: Caliber designations as reported in ATF reports are preceded by the word "to." This represents a range of calibers in a category. For example, the pistol "To .50" category includes .40- and .45-caliber models among others that are larger than 9mm.



84.4% Rifles · 15.6% Shotguns

Source: AFMER

**INDUSTRY** INTELLIGENCE REPORTS

# U.S. Pistol Production by Caliber (1991 – 2018)



| Year | To .22 | To .25 | To .32 | To .380 | To 9mm | To .50 | TOTALS |
|------|--------|--------|--------|---------|--------|--------|--------|
| 1991 | 306,088 | 252,370 | 55,007 | 215,595 | 358,228 | 190,964 | 1,378,252 |
| 1992 | 352,621 | 253,955 | 50,916 | 371,095 | 468,182 | 172,768 | 1,669,537 |
| 1993 | 452,509 | 277,306 | 52,268 | 508,469 | 586,039 | 216,771 | 2,093,362 |
| 1994 | 449,495 | 119,769 | 25,972 | 313,915 | 750,693 | 344,454 | 2,004,298 |
| 1995 | 260,059 | 51,025 | 19,220 | 182,801 | 398,472 | 283,707 | 1,195,284 |
| 1996 | 206,485 | 41,156 | 20,709 | 166,089 | 319,696 | 233,393 | 987,528 |
| 1997 | 250,983 | 43,103 | 43,623 | 154,046 | 303,212 | 241,110 | 1,036,077 |
| 1998 | 184,836 | 50,936 | 62,338 | 98,266 | 284,374 | 279,615 | 960,365 |
| 1999 | 229,852 | 24,393 | 52,632 | 81,881 | 270,298 | 336,390 | 995,446 |
| 2000 | 184,577 | 23,198 | 60,527 | 108,523 | 277,176 | 308,900 | 962,901 |
| 2001 | 123,374 | 5,697 | 57,823 | 41,634 | 213,378 | 184,930 | 626,836 |
| 2002 | 144,722 | 10,009 | 53,999 | 59,476 | 205,197 | 268,111 | 741,514 |
| 2003 | 189,785 | 10,987 | 43,471 | 79,788 | 219,668 | 267,961 | 811,660 |
| 2004 | 211,473 | 10,140 | 32,435 | 68,291 | 182,493 | 223,679 | 728,511 |
| 2005 | 139,178 | 10,455 | 29,024 | 107,386 | 299,681 | 217,701 | 803,425 |
| 2006 | 141,651 | 9,625 | 39,197 | 126,939 | 352,383 | 351,465 | 1,021,260 |
| 2007 | 180,419 | 11,361 | 43,914 | 138,484 | 391,312 | 454,174 | 1,219,664 |
| 2008 | 195,633 | 14,586 | 40,485 | 278,945 | 421,746 | 435,876 | 1,387,271 |
| 2009 | 320,697 | 15,053 | 47,396 | 390,897 | 586,364 | 507,861 | 1,868,268 |
| 2010 | 320,237 | 21,722 | 39,792 | 615,630 | 591,876 | 498,320 | 2,087,577 |
| 2011 | 357,884 | 19,182 | 13,890 | 537,063 | 838,957 | 697,279 | 2,464,255 |
| 2012 | 586,625 | 9,853 | 11,248 | 582,645 | 1,175,564 | 945,146 | 3,311,081 |
| 2013 | 554,431 | 18,578 | 6,591 | 852,663 | 1,653,900 | 1,228,387 | 4,314,550 |
| 2014 | 410,747 | 19,097 | 10,494 | 873,087 | 1,254,582 | 1,034,570 | 3,602,577 |
| 2015 | 410,041 | 11,567 | 14,763 | 819,103 | 1,531,033 | 766,528 | 3,553,035 |
| 2016 | 439,628 | 13,174 | 10,269 | 1,129,761 | 2,275,660 | 837,438 | 4,705,930 |
| 2017 | 408,705 | 11,135 | 8,152 | 848,425 | 1,756,618 | 657,971 | 3,691,006 |
| 2018 | 417,805 | 25,370 | 30,306 | 760,044 | 2,062,010 | 546,809 | 3,842,344 |
| TOTALS | 8,430,540 | 1,384,802 | 976,461 | 10,510,941 | 20,028,792 | 12,732,278 | 54,063,814 |

## Percentage of Pistols produced in the U.S. by caliber



NOTE: Caliber designations as reported in ATF reports are preceded by the word "to." This represents a range of calibers in a category. For example, the pistol "To .50" category includes .40- and .45- caliber models among others that are larger than 9mm.

Source: AFMER

# U.S. Revolver Production by Caliber (1991 – 2018)


Revolvers



| Year | To .22 | To .32 | To .357 MAG | To .38 SPEC | To .44 MAG | To .50 | TOTALS |
|------|--------|--------|-------------|-------------|------------|--------|--------|
| 1991 | 79,676 | 10,957 | 155,237 | 121,387 | 76,582 | 13,127 | 456,966 |
| 1992 | 74,408 | 10,243 | 168,720 | 120,721 | 80,705 | 14,616 | 469,413 |
| 1993 | 122,614 | 10,421 | 183,328 | 146,767 | 70,381 | 28,781 | 562,292 |
| 1994 | 133,990 | 9,160 | 170,856 | 146,630 | 89,713 | 36,101 | 586,450 |
| 1995 | 99,578 | 4,381 | 210,379 | 92,913 | 90,144 | 30,269 | 527,664 |
| 1996 | 127,119 | 3,083 | 134,910 | 115,432 | 80,456 | 37,944 | 498,944 |
| 1997 | 109,296 | 3,876 | 70,792 | 85,935 | 61,324 | 39,205 | 370,428 |
| 1998 | 68,108 | 2,602 | 73,905 | 77,289 | 64,236 | 38,250 | 324,390 |
| 1999 | 80,140 | 5,844 | 68,174 | 86,356 | 55,957 | 39,313 | 335,784 |
| 2000 | 79,472 | 1,598 | 81,017 | 59,339 | 46,931 | 50,603 | 318,960 |
| 2001 | 77,433 | 5,003 | 50,120 | 85,628 | 39,515 | 62,444 | 320,143 |
| 2002 | 86,806 | 17,599 | 95,570 | 51,472 | 46,080 | 49,543 | 347,070 |
| 2003 | 108,518 | 3,928 | 59,591 | 57,078 | 46,533 | 33,716 | 309,364 |
| 2004 | 88,570 | 3,446 | 62,640 | 54,842 | 35,097 | 49,504 | 294,099 |
| 2005 | 63,333 | 2,297 | 68,476 | 68,785 | 25,802 | 45,512 | 274,205 |
| 2006 | 84,452 | 2,242 | 99,562 | 85,321 | 54,308 | 56,184 | 382,069 |
| 2007 | 91,963 | 3,509 | 93,320 | 104,498 | 46,719 | 51,325 | 391,334 |
| 2008 | 115,511 | 6,681 | 105,944 | 133,621 | 31,135 | 38,861 | 431,753 |
| 2009 | 141,840 | 7,590 | 107,834 | 232,339 | 29,967 | 27,977 | 547,547 |
| 2010 | 131,543 | 8,605 | 126,525 | 210,762 | 45,361 | 36,131 | 558,927 |
| 2011 | 153,749 | 5,182 | 125,237 | 206,191 | 35,791 | 46,707 | 572,857 |
| 2012 | 234,164 | 1,717 | 126,594 | 203,005 | 36,116 | 65,761 | 667,357 |
| 2013 | 226,749 | 1,914 | 149,730 | 238,384 | 46,466 | 62,039 | 725,282 |
| 2014 | 200,739 | 5,260 | 151,635 | 283,990 | 41,640 | 60,783 | 744,047 |
| 2015 | 278,784 | 9,413 | 185,976 | 225,782 | 48,170 | 136,453 | 884,578 |
| 2016 | 320,773 | 7,851 | 182,564 | 248,143 | 51,451 | 45,506 | 856,288 |
| 2017 | 319,364 | 1,715 | 134,053 | 177,956 | 42,062 | 45,767 | 720,917 |
| 2018 | 271,553 | 1,100 | 113,394 | 199,228 | 42,434 | 37,323 | 664,832 |
| TOTALS | 3,693,547 | 125,596 | 2,848,798 | 3,530,719 | 1,233,408 | 1,223,221 | 12,655,289 |

## Percentage of Revolvers produced in the U.S. by caliber



**INDUSTRY** INTELLIGENCE REPORTS

# Modern Sporting Rifle Production Plus Imports Less Exports (1990 – 2018)

(estimated)

| Year | US Production less exports of MSRs | US Imports less exports of MSRs | TOTALS |
|---|---|---|---|
| 1990 | 43,000 | 31,000 | 74,000 |
| 1991 | 46,000 | 69,000 | 115,000 |
| 1992 | 33,000 | 72,000 | 105,000 |
| 1993 | 62,000 | 226,000 | 288,000 |
| 1994 | 103,000 | 171,000 | 274,000 |
| 1995 | 54,000 | 77,000 | 131,000 |
| 1996 | 27,000 | 43,000 | 70,000 |
| 1997 | 44,000 | 81,000 | 125,000 |
| 1998 | 70,000 | 75,000 | 145,000 |
| 1999 | 113,000 | 119,000 | 232,000 |
| 2000 | 86,000 | 130,000 | 216,000 |
| 2001 | 60,000 | 119,000 | 179,000 |
| 2002 | 97,000 | 145,000 | 242,000 |
| 2003 | 118,000 | 262,000 | 380,000 |
| 2004 | 107,000 | 207,000 | 314,000 |
| 2005 | 141,000 | 170,000 | 311,000 |
| 2006 | 196,000 | 202,000 | 398,000 |
| 2007 | 269,000 | 229,000 | 498,000 |
| 2008 | 444,000 | 189,000 | 633,000 |
| 2009 | 692,000 | 314,000 | 1,006,000 |
| 2010 | 444,000 | 140,000 | 584,000 |
| 2011 | 653,000 | 163,000 | 816,000 |
| 2012 | 1,308,000 | 322,000 | 1,630,000 |
| 2013 | 1,882,000 | 393,000 | 2,275,000 |
| 2014 | 950,000 | 237,000 | 1,187,000 |
| 2015 | 1,360,000 | 244,000 | 1,604,000 |
| 2016 | 2,217,000 | 230,000 | 2,447,000 |
| 2017 | 1,406,000 | 158,000 | 1,564,000 |
| 2018 | 1,729,000 | 225,000 | 1,954,000 |
| TOTALS | 14,754,000 | 5,043,000 | 19,797,000 |



## NSSF® Magazine Chart
Estimated 304 Million Detachable Pistol and Rifle Magazines
in U.S. Consumer Possession 1990 – 2018



Source: ATF AFMER, US ITC, Industry estimates

**INDUSTRY INTELLIGENCE REPORTS**

# U.S. Production by Manufacturer (2018)

| LICENSE NAME   HANDGUN | PISTOLS | REVOLVERS | TOTALS |
|---|---|---|---|
| SMITH & WESSON CORP | 886,917 | 210,333 | 1,097,250 |
| STURM, RUGER & COMPANY, INC | 704,588 | 145,534 | 850,122 |
| SIG SAUER INC | 635,155 | 0 | 635,155 |
| GLOCK INC | 247,546 | 0 | 247,546 |
| KIMBER MFG INC | 201,138 | 9,609 | 210,747 |
| HERITAGE MANUFACTURING INC | 0 | 187,104 | 187,104 |
| SCCY INDUSTRIES LLC | 169,819 | 0 | 169,819 |
| SPRINGFIELD INC | 140,037 | 0 | 140,037 |
| BROWNING ARMS COMPANY | 125,486 | 0 | 125,486 |
| TAURUS INTERNATIONAL MANUFACTURING INC | 94,600 | 0 | 94,600 |
| BERETTA USA CORP | 79,432 | 0 | 79,432 |
| KEL TEC CNC INDUSTRIES INC | 67,151 | 0 | 67,151 |
| COLT'S MANUFACTURING COMPANY LLC | 40,973 | 16,697 | 57,670 |
| FN AMERICA, LLC | 51,843 | 0 | 51,843 |
| NORTH AMERICAN ARMS INC | 365 | 49,171 | 49,536 |
| STRASSELLS MACHINE INC | 36,900 | 0 | 36,900 |
| DIAMONDBACK FIREARMS LLC | 36,591 | 0 | 36,591 |
| REMINGTON ARMS COMPANY LLC | 33,821 | 0 | 33,821 |
| COBRA ENTERPRISES OF UTAH, INC | 30,330 | 6 | 30,336 |
| CHARCO 2000 INC | 0 | 21,761 | 21,761 |
| VALLEY STEEL STAMP INC | 0 | 21,438 | 21,438 |
| PHOENIX ARMS | 20,000 | 0 | 20,000 |
| JIMENEZ ARMS INC | 19,927 | 0 | 19,927 |
| BOND ARMS, INC | 15,854 | 0 | 15,854 |
| AMERICAN TACTICAL  INC | 14,946 | 0 | 14,946 |
| SAEILO, INC | 13,449 | 0 | 13,449 |
| HASKELL MANUFACTURING INC | 12,800 | 0 | 12,800 |
| PALMETTO STATE ARMORY LLC | 9,613 | 0 | 9,613 |
| CZ-USA INC  (subsid. Dan Wesson) | 8,764 | 440 | 9,204 |
| FMK FIREARMS INCORPORATED | 8,359 | 0 | 8,359 |
| DANIEL DEFENSE INC | 7,565 | 0 | 7,565 |
| IBERIA FIREARMS INC | 7,400 | 0 | 7,400 |
| CZ USA | 6,444 | 0 | 6,444 |
| FREEDOM ORDNANCE MANUFACTURING INC | 6,229 | 0 | 6,229 |
| WILSONS GUN SHOP INC | 5,759 | 0 | 5,759 |
| CMMG INC | 5,730 | 0 | 5,730 |
| TRAILBLAZER FIREARMS LLC | 5,337 | 0 | 5,337 |
| STI FIREARMS LLC | 5,204 | 0 | 5,204 |
| ALPHATECH INC | 4,775 | 0 | 4,775 |
| KRISS USA, INC | 4,378 | 0 | 4,378 |
| HENRY RAC HOLDING CORP | 4,326 | 0 | 4,326 |
| HECKLER & KOCH, INC | 4,308 | 0 | 4,308 |
| PAUWAY CORP | 4,250 | 0 | 4,250 |
| RADICAL FIREARMS LLC | 3,907 | 0 | 3,907 |
| FULL CONCEAL INC | 3,675 | 0 | 3,675 |
| CENTURY ARMS INC | 3,299 | 0 | 3,299 |
| MASTERPIECE ARMS HOLDING COMPANY | 3,045 | 0 | 3,045 |
| DEL-TON, INC | 2,750 | 0 | 2,750 |
| PTR INDUSTRIES INC | 2,676 | 0 | 2,676 |
| VLH INC | 2,587 | 0 | 2,587 |
| HONOR DEFENSE LLC | 2,447 | 0 | 2,447 |
| NIGHTHAWK CUSTOM LLC | 2,429 | 0 | 2,429 |
| POLYMER80 INC | 2,203 | 0 | 2,203 |
| EXTAR LLC | 1,609 | 0 | 1,609 |
| FRANK ROTH CO INC | 0 | 1,490 | 1,490 |
| WHALLEY PRECISION INC | 1,479 | 0 | 1,479 |
| FEDERAL ARMAMENT LLC | 1,158 | 0 | 1,158 |
| LES BAER CUSTOM INC | 1,153 | 0 | 1,153 |
| LWRC INTERNATIONAL | 1,135 | 0 | 1,135 |
| ARES DEFENSE SYSTEMS INC | 1,126 | 0 | 1,126 |
| **TOTALS** | **3,842,344** | **664,832** | **4,507,176** |

NOTE: Manufacturers producing less than 1,000 handguns in 2018 are not displayed above, but all reported units are included in the total.

| LICENSE NAME   LONG GUNS | RIFLES | SHOTGUNS | TOTALS |
|---|---|---|---|
| STURM, RUGER & COMPANY, INC | 731,585 | 10 | 731,595 |
| REMINGTON ARMS COMPANY LLC | 273,246 | 155,488 | 428,734 |
| SAVAGE ARMS INC | 370,443 | 15,265 | 385,708 |
| MAVERICK ARMS, INC | 77,747 | 249,183 | 326,930 |
| SMITH & WESSON CORP | 278,372 | 228 | 278,600 |
| HENRY RAC HOLDING CORP | 238,158 | 3,914 | 242,072 |
| KEL TEC CNC INDUSTRIES INC | 74,557 | 22,698 | 97,255 |
| SPRINGFIELD INC | 63,536 | 0 | 63,536 |
| BP FIREARMS COMPANY LLC | 58,243 | 0 | 58,243 |
| HENRY WISCONSIN INC | 42,443 | 14,439 | 56,882 |
| KEYSTONE SPORTING ARMS LLC | 48,300 | 0 | 48,300 |
| DIAMONDBACK FIREARMS LLC | 46,593 | 0 | 46,593 |
| AERO PRECISION LLC | 43,000 * | 0 | 43,000 |
| STRASSELLS MACHINE INC | 39,500 | 0 | 39,500 |
| WEATHERBY INC | 28,925 | 10,297 | 39,222 |
| AMERICAN TACTICAL  INC | 31,747 | 3,116 | 34,863 |
| DEL-TON, INC | 33,416 | 0 | 33,416 |
| OUTDOOR COLORS LLC | 15,137 | 17,853 | 32,990 |
| BERETTA USA CORP | 2,496 | 25,669 | 28,165 |
| SIG SAUER INC | 26,799 | 0 | 26,799 |
| CENTURY ARMS INC | 24,249 | 0 | 24,249 |
| DANIEL DEFENSE INC | 23,884 | 47 | 23,931 |
| COLT'S MANUFACTURING COMPANY LLC | 21,613 | 0 | 21,613 |
| PALMETTO STATE ARMORY LLC | 20,990 | 0 | 20,990 |
| TDJ INC | 17,191 | 0 | 17,191 |
| RADICAL FIREARMS LLC | 15,809 | 0 | 15,809 |
| STAG ARMS LLC | 13,735 | 0 | 13,735 |
| KIMBER MFG INC | 13,674 | 0 | 13,674 |
| WM C ANDERSON INC | 13,336 | 0 | 13,336 |
| WINDHAM WEAPONRY INC | 11,240 | 0 | 11,240 |
| STRATEGIC ARMORY CORPS LLC | 8,120 | 0 | 8,120 |
| ROCK RIVER ARMS INC | 7,679 | 0 | 7,679 |
| LWRC INTERNATIONAL | 7,414 | 0 | 7,414 |
| I O INC | 7,343 | 0 | 7,343 |
| FEDERAL ARMAMENT LLC | 2,205 | 5,115 | 7,320 |
| CZ USA | 7,152 | 137 | 7,289 |
| BRAVO COMPANY MFG INC | 7,001 | 0 | 7,001 |
| PTR INDUSTRIES INC | 6,924 | 0 | 6,924 |
| BARRETT FIREARMS MFG INC | 6,187 | 286 | 6,473 |
| SAEILO, INC | 6,966 | 0 | 6,966 |
| O F MOSSBERG & SONS INC | 5,601 | 0 | 5,601 |
| PATRIOT ORDNANCE FACTORY INC | 4,863 | 0 | 4,863 |
| FN AMERICA, LLC | 4,803 | 0 | 4,803 |
| BEAR CREEK ARSENAL LLC | 4,305 | 0 | 4,305 |
| KRISS USA, INC | 4,170 | 0 | 4,170 |
| FORGE METAL FINISHING INC | 0 | 3,958 | 3,958 |
| BLACK RAIN ORDNANCE INC | 3,933 | 0 | 3,933 |
| CMMG INC | 3,621 | 0 | 3,621 |
| STANDARD MANUFACTURING CO LLC | 197 | 3,119 | 3,316 |
| JAMES RIVER ARMORY | 3,187 | 0 | 3,187 |
| TACTICAL SOLUTIONS INC | 2,988 | 0 | 2,988 |
| BROWNELLS INC | 2,687 | 0 | 2,687 |
| ALEX PRO FIREARMS LLC | 2,587 | 0 | 2,587 |
| PRIMARY WEAPONS SYSTEMS INC | 2,374 | 0 | 2,374 |
| TROY INDUSTRIES INC | 2,271 | 0 | 2,271 |
| WILSONS GUN SHOP INC | 2,003 | 144 | 2,147 |
| ADAMS ARMS LLC | 2,095 | 0 | 2,095 |
| FMK FIREARMS INCORPORATED | 2,075 | 0 | 2,075 |
| GOOD TIME OUTDOORS INC | 2,075 | 0 | 2,075 |
| DESERT TECH LLC | 2,013 | 0 | 2,013 |
| **TOTALS** | **2,905,178** | **536,119** | **3,441,297** |

NOTE: Manufacturers producing less than 2,000 long guns in 2018 are not displayed above, but all reported units are included in the total.

# Top 25 Manufacturers of Firearms Manufactured in the U.S.

(Based on Total U.S. Production in 2018)

| LICENSE NAME | PISTOLS | REVOLVERS | TOTAL HANDGUNS | RIFLES | SHOTGUNS | TOTAL LONG GUNS | TOTAL FIREARMS MANUFACTURED | % OF TOTAL 2018 U.S. HANGUN & LONG GUN PRODUCTION |
|---|---|---|---|---|---|---|---|---|
| STURM, RUGER & COMPANY, INC | 704,588 | 145,534 | 850,122 | 731,585 | 10 | 731,595 | 1,581,717 | 19.9% |
| SMITH & WESSON CORP | 886,917 | 210,333 | 1,097,250 | 278,372 | 228 | 278,600 | 1,375,850 | 17.3% |
| SIG SAUER INC | 635,155 | 0 | 635,155 | 26,799 | 0 | 26,799 | 661,954 | 8.3% |
| REMINGTON ARMS COMPANY LLC | 33,821 | 0 | 33,821 | 273,246 | 155,488 | 428,734 | 462,555 | 5.8% |
| SAVAGE ARMS, INC | 0 | 0 | 0 | 370,443 | 15,265 | 385,708 | 385,708 | 4.9% |
| MAVERICK ARMS, INC | 0 | 0 | 0 | 77,747 | 249,183 | 326,930 | 326,930 | 4.1% |
| GLOCK INC | 247,546 | 0 | 247,546 | 0 | 0 | 0 | 247,546 | 3.1% |
| HENRY RAC HOLDING CORP | 4,326 | 0 | 4,326 | 238,158 | 3,914 | 242,072 | 246,398 | 3.1% |
| KIMBER MFG INC | 201,138 | 9,609 | 210,747 | 13,674 | 0 | 13,674 | 224,421 | 2.8% |
| SPRINGFIELD INC | 140,037 | 0 | 140,037 | 63,536 | 0 | 63,536 | 203,573 | 2.6% |
| HERITAGE MANUFACTURING INC | 0 | 187,104 | 187,104 | 0 | 0 | 0 | 187,104 | 2.4% |
| SCCY INDUSTRIES LLC | 169,819 | 0 | 169,819 | 0 | 0 | 0 | 169,819 | 2.1% |
| KEL TEC CNC INDUSTRIES INC | 67,151 | 0 | 67,151 | 74,557 | 22,698 | 97,255 | 164,406 | 2.1% |
| BROWNING ARMS COMPANY | 125,486 | 0 | 125,486 | 912 | 0 | 912 | 126,398 | 1.6% |
| BERETTA USA CORP | 79,432 | 0 | 79,432 | 2,496 | 25,669 | 28,165 | 107,597 | 1.4% |
| TAURUS INTERNATIONAL MANUFACTURING INC | 94,600 | 0 | 94,600 | 97 | 0 | 97 | 94,697 | 1.2% |
| DIAMONDBACK FIREARMS LLC | 36,591 | 0 | 36,591 | 46,593 | 0 | 46,593 | 83,184 | 1.0% |
| COLT'S MANUFACTURING COMPANY LLC | 40,973 | 16,697 | 57,670 | 21,613 | 0 | 21,613 | 79,283 | 1.0% |
| STRASSELLS MACHINE INC | 36,900 | 0 | 36,900 | 39,500 | 0 | 39,500 | 76,400 | 1.0% |
| BP FIREARMS COMPANY LLC | 0 | 0 | 0 | 58,243 | 0 | 58,243 | 58,243 | 0.7% |
| HENRY WISCONSIN INC | 11 | 0 | 11 | 42,443 | 14,439 | 56,882 | 56,893 | 0.7% |
| FN AMERICA, LLC | 51,843 | 0 | 51,843 | 4,803 | 0 | 4,803 | 56,646 | 0.7% |
| AMERICAN TACTICAL  INC | 14,946 | 0 | 14,946 | 31,747 | 3,116 | 34,863 | 49,809 | 0.6% |
| NORTH AMERICAN ARMS INC | 365 | 49,171 | 49,536 | 0 | 0 | 0 | 49,536 | 0.6% |
| KEYSTONE SPORTING ARMS LLC | 823 | 0 | 823 | 48,300 | 0 | 48,300 | 49,123 | 0.6% |
| **Total Produced in 2018 by Top 25 Manufacturers** | **3,572,468** | **618,448** | **4,190,916** | **2,444,864** | **490,010** | **2,934,874** | **7,125,790** | **89.6%** |
|  | **93.0%** | **93.0%** | **93.0%** | **84.2%** | **91.4%** | **85.3%** | **89.6%** | |

Source:AFMER

**INDUSTRY** INTELLIGENCE REPORTS

# U.S. Manufacturers Direct Exports at a Glance (2018)

| PISTOL MANUFACTURER | EXPORTS |
|---|---|
| SIG SAUER INC | 167,851 |
| GLOCK INC | 110,943 |
| SMITH & WESSON CORP | 25,406 |
| STURM, RUGER & COMPANY, INC | 10,196 |
| BERETTA USA CORP | 5,145 |
| FN AMERICA, LLC | 2,377 |
| KIMBER MFG INC | 2,225 |
| COLT'S MANUFACTURING COMPANY LLC | 1,812 |
| STI FIREARMS LLC | 1,048 |
| REMINGTON ARMS COMPANY LLC | 827 |
| HENRY RAC HOLDING CORP | 720 |
| SPRINGFIELD INC | 693 |
| ANGSTADT ARMS LLC | 469 |
| TAURUS INTERNATIONAL MANUFACTURING INC | 390 |
| SCCY INDUSTRIES LLC | 270 |
| STRAYER VOIGT INC / STRAYER-VOIGT LLC | 251 |
| LES BAER CUSTOM INC | 242 |
| KEL TEC CNC INDUSTRIES INC | 213 |
| KRISS USA, INC | 197 |
| FMK FIREARMS INCORPORATED | 165 |
| SAEILO, INC | 121 |
| NIGHTHAWK CUSTOM LLC | 110 |
| WILSONS GUN SHOP INC | 103 |
| V CUSTOM INC | 52 |
| FEDERAL ARMAMENT LLC | 51 |
| CABOT GUN COMPANY LLC | 51 |
| PISTOL TOTAL | 332,218 |

| REVOLVER MANUFACTURER | EXPORTS |
|---|---|
| SMITH & WESSON CORP | 17,009 |
| STURM, RUGER & COMPANY, INC | 3,736 |
| KIMBER MFG INC | 254 |
| NORTH AMERICAN ARMS INC | 232 |
| COLT'S MANUFACTURING COMPANY LLC | 223 |
| REVOLVER TOTAL | 21,498 |

| SHOTGUN MANUFACTURER | EXPORTS |
|---|---|
| REMINGTON ARMS COMPANY LLC | 13,503 |
| MAVERICK ARMS, INC | 9,610 |
| KEL TEC CNC INDUSTRIES INC | 1,378 |
| SAVAGE ARMS, INC | 1,059 |
| WEATHERBY INC | 801 |
| HENRY RAC HOLDING CORP | 718 |
| GOOD, WILLIAM J | 341 |
| BERETTA USA CORP | 308 |
| SHOTGUN TOTAL | 27,774 |

| RIFLE MANUFACTURERS | EXPORTS |
|---|---|
| REMINGTON ARMS COMPANY LLC | 44,239 |
| STURM, RUGER & COMPANY, INC | 39,731 |
| SAVAGE ARMS, INC | 26,335 |
| HENRY RAC HOLDING CORP | 10,885 |
| SMITH & WESSON CORP | 10,483 |
| BEAR CREEK ARSENAL LLC | 8,501 |
| MAVERICK ARMS, INC | 5,758 |
| CREED MONARCH INC | 2,510 |
| SIG SAUER INC | 2,254 |
| WEATHERBY INC | 1,790 |
| KEL TEC CNC INDUSTRIES INC | 1,412 |
| DANIEL DEFENSE INC | 897 |
| BARRETT FIREARMS MFG INC | 797 |
| BP FIREARMS COMPANY LLC | 782 |
| TDJ INC | 754 |
| TNW FIREARMS INC | 648 |
| KRISS USA, INC | 647 |
| LEWIS MACHINE & TOOL CO | 576 |
| FREEDOM ORDNANCE MANUFACTURING INC | 540 |
| JUST RIGHT CARBINES LLC | 530 |
| DESERT TECH LLC | 497 |
| KIMBER MFG INC | 478 |
| COLT'S MANUFACTURING COMPANY LLC | 461 |
| M+M INC | 446 |
| STRATEGIC ARMORY CORPS LLC | 316 |
| FEDERAL ARMAMENT LLC | 298 |
| TROY INDUSTRIES INC | 280 |
| PNEU DART INC | 244 |
| TIPPMANN ARMS COMPANY LLC | 236 |
| PATRIOT ORDNANCE FACTORY INC | 207 |
| NORDIC COMPONENTS INC | 172 |
| STAG ARMS LLC | 160 |
| SPRINGFIELD INC | 156 |
| ZDF IMPORT/EXPORT, LLC | 156 |
| AMCHAR WHOLESALE, INC | 130 |
| JARD INC | 126 |
| V CUSTOM INC | 118 |
| WINDHAM WEAPONRY INC | 70 |
| AERO PRECISION LLC | 69 |
| GUNWERKS LLC | 51 |
| RIFLE TOTAL | 165,573 |

Source: Annual Firearms Manufacturing and Export Report (AFMER)
NOTE: A manufacturer that reported exporting less than 50 units does not appear in the tables above.



Source: AFMER

# Industry Statistics (current Snapshot)

The data listed on this page is sourced from the most current Census Bureau report. At this time it is the 2018 Annual Survey of Manufacturers. NAICS (North American Industry classification System) code 332992 represents "Small-Arms Ammunition," and NAICS code 332 represents "Fabricated-Metal-Product Manufacturing."

## DEFINITION OF TERMS

**Employees:** includes all full-time and part-time employees on the payroll of operating manufacturing establishments.

**Production workers:** includes workers (up through the line-supervisor level) actively engaged in the manufacturing process.

**Payroll:** includes the gross earnings of all employees paid in a calendar year.

**Value added:** measure of manufacturing activity derived by subtracting the cost of materials and supplies from the value of shipments (finished products and services rendered).

**Capital expenditures:** represents the total new and used expenditures reported by establishments in operation and any known plants under construction.

**Inventories:** includes products and materials held outside of the establishment, such as in warehouses (private or public).



**NOTE: The fabricated metal product manufacturing (NAICS code 332) subsector consists of all of these industry groups. Forging and Stamping: NAICS 3321; Cutlery and Handtool Manufacturing: NAICS 3322; Architectural and Structural Metals Manufacturing: NAICS 3323; Boiler, Tank, and Shipping Container Manufacturing: NAICS 3324; Hardware Manufacturing: NAICS 3325; Spring and Wire Product Manufacturing: NAICS 3326; Machine Shops; Turned Product; and Screw, Nut, and Bolt Manufacturing: NAICS 3327; Coating, Engraving, Heat Treating, and Allied Activities: NAICS 3328; Other Fabricated Metal Product Manufacturing: NAICS 3329.

| INDUSTRY STATISTIC | (332) Fabricated Metal Product Manufacturing (2018) | (332992) Firearms Ammunition Manufacturing (2018) | Ammunition Manufacturing as Percent of Total Fabricated Metal Product Manufacturing |
|---|---|---|---|
| **Employment & Labor Costs** | | | |
| Total number of employees | 1,400,643 | 11,851 | 0.8% |
| Number of production workers | 1,058,271 | 10,313 | 1.0% |
| Production workers hours worked | 2,048,355,000 | 21,128,000 | 1.0% |
| Production workers wages | $50,421,928,000 | $522,928,000 | 1.0% |
| Total annual payroll | $77,612,291,000 | $655,992,000 | 0.8% |
| Total fringe benefits | ** | ** | not available |
| **Total annual compensation** | **$77,612,291,000** | **$655,992,000** | **0.8%** |
| **Purchased Fuels and Electric Energy Used for Heat and Power** | | | |
| Electric energy purchased (kWh) | 42,369,630,000 | 400,619,000 | 0.9% |
| Cost of electric energy | $3,617,620,000 | $31,563,000 | 0.9% |
| Cost of purchased fuels | $1,263,081,000 | D* | not available |
| **Total cost of fuels and electric energy** | **$4,880,701,000** | **$31,563,000** | **0.6%** |
| **Capital Expenditures for Plant and Equipment** | | | |
| Capital expenditures for buildings and other structures | ** | ** | not available |
| Rental or lease payments (buildings and equipment) | $4,973,295,000 | $27,886,000 | 0.6% |
| Capital expenditures for machinery and equipment | ** | ** | not available |
| All other operating expenses | $29,322,789,000 | $317,891,000 | 1.1% |
| **Total capital expenditures for plant and equipment** | **$34,296,084,000** | **$345,777,000** | **1.0%** |
| **Value of Manufacturers' Inventories by Stage of Fabrication** | | | |
| **Beginning of Year** | | | |
| Finished products | $18,033,061,000 | $350,082,000 | 1.9% |
| Work-in-process | $12,548,241,000 | $232,261,000 | 1.9% |
| Materials and supplies inventories | $18,501,248,000 | $202,336,000 | 1.1% |
| **Total** | **$49,082,550,000** | **$784,679,000** | **1.6%** |
| **End of Year** | | | |
| Finished products | $19,272,292,000 | $379,817,000 | 2.0% |
| Work-in-process | $13,786,425,000 | $195,571,000 | 1.7% |
| Materials and supplies inventories | $20,902,305,000 | $204,010,000 | 1.0% |
| **Total** | **$53,961,022,000** | **$779,398,000** | **1.4%** |
| **Manufacturing Activity** | | | |
| **Total value of shipments** | **$375,880,137,000** | **$3,960,277,000** | **1.1%** |
| **Total cost of materials** | **$171,539,777,000** | **$1,659,962,000** | **1.0%** |
| **Value added** | **$206,817,774,000** | **$2,293,361,000** | **1.1%** |

Source: 2018 Annual Survey of Manufacturers (ASM)
NOTE: The D* indicates that information was withheld to avoid disclosing data for individual companies. Double asterisks, **, identify data fields that are expected to be available between November 2020 and January 2021.

**INDUSTRY** INTELLIGENCE REPORTS

## Manufacturing Trends

Small Arms Ammunition (NAICS 332992)

### ALL EMPLOYEES (NUMBER)

**10-Year Average**

Small Arms Ammunition: **10,892**

Bar chart values by year:
- 2009: 10,283
- 2010: 10,730
- 2011: 10,346
- 2012: 10,413
- 2013: 10,505
- 2014: 10,660
- 2015: 10,387
- 2016: 11,809
- 2017: 11,958
- 2018: 11,851



### PAYROLL ($ IN MILLIONS)

**10-Year Average**

Small Arms Ammunition: **$776M**

Bar chart values by year:
- 2009: 696
- 2010: 741
- 2011: 748
- 2012: 793
- 2013: 842
- 2014: 828
- 2015: 876
- 2016: 912
- 2017: 667
- 2018: 656



### VALUE ADDED ($ IN MILLIONS)

**10-Year Average**

Small Arms Ammunition: **$2,177M**

Bar chart values by year:
- 2009: 1,798
- 2010: 1,783
- 2011: 1,582
- 2012: 2,291
- 2013: 2,579
- 2014: 2,440
- 2015: 2,135
- 2016: 2,480
- 2017: 2,480
- 2018: 2,293



### COST OF MATERIALS ($ IN MILLIONS)

**10-Year Average**

Small Arms Ammunition: **$1,639M**

Bar chart values by year:
- 2009: 1,288
- 2010: 1,703
- 2011: 1,830
- 2012: 1,346
- 2013: 1,650
- 2014: 1,671
- 2015: 1,872
- 2016: 1,711
- 2017: 1,662
- 2018: 1,680

Source: U.S. Census Bureau Annual Survey of Manufacturers (ASM) and Economic Census reports



| U.S. Ammunition Consumer Market Unit Estimate | | | |
|---|---|---|---|
| **Category** | **2012** | **2015** | **2018** |
| Shotshell | 1.4 billion | 1.4 billion | 1.0 billion |
| Rimfire | 4.5 billion | 5.4 billion | 4.1 billion |
| Centerfire | 3.6 billion | 3.7 billion | 3.6 billion |
| **TOTALS** | **9.5 billion** | **10.5 billion** | **8.7 billion** |

Source: USITC and NSSF Estimates

**INDUSTRY INTELLIGENCE REPORTS**

# Firearm Imports By Country (2009 – 2018) (in actual units of quantity)

**Pistols:** HTS 9302000040 [PISTOLS, SEMIAUTOMATIC EXCEPT OF HEADING 9303 OR 9304] --or-- HTS 9302000090 [PISTOLS, EXCEPT OF HEADING 9303 OR 9304, NESOI (not elsewhere specified or included)]

| COUNTRY | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | 63,872 | 74,245 | 71,838 | 75,984 | 82,635 | 43,710 | 42,304 | 75,834 | 33,676 | 39,969 | 604,067 |
| Austria | 602,146 | 431,118 | 515,396 | 821,522 | 932,117 | 794,540 | 923,986 | 1,318,204 | 1,198,740 | 927,511 | 8,465,280 |
| Belgium | 33,195 | 18,874 | 9,769 | 10,754 | 14,493 | 18,221 | 18,679 | 25,299 | 21,691 | 25,410 | 196,385 |
| Brazil | 285,075 | 206,207 | 161,597 | 215,470 | 215,895 | 113,976 | 273,792 | 455,368 | 465,652 | 501,995 | 2,895,027 |
| Bulgaria | 2,881 | 3,325 | 1,450 | 4,586 | 8,397 | 270 | 6,267 | 3,290 | 1,174 | 1,293 | 32,933 |
| Canada | 10,544 | 6 | 2 | 13 | 36 | 134 | 15 | 4 | 106 | 1 | 10,861 |
| Colombia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 10 | 10 |
| Croatia | 272,204 | 239,021 | 211,001 | 389,014 | 451,657 | 441,337 | 338,535 | 574,486 | 326,653 | 295,107 | 3,539,015 |
| Czech Republic | 49,408 | 19,531 | 18,588 | 38,540 | 37,467 | 47,104 | 71,889 | 107,600 | 140,653 | 184,926 | 715,706 |
| Denmark | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 75 | 0 | 75 |
| Finland | 0 | 0 | 0 | 0 | 0 | 52 | 0 | 5 | 3 | 130 | 191 |
| France | 0 | 0 | 10 | 465 | 15 | 0 | 13 | 34 | 25 | 263 | 825 |
| Germany | 282,075 | 221,446 | 254,574 | 402,566 | 502,117 | 282,018 | 225,052 | 416,961 | 325,829 | 307,085 | 3,219,723 |
| Hungary | 7,950 | 349 | 311 | 695 | 777 | 898 | 1,521 | 852 | 488 | 883 | 14,724 |
| Israel | 10,238 | 2,645 | 9,995 | 20,017 | 23,979 | 13,189 | 15,618 | 22,342 | 15,174 | 11,979 | 145,176 |
| Italy | 81,811 | 86,867 | 63,540 | 154,999 | 171,221 | 106,462 | 48,909 | 129,456 | 124,490 | 97,909 | 1,065,664 |
| Japan | 0 | 0 | 0 | 0 | 0 | 40 | 0 | 0 | 0 | 0 | 40 |
| Norway | 14 | 21 | 14 | 0 | 1 | 10 | 28 | 23 | 0 | 24 | 135 |
| Pakistan | 0 | 0 | 0 | 0 | 0 | 161 | 250 | 575 | 175 | 400 | 1,561 |
| Philippines | 27,294 | 38,572 | 48,908 | 73,430 | 131,898 | 62,823 | 66,408 | 78,314 | 68,754 | 100,802 | 697,203 |
| Poland | 10,234 | 3,922 | 20,895 | 9,806 | 8,406 | 12,094 | 10,276 | 11 | 45 | 5,431 | 81,120 |
| Romania | 10,571 | 16,945 | 13,775 | 3,579 | 3,655 | 5,800 | 9,460 | 5,272 | 10,331 | 23,562 | 102,930 |
| Russia | 90 | 1,050 | 5,400 | 61 | 772 | 0 | 0 | 60 | 17 | 0 | 7,450 |
| Serbia | 3,038 | 12,455 | 720 | 29,204 | 48,786 | 10,180 | 18,066 | 12,823 | 16,470 | 5,575 | 157,317 |
| Slovakia | 0 | 0 | 0 | 801 | 1,204 | 417 | 1,075 | 1,223 | 2,196 | 1,996 | 8,912 |
| Slovenia | 0 | 0 | 0 | 0 | 0 | 0 | 1,058 | 7,083 | 6,014 | 3,232 | 17,387 |
| South Africa | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 0 | 0 | 18 | 35 |
| South Korea | 20 | 29 | 0 | 1,021 | 3,879 | 62 | 0 | 47 | 0 | 70 | 5,128 |
| Spain | 410 | 989 | 322 | 376 | 262 | 10,485 | 83 | 622 | 22,793 | 21,022 | 57,364 |
| Sweden | 0 | 0 | 13 | 45 | 31 | 9 | 0 | 0 | 4 | 35 | 137 |
| Switzerland | 2,207 | 735 | 979 | 3,110 | 5,508 | 2,222 | 3,953 | 2,289 | 6,982 | 10,600 | 38,585 |
| Turkey | 17,984 | 15,825 | 15,408 | 25,798 | 92,321 | 17,446 | 61,948 | 87,999 | 81,330 | 70,923 | 486,982 |
| United Arab Em | 0 | 0 | 0 | 3,814 | 909 | 47 | 0 | 110 | 300 | 0 | 5,180 |
| United Kingdom | 0 | 1 | 4,355 | 1 | 63 | 149 | 59 | 66 | 2 | 155 | 4,851 |
| **TOTALS** | **1,774,261** | **1,394,178** | **1,448,435** | **2,286,720** | **2,738,747** | **1,983,945** | **2,139,744** | **3,326,334** | **2,871,027** | **2,637,916** | **22,601,307** |

## Revolvers: HTS 9302000020 [REVOLVERS, EXCEPT OF HEADING 9303 OR 9304]

| COUNTRY | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | 303 | 0 | 0 | 200 | 0 | 100 | 0 | 0 | 0 | 0 | 603 |
| Brazil | 368,128 | 319,804 | 198,249 | 228,876 | 236,270 | 98,480 | 211,847 | 201,544 | 238,101 | 162,703 | 2,264,002 |
| Czech Republic | 6,287 | 9 | 83 | 38 | 0 | 0 | 0 | 115 | 42 | 58 | 6,632 |
| France | 0 | 0 | 0 | 2 | 350 | 163 | 8 | 420 | 497 | 233 | 1,673 |
| Germany | 9,367 | 8,431 | 9,423 | 11,416 | 11,747 | 11,906 | 12,010 | 15,383 | 15,724 | 16,224 | 121,631 |
| Italy | 16,929 | 18,536 | 27,847 | 40,238 | 53,152 | 48,617 | 45,843 | 50,665 | 49,889 | 56,311 | 408,027 |
| Philippines | 6,127 | 6,054 | 5,339 | 6,666 | 8,915 | 8,198 | 13,049 | 18,852 | 19,034 | 22,816 | 115,050 |
| Poland | 0 | 0 | 0 | 0 | 0 | 79 | 507 | 0 | 0 | 0 | 586 |
| Russia | 0 | 0 | 11,500 | 11,486 | 0 | 0 | 0 | 0 | 0 | 0 | 22,986 |
| Serbia | 0 | 0 | 0 | 0 | 1,872 | 0 | 0 | 0 | 0 | 0 | 1,872 |
| Slovakia | 1,503 | 260 | 640 | 480 | 0 | 0 | 0 | 0 | 0 | 0 | 2,883 |
| Spain | 0 | 0 | 0 | 0 | 0 | 0 | 156 | 586 | 0 | 0 | 742 |
| Switzerland | 23 | 3 | 12 | 0 | 268 | 0 | 18 | 5 | 28 | 63 | 420 |
| Turkey | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 125 | 250 | 0 | 395 |
| Ukraine | 1,000 | 0 | 5,500 | 0 | 4,000 | 0 | 0 | 0 | 0 | 0 | 10,500 |
| United Arab Em | 0 | 0 | 285 | 4,995 | 0 | 0 | 0 | 0 | 0 | 0 | 5,280 |
| United Kingdom | 489 | 360 | 0 | 0 | 1 | 83 | 0 | 20 | 5 | 56 | 1,014 |
| **TOTALS** | **410,156** | **353,457** | **258,878** | **304,397** | **316,582** | **167,646** | **283,438** | **287,723** | **323,572** | **258,465** | **2,964,314** |

Note: Countries with limited activity over this 10-year period are not shown; however, the totals include the units from all countries.
Source: Data from the U.S. Department of Commerce and the U.S. International Trade Commission.

More detail on import and export data is available through the USITC website at dataweb.usitc.gov/. To obtain the highest level of product definition, use the HTS (Harmonized Tariff Schedule) 10-digit codes whenever possible.

Refer to the most current 'Harmonized Tariff Schedule' for IMPORT codes and to 'Schedule B' for EXPORT codes. Note that import and export codes do not always match.

The import and export data on DataWeb for 2010 – 2018 have been updated as of June 21, 2020 based on the latest official revisions from the Census Bureau (the first official revisions for 2020 data will not be available until June 2021).

For posted corrections pertaining to years prior to 2010, go to: census.gov/foreign-trade/statistics/corrections/index.html



**INDUSTRY** INTELLIGENCE REPORTS

# Firearm Imports By Country (2009 – 2018) (in actual units of quantity)

## Shotguns: HTS 930320 [SPORTING, HUNTING OR TARGET-SHOTING SHOTGUNS, INCLUDING COMBINATION SHOTGUN-RIFLES, EXCEPT MUZZLELOADING FIREARMS]

| Country | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Austria | 245 | 497 | 1,507 | 783 | 618 | 34 | 716 | 65 | 19 | 1,264 | 5,748 |
| Belgium | 25 | 48 | 114 | 157 | 9 | 1,377 | 715 | 546 | 120 | 3,768 | 6,879 |
| Brazil | 172,369 | 169,136 | 105,676 | 125,891 | 119,090 | 58,729 | 38,225 | 39,225 | 36,947 | 61,082 | 926,370 |
| Canada | 13 | 0 | 13 | 26 | 5 | 0 | 192 | 148 | 0 | 0 | 397 |
| China | 53,336 | 61,956 | 90,952 | 154,446 | 234,486 | 112,095 | 164,818 | 149,091 | 140,171 | 111,696 | 1,273,047 |
| Czech Republic | 1,738 | 34 | 6 | 0 | 142 | 50 | 109 | 22 | 15 | 43 | 2,159 |
| France | 20 | 20 | 10 | 6,284 | 10 | 9 | 23 | 84 | 116 | 79 | 6,655 |
| Germany | 1,254 | 2,364 | 2,204 | 3,467 | 1,370 | 1,224 | 1,547 | 2,371 | 2,284 | 3,589 | 21,674 |
| Hungary | 0 | 0 | 0 | 34 | 0 | 0 | 0 | 50 | 0 | 0 | 84 |
| Italy | 140,500 | 139,182 | 137,767 | 170,460 | 212,557 | 206,773 | 199,231 | 182,368 | 138,323 | 168,368 | 1,695,529 |
| Japan | 1,148 | 344 | 1,834 | 2,875 | 1,525 | 652 | 907 | 766 | 733 | 931 | 11,715 |
| Pakistan | 5 | 4 | 0 | 0 | 19 | 0 | 335 | 0 | 250 | 0 | 613 |
| Philippines | 560 | 1,139 | 950 | 5,500 | 9,800 | 6,496 | 6,400 | 7,100 | 3,100 | 8,050 | 49,095 |
| Portugal | 5 | 704 | 2,115 | 2,384 | 6,415 | 3,465 | 4,175 | 78 | 10 | 33 | 19,384 |
| Russia | 60,937 | 3,708 | 50,837 | 47,360 | 34,904 | 21,830 | 5,150 | 12,420 | 7,410 | 14 | 244,570 |
| Spain | 4,628 | 1,722 | 1,328 | 1,692 | 1,620 | 1,746 | 839 | 2,637 | 4,191 | 1,554 | 21,957 |
| Sweden | 133 | 42 | 0 | 238 | 143 | 228 | 2 | 183 | 91 | 27 | 1,087 |
| Turkey | 113,618 | 122,721 | 122,682 | 174,212 | 306,312 | 233,571 | 220,310 | 335,190 | 295,362 | 342,184 | 2,265,962 |
| United Kingdom | 8,046 | 6,099 | 8,251 | 8,836 | 8,922 | 490 | 578 | 4,042 | 2,847 | 3,864 | 51,975 |
| **TOTALS** | **558,679** | **509,792** | **530,564** | **704,828** | **937,952** | **648,592** | **644,274** | **736,443** | **631,998** | **706,648** | **6,604,900** |

Source: Data on this page have been compiled from the U.S. Department of Commerce and the U.S. International Trade Commission (USITC).
NOTE: The bottom-line total accounts for all imports under the HTS code listed, but countries with limited activity over the period shown are not displayed.



## Rifles: HTS 930330 [SPORTING, HUNTING OR TARGET-SHOTING RIFLES, EXCEPT MUZZLELOADING FIREARMS AND COMBINATION SHOTGUN-RIFLES] (Adjusted to EXCLUDE HTS codes 9303304010 & 9303308005 - Telescopic Sights Imported with Rifles)

| Country | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Australia | 2 | 5 | 23 | 1 | 1 | 0 | 0 | 61 | 0 | 820 | 913 |
| Austria | 2,593 | 2,756 | 6,192 | 6,319 | 8,966 | 2,988 | 1,109 | 3,387 | 3,113 | 4,778 | 42,201 |
| Belgium | 21,819 | 16,017 | 16,317 | 20,634 | 29,920 | 34,067 | 54,497 | 58,129 | 40,268 | 29,651 | 321,319 |
| Brazil | 94,858 | 46,243 | 156,847 | 316,577 | 404,234 | 56,411 | 78,585 | 31,204 | 19,317 | 138,931 | 1,343,207 |
| Bulgaria | 5,142 | 0 | 0 | 10,790 | 31,087 | 12,900 | 5,100 | 290 | 1,816 | 3,000 | 70,125 |
| Canada | 161,552 | 134,519 | 156,860 | 267,993 | 292,404 | 258,803 | 276,821 | 225,108 | 202,119 | 172,406 | 2,148,585 |
| China | 0 | 0 | 0 | 0 | 1,050 | 4,049 | 0 | 0 | 0 | 0 | 5,099 |
| Czech Republic | 16,774 | 15,072 | 20,236 | 23,264 | 25,507 | 25,412 | 28,125 | 31,385 | 27,080 | 27,877 | 240,732 |
| Denmark | 157 | 179 | 169 | 0 | 0 | 0 | 0 | 0 | 81 | 0 | 586 |
| Finland | 32,623 | 26,464 | 23,417 | 33,536 | 43,858 | 40,183 | 50,492 | 56,614 | 35,285 | 34,728 | 377,200 |
| France | 60 | 42 | 64 | 64 | 47 | 50 | 482 | 307 | 739 | 544 | 2,399 |
| Germany | 101,939 | 32,476 | 42,116 | 96,013 | 134,305 | 39,376 | 16,008 | 30,229 | 9,976 | 15,043 | 517,481 |
| Hungary | 18,050 | 0 | 354 | 0 | 0 | 0 | 0 | 0 | 0 | 350 | 18,754 |
| Israel | 0 | 0 | 0 | 18,502 | 27,771 | 4,302 | 24,965 | 6,615 | 3,678 | 85,834 |
| Italy | 21,829 | 16,393 | 12,222 | 20,705 | 53,115 | 27,943 | 26,981 | 18,873 | 14,526 | 18,276 | 230,863 |
| Japan | 83,329 | 49,946 | 59,471 | 71,538 | 76,399 | 89,657 | 87,012 | 98,324 | 76,676 | 67,825 | 760,177 |
| Mexico | 1,770 | 0 | 0 | 0 | 200 | 800 | 0 | 0 | 0 | 0 | 2,770 |
| Netherlands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 |
| New Zealand | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 3 | 1 | 1 | 8 |
| Philippines | 4,092 | 2,050 | 1,430 | 2,437 | 5,909 | 7,435 | 5,603 | 4,847 | 3,725 | 7,430 | 44,958 |
| Poland | 1,313 | 0 | 1,081 | 2,170 | 510 | 1,454 | 527 | 5 | 778 | 2,576 | 10,414 |
| Portugal | 14,173 | 4,740 | 0 | 250 | 4 | 1,298 | 2,117 | 1,842 | 8,037 | 6,287 | 38,748 |
| Romania | 82,312 | 33,855 | 37,648 | 46,533 | 44,734 | 14,039 | 17,870 | 8,220 | 5,735 | 7,053 | 297,999 |
| Russia | 22,933 | 50,547 | 87,681 | 74,512 | 71,230 | 29,864 | 4,404 | 28,832 | 8,430 | 0 | 378,433 |
| Serbia | 1,224 | 13,468 | 7,562 | 20,320 | 44,672 | 12,720 | 17,357 | 18,139 | 8,394 | 154 | 144,010 |
| South Africa | 0 | 4 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 42 |
| Spain | 1,532 | 6,898 | 10,015 | 18,989 | 17,403 | 9,411 | 25,393 | 26,679 | 39,632 | 56,182 | 212,134 |
| Sweden | 55 | 0 | 138 | 114 | 375 | 758 | 113 | 552 | 298 | 75 | 2,478 |
| Switzerland | 2,275 | 1,260 | 441 | 163 | 3,607 | 3,889 | 510 | 526 | 674 | 1,917 | 15,262 |
| Turkey | 200 | 400 | 1,153 | 475 | 0 | 15 | 339 | 2,428 | 1,330 | 2,020 | 8,360 |
| Ukraine | 0 | 6,800 | 10,600 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17,400 |
| United Kingdom | 5,183 | 6,665 | 3,979 | 3,575 | 4,243 | 5,028 | 4,668 | 6,019 | 4,748 | 5,680 | 49,803 |
| **TOTALS** | **697,800** | **466,799** | **656,256** | **1,039,716** | **1,313,678** | **706,362** | **708,436** | **676,987** | **519,400** | **607,293** | **7,392,727** |

Source: Data on this page have been compiled from the U.S. Department of Commerce and the U.S. International Trade Commission (USITC).
NOTE: The bottom-line total accounts for all imports under the HTS code listed, but countries with limited activity over the period shown are not displayed. Units posted under Russia in 2009 were revised per posted corrections, Census Bureau.

## Muzzleloaders: HTS=930310 [MUZZLELOADING]

| Country | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brazil | 480 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 480 |
| China | 56 | 0 | 1,500 | 0 | 0 | 0 | 0 | 0 | 0 | 150 | 1,706 |
| France | 0 | 0 | 0 | 0 | 2,300 | 0 | 2 | 0 | 0 | 2,355 | 4,657 |
| Germany | 30 | 5 | 4,183 | 0 | 0 | 0 | 401 | 0 | 0 | 60 | 4,679 |
| India | 27 | 87 | 21 | 90 | 135 | 26 | 28 | 0 | 0 | 0 | 414 |
| Italy | 37,595 | 26,171 | 32,613 | 40,559 | 44,007 | 51,730 | 42,077 | 37,499 | 38,472 | 31,060 | 381,783 |
| Spain | 103,468 | 129,472 | 128,778 | 124,509 | 133,189 | 122,861 | 111,834 | 112,951 | 107,112 | 104,701 | 1,178,875 |
| Taiwan | 0 | 0 | 0 | 0 | 0 | 0 | 65 | 0 | 0 | 87 | 152 |
| United Kingdom | 0 | 83 | 0 | 0 | 0 | 0 | 498 | 1 | 1 | 1,934 | 2,517 |
| **TOTALS** | **141,656** | **155,818** | **167,095** | **165,158** | **179,631** | **174,919** | **154,848** | **150,518** | **145,989** | **140,347** | **1,575,979** |

Source: Data on this page have been compiled from the U.S. Department of Commerce and the U.S. International Trade Commission (USITC).
NOTE: The bottom-line total accounts for all imports under the HTS code listed, but countries with limited activity over the period shown are not displayed.

**INDUSTRY** INTELLIGENCE REPORTS

## U.S. Imports for Consumption (1991 – 2018)

| | Year | Revolvers & Pistols (930200) | Rifles (930330) | Shotguns (930320) | Muzzleloaders (930310) | TOTAL FIREARMS |
|---|---|---|---|---|---|---|
| **IMPORTS** | 1991 | 692,282 | 348,765 | 98,645 | 179,674 | 1,319,366 |
| | 1992 | 876,314 | 407,643 | 325,345 | 148,679 | 1,757,981 |
| | 1993 | 1,169,123 | 749,433 | 132,502 | 197,899 | 2,248,957 |
| | 1994 | 1,383,279 | 733,277 | 142,590 | 259,975 | 2,519,121 |
| | 1995 | 825,127 | 286,218 | 136,733 | 331,168 | 1,579,246 |
| | 1996 | 663,801 | 234,931 | 145,676 | 221,585 | 1,265,993 |
| | 1997 | 1,316,931 | 266,869 | 142,067 | 185,145 | 1,911,012 |
| | 1998 | 590,661 | 229,051 | 163,663 | 186,514 | 1,169,889 |
| | 1999 | 677,757 | 313,980 | 335,489 | 155,764 | 1,482,990 |
| | 2000 | 712,661 | 321,316 | 332,704 | 259,315 | 1,625,996 |
| | 2001 | 710,958 | 322,201 | 428,308 | 345,534 | 1,807,001 |
| | 2002 | 971,135 | 458,684 | 498,535 | 380,499 | 2,308,853 |
| | 2003 | 762,764 | 517,509 | 498,677 | 353,673 | 2,132,623 |
| | 2004 | 838,856 | 491,932 | 507,050 | 379,883 | 2,217,721 |
| | 2005 | 878,172 | 448,862 | 546,261 | 244,564 | 2,117,859 |
| | 2006 | 1,164,973 | 516,127 | 607,894 | 208,279 | 2,497,273 |
| | 2007 | 1,387,428 | 612,837 | 725,635 | 222,404 | 2,948,304 |
| | 2008 | 1,468,062 | 538,283 | 535,960 | 170,998 | 2,713,303 |
| | 2009 | 2,184,417 | 697,800 | 558,679 | 141,656 | 3,582,552 |
| | 2010 | 1,747,635 | 466,799 | 509,792 | 155,818 | 2,880,044 |
| | 2011 | 1,707,313 | 656,256 | 530,564 | 167,095 | 3,061,228 |
| | 2012 | 2,591,117 | 1,039,716 | 704,828 | 165,158 | 4,500,819 |
| | 2013 | 3,055,329 | 1,313,678 | 937,952 | 179,631 | 5,486,590 |
| | 2014 | 2,151,591 | 706,362 | 648,592 | 174,919 | 3,681,464 |
| | 2015 | 2,423,182 | 708,436 | 644,274 | 154,848 | 3,930,740 |
| | 2016 | 3,614,057 | 676,987 | 736,443 | 150,518 | 5,178,005 |
| | 2017 | 3,194,599 | 519,400 | 631,998 | 145,989 | 4,491,986 |
| | 2018 | 2,896,381 | 607,293 | 706,648 | 140,347 | 4,350,669 |
| | **AVERAGE** | | | | | |
| | 5-year (2014 – 2018) | 2,855,962 | 643,696 | 673,591 | 153,324 | 4,326,573 |
| | 10-year (2009 – 2018) | 2,556,562 | 739,273 | 660,977 | 157,598 | 4,114,410 |
| | 15-year (2004 – 2018) | 2,086,874 | 666,718 | 635,505 | 186,807 | 3,575,904 |
| | 20-year (1999 – 2018) | 1,756,919 | 596,723 | 581,314 | 214,845 | 3,149,801 |
| | 25-year (1994 – 2018) | 1,596,727 | 547,392 | 494,280 | 219,251 | 2,857,651 |

## Total U.S. Exports (1991 – 2018)

| | Year | Revolvers & Pistols (930200) | Rifles (930330) | Shotguns (930320) | Muzzleloaders (930310) | TOTAL FIREARMS |
|---|---|---|---|---|---|---|
| **EXPORTS** | 1991 | 223,248 | 152,647 | 165,574 | 4,823 | 546,292 |
| | 1992 | 210,358 | 152,062 | 157,109 | 5,065 | 524,594 |
| | 1993 | 170,378 | 125,694 | 175,563 | 29,930 | 501,565 |
| | 1994 | 195,031 | 131,034 | 163,031 | 31,872 | 520,968 |
| | 1995 | 218,826 | 106,504 | 125,387 | 4,589 | 455,306 |
| | 1996 | 193,647 | 101,961 | 115,555 | 15,908 | 427,071 |
| | 1997 | 146,846 | 106,838 | 105,814 | 30,785 | 390,283 |
| | 1998 | 124,295 | 85,755 | 136,652 | 11,248 | 357,950 |
| | 1999 | 116,467 | 69,389 | 82,046 | 7,680 | 275,582 |
| | 2000 | 80,249 | 67,188 | 95,782 | 6,063 | 249,282 |
| | 2001 | 86,041 | 83,671 | 123,430 | 19,361 | 312,503 |
| | 2002 | 82,338 | 102,588 | 133,559 | 8,290 | 326,775 |
| | 2003 | 73,337 | 102,429 | 95,299 | 7,294 | 278,359 |
| | 2004 | 69,316 | 236,525 | 94,854 | 10,035 | 410,730 |
| | 2005 | 80,882 | 142,252 | 115,083 | 12,587 | 350,804 |
| | 2006 | 90,944 | 150,493 | 130,310 | 9,536 | 381,283 |
| | 2007 | 133,774 | 220,593 | 157,536 | 13,439 | 525,342 |
| | 2008 | 151,290 | 264,114 | 171,360 | 11,849 | 598,613 |
| | 2009 | 162,951 | 199,417 | 123,209 | 11,185 | 496,762 |
| | 2010 | 201,231 | 205,950 | 150,956 | 12,842 | 570,979 |
| | 2011 | 247,738 | 263,223 | 172,770 | 8,786 | 692,517 |
| | 2012 | 220,923 | 315,783 | 180,634 | 9,841 | 727,181 |
| | 2013 | 268,024 | 363,950 | 146,624 | 5,664 | 784,262 |
| | 2014 | 234,329 | 431,890 | 158,471 | 9,180 | 833,870 |
| | 2015 | 201,390 | 328,395 | 101,656 | 5,693 | 637,134 |
| | 2016 | 240,642 | 266,589 | 81,689 | 10,603 | 599,523 |
| | 2017 | 278,082 | 346,936 | 79,854 | 5,159 | 710,031 |
| | 2018 | 400,172 | 309,312 | 71,994 | 35,711 | 817,189 |
| | **AVERAGE** | | | | | |
| | 5-year (2014 – 2018) | 270,923 | 336,624 | 98,733 | 13,269 | 719,549 |
| | 10-year (2009 – 2018) | 245,548 | 303,145 | 126,786 | 11,466 | 686,945 |
| | 15-year (2004 – 2018) | 198,779 | 269,695 | 129,133 | 11,474 | 609,081 |
| | 20-year (1999 – 2018) | 171,006 | 223,534 | 123,356 | 11,040 | 528,936 |
| | 25-year (1994 – 2018) | 171,951 | 200,111 | 124,542 | 12,608 | 509,212 |

Source: U.S. International Trade Commission (USITC)        NOTE: Rifle imports adjusted to exclude HTS codes 9303304010 and 9303308005 (telescopic sights imported with rifles.)

# U.S. Firearms Total Exports (1991 – 2018)

PISTOLS (2005 – 2018)

REVOLVERS (2005 – 2018)

RIFLES (1991 – 2018)

SHOTGUNS (1991 – 2018)

MUZZLELOADERS(1991 – 2018)

Source: U.S. International Trade Commission (USITC)

# Total Firearm Units Produced for the United States Market Annually

| YEAR | Handguns Produced in U.S. | Handguns Imported into U.S. | Handguns Exported out of U.S. | Total Handguns | Rifles Produced in U.S. | Rifles Imported into U.S. | Rifles Exported out of U.S. | Total Rifles | Shotguns Produced in U.S. | Shotguns Imported into U.S. | Shotguns Exported out of U.S. | Total Shotguns | TOTAL HANDGUNS, RIFLES & SHOTGUNS | % Change Yoy | YEAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1991 | 1,835,218 | 692,282 | 223,248 | 2,304,252 | 883,482 | 348,765 | 152,647 | 1,079,600 | 828,426 | 98,645 | 165,574 | 761,497 | 4,145,349 | - | 1991 |
| 1992 | 2,138,950 | 876,314 | 210,358 | 2,804,906 | 1,001,708 | 407,643 | 152,062 | 1,257,289 | 1,018,204 | 325,345 | 157,109 | 1,186,440 | 5,248,635 | 26.6% | 1992 |
| 1993 | 2,655,654 | 1,169,123 | 170,378 | 3,654,399 | 1,173,694 | 749,433 | 125,694 | 1,797,433 | 1,148,939 | 132,502 | 175,563 | 1,105,878 | 6,557,710 | 24.9% | 1993 |
| 1994 | 2,590,748 | 1,383,279 | 195,031 | 3,778,996 | 1,316,607 | 733,277 | 131,034 | 1,918,850 | 1,254,924 | 142,590 | 163,031 | 1,234,483 | 6,932,329 | 5.7% | 1994 |
| 1995 | 1,722,948 | 825,127 | 218,826 | 2,329,249 | 1,441,120 | 286,218 | 106,504 | 1,620,834 | 1,176,958 | 136,733 | 125,387 | 1,188,304 | 5,138,387 | -25.9% | 1995 |
| 1996 | 1,486,472 | 663,801 | 193,647 | 1,956,626 | 1,424,315 | 234,931 | 101,961 | 1,557,285 | 925,732 | 145,676 | 115,555 | 955,853 | 4,469,764 | -13.0% | 1996 |
| 1997 | 1,406,505 | 1,316,931 | 146,846 | 2,576,590 | 1,251,341 | 266,869 | 106,838 | 1,411,372 | 915,978 | 142,067 | 105,814 | 952,231 | 4,940,193 | 10.5% | 1997 |
| 1998 | 1,284,755 | 590,661 | 124,295 | 1,751,121 | 1,345,899 | 229,051 | 85,755 | 1,489,195 | 1,036,520 | 163,663 | 136,652 | 1,063,531 | 4,303,847 | -12.9% | 1998 |
| 1999 | 1,331,230 | 677,757 | 116,467 | 1,892,520 | 1,569,685 | 313,980 | 69,389 | 1,814,276 | 1,106,995 | 335,489 | 82,046 | 1,360,438 | 5,067,234 | 17.7% | 1999 |
| 2000 | 1,281,861 | 712,661 | 80,249 | 1,914,273 | 1,583,042 | 321,316 | 67,188 | 1,837,170 | 898,442 | 332,704 | 95,782 | 1,135,364 | 4,886,807 | -3.6% | 2000 |
| 2001 | 946,979 | 710,958 | 86,041 | 1,571,896 | 1,284,554 | 322,201 | 83,671 | 1,523,084 | 679,813 | 428,308 | 123,430 | 984,691 | 4,079,671 | -16.5% | 2001 |
| 2002 | 1,088,584 | 971,135 | 82,338 | 1,977,381 | 1,515,286 | 458,684 | 102,588 | 1,871,382 | 741,325 | 498,535 | 133,559 | 1,106,301 | 4,955,064 | 21.5% | 2002 |
| 2003 | 1,121,024 | 762,764 | 73,337 | 1,810,451 | 1,430,324 | 517,509 | 102,429 | 1,845,404 | 726,078 | 498,677 | 95,299 | 1,129,456 | 4,785,311 | -3.4% | 2003 |
| 2004 | 1,022,610 | 838,856 | 69,316 | 1,792,150 | 1,325,138 | 491,932 | 236,525 | 1,580,545 | 731,769 | 507,050 | 94,854 | 1,143,965 | 4,516,660 | -5.6% | 2004 |
| 2005 | 1,077,630 | 878,172 | 80,882 | 1,874,920 | 1,431,372 | 448,862 | 142,252 | 1,737,982 | 709,313 | 546,261 | 115,083 | 1,140,491 | 4,753,393 | 5.2% | 2005 |
| 2006 | 1,403,329 | 1,164,973 | 90,944 | 2,477,358 | 1,496,505 | 516,127 | 150,493 | 1,862,139 | 714,618 | 607,894 | 130,310 | 1,192,202 | 5,531,699 | 16.4% | 2006 |
| 2007 | 1,610,998 | 1,387,428 | 133,774 | 2,864,652 | 1,610,923 | 612,837 | 220,593 | 2,003,167 | 645,231 | 725,635 | 157,536 | 1,213,330 | 6,081,149 | 9.9% | 2007 |
| 2008 | 1,819,024 | 1,468,062 | 151,290 | 3,135,796 | 1,746,139 | 538,283 | 264,114 | 2,020,308 | 630,710 | 535,960 | 171,360 | 995,310 | 6,151,414 | 1.2% | 2008 |
| 2009 | 2,415,815 | 2,184,417 | 162,951 | 4,437,281 | 2,253,103 | 697,800 | 199,417 | 2,751,486 | 752,699 | 558,679 | 123,209 | 1,188,169 | 8,376,936 | 36.2% | 2009 |
| 2010 | 2,646,504 | 1,747,635 | 201,231 | 4,192,908 | 1,830,556 | 466,799 | 205,950 | 2,091,405 | 743,378 | 509,792 | 150,956 | 1,102,214 | 7,386,527 | -11.8% | 2010 |
| 2011 | 3,037,112 | 1,707,313 | 247,738 | 4,496,687 | 2,305,854 | 656,256 | 263,223 | 2,698,887 | 862,401 | 530,564 | 172,770 | 1,220,195 | 8,415,769 | 13.9% | 2011 |
| 2012 | 3,978,438 | 2,591,117 | 220,923 | 6,348,632 | 3,109,940 | 1,039,716 | 315,783 | 3,833,873 | 949,010 | 704,828 | 180,634 | 1,473,204 | 11,655,709 | 38.5% | 2012 |
| 2013 | 5,039,832 | 3,055,329 | 268,024 | 7,827,137 | 3,996,673 | 1,313,678 | 363,950 | 4,946,401 | 1,203,072 | 937,952 | 146,624 | 1,994,400 | 14,767,938 | 26.7% | 2013 |
| 2014 | 4,346,624 | 2,151,591 | 234,329 | 6,263,886 | 3,379,009 | 706,362 | 431,890 | 3,653,481 | 935,411 | 648,592 | 158,471 | 1,425,532 | 11,342,899 | -23.2% | 2014 |
| 2015 | 4,437,613 | 2,423,182 | 201,390 | 6,659,405 | 3,701,443 | 708,436 | 328,395 | 4,081,484 | 777,273 | 644,274 | 101,656 | 1,319,891 | 12,060,780 | 6.3% | 2015 |
| 2016 | 5,562,218 | 3,614,057 | 240,642 | 8,935,633 | 4,998,692 | 676,987 | 266,589 | 4,609,090 | 848,615 | 736,443 | 81,689 | 1,503,369 | 15,048,092 | 24.8% | 2016 |
| 2017 | 4,411,923 | 3,194,599 | 278,082 | 7,328,440 | 2,821,945 | 519,400 | 346,936 | 2,994,409 | 667,350 | 631,998 | 79,854 | 1,219,494 | 11,542,343 | -23.3% | 2017 |
| 2018 | 4,507,176 | 2,896,381 | 400,172 | 7,003,385 | 2,905,178 | 607,293 | 309,312 | 3,203,159 | 536,119 | 706,648 | 71,994 | 1,170,773 | 11,377,317 | -1.4% | 2018 |
| 2019 Interim | 3,614,982 | 2,561,076 | 230,930 | 5,945,128 | 1,951,898 | 592,214 | 290,768 | 2,253,344 | 480,444 | 743,503 | 65,580 | 1,158,367 | 9,356,839 | -17.8% | 2019 Int. |
| TOTALS | 71,822,756 | 45,216,981 | 5,133,679 | 111,906,058 | 57,285,425 | 15,782,859 | 5,723,950 | 67,344,334 | 24,645,747 | 13,657,007 | 3,677,381 | 34,625,373 | 213,875,765 | | |

Sources: U.S. Firearm production figures from AFMER, Import and Export figures from USITC.
NOTE: In order to obtain an estimate for the number of total firearms available in the United States in a given year, NSSF combined U.S. firearm production with firearms imported less firearms exported.

# Total Firearm Units Produced for the United States Market Annually



Source:  AFMER and U.S. International Trade Commission (USITC)

# Firearms to U.S. Market (1991 – 2019 Interim)



**CUMULATIVE ANNUAL FIREARM PRODUCTION PLUS (+) IMPORTS LESS (-) EXPORTS**

Source:  AFMER and U.S. International Trade Commission (USITC)


**FACT**

From 1991 to 2019, more than
213.0 million firearms have been
made available to the U.S. market.

| Estimated Number of Semi-Automatic Firearms for U.S. Market 1990 - 2018 | |
|---|---|
| Estimated Semi-Automatic Handguns | 89,000,000 |
| Estimated Semi-Automatic Shotguns | 12,000,000 |
| Estimated Semi-Automatic Rifles | 43,400,000 |
| ESTIMATED TOTAL SEMI-AUTOMATIC FIREARMS 1990 - 2018 | 144,400,000 |
| Sources: USITC, ATF AFMER & NSSF estimates | |

**From 1991 – 2018 the**

the violent crime
rate has
decreased by ➔ **51.3** percent

and unintentional
firearm-related
fatalities
have declined by ➔ **68.2** percent

Sources: 2018 FBI Uniform Crime Reports and National
Safety Council Injury Facts (online, for 2018 data)

## INDUSTRY INTELLIGENCE REPORTS

## KEY FINDINGS

- The latest figures show that 67.9% of U.S. pistol production fell into either the "up to" 9mm calibers (53.7%) or the "up to".50 calibers (14.2%).

- The 2018 top-25 U.S. firearm manufacturers accounted for 89.6% of the U.S. production total for the year.

- Sturm, Ruger & Company, Inc. topped the list in 2018 accounting for 19.9% of total firearm production in the U.S. reported, followed by Smith & Wesson Corporation, 17.3%; Sig Sauer Inc, 8.3%; Remington Arms Company LLC, 5.8%; Savage Arms, Inc., 4.9%; and Maverick Arms, Inc, 4.1%.

- Firearm-ammunition manufacturing accounted for nearly 12,000 employees producing over $3.9 billion in goods shipped in 2018.

- In 2018, the greatest number of imported pistols came from Austria (927,511) representing 35.2% of all imported pistols. Austria was followed by Brazil with 501,995 or 19.0%, Germany at 11.7% with 307,085 units, and 11.6% were imported from Croatia (307,085).

- Brazil was the source of the greatest number of revolvers imported in 2018 (162,703), followed by Italy with 56,311; Philippines 22,816; and 16,224 imported from Germany.

- The greatest number of shotguns imported in 2018 came from Turkey (342,184), Italy (168,368), and China (111,696); and for rifles, Canada (172,406), Brazil (138,931), and Japan (67,840). Spain (104,701) was the source of the highest of number of muzzleloaders imported, followed by Italy (31,060).

- According to USITC data, the U.S. exported 817,189 total firearms in 2018 as compared to 710,031 in 2017 - an increase of 15.1 percent.

- Approximately 48% of all rifles produced in 2018 were modern sporting rifles.

- According to data in reports such as ATF Firearms Commerce in the United States, ATF Annual Firearms Manufacturing and Exportation Reports and Congressional Research Service, the estimated total number of overall firearms in civilian possession is 433.9 million.

## SOURCES

| | |
|---|---|
| **Total Production** | Detail data source: The 2018 Annual Firearms Manufacturing and Export Report (AFMER). This annual report is prepared by the office of Firearms and Explosives Services Division (FESD), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Washington D.C. (Historical analysis conducted by NSSF.) For purposes of this report only, "Production" is defined as firearms, including separate frames, receivers, actions or barreled actions, manufactured and disposed of in commerce during each calendar year. The ATF's latest full AFMER is for calendar year 2018, since the agency embargoes the data for a period of one year. Production totals data source: The AFMER 2018 as reported through February 28, 2020 -- reviewed/adjusted by NSSF (adjustments are noted on page 2). **For more information visit** atf.gov/content/about/statistics |
| **Manufacturing Trends** | U.S. Census Bureau: Economic Census, 2018 Annual Survey of Manufactures: Tables. The 2018 data is available through the U.S. Census Bureau web site: https://www.census.gov/programs-surveys/asm/data/tables.html Historical analysis conducted by NSSF. |
| **Firearm Imports for Consumption / Total Exports** | U.S. Department of Commerce and the U.S. International Trade Commission (USITC) - Interactive Tariff and Trade DataWeb:  dataweb.usitc.gov U.S. Census Bureau for corrections to import/export data prior to year 2010 may be found at census.gov/foreign-trade/statistics/corrections/index.html |
| **Manufacturers Export** | The 2018 Annual Firearms Manufacturing and Export Report (AFMER)  atf.gov/content/about/statistics |



Report provided by NSSF. For additional research materials, please visit nssf.org/research

© 2020 National Shooting Sports Foundation, Inc. All Rights Reserved

Item #30336-20  10/20

# Exhibit B

GUNS IN AMERICA

# Pregnant Florida woman uses AR-15 to fatally shoot armed intruder

Two armed men broke into the house and pistol whipped husband, before wife pulled out their legally possessed weapon and opened fire.



—— Police respond at the scene of a home invasion in Lithia, Fla.  WFLA

  |  🔖 SAVE

Nov. 4, 2019, 10:32 AM EST / Updated Nov. 4, 2019, 12:27 PM EST

**By David K. Li**

A pregnant Florida woman, armed with a semi-automatic rifle, gunned down one of two home invaders who had broken in and were pistol whipping her husband, officials said Monday.

The deadly confrontation happened at about 9 p.m Wednesday on Old Welcome Road in Lithia, Florida, about 25 miles southeast of downtown Tampa, Hillsborough County Sheriff's

spokeswoman Amanda Granit told NBC News.

After the woman fired one shot from the family's AR-15-style rifle, both men fled and the mortally wounded robber collapsed in a drainage ditch outside where he died, according to deputies and her husband.



Hillsborough County Sheriff's Office was live · Follow

Share

Deputies were still searching for the other robber on Monday. The dead robber was described by deputies as a man in his late 20s, but he was not immediately identified.

"Two unknown males broke in and made demands of them. The male victim, who is the homeowner, began to get pistol-whipped and beat up," Hillsborough County Sheriff's Maj. Frank Losat told reporters on the scene.

## Get the Morning Rundown

Get a head start on the morning's top stories.

Enter your email

**SIGN UP**

THIS SITE IS PROTECTED BY RECAPTCHA PRIVACY POLICY | TERMS OF SERVICE

"During that incident, the female homeowner retrieved a firearm, which was in the house legally, and fired one round which struck the male victim that was deceased in the ditch."

Homeowner Jeremy King said he'd be dead if not for his fast-thinking, eight-months-pregnant wife. He said both home invaders had pistols and they fired one shot.

"Them guys came in with two normal pistols and my AR stopped it," King told Bay News 9. "(My wife) evened the playing field and kept them from killing me."

King suffered a fractured eye socket, a fractured sinus cavity and a concussion to go along with 20 stitches from the attack.

The husband, whose 11-year-old daughter was at home during the home invasion, said he and wife did not know their attackers.

"We also know this was not a random act," Losat said. "This family was probably targeted."

---



David K. Li
✉

David K. Li is a breaking news reporter for NBC News.

---

**Sponsored Stories**                                                                 by Taboola

S VEGAS DEALS | SPONSORED SEARCHES
npty Las Vegas Suites That Overlook The Strip

ND ATTORNEY | SEARCH ADS
e Most Successful Lawyers In Harwinton. See the List

ILLINI
omeowners Are Trading in Their Doorbell Cams for This.

EETTH
e Best Walking Shoes For Women To Wear All Day Long Without Discomfort



SPONSORED / LAS VEGAS DEALS | SPONSORED SEARCHES

## Empty Las Vegas Suites That Overlook The Strip

SPONSORED / $2.99 - GAMEFOOLS.COM

## Buccaneer: The Pursuit of Infamy [PC Download]

$2.99 Set sail across the seas and become the world's greatest pirate captain.

SPONSORED / FIND ATTORNEY | SEARCH ADS

### The Most Successful Lawyers In Harwinton. See the List

SPONSORED / KEILLINI

### Homeowners Are Trading in Their Doorbell Cams for This.

SPONSORED / SWEETTH

### The Best Walking Shoes For Women To Wear All Day Long Without Discomfort

SPONSORED / TAONGA: THE ISLAND FARM

### The most relaxing farm game of 2022. No Install

Enjoy farming, stock up and make friends. Taonga is a whole world full of adventure!

SPONSORED / COOLGIFTS

## Here Are 23 of the Coolest Gifts for This 2022

23 Insanely Cool Gadgets You'll Regret Not Getting Before They Sell Out

SPONSORED / BALLSHOT

## We are selling off our remaining magic metal windmills. Great garden decor.

SPONSORED / VACATION DEALS | SEARCH ADS

## Overwater Bungalow Vacations On Clearance

SPONSORED / ALASKA CRUISE DEALS | SPONSORED SEARCHES

## Empty Alaska Cruise Cabins Cost Almost Nothing

SPONSORED / TOOL

## Seal Every Gap & Keep The Water Where It Belongs!

SPONSORED / THE NEW HYUNDAI IONIQ EV

## The New Hyundai Ioniq EV Is Nearly Unrecognizable

SPONSORED / TOP SALES | SEARCHES

## Pottery Barn Clearance Sales Are Happening Now. Beds, Sofas, Patio & More

SPONSORED / LAPTOP DEALS | SEARCH ADS

## Harwinton: Unsold Never-Used Laptops Are Almost Being Given Away: See Prices

ABOUT

CONTACT

HELP

CAREERS

AD CHOICES

PRIVACY POLICY

DO NOT SELL MY PERSONAL INFORMATION

CA NOTICE

TERMS OF SERVICE

NBC NEWS SITEMAP

ADVERTISE

SELECT SHOPPING

SELECT PERSONAL FINANCE

© 2022 NBC UNIVERSAL

# Exhibit C

U.S. NEWS

# Oklahoma Man Uses AR-15 to Kill Three Teen Home Intruders

A 23-year-old Oklahoma man used a semiautomatic AR-15 rifle to shoot and kill three intruders who broke into his home Monday afternoon in a suburb of Tulsa.



— Police investigate the scene of a failed robbery that led to the death of the three robbers in Broken Arrow, Okla., on March 27.   Ian Maule / AP

    |  SAVE

March 28, 2017, 1:55 PM EDT / Updated March 28, 2017, 6:29 PM EDT

**By Avalon Zoppo**

A 23-year-old Oklahoma man used a semi-automatic AR-15 rifle to shoot and kill three masked teenage intruders dressed in black who broke into his home Monday afternoon – an act authorities are investigating as self-defense.

Zach Peters, the homeowner's son, fatally shot an 18-year-old man and two boys ranging between 16 and 17 around 12:30 p.m. The trio allegedly forced their way into the residence through a back door and were killed after exchanging words with Peters, who fired multiple shots.

Police said the alleged getaway driver, 21-year-old Elizabeth Rodriguez, surrendered to the Broken Arrow Police Department Monday evening and is facing charges on three counts of first-degree murder and three counts of burglary.

Her first court appearance, set for Tuesday, has been pushed to April 5 and she was ordered to be held on no bond.



—    Police say Elizabeth Rodriguez drove the getaway car in a home invasion in Broken Arrow, Oklahoma.
Wagoner County Sheriff's Office

"Upon making entry to the home, one of the residents fired a rifle striking all three of the suspects," the Wagoner County Sheriff's Office said in a statement.

Wagoner County Deputy Sheriff Nick Mahoney said that Rodriguez is being charged with the murders because she was in "commission of felony" when she allegedly dropped them off at the residence, meaning she had an intent to burglarize the home. He said the crime was random and there was no connection between the suspects and Peters.

Police said all of the unidentified suspects were wearing black clothes, masks and gloves. One was armed with a knife and another with brass knuckles. Two of the intruders died in the kitchen, while the other reached the driveway, "before succumbing to his injuries," according to the statement.

After the shooting, police said the son and homeowner made statements at the sheriff's office.

Although authorities are approaching the shooting as self-defense, Mahoney said the investigation is open and the district attorney will ultimately decide whether charges are filed.

## Get the Morning Rundown

Get a head start on the morning's top stories.

| Enter your email | SIGN UP |
|---|---|

THIS SITE IS PROTECTED BY RECAPTCHA PRIVACY POLICY | TERMS OF SERVICE



—   Police investigate the scene of a failed robbery that led to the death of the three robbers in Broken Arrow, Okla., on March 27.  Ian Maule / AP

Similar to 22 other states, Oklahoma has passed stand-your-ground legislation which justifies a person using deadly force in order to protect themselves under certain circumstances.

Oklahoma's law states that a person who is attacked in their home "has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony."

"They are looking at it as self-defense but they are also looking at any other possible way that it could be looked at," Mahoney said.

**Recommended**



**U.K. ROYALS**

**Queen under medical supervision as doctors are 'concerned'; royal family traveling to her Scottish castle**

---



**NEWS**

**Bernard Shaw, CNN's chief anchor for 20 years, dies at 82**

During a press conference, First Assistant District Attorney Jack Thorp called the case "complex" and said a Medical Examiner is working to identify the bodies of the three teens. Charges will likely be filed against Rodriguez next week.

A probable cause affidavit was presented to the court, allowing Rodriguez to be held without charges past 48 hours, officials said. Thorp told NBC News that Rodriguez does not yet have a lawyer.

"This is a triple homicide. We want to make sure we cross all our t's and dot our i's. We need the maximum amount of information before filing charges... Hopefully, as we go forward, we'll see whether the facts meet the law," Thorp said during the press conference.

The AR-15 was the weapon used in mass shootings such as Newtown, the Aurora movie theater in Colorado and San Bernardino.

Bloodshed like this is rare in the area, Mahoney told NBC-affiliate KJRH. Broken Arrow, with a population of 103,500 people, is the largest suburb of Tulsa and is located about 15 miles east of the city.

"This isn't something that happens frequently here," Mahoney told NBC-affiliate KJRH. "We don't generally have triple shootings inside Wagoner County. It's a very nice neighborhood...the neighbors have all been concerned...it's not something that happens."

---

Avalon Zoppo



SPONSORED / LAS VEGAS DEALS | SPONSORED SEARCHES

## Empty Las Vegas Suites That Overlook The Strip

SPONSORED / $2.99 - GAMEFOOLS.COM

## Buccaneer: The Pursuit of Infamy [PC Download]

$2.99 Set sail across the seas and become the world's greatest pirate captain.

SPONSORED / TOOL

## Seal Every Gap & Keep The Water Where It Belongs!

SPONSORED / COOLGIFTS

## Here Are 23 of the Coolest Gifts for This 2022

23 Insanely Cool Gadgets You'll Regret Not Getting Before They Sell Out

SPONSORED / KEILLINI

## Homeowners Are Trading in Their Doorbell Cams for This.

SPONSORED / SWEETH

## The Best Women's Shoes for Walking and Standing All Day

SPONSORED / TOP SALES | SEARCHES

## Pottery Barn Clearance Sales Are Happening Now. Beds, Sofas, Patio & More

SPONSORED / TAONGA: THE ISLAND FARM

## The most relaxing farm game of 2022. No Install

Enjoy farming, stock up and make friends. Taonga is a whole world full of adventure!

SPONSORED / FIND ATTORNEY | SEARCH ADS

**The Most Successful Lawyers In Harwinton. See the List**

SPONSORED / BALLSHOT

**We are selling off our remaining magic metal windmills. Great garden decor.**

SPONSORED / VACATION DEALS | SEARCH ADS

**Overwater Bungalow Vacations On Clearance**

SPONSORED / TRUTHFINDER

**Locate Almost Anyone By Entering Their Name (This Is Addicting!)**

SPONSORED / ALASKA CRUISE DEALS | SPONSORED SEARCHES

**Empty Alaska Cruise Cabins Cost Almost Nothing**

SPONSORED / LAPTOP DEALS | SEARCH ADS

**Harwinton: Unsold Never-Used Laptops Are Almost Being Given Away: See Prices**

ABOUT

CONTACT

HELP

CAREERS

CA NOTICE

TERMS OF SERVICE

NBC NEWS SITEMAP

ADVERTISE

CAREERS                                          ADVERTISE

AD CHOICES                                       SELECT SHOPPING

PRIVACY POLICY                                   SELECT PERSONAL FINANCE

DO NOT SELL MY PERSONAL INFORMATION

© 2022 NBC UNIVERSAL

# Exhibit D



NEWS   SPORTS   WEATHER   FEATURES   CW17   TRAFFIC   JAX BEST   NEWSLETTERS   CO

2 warnings and a watch in effect for 22 regions in the area
See the complete list

WEATHER ALERT                                                                    HIDE

**NEWS**

# Deputies: 30 rounds fired from AR-15 in deadly Florida home invasion

Incident stemmed from ongoing feud between two groups, investigators say

Garrett Pelican, Digital executive producer

Published: **April 17, 2018 at 7:20 PM**

Tags: **Florida, Baker County, Weird News, News, Glen St Mary**




NEWS   SPORTS   WEATHER   FEATURES   CW17   TRAFFIC   JAX BEST   NEWSL



*(Left to right: Bell, Watkins, Cayden Lauramore, Albino)*



**GLEN ST. MARY, Fla** – Three men say they were asleep inside a mobile home in Glen St. Mary about 4 a.m. Sunday when they heard a voice outside yell "Sheriff's Office!" before the front door burst open.

In stormed a masked gunman who fired off a single round before two of the men inside, one armed with an AR-15 rifle and the other with a handgun, emerged from two bedrooms and opened fire.

Gunfire ripped into the masked gunman and two other intruders, who crumpled to the floor with multiple gunshot wounds.

Those details surfaced Tuesday when the Baker County Sheriff's Office released an arrest report linked to **this weekend's home invasion turned deadly triple shooting**.

Five people are charged in the case. Investigators suspect the home invasion escalated from an ongoing feud between two groups that was stoked by social media threats.

Ad

The victims told deputies they acted in self-defense when they turned their guns on the intruders, with one of them estimating he fired over 30 rounds from an AR-15 before the threat was over.

Afterward, the victims retreated to another part of the home before they dialed 911, according to the report. None of them was hurt during the shooting.

The same cannot be said for the intruders, **several of whom were inside a vehicle deputies intercepted as it sped away** from the mobile home off County Road 125.

   NEWS       SPORTS       WEATHER       FEATURES       CW17       TRAFFIC       JAX BEST       NEWSL

One of them, Corey Lauramore, died of gunshot wounds to the head. An unidentified 16-year-old remains hospitalized, and a third suspect, William Lauramore, was treated and released to police.

Investigators found a heavy amount of dried blood caked on the front steps of the home, a bloodstained mask with a bullet hole through it and a .380 caliber handgun lying nearby, the report said.

Ad

They also recovered an AR-15 rifle and a 9MM handgun inside the home.

The Sheriff's Office said the **five individuals charged in the case were among a group of seven that went to the mobile home that morning to confront and fight** the group staying there.

William Lauramore, 24; Joseph Albino, 24; Zachary Bell, 20; Christian Watkins, 19; and Cayden Lauramore, 15, are charged with home invasion. But additional charges are possible.

Albino, Bell and Watkins provided conflicting details about their involvement in the shooting, but all three said they had no idea others in their group had brought weapons along, according to the report.

*Copyright 2018 by WJXT News4Jax - All rights reserved.*

Recommended by

Sponsored     1/5

 NEWS     SPORTS     WEATHER     FEATURES     CW17     TRAFFIC     JAX BEST     NEWSL

[Gallery] 27 Dresses Worn to the VMA That Went Too Viral

Read More ❯

  

**GET RESULTS WITH OMNE**



| | | | |
|---|---|---|---|
| TV Listings | Contact Us | Email Newsletters | RSS Feeds | Contests and Rules |

TV Listings            Contact Us            Email Newsletters            RSS Feeds            Contests and Rules

Closed Captioning /    Careers at WJXT /     Terms of Use          WJXT Public File      WCWJ Public File
Audio Description      WCWJ

FCC Applications       Privacy Policy        Do Not Sell My Info

**If you need help with WJXT's or WCWJ's FCC public inspection file, call (904) 393-9801.**

 

Copyright © 2022 News4JAX.com is managed by Graham Digital and published by Graham Media Group, a division of Graham Holdings.

# Exhibit E



74°

LIVE

NEWS

# Man armed with AR-15 stops attack by neighbor in Oswego

*Dave Thomas*

by: [Nancy Loo](#), [Charles Hayes](#)
Posted: Feb 27, 2018 / 05:37 AM CST
Updated: Feb 27, 2018 / 12:59 PM CST

SHARE    • • •

*This is an archived article and the information in the article may be outdated. Please look at the time stamp on the story to see when it was last updated.*

✕

Police say it all began when someone with a knife attacked another person during an argument.

Neighbor Dave Thomas, who witnessed the attack, went into his home, got his rifle and ordered the suspect to stop.

"I ran back into the home, into my house and grabbed my AR-15. Grabbed the AR-15 over my handgun. It's just a bigger gun. I think a little bit more than an intimidation factor definitely played a part in him actually stopping."

No shots were fired.

The suspect was able to get away briefly, before police captured him.

The stabbing victim was taken to a hospital, and is expected to recover.

Police say Thomas has a valid firearm owner's identification card and a concealed carry permit. Thomas says he is also a firearms instructor.

"The AR-15 is my weapon of choice for home protection," Thomas said. "It's light, it's maneuverable. If you train and know how to use it properly, it's not dangerous. And this is just a perfect example of good guy with an AR-15 stopped a bad guy with a knife. And there were no lives taken, so all in all it was a good day."

**Suggest a Correction**

Copyright 2022 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

AROUND THE WEB  ✕



## Adults over 65 Can Now Get Low Cost Walk in Tubs

The Senior Scoop



## Government Will Cover The Cost To Install Solar If You Live In These Zip Codes

Solar Sesame



## High Blood Sugar: Try This Simple Method (Watch)

Awareness Alert



## $49 Keilini Lightbulb Security Camera

Keillini.com



## Here Are 50 of the Coolest Gifts for This 2022

Smart Lifestyle Trends



## $34.99 Security Camera Makes Doorbell Cams Seem Ancient

Keilini



## 25 Gifts That Will Sell Out in 2022

Bargain Fans



## The Security Camera



## Here Are 13 Deals Most









**Connecticut Launches New Policy for Cars Used Less Than 50 Miles/day**

Smart Lifestyle Trends

**Hands Down the Top Credit Card of 2022**

CompareCredit

**Hairstyles That Make Women Over 60 Look 40**

HD Tips

SUBSCRIBE NOW

# WGN News Daily Update

Your email

SIGN UP NOW  ➤

**TOP STORIES**





### Naperville police to fine drivers fleeing police

### R. Kelly trial likely to extend beyond 4-week timeline

### Steve Bannon surrenders in NY court

### HBO to fix 'House of the Dragon' green-screen goof

Top Stories



 **Naperville police to fine drivers fleeing police**

 **R. Kelly trial likely to extend beyond 4-week timeline**

 **Steve Bannon surrenders in NY court**

 **HBO to fix 'House of the Dragon' green-screen goof**

 **Jeep unveils 1st electric SUVs for North America …**

 **Man, 3 kids in Indianapolis pond died accidentally**

 **Where to get the omicron COVID-19 booster**

**More Stories**



**Double murder suspect due in cour...**

2 hours ago

**6 @ 6: Chandelier earrings, babies on...**

3 hours ago

**Man dead following shootout in South...**

3 hours ago

**Loved ones remember mother...**

11 hours ago

**More Videos**



**SPONSORED CONTENT**





## 6 Strange Things Millionaires Do With Their Money, But Most of Us Have Never Tried ⬀

By **The Penny Hoarder**

---

### WHAT DO YOU THINK?                                                                        ⋮

**If the Justice Dept. were to appeal the recent court ruling ordering a pause in its investigation of classified documents seized from Mar-a-Lago, do you think the appeal would be successful or unsuccessful?**

◯  Successful

◯  Unsuccessful                                                                              ✕

NEXT *

* By clicking "NEXT" you agree to the following: We use cookies to track your survey answers. If you would like to continue with this survey, please read and agree to the CivicScience Privacy Policy and Terms of Service

**POPULAR**

1   **Wife listened as husband stabbed, killed by nephew**

2   **2 found dead in Highland Park apartment**

3   **Soldier Field switches to Bermuda grass for Bears**

4   **Queen under medical care amid health fears**

5   **Man, 3 kids in Indianapolis pond died accidentally**

6   **Woman convicted in 1999 murder of 3 kids speaks out**

7   **Steve Bannon surrenders in NY court**

**LATEST NEWS**





### Naperville police to fine drivers fleeing police

Western suburbs • 24 mins ago



### R. Kelly trial likely to extend beyond 4-week timeline

R. Kelly Trial • 30 mins ago



### Steve Bannon surrenders in NY court

News • 60 mins ago



### HBO to fix 'House of the Dragon' green-screen goof

Trending • 40 mins ago



### Jeep unveils 1st electric SUVs for North America …

News • 1 hour ago

View All News

# Chicago's Very Own source for breaking news, weather, sports and entertainment.

**Follow Us**

**News App**





**Weather App**





WGNTV EEO Report

Online Public File

FCC Public Inspection File Help

Privacy Policy

Terms Of Use

Do Not Sell My Personal Information

FCC Applications

Public File Assistance Contact

Subscribe To WGN-TV Push Notifications

The Hill

NewsNation

BestReviews

Content Licensing

Nexstar Digital

# Exhibit F

NATIONAL REVIEW | THE CORNER | POLITICS & POLICY

# Texas Hero Reportedly Used His Own AR to Confront the Sutherland Springs Shooter

By **DAVID FRENCH**
November 6, 2017 10:54 PM

During today's press conference about the Texas mass shooting, the regional director of the Texas Department of Public Safety indicated that the Texas Good Samaritan, Stephen Willeford, engaged the Sutherland Springs shooter with his own AR:

> He armed himself with an AR assault rifle and engaged the suspect. They engaged in gunfire here at the church. We know that the suspect was shot, when he dropped his assault rifle and jumped in his Ford Expedition and fled the scene.

Given what we know from other reports, this makes a great deal of sense. After all, Willeford apparently fired with a great deal of precision. Here's an account from CNN, taken from an interview of his cousin:

> And what he did, according to his cousin, is exchange fire with the gunman, hitting him in the side and twice in the neck.

> "He saw that the guy was wearing body armor, and there was a velcro strap, from the back to the front," detailed Leonard, speaking live on Monday. "He knew from that … that the vulnerable spot was going to be in the side. And so that's where he shot him."

An AR is an easy-to-use, extraordinarily accurate weapon, and one can see how it would enable a surprised civilian to engage the shooter so quickly and effectively.

We keep hearing that AR's are useless for self-defense, that they're simply "weapons of war," useful only for mass killing. This is simply not true. Earlier this year, an Oklahoma man used an AR-15 to kill three home intruders, and multiple self-defense experts have long pegged AR-style rifles as their "home defense weapon of choice." I have one in my own home, and I feel far more comfortable using it than even one of my handguns.

While Willeford obviously didn't prevent the massacre, he did stop the shooter and prevented him from harming anyone else. He did so with exactly the kind of weapon that the gun control lobby would like to deny to law-abiding Americans. That's a fact worth noting.

 BACK TO THE CORNER

ADVERTISEMENT

# Exhibit G



*Substitute House Bill No. 6667*

# *Public Act No. 23-53*

### *AN ACT ADDRESSING GUN VIOLENCE.*

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. Section 29-35 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) (1) No person shall carry any pistol or revolver upon **[**his or her**]** such person's person, except when such person is within **[**the dwelling house or place of business of such person**]** such person's dwelling house, on land leased or owned by such person or within the place of business of such person, without a permit to carry the same issued as provided in section 29-28, as amended by this act.

(2) No person shall knowingly carry any firearm with intent to display such firearm, except when such person is within such person's dwelling house, on land leased or owned by such person or within the place of business of such person, or such person is engaged in firearm training or bona fide hunting activity. For the purposes of this subdivision, a person shall not be deemed to be carrying a firearm with intent to display such firearm if such person has taken reasonable measures to conceal the fact that such person is carrying a firearm. Neither a fleeting glimpse of a firearm nor an imprint of a firearm through such person's clothing shall constitute a violation of this

*Substitute House Bill No. 6667*

subdivision. <u>If a person displays a firearm temporarily while engaged in self-defense or other conduct that is otherwise lawful, such display shall not constitute a violation of this subdivision.</u>

<u>(3)</u> The provisions of this subsection shall not apply to the carrying of any **[**pistol or revolver**]** <u>firearm</u> by any: **[**parole**]**

<u>(A) (i) Parole</u> officer or peace officer of this state, or **[**any**]** <u>(ii) parole officer or peace officer of any other state while engaged in the pursuit of official duties;</u>

<u>(B)</u> Department of Motor Vehicles inspector appointed under section 14-8 and certified pursuant to section 7-294d<u>;</u> **[**, or parole officer or peace officer of any other state while engaged in the pursuit of official duties, or federal**]**

<u>(C) Federal</u> marshal or federal law enforcement agent<u>;</u> **[**, or to any member**]**

<u>(D) Member</u> of the armed forces of the United States, as defined in section 27-103, or of the state, as defined in section 27-2, when on duty or going to or from duty<u>;</u> **[**, or to any member**]**

<u>(E) Member</u> of any military organization when on parade or when going to or from any place of assembly<u>;</u> **[**, or to the transportation of pistols or revolvers**]**

<u>(F) Person transporting or inspecting a firearm</u> as merchandise<u>;</u> **[**, or to any person transporting any pistol or revolver while**]**

<u>(G) Person transporting a firearm</u> contained in the package in which **[**it**]** <u>such firearm</u> was originally wrapped at the time of sale and while transporting the same from the place of sale to the purchaser's residence or place of business<u>;</u> **[**, or to any person**]**

<u>(H) Person transporting a firearm as part of the process of</u> removing

*Substitute House Bill No. 6667*

such person's household goods or effects from one place to another; [, or to any person while]

(I) Person transporting [any such pistol or revolver] a firearm from such person's place of residence or business to a place or [individual] person where or by whom such [pistol or revolver] firearm is to be repaired or while returning to such person's place of residence or business after the same has been repaired; [, or to any person]

(J) Person transporting a [pistol or revolver] firearm in or through the state for the purpose of taking part in competitions, taking part in [formal pistol or revolver] firearm training, repairing such [pistol or revolver] firearm or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States and is permitted to possess and carry a [pistol or revolver] firearm in the state or subdivision of the United States in which such person resides; [, or to any person]

(K) Person transporting a [pistol or revolver] firearm to and from a testing range at the request of the issuing authority; [, or to any person] or

(L) Person transporting an antique pistol or revolver, as defined in section 29-33, as amended by this act.

(4) For the purposes of this subsection, ["formal pistol or revolver training"] "firearm training" means [pistol or revolver] firearm training at a [locally approved or permitted] firing range, [or] training facility or fish and game club or sporting club, and ["transporting a pistol or revolver"] "transporting a firearm" means transporting a [pistol or revolver] firearm that is unloaded and, if such [pistol or revolver] firearm is being transported in a motor vehicle, is not readily accessible or directly accessible from the passenger compartment of the vehicle or, if such [pistol or revolver] firearm is being transported in a motor

*Substitute House Bill No. 6667*

vehicle that does not have a compartment separate from the passenger compartment, such [pistol or revolver] <u>firearm</u> shall be contained in a locked container other than the glove compartment or console. Nothing in this section shall be construed to prohibit the carrying of a [pistol or revolver] <u>firearm</u> during [formal pistol or revolver] <u>firearm</u> training or repair.

(b) The holder of a permit issued pursuant to section 29-28<u>, as amended by this act,</u> shall carry such permit upon one's person while carrying such pistol or revolver. Such holder shall present his or her permit upon the request of a law enforcement officer who has reasonable suspicion of a crime for purposes of verification of the validity of the permit or identification of the holder, provided such holder is carrying a pistol or revolver that is observed by such law enforcement officer.

<u>(c) Not later than February 1, 2025, and annually thereafter, each law enforcement unit, as defined in section 7-294a, shall prepare and submit a report to the Institute for Municipal and Regional Policy at The University of Connecticut concerning any stops conducted on suspicion of a violation of subdivision (2) of subsection (a) of this section during the preceding calendar year, except that the initial report shall be based on the fifteen months preceding January 1, 2025. Such report shall be submitted electronically using a standardized method and form disseminated jointly by the Institute for Municipal and Regional Policy and the Police Officer Standards and Training Council. The standardized method and form shall allow compilation of statistics on each incident, including, but not limited to, the race and gender of the person stopped, provided the identification of such characteristics shall be based on the observation and perception of the police officer. The Institute for Municipal and Regional Policy and the Police Officer Standards and Training Council may revise the standardized method and form and disseminate such revisions to law enforcement units. Each</u>

*Substitute House Bill No. 6667*

law enforcement unit shall, prior to submission of any such report pursuant to this subsection, redact any information from such report that may identify a minor, witness or victim.

(d) The Institute for Municipal and Regional Policy at The University of Connecticut shall, within available appropriations, review the incidents reported pursuant to subsection (c) of this section. Not later than December 1, 2025, and annually thereafter, the institute shall report, in accordance with the provisions of section 11-4a, the results of any such review, including any recommendations, to the Governor and the joint standing committees of the General Assembly having cognizance of matters relating to the judiciary, public safety and municipalities.

Sec. 2. Section 29-37 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) Any person violating any provision of section 29-28, as amended by this act, or 29-31, as amended by this act, shall be guilty of a class E felony, and any pistol or revolver found in the possession of any person in violation of any of said provisions shall be forfeited.

(b) Any person violating any provision of subdivision (1) of subsection (a) of section 29-35, as amended by this act, shall be guilty of a class D felony, and, in the absence of any mitigating circumstances as determined by the court, one year of the sentence imposed may not be suspended or reduced by the court. The court shall specifically state the mitigating circumstances, or the absence thereof, in writing for the record. Any pistol or revolver found in the possession of any person in violation of any provision of subsection (a) of section 29-35, as amended by this act, shall be forfeited.

(c) Any person violating any provision of subdivision (2) of subsection (a) of section 29-35, as amended by this act, shall be guilty of

*Substitute House Bill No. 6667*

a class B misdemeanor for a first offense and a class A misdemeanor for any subsequent offense. The court may order suspension of prosecution in addition to any other diversionary programs available to the defendant, if the court finds that a violation of said subdivision is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection. The court shall not order suspension of prosecution unless the accused person has acknowledged that he or she understands the consequences of the suspension of prosecution. Any person for whom prosecution is suspended shall agree to the tolling of any statute of limitations with respect to such violation and to a waiver of his or her right to a speedy trial. Such person shall appear in court and shall be released to the supervision of the Court Support Services Division for such period, not exceeding two years, and under such conditions as the court shall order. If the person refuses to accept, or, having accepted, violates such conditions, the court shall terminate the suspension of prosecution and the case shall be brought to trial. If such person satisfactorily completes such person's period of probation, he or she may apply for dismissal of the charges against such person and the court, on finding such satisfactory completion, shall dismiss such charges. If the person does not apply for dismissal of the charges against such person after satisfactorily completing such person's period of probation, the court, upon receipt of a report submitted by the Court Support Services Division that the person satisfactorily completed such person's period of probation, may on its own motion make a finding of such satisfactory completion and dismiss such charges. Upon dismissal, all records of such charges shall be erased pursuant to section 54-142a. An order of the court denying a motion to dismiss the charges against a person who has completed such person's period of probation or terminating the participation of a defendant in such program shall be a final judgment for purposes of appeal.

*Substitute House Bill No. 6667*

**[**(c)**]** <u>(d)</u> Any person violating any provision of subsection (b) of section 29-35<u>, as amended by this act,</u> shall have committed an infraction and shall be fined thirty-five dollars.

Sec. 3. Section 29-36a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) No person shall complete the manufacture of a firearm without subsequently (1) obtaining a unique serial number or other mark of identification from the Department of Emergency Services and Public Protection pursuant to subsection (b) of this section, and (2) engraving upon or permanently affixing to the firearm such serial number or other mark in a manner that conforms with the requirements imposed on licensed importers and licensed manufacturers of firearms pursuant to 18 USC 923(i), as amended from time to time, and any regulation adopted thereunder.

(b) Not later than thirty days after a person completes the manufacture of a firearm<u>,</u> **[**or ninety days after the Department of Emergency Services and Public Protection provides notice in accordance with section 29-36b that the system to distribute a unique serial number or other mark of identification pursuant to this section is operational, whichever date is later,**]** such person shall notify the department of such manufacture and provide any identifying information to the department concerning the firearm and the owner of such firearm, in a manner prescribed by the Commissioner of Emergency Services and Public Protection. Upon receiving a properly submitted request for a unique serial number or other mark of identification from a person who completes manufacture of a firearm, the department shall determine if such person is prohibited from purchasing a firearm and if not, shall issue to such person a unique serial number or other mark of identification immediately and in no instance more than three business days after the department receives such request. Issuance of a unique serial number or other mark of

*Substitute House Bill No. 6667*

identification pursuant to this subsection shall not be evidence that the firearm is otherwise lawfully possessed.

(c) (1) On and after January 1, 2024, no person shall possess a firearm without a serial number or other mark of identification unless such person has (A) declared possession of such firearm pursuant to subdivision (2) or (3) of this subsection, or (B) applied to obtain a unique serial number or other mark of identification from the Department of Emergency Services and Public Protection pursuant to subsections (a) and (b) of this section and such person has not yet received such serial number or other mark of identification.

(2) Any person who, prior to January 1, 2024, lawfully possesses a firearm without a serial number or other mark of identification manufactured prior to October 1, 2019, shall apply by January 1, 2024, or, if such person is a member of the military or naval forces of this state or of the United States and is unable to apply by January 1, 2024, because such member is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the department to declare possession of such firearm. Such application shall be made on such form and in such manner as the Commissioner of Emergency Services and Public Protection prescribes.

(3) Any person who moves into the state in lawful possession of a firearm without a serial number or other mark of identification shall, within ninety days, either (A) obtain a unique serial number or other mark of identification from the department and engrave upon or permanently affix to the firearm such serial number or other mark pursuant to subsection (a) of this section, (B) render such firearm permanently inoperable, (C) sell such firearm to a federally licensed firearm dealer, or (D) remove such firearm from the state, except that any person who is a member of the military or naval forces of this state or of the United States, is in lawful possession of a firearm without a serial number or other mark of identification and has been transferred

*Substitute House Bill No. 6667*

into the state after January 1, 2024, may, within ninety days of arriving in the state, apply to the department to declare possession of such firearm.

(4) For purposes of this subsection, "lawfully possesses", with respect to a firearm without a serial number or other mark of identification, means that a person has (A) actual and lawful possession of such firearm, (B) constructive possession of such firearm pursuant to a lawful purchase that was transacted prior to or on the date preceding the effective date of this section, regardless of whether the firearm was delivered to the purchaser prior to or on the date preceding the effective date of this section, which lawful purchase is evidenced by a writing sufficient to indicate that (i) a contract for sale was made between the parties prior to or on the date preceding the effective date of this section, for the purchase of the firearm, or (ii) full or partial payment for the firearm was made by the purchaser to the seller of the firearm prior to or on the date preceding the effective date of this section, or (C) actual possession under subparagraph (A) of this subdivision, or constructive possession under subparagraph (B) of this subdivision, as evidenced by a written statement made under penalty of false statement on such form as the commissioner prescribes.

(5) The department may adopt regulations, in accordance with the provisions of chapter 54, to establish procedures with respect to applications under this subsection. Notwithstanding the provisions of sections 1-210 and 1-211, the name and address of a person who has declared possession of a firearm without a serial number or other mark of identification shall be confidential and shall not be disclosed, except such records may be disclosed to (A) law enforcement agencies and employees of the United States Probation Office acting in the performance of their duties and parole officers within the Department of Correction acting in the performance of their duties, and (B) the Commissioner of Mental Health and Addiction Services to carry out the

*Substitute House Bill No. 6667*

provisions of subsection (c) of section 17a-500.

(6) (A) Except as provided in this subsection, no person within this state shall distribute, import into this state, keep for sale, offer or expose for sale or purchase a firearm without a serial number or other mark of identification.

(B) The provisions of subparagraph (A) of this subdivision shall not apply to the transfer of a firearm without a serial number or other mark of identification (i) the possession of which has been declared to the department pursuant to this section, by bequest or intestate succession, or, upon the death of a testator or settlor: (I) To a trust, or (II) from a trust to a beneficiary; or (ii) to a police department or the Department of Emergency Services and Public Protection.

**[**(c)**]** <u>(d)</u> The provisions of subsections (a)<u>,</u> **[**and**]** (b) <u>and (c)</u> of this section shall not apply to the manufacture of a firearm manufactured using an unfinished frame or lower receiver on which a serial number or other mark has been engraved or permanently affixed pursuant to subsection (c) of section 53-206j.

**[**(d)**]** <u>(e)</u> No person shall transfer to another person any firearm manufactured in violation of this section.

**[**(e)**]** <u>(f)</u> The provisions of this section shall not apply to (1) the manufacture of firearms by a federally licensed firearm manufacturer, (2) (A) any antique firearm, as defined in 18 USC 921, as amended from time to time, or (B) any firearm manufactured prior to **[**the effective date of this section**]** <u>December 16, 1968</u>, provided such firearm is otherwise lawfully possessed, or (3) delivery or transfer of a firearm to a law enforcement agency.

**[**(f)**]** <u>(g)</u> No person shall <u>knowingly, recklessly or with criminal negligence</u> facilitate, aid or abet the manufacture of a firearm (1) by a person or for a person who is otherwise prohibited by law from

*Substitute House Bill No. 6667*

purchasing or possessing a firearm, or (2) that a person is otherwise prohibited by law from purchasing or possessing.

**[**(g)**]** (h) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, the court may order suspension of prosecution. The court shall not order suspension of prosecution unless the accused person has acknowledged that he or she understands the consequences of the suspension of prosecution. Any person for whom prosecution is suspended shall agree to the tolling of any statute of limitations with respect to such violation and to a waiver of his or her right to a speedy trial. Such person shall appear in court and shall be released to the supervision of the Court Support Services Division for such period, not exceeding two years, and under such conditions as the court shall order. If the person refuses to accept, or, having accepted, violates such conditions, the court shall terminate the suspension of prosecution and the case shall be brought to trial. If such person satisfactorily completes such person's period of probation, **[**he or she**]** such person may apply for dismissal of the charges against such person and the court, on finding such satisfactory completion, shall dismiss such charges. If the person does not apply for dismissal of the charges against such person after satisfactorily completing such person's period of probation, the court, upon receipt of a report submitted by the Court Support Services Division that the person satisfactorily completed such person's period of probation, may on its own motion make a finding of such satisfactory completion and dismiss such charges. Upon dismissal, all records of such charges shall be erased pursuant to section 54-142a. An order of the court denying a motion to dismiss the charges against a person who has completed such person's period of probation or terminating the participation of a defendant in such program shall be a final judgment for purposes of

appeal.

**[**(h)**]** (i) (1) Any person who is ineligible to possess a firearm under state or federal law and violates any provision of this section shall be guilty of a class C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, and any firearm found in the possession of any person in violation of any provision of this section shall be forfeited.

(2) Any person who is not ineligible to possess a firearm under state or federal law and violates any provision of this section shall be guilty of a class C misdemeanor.

**[**(i)**]** (j) For purposes of this section, "manufacture" means to fabricate or construct a firearm including the initial assembly, "firearm" means firearm, as defined in section 53a-3, as amended by this act, and "law enforcement agency" means law enforcement agency, as defined in section 29-1i.

Sec. 4. Subsection (a) of section 29-28 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) (1) No person who sells ten or more **[**pistols or revolvers**]** firearms in a calendar year or is a federally licensed firearm dealer shall advertise, sell, deliver, or offer or expose for sale or delivery, or have in such person's possession with intent to sell or deliver, any pistol or revolver at retail without having a permit therefor issued as provided in this subsection.

(2) The chief of police or, where there is no chief of police, the chief executive officer of the municipality, as defined in section 7-148, or, if designated by such chief executive officer, the resident state trooper

serving such municipality or a state police officer of the state police troop having jurisdiction over such municipality, may, upon the application of any person, issue a permit in such form as may be prescribed by the Commissioner of Emergency Services and Public Protection for the sale at retail of [pistols and revolvers] <u>firearms</u> within the jurisdiction of the authority issuing such permit. No permit for the sale at retail of [any pistol or revolver] <u>firearms</u> shall be issued unless the applicant holds a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f<u>, as amended by this act,</u> or a valid state permit to carry a pistol or revolver issued pursuant to subsection (b) of this section<u>;</u> and the applicant submits documentation sufficient to establish that local zoning requirements have been met for the location where the sale is to take place, except that any person selling or exchanging a pistol or revolver for the enhancement of a personal collection or for a hobby or who sells all or part of such person's personal collection of pistols or revolvers shall not be required to submit such documentation for the location where the sale or exchange is to take place.

<u>(3) Any person holding a valid permit for the sale at retail of pistols or revolvers issued on or before September 30, 2023, shall be deemed to be a holder of a valid permit for the sale at retail of firearms until such permit for the sale at retail of pistols or revolvers expires or is revoked, suspended, confiscated or surrendered. The holder of such permit may renew such permit as a permit for the sale at retail of firearms pursuant to section 29-30, as amended by this act.</u>

Sec. 5. Subsection (d) of section 29-28 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(d) Notwithstanding the provisions of sections 1-210 and 1-211, the name and address of a person issued a permit to sell <u>firearms</u> at retail [pistols and revolvers] pursuant to subsection (a) of this section or a state

*Substitute House Bill No. 6667*

or a temporary state permit to carry a pistol or revolver pursuant to subsection (b) of this section, or a local permit to carry pistols and revolvers issued by local authorities prior to October 1, 2001, shall be confidential and shall not be disclosed, except (1) such information may be disclosed to law enforcement officials acting in the performance of their duties, including, but not limited to, employees of the United States Probation Office acting in the performance of their duties and parole officers within the Department of Correction acting in the performance of their duties, (2) the issuing authority may disclose such information to the extent necessary to comply with a request made pursuant to section 29-33, as amended by this act, 29-37a, as amended by this act, or 29-38m, as amended by this act, for verification that such state or temporary state permit is still valid and has not been suspended or revoked, and the local authority may disclose such information to the extent necessary to comply with a request made pursuant to section 29-33, as amended by this act, 29-37a, as amended by this act, or 29-38m, as amended by this act, for verification that a local permit is still valid and has not been suspended or revoked, and (3) such information may be disclosed to the Commissioner of Mental Health and Addiction Services to carry out the provisions of subsection (c) of section 17a-500.

Sec. 6. Subsection (a) of section 29-30 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) The fee for each permit originally issued under the provisions of subsection (a) of section 29-28, as amended by this act, for the sale at retail of [pistols and revolvers] firearms shall be two hundred dollars and for each renewal of such permit two hundred dollars. The fee for each state permit originally issued under the provisions of subsection (b) of section 29-28, as amended by this act, for the carrying of pistols and revolvers shall be one hundred forty dollars plus sufficient funds as required to be transmitted to the Federal Bureau of Investigation to

*Substitute House Bill No. 6667*

cover the cost of a national criminal history records check. The local authority shall forward sufficient funds for the national criminal history records check to the commissioner no later than five business days after receipt by the local authority of the application for the temporary state permit. Seventy dollars shall be retained by the local authority. Upon approval by the local authority of the application for a temporary state permit, seventy dollars shall be sent to the commissioner. The fee to renew each state permit originally issued under the provisions of subsection (b) of section 29-28, as amended by this act, shall be seventy dollars. Upon deposit of such fees in the General Fund, ten dollars of each fee shall be credited within thirty days to the appropriation for the Department of Emergency Services and Public Protection to a separate nonlapsing account for the purposes of the issuance of permits under subsections (a) and (b) of section 29-28, as amended by this act.

Sec. 7. Section 29-31 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

No sale of any [pistol or revolver] firearm shall be made except in the room, store or place described in the permit for the sale of [pistols and revolvers] firearms, and such permit or a copy [thereof] of such permit certified by the authority issuing the same shall be exposed to view within the room, store or place where [pistols or revolvers] firearms are sold or offered or exposed for sale. No sale or delivery of any [pistol or revolver] firearm shall be made unless the purchaser or person to whom the same is to be delivered is personally known to the vendor of such [pistol or revolver] firearm or the person making delivery thereof or unless the person making such purchase or to whom delivery thereof is to be made provides evidence of his or her identity. The vendor of any [pistol or revolver] firearm shall keep a record of each [pistol or revolver] firearm sold in a book kept for that purpose, which record shall be in such form as is prescribed by 27 CFR 478.125. The vendor of any [pistol or revolver] firearm shall make such record available for

*Substitute House Bill No. 6667*

inspection upon the request of any sworn member of an organized local police department or the Division of State Police within the Department of Emergency Services and Public Protection or any investigator assigned to the state-wide firearms trafficking task force established under section 29-38e <u>or any investigator employed by a federal law enforcement agency for official purposes related to such member's, investigator's employment</u>.

Sec. 8. (NEW) (*Effective October 1, 2023*) (a) In addition to any other duty required by chapter 529 of the general statutes, a person who possesses a permit to sell firearms at retail issued pursuant to subsection (a) of section 29-28 of the general statutes, as amended by this act, shall not:

(1) Furnish false or fraudulent information in any application to the Department of Emergency Services and Public Protection or fail to comply with representations made in any application;

(2) Fail to maintain a permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28 of the general statutes, as amended by this act, or a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f of the general statutes, as amended by this act;

(3) Fail to maintain a permit to sell firearms at retail issued pursuant to subsection (a) of section 29-28 of the general statutes, as amended by this act;

(4) Fail to maintain effective controls against theft of firearms, including, but not limited to, installation or maintenance of the burglar alarm system required under section 29-37d of the general statutes;

(5) Fail to acquire an authorization number for a firearm transfer pursuant to sections 29-36*l* and 29-37a of the general statutes, as amended by this act;

*Substitute House Bill No. 6667*

(6) Transfer a firearm to a person ineligible to receive such firearm, unless the permittee relied in good faith on information provided to such permittee by the department in verifying the eligibility of such ineligible person;

(7) Sell, deliver or otherwise transfer an assault weapon in violation of sections 53-202a to 53-202k, inclusive, of the general statutes, as amended by this act, or fail to maintain accurate records of any such sale, delivery or transfer;

(8) Sell, deliver or otherwise transfer a large capacity magazine in violation of sections 53-202w of the general statutes, as amended by this act, and 53-202x of the general statutes or fail to maintain accurate records of any such sale, delivery or transfer;

(9) Fail to maintain current and proper acquisition and disposition records required by the Bureau of Alcohol, Tobacco, Firearms and Explosives;

(10) Fail to post placards or furnish written warnings pursuant to section 29-37b of the general statutes, as amended by this act;

(11) Fail to provide a trigger lock, gun lock or gun locking device with each purchase pursuant to section 29-37b of the general statutes, as amended by this act;

(12) Fail to verify the age and criminal background of employees pursuant to section 29-37f of the general statutes;

(13) Fail to report any firearm stolen in compliance with section 53-202g, as amended by this act, and 18 USC 923(g)(6), as amended from time to time; or

(14) Fail to conduct an annual physical inventory reconciliation as required by subsection (b) of this section.

*Substitute House Bill No. 6667*

(b) Any person who possesses a permit to sell firearms at retail shall, not later than the fifth business day of October of each year, cause a physical inventory reconciliation to be performed that includes comparing the physical inventory of firearms with acquisition and disposition records required to be maintained pursuant to this chapter and 27 CFR 478.125 (e), as amended from time to time. A permittee shall, within five business days of performing this inventory reconciliation, attest to the commissioner, in a form and manner specified by the commissioner, that the required inventory reconciliation was performed and any firearms determined to be missing from the inventory were reported to the Attorney General and appropriate local authorities as required by section 53-202g of the general statutes, as amended by this act, and 18 USC 923 (g)(6), as amended from time to time.

(c) (1) If there is probable cause to believe that a person has failed to comply with the duties specified in subsection (a) of this section, the commissioner or the chief of police or, where there is no chief of police, the chief executive officer of the municipality or if designated by such chief executive officer, the resident state trooper serving such municipality or a state police officer of the state police troop having jurisdiction over such municipality in which such person resides may issue notice of a violation. Such notice shall detail the reasons for issuing such notice and provide a date, not earlier than thirty days following the date of service of the notice, by which such person must cure the violation.

(2) If the period for cure described in subdivision (1) of this subsection has expired and the commissioner or chief determines that the violation is not cured, the commissioner or chief or, where there is no chief of police, the chief executive officer of the municipality or if designated by such chief executive officer, the resident state trooper may temporarily prohibit further sale of firearms at the permitted premises by issuing a stop sales order. Such order shall be effective when served upon the

*Substitute House Bill No. 6667*

person in violation or posted by the commissioner or chief or, where there is no chief of police, the chief executive officer of the municipality or if designated by such chief executive officer, the resident state trooper at the permitted premises. The commissioner or chief or, where there is no chief of police, the chief executive officer of the municipality or if designated by such chief executive officer, the resident state trooper may assess a civil penalty against of not more than one hundred dollars per day during which the violation continues. Any person who sells, delivers or otherwise transfers a firearm in violation of a stop sales order shall be guilty of a class C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

(3) Any person against which a stop sales order is issued pursuant to subdivision (2) of this subsection may request a hearing before the commissioner to challenge the grounds for issuance of such stop sales order and any associated civil penalties. Such hearing shall be conducted not later than seven days after receipt of such request in accordance with the provisions of chapter 54 of the general statutes.

(4) Stop sales orders shall be effective against any successor entity that has one or more of the same principals or officers as the corporation, partnership or sole proprietorship against which the stop sales order was issued and are engaged in the same or equivalent trade or activity.

(5) The commissioner shall adopt regulations, in accordance with the provisions of chapter 54 of the general statutes, to specify any hearing provisions necessary to carry out the provisions of this subsection.

Sec. 9. Section 29-33 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

*Substitute House Bill No. 6667*

(a) No person, firm or corporation shall sell, deliver or otherwise transfer any pistol or revolver to any person who is prohibited from possessing a pistol or revolver as provided in section 53a-217c, as amended by this act.

(b) [On and after October 1, 1995, no] No person may purchase or receive any pistol or revolver unless such person holds a valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28, as amended by this act, a valid permit to sell firearms at retail [a pistol or revolver] issued pursuant to subsection (a) of section 29-28, as amended by this act, or a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f, as amended by this act, or is a federal marshal, parole officer or peace officer.

(c) No person, firm or corporation shall sell, deliver or otherwise transfer any pistol or revolver except upon written application on a form prescribed and furnished by the Commissioner of Emergency Services and Public Protection. Such person, firm or corporation shall ensure that all questions on the application are answered properly prior to releasing the pistol or revolver and shall retain the application, which shall be attached to the federal sale or transfer document, for at least twenty years or until such vendor goes out of business. Such application shall be available for inspection during normal business hours by law enforcement officials. No sale, delivery or other transfer of any pistol or revolver shall be made unless the person making the purchase or to whom the same is delivered or transferred is personally known to the person selling such pistol or revolver or making delivery or transfer thereof or provides evidence of his identity in the form of a motor vehicle operator's license, identity card issued pursuant to section 1-1h or valid passport. No sale, delivery or other transfer of any pistol or revolver shall be made until the person, firm or corporation making such transfer obtains an authorization number from the Commissioner of Emergency Services and Public Protection. Said commissioner shall

*Substitute House Bill No. 6667*

perform the national instant criminal background check and make a reasonable effort to determine whether there is any reason that would prohibit such applicant from possessing a pistol or revolver as provided in section 53a-217c, as amended by this act. If the commissioner determines the existence of such a reason, the commissioner shall (1) deny the sale and no pistol or revolver shall be sold, delivered or otherwise transferred by such person, firm or corporation to such applicant, and (2) inform the chief of police of the town in which the applicant resides, or, where there is no chief of police, the warden of the borough or the first selectman of the town, as the case may be, that there exists a reason that would prohibit such applicant from possessing a pistol or revolver.

(d) No person, firm or corporation shall sell, deliver or otherwise transfer any pistol or revolver, other than at wholesale, unless such pistol or revolver is equipped with a reusable trigger lock, gun lock or gun locking device appropriate for such pistol or revolver, which lock or device shall be constructed of material sufficiently strong to prevent it from being easily disabled and have a locking mechanism accessible by key or by electronic or other mechanical accessory specific to such lock or device to prevent unauthorized removal. No pistol or revolver shall be loaded or contain therein any gunpowder or other explosive or any bullet, ball or shell when such pistol or revolver is sold, delivered or otherwise transferred.

(e) Upon the sale, delivery or other transfer of any pistol or revolver, the person making the purchase or to whom the same is delivered or transferred shall sign a receipt for such pistol or revolver, which shall contain the name and address of such person, the date of sale, the caliber, make, model and manufacturer's number and a general description of such pistol or revolver, the identification number of such person's permit to carry pistols or revolvers, issued pursuant to subsection (b) of section 29-28, as amended by this act, permit to sell

*Substitute House Bill No. 6667*

firearms at retail, [pistols or revolvers,] issued pursuant to subsection (a) of said section, or eligibility certificate for a pistol or revolver, issued pursuant to section 29-36f, as amended by this act, if any, and the authorization number designated for the transfer by the Department of Emergency Services and Public Protection. The person, firm or corporation selling such pistol or revolver or making delivery or transfer thereof shall (1) give one copy of the receipt to the person making the purchase of such pistol or revolver or to whom the same is delivered or transferred, (2) retain one copy of the receipt for at least five years, and (3) send, by first class mail, or electronically transmit, within forty-eight hours of such sale, delivery or other transfer, (A) one copy of the receipt to the Commissioner of Emergency Services and Public Protection, and (B) one copy of the receipt to the chief of police of the municipality in which the transferee resides or, where there is no chief of police, the chief executive officer of the municipality, as defined in section 7-148, in which the transferee resides or, if designated by such chief executive officer, the resident state trooper serving such municipality or a state police officer of the state police troop having jurisdiction over such municipality.

(f) (1) The Commissioner of Emergency Services and Public Protection shall not issue more than three authorization numbers for sale at retail of a pistol or revolver to any transferee within a thirty-day period, except that if such transferee is certified as a firearms instructor by the state pursuant to section 29-28, as amended by this act, or the National Rifle Association, said commissioner shall not issue more than six authorization numbers within a thirty-day period.

(2) No authorization number issued for any of the following purposes shall count toward the limits in subdivision (1) of this subsection: (A) Any firearm transferred to a federal, state or municipal law enforcement agency, or any firearm legally transferred under the provisions of section 29-36k, (B) the exchange of a pistol or revolver purchased by an

*Substitute House Bill No. 6667*

individual from a federally licensed firearm dealer for another pistol or revolver from the same federally licensed firearm dealer not later than thirty days after the original transaction, provided the federally licensed firearm dealer reports the transaction to the Commissioner of Emergency Services and Public Protection, (C) as otherwise provided in subsection (h) or (i) of this section, or (D) a transfer to a museum at a fixed location that is open to the public and displays firearms as part of an educational mission.

[(f)] (g) The provisions of this section shall not apply to antique pistols or revolvers. An antique pistol or revolver, for the purposes of this section, means any pistol or revolver which was manufactured in or before 1898 and any replica of such pistol or revolver provided such replica is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition except rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and not readily available in the ordinary channel of commercial trade.

[(g)] (h) The provisions of this section shall not apply to the sale, delivery or transfer of pistols or revolvers between (1) a federally-licensed firearm manufacturer and a federally-licensed firearm dealer, (2) a federally-licensed firearm importer and a federally-licensed firearm dealer, [or] (3) federally-licensed firearm dealers, or (4) federally-licensed firearm manufacturers.

[(h)] (i) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, the court may order suspension of prosecution. The court shall not order suspension of prosecution unless the accused person has acknowledged that he understands the consequences of the suspension of prosecution. Any person for whom prosecution is suspended shall agree to the

*Substitute House Bill No. 6667*

tolling of any statute of limitations with respect to such violation and to a waiver of his right to a speedy trial. Such person shall appear in court and shall be released to the supervision of the Court Support Services Division for such period, not exceeding two years, and under such conditions as the court shall order. If the person refuses to accept, or, having accepted, violates such conditions, the court shall terminate the suspension of prosecution and the case shall be brought to trial. If such person satisfactorily completes his period of probation, he may apply for dismissal of the charges against him and the court, on finding such satisfactory completion, shall dismiss such charges. If the person does not apply for dismissal of the charges against him after satisfactorily completing his period of probation, the court, upon receipt of a report submitted by the Court Support Services Division that the person satisfactorily completed his period of probation, may on its own motion make a finding of such satisfactory completion and dismiss such charges. Upon dismissal, all records of such charges shall be erased pursuant to section 54-142a. An order of the court denying a motion to dismiss the charges against a person who has completed his period of probation or terminating the participation of a defendant in such program shall be a final judgment for purposes of appeal.

[(i)] (j) Any person who violates any provision of this section shall be guilty of a class C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, except that any person who sells, delivers or otherwise transfers a pistol or revolver in violation of the provisions of this section knowing that such pistol or revolver is stolen or that the manufacturer's number or other mark of identification on such pistol or revolver has been altered, removed or obliterated, shall be guilty of a class B felony for which three years of the sentence imposed may not be suspended or reduced by the court, and ten thousand dollars of the fine imposed may

*Substitute House Bill No. 6667*

not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, and any pistol or revolver found in the possession of any person in violation of any provision of this section shall be forfeited.

Sec. 10. Section 29-36*l* of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) The Commissioner of Emergency Services and Public Protection shall establish a state database that any person, firm or corporation who sells or otherwise transfers firearms may access, by telephone or other electronic means in addition to the telephone, for information to be supplied immediately, on whether a permit to carry a pistol or revolver, issued pursuant to subsection (b) of section 29-28, as amended by this act, a permit to sell firearms at retail, [a pistol or revolver,] issued pursuant to subsection (a) of section 29-28, as amended by this act, an eligibility certificate for a pistol or revolver, issued pursuant to section 29-36f, as amended by this act, or a long gun eligibility certificate, issued pursuant to section 29-37p, as amended by this act, is valid and has not been revoked or suspended.

(b) Upon establishment of the database, the commissioner shall notify each person, firm or corporation holding a permit to sell firearms at retail [pistols or revolvers] issued pursuant to subsection (a) of section 29-28, as amended by this act, of the existence and purpose of the system and the means to be used to access the database.

(c) The Department of Emergency Services and Public Protection shall establish days and hours during which the telephone number or other electronic means shall be operational for purposes of responding to inquiries, taking into consideration the normal business hours of retail firearm businesses.

(d) (1) The Department of Emergency Services and Public Protection

*Substitute House Bill No. 6667*

shall be the point of contact for initiating a background check through the National Instant Criminal Background Check System (NICS), established under section 103 of the Brady Handgun Violence Prevention Act, on individuals purchasing firearms.

(2) The Department of Emergency Services and Public Protection, Department of Mental Health and Addiction Services and Judicial Department shall, in accordance with state and federal law regarding confidentiality, enter into a memorandum of understanding with the Federal Bureau of Investigation for the purpose of implementing the National Instant Criminal Background Check System in the state. The Department of Emergency Services and Public Protection shall report the name, date of birth and physical description of any person prohibited from possessing a firearm pursuant to 18 USC 922(g) or (n) to the National Instant Criminal Background Check System Index, Denied Persons Files.

(e) Any person, firm or corporation that contacts the Department of Emergency Services and Public Protection to access the database established under this section and determine if a person is eligible to receive or possess a firearm shall not be held civilly liable for the sale or transfer of a firearm to a person whose receipt or possession of such firearm is unlawful or for refusing to sell or transfer a firearm to a person who may lawfully receive or possess such firearm if such person, firm or corporation relied, in good faith, on the information provided to such person, firm or corporation by said department, unless the conduct of such person, firm or corporation was unreasonable or reckless.

(f) Any person, firm or corporation that sells, delivers or otherwise transfers any firearm pursuant to section 29-33, as amended by this act, or 29-37a, as amended by this act, shall contact the Department of Emergency Services and Public Protection to access the database established under this section and receive an authorization number for such sale, delivery or transfer. The provisions of this subsection shall not

*Substitute House Bill No. 6667*

apply to: (1) Any sale, delivery or transfer of an antique firearm manufactured in or before 1898, including any firearm with a matchlock, flintlock, percussion cap or similar type of ignition system manufactured in or before 1898; (2) any sale, delivery or transfer of any replica of any firearm described in subdivision (1) of this subsection if such replica uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; (3) transactions between persons who are licensed as firearms importers or collectors, manufacturers or dealers pursuant to 18 USC 921 et seq.; (4) the transfer of firearms to and from gunsmiths for purposes of repair only; and (5) any sale, delivery or transfer of any firearm to any agency of the United States, the state of Connecticut or any local government.

Sec. 11. Section 29-37a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) For the purposes of this section, "long gun" means a firearm, as defined in section 53a-3, as amended by this act, other than a pistol or revolver.

(b) (1) Except as provided in subdivision (2) of this subsection, no person, firm or corporation may sell, deliver or otherwise transfer, at retail, any long gun to any person under eighteen years of age.

(2) No person, firm or corporation may sell, deliver or otherwise transfer [, at retail,] any semi-automatic centerfire rifle that has or accepts a magazine with a capacity exceeding five rounds to any person under twenty-one years of age. The provisions of this subdivision shall not apply to the sale, delivery or transfer of such a rifle to any person who is a member or employee of an organized local police department, the Department of Emergency Services and Public Protection or the Department of Correction or a member of the military or naval forces of this state or of the United States for use in the discharge of their duties.

*Substitute House Bill No. 6667*

(c) **[**On and after April 1, 2014, no**]** <u>No</u> person may purchase or receive any long gun unless such person holds a valid long gun eligibility certificate issued pursuant to section 29-37p<u>, as amended by this act</u>, a valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28<u>, as amended by this act</u>, a valid permit to sell <u>firearms</u> at retail **[**a pistol or revolver**]** issued pursuant to subsection (a) of section 29-28<u>, as amended by this act,</u> or a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f<u>, as amended by this act</u>.

(d) No person, firm or corporation may sell, deliver or otherwise transfer, at retail, any long gun to any person unless such person makes application on a form prescribed and furnished by the Commissioner of Emergency Services and Public Protection, which shall be attached by the transferor to the federal sale or transfer document and filed and retained by the transferor for at least twenty years or until such transferor goes out of business. Such application shall be available for inspection during normal business hours by law enforcement officials. No such sale, delivery or other transfer of any long gun shall be made until the person, firm or corporation making such sale, delivery or transfer has ensured that such application has been completed properly and has obtained an authorization number from the Commissioner of Emergency Services and Public Protection for such sale, delivery or transfer. The Department of Emergency Services and Public Protection shall make every effort, including performing the national instant criminal background check, to determine if the applicant is eligible to receive such long gun. If it is determined that the applicant is ineligible to receive such long gun, the Commissioner of Emergency Services and Public Protection shall immediately notify the (1) person, firm or corporation to whom such application was made and no such long gun shall be sold, delivered or otherwise transferred to such applicant by such person, firm or corporation, and (2) chief of police of the town in which the applicant resides, or, where there is no chief of police, the

*Substitute House Bill No. 6667*

warden of the borough or the first selectman of the town, as the case may be, that the applicant is not eligible to receive a long gun. When any long gun is delivered in connection with any sale or purchase, such long gun shall be enclosed in a package, the paper or wrapping of which shall be securely fastened, and no such long gun when delivered on any sale or purchase shall be loaded or contain any gunpowder or other explosive or any bullet, ball or shell. Upon the sale, delivery or other transfer of the long gun, the transferee shall sign in triplicate a receipt for such long gun, which shall contain the name, address and date and place of birth of such transferee, the date of such sale, delivery or transfer and the caliber, make, model and manufacturer's number and a general description thereof. Not later than twenty-four hours after such sale, delivery or transfer, the transferor shall send by first class mail or electronically transfer one receipt to the Commissioner of Emergency Services and Public Protection and one receipt to the chief of police of the municipality in which the transferee resides or, where there is no chief of police, the chief executive officer of the municipality, as defined in section 7-148, in which the transferee resides or, if designated by such chief executive officer, the resident state trooper serving such municipality or a state police officer of the state police troop having jurisdiction over such municipality, and shall retain one receipt, together with the original application, for at least five years.

(e) No sale, delivery or other transfer of any long gun shall be made by a person who is not a federally licensed firearm manufacturer, importer or dealer to a person who is not a federally licensed firearm manufacturer, importer or dealer unless:

(1) The prospective transferor and prospective transferee comply with the provisions of subsection (d) of this section and the prospective transferor has obtained an authorization number from the Commissioner of Emergency Services and Public Protection for such sale, delivery or transfer; or

*Substitute House Bill No. 6667*

(2) The prospective transferor or prospective transferee requests a federally licensed firearm dealer to contact the Department of Emergency Services and Public Protection on behalf of such prospective transferor or prospective transferee and the federally licensed firearm dealer has obtained an authorization number from the Commissioner of Emergency Services and Public Protection for such sale, delivery or transfer.

(f) (1) **[**On and after January 1, 2014, for**]** <u>For</u> purposes of a transfer pursuant to subdivision (2) of subsection (e) of this section, a prospective transferor or prospective transferee may request a federally licensed firearm dealer to contact the Department of Emergency Services and Public Protection to obtain an authorization number for such sale, delivery or transfer. If a federally licensed firearm dealer consents to contact the department on behalf of the prospective transferor or prospective transferee, the prospective transferor or prospective transferee shall provide to such dealer the name, sex, race, date of birth and state of residence of the prospective transferee and, if necessary to verify the identity of the prospective transferee, may provide a unique numeric identifier including, but not limited to, a Social Security number, and additional identifiers including, but not limited to, height, weight, eye and hair color, and place of birth. The prospective transferee shall present to the dealer such prospective transferee's valid long gun eligibility certificate issued pursuant to section 29-37p<u>, as amended by this act</u>, valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28<u>, as amended by this act</u>, valid permit to sell <u>firearms</u> at retail **[**a pistol or revolver**]** issued pursuant to subsection (a) of section 29-28<u>, as amended by this act,</u> or valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f<u>, as amended by this act</u>. The dealer may charge a fee for contacting the department on behalf of the prospective transferor or prospective transferee.

*Substitute House Bill No. 6667*

(2) The Department of Emergency Services and Public Protection shall make every effort, including performing the national instant criminal background check, to determine if the prospective transferee is eligible to receive such long gun. The Commissioner of Emergency Services and Public Protection shall immediately notify the dealer of the department's determination and the dealer shall immediately notify the prospective transferor or prospective transferee of such determination. If the department determines the prospective transferee is ineligible to receive such long gun, no long gun shall be sold, delivered or otherwise transferred by the prospective transferor to the prospective transferee. If the department determines the prospective transferee is eligible to receive such long gun and provides an authorization number for such sale, delivery or transfer, the prospective transferor may proceed to sell, deliver or otherwise transfer the long gun to the prospective transferee.

(3) Upon the sale, delivery or other transfer of the long gun, the transferor or transferee shall complete a form, prescribed by the Commissioner of Emergency Services and Public Protection, that contains the name and address of the transferor, the name and address of the transferee, the date and place of birth of such transferee, the firearm permit or certificate number of the transferee, the firearm permit or certificate number of the transferor, if any, the date of such sale, delivery or transfer, the caliber, make, model and manufacturer's number and a general description of such long gun and the authorization number provided by the department. Not later than twenty-four hours after such sale, delivery or transfer, the transferor shall send by first class mail or electronically transfer one copy of such form to the Commissioner of Emergency Services and Public Protection and one copy to the chief of police of the municipality in which the transferee resides or, where there is no chief of police, the chief executive officer of the municipality, as defined in section 7-148, in which the transferee resides or, if designated by such chief executive officer, the resident state trooper serving such municipality or a state police officer

*Substitute House Bill No. 6667*

of the state police troop having jurisdiction over such municipality, and shall retain one copy, for at least five years.

(g) **[**Prior to April 1, 2014, no**]** <u>No</u> sale, delivery or other transfer of any long gun shall be made until the expiration of two weeks from the date of the application, except that such waiting period shall not apply to any federal marshal, parole officer or peace officer, or to the sale, delivery or other transfer of (1) any long gun to a holder of a valid state permit to carry a pistol or revolver issued under the provisions of section 29-28<u>, as amended by this act</u>, a valid eligibility certificate issued under the provisions of section 29-36f<u>, as amended by this act</u>, or a valid long gun eligibility certificate issued under the provisions of section 29-37p<u>, as amended by this act</u>, (2) any long gun to an active member of the armed forces of the United States or of any reserve component thereof, (3) any long gun to a holder of a valid hunting license issued pursuant to chapter 490, or (4) antique firearms. For the purposes of this subsection, "antique firearm" means any firearm which was manufactured in or before 1898 and any replica of such firearm, provided such replica is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition except rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and not readily available in the ordinary channel of commercial trade.

(h) The provisions of subsections (c) to (g), inclusive<u>,</u> of this section shall not apply to the sale, delivery or transfer of (1) long guns to (A) the Department of Emergency Services and Public Protection, police departments, the Department of Correction, the Division of Criminal Justice, the Department of Motor Vehicles, the Department of Energy and Environmental Protection or the military or naval forces of this state or of the United States, (B) a sworn and duly certified member of an organized police department, the Division of State Police within the Department of Emergency Services and Public Protection or the

*Substitute House Bill No. 6667*

Department of Correction, a chief inspector or inspector in the Division of Criminal Justice, a salaried inspector of motor vehicles designated by the Commissioner of Motor Vehicles, a conservation officer or special conservation officer appointed by the Commissioner of Energy and Environmental Protection pursuant to section 26-5, or a constable who is certified by the Police Officer Standards and Training Council and appointed by the chief executive authority of a town, city or borough to perform criminal law enforcement duties, pursuant to a letter on the letterhead of such department, division, commissioner or authority authorizing the purchase and stating that the sworn member, inspector, officer or constable will use the long gun in the discharge of official duties, and that a records check indicates that the sworn member, inspector, officer or constable has not been convicted of a crime of family violence, for use by such sworn member, inspector, officer or constable in the discharge of such sworn member's, inspector's, officer's or constable's official duties or when off duty, (C) a member of the military or naval forces of this state or of the United States, or (D) a nuclear facility licensed by the United States Nuclear Regulatory Commission for the purpose of providing security services at such facility, or any contractor or subcontractor of such facility for the purpose of providing security services at such facility; (2) long guns to or between federally licensed firearm manufacturers, importers or dealers; (3) curios or relics, as defined in 27 CFR 478.11, to or between federally licensed firearm collectors; or (4) antique firearms, as defined in subsection (g) of this section.

(i) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution. The court shall not order suspension of prosecution unless the accused person has acknowledged that he

*Substitute House Bill No. 6667*

understands the consequences of the suspension of prosecution. Any person for whom prosecution is suspended shall agree to the tolling of any statute of limitations with respect to such violation and to a waiver of his right to a speedy trial. Such person shall appear in court and shall be released to the supervision of the Court Support Services Division for such period, not exceeding two years, and under such conditions as the court shall order. If the person refuses to accept, or, having accepted, violates such conditions, the court shall terminate the suspension of prosecution and the case shall be brought to trial. If such person satisfactorily completes his period of probation, he may apply for dismissal of the charges against him and the court, on finding such satisfactory completion, shall dismiss such charges. If the person does not apply for dismissal of the charges against him after satisfactorily completing his period of probation, the court, upon receipt of a report submitted by the Court Support Services Division that the person satisfactorily completed his period of probation, may on its own motion make a finding of such satisfactory completion and dismiss such charges. Upon dismissal, all records of such charges shall be erased pursuant to section 54-142a. An order of the court denying a motion to dismiss the charges against a person who has completed his period of probation or terminating the participation of a defendant in such program shall be a final judgment for purposes of appeal.

(j) Any person who violates any provision of this section shall be guilty of a class D felony, except that any person who sells, delivers or otherwise transfers a long gun in violation of the provisions of this section, knowing that such long gun is stolen or that the manufacturer's number or other mark of identification on such long gun has been altered, removed or obliterated, shall be guilty of a class B felony, and any long gun found in the possession of any person in violation of any provision of this section shall be forfeited.

Sec. 12. Section 29-37i of the general statutes is repealed and the

*Substitute House Bill No. 6667*

following is substituted in lieu thereof (*Effective October 1, 2023*):

No person shall store or keep any firearm, as defined in section 53a-3, as amended by this act, on any premises under such person's control **[**if such person knows or reasonably should know that (1) a minor is likely to gain access to the firearm without the permission of the parent or guardian of the minor, (2) a resident of the premises is ineligible to possess a firearm under state or federal law, (3) a resident of the premises is subject to a risk protection order issued pursuant to section 29-38c, or (4) a resident of the premises poses a risk of imminent personal injury to himself or herself or to another person,**]** unless such person **[**(A)**]** (1) keeps the firearm in a securely locked box or other container or in a manner which a reasonable person would believe to be secure, or **[**(B)**]** (2) carries the firearm on his or her person or within such close proximity thereto that such person can readily retrieve and use the firearm as if such person carried the firearm on his or her person. **[**For the purposes of this section, "minor" means any person under the age of eighteen years.**]**

Sec. 13. Section 29-38b of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) The Commissioner of Emergency Services and Public Protection, in fulfilling **[**his**]** the commissioner's obligations under sections 29-28 to 29-38, inclusive, as amended by this act, and section 53-202d, as amended by this act, shall verify that any person who **[**, on or after October 1, 1998,**]** applies for or seeks renewal of a permit to sell firearms at retail, **[**a pistol or revolver,**]** a permit to carry a pistol or revolver, an eligibility certificate for a pistol or revolver or a certificate of possession for an assault weapon, or who **[**, on or after July 1, 2013,**]** applies for or seeks renewal of a long gun eligibility certificate, has not been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court or has not been voluntarily admitted to a hospital for persons with

*Substitute House Bill No. 6667*

psychiatric disabilities, as defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a-680, by making an inquiry to the Department of Mental Health and Addiction Services in such a manner so as to only receive a report on the commitment or admission status of the person with respect to whom the inquiry is made including identifying information in accordance with the provisions of subsection (b) of section 17a-500.

(b) If the Commissioner of Emergency Services and Public Protection determines pursuant to subsection (a) of this section that a person has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court or has been voluntarily admitted to a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a-680, said commissioner shall report the status of such person's application for or renewal of a permit to sell <u>firearms</u> at retail, **[**a pistol or revolver,**]** a permit to carry a pistol or revolver, an eligibility certificate for a pistol or revolver, a certificate of possession for an assault weapon or a long gun eligibility certificate to the Commissioner of Mental Health and Addiction Services for the purpose of fulfilling his responsibilities under subsection (c) of section 17a-500.

Sec. 14. Section 29-38m of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) For the purposes of this section and sections 29-38n to 29-38p, inclusive, "ammunition" means a loaded cartridge, consisting of a primed case, propellant or projectile, designed for use in any firearm, "firearm" has the meaning provided in section 53a-3<u>, as amended by this</u>

*Substitute House Bill No. 6667*

act, and "magazine" means any firearm magazine, belt, drum, feed strip or similar device that accepts ammunition.

(b) No person, firm or corporation shall sell ammunition or an ammunition magazine to any person under eighteen years of age.

(c) **[**On and after October 1, 2013, no**]** No person, firm or corporation shall sell ammunition or an ammunition magazine to any person unless such person holds a valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28, as amended by this act, a valid permit to sell firearms at retail **[**a pistol or revolver**]** issued pursuant to subsection (a) of section 29-28, as amended by this act, a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f, as amended by this act, or a valid long gun eligibility certificate issued pursuant to section 29-37p, as amended by this act, and presents to the transferor such permit or certificate, or unless such person holds a valid ammunition certificate issued pursuant to section 29-38n and presents to the transferor such certificate and such person's motor vehicle operator's license, passport or other valid form of identification issued by the federal government or a state or municipal government that contains such person's date of birth and photograph.

(d) The provisions of **[**subsection**]** subsections (b) and (c) of this section shall not apply to the sale of ammunition to (1) the Department of Emergency Services and Public Protection, police departments, the Department of Correction, the Division of Criminal Justice, the Department of Motor Vehicles, the Department of Energy and Environmental Protection or the military or naval forces of this state or of the United States; (2) a sworn and duly certified member of an organized police department, the Division of State Police within the Department of Emergency Services and Public Protection or the Department of Correction, a chief inspector or inspector in the Division of Criminal Justice, a salaried inspector of motor vehicles designated by the Commissioner of Motor Vehicles, a conservation officer or special

conservation officer appointed by the Commissioner of Energy and Environmental Protection pursuant to section 26-5, or a constable who is certified by the Police Officer Standards and Training Council and appointed by the chief executive authority of a town, city or borough to perform criminal law enforcement duties, for use by such sworn member, inspector, officer or constable in the discharge of such sworn member's, inspector's, officer's or constable's official duties or when off duty; (3) a member of the military or naval forces of this state or of the United States; (4) a nuclear facility licensed by the United States Nuclear Regulatory Commission for the purpose of providing security services at such facility, or any contractor or subcontractor of such facility for the purpose of providing security services at such facility; or (5) a federally licensed firearm manufacturer, importer, dealer or collector.

(e) Any person who violates any provision of this section shall be guilty of a class D felony.

Sec. 15. Subsections (d) to (f), inclusive, of section 53-202f of the general statutes are repealed and the following is substituted in lieu thereof (*Effective from passage*):

(d) <u>(1)</u> Not later than December 31, 2013, any person who lawfully possessed an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a<u>, as amended by this act,</u> on April 4, 2013, which was lawful under the provisions of sections 53-202a to 53-202k, inclusive<u>, as amended by this act</u>, in effect on January 1, 2013, may transfer possession of the assault weapon to a licensed gun dealer within or outside of this state for sale outside of this state, and may transport the assault weapon to such dealer for the purpose of making such transfer, without obtaining a certificate of possession under section 53-202d<u>, as amended by this act</u>.

<u>(2) Not later than April 30, 2024, any person who lawfully possessed a 2023 assault weapon on the date immediately preceding the effective</u>

*Substitute House Bill No. 6667*

date of this section, which was lawful under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, in effect on January 1, 2023, may transfer possession of the 2023 assault weapon to a licensed gun dealer within or outside of this state for sale outside of this state, and may transport the 2023 assault weapon to such dealer for the purpose of making such transfer, without obtaining a certificate of possession under section 53-202d, as amended by this act.

(e) (1) Not later than October 1, 2013, any licensed gun dealer, pawnbroker licensed under section 21-40, or consignment shop operator, as defined in section 21-39a, may transfer possession of an assault weapon to any person who **[**(1)**]** (A) legally possessed the assault weapon prior to or on April 4, 2013, **[**(2)**]** (B) placed the assault weapon in the possession of such dealer, pawnbroker or operator prior to or on April 4, 2013, pursuant to an agreement between such person and such dealer, pawnbroker or operator for the sale of the assault weapon to a third person, and **[**(3)**]** (C) is eligible to possess a firearm on the date of such transfer.

(2) Any licensed gun dealer, pawnbroker licensed under section 21-40, or consignment shop operator, as defined in section 21-39a, may transfer possession of a 2023 assault weapon to any person who (A) legally possessed the 2023 assault weapon prior to the effective date of this section, (B) placed the 2023 assault weapon in the possession of such dealer, pawnbroker or operator pursuant to an agreement between such person and such dealer, pawnbroker or operator for the sale of the assault weapon to a third person, and (C) is eligible to possess a firearm on the date of such transfer.

(f) The term "licensed gun dealer", as used in sections 53-202a to 53-202k, inclusive, as amended by this act, means a person who has a federal firearms license and a permit to sell firearms pursuant to section 29-28, as amended by this act.

*Substitute House Bill No. 6667*

Sec. 16. Subsection (b) of section 54-36e of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(b) Firearms and ammunition turned over to the state police pursuant to subsection (a) of this section which are not destroyed or retained for appropriate use shall be sold at public auctions, conducted by the Commissioner of Administrative Services or said commissioner's designee. Pistols and revolvers, as defined in section 53a-3, as amended by this act, which are antiques, as defined in section 29-33, as amended by this act, or curios or relics, as defined in the Code of Federal Regulations, Title 27, Chapter 1, Part 178, or modern pistols and revolvers which have a current retail value of one hundred dollars or more may be sold at such public auctions, provided such pistols and revolvers shall be sold only to persons who have a valid permit to sell [a pistol or revolver] firearms at retail, or a valid permit to carry a pistol or revolver, issued pursuant to section 29-28, as amended by this act. Rifles and shotguns, as defined in section 53a-3, as amended by this act, shall be sold only to persons qualified under federal law to purchase such rifles and shotguns and who have a valid long gun eligibility certificate issued pursuant to section 29-37p, as amended by this act. The proceeds of any such sale shall be paid to the State Treasurer and deposited by the State Treasurer in the forfeit firearms account within the General Fund.

Sec. 17. Subsection (e) of section 53-202*l* of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(e) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order

*Substitute House Bill No. 6667*

suspension of prosecution in accordance with the provisions of subsection **[**(h)**]** (i) of section 29-33, as amended by this act.

Sec. 18. Subsection (g) of section 53-202w of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(g) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution in accordance with the provisions of subsection **[**(h)**]** (i) of section 29-33, as amended by this act.

Sec. 19. Subsection (f) of section 53-206g of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(f) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution in accordance with the provisions of subsection **[**(h)**]** (i) of section 29-33, as amended by this act.

Sec. 20. Section 53a-217a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) **[**A**]** Except as provided in subsection (b) of this section, a person is guilty of criminally negligent storage of a firearm when such person violates the provisions of section 29-37i, as amended by this act, and **[**a minor or, a resident of the premises who is ineligible to possess a firearm under state or federal law or who poses a risk of imminent personal

*Substitute House Bill No. 6667*

injury to himself or herself or to other individuals,**]** another person obtains the firearm and causes the injury or death of such **[**minor, resident**]** person or any other person. **[**For the purposes of this section, "minor" means any person under the age of eighteen years.**]**

(b) The provisions of this section shall not apply if the **[**minor**]** person obtains the firearm as a result of an unlawful entry to any premises by any person and, if such firearm is stolen, such firearm is reported stolen pursuant to the provisions of section 53-202g, as amended by this act.

(c) Criminally negligent storage of a firearm is a class D felony.

Sec. 21. Section 54-66a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

Any bail bond posted in any criminal proceeding in this state shall be automatically terminated and released whenever the defendant: (1) Is granted accelerated rehabilitation pursuant to section 54-56e; (2) is granted admission to the pretrial alcohol education program pursuant to section 54-56g; (3) is granted admission to the pretrial family violence education program pursuant to section 46b-38c; (4) is granted admission to the pretrial drug education and community service program pursuant to section 54-56i; (5) has the complaint or information filed against such defendant dismissed; (6) has the prosecution of the complaint or information filed against such defendant terminated by entry of a nolle prosequi; (7) is acquitted; (8) is sentenced by the court and a stay of such sentence, if any, is lifted; (9) is granted admission to the pretrial school violence prevention program pursuant to section 54-56j; (10) is charged with a violation of section 29-33, as amended by this act, 53-202*l*, as amended by this act, or 53-202w, as amended by this act, and prosecution has been suspended pursuant to subsection **[**(h)**]** (i) of section 29-33, as amended by this act; (11) is charged with a violation of section 29-37a, as amended by this act, and prosecution has been suspended pursuant to subsection (i) of section 29-37a, as amended by

*Substitute House Bill No. 6667*

this act; (12) is granted admission to the supervised diversionary program for persons with psychiatric disabilities, or persons who are veterans, pursuant to section 54-56*l*; (13) is granted admission to a diversionary program for young persons charged with a motor vehicle violation or an alcohol-related offense pursuant to section 54-56p; (14) is granted admission to the pretrial drug intervention and community service program pursuant to section 54-56q; or (15) is granted admission to the pretrial impaired driving intervention program pursuant to section 54-56r.

Sec. 22. Subdivision (8) of section 54-280 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(8) "Offense committed with a deadly weapon" or "offense" means: (A) A violation of subsection (c) of section 2-1e, subsection (e) of section 29-28, subsections (a) to (e), inclusive, or **[**(i)**]** (j) of section 29-33, as amended by this act, section 29-34, subsection (a) of section 29-35, as amended by this act, section 29-36, 29-36k, 29-37a, as amended by this act, or 29-37e, subsection (c) of section 29-37g, section 29-37j, subsection (b), (c) or (g) of section 53-202, section 53-202b, 53-202c, as amended by this act, 53-202j, 53-202k, 53-202*l*, as amended by this act, 53-202aa or 53-206b, subsection (b) of section 53a-8, section 53a-55a, 53a-56a, 53a-60a, 53a-60c, 53a-72b, 53a-92a, 53a-94a, 53a-102a, 53a-103a, 53a-211, 53a-212, 53a-216, 53a-217, 53a-217a, as amended by this act, 53a-217b or 53a-217c, as amended by this act, or a second or subsequent violation of section 53-202g, as amended by this act; or (B) a violation of any section of the general statutes which constitutes a felony, as defined in section 53a-25, provided the court makes a finding that, at the time of the offense, the offender used a deadly weapon, or was armed with and threatened the use of or displayed or represented by words or conduct that the offender possessed a deadly weapon;

Sec. 23. Section 53-202a of the general statutes is repealed and the

*Substitute House Bill No. 6667*

following is substituted in lieu thereof (*Effective from passage*):

As used in this section and sections 53-202b to 53-202k, inclusive:

(1) "Assault weapon" means:

(A) (i) Any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user or any of the following specified semiautomatic firearms: Algimec Agmi; Armalite AR-180; Australian Automatic Arms SAP Pistol; Auto-Ordnance Thompson type; Avtomat Kalashnikov AK-47 type; Barrett Light-Fifty model 82A1; Beretta AR-70; Bushmaster Auto Rifle and Auto Pistol; Calico models M-900, M-950 and 100-P; Chartered Industries of Singapore SR-88; Colt AR-15 and Sporter; Daewoo K-1, K-2, Max-1 and Max-2; Encom MK-IV, MP-9 and MP-45; Fabrique Nationale FN/FAL, FN/LAR, or FN/FNC; FAMAS MAS 223; Feather AT-9 and Mini-AT; Federal XC-900 and XC-450; Franchi SPAS-12 and LAW-12; Galil AR and ARM; Goncz High-Tech Carbine and High-Tech Long Pistol; Heckler & Koch HK-91, HK-93, HK-94 and SP-89; Holmes MP-83; MAC-10, MAC-11 and MAC-11 Carbine type; Intratec TEC-9 and Scorpion; Iver Johnson Enforcer model 3000; Ruger Mini-14/5F folding stock model only; Scarab Skorpion; SIG 57 AMT and 500 series; Spectre Auto Carbine and Auto Pistol; Springfield Armory BM59, SAR-48 and G-3; Sterling MK-6 and MK-7; Steyr AUG; Street Sweeper and Striker 12 revolving cylinder shotguns; USAS-12; UZI Carbine, Mini-Carbine and Pistol; Weaver Arms Nighthawk; Wilkinson "Linda" Pistol;

(ii) A part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined in subparagraph (A)(i) of this subdivision, or any combination of parts from which an assault weapon, as defined in subparagraph (A)(i) of this subdivision, may be rapidly assembled if those parts are in the possession or under the control of the same person;

*Substitute House Bill No. 6667*

(B) Any of the following specified semiautomatic centerfire rifles, or copies or duplicates thereof with the capability of any such rifles, that were in production prior to or on April 4, 2013: (i) AK-47; (ii) AK-74; (iii) AKM; (iv) AKS-74U; (v) ARM; (vi) MAADI AK47; (vii) MAK90; (viii) MISR; (ix) NHM90 and NHM91; (x) Norinco 56, 56S, 84S and 86S; (xi) Poly Technologies AKS and AK47; (xii) SA 85; (xiii) SA 93; (xiv) VEPR; (xv) WASR-10; (xvi) WUM; (xvii) Rock River Arms LAR-47; (xviii) Vector Arms AK-47; (xix) AR-10; (xx) AR-15; (xxi) Bushmaster Carbon 15, Bushmaster XM15, Bushmaster ACR Rifles, Bushmaster MOE Rifles; (xxii) Colt Match Target Rifles; (xxiii) Armalite M15; (xxiv) Olympic Arms AR-15, A1, CAR, PCR, K3B, K30R, K16, K48, K8 and K9 Rifles; (xxv) DPMS Tactical Rifles; (xxvi) Smith and Wesson M&P15 Rifles; (xxvii) Rock River Arms LAR-15; (xxviii) Doublestar AR Rifles; (xxix) Barrett REC7; (xxx) Beretta Storm; (xxxi) Calico Liberty 50, 50 Tactical, 100, 100 Tactical, I, I Tactical, II and II Tactical Rifles; (xxxii) Hi-Point Carbine Rifles; (xxxiii) HK-PSG-1; (xxxiv) Kel-Tec Sub-2000, SU Rifles, and RFB; (xxxv) Remington Tactical Rifle Model 7615; (xxxvi) SAR-8, SAR-4800 and SR9; (xxxvii) SLG 95; (xxxviii) SLR 95 or 96; (xxxix) TNW M230 and M2HB; (xl) Vector Arms UZI; (xli) Galil and Galil Sporter; (xlii) Daewoo AR 100 and AR 110C; (xliii) Fabrique Nationale/FN 308 Match and L1A1 Sporter; (xliv) HK USC; (xlv) IZHMASH Saiga AK; (xlvi) SIG Sauer 551-A1, 556, 516, 716 and M400 Rifles; (xlvii) Valmet M62S, M71S and M78S; (xlviii) Wilkinson Arms Linda Carbine; and (xlix) Barrett M107A1;

(C) Any of the following specified semiautomatic pistols, or copies or duplicates thereof with the capability of any such pistols, that were in production prior to or on April 4, 2013: (i) Centurion 39 AK; (ii) Draco AK-47; (iii) HCR AK-47; (iv) IO Inc. Hellpup AK-47; (v) Mini-Draco AK-47; (vi) Yugo Krebs Krink; (vii) American Spirit AR-15; (viii) Bushmaster Carbon 15; (ix) Doublestar Corporation AR; (x) DPMS AR-15; (xi) Olympic Arms AR-15; (xii) Rock River Arms LAR 15; (xiii) Calico Liberty III and III Tactical Pistols; (xiv) Masterpiece Arms MPA Pistols

*Substitute House Bill No. 6667*

and Velocity Arms VMA Pistols; (xv) Intratec TEC-DC9 and AB-10; (xvi) Colefire Magnum; (xvii) German Sport 522 PK and Chiappa Firearms Mfour-22; (xviii) DSA SA58 PKP FAL; (xix) I.O. Inc. PPS-43C; (xx) Kel-Tec PLR-16 Pistol; (xxi) Sig Sauer P516 and P556 Pistols; and (xxii) Thompson TA5 Pistols;

(D) Any of the following semiautomatic shotguns, or copies or duplicates thereof with the capability of any such shotguns, that were in production prior to or on April 4, 2013: All IZHMASH Saiga 12 Shotguns;

(E) Any semiautomatic firearm regardless of whether such firearm is listed in subparagraphs (A) to (D), inclusive, of this subdivision, and regardless of the date such firearm was produced, that meets the following criteria:

(i) A semiautomatic, centerfire rifle that has an ability to accept a detachable magazine and has at least one of the following:

(I) A folding or telescoping stock;

(II) Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;

(III) A forward pistol grip;

(IV) A flash suppressor; or

(V) A grenade launcher or flare launcher; or

(ii) A semiautomatic, centerfire rifle that has a fixed magazine with the ability to accept more than ten rounds; or

*Substitute House Bill No. 6667*

(iii) A semiautomatic, centerfire rifle that has an overall length of less than thirty inches; or

(iv) A semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of the following:

(I) An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip;

(II) A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer;

(III) A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel; or

(IV) A second hand grip; or

(v) A semiautomatic pistol with a fixed magazine that has the ability to accept more than ten rounds; or

(vi) A semiautomatic shotgun that has both of the following:

(I) A folding or telescoping stock; and

(II) Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing; or

(vii) A semiautomatic shotgun that has the ability to accept a detachable magazine; or

(viii) A shotgun with a revolving cylinder; or

(ix) Any semiautomatic firearm that meets the criteria set forth in

*Substitute House Bill No. 6667*

subdivision (3) or (4) of subsection (a) of section 53-202a of the general statutes, revision of 1958, revised to January 1, 2013; or

(F) A part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined in any provision of subparagraphs (B) to (E), inclusive, of this subdivision, or any combination of parts from which an assault weapon, as defined in any provision of subparagraphs (B) to (E), inclusive, of this subdivision, may be assembled if those parts are in the possession or under the control of the same person;

(G) Any semiautomatic firearm other than a pistol, revolver, rifle or shotgun, regardless of whether such firearm is listed in subparagraphs (A) to (D), inclusive, of this subdivision, and regardless of the date such firearm was produced, that has at least one of the following:

(i) Any grip of the weapon, including a pistol grip, a thumbhole stock or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;

(ii) An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip;

(iii) A fixed magazine with the ability to accept more than ten rounds;

(iv) A flash suppressor or silencer, or a threaded barrel capable of accepting a flash suppressor or silencer;

(v) A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel;

(vi) A second hand grip; or

*Substitute House Bill No. 6667*

(vii) An arm brace or other stabilizing brace that could allow such firearm to be fired from the shoulder, with or without a strap designed to attach to an individual's arm;

(H) Any semiautomatic firearm that meets the criteria set forth in subdivision (3) or (4) of subsection (a) of section 53-202a of the general statutes, revision of 1958, revised to January 1, 2013, that was legally manufactured prior to September 13, 1994; or

(I) A combination of parts designed or intended to convert a firearm into an assault weapon, as defined in any provision of subparagraph (G) or (H) of this subdivision, or any combination of parts from which an assault weapon, as defined in any provision of subparagraph (G) or (H) of this subdivision, may be assembled if those parts are in the possession or under the control of the same person;

(2) "Assault weapon" does not include (A) any firearm modified to render it permanently inoperable, or (B) a part or any combination of parts of an assault weapon, that are not assembled as an assault weapon, when in the possession of a licensed gun dealer, as defined in subsection (f) of section 53-202f, as amended by this act, or a gunsmith who is in the licensed gun dealer's employ, for the purposes of servicing or repairing lawfully possessed assault weapons under sections 53-202a to 53-202k, inclusive, as amended by this act;

(3) "Action of the weapon" means the part of the firearm that loads, fires and ejects a cartridge, which part includes, but is not limited to, the upper and lower receiver, charging handle, forward assist, magazine release and shell deflector;

(4) "Detachable magazine" means an ammunition feeding device that can be removed without disassembling the firearm action;

(5) "Firearm" means a firearm, as defined in section 53a-3, as amended by this act;

*Substitute House Bill No. 6667*

(6) "Forward pistol grip" means any feature capable of functioning as a grip that can be held by the nontrigger hand;

(7) "Lawfully possesses" means: **[**, with**]**

(A) With respect to an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of **[**this**]** subdivision (1) of this section, **[**(A)**]** (i) actual possession that is lawful under sections 53-202b to 53-202k, **[**(B)**]** (ii) constructive possession pursuant to a lawful purchase transacted prior to or on April 4, 2013, regardless of whether the assault weapon was delivered to the purchaser prior to or on April 4, 2013, which lawful purchase is evidenced by a writing sufficient to indicate that **[**(i)**]** (I) a contract for sale was made between the parties prior to or on April 4, 2013, for the purchase of the assault weapon, or **[**(ii)**]** (II) full or partial payment for the assault weapon was made by the purchaser to the seller of the assault weapon prior to or on April 4, 2013, or **[**(C)**]** (iii) actual possession under subparagraph **[**(A)**]** (A)(i) of this subdivision, or constructive possession under subparagraph **[**(B)**]** (A)(ii) of this subdivision, as evidenced by a written statement made under penalty of false statement on such form as the Commissioner of Emergency Services and Public Protection prescribes; or

(B) With respect to a 2023 assault weapon, (i) actual possession that is lawful under sections 53-202b to 53-202k, inclusive, (ii) constructive possession pursuant to a lawful purchase transacted prior to the effective date of this section, regardless of whether such assault weapon was delivered to the purchaser prior to the effective date of this section, which lawful purchase is evidenced by a writing sufficient to indicate that (I) a contract for sale was made between the parties prior to the effective date of this section, for the purchase of such assault weapon, or (II) full or partial payment for such assault weapon was made by the purchaser to the seller of such assault weapon prior to the effective date of this section, or (iii) actual possession under subparagraph (B)(i) of this subdivision, or constructive possession under subparagraph (B)(ii) of

*Substitute House Bill No. 6667*

this subdivision, as evidenced by a written statement made under penalty of false statement on such form as the Commissioner of Emergency Services and Public Protection prescribes;

(8) "Pistol grip" means a grip or similar feature that can function as a grip for the trigger hand; **[**and**]**

(9) "Second hand grip" means a grip or similar feature that can function as a grip that is additional to the trigger hand grip; and

(10) "2023 assault weapon" means an assault weapon described in any provision of subparagraphs (G) to (I), inclusive, of subdivision (1) of this section.

Sec. 24. Section 53-202c of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) Except as provided in section 53-202e, any person who, within this state, possesses an assault weapon, except as provided in sections 53-202a to 53-202k, inclusive, as amended by this act, and 53-202o, shall be guilty of a class D felony and shall be sentenced to a term of imprisonment of which one year may not be suspended or reduced by the court, except that a first-time violation of this subsection shall be a class A misdemeanor if (1) the person presents proof that such person lawfully possessed the assault weapon (A) prior to October 1, 1993, with respect to an assault weapon described in subparagraph (A) of subdivision (1) of section 53-202a, as amended by this act, **[**or**]** (B) on April 4, 2013, under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, in effect on January 1, 2013, with respect to an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, or (C) on the date immediately preceding the effective date of this section, under the provisions of sections 53-202a to 53-202k, inclusive, revision of 1958, revised to January 1, 2023, with

*Substitute House Bill No. 6667*

respect to an assault weapon defined as a 2023 assault weapon in section 53-202a, as amended by this act, and (2) the person has otherwise possessed the assault weapon in compliance with subsection (f) of section 53-202d.

(b) The provisions of subsection (a) of this section shall not apply to the possession of assault weapons by: (1) The Department of Emergency Services and Public Protection, police departments, the Department of Correction, the Division of Criminal Justice, the Department of Motor Vehicles, the Department of Energy and Environmental Protection or the military or naval forces of this state or of the United States, (2) a sworn and duly certified member of an organized police department, the Division of State Police within the Department of Emergency Services and Public Protection or the Department of Correction, a chief inspector or inspector in the Division of Criminal Justice, a salaried inspector of motor vehicles designated by the Commissioner of Motor Vehicles, a conservation officer or special conservation officer appointed by the Commissioner of Energy and Environmental Protection pursuant to section 26-5, or a constable who is certified by the Police Officer Standards and Training Council and appointed by the chief executive authority of a town, city or borough to perform criminal law enforcement duties, for use by such sworn member, inspector, officer or constable in the discharge of such sworn member's, inspector's, officer's or constable's official duties or when off duty, (3) a member of the military or naval forces of this state or of the United States, or (4) a nuclear facility licensed by the United States Nuclear Regulatory Commission for the purpose of providing security services at such facility, or any contractor or subcontractor of such facility for the purpose of providing security services at such facility.

(c) The provisions of subsection (a) of this section shall not apply to the possession of an assault weapon described in subparagraph (A) of subdivision (1) of section 53-202a, as amended by this act, by any person

*Substitute House Bill No. 6667*

prior to July 1, 1994, if all of the following are applicable:

(1) The person is eligible under sections 53-202a to 53-202k, inclusive, as amended by this act, to apply for a certificate of possession for the assault weapon by July 1, 1994;

(2) The person lawfully possessed the assault weapon prior to October 1, 1993; and

(3) The person is otherwise in compliance with sections 53-202a to 53-202k, inclusive, as amended by this act.

(d) The provisions of subsection (a) of this section shall not apply to the possession of an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, by any person prior to April 5, 2013, if all of the following are applicable:

(1) The person is eligible under sections 53-202a to 53-202k, inclusive, as amended by this act, to apply for a certificate of possession for the assault weapon by January 1, 2014;

(2) The person lawfully possessed the assault weapon on April 4, 2013, under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, in effect on January 1, 2013; and

(3) The person is otherwise in compliance with sections 53-202a to 53-202k, inclusive, as amended by this act.

(e) The provisions of subsection (a) of this section shall not apply to the possession of a 2023 assault weapon by any person prior to May 1, 2024, if all of the following are applicable:

(1) The person is eligible under sections 53-202a to 53-202k, inclusive, as amended by this act, to apply for a certificate of possession for such assault weapon by May 1, 2024;

*Substitute House Bill No. 6667*

(2) The person lawfully possessed such assault weapon on the date immediately preceding the effective date of this section, under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, and section 53-202m of the general statutes, revision of 1958, revised to January 1, 2023; and

(3) The person is otherwise in compliance with sections 53-202a to 53-202k, inclusive, as amended by this act.

(f) The provisions of subsection (a) of this section shall not apply to the possession of a 2023 assault weapon by any person if all of the following are applicable:

(1) Such assault weapon was reclassified for federal purposes as a rifle pursuant to the amendments to 27 CFR Parts 478 and 479 published at 88 Federal Register 6478 (January 31, 2023).

(2) The person applied to register such assault weapon under the National Firearms Act, P. L. 73-474, as amended from time to time, using the form known as Form 1 published by the Bureau of Alcohol, Tobacco, Firearms and Explosives, and submitted a copy of such form to the Department of Emergency Services and Public Protection not later than August 1, 2023, and the Bureau of Alcohol, Tobacco, Firearms and Explosives has approved such application, has denied such application within the past thirty days, or has not yet processed such application.

(3) The person lawfully possessed such assault weapon on the date immediately preceding the effective date of this section, under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, and section 53-202m of the general statutes, revision of 1958, revised to January 1, 2023; and

(4) The person is otherwise in compliance with sections 53-202a to 53-202k, inclusive, as amended by this act.

*Substitute House Bill No. 6667*

[(e)] (g) The provisions of subsection (a) of this section shall not apply to a person who is the executor or administrator of an estate that includes an assault weapon, or the trustee of a trust that includes an assault weapon, for which a certificate of possession has been issued under section 53-202d, as amended by this act, if the assault weapon is possessed at a place set forth in subdivision (1) of subsection (f) of section 53-202d or as authorized by the Probate Court.

[(f)] (h) The provisions of subsection (a) of this section shall not apply to the possession of a semiautomatic pistol that is defined as an assault weapon in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, that the Commissioner of Emergency Services and Public Protection designates as being designed expressly for use in target shooting events at the Olympic games sponsored by the International Olympic Committee pursuant to regulations adopted under subdivision (4) of subsection (b) of section 53-202b that is (1) possessed and transported in accordance with subsection (f) of section 53-202d, or (2) possessed at or transported to or from a collegiate, Olympic or target pistol shooting competition in this state which is sponsored by, conducted under the auspices of, or approved by a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms, provided such pistol is transported in the manner prescribed in subsection (a) of section 53-202f.

Sec. 25. Subsections (a) and (b) of section 53-202d of the general statutes are repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) (1) (A) Except as provided in subparagraph (B) of this subdivision, any person who lawfully possesses an assault weapon, as defined in subparagraph (A) of subdivision (1) of section 53-202a, as amended by this act, prior to October 1, 1993, shall apply by October 1, 1994, or, if such person is a member of the military or naval forces of this state or of

*Substitute House Bill No. 6667*

the United States and is unable to apply by October 1, 1994, because such member is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the Department of Emergency Services and Public Protection, for a certificate of possession with respect to such assault weapon.

(B) No person who lawfully possesses an assault weapon pursuant to subdivision (1), (2) or (4) of subsection (b) of section 53-202c, as amended by this act, shall be required to obtain a certificate of possession pursuant to this subdivision with respect to an assault weapon used for official duties, except that any person described in subdivision (2) of subsection (b) of section 53-202c, as amended by this act, who purchases an assault weapon, as defined in subparagraph (A) of subdivision (1) of section 53-202a, as amended by this act, for use in the discharge of official duties who retires or is otherwise separated from service shall apply within ninety days of such retirement or separation from service to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon.

(2) (A) Except as provided in subparagraph (B) of this subdivision, any person who lawfully possesses an assault weapon, as defined in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, on April 4, 2013, under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, in effect on January 1, 2013, or any person who regains possession of an assault weapon as defined in any provision of said subparagraphs pursuant to subsection (e) of section 53-202f, or any person who lawfully purchases a firearm on or after April 4, 2013, but prior to June 18, 2013, that meets the criteria set forth in subdivision (3) or (4) of subsection (a) of section 53-202a of the general statutes, revision of 1958, revised to January 1, 2013, shall apply by January 1, 2014, or, if such person is a member of the military or naval forces of this state or of the United States and is unable to apply by January 1, 2014, because such member

*Substitute House Bill No. 6667*

is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon. Any person who lawfully purchases a semiautomatic pistol that is defined as an assault weapon in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, that the Commissioner of Emergency Services and Public Protection designates as being designed expressly for use in target shooting events at the Olympic games sponsored by the International Olympic Committee pursuant to regulations adopted under subdivision (4) of subsection (b) of section 53-202b shall apply within ninety days of such purchase to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon.

(B) No person who lawfully possesses an assault weapon pursuant to subdivision (1), (2) or (4) of subsection (b) of section 53-202c, as amended by this act, shall be required to obtain a certificate of possession pursuant to this subdivision with respect to an assault weapon used for official duties, except that any person described in subdivision (2) of subsection (b) of section 53-202c, as amended by this act, who purchases an assault weapon, as defined in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, for use in the discharge of official duties who retires or is otherwise separated from service shall apply within ninety days of such retirement or separation from service to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon.

(3) Any person who obtained a certificate of possession for an assault weapon, as defined in subparagraph (A) of subdivision (1) of section 53-202a, as amended by this act, prior to April 5, 2013, that is defined as an assault weapon pursuant to any provision of subparagraphs (B) to (F),

*Substitute House Bill No. 6667*

inclusive, of subdivision (1) of section 53-202a, as amended by this act, shall be deemed to have obtained a certificate of possession for such assault weapon for the purposes of sections 53-202a to 53-202k, inclusive, as amended by this act, and shall not be required to obtain a subsequent certificate of possession for such assault weapon.

(4) (A) Except as provided in subparagraphs (B) and (C) of this subdivision, any person who lawfully possesses a 2023 assault weapon on the date immediately preceding the effective date of this section, under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, in effect on January 1, 2023, or any person who regains possession of a 2023 assault weapon pursuant to subdivision (2) of subsection (e) of section 53-202f, as amended by this act, shall apply by May 1, 2024, or, if such person is a member of the military or naval forces of this state or of the United States and is unable to apply by May 1, 2024, because such member is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon. The Department of Emergency Services and Public Protection shall accept applications both in paper and electronic form, to the extent practicable, and shall not require such applications be notarized.

(B) No person who lawfully possesses an assault weapon pursuant to subdivision (1), (2) or (4) of subsection (b) of section 53-202c, as amended by this act, shall be required to obtain a certificate of possession pursuant to this subdivision with respect to an assault weapon used for official duties, except that any person described in subdivision (2) of subsection (b) of section 53-202c, as amended by this act, who purchases a 2023 assault weapon for use in the discharge of official duties who retires or is otherwise separated from service shall apply within ninety days of such retirement or separation from service to the Department of Emergency Services and Public Protection for a certificate of possession

*Substitute House Bill No. 6667*

with respect to such assault weapon.

(C) Any person who lawfully possesses a 2023 assault weapon pursuant to the provisions of subsection (f) of section 53-202c, as amended by this act, and whose Form 1 application to the Bureau of Alcohol, Tobacco, Firearms and Explosives has not yet been processed may, instead of following the procedure specified in subparagraph (A) of this subdivision, apply by May 1, 2024, to the Department of Emergency Services and Public Protection for a temporary certificate of possession with respect to such assault weapon. Such temporary certificate of possession shall expire on the earlier of January 1, 2027, and the date seven days succeeding a denial of the Form 1 application. When the Form 1 application is approved with respect to such assault weapon, such person may apply to the Department of Emergency Services and Public Protection to convert such temporary certificate of possession into a certificate of possession with respect to such assault weapon. If a complete application to convert is received, the Commissioner of Emergency Services and Public Protection shall approve the application. For the purposes of this subparagraph, a full and complete Form 1 application submitted to the Department of Emergency Services and Public Protection in a form and manner determined by the department shall be sufficient to constitute a complete application for a temporary certificate of possession, and a copy of the notice that a Form 1 application has been approved shall constitute a complete application to convert a temporary certificate of possession into a certificate of possession. The Department of Emergency Services and Public Protection shall accept applications under this subparagraph both in paper and electronic form, to the extent practicable, and shall not require such applications to be notarized.

(5) Any person who obtained a certificate of possession for an assault weapon, as defined in any provision of subparagraphs (A) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act,

*Substitute House Bill No. 6667*

prior to the effective date of this section, that is also a 2023 assault weapon shall be deemed to have obtained a certificate of possession for such assault weapon for the purposes of sections 53-202a to 53-202k, inclusive, as amended by this act, and shall not be required to obtain a subsequent certificate of possession for such assault weapon.

**[**(4)**]** (6) The certificate of possession shall contain a description of the firearm that identifies it uniquely, including all identification marks, the full name, address, date of birth and thumbprint of the owner, and any other information as the department may deem appropriate.

**[**(5)**]** (7) The department shall adopt regulations, in accordance with the provisions of chapter 54, to establish procedures with respect to the application for and issuance of certificates of possession pursuant to this section. Notwithstanding the provisions of sections 1-210 and 1-211, the name and address of a person issued a certificate of possession shall be confidential and shall not be disclosed, except such records may be disclosed to (A) law enforcement agencies and employees of the United States Probation Office acting in the performance of their duties and parole officers within the Department of Correction acting in the performance of their duties, and (B) the Commissioner of Mental Health and Addiction Services to carry out the provisions of subsection (c) of section 17a-500.

(b) (1) No assault weapon, as defined in subparagraph (A) of subdivision (1) of section 53-202a, as amended by this act, possessed pursuant to a certificate of possession issued under this section may be sold or transferred on or after January 1, 1994, to any person within this state other than to a licensed gun dealer, as defined in subsection (f) of section 53-202f, as amended by this act, or as provided in section 53-202e, or by bequest or intestate succession, or, upon the death of a testator or settlor: (A) To a trust, or (B) from a trust to a beneficiary who is eligible to possess the assault weapon.

*Substitute House Bill No. 6667*

(2) No assault weapon, as defined in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, possessed pursuant to a certificate of possession issued under this section may be sold or transferred on or after April 5, 2013, to any person within this state other than to a licensed gun dealer, as defined in subsection (f) of section 53-202f, as amended by this act, or as provided in section 53-202e, or by bequest or intestate succession, or, upon the death of a testator or settlor: (A) To a trust, or (B) from a trust to a beneficiary who is eligible to possess the assault weapon.

(3) No 2023 assault weapon possessed pursuant to a certificate of possession issued under this section may be sold or transferred on or after the effective date of this section, to any person within this state other than to a licensed gun dealer, or as provided in section 53-202e, or by bequest or intestate succession, or, upon the death of a testator or settlor: (A) To a trust, or (B) from a trust to a beneficiary who is eligible to possess the assault weapon.

Sec. 26. Subsection (b) of section 29-36n of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(b) The Commissioner of Emergency Services and Public Protection, in conjunction with the Chief State's Attorney and the Connecticut Police Chiefs Association, shall update the protocol developed pursuant to subsection (a) of this section to reflect the provisions of sections 29-7h, 29-28, as amended by this act, 29-28a, as amended by this act, 29-29, 29-30, as amended by this act, 29-32 and 29-35, as amended by this act, subsections (b) and (h) of section 46b-15, subsections (c) and (d) of section 46b-38c and sections 53-202a, as amended by this act, 53-202*l* [, 53-202m] and 53a-217, as amended by this act, and shall include in such protocol specific instructions for the transfer, delivery or surrender of pistols and revolvers and other firearms and ammunition when the assistance of more than one law enforcement agency is necessary to

effect the requirements of section 29-36k.

Sec. 27. Section 53-202w of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) As used in this section and section 53-202x:

(1) "Large capacity magazine" means any firearm magazine, belt, drum, feed strip or similar device that has the capacity of, or can be readily restored or converted to accept, more than ten rounds of ammunition, but does not include: (A) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds of ammunition, (B) a .22 caliber tube ammunition feeding device, (C) a tubular magazine that is contained in a lever-action firearm, or (D) a magazine that is permanently inoperable;

(2) "Lawfully possesses", with respect to a large capacity magazine, means that a person has (A) actual and lawful possession of the large capacity magazine, (B) constructive possession of the large capacity magazine pursuant to a lawful purchase of a firearm that contains a large capacity magazine that was transacted prior to or on April 4, 2013, regardless of whether the firearm was delivered to the purchaser prior to or on April 4, 2013, which lawful purchase is evidenced by a writing sufficient to indicate that (i) a contract for sale was made between the parties prior to or on April 4, 2013, for the purchase of the firearm, or (ii) full or partial payment for the firearm was made by the purchaser to the seller of the firearm prior to or on April 4, 2013, or (C) actual possession under subparagraph (A) of this subdivision, or constructive possession under subparagraph (B) of this subdivision, as evidenced by a written statement made under penalty of false statement on such form as the Commissioner of Emergency Services and Public Protection prescribes; and

(3) "Licensed gun dealer" means a person who has a federal firearms

*Substitute House Bill No. 6667*

license and a permit to sell firearms pursuant to section 29-28.

(b) Except as provided in this section, on and after April 5, 2013, any person who, within this state, distributes, imports into this state, keeps for sale, offers or exposes for sale, or purchases a large capacity magazine shall be guilty of a class D felony. On and after April 5, 2013, any person who, within this state, transfers a large capacity magazine, except as provided in subsection (f) of this section, shall be guilty of a class D felony.

(c) Except as provided in this section and section 53-202x, **[**: (1) Any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained prior to April 5, 2013, shall commit an infraction and be fined not more than ninety dollars for a first offense and shall be guilty of a class D felony for any subsequent offense, and (2) any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained on or after April 5, 2013, shall be guilty of a class D felony**]** <u>any person who possesses a large capacity magazine shall be guilty of a (1) class D felony if such person is ineligible to possess a firearm under state or federal law, or (2) class A misdemeanor if such person is not ineligible to possess a firearm under state or federal law</u>.

(d) A large capacity magazine may be possessed, purchased or imported by:

(1) The Department of Emergency Services and Public Protection, police departments, the Department of Correction, the Division of Criminal Justice, the Department of Motor Vehicles, the Department of Energy and Environmental Protection or the military or naval forces of this state or of the United States;

(2) A sworn and duly certified member of an organized police department, the Division of State Police within the Department of Emergency Services and Public Protection or the Department of

*Substitute House Bill No. 6667*

Correction, a chief inspector or inspector in the Division of Criminal Justice, a salaried inspector of motor vehicles designated by the Commissioner of Motor Vehicles, a conservation officer or special conservation officer appointed by the Commissioner of Energy and Environmental Protection pursuant to section 26-5, or a constable who is certified by the Police Officer Standards and Training Council and appointed by the chief executive authority of a town, city or borough to perform criminal law enforcement duties, for use by such sworn member, inspector, officer or constable in the discharge of such sworn member's, inspector's, officer's or constable's official duties or when off duty;

(3) A member of the military or naval forces of this state or of the United States;

(4) A nuclear facility licensed by the United States Nuclear Regulatory Commission for the purpose of providing security services at such facility, or any contractor or subcontractor of such facility for the purpose of providing security services at such facility;

(5) Any person who is sworn and acts as a policeman on behalf of an armored car service pursuant to section 29-20 in the discharge of such person's official duties; or

(6) Any person, firm or corporation engaged in the business of manufacturing large capacity magazines in this state that manufactures, purchases, tests or transports large capacity magazines in this state for sale within this state to persons specified in subdivisions (1) to (5), inclusive, of this subsection or for sale outside this state, or a federally-licensed firearm manufacturer engaged in the business of manufacturing firearms or large capacity magazines in this state that manufactures, purchases, tests or transports firearms or large capacity magazines in this state for sale within this state to persons specified in subdivisions (1) to (5), inclusive, of this subsection or for sale outside

*Substitute House Bill No. 6667*

this state.

(e) A large capacity magazine may be possessed by:

(1) A licensed gun dealer;

(2) A gunsmith who is in a licensed gun dealer's employ, who possesses such large capacity magazine for the purpose of servicing or repairing a lawfully possessed large capacity magazine;

(3) A person, firm, corporation or federally-licensed firearm manufacturer described in subdivision (6) of subsection (d) of this section that possesses a large capacity magazine that is lawfully possessed by another person for the purpose of servicing or repairing the large capacity magazine;

(4) Any person who has declared possession of the magazine pursuant to section 53-202x; or

(5) Any person who is the executor or administrator of an estate that includes a large capacity magazine, or the trustee of a trust that includes a large capacity magazine, the possession of which has been declared to the Department of Emergency Services and Public Protection pursuant to section 53-202x, which is disposed of as authorized by the Probate Court, if the disposition is otherwise permitted by this section and section 53-202x.

(f) Subsection (b) of this section shall not prohibit:

(1) The transfer of a large capacity magazine, the possession of which has been declared to the Department of Emergency Services and Public Protection pursuant to section 53-202x, by bequest or intestate succession, or, upon the death of a testator or settlor: (A) To a trust, or (B) from a trust to a beneficiary;

(2) The transfer of a large capacity magazine to a police department

*Substitute House Bill No. 6667*

or the Department of Emergency Services and Public Protection;

(3) The transfer of a large capacity magazine to a licensed gun dealer in accordance with section 53-202x; or

(4) The transfer of a large capacity magazine prior to October 1, 2013, from a licensed gun dealer, pawnbroker licensed under section 21-40, or consignment shop operator, as defined in section 21-39a, to any person who (A) possessed the large capacity magazine prior to or on April 4, 2013, (B) placed a firearm that such person legally possessed, with the large capacity magazine included or attached, in the possession of such dealer, pawnbroker or operator prior to or on April 4, 2013, pursuant to an agreement between such person and such dealer, pawnbroker or operator for the sale of the firearm to a third person, and (C) is eligible to possess the firearm on the date of such transfer.

(g) **[If]** The court may order suspension of prosecution in addition to any other diversionary programs available to the defendant, if the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution in accordance with the provisions of subsection **[(h)]** (i) of section 29-33, as amended by this act.

Sec. 28. Subsections (a) and (b) of section 29-37p of the general statutes are repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) Any person who is eighteen years of age or older may apply to the Commissioner of Emergency Services and Public Protection for a long gun eligibility certificate.

(b) The Commissioner of Emergency Services and Public Protection

*Substitute House Bill No. 6667*

shall issue a long gun eligibility certificate unless said commissioner finds that the applicant: (1) [Has] (A) For any application filed prior to July 1, 2024, has failed to successfully complete a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of firearms including, but not limited to, a safety or training course in the use of firearms available to the public offered by a law enforcement agency, a private or public educational institution or a firearms training school, utilizing instructors certified by the National Rifle Association or the Department of Energy and Environmental Protection and a safety or training course in the use of firearms conducted by an instructor certified by the state or the National Rifle Association, or (B) for any application filed on or after July 1, 2024, has failed to successfully complete, not earlier than two years prior to the submission of such application, a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of firearms, which courses may include those certified by the National Rifle Association or other organizations, conducted by an instructor certified by the National Rifle Association or by the state, provided any such course includes instruction in state law requirements pertaining to safe storage in the home and in vehicles, lawful use of firearms and lawful carrying of firearms in public; (2) has been convicted of (A) a felony, (B) a misdemeanor violation of section 21a-279 on or after October 1, 2015, [or] (C) a misdemeanor violation of section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d during the preceding twenty years, or (D) a misdemeanor violation of any law of this state that has been designated as a family violence crime pursuant to section 46b-38h; (3) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120; (4) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13; (5) has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court; (6) has

*Substitute House Bill No. 6667*

been voluntarily admitted to a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a-680; (7) is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical force against another person, including an ex parte order issued pursuant to section 46b-15 or 46b-16a; (8) is subject to a firearms seizure order issued prior to June 1, 2022, pursuant to section 29-38c after notice and hearing, or a risk protection order or risk protection investigation order issued on or after June 1, 2022, pursuant to section 29-38c; (9) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to [18 USC 922(g)(4)] 18 USC 922(g)(2), (g)(4) or (g)(9); or (10) is an alien illegally or unlawfully in the United States.

Sec. 29. Subsection (b) of section 29-28 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(b) Upon the application of any person having a bona fide permanent residence within the jurisdiction of any such authority, such chief of police or, where there is no chief of police, such chief executive officer or designated resident state trooper or state police officer, as applicable, may issue a temporary state permit to such person to carry a pistol or revolver within the state, provided such authority shall find that such applicant intends to make no use of any pistol or revolver which such applicant may be permitted to carry under such permit other than a lawful use and that such person is a suitable person to receive such permit. If the applicant has a bona fide permanent residence within the jurisdiction of any federally recognized Native American tribe within the borders of the state, and such tribe has a law enforcement unit, as defined in section 7-294a, the chief of police of such law enforcement

*Substitute House Bill No. 6667*

unit may issue a temporary state permit to such person pursuant to the provisions of this subsection, and any chief of police of any other law enforcement unit having jurisdiction over an area containing such person's bona fide permanent residence shall not issue such temporary state permit if such tribal law enforcement unit accepts applications for temporary state permits. No state or temporary state permit to carry a pistol or revolver shall be issued under this subsection if the applicant: (1) (A) For any application filed prior to July 1, 2024, has failed to successfully complete a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of pistols and revolvers including, but not limited to, a safety or training course in the use of pistols and revolvers available to the public offered by a law enforcement agency, a private or public educational institution or a firearms training school, utilizing instructors certified by the National Rifle Association or the Department of Energy and Environmental Protection and a safety or training course in the use of pistols or revolvers conducted by an instructor certified by the state or the National Rifle Association, and (B) for any application filed on or after July 1, 2024, has failed to successfully complete, not earlier than two years prior to the submission of such application, a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of firearms, which courses may include those certified by the National Rifle Association or other organizations, conducted by an instructor certified by the National Rifle Association or by the state, provided any such course includes instruction in state law requirements pertaining to safe storage in the home and in vehicles, lawful use of firearms and lawful carrying of firearms in public. Any person wishing to provide such course, may apply in the form and manner prescribed by the commissioner. The commissioner shall approve or deny any application for provision of such a course not later than July 1, 2024, in the case of an application submitted before October 1, 2023; (2) has been convicted of (A) a felony, **[**or**]** (B) a misdemeanor violation of section 21a-279 on or after October 1, 2015, **[**or**]** (C) a misdemeanor violation of

*Substitute House Bill No. 6667*

section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d during the preceding twenty years, <u>a misdemeanor violation of any law of this state that has been designated as a family violence crime pursuant to section 46b-38h;</u> (3) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120<u>;</u> **[,]** (4) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13<u>;</u> **[,]** (5) (A) has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court, or (B) has been voluntarily admitted on or after October 1, 2013, to a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person, as those terms are defined in section 17a-680<u>;</u> **[,]** (6) is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical force against another person, including an ex parte order issued pursuant to section 46b-15 or 46b-16a<u>;</u> **[,]** (7) is subject to a firearms seizure order issued prior to June 1, 2022, pursuant to section 29-38c after notice and hearing, or a risk protection order or risk protection investigation order issued on or after June 1, 2022, pursuant to section 29-38c<u>;</u> **[,]** (8) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to **[**18 USC 922(g)(4),**]** <u>18 USC 922(g)(2), (g)(4) or (g)(9);</u> (9) is an alien illegally or unlawfully in the United States<u>;</u> **[,]** or (10) is less than twenty-one years of age. Nothing in this section shall require any person who holds a valid permit to carry a pistol or revolver on **[**October 1, 1994**]** <u>July 1, 2024</u>, to participate in any additional training in the safety and use of pistols and revolvers. No person may apply for a temporary state permit to carry a pistol or revolver more than once within any twelve-month period, and no temporary state permit to carry a pistol or revolver shall be issued to any person who has applied for such permit more than once within the

*Substitute House Bill No. 6667*

preceding twelve months. Any person who applies for a temporary state permit to carry a pistol or revolver shall indicate in writing on the application, under penalty of false statement in such manner as the issuing authority prescribes, that such person has not applied for a temporary state permit to carry a pistol or revolver within the past twelve months. Upon issuance of a temporary state permit to carry a pistol or revolver to the applicant, the local authority shall forward the original application to the commissioner. Not later than sixty days after receiving a temporary state permit, an applicant shall appear at a location designated by the commissioner to receive the state permit. The commissioner may then issue, to any holder of any temporary state permit, a state permit to carry a pistol or revolver within the state. Upon issuance of the state permit, the commissioner shall make available to the permit holder a copy of the law regarding the permit holder's responsibility to report the loss or theft of a firearm and the penalties associated with the failure to comply with such law. Upon issuance of the state permit, the commissioner shall forward a record of such permit to the local authority issuing the temporary state permit. The commissioner shall retain records of all applications, whether approved or denied. The copy of the state permit delivered to the permittee shall be laminated and shall contain a full-face photograph of such permittee. A person holding a state permit issued pursuant to this subsection shall notify the issuing authority within two business days of any change of such person's address. The notification shall include the old address and the new address of such person.

Sec. 30. Subsection (b) of section 29-36f of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(b) The Commissioner of Emergency Services and Public Protection shall issue an eligibility certificate unless said commissioner finds that the applicant: (1) **[**Has**]** (A) For any application filed prior to July 1, 2024,

*Substitute House Bill No. 6667*

has failed to successfully complete a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of pistols and revolvers including, but not limited to, a safety or training course in the use of pistols and revolvers available to the public offered by a law enforcement agency, a private or public educational institution or a firearms training school, utilizing instructors certified by the National Rifle Association or the Department of Energy and Environmental Protection and a safety or training course in the use of pistols or revolvers conducted by an instructor certified by the state or the National Rifle Association, or (B) for any application filed on or after July 1, 2024, has failed to successfully complete, not earlier than two years prior to the submission of such application, a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of firearms, which courses may include those certified by the National Rifle Association or other organizations, conducted by an instructor certified by the National Rifle Association or by the state, provided any such course includes instruction in state law requirements pertaining to safe storage in the home and in vehicles, lawful use of firearms and lawful carrying of firearms in public; (2) has been convicted of (A) a felony, (B) a misdemeanor violation of section 21a-279 on or after October 1, 2015, **[or]** (C) a misdemeanor violation of section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d during the preceding twenty years, or (D) a misdemeanor violation of any law of this state that has been designated as a family violence crime pursuant to section 46b-38h; (3) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120; (4) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13; (5) (A) has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court; or (B) has been voluntarily admitted on or after October 1, 2013, to a hospital for persons with psychiatric disabilities, as

*Substitute House Bill No. 6667*

defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a-680; (6) is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical force against another person, including an ex parte order issued pursuant to section 46b-15 or section 46b-16a; (7) is subject to a firearms seizure order issued prior to June 1, 2022, pursuant to section 29-38c after notice and hearing, or a risk protection order or risk protection investigation order issued on or after June 1, 2022, pursuant to section 29-38c; (8) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to **[**18 USC 922(g)(4)**]** 18 USC 922(g)(2), (g)(4) or (g)(9); or (9) is an alien illegally or unlawfully in the United States.

Sec. 31. Section 53a-217 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) A person is guilty of criminal possession of a firearm, ammunition or an electronic defense weapon when such person possesses a firearm, ammunition or an electronic defense weapon and (1) has been convicted of (A) a felony committed prior to, on or after October 1, 2013, (B) a misdemeanor violation of section 21a-279 on or after October 1, 2015, **[**or**]** (C) a misdemeanor violation of section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d committed on or after October 1, 2013, and during the preceding twenty years, or (D) a misdemeanor violation of any law of this state that has been designated as a family violence crime pursuant to section 46b-38h and was committed on or after October 1, 2023, (2) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120, (3) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13, (4) knows

*Substitute House Bill No. 6667*

that such person is subject to (A) a restraining or protective order of a court of this state that has been issued against such person, after notice has been provided to such person, in a case involving the use, attempted use or threatened use of physical force against another person, or (B) a foreign order of protection, as defined in section 46b-15a, that has been issued against such person in a case involving the use, attempted use or threatened use of physical force against another person, (5) (A) has been confined on or after October 1, 2013, in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court, or with respect to any person who holds a valid permit or certificate that was issued or renewed under the provisions of section 29-28, as amended by this act, or 29-36f, as amended by this act, in effect prior to October 1, 2013, such person has been confined in such hospital within the preceding twelve months, or (B) has been voluntarily admitted on or after October 1, 2013, to a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability, unless the person (i) was voluntarily admitted solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a-680, or (ii) is a police officer who was voluntarily admitted and had his or her firearm, ammunition or electronic defense weapon used in the performance of the police officer's official duties returned in accordance with section 7-291d, (6) knows that such person is subject to a firearms seizure order issued prior to June 1, 2022, pursuant to section 29-38c after notice and an opportunity to be heard has been provided to such person, or a risk protection order or risk protection investigation order issued on or after June 1, 2022, pursuant to section 29-38c, or (7) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to **[**18 USC 922(g)(4)**]** 18 USC 922(g)(2), (g)(4) or (g)(9). For the purposes of this section, "convicted" means having a judgment of conviction entered by a court of competent jurisdiction, "ammunition" means a loaded cartridge, consisting of a primed case, propellant or projectile, designed

*Substitute House Bill No. 6667*

for use in any firearm, and a motor vehicle violation for which a sentence to a term of imprisonment of more than one year may be imposed shall be deemed an unclassified felony.

(b) Criminal possession of a firearm, ammunition or an electronic defense weapon is a class C felony, for which two years <u>and one day</u> of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

Sec. 32. Section 53a-217c of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of (A) a felony committed prior to, on or after October 1, 2013, (B) a misdemeanor violation of section 21a-279 committed on or after October 1, 2015, **[or]** (C) a misdemeanor violation of section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d committed during the preceding twenty years, <u>or (D) a misdemeanor violation of any law of this state that has been designated as a family violence crime pursuant to section 46b-38h and was committed on or after October 1, 2023,</u> (2) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120, (3) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13, (4) (A) has been confined prior to October 1, 2013, in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding twelve months by order of a probate court, or has been confined on or after October 1, 2013, in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court, or, with respect to

*Substitute House Bill No. 6667*

any person who holds a valid permit or certificate that was issued or renewed under the provisions of section 29-28, as amended by this act, or 29-36f, as amended by this act, in effect prior to October 1, 2013, such person has been confined in such hospital within the preceding twelve months, or (B) has been voluntarily admitted on or after October 1, 2013, to a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability, unless the person (i) was voluntarily admitted solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a-680, or (ii) is a police officer who was voluntarily admitted and had his or her firearm, ammunition or electronic defense weapon used in the performance of the police officer's official duties returned in accordance with section 7-291d, (5) knows that such person is subject to (A) a restraining or protective order of a court of this state that has been issued against such person, after notice has been provided to such person, in a case involving the use, attempted use or threatened use of physical force against another person, or (B) a foreign order of protection, as defined in section 46b-15a, that has been issued against such person in a case involving the use, attempted use or threatened use of physical force against another person, (6) knows that such person is subject to a firearms seizure order issued prior to June 1, 2022, pursuant to section 29-38c after notice and an opportunity to be heard has been provided to such person, or a risk protection order or risk protection investigation order issued on or after June 1, 2022, pursuant to section 29-38c, (7) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to **[**18 USC 922(g)(4)**]** 18 USC 922(g)(2), (g)(4) or (g)(9), or (8) is an alien illegally or unlawfully in the United States. For the purposes of this section, "convicted" means having a judgment of conviction entered by a court of competent jurisdiction.

(b) Criminal possession of a pistol or revolver is a class C felony, for which two years of the sentence imposed may not be suspended or

*Substitute House Bill No. 6667*

reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

Sec. 33. Subsection (a) of section 29-37b of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) Each person, firm or corporation which engages in the retail sale of any **[**pistol or revolver**]** <u>firearm</u>, at the time of sale of any such **[**pistol or revolver**]** <u>firearm</u>, shall (1) equip such **[**pistol or revolver**]** <u>firearm</u> with a reusable trigger lock, gun lock or gun locking device appropriate for such firearm, which lock or device shall be constructed of material sufficiently strong to prevent it from being easily disabled and have a locking mechanism accessible by key or by electronic or other mechanical accessory specific to such lock or device to prevent unauthorized removal, and (2) provide to the purchaser thereof a written warning which shall state in block letters not less than one inch in height: "UNLAWFUL STORAGE OF A LOADED FIREARM MAY RESULT IN IMPRISONMENT OR FINE."

Sec. 34. Subsection (a) of section 53-205 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2023*):

(a) No person shall carry or possess in any vehicle or snowmobile any **[**shotgun, rifle or muzzleloader of any gauge or caliber**]** <u>firearm, other than a pistol or revolver,</u> while such **[**shotgun, rifle or muzzleloader**]** <u>firearm</u> contains in the barrel, chamber or magazine any loaded shell or cartridge capable of being discharged or<u>, if such firearm is a muzzleloader,</u> when such muzzleloader has a percussion cap in place or when the powder pan of a flintlock contains powder. As used in this subsection, "muzzleloader" means a rifle or shotgun that is incapable of firing a self-contained cartridge and must be loaded at the muzzle end.

*Substitute House Bill No. 6667*

Sec. 35. Section 53-341b of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) No person, firm or corporation shall sell or deliver body armor to another person unless the transferee (1) meets in person with the transferor to accomplish the sale or delivery, and (2) possesses a permit or certificate issued under the provisions of section 29-28, as amended by this act, 29-36f, as amended by this act, 29-37p, as amended by this act, or 29-38n.

(b) The provisions of subsection (a) of this section shall not apply to the sale or delivery of body armor to (1) a sworn member or authorized official of an organized local police department, the Division of State Police within the Department of Emergency Services and Public Protection, the Division of Criminal Justice, the Department of Correction, the Board of Pardons and Paroles or the Department of Motor Vehicles, (2) an authorized official of a municipality or the Department of Administrative Services that purchases body armor on behalf of an organized local police department, the Division of State Police within the Department of Emergency Services and Public Protection, the Division of Criminal Justice, the Department of Correction, the Board of Pardons and Paroles or the Department of Motor Vehicles, (3) a judicial marshal or probation officer or an authorized official of the Judicial Branch who purchases body armor on behalf of a probation officer or a judicial marshal, **[or]** (4) a member of the National Guard or the armed forces reserve, (5) a federal firearms licensee, or (6) an employee of an emergency medical service organization, as defined in section 53a-3, as amended by this act.

(c) As used in this section, "body armor" means any **[material]** item designed to provide bullet penetration resistance and to be worn on or under clothing on the body, **[and to provide bullet penetration resistance]** like a vest or other article of clothing.

**Public Act No. 23-53**                                   **78** *of 102*

*Substitute House Bill No. 6667*

(d) Any person, firm or corporation that violates the provisions of this section shall be guilty of a class B misdemeanor.

Sec. 36. Section 53a-3 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

Except where different meanings are expressly specified, the following terms have the following meanings when used in this title:

(1) "Person" means a human being, and, where appropriate, a public or private corporation, a limited liability company, an unincorporated association, a partnership, a government or a governmental instrumentality;

(2) "Possess" means to have physical possession or otherwise to exercise dominion or control over tangible property;

(3) "Physical injury" means impairment of physical condition or pain;

(4) "Serious physical injury" means physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ;

(5) "Deadly physical force" means physical force which can be reasonably expected to cause death or serious physical injury;

(6) "Deadly weapon" means any weapon, whether loaded or unloaded, from which a shot may be discharged, or a switchblade knife, gravity knife, billy, blackjack, bludgeon, or metal knuckles. The definition of "deadly weapon" in this subdivision shall be deemed not to apply to section 29-38 or 53-206;

(7) "Dangerous instrument" means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or

serious physical injury, and includes a "vehicle" as that term is defined in this section and includes a dog that has been commanded to attack, except a dog owned by a law enforcement agency of the state or any political subdivision thereof or of the federal government when such dog is in the performance of its duties under the direct supervision, care and control of an assigned law enforcement officer;

(8) "Vehicle" means a "motor vehicle" as defined in section 14-1, a snowmobile, any aircraft, or any vessel equipped for propulsion by mechanical means or sail;

(9) "Peace officer" means a member of the Division of State Police within the Department of Emergency Services and Public Protection or an organized local police department, a chief inspector or inspector in the Division of Criminal Justice, a state marshal while exercising authority granted under any provision of the general statutes, a judicial marshal in the performance of the duties of a judicial marshal, a conservation officer or special conservation officer, as defined in section 26-5, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, 29-18a, 29-18b or 29-19, an adult probation officer, an official of the Department of Correction authorized by the Commissioner of Correction to make arrests in a correctional institution or facility, any investigator in the investigations unit of the office of the State Treasurer, an inspector of motor vehicles in the Department of Motor Vehicles, who is certified under the provisions of sections 7-294a to 7-294e, inclusive, a United States marshal or deputy marshal, any special agent of the federal government authorized to enforce the provisions of Title 21 of the United States Code, or a member of a law enforcement unit of the Mashantucket Pequot Tribe or the Mohegan Tribe of Indians of Connecticut created and governed by a memorandum of agreement under section 47-65c who is certified as a police officer by the Police Officer Standards and Training Council pursuant to sections 7-294a to 7-294e, inclusive;

*Substitute House Bill No. 6667*

(10) "Firefighter" means any agent of a municipality whose duty it is to protect life and property therein as a member of a duly constituted fire department whether professional or volunteer;

(11) A person acts "intentionally" with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct;

(12) A person acts "knowingly" with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists;

(13) A person acts "recklessly" with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation;

(14) A person acts with "criminal negligence" with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation;

(15) "Machine gun" means a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a submachine gun;

(16) "Rifle" means a weapon designed or redesigned, made or

*Substitute House Bill No. 6667*

remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger;

(17) "Shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger;

(18) "Pistol" or "revolver" means any firearm having a barrel less than twelve inches;

(19) "Firearm" means any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged;

(20) "Electronic defense weapon" means a weapon which by electronic impulse or current is capable of immobilizing a person temporarily, including a stun gun or other conductive energy device;

(21) "Martial arts weapon" means a nunchaku, kama, kasari-fundo, octagon sai, tonfa or chinese star;

(22) "Employee of an emergency medical service organization" means an ambulance driver, emergency medical technician or paramedic as defined in section 19a-175;

(23) "Railroad property" means all tangible property owned, leased or operated by a railroad carrier including, but not limited to, a right-of-way, track, roadbed, bridge, yard, shop, station, tunnel, viaduct, trestle, depot, warehouse, terminal or any other structure or appurtenance or equipment owned, leased or used in the operation of a railroad carrier including a train, locomotive, engine, railroad car, signals or safety

*Substitute House Bill No. 6667*

device or work equipment or rolling stock;

(24) "Serious firearm offense" means a violation of section 29-36, 29-36a, as amended by this act, or 53-202w, as amended by this act, possession of a stolen firearm or a firearm that is altered in a manner that renders the firearm unlawful, or any crime of which an essential element is that the person discharged, used or was armed with and threatened the use of a firearm; and

(25) "Serious firearm offender" means a person who has (A) two convictions for a serious firearm offense, (B) a conviction for a serious firearm offense and was previously convicted of a violation of section 29-36, 29-36a, as amended by this act, subdivision (1) of subsection (a) of section 53a-217, as amended by this act, or subdivision (1) of subsection (a) of section 53a-217c, as amended by this act, or (C) a conviction for a serious firearm offense and was previously convicted of two or more additional felony offenses.

Sec. 37. Section 53a-32 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) At any time during the period of probation or conditional discharge, the court or any judge thereof may issue a warrant for the arrest of a defendant for violation of any of the conditions of probation or conditional discharge, or may issue a notice to appear to answer to a charge of such violation, which notice shall be personally served upon the defendant. Whenever a probation officer has probable cause to believe that a person on probation who is a serious firearm offender has violated a condition of probation, or knows that a person on probation for a felony conviction has been arrested for the commission of a serious firearm offense, such probation officer shall apply to the court or any judge thereof for a warrant for the arrest of such person for violation of a condition or conditions of probation or conditional discharge. Any such warrant shall authorize all officers named therein to return the

*Substitute House Bill No. 6667*

defendant to the custody of the court or to any suitable detention facility designated by the court. Whenever a probation officer has probable cause to believe that a person has violated a condition of such person's probation, such probation officer (1) may notify any police officer that such person has, in such officer's judgment, violated the conditions of such person's probation, and [such] (2) shall notify such police officer if such person is a serious firearm offender or is on probation for a felony conviction and has been arrested for the commission of a serious firearm offense. Such notice shall be sufficient warrant for the police officer to arrest such person and return such person to the custody of the court or to any suitable detention facility designated by the court. Whenever a probation officer so notifies a police officer, the probation officer shall notify the victim of the offense for which such person is on probation, and any victim advocate assigned to assist the victim, provided the probation officer has been provided with the name and contact information for such victim or victim advocate. Any probation officer may arrest any defendant on probation without a warrant or may deputize any other officer with power to arrest to do so by giving such other officer a written statement setting forth that the defendant has, in the judgment of the probation officer, violated the conditions of the defendant's probation. Such written statement, delivered with the defendant by the arresting officer to the official in charge of any correctional center or other place of detention, shall be sufficient warrant for the detention of the defendant. After making such an arrest, such probation officer shall present to the detaining authorities a similar statement of the circumstances of violation. [Provisions] Except as provided in subsection (e) of this section, provisions regarding release on bail of persons charged with a crime shall be applicable to any defendant arrested under the provisions of this section. Upon such arrest and detention, the probation officer shall immediately so notify the court or any judge thereof.

(b) When the defendant is presented for arraignment on the charge

*Substitute House Bill No. 6667*

of violation of any of the conditions of probation or conditional discharge, the court shall review any conditions previously imposed on the defendant and may order, as a condition of the pretrial release of the defendant, that the defendant comply with any or all of such conditions in addition to any conditions imposed pursuant to section 54-64a, as amended by this act. Unless the court, pursuant to subsection (c) of section 54-64a, as amended by this act, orders that the defendant remain under the supervision of a probation officer or other designated person or organization, the defendant shall be supervised by the Court Support Services Division of the Judicial Branch in accordance with subsection (a) of section 54-63b.

(c) Upon notification by the probation officer of the arrest of the defendant or upon an arrest by warrant as herein provided, the court shall cause the defendant to be brought before it without unnecessary delay for a hearing on the violation charges. At such hearing the defendant shall be informed of the manner in which such defendant is alleged to have violated the conditions of such defendant's probation or conditional discharge, shall be advised by the court that such defendant has the right to retain counsel and, if indigent, shall be entitled to the services of the public defender, and shall have the right to cross-examine witnesses and to present evidence in such defendant's own behalf. Unless good cause is shown, a charge of violation of any of the conditions of probation or conditional discharge shall be disposed of or scheduled for a hearing not later than one hundred twenty days after the defendant is arraigned on such charge, except, if the defendant is a serious firearm offender, or is on probation for a felony conviction and has been arrested for the commission of a serious firearm offense, such charge shall be disposed of or scheduled for a hearing not later than sixty days after the defendant is arraigned on such charge.

(d) If such violation is established and the violation consisted of the commission of a serious firearm offense or the defendant is a serious

*Substitute House Bill No. 6667*

firearm offender, the court shall revoke the sentence of probation or conditional discharge, otherwise, the court may: (1) Continue the sentence of probation or conditional discharge; (2) modify or enlarge the conditions of probation or conditional discharge; (3) extend the period of probation or conditional discharge, provided the original period with any extensions shall not exceed the periods authorized by section 53a-29; or (4) revoke the sentence of probation or conditional discharge. If such sentence is revoked, the court shall require the defendant to serve the sentence imposed or impose any lesser sentence. Any such lesser sentence may include a term of imprisonment, all or a portion of which may be suspended entirely or after a period set by the court, followed by a period of probation with such conditions as the court may establish. No such revocation shall be ordered, except upon consideration of the whole record and unless such violation is established by the introduction of reliable and probative evidence and by a preponderance of the evidence.

(e) Provisions regarding release on bail of any serious firearm offender arrested pursuant to this section who is charged with a crime, or any felony offender arrested pursuant to this section for a serious firearm offense, shall be applicable to such serious firearm offender provided that, for the purpose of applying such provisions, there shall be a rebuttable presumption that such serious firearm offender poses a danger to the safety of other persons.

Sec. 38. Section 54-64a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) (1) Except as provided in subdivision (2) of this subsection and subsection (b) or (c) of this section, when any arrested person is presented before the Superior Court, said court shall, in bailable offenses, promptly order the release of such person upon the first of the following conditions of release found sufficient to reasonably ensure the appearance of the arrested person in court: (A) Upon execution of a

*Substitute House Bill No. 6667*

written promise to appear without special conditions, (B) upon execution of a written promise to appear with nonfinancial conditions, (C) upon execution of a bond without surety in no greater amount than necessary, or (D) upon execution of a bond with surety in no greater amount than necessary, but in no event shall a judge prohibit a bond from being posted by surety. In addition to or in conjunction with any of the conditions enumerated in subparagraphs (A) to (D), inclusive, of this subdivision the court may, when it has reason to believe that the person is drug-dependent and where necessary, reasonable and appropriate, order the person to submit to a urinalysis drug test and to participate in a program of periodic drug testing and treatment. The results of any such drug test shall not be admissible in any criminal proceeding concerning such person.

(2) If the arrested person is charged with no offense other than a misdemeanor, the court shall not impose financial conditions of release on the person unless (A) the person is charged with a family violence crime, as defined in section 46b-38a, or (B) the person requests such financial conditions, or (C) the court makes a finding on the record that there is a likely risk that (i) the arrested person will fail to appear in court, as required, or (ii) the arrested person will obstruct or attempt to obstruct justice, or threaten, injure or intimidate or attempt to threaten, injure or intimidate a prospective witness or juror, or (iii) the arrested person will engage in conduct that threatens the safety of himself or herself or another person. In making a finding described in this subsection, the court may consider past criminal history, including any prior record of failing to appear as required in court that resulted in any conviction for a violation of section 53a-172 or any conviction during the previous ten years for a violation of section 53a-173 and any other pending criminal cases of the person charged with a misdemeanor.

(3) The court may, in determining what conditions of release will reasonably ensure the appearance of the arrested person in court,

*Substitute House Bill No. 6667*

consider the following factors: (A) The nature and circumstances of the offense, (B) such person's record of previous convictions, (C) such person's past record of appearance in court, (D) such person's family ties, (E) such person's employment record, (F) such person's financial resources, character and mental condition, (G) such person's community ties, and (H) in the case of a violation of section 53a-222a, as amended by this act, when the condition of release was issued for a family violence crime, as defined in section 46b-38a, the heightened risk posed to victims of family violence by violations of conditions of release.

(b) (1) [When] Except as provided in subsection (c) of this section, any arrested person charged with the commission of a class A felony, a class B felony, except a violation of section 53a-86 or 53a-122, a class C felony, except a violation of section 53a-87, 53a-152 or 53a-153, or a class D felony under sections 53a-60 to 53a-60c, inclusive, section 53a-72a, 53a-95, 53a-103, 53a-103a, 53a-114, 53a-136 or 53a-216, or a family violence crime, as defined in section 46b-38a, is presented before the Superior Court, said court shall, in bailable offenses, promptly order the release of such person upon the first of the following conditions of release found sufficient to reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered: (A) Upon such person's execution of a written promise to appear without special conditions, (B) upon such person's execution of a written promise to appear with nonfinancial conditions, (C) upon such person's execution of a bond without surety in no greater amount than necessary, or (D) upon such person's execution of a bond with surety in no greater amount than necessary, but in no event shall a judge prohibit a bond from being posted by surety. In addition to or in conjunction with any of the conditions enumerated in subparagraphs (A) to (D), inclusive, of this subdivision, the court may, when it has reason to believe that the person is drug-dependent and where necessary, reasonable and appropriate, order the person to submit to a urinalysis drug test and to participate in a program of periodic drug testing and treatment. The

*Substitute House Bill No. 6667*

results of any such drug test shall not be admissible in any criminal proceeding concerning such person.

(2) The court may, in determining what conditions of release will reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered, consider the following factors: (A) The nature and circumstances of the offense, (B) such person's record of previous convictions, (C) such person's past record of appearance in court after being admitted to bail, (D) such person's family ties, (E) such person's employment record, (F) such person's financial resources, character and mental condition, (G) such person's community ties, (H) the number and seriousness of charges pending against the arrested person, (I) the weight of the evidence against the arrested person, (J) the arrested person's history of violence, (K) whether the arrested person has previously been convicted of similar offenses while released on bond, (L) the likelihood based upon the expressed intention of the arrested person that such person will commit another crime while released, and (M) the heightened risk posed to victims of family violence by violations of conditions of release and court orders of protection.

(3) When imposing conditions of release under this subsection, the court shall state for the record any factors under subdivision (2) of this subsection that it considered and the findings that it made as to the danger, if any, that the arrested person might pose to the safety of any other person upon the arrested person's release that caused the court to impose the specific conditions of release that it imposed.

(c) (1) When any arrested person charged with the commission of a serious firearm offense, as defined in section 53a-3, as amended by this act, is (A) a serious firearm offender, (B) has two previous convictions for a violation of section 29-36, 29-36a, as amended by this act, 53-202, 53-202a, as amended by this act, 53-202b, 53-202c, as amended by this act, 53-202w, as amended by this act, 53-202aa, 53-206i, 53a-54a, 53a-54b,

*Substitute House Bill No. 6667*

53a-54c, 53a-54d, 53a-55, 53a-55a, 53a-56, 53a-56a, 53a-59, 53a-60, 53a-60a, 53a-134, 53a-212, 53a-216, 53a-217, as amended by this act, 53a-217b or 53a-217c, as amended by this act, (C) a previous conviction for a violation of section 29-35, as amended by this act, in addition to a prior conviction for a violation of section 29-36, 29-36a, as amended by this act, 53-202, 53-202a, as amended by this act, 53-202b, 53-202c, as amended by this act, 53-202w, as amended by this act, 53-202aa, 53-206i, 53a-54a, 53a-54b, 53a-54c, 53a-54d, 53a-55, 53a-55a, 53a-56, 53a-56a, 53a-59, 53a-60, 53a-60a, 53a-134, 53a-212, 53a-216, 53a-217, as amended by this act, 53a-217b or 53a-217c, as amended by this act, or (D) two or more convictions during the five-year period immediately prior to the current arrest for a violation of section 21a-277, 21a-278, 53a-122 or 53a-123, is presented before the Superior Court, the court shall, in bailable offenses, promptly order the release of such person after establishing a bond amount found sufficient to reasonably ensure the appearance of the arrested person in court, and that the safety of any other person will not be endangered and upon such person's execution of a bond with or without surety in no greater amount than necessary. The prosecutorial official shall petition for the arrested person to deposit at least thirty per cent of the bond amount directly with the court, and there shall be a rebuttable presumption that the safety of other persons will be endangered without the granting of such petition. Additionally, the court may, when it has reason to believe that the person is drug-dependent and where necessary, reasonable and appropriate, order the person to submit to a urinalysis drug test and to participate in a program of periodic drug testing and treatment. The results of any such drug test shall not be admissible in any criminal proceeding concerning such person.

(2) When any arrested person charged with the commission of a serious firearm offense, as defined in section 53a-3, as amended by this act, other than a person described in subdivision (1) of this subsection, is presented before the Superior Court, the court shall, in bailable

*Substitute House Bill No. 6667*

offenses, promptly order the release of such person upon the first of the following conditions of release found sufficient to reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered: (A) Upon such person's execution of a written promise to appear without special conditions, (B) upon such person's execution of a written promise to appear with nonfinancial conditions, (C) upon such person's execution of a bond without surety in no greater amount than necessary, or (D) upon such person's execution of a bond with surety in no greater amount than necessary, but in no event shall a judge prohibit a bond from being posted by surety. The prosecutorial official may petition the court to deem such person a serious risk to the safety of another person or persons. The prosecutorial official may present any information developed by federal, state and local law enforcement agencies in the course of a criminal investigation or enforcement action, including, but not limited to, social media posts, pictures or videos threatening violence, claiming responsibility for violence or suggesting possession of a firearm. If the court finds that the arrested person poses a serious risk to the safety of another person or persons, the arrested person may only be released pursuant to subparagraph (C) or (D) of this subdivision and the arrested person shall be required to deposit at least thirty per cent of any bond amount directly with the court. Additionally, the court may, when it has reason to believe that the person is drug-dependent and where necessary, reasonable and appropriate, order the person to submit to a urinalysis drug test and to participate in a program of periodic drug testing and treatment. The results of any such drug test shall not be admissible in any criminal proceeding concerning such person.

(3) The court may, in determining what conditions of release will reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered, consider the following factors: (A) The nature and circumstances of the offense, (B) such person's record of previous convictions, (C) such person's past

*Substitute House Bill No. 6667*

record of appearances in court after being admitted to bail, (D) such person's family ties, (E) such person's employment record, (F) such person's financial resources, character and mental condition, (G) such person's community ties, (H) the number and seriousness of charges pending against the arrested person, (I) the weight of the evidence against the arrested person, (J) the arrested person's history of violence, (K) whether the arrested person has previously been convicted of similar offenses while released on bond, and (L) the likelihood based upon the expressed intention of the arrested person that such person will commit another crime while released.

(4) When imposing conditions of release under this subsection, the court shall state for the record any factors under subdivision (3) of this subsection that it considered and the findings that it made as to the danger, if any, that the arrested person might pose to the safety of any other person upon the arrested person's release that caused the court to impose the specific conditions of release that the court imposed.

**[**(c)**]** (d) If the court determines that a nonfinancial condition of release should be imposed pursuant to subparagraph (B) of subdivision (1) of subsection (a) or (b) of this section, the court shall order the pretrial release of the person subject to the least restrictive condition or combination of conditions that the court determines will reasonably ensure the appearance of the arrested person in court and, with respect to the release of the person pursuant to subsection (b) or (c) of this section, that the safety of any other person will not be endangered, which conditions may include an order that the arrested person do one or more of the following: (1) Remain under the supervision of a designated person or organization; (2) comply with specified restrictions on such person's travel, association or place of abode; (3) not engage in specified activities, including the use or possession of a dangerous weapon, an intoxicant or a controlled substance; (4) provide sureties of the peace pursuant to section 54-56f under supervision of a

*Substitute House Bill No. 6667*

designated bail commissioner or intake, assessment and referral specialist employed by the Judicial Branch; (5) avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense; (6) maintain employment or, if unemployed, actively seek employment; (7) maintain or commence an educational program; (8) be subject to electronic monitoring; or (9) satisfy any other condition that is reasonably necessary to ensure the appearance of the person in court and that the safety of any other person will not be endangered. The court shall state on the record its reasons for imposing any such nonfinancial condition.

**[**(d)**]** <u>(e)</u> If the arrested person is not released, the court shall order him committed to the custody of the Commissioner of Correction until he is released or discharged in due course of law.

**[**(e)**]** <u>(f)</u> The court may require that the person subject to electronic monitoring pursuant to subsection **[**(c)**]** <u>(d)</u> of this section pay directly to the electronic monitoring service provider a fee for the cost of such electronic monitoring services. If the court finds that the person subject to electronic monitoring is indigent and unable to pay the costs of electronic monitoring services, the court shall waive such costs. Any contract entered into by the Judicial Branch and the electronic monitoring service provider shall include a provision stating that the total cost for electronic monitoring services shall not exceed five dollars per day. Such amount shall be indexed annually to reflect the rate of inflation.

Sec. 39. Section 54-64f of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) Upon application by the prosecuting authority alleging that a defendant has violated the conditions of the defendant's release, the court may, if probable cause is found, order that the defendant appear in court for an evidentiary hearing upon such allegations. An order to

*Substitute House Bill No. 6667*

appear shall be served upon the defendant by any law enforcement officer delivering a copy to the defendant personally, or by leaving it at the defendant's usual place of abode with a person of suitable age and discretion then residing therein, or mailing it by registered or certified mail to the last-known address of the defendant.

(b) **[**If**]** Except as provided in subsection (d) of this section, if the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by clear and convincing evidence that the defendant has violated reasonable conditions imposed on the defendant's release it may impose different or additional conditions upon the defendant's release. If the defendant is on release with respect to an offense for which a term of imprisonment of ten or more years may be imposed and the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by clear and convincing evidence that the defendant has violated reasonable conditions of the defendant's release and that the safety of any other person is endangered while the defendant is on release, it may revoke such release. The revocation of a defendant's release pursuant to this subsection shall cause any bond posted in the criminal proceeding to be automatically terminated and the surety to be released.

(c) **[**If**]** Except as provided in subsection (d) of this section, if the defendant is a serious firearm offender or is on release with respect to a serious firearm offense as defined in section 53a-3, as amended by this act, or the defendant is on release with respect to an offense for which a term of imprisonment of ten or more years may be imposed and the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by clear and convincing evidence that the safety of any other person is endangered while the defendant is on release and that there is probable cause to believe that the defendant has committed a federal, state or local crime while on release, there shall be a rebuttable presumption that the defendant's release should be

*Substitute House Bill No. 6667*

revoked.

(d) If the defendant is a serious firearm offender as defined in section 53a-3, as amended by this act, and is on release with respect to any offense and the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by the preponderance of the evidence that there is probable cause to believe that the defendant has committed a serious firearm offense, as defined in section 53a-3, as amended by this act, while on release, or if the defendant is on release with respect to any offense referenced in subsection (c) of section 54-64a, as amended by this act, and the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by the preponderance of evidence that there is probable cause to believe that the defendant has committed a serious firearm offense, the defendant's release shall be revoked.

**[**(d)**]** (e) The revocation of a defendant's release pursuant to this section shall cause any bond posted in the criminal proceeding to be automatically terminated and the surety to be released.

(f) If the defendant commits a serious firearm offense while on pretrial release and is subsequently convicted of any offense for which the defendant was on pretrial release and a serious firearm offense committed while on pretrial release, any bond posted in the criminal proceeding for the offense for which the defendant was on pretrial release shall be forfeited.

Sec. 40. Section 54-127 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

The request of the Commissioner of Correction or any officer of the Department of Correction so designated by the commissioner, or of the Board of Pardons and Paroles or its chairman shall be sufficient warrant to authorize any officer of the Department of Correction or any officer

*Substitute House Bill No. 6667*

authorized by law to serve criminal process within this state, to return any **[**convict or inmate**]** <u>parolee</u> on parole into actual custody; and any such officer, police officer, constable or state marshal shall arrest and hold any parolee **[**or inmate**]** when so requested, without any written warrant<u>, and the commissioner shall make such request if the parolee is a serious firearm offender, as defined in section 53a-3, as amended by this act, and is arrested while on parole for a felony offense, or if the parolee is arrested for a serious firearm offense as defined in section 53a-3, as amended by this act</u>.

Sec. 41. (NEW) (*Effective from passage*) (a) For the purposes of this section, "firearm-related crime docket" means a docket in a geographical area separate and apart from other criminal matters for the hearing of firearm-related matters.

(b) Not later than December 31, 2023, the Chief Court Administrator shall establish a firearm-related crime docket to serve the geographical area courts in Fairfield, Hartford, New Haven and Waterbury. The Chief Court Administrator shall establish policies and procedures to implement such firearm-related crime docket.

Sec. 42. (NEW) (*Effective October 1, 2023*) Notwithstanding any provision of the general statutes, any peace officer who is a sworn member of a law enforcement agency or any prosecutorial official who is aware of any person released on parole or serving probation who poses a serious threat to public safety, may file an emergency petition with the supervisory staff of the probation or parole office, as applicable, and a copy of such petition with the office of the Chief State's Attorney. Such petition shall cite risk factors pointing to the person released on parole or serving probation as a serious threat to public safety and may present any information developed by federal, state and local law enforcement agencies in the course of a criminal investigation or enforcement action, including, but not limited to, social media posts, pictures or videos threatening violence, claiming responsibility for

*Substitute House Bill No. 6667*

violence or suggesting possession of a firearm. Not later than forty-eight hours after receiving such petition, the supervisory staff of the probation or parole office, as applicable, shall (1) seek a warrant for such person serving probation for a violation of such probation, as applicable, or (2) provide the rationale for not taking an action described in subdivision (1) of this section.

Sec. 43. Subsection (a) of section 53a-222 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) A person is guilty of violation of conditions of release in the first degree when, while charged with the commission of a felony, such person is released pursuant to subsection (b) of section 54-63c, subsection (c) of section 54-63d or subsection **[**(c)**]** (d) of section 54-64a, as amended by this act, and intentionally violates one or more of the imposed conditions of release.

Sec. 44. Subsection (a) of section 53a-222a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) A person is guilty of violation of conditions of release in the second degree when, while charged with the commission of a misdemeanor or motor vehicle violation for which a sentence to a term of imprisonment may be imposed, such person is released pursuant to subsection (b) of section 54-63c, subsection (c) of section 54-63d or subsection **[**(c)**]** (d) of section 54-64a, as amended by this act, and intentionally violates one or more of the imposed conditions of release.

Sec. 45. Section 53-202g of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) Any person who lawfully possesses an assault weapon under sections 53-202a to 53-202k, inclusive, as amended by this act, or a

*Substitute House Bill No. 6667*

firearm, as defined in section 53a-3, as amended by this act, that is lost or stolen from such person shall report the loss or theft to the organized local police department for the town in which the loss or theft occurred or, if such town does not have an organized local police department, to the state police troop having jurisdiction for such town within seventy-two hours of when such person discovered or should have discovered the loss or theft. Such department or troop shall forthwith forward a copy of such report to the Commissioner of Emergency Services and Public Protection. The provisions of this subsection shall not apply to the loss or theft of an antique firearm as defined in section 29-37a, as amended by this act.

(b) Any person who fails to make a report required by subsection (a) of this section, within the prescribed time period shall **[**commit an infraction and be fined not more than ninety dollars**]** be guilty of a class A misdemeanor for a first offense and be guilty of a class C felony for any subsequent offense, except that, if such person intentionally fails to make such report within the prescribed time period, such person shall be guilty of a class B felony. Any person who violates subsection (a) of this section for the first offense shall not lose such person's right to hold or obtain any firearm permit under the general statutes.

Sec. 46. Subsection (b) of section 29-28a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(b) (1) The local authority shall, not later than eight weeks after a sufficient application for a temporary state permit has been made, inform the applicant that such applicant's request for a temporary state permit has been approved or denied, and if denied, supply to the applicant a detailed written reason for such denial. The local authority shall forward a copy of the application indicating approval or denial of the temporary state permit to the Commissioner of Emergency Services and Public Protection. If the local authority has denied the application

*Substitute House Bill No. 6667*

for a temporary state permit, no state permit may be issued. If the local authority has failed to expressly deny the application or issue a temporary state permit during the eight-week period following the submission of such application, upon presentation by the applicant of an affidavit attesting to such failure to expressly deny the application at least (A) thirty-two weeks, in the case of an application filed on or before March 30, 2024, and (B) sixteen weeks, in the case of an application filed on or after April 1, 2024, after submission of such application, the commissioner shall accept such affidavit in lieu of a temporary state permit and notify the local authority immediately of the receipt of such affidavit. The commissioner shall, not later than eight weeks after receiving an application indicating approval from the local authority, or an affidavit attesting to a failure to expressly deny the application, inform the applicant in detailed writing that the applicant's application for a state permit has been approved or denied, or that the results of the national criminal history records check have not been received. If grounds for denial become known after a temporary state permit has been obtained, the temporary state permit shall be immediately revoked pursuant to section 29-32. The failure of the issuing authority to complete the review of an application for a temporary state permit shall not be grounds for the commissioner to deny issuance of a state permit.

(2) Notwithstanding subparagraph (B) of subdivision (1) of this subsection, during a major disaster or an emergency declaration by the President of the United States, or an emergency declaration issued by the Governor due to any disease epidemic, public health emergency or natural disaster impacting a local authority, the Commissioner of Emergency Services and Public Protection shall not accept any affidavit filed under subdivision (1) of this subsection until thirty-two weeks have passed since submission of the application for a temporary state permit.

Sec. 47. (NEW) (*Effective from passage*) (a) Any comprehensive plan

*Substitute House Bill No. 6667*

and program developed by the Commissioner of Emergency Services and Public Protection pursuant to subsection (b) of section 28-5 of the general statutes shall include a response plan for a mass shooting event. A mass shooting event is deemed to occur when, within a period of twenty-four hours, four or more individuals are shot within a three-mile radius.

(b) In any response plan for a mass shooting event, the commissioner shall include provisions directing the coordination of a meeting with the Department of Emergency Services and Public Protection, the local police department, community leaders, including religious leaders and representatives of the Project Longevity Initiative, established under section 4-68bb of the general statutes, for the purpose of determining (1) why the shooting event occurred, (2) what circumstances led to the shooting event, (3) whether there were warning signs that such shooting event would occur, (4) preventative measures the community can enact to prevent further shooting events, and (5) if there are resources available to assist the community in its response to the shooting event. At the conclusion of such meeting, the meeting participants shall report their findings to the Commissioner of Emergency Services and Public Protection. The commissioner shall review and report the findings and any other information the commissioner deems pertinent, in accordance with the provisions of section 11-4a of the general statutes, to the Governor, majority and minority leaders of the House of Representatives and the Senate and the joint standing committee of the General Assembly having cognizance of matters relating to public safety and security. Such report shall include recommendations, if any, for legislative action to reduce mass shooting events.

(c) The Commissioner of Emergency Services and Public Protection shall coordinate with the Commissioner of Public Health for the deployment of grief counselors and mental health professionals to provide mental health services to the family members or other

*Substitute House Bill No. 6667*

individuals with a close association with any victim of a mass shooting. Such deployments shall be made to local community outreach groups in and around the impacted geographical location and to any school or institution of higher education where any victim or perpetrator of a mass shooting event was enrolled.

(d) The Commissioner of Emergency Services and Public Protection shall coordinate an investigation into each mass shooting event with the office of the Chief State's Attorney. Each such investigation shall consider: (1) How the perpetrator acquired any firearm used in the event, (2) whether the firearm that was used was legally acquired, (3) if the magazine used in the shooting was a large capacity magazine, as defined in section 53-202w of the general statutes, as amended by this act, and (4) the backgrounds of the perpetrator and the victims. The commissioner and Chief State's Attorney shall report, in accordance with the provisions of section 11-4a of the general statutes, a summary of each such investigation, all findings of such investigation, including any determination of cause of the mass shooting event and any recommendations to prevent future mass shooting events to the Governor, majority and minority leaders of the House of Representatives and the Senate and the joint standing committee of the General Assembly having cognizance of matters relating to public safety and security and to the chief elected officer and legislative body, each as described in section 7-193 of the general statutes, of the municipality where the mass shooting event occurred.

Sec. 48. (NEW) (*Effective October 1, 2023*) The administrative head of each law enforcement unit, as defined in section 7-291e of the general statutes, shall ensure that each police station, headquarters or barracks under such administrative head's jurisdiction posts in a conspicuous place that is readily available for viewing by the public a statement informing individuals of (1) their right to request and obtain an application to apply for a permit to carry a pistol or revolver, their right

*Substitute House Bill No. 6667*

to submit an application for a permit to carry a pistol or revolver no more than one week after their request to do so, their right to be informed in writing of the result of their application within eight weeks from its submittal, their right to file an appeal in the event of a denial of a permit for the carrying of a pistol or revolver and an individual's state and federal constitutional right to own, possess and carry a firearm for the protection of the individual's home or family as the individual so lawfully chooses, and (2) the application process for a risk protection order pursuant to section 29-38c of the general statutes, including the process by which a family member or medical professional can apply.

Sec. 49. Section 53-202m of the general statutes is repealed. (*Effective from passage*)

Approved June 6, 2023