# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| EDDIE GRANT, JR., JENNIFER HAMILTON; MICHAEL STIEFEL; CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; AND SECOND AMENDMENT FOUNDATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> EDWARD M. LAMONT, JR., in his official capacity; JAMES ROVELLA, in his official capacity; PATRICK GRIFFIN, in his official capacity; MARGARET E. KELLY, in her official capacity; DAVID R. APPLEGATE, in his official capacity; JOSEPH T. CORRADINO, in his official capacity; SHARMESE L. WALCOTT, in her official capacity; DAVID R. SHANNON, in his official capacity; MICHAEL A. GAILOR, in his official capacity; CHRISTIAN WATSON, in his official capacity; JOHN P. DOYLE, JR., in his official capacity, PAUL J. NARDUCCI, in his official capacity; PAUL J. FERENCEK, in his official capacity; MATTHEW C. GEDANSKY, in his official capacity, MAUREEN PLATT, in her official capacity; ANNE F. MAHONEY, in her official capacity, <br><br> Defendants. | CIV. NO. 3:22-cv-01223-JBA <br><br><br> JULY 5, 2023 <br><br><br> **MEMORANDUM OF LAW IN SUPPORT OF** <br><br> **PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION** |

The Plaintiffs respectfully submit this Memorandum of Law in support of their Amended Motion for a Preliminary Injunction.

The Plaintiffs filed this action on September 29, 2022 seeking a declaratory judgment that Connecticut's "assault weapon" ban is unconstitutional, and seeking a permanent injunction against enforcement of that ban. On Tuesday, January 31, 2023, the United States Justice Department, through the Bureau of Alcohol, Tobacco, Firearms, and Explosives

**ORAL ARGUMENT REQUESTED**

("ATF"), published a new rule in the Federal Register, effective immediately, redesignating a class of firearms known as "any other firearm" or simply "others" as either "rifles" or "short barreled rifles" depending on the barrel length. "Others" are called such because they were previously not considered either "rifles," "pistols," or "shotguns." For most people in the United States who own "other" firearms with short barrels, the new ATF rule required that they register the firearms with the ATF, or replace the short barrel with a barrel of sixteen inches or greater. Those with "others" with barrels of sixteen inches or greater need not do anything in response to the rule.

The Plaintiffs sought emergency injunctive relief in this action because they maintained that the new ATF rule's redesignation of "others" pushed them within the category of the "assault weapons" banned in Connecticut. The Court denied the emergency relief sought by the Plaintiffs.

Connecticut, however, took its own action to ban "others," enacting Conn. Public Act No. 23-53. Section 23 of Public Act No. 23-53 became effective immediately, and categorically reclassified firearms previously known as merely "others" to be "assault weapons" under Connecticut law. The law also prohibits the Plaintiffs and similarly situated members of Plaintiff Connecticut Citizens Defense League, Inc. ("CCDL") and Second Amendment Foundation Inc. ("SAF"), as well as members of the public from acquiring new "others" on the pain of criminal prosecution and punishment.

Connecticut's scheme for defining "assault weapons" and prohibiting their purchase and possession deprives the individual Plaintiffs, members of Plaintiffs CCDL and SAF, and similarly situated Connecticut citizens of their constitutional right to purchase and possess

firearms that are in common use for lawful purposes in Connecticut and throughout the United States. Thus, the Plaintiffs seek a preliminary injunction enjoining the Defendants and their subordinates from enforcing Connecticut's "assault weapons" ban.

## FACTUAL BACKGROUND

### I.    Connecticut's Criminalization of "Assault Weapons"

Prior to 1993, Connecticut did not prohibit the purchase, sale, or possession of certain modern sporting rifles that it now classifies as "assault weapons." In 1993, it changed course, enacting legislation that banned "assault weapons" and criminalized their possession. 1993 Conn. Pub. Acts 93-306, § 1(a); *see also New York State Rifle and Pistol Ass'n v. Cuomo*, 804 F.3d 242, 248 (2d Cir. 2015) (discussing the history of Connecticut's assault weapons ban). The 1993 ban employed a two-track approach – banning 67 specifically named semiautomatic firearm models and firearms "capable of fully automatic, semiautomatic or burst fire at the option of the user." *Cuomo*, 804 F.3d at 248.

A year after Pub. Acts 93-306, the United States Congress enacted the Violent Crime Control and Law Enforcement Act of 1994, which purported to restrict the manufacture, transfer, and possession of certain "semiautomatic assault weapons." *Id.* The federal ban followed Connecticut's two-track approach to a limited extent, banning 18 specific firearms but introducing what became known as the "two-feature test." *Id.* The "two-feature test" banned "any semiautomatic firearm that contained at least two listed military-style features, including a telescoping stock, a conspicuously protruding pistol grip, a bayonet mount, a flash suppressor, and a grenade launcher." *Id.* The federal ban, however, contained a sunset clause that caused it to expire in 2004. *Id.*

3

The approaching expiration of the federal "assault weapons" ban inspired Connecticut to adopt its own equivalent of the federal ban in 2001, embracing the "two feature test" for the first time. 2001 Conn. Pub. Acts 01–130, § 1. In 2013, Connecticut expanded its criminalization of "assault weapons" broadly to create the statutory schem that the Plaintiffs now challenge - Conn. Gen. Stat. §§ 53-202a-f and Conn. Gen. Stat. §§ 53-202h-j.[1]

The law makes the possession of an "assault weapon" a Class D felony and prescribes a punishment of a mandatory one-year sentence of incarceration and a maximum of five years' incarceration. Conn. Gen. Stat. § 53-202c(a); *see also* Conn. Gen. Stat. § 53a-35a(8). It also makes the distribution, transportation, importation, stocking for sale, advertisement for sale, sale, or gifting of an "assault weapon" a Class C felony, which carries a mandatory two-year sentence of incarceration and a maximum term of ten years' incarceration. Conn. Gen. Stat. § 53-202b(a)(1); *see also* Conn. Gen. Stat. § 53a-35a(7).

There is a limited "grandfathering" provision to the law, which allows individuals who lawfully possessed "assault weapons" on or prior to April 3, 2013 to continue to possess them if they proved previous lawful ownership to the Connecticut State Police, applied to the Connecticut State Police for a certificate of possession of the "assault weapons" by January 1, 2014, and have actually received the certificate. Conn. Gen. Stat. § 53-202d(a)(2). The "grandfathered" possession, however, is limited to narrowly defined places and for narrowly defined purposes, which do not include self-defense outside of a home. Conn. Gen. Stat. § 53-202d(f).

---

[1] Conn. Gen. Stat. § 53-202g relates to reporting the loss or theft of a firearm and is not being challenged in this action.

Connecticut's two-track approach to defining "assault weapons" for purposes of criminalizing their possession, sale, and transfer first criminalizes the possession, sale, or transfer of approximately 160 specifically named firearm models in four statutory subsections. *See generally* Conn. Gen. Stat. § 53-202a. Second, it criminalizes the possession, sale, and transfer of all firearms that have certain features, which are classified in eleven categories. Conn. Gen. Stat. § 53-202a; *see* Dkt. No. 13 – Amended Complaint.

Thus, the statutory scheme criminalizes countless ubiquitous semiautomatic firearms that are widely popular and commonly used for lawful purposes in Connecticut and throughout the United States. Additionally, a violation of the ban on "assault weapons" saddles the average citizen with a felony conviction, rendering him/her ineligible to ever lawfully possess a firearm again in his/her life. *See e.g.*, 18 U.S.C. § 922(g)(1).

## II.   Connecticut's "Others"

Connecticut supervises the commercial sale of firearms through the SLFU. Since 2013, the SLFU has routinely approved the commercial sale of "others." A firearm is considered an "other" because it does not meet the statutory definition of either "rifle," "shotgun," or "pistol" under Connecticut law. See Conn Gen Stat. Sec. 53a-3(16)-(18).

Despite being legal in Connecticut, "others" have drawn political ire because of their visual similarities to "assault rifles." The key distinction, however, is that "others" often use "pistol braces"[2] which gives them a similar visual appearance to "assault rifles." "Others," however, have not previously been categorized as "rifles" or "assault weapons" under

---

[2] "Pistol braces" are firearm accessories that usually attach to a person's forearm to provide greater stability. While their appearance resembles a shoulder stock, they are not intended to act as shoulder stocks.

Connecticut or federal law as shown by SLFU's systematic approval of their sale in Connecticut over the past decade.

On January 26, 2023, Defendant Lamont issued a press release indicating his intent to criminalize the possession of "others" in Connecticut. *See* **Exhibit A – Governor Lamont Announces 2023 Legislative Proposal, p. 2.**[3]

## III.   The Department of Justice's "Pistol Brace" Rule

After Congress defined what a "rifle" is in 18 U.S.C. § 921(a)(7), the Department of Justice included its statutory definition as a matter of course in 27 C.F.R. 479.11. On January 31, 2023, it amended 27 C.F.R. 479.11's definition of a "rifle" by publishing a final rule in the Federal Register. *See* **Exhibit H - Factoring Criteria for Firearms With Attached "Stabilizing Braces."** This new final rule changes the definition of "rifle" to include "a weapon that is equipped with an accessory component, or other rearward attachment (*e.g.*, a 'stabilizing brace') that provides surface area that allows the weapon to be fired from the shoulder...." *Id.* at p. 92. In particular, the final rule specifically factors "whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or other rearward attachment that is necessary for the cycle of operations … ." *Id.*

The operative effect of this final rule was to immediately classify most Connecticut "others" as either "rifles" or "short-barreled rifles," which, in turn, renders them illegal under Connecticut's "assault weapons" ban. While in most other states, a person in possession of an

---

[3]    Retrieved    from:    https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2023/01-2023/Governor-Lamont-Announces-2023-Legislative-Proposal-on-Mass-Shootings#:~:text=So%2Dcalled%20%E2%80%9Cother%E2%80%9D%20weapons,do%20not%20include%20all%20weapons.

"other" with a stabilizing brace would be legally entitled to retain the firearm as a "rifle" or, by registering it with ATF as a "short barreled rifle," in Connecticut, both designations bring the "other" into the category of banned "assault weapon."

During an online public information session the ATF gave on January 31, 2023, the Department of Justice confirmed that continued possession of "others" was likely in violation of Connecticut state law. During that information session, members of the public directly asked the ATF officials if they could follow the same steps as people from other states to register their "others" as "short barreled rifles" under the final rule so they can keep them. **Exhibit C – Affidavit of Holly Sullivan, ¶ 12**. ATF officials responded that ATF would not be accepting registrations from Connecticut residents because the ATF took the position that their "others" were now illegal "assault weapons" under Connecticut law. *Id.* at ¶ 14. Connecticut officials have yet to weigh in. *Id.* at ¶ 14.

## IV.   Connecticut Criminalizes "Others"

Connecticut made good on Defendant Lamont's expressed intent to criminalize "others" by including them in Connecticut's definition of "assault weapons." On June 6, 2023, Defendant Lamont signed Conn. Public Act No. 23-53 – a comprehensive gun control bill. It contained a provision that classified as an assault weapon, "any semiautomatic firearm other than a pistol, revolver, rifle, or shotgun" having one of the following characteristics:

i.    Any grip of the weapon including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;

ii.   An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip;

iii.  A fixed magazine with the ability to accept more than ten rounds;

iv.    A flash suppressor or silencer, or a threaded barrel capable of accepting a flash suppressor or silencer;

v.    A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel;

vi.    A second hand grip; or

vii.    An arm brace or other stabilizing brace that could allow such firearm to be fired from the shoulder, with or without a strap designed to attach to an individual's arm.

*See* **Exhibit I - Conn. Public Act No. § 23-53, § 23, pp. 48-49**.

This new statutory scheme criminalizes countless ubiquitous semiautomatic firearms that are widely popular and commonly used for lawful purposes among Connecticut residents. Additionally, as noted previously, a violation of the new ban on "others" saddles the average citizen with a felony conviction, rendering him/her ineligible to ever lawfully possess a firearm again in his/her life. *See e.g.,* 18 U.S.C. § 922(g)(1).

## V.    Plaintiff Eddie W. Grant, Jr.

Plaintiff Eddie Grant, Jr. is a retired Connecticut Department of Corrections officer who maintains his permanent residence in Meriden, Connecticut. **Exhibit D – Affidavit of Eddie W. Grant, Jr., ¶ 3.** He has held a Connecticut pistol permit for over 30 years, and he meets all of the legal qualifications under federal and state law to acquire and possess firearms, ammunition, and magazines. *Id.* at ¶ 5. He is also a member and supporter of both the Connecticut Citizens Defense League, Inc. ("CCDL") and the Second Amendment Foundation, Inc. ("SAF"). *Id.* at ¶ 6.

Grant served as a uniformed Corrections officer for twenty-one years, retiring in 2011. *Id.* at ¶ 7. During his service, the Department of Corrections assigned him to facilities such as Cheshire Correctional Institution (a Level 4 facility); Manson Youth Institution (a Level 4

facility); Carl Robinson Correctional Institution (a Level 3 facility); and Webster Correctional Institution (a Level 2 facility).[4] *Id.* at ¶ 7. Grant's responsibilities included conducting armed transports of high-risk inmates and acting as an armed Perimeter Officer. *Id.* at ¶ 8. These responsibilities required the State of Connecticut to train Grant on the safe and effective use of AR-15-platform firearms, which are currently banned by the statutes at issue in this lawsuit. *Id.* at ¶ 8. After receiving his training, the State of Connecticut required Grant to qualify annually as a safe and effective user of AR-15-platform firearms. *Id.* at ¶ 8. Grant repeatedly qualified as a safe and effective user during his service with the Department of Corrections, and he carried and used AR-15-platform firearms during his service as a corrections officer. *Id.* at ¶ 8.

Grant seeks to lawfully purchase and possess an AR-15-platform firearm for defensive purposes. *Id.* at ¶ 9. Conn. Gen. Stat. §§ 53-202a and § 53-202c, however, prohibit him from purchasing or possessing an AR-15-platform firearm.

Grant's interest in lawfully purchasing and possessing an AR-15-platform firearm is no armchair interest. As an African-American, Grant is acutely conscious of the struggle that his parents, specifically his mother, faced growing up in 1950s-60s. *Id.* at ¶ 10. During the struggle for equality and civil rights in the Deep South, Grant's mother witnessed church burnings, and the racially motivated killings experienced by her family and friends were a concrete part of

---

[4] A facility's level designates what its security level is. Connecticut uses a five-level scheme with Level 1 being reserved for community release programs, Level 2 – minimum security, Level 3 – medium security, Level 4 – high security, and Level 5 – maximum security. *See* Conn. Gen. Assembly – Legislative Program Review and Investigations Committee, *Report: Factors Impacting Prison Overcrowding*, p. 16 (Dec. 2000). Retrieved from: https://www.cga.ct.gov/pri/archives/fipo/20001201FINAL_Full.pdf

her life. *Id.* at ¶ 10. Grant's understanding that these racially motivated attacks were repelled in large part by the private ownership of effective defensive firearms as African-Americans bravely defended their lives and their right to equality under the rights guaranteed by the Constitution. *Id.* at ¶ 10.

In Grant's view, Conn. Gen. Stat. § 53-202a-c gives criminals and attackers a strong tactical advantage over him. *Id.* at ¶ 10. Criminals do not follow gun restrictions, placing him at a disadvantage to someone who possesses and carries any type of so-called "assault weapon" for malevolent purposes. As a law-abiding citizen, Grant wants, and intends, to lawfully purchase, possess, and defensively carry one or more of the firearms banned by Conn. Gen. Stat. §§ 53-202a and 53-202c. *Id.* at ¶ 12.

Grant also owns firearms that are Connecticut "others." *Id.* at ¶ 15. He intends to acquire more Connecticut "others," and he has taken specific steps to do so. On June 30, 2023, Grant contacted Lock N' Load Firearms, LLC in Plantsville, Connecticut to inquire whether he could purchase either a .300 Blackout in a Connecticut "other" configuration – specifically with pistol and fore grips. **Exhibit J – Supplemental Declaration of Eddie Grant, Jr., ¶¶ 5-6.** Lock N' Load Firearms, LLC declined to sell him such a firearm because doing so would now be illegal under Connecticut law. *Id.* at ¶ 7. Grant still intends to acquire a .300 Blackout in a Connecticut "other" configuration and would like to do so lawfully without fear of criminal prosecution. *Id.* at ¶ 8.

## VI.   Plaintiff Jennifer Hamilton

Plaintiff Jennifer Hamilton is a Nuisance Wildlife Control Operator trained and licensed by the Connecticut Department of Energy and Environmental Protection and a

firearms instructor who teaches initial pistol permit classes, personal defense classes, and tactical firearms use classes. **Exhibit E – Affidavit of Jennifer Hamilton**, ¶ 8. She maintains her permanent residence in Enfield, Connecticut, and she holds pistol permits from Connecticut and Massachusetts. *Id.* at ¶¶ 3, 5. She meets all federal and state requirements to lawfully acquire and possess firearms, ammunition, and magazines. *Id.* at ¶ 5. She is also a member and supporter of CCDL and SAF. *Id.* at ¶ 6.

Hamilton is a petite, 5'-2" tall woman who relies on defensive firearms instead of bodily strength to protect herself and her family from threats and attack. *Id.* at ¶ 7. Because of her physical size, Hamilton prefers firearms that are smaller and more customizable to her physical build. *Id.* at ¶¶ 9-10. Thus, she seeks, and intends, to lawfully purchase one or more firearms prohibited in Conn. Gen. Stat. § 53-202a – likely an AR-15-platform firearm – because of their adaptability and effectiveness for defensive purposes. *Id.* at ¶ 12. Additionally, Hamilton seeks to purchase such a firearm with a telescopic stock in order to adjust the firearm's length of pull to fit her specific body type and size, which will, in turn, give her greater control over the firearm and improve her accuracy with it. *Id.* at ¶ 10.

Hamilton's interest in purchasing, possessing, and carrying an AR-15-platform firearm is not abstract. She has been the victim of domestic violence, and she depends on effective defensive firearms to protect herself and her family from further attacks. *Id.* at ¶ 7.

Conn. Gen. Stat. §§ 53-202a and 53-202c prohibit her from purchasing either an AR-15-platform firearm or a similar rifle with a telescopic stock because they classify both as being "assault weapons." In sum, Connecticut's "assault weapon" ban prohibits Hamilton from

purchasing, possessing, or carrying a firearm that she can operate more safely, comfortably, and effectively.

Hamilton also owns firearms that are Connecticut "others." *Id.* at ¶ 15. She intends to acquire more Connecticut "others," and she has taken specific steps to do so. On July 5, 2023, she contacted Tobacco Valley Gun in East Windsor, Connecticut to inquire whether she could purchase a JP Firearm Corp. ".300 Blackout" with a 12.5 inch barrel, a pistol grip, and a fore grip in a Connecticut "other" configuration. **Exhibit K – Supplemental Declaration of Jennifer Hamilton, ¶¶ 5-6.** Tobacco Valley Gun declined to sell her this "other" because doing so would now be illegal under Connecticut law. *Id.* at ¶ 7. Hamilton still intends to acquire a JP Firearm Corp. .300 Blackout with a 12.5 inch barrel, a pistol grip, and a fore grip in a Connecticut "other" configuration, and she wants the ability to do so lawfully without fear of criminal prosecution. *Id.* at ¶ 8.

## VII.   Plaintiff Michael Stiefel

Plaintiff Michael Stiefel is a retired Connecticut Department of Corrections officer. **Exhibit F – Affidavit of Michael Stiefel**, ¶ 10. He has held a Connecticut pistol permit for over thirty years, and he meets all of the state and federal requirements to lawfully acquire, possess, and bear firearms, ammunition, and magazines. *Id.* at ¶ 5. Stiefel is a member and supporter of CCDL and SAF.

Stiefel served as a uniformed Department of Corrections Officer for approximately 20 years, retiring in 2010. *Id.* at ¶ 7. During his career with the Department of Corrections, he was responsible for conducting armed transports of high-risk inmates and served as an armed perimeter officer. *Id.* at ¶ 7. Like Plaintiff Grant, these responsibilities required the State of

Connecticut to train Stiefel on the safe and effective use of AR-15-platform firearms, which are currently banned by the statutes at issue in this lawsuit. *Id.* at ¶ 8. After receiving his training, the State of Connecticut required Stiefel to qualify annually as a safe and effective user of AR-15-platform firearms. *Id.* at ¶ 8**.**

Stiefel seeks, and intends, to lawfully purchase and possess an AR-15-platform firearm for defensive purposes. *Id.* at ¶ 12. Connecticut's "assault weapons" ban, however, prohibits him from purchasing or possessing an AR-15-platform firearm.

Stiefel also currently owns firearms that have been previously classified as "others" in Connecticut. *Id.* at ¶ 15. He intends to acquire more Connecticut "others," and he has taken specific steps to do so. On July 3, 2023, he contacted Swamp Yankee Arms, LLC to discuss whether they could build him a custom .300 Blackout in a Connecticut "other" configuration – specifically with a pistol grip and a fore grip. **Exhibit L – Supplemental Declaration of Michael Stiefel, ¶¶ 5-6.** Swamp Yankee Arms, LLC, however, declined to build or sell him a .300 Blackout in a Connecticut "other" configuration because doing so would be illegal under Connecticut law. *Id.* at ¶ 7. Stiefel still intends to acquire a custom .300 Blackout in a Connecticut "other" configuration and would like to do so lawfully without fear of criminal prosecution. *Id.* at ¶ 8.

## LEGAL STANDARD

To obtain a preliminary injunction under Fed. R. Civ. P. 65, the moving party must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks and citation omitted). Additionally, the moving party must show "that the public interest would not be disserved by the issuance of [the] injunction." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal quotation marks omitted). To show irreparable harm, the Plaintiffs must show that, absent a preliminary injunction, they will "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Whether there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Id.* at 118-19. Courts, however, will presume that a movant has established irreparable harm when the movant's claim involves the alleged deprivation of a constitutional right. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

## ARGUMENT

### I.   Second Circuit Precedent Entitles the Plaintiffs to a Presumption of Irreparable Harm. In the Alternative, the Plaintiffs Satisfy the Test for Irreparable Harm.

There is no question that the Plaintiffs are entitled to the presumption of irreparable harm. They claim a constitutional right to keep and bear modern sporting arms and "others" for the purposes of self-defense and allege that the challenged statutory scheme banning "assault weapons" and Conn. Public Act No. 23-53, § 23 bringing "others" within that scheme deprives the Plaintiffs of their Second Amendment right to obtain, keep, and bear arms in common usage for lawful purposes, including self-defense.

The Supreme Court has twice established that the Second Amendment's text protects the right to keep and bear arms in case of confrontation. *New York State Rifle & Pistol*

*Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2127 (Jun. 23, 2022); *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). *Bruen* solidifies *Heller*'s holding that the Second Amendment's protections are <u>not</u> limited "only to those arms in existence in the 18th century." *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582) (internal quotation marks and alterations omitted). Instead, "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 2132 (quoting *Heller*, 554 U.S. at 582) (internal quotation marks omitted); *see also Caetano v. Massachusetts*, 577 U.S. 411 (2016) (holding that the Second Amendment, *prima facie*, protects stun guns). Thus, the Second Amendment presumptively protects the Plaintiffs' right to possess and bear modern sporting arms – including AR-15 platform firearms – and Connecticut "others" unless the Defendants "affirmatively prove that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.

The Defendants have never before carried their burden under the historical analysis mandated by *Bruen*, and they cannot do so now. Their enforcement of Connecticut's criminalization of the possession, carrying, and sale of modern sporting firearms deprives the Plaintiffs of their constitutional right to keep and bear "bearable arms." *Bruen* at 2132. Thus, the Plaintiffs are entitled to a presumption of irreparable harm based on their alleged deprivation of their constitutional rights. *Clapper*, 804 F.3d at 622.

The Plaintiffs clearly meet the standard for preliminary relief notwithstanding the presumption of irreparable harm. The Plaintiffs seek to obtain, possess, and bear modern sporting firearms for the purpose of self-defense. Every day that passes that they cannot do

so without facing criminal consequences is an injury that money cannot remedy. In fact, the Plaintiffs seek no monetary remedy, nor is such a remedy likely available to them. Declaratory and injunctive relief is their only available remedy. They should not be required to wait for it, especially in a case where the Defendants bear the burden of proving the constitutionality of their conduct, a burden the Defendants simply cannot meet.

## II.    The Plaintiffs Show a Likelihood of Success on the Merits, and Raise Serious Questions Going to the Merits Sufficient to Make a Fair Ground for Litigation.

Under the Supreme Court's newly clarified standard for reviewing claims of Second Amendment violations, the Plaintiffs easily surpass the threshold of showing a likelihood of success on the merits.  On June 23, 2022, the U.S. Supreme Court drastically reshaped Second Amendment jurisprudence in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022). *Bruen* abrogated the use of tiers of "means-end" scrutiny – e.g., rational basis, intermediate, and strict scrutiny – that American courts have habitually used to assess Second Amendment rights claims and replaced it with a textual and historical analysis. The reshaped analysis negates the use of the "means-end" scrutiny *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) and *Shew v. Malloy*, 994 F.Supp.2d 234 (D.Conn. 2014) used to uphold Connecticut's criminalization of "assault weapons," and it requires a fresh consideration of their ultimate conclusions under *Bruen*'s textual and historical analysis.[5]

While the Plaintiffs retain the initial burden to show either "likelihood of success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground

---

[5] The Supreme Court itself has summarily instructed lower courts to reconsider decisions upholding "assault weapons" bans in the wake of *Bruen. See Bianchi v. Frosh*, 142 S.Ct. 2898 (Mem) (Jun. 30, 2022) (reversing and remanding a Fourth Circuit decision upholding Maryland's "assault weapons" ban).

16

for litigation" at this stage, *Bruen*'s textual and historical analysis shifts the burden to the Defendants to defend their criminalization of "assault weapons" and their infringement on the Plaintiffs' constitutional rights. Under the Supreme Court's new analytical framework, the Defendants are unable to satisfy that burden.

### A. *Bruen* replaces the Second Circuit's "two step" test with a textual and historical analysis under which the Defendants bear a heavy burden of proof.

*Bruen* changed everything. Prior to *Bruen*, the Second Circuit used a "two-step" test.[6] *Cuomo*, 804 F.3d at 254. It first considered whether the challenged law "burdens conduct protected by the Second Amendment." *Id.* If the law did not implicate conduct that the Second Amendment protects, the law survived. *Id.* If, however, the law burdened conduct protected by the Second Amendment, courts then assessed the appropriate level of scrutiny to apply. *Id.*

At the first step of the test, courts examined whether the arms at issue are "in common use" and "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 254-55. In *Cuomo*, the Second Circuit ruled that "assault weapons" met both criterion *Id.* at 255-57.

Under the second step, pre-*Bruen* courts then assessed "how close the law comes to the core of the Second Amendment right" and "the severity of the law's burden on the right." *Id.* at 258. In *Cuomo*, the Second Circuit applied intermediate scrutiny and found that while New York and Connecticut's "assault weapons" bans did indeed burden the core of the Second Amendment's protections, alternatives to such firearms – namely handguns – remained available for home defense. *Id.* at 258-261. Thus, the Second Circuit found the burden on the

---

[6] As noted by the Second Circuit, it was not alone in applying the "two step" test. *Cuomo*, 804 F.3d at 254 (noting that the Third, Fourth, Fifth, Six, Seventh, Ninth, Tenth, Eleventh, and D.C. Circuits also used the same general approach).

Plaintiffs' core of the Second Amendment right insufficiently severe to strike down New York and Connecticut's "assault weapons" bans. *Id.* at 261.

*Bruen* explicitly rejects the "two step" test and "means-end" scrutiny previously used in the Second Circuit as being inconsistent with *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010):

> Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context.

*Bruen*, 142 S.Ct. at 2127. Instead, *Bruen* holds that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* This, the Defendants cannot do.

*Bruen*'s analysis starts with the Second Amendment's text:[7] "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. The Supreme Court explained: "Heller's methodology centered on constitutional text and history. Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, Heller relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny." *Id.* at 2128-29. As *Bruen* indicates, the Second Amendment's text and history left "no doubt" that the "Second Amendment

---

[7] "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II.

confers an individual right to keep and bear arms." *Id.* at 2127 (quoting *Heller*, 554 U.S. at 595) (internal quotation marks omitted).

*Bruen* confirmed *Heller*'s finding that it is "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons that the Second Amendment protects the possession and use of weapons that are in common use at the time." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627) (internal quotation marks omitted).

In the context of this action, *Bruen*'s test is straightforward. First, the Court must determine whether the right claimed by the Plaintiffs falls within the protections of the Second Amendment's text. Second, the Court must consider the "dangerous and unusual weapons" exception within the historical guidelines established by *Heller* and *Bruen*.

There is absolutely no question that the Plaintiffs meet the first requirement. They claim a right to keep and bear modern sporting firearms for the purposes of self-defense. Both *Heller* and *Bruen* establish that the Second Amendment's text protects the individual right to keep and bear arms in case of confrontation. *Bruen*, 142 S.Ct. at 2127; *Heller*, 554 U.S. at 592. *Bruen* solidifies *Heller*'s holding that the Second Amendment's protections do not apply "only to those arms in existence in the 18th century." *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582) (internal quotation marks and alterations omitted). Instead, "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 2132 (quoting *Heller*, 554 U.S. at 582) (internal quotation marks omitted); *see also Caetano v. Massachusetts*, 577 U.S. 411 (2016) (holding that the Second Amendment, *prima facie*, protects stun guns). In *Cuomo*, the Second Circuit determined that Connecticut's "assault weapons" ban did indeed burden the core of

the Second Amendment's protections. *Cuomo* at 258-261. Thus, the Second Amendment presumptively protects the Plaintiffs' right to possess and bear modern sporting firearms -- including AR-15 platform firearms – and "others" unless the Defendants "affirmatively prove that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127. Again, this is a burden the Defendants cannot meet.

The now-deceased "means-end" scrutiny test purported to give courts the power to "make difficult empirical judgements about the cost and benefits of firearms restrictions…" – judgments that they are ill-suited to make "especially given their lack of expertise in the field." *Id.* at 2130 (quoting *City of Chicago v. McDonald*, 561 U.S. 742, 790-791 (2010)) (internal quotation marks and alterations markings omitted). *Bruen* now flatly forbids this type of interest balancing:

> If the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of "intermediate scrutiny" often defer to the determinations of legislatures. But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. The Second Amendment "is the very *product* of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller*, 554 U.S. at 635, 128 S.Ct. 2783. It is this balance—struck by the traditions of the American people— that demands our unqualified deference.

*Id.* at 2131 (emphasis in original).

Instead, *Bruen* requires courts to assess "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" through "reasoning by analogy – a commonplace task for any lawyer or judge." *Id.* at 2131, 2132. It

contemplates two types of cases: straightforward cases, and "other cases implicating unprecedented societal concerns or dramatic technological changes." *Id.* at 2131-32.

*Bruen* describes the straightforward cases as follows:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131.

This case falls squarely within *Bruen*'s category of straightforward cases. Crimes perpetrated with firearms have existed since firearms were invented. But it was not until long after the Second Amendment was ratified that local governments began to ban whole categories of firearms from the people under the guise of crime prevention. The Founders knew well of the misuse of firearms by criminals, but their regulation to address that societal problem was not to ban bearable arms from the public as Connecticut has done. To the contrary, the Founders' regulatory response – the Second Amendment – was to guarantee that every law-abiding person in the nation had the uninfringed right to keep and bear arms for their personal defense and the defense of others. There is no "distinctly similar historical regulation addressing that problem. . . ." *Id.* Thus, Connecticut's statutory scheme must fall.

But even viewing Connecticut's "assault weapon" ban under a more complex analysis, it has no "well-established and representative historical analogue" to save it. *Id.* at 2133. When a court considers the more complex "modern regulations that were unimaginable at the

founding," *Bruen* requires the Defendants to identify "a well-established and representative historical analogue…" to its modern regulations. *Id.* at 2133. To determine whether the analogue is representative and "relevantly similar under the Second Amendment," *Bruen* provides courts with "at least two metrics" that "are [the] *central* considerations when engaging in an analogical inquiry" from *Heller* and *McDonald*: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33 (internal quotation marks and citations omitted) (emphasis in original).

The *Bruen* analysis requires that the historical inquiry must focus on the scope of the people's constitutional rights "they were understood to have *when the people adopted them.*" *Id.* at 2136 (internal quotation marks and citations omitted) (emphasis in original). The Supreme Court in *Bruen* cautioned courts to focus on common law practices that "prevailed up to the period immediately before and after the framing of the Constitution" and contemporary history in the immediate postenactment period. *Id.* at 2136-37 (internal quotation marks and citations omitted). In particular, *Bruen* cautions courts "against giving postenactment history more weight than it can rightly bear," and it describes mid-to-late 19th century evidence as confirmation of the original public meaning instead of being of independent significance. *Id.* at 2136-37.

*Bruen* closes its instructions on these more complex cases with two cautions to courts. First, it expressly forbids courts from entertaining or engaging in "independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 2133 n.7. Second, while *Bruen* does not require the Defendants to "identify… a historical *twin*" or "a dead ringer" as an historical analogue, it also does not permit courts to "uphold every modern law that remotely resembles

22

a historical analogue… because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* at 2133 (internal quotation marks, citations, and alteration marks omitted) (emphasis in original).

Here, there were simply no common law practices that "prevailed up to the period immediately before and after the framing of the Constitution" and contemporary history in the immediate postenactment period which is a "well-established and representative historical analogue" to Connecticut's ban on an entire category of bearable arms. *Id.* at 2136-37. Connecticut's "assault weapon" ban is unconstitutional.

### B. The modern sporting firearms banned by the Defendants are not "dangerous and unusual."

Because the firearms banned by the challenged statutory scheme, and "others" which have unexpectedly been drawn into that scheme, are each in common use for lawful purposes – both in Connecticut and nationwide – they cannot be found to be "dangerous and unusual." The "dangerous and unusual" exception to protection under the Second Amendment has its roots in *United States v. Miller*, 307 U.S. 174 (1939). *Miller* permitted the felony indictment of two men who transported a short-barreled shotgun across state lines without obtaining permission from, or registering it with, federal authorities. *Id.* at 175. The district court dismissed the indictment on the ground that the law violated the men's Second Amendment rights, and the government appealed. *Id.* at 176-77. The Supreme Court reversed the dismissal of the indictment on the grounds that there was no evidence that short-barreled shotguns had a reasonable relationship to "the preservation or efficiency of a well-regulated militia." *Id.* at 178. It reasoned that the Second Amendment protected the arms that were "of the kind in

common use at the time" and which citizens would bring with them if called upon to serve in the militia. *Id.* at 179.

Since *Miller*, the Supreme Court has only once clarified the "dangerous and unusual" exception. *See Caetano v. Massachusetts*, 577 U.S. 411 (2016). In *Caetano*, the Court found "stun guns" were protected arms under the Second Amendment, and corrected two fatal errors that the Massachusetts Supreme Judicial Court made in labeling them as "dangerous and unusual" weapons. *Id.* The first was the Massachusetts court's erroneous conclusion that the Second Amendment did not protect weapons that "were not in common use at the time of the Second Amendment's enactment." *Id.* at 411-12 (reaffirming *Heller*'s statement that the Second Amendment "extends... to... arms... that were not in existence at the time of the founding") (internal quotation marks and citations omitted). The second was the Massachusetts court's erroneous conclusion that the Second Amendment did not protect "stun guns" because "nothing in the record [suggested] that [they] are readily adaptable to use in the military." *Id.* at 412 (reaffirming *Heller*'s rejection of that proposition) (internal quotation marks and citations omitted).

That a given class of firearms may be "dangerous" is irrelevant to a Second Amendment analysis if it is commonly used for lawful purposes. *Caetano* at 418, ("the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes.") (Alito, J. concurring). The most relevant statistic for finding electronic defense weapons are not "unusual" was that "hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess

them in 45 States." *Id.* at 420 (Alito, J. concurring) (internal quotation marks, citations, and alteration marks omitted).

The Second Circuit has not exempted any class of firearms from Second Amendment protection under *Bruen's* "dangerous and unusual" analysis.[8] To the extent it addressed the issue in *Cuomo* concerning Connecticut's "assault weapons" ban, **the Second Circuit expressly held that,** even accepting most conservative statistical estimates presented by the parties and amici,[9] **"assault weapons" are in common use.** *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015). The Second Circuit relied on a conservative estimate that "assault weapons" constituted about two percent of the nation's firearms, or approximately seven million firearms. *Id.* at 255. On the basis of that estimate, **the Second Circuit held that "the assault weapons… at issue are 'in common use' as that term was used in *Heller*."** *Id.* at 255.

Despite the Supreme Court's revised standard set forth in *Bruen*, there is no question that the Second Circuit's holding that "assault weapons" are not "unusual" remains good law and is dispositive of this motion for a preliminary injunction – and this entire case – since the Defendants bear the burden to prevail on both elements. A class of firearms cannot be "dangerous and unusual" if it is not unusual. Thus, as long as the Plaintiffs make a showing of

---

[8] The Second Circuit did not fully engage with the "dangerous" element, which it classified as "typical possession." *Cuomo*, 804 F.3d at 256-57. Instead, it assumed *arguendo* that these "commonly used weapons and magazines are also typically possessed by law-abiding citizens for lawful purposes" – an approach used by the D.C. Circuit and the D.C. district court after the Supreme Court remanded *Heller*. *Id.* at 257.

[9] *Cuomo* was clear that the "unusual" element requires "an objective and largely statistical inquiry." *Id.* at 256.

common usage that at least approaches the two percent found in *Cuomo*, the Plaintiffs prevail on the merits.

In Connecticut and nationwide, both "assault weapons" and "others" are in common use for lawful purposes as defined by the Second Circuit. Any inquiry into whether modern sporting firearms are "unusual" begins with where they are legal. *Caetano*, 577 U.S. at 420 (2016) (Alito, J., concurring). Research reveals that only 9 states and the District of Columbia prohibit their possession.[10] The class of firearms subject to the challenged law are legal to freely buy, sell, and own in the remaining forty-one states. Thus, the overwhelming majority of the states recognize that modern sporting firearms are not "dangerous and unusual," and the few states such as Connecticut that prohibit their possession are outliers.

The second aspect of the "unusual" inquiry objectively examines the statistical data supporting whether modern sporting firearms are in "common use." *Cuomo*, 804 F.3d at 255-56. While there is no minimum threshold of common usage that the Plaintiffs need to show, they clearly surpass the "hundreds of thousands" finding that Justice Alito declared sufficient in his *Caetano* concurrence regarding stun guns. More importantly, they at least equal or surpass the threshold that the Second Circuit recognized as establishing "common usage." *Cuomo*, 804 F.3d at 255 (relying on the most conservative estimates and still finding that "assault weapons"

---

[10] California – *see* Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115; Connecticut – laws already discussed; Delaware – *see* Del. Code tit. 11, § 1466(a); Hawaii – *see* Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8; Illinois – *see* IL HB 5471, enacted January 10, 2023; Maryland – *see* Md. Code Ann., Crim. Law §§    4-301 – 4-306, Md. Code Ann., Pub. Safety § 5-101(r); Massachusetts – *see* Mass. Gen. Laws ch. 140, §§ 121, 122, 123, 131M; New Jersey – *see* N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13; New York – *see* N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10, 400.00(16-a); DC Code Ann. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c)

were in common use). The most conservative estimate as to the popularly of a single model of modern sporting arm – the AR-15 – was "two percent of the nation's firearms" or "approximately seven million guns." *Id.* at 255. Simply put, in the Second Circuit, two percent or more clearly equals common use.

Under an objective "unusual" inquiry, the Defendants' own data dooms their case. In a January 17, 2023 response to a Freedom of Information Act request, the SLFU declared that there are 1,306,867 firearms in the state weapons registry database. **Exhibit B**, **Affidavit of Ray Bevis, Jr.  ¶¶ 13, 14**.  In a January 10, 2020 response to a Freedom of Information Act request, the SLFU declared that there are 53,849 "assault weapons" registered in Connecticut. *Id.* at ¶¶ 7**,** 15.  53,849 "assault weapons" is approximately 4.1% of the 1,306,867 firearms in the state weapons registry database, more than enough to show common use under Second Circuit precedent. *Id.* at ¶¶ 7**,** 15.

In its January 17, 2023 response, SLFU also declared that, of those 1,306,867 firearms, there are 88,766 firearms in the state weapons registry database that are classified as "others." *Id.* at ¶¶ 13, 16. In other words, approximately 6.8 percent of Connecticut's registered firearms are "others," which, based on Conn. Public Act No. 23-53, § 23, have suddenly become "assault weapons" under Connecticut's ban. *Id.* at ¶¶ 13**,** 16. That is more than three times the percentage of firearms that *Cuomo* found to constitute "common use."

Collectively, these numbers become even worse for the Defendants. Since Conn. Public Act No. 23-53, § 23 makes "others" "assault weapons," this data shows that there are currently at least 142,615 "assault weapons" lawfully owned by private individuals in Connecticut. In other words, approximately 10.9 percent of Connecticut firearms are "assault

weapons" – **more than 5 times the percentage that the Second Circuit found to equate to common usage**.

The Defendants fair no better when it comes to national data. According to production and import/export data ranging from 1991-2018 compiled and estimated by the National Shooting Sports Foundation ("NSSF") based on the ATF's Annual Firearms Manufacturing and Export Report ("AFMER"), there are approximately 254,752,987 firearms in circulation in the United States. **Exhibit G – Declaration of Salam Fatohi, ¶¶ 6-7, 12**. Approximately 24,446,000 of those firearms are modern sporting rifles. *Id.* at ¶ 17. In other words, an estimated 10 percent of all firearms currently in circulation in the United States are modern sporting rifles, a.k.a. "assault rifles." *Id.* at pp. 2, 7. **That is approximately five times the percentage of the same type of firearms that *Cuomo* found to constitute "common use."**

Thus, there is absolutely no question that the firearms banned by the challenged statutory scheme as "assault weapons" are in common use both in Connecticut and nationally, as are "others" which have now been redefined as such. Therefore, both are protected by the Second Amendment and neither can be considered "dangerous and unusual."

**III.    The Balance of Hardships Decidedly Tips in Favor of the Plaintiffs.**

On June 6, 2023, the Defendants suddenly stripped the Plaintiffs of their right to purchase "others" on the grounds that they were "assault weapons." Lost in this sudden termination of their Second Amendment rights was any respect for the protections of the Constitution. Connecticut law has succumbed to the political passions and hysteria led by Defendant Lamont's near-daily anti-constitutional rhetoric in the press. Individuals who

violate Connecticut's prohibition on the ownership of "assault weapons" can expect little mercy or sympathy in Connecticut's criminal justice system. The Plaintiffs, and tens of thousands of law-abiding Connecticut residents now are at real and immediate risk of Defendants' enforcement actions if they attempt to obtain commonly used firearms that they are constitutionally entitled to obtain.

Any balancing of the equities does not require the Plaintiffs to sit in limbo on the pain of felony criminal consequences while the Defendants trod the Plaintiffs' constitutional rights under foot. Nor does any balancing of equities justify withholding preliminary relief from the Plaintiffs.

More broadly speaking, *Cuomo* already made the necessary findings regarding the common use of "assault weapons." *Cuomo*, 804 F.3d at 255-56. *Bruen*'s elimination of the second part of *Cuomo*'s analysis – the part that upheld Connecticut's "assault weapons" ban under the now-abrogated "two-part test" – did not change *Cuomo*'s findings on the first part of the test. As soon as the Supreme Court issued its decision in *Bruen*, the findings in *Cuomo* rendered Connecticut's "assault weapons" ban unconstitutional.

While the Court must *presume* in this case that the Plaintiffs will suffer irreparable harm, *Clapper*, 804 F.3d at 622, the harm that they are suffering is *actually* irreparable, and the Court should consider that in any balancing of the hardships. Every day that passes where the Plaintiffs cannot purchase, keep, and bear modern sporting firearms places them at a disadvantage to violent criminals who have no regard for the law and who may target them. Every day that passes is a day the Plaintiffs' ability to exercise their constitutional rights is lost forever. The Court should decline to leave them so vulnerable.

For these reasons, the Court should find that the Plaintiffs are suffering irreparable harm through the ongoing deprivation of their constitutional rights and that, after the *Bruen* decision, *Cuomo* clearly establishes that Connecticut's "assault weapons" ban is unconstitutional. Based on that finding, the Court should find that the Defendants' actions in altering the status quo impose a far greater hardship on the Plaintiffs than any enjoining of the laws that they complain of will impose on the Defendants.

## IV.    The Public Interest Will be Served by a Preliminary Injunction.

The Second Amendment is not a "second class right" and the Supreme Court has made it abundantly clear that lower courts shall no longer treat it as such. *McDonald,* 561 U.S. at 780. Courts can no longer interest balance away the people's Second Amendment rights. The Supreme Court stated in *Bruen* that "[t]he Second Amendment is the *very product* of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S.Ct. at 2131 (internal citations and quotation marks omitted) (emphasis in original). Thus, it "demands" courts' "unqualified deference" to the Plaintiffs' Second Amendment rights. *Id.* at 2131.

The Defendants cannot shoehorn the commonly used firearms at issue in this action into the "dangerous and unusual" exception. The Second Circuit in *Cuomo* has already definitively settled that question. All that remains is for the Court to apply the *Bruen* standard and protect the Plaintiffs from ongoing, and imminent irreparable harm by issuing a temporary restraining order and a preliminary injunction.

Since the Plaintiffs have shown that the Defendants are highly unlikely to carry their burden in the face of *Bruen* and *Cuomo*, the Court's issuance of preliminary injunctive relief

would preserve the status quo and protect and uphold the public interest articulated in the Second Amendment. At the same time, it would not disturb other Connecticut laws that, for example, screen who may purchase or possess a firearm. Thus, the public interest favors preliminary relief in this case.

## **CONCLUSION**

For all of the aforementioned reasons, the Plaintiffs respectfully ask the Court to issue a Preliminary Injunction enjoining the Defendants and those under them from enforcing Connecticut's "assault weapon" ban pending full adjudication on the merits of the Plaintiffs' claims.

Dated: July 5, 2023

Respectfully submitted,

_//s//  Doug Dubitsky_
Doug Dubitsky, Esq.
(ct21558)
LAW OFFICES OF DOUG DUBITSKY
P.O. Box 70
North Windham, CT 06256
Telephone: 860.933.9495
Facsimile: 866.477.1120
Email: doug@lawyer.com


_//s//  Craig C. Fishbein_
Craig C. Fishbein, Esq.
(ct25142)
FISHBEIN LAW FIRM, LLC
100 South Main Street
P.O. Box 363
Wallingford, Connecticut 06492
Telephone: 203.265.2895
Facsimile: 203.294.1396
E-mail: ccf@fishbeinlaw.com

_//s//  Cameron L. Atkinson_
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Facsimile: 203.672.6551
Email: catkinson@atkinsonlawfirm.com


_Attorneys for the Plaintiff_

## <u>CERTIFICATION OF SERVICE</u>

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

<u>/s/ Cameron L. Atkinson /s/</u>