# EXHIBIT G

## Declaration of Professor Saul Cornell

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EDDIE GRANT, JR. ET AL | : | 3:22-CV-01223-JBA |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, ET AL., | : | |
| *Defendant.* | | |

**<u>DECLARATION OF PROFESSOR SAUL CORNELL</u>**

## I.      Assignment

1.      I have been asked to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition. I have further been asked to opine on how the Founding-era generation understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution.

## II.      Qualifications and Background

2.      I am the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther chair is one of three endowed chairs in the history department at Fordham and the only one in American history. In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.

3.      My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority opinion and dissenting opinion in *NYSRPA v.*

*Bruen*.[1] My scholarship on this topic has appeared in leading law reviews and top peer reviewed legal history journals. I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[2] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined. I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller v. Smith*, No. 2018 cv 3085 (C.D. Ill.); *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal. 2019); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal. 2017); *Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal. 2020); *Boland v. Bonta*, No. 8:22-cv-1421-CJC-ADS (C.D. Cal. 2022); *Rupp v. Bonta*, No. 8:17-cv-746JLS-JDE (C.D. Cal. 2017); *B&L Productions, Inc. v. Newsom*, No. 21-cv-1718-AJB-DDL (S.D. Cal. 2021); *Nat'l Assoc. for Gun Rts. v. Campbell*, No.1:22-cv-11431-FDS (D. Mass. 2022); *Nat'l Assoc. for Gun Rts. v. Lamont*, No. 3:22-cv-0118 (D. Conn. 2022); *Nastri v. Dykes*, No. 3:23-cv-00056 (D. Conn. 2023); and *Nat'l Assoc. for Gun Rts. v. Lopez*, No. 1:22-cv-00404 (D. Haw. 2022).

## III.    Retention and Compensation

4.      I am being compensated for services performed in the above-entitled case at an hourly rate of $750 for reviewing materials, participating in meetings, and preparing reports; $1,000 per hour for depositions and court appearances; and an additional $100 per hour for travel time. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## IV.     Basis for Opinion and Materials Considered

---

[1] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2022 U.S. Lexis 3055 (2022).

[2] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

5.      The opinion I provide in this report is based on my review of the amended complaint filed in this lawsuit; my review of the local ordinances at issue in this lawsuit; my education, expertise, and research in the field of legal history. Additionally, my conclusions draw on a detailed review and analysis of the primary sources, secondary sources, and other materials cited in the footnotes and text of this report. The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

## V.      Summary of Opinion

6.      In *Bruen*, the Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence. To understand text, history, and tradition one must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment.

7.      It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way it fits within the larger context of American law in the Founding era. The members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas. Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[3] Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law that had been in effect in the English colonies for generations.[4] No concept was more important to the common law than the concept of the peace.[5]  As one early American justice of the peace manual published after the adoption of the Second Amendment noted: "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[6]

[3]  William B. Stoebuck, Reception of English Common Law in the American Colonies, 10 Wm. & Mary L. Rev. 393 (1968); MD. CONST. of 1776, DECLARATION OF RIGHTS, art. III, § 1. William B. Stoebuck, Reception of English Common Law in the American Colonies, 10 Wm. & Mary L. Rev. 393 (1968); Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).
[4]  9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903). FRANCOIS XAVIER MARTIN, ACOLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern 1792). Commonwealth v. Leach, 1 Mass. 59 (1804).
[5]  Laura F. Edwards, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (2009).
[6]  JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

## **The Historical Inquiry Required by *Bruen, McDonald,* and *Heller***

8.      The United States Supreme Court's decisions in *Heller and McDonald,*[7] and *Bruen,* have directed courts to look to text, history, and tradition for guideposts in evaluating the scope of permissible firearms regulation under the Second Amendment. Justice Thomas, the author of the majority opinion in *Buren,* has noted that judges must avoid approaching history, text, and tradition with an "ahistorical literalism."[8]   Legal texts must not be read in a decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts.[9]

9.      Following the mandates set out in *Heller, McDonald* and more recently in *Bruen,* history illuminates the scope of permissible regulation under the Second Amendment.[10] Moreover, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[11] In particular, the court acknowledged that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."   *Bruen* differentiates between cases in which contested regulations are responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

10.      In the years between *Heller* and *Bruen,* historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[12]   Indeed, such research is still ongoing:  new materials continue to emerge, and in the months since *Bruen* was decided additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[13]

---

[7] *McDonald v. City of Chicago*, 557 U.S. 965 (2009).
[8] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (Thomas, J.) (criticizing "ahistorical literalism").

[9] *See* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).
[10]   *Supra* note 2 at 21
[11]   *Id.*
[12] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

[13]*Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*   55 U.C. DAVIS L. REV. 2495 (2022).

11.     Justice Kavanaugh  underscored a key holding of *Heller* in his  *Bruen* concurrence: "Like   most   rights,   the   right   secured   by   the   Second Amendment   is   not   unlimited. From   Blackstone through   the   19th-century   cases,   commentators and courts   routinely explained that   the   right   was   not   a right   to keep and carry   any   weapon whatsoever   in any manner   whatsoever   and   for   whatever   purpose." Crucially, the court   further noted that "we do think that *Heller* and *McDonald* point toward at least two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[14]

12.     One overarching principle regarding firearms regulation does emerge from this period and it reflects not only the common law assumptions familiar to the Founding generation, but it is hard wired into the Second Amendment itself. As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of a form of interest balancing undertaken by the people themselves in framing the federal constitution and the first ten amendments. Thus, from its outset the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary. Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits  diminishing the rights it protects. The Second Amendment's language employs a  different term, requiring that the right to bear arms not be "infringed." In Founding era American English, the word "infringement" meant to "violate" or "destroy." Richard Burns, in his influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of violations of common law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted

---

NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

[14]  *Supra* note 2.

*ordered* liberty.[15] Regulation was therefore not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the  proper exercise of that right as required by the concept of ordered liberty.[16] In short, when read with the Founding era's interpretive assumptions and  legal definitions in mind, the text of the two Amendments was seen to set up very different frameworks for thinking about the rights they protect. Members of the Founding generation would have understood that  legislature could regulate the *conduct* protected by the Second Amendment  and comparable state arms bearing provisions provided such regulations  did not destroy the underlying *right*. In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.[17]  In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.

13.     *Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[18] Unfortunately, many of these myths continue to cloud Second Amendment jurisprudence.[19]  The dominant  understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace.[20]  In the years following the adoption of the

---

[17] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[18] Pamela Haag, GUNNING OF AMERICA : BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE. (2016).

[19] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006).

[20] On Founding era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937). For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (2013). On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

Second Amendment and its state analogues, gun regulation increased. Indeed, the individual states exercised their police power to address long standing  issues and novel problems created by firearms in American society.

### Gun Violence in Early American History, 1776-1861

14.    Although it is hard for modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment. A combination of factors, including the nature of firearms technology, the realities of living life in small face to face and mostly homogenous rural communities of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government gun policy needed to address at the time of the Second Amendment.[21]  The generation that wrote and enacted the Second Amendment and the analogous provisions in state constitutions faced a problem quite unalike the one modern legislatures face. Today America confronts a firearms market that is awash in guns . The range of weapons available, their lethality, and relative reliability would have astounded the Founding generation. The black powder muzzle loading weapons that predominated in the era of the Second Amendment thus shared few features with today's guns. Consumer preferences in the Founding era were also dissimilar from modern America. Government policies in the Founding era did not need to discourage the acquisition of  especially lethal guns. The Founders faced an altogether different problem. Most Americans wanted guns useful to life in an agrarian society  where most families were farmers. Nobody bayoneted turkeys, and a pair of polished dueling pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men., as the tragic fate of  Alexander Hamilton so vividly illustrates. The on-going problem of arming the militia persisted during the Founding era. A census of state militias during Jefferson's presidency revealed that  less than half the militia eligible population owned  a working military quality musket.[22]   The problem Americans faced at the time of the Second Amendment was not too many guns, but too many of the wrong type of guns. Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an

---

[21]  Randolph Roth, AMERICAN HOMICIDE  56, 315 (2009).
[22]  Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

agrarian society: fowling pieces and light hunting muskets with only limited utility on the battlefield.

15.     Limits in Founding era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Keeping guns loaded was not a viable option because the black powder used in these weapons was not only corrosive but attracted moisture like a sponge. Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth. As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded. Why do they always show the gun over the fireplace? Because that's the warmest, driest place in the house."[23] Similar problems also limited the utility of muzzle loading pistols as practical tools for self-defense or as useful weapons for criminal offenses. Indeed, at the time of the Second Amendment, over ninety percent of the weapons owned by Americans were long guns, not pistols.[24] Simply put, recent historical research has established that guns were not the primary weapon of choice for those with evil intent during this period.[25] Gun policy in the Founding era reflected these social, economic, and technological realities, and accordingly one must approach any analogies drawn from this period's regulations with some caution when applying them to a modern heterogenous industrial society capable of producing a bewildering assortment of firearms whose lethality would have been almost unimaginable to the Founding generation.[26] Put another way, laws created for a society without much of a gun violence problem enacted at a time of relative gun scarcity have limited value in illuminating the challenges Americans face today. In particular, interpreting silences in the historical record, the absence of modern style gun regulations, tells us more about the social history of the period than it does about the original meaning of the Second Amendment.[27]

---

[23] Randolph Roth, transcript interview, *Why is the United States the Most Homicidal in the Affluent World*, available at https://nij.ojp.gov/media/video/24061#transcript--0 (last visited 9/14/2022.

[24] *Id.*

[25] *Id.*

[26] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495 (2022)

[27] Jacob D. Charles, "The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History" 73 DUKE L. J. (forthcoming).

16.     The calculus of individual self-defense changed dramatically in the decades following the adoption of the Second Amendment.[28] The early decades of the nineteenth century witnessed a revolution in the production and marketing of guns.[29]  The same technological changes and economic forces that made wooden clocks and other consumer goods such as Currier and Ives prints common items in many homes transformed  American gun culture. [30]  These same changes also made handguns and a gruesome assortment of deadly knives, including the dreaded Bowie knife, more common. Economic transformation was accompanied by a host of profound social and economic changes that gave rise to America's first gun violence crisis.  As cheaper, more dependable, and easily concealable weapons proliferated in large numbers, Americans, particularly southerners, began sporting them with alarming regularity.[31]  The change in behavior was most noticeable in the case of handguns.  The culmination of this gradual process of evolution in both firearms and ammunition technology was the development of Samuel Colt's pistols around the time of the Mexican War.[32]

To combat the new and unprecedented problem of gun violence states drew on common law and supplemented its tools with  new laws to address novel  problems  posed by firearms that were more common and deadly. Courts deciding claims about the right to keep and bear arms and firearms regulation typically employed the emerging judicial doctrine on the  police power to sort out the competing interests of public safety and individual liberty.[33]

### From Muskets to Pistols and Beyond: Change and Continuity in American Firearms Regulation

17.     Guns have been regulated from the dawn of American history.[34] At the time *Heller* was decided there was little scholarship on the history of gun regulation and little quality

---

[28]  *Supra* note 21.

[29] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion* 93 BUSINESS HISTORY REVIEW  57 (2018).

[30]  Sean Wilentz, *Society, Politics, and the Market Revolution*, in THE NEW AMERICAN HISTORY, edited by Eric Foner (1990).

[31] *Supra* note 21.

[32]  William N. Hosley, COLT: THE MAKING OF AN AMERICAN LEGEND (1986).

[33]  *Supra* note 2.

[34] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

scholarship on early American gun culture.[35] Fortunately, a burgeoning body of scholarship has illuminated both these topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen's* framework.[36]

18.     It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way it fits within the larger context of American law, including the ways in which Americans in the Founding era approached legal questions and rights claims. In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas. Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[37]   Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[38]   No legal principle was more important to the common law than the concept of the peace.[39]   As one early American justice of the peace manual noted:   "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[40]   Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[41]

---

[35] *Id.*

[36] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 Law and Contemporary Problems 1 (2017).

[37] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[38] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[39] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[40] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[41] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

19.     The common law Americans inherited from England always acknowledged that the right of self-defense was not unlimited, but this idea existed within a well delineated jurisprudential framework. There was universal agreement in the Founding era that individuals traded the absolute right of self- defense enjoyed in the state of nature for a more limited right  under  common law. The entire body of the common law was designed to  preserve the peace and the scope of legitimate self-defense was no exception to this principle.[42]   Statutory law, both in England and America functioned to further secure the peace and public safety. Given these indisputable facts, *Heller* correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote peace and maintain public safety. To deny such an authority would be to convert the Constitution into a suicide pact and not a charter of government. The Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[43]

20.     Heller cited the ancient common law  prohibition on " carrying of dangerous and unusual weapons."[44]   Two  formulations of this legal rule were familiar to the Founders, one drawn from  William Hawkins and the other William  Blackstone. The two different constructions employed in these influential treatises  described  weapons as either,  "dangerous and unusual " or "dangerous or unusual."[45]   Modern readers would naturally view these two phrases as articulating different concepts, the former supporting a two-prong test requiring weapons to be both dangerous and unusual.   This was not how the two phrases would have been understood by those immersed in the Latinate legal culture of the Founding era. The two phrases were an example of  the grammatical and rhetorical form hendiadys. Educated readers in the Founding era would have

---

[42] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS. 11 (2017).

[43]  *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

[44] *District of Columbia v. Heller*, 554 U. S. 570, at 626−627 (2008), and n. 26.

[45] See Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016); On the use of the two formulations, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695 (2012). Hendiadys is a form of speech that uses two independent words connected by a conjunction, typically "and," to express a single concept. Shakespeare was especially fond of this construction, most famously associated with Macbeth's speech  describing life as  "a tale told by an idiot, full of sound and fury." The author chose this formulation over the less poetic turn of phrase, furious sound. For a discussion of this grammatical form in recent Supreme Court jurisprudence, See also, Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin, 143 S. Ct. 1689, 1710 (2023) (Gorsuch dissenting)

interpreted both phrases to  mean the same thing, a ban on weapons that were "unusually dangerous." This framework persisted throughout the nineteenth century. [46] Joel Prentis Bishop's influential  treatise on criminal law published on the eve of the Civil War described the legal rule as follows:  "The same thing has, moreover has been very properly held in the United States; and so here, whether we receive the English statute or not, we hold criminal by our common law the going or riding about armed, with unusual and dangerous weapons, to the terror of the people."[47]

21.      Another important  guiding principle inherited from English common was the concept of *in terrorem populi*.[48]  Blackstone's formulation of this rule made clear that the act of arming was the cause of the terror: "The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the Statute of Northampton." [49] This ancient common law prohibition  traveling with  unusually dangerous weapons influenced firearms regulation outside of parts of the slave south.[50]

Building on this common law tradition individual  states passed a host of new laws to deal with  emergence of  more dangerous firearms. In short, when faced with changes in technology, consumer behavior, and faced with novel threats to public safety, the individual states enacted laws to address these problems. The most sweeping laws were passed in the Slave South. These laws targeted easily concealed weapons such as pistols, bowie knives, dirks. Apart from outlier cases in

---

[46] " Yet may an Affray be, without word or blow given; as if a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike a fear upon others that be not armed as he is; and therefore both the Statutes of Northampton made against wearing Armour, do speak of it." JOSEPH KEBLE, AN ASSISTANCE TO JUSTICES OF THE PEACE, FOR THE EASIER PERFORMANCE OF THEIR DUTY 147, 224 (1683). at 147. See also Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.), 20 Rich. 2, c. 1 (1396-97) (Eng.) This was the view of American justice of the peace manual, ustices of the Peace, upon their own View, or upon Complaint, may apprehend any Person who shall go or ride armed with unusual and offensive weapons, in an Affray, or among any great Concourse of the People, or who shall appear, so armed, before the King's Justices sitting in Court." J. DAVIS, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE 13 (Newbern, James Davis 1774) (citing Michael Dalton, THE COUNTRY JUSTICE CONTAINING THE PRACTICE, DUTY AND POWER OF THE JUSTICES OF THE PEACE AS WELL IN AS OUT OF THEIR SESSIONS 37 (London 1705).

[47] Joel Prentis Bishop, 2 COMMENTARIES ON CRIMINAL LAW 2nd ed. (1859) at 678.  Bishop treated the two formulations as identical. For further discussion, see Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Understanding of the Second Amendment*, 42 S. Ill. U. L.J. 61 (2018).

[48] John Bouvier 1 A LEGAL DICTIONARY 2nd ed., (1843) at 660.

[49] 4 WILLIAM BLACKSTONE, COMMENTARIES *148-49.

[50] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L. J. F. 121, 128 (2015)

this region,  courts upheld such limits on the unfettered exercise of the right to keep and bear arms. The primary limit identified by courts in evaluating such laws was the threshold question about abridgement: did the law negate the ability to act in self-defense? Thus, the people themselves acting through their legislatures retained the fundamental right to determine which unusually dangerous weapons were exempted from the full protection of the constitutional right to keep and bear arms.

### Firearms Then and Now: Lethality in Historical Perspective

Modern firearms are not only more deadly, but they are lighter, easier to use, more accurate, and require far less training to be effective. Although comparisons of weapons from different eras is inherently subjective, one effort to compile a comparative lethality index for military weapons is instructive. Military historian and defense analyst Trevor DuPuy's theoretical lethality index captures the exponential growth in the lethality of modern firearms. Of course, this index was developed to compare weapons on the battlefield. The increased lethality of these weapons in a civilian context is almost unimaginable. An attack on a school with an eighteenth-century musket could easily result in no casualties given the difficulty of using such weapons and the likelihood of misfiring. The attack on Sandy Hook Elementary School and the scores of mass shootings would have been impossible using  common eighteenth- century firearms. Given these facts any effort to analogize Founding era weapons with modern semi-automatic weapons invariably understates the increase in the level of carnage that contemporary firearms can cause in a non-military setting.[51]

---

[51] Darrell Miller and Jennifer Tucker, *Common Use Lineage, and Lethality*  55 U.C DAVIS. L. REV 2495, 2509 (2022).

Dupuy's Theoretical Lethality Index[74]

| Weapon | TLI |
|---|---|
| Sword, pike, etc. | 23 |
| Longbow | 36 |
| 17th c. musket | 19 |
| 18th c. flintlock | 43 |
| Early 19th c. rifle | 36 |
| Mid-19th c. rifle/conoidal bullet | 102 |
| Late 19th c. breech-loading rifle | 153 |
| Springfield Model 1903 rifle (magazine) | 495 |
| World War I machine gun | 3,463 |
| World War II machine gun | 4,973 |

Another important insight derived from Dupuy's work concerns the increased lethality of guns in the late nineteenth century. The expansion of gun laws after the Civil War, in part, reflects the improvements in firearms lethality and their wider availability to the civilian population. The ease of use of these weapons increased their popularity. The rise of easily concealed weapons, pocket pistols, contributed to rising urban crime and violence. The expansion of arms in the post-Civil War era made these arms more readily available for use in crimes of violence so states and localities enacted laws to regulate the baneful consequences of arms proliferation.[52]

### The Police Power and Firearms Regulation

22.    The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[53]   The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[54] By

---

[52] *Supra* note 21 352.

[53] PA. CONST. OF 1776, Ch. I, art iii.

[54] For other examples of similar constitutional language,  see N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage in laws creating municipal governments, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to

the early nineteenth century the term "police" was a fixture in American law.[55] Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[56] The Founding era's police right, and its heir the Marshall Court's doctrine of the police power became a fixture in American law.

23.    The power to regulate firearms and gunpowder has always been central to the police power  and historically was shared by both states,  local municipalities and the federal government on federal land and buildings.[57]   The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers. Indeed,  if it had,  the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only possible because Federalists offered  Anti-Federalists,  strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority.[58]

24.    Federalists and  Anti-Federalist bitterly disagreed over many legal issues, but this one point of accord was indisputable. Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."  Federalist Tench Coxe  concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress." States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[59]

---

incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791). For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[55] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[56] 10 ENCYCLOPÆDIA AMERICANA 214 new edition (Francis Lieber ed.).

[57] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).
[58]  Saul Cornell,  THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).
[59] Brutus, ESSAYS OF BRUTUS VII, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981). Tench Coxe, A Freeman, PA. GAZETTE, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

25.     At the Founding it was recognized that state police power authority was at its pinnacle in matters relating to guns or gun powder. Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[60] New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

> it shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[61]

26.     The power to regulate firearms and gunpowder was therefore at the very core of the police power and inheres in both states and local municipalities. A slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning with the Marshall Court and continuing with the Taney Court. This concept would become the primary tool for courts attempting to adjudicate cases involving gun regulation.[62]

27.     The application of the police power to firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his 1827 discussion of

---

[60] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

[61] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 191-2 (Thomas Greenleaf, ed., 1792).

[62] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief overview, *see* https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years 1836-1864, https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/.

laws regulating gun powder in *Brown v. Maryland.*[63]  Nor was Marshall unique in highlighting the centrality of this idea to American law. [64] The ubiquity of the police power framework for evaluating the constitutionality of legislation regarding firearms reflected the centrality of this approach to nearly every question of municipal legislation touching health or public safety.[65] Massachusetts Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power. Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[66]

28.     Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout

---

[63] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

[64] In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN LAW (340)  464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[65]ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005); MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN GOVERNMENT, FROM THE FOUNDING TO THE PRESENT (2015).

[66] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851). For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

American history.[67] A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

> Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefore according to law.[68]

29.     No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance. Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged. This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[69] Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[70] This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[71]

---

[67] Robert  SPITZER, GUNS ACROSS AMERICA : RECONCILING GUN RULES AND GUN RIGHTS (2015) at 39-64.

[68] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.

[69] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN AMERICA, 1790-1900: LEGAL THOUGHT BEFORE MODERNISM (2013).

[70] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

[71] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

30.     One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[72] The case was a classic example of antebellum police power jurisprudence: "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[73] The regulation of arms was in the court's view something at the very core of state police power.[74]

### Reconstruction and the Expansion of State Police Power to Regulate Firearms

31.     Although Founding-era constitutions separated the right of the people to regulate their internal police from statements about the right to bear arms, Reconstruction-era Constitutions adopted a new formulation, fusing the two rights together as one. Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military. By contrast constitution writers in the era of the Fourteenth Amendment were motivated by a different fear:  the proliferation of especially dangerous weapons. The language of the right to bear arms provisions in state constitutions enacted during Reconstruction and after began to recognize that the police power of the state could be used to regulate firearms.[75]  Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms. For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the

---

[72] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

[73] *Id.* at 616.

[74] Apart from rare outlier decisions, such as Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to settle claims about the scope of  state power to regulate arms. For a useful discussion of *Bliss* in terms of the police power, see ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 91 (1904).

[75] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2021).

Legislature may prescribe."[76] Nor was Texas an outlier in this regard. Sixteen state constitutions adopted during this period employed similarly expansive language.[77] Thus, millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority over firearms was at its apogee when regulating the use of guns in public.[78]

32.    This  new constitutional focus on regulation was entirely consistent with the Fourteenth  Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of  recently free people  of the South and Republicans hoping to  further  the goals of Reconstruction.[79] The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for  "local administration and personal security."[80] As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good pursuant to their police power authority that was "inalienable."[81]

33.    The unprecedented threats post by guns in post-Civil War America prompted scores of new laws.  Across the nation legislatures enacted a staggering range of new laws to regulate arms. Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[82]  Not only did the number of laws increase, but the number of states passing such laws expanded.[83]

---

[76] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[77] *Supra* note 75.

[78] *Id.*

[79] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019).

[80] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043. 1058 (2010).

[81] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[82] *See* Robert F. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55, 59-61 tbl. 1 (2017).

[83] *Id.*

34.     Henry Campbell Black, the author of *Black's Law Dictionary*,  reiterated a point that was beyond dispute for jurists in this era, the police power was "inalienable" and not easily defined  in the abstract. In keeping with the continuing influence of common law modes of legal thought, virtually every jurist and legal scholar underscored that the determination of its limits was best left to courts on a case-by-case basis.[84] Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[85]

35.     Reconstruction (1863-1877) ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety. Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder. In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power. As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[86]

36.     In keeping with the larger goals of Reconstruction, this period witnessed an intensification of firearms regulation. Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral regulations aimed at public safety. The violence of the Reconstruction period led to the enactment of a range of more robust firearms regulations.[87]

---

[84] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[85] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886), *citing Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854).

[86] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (2005-2006).

[87] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

37.     The laws enacted during Reconstruction underscore the fact that strong regulation of firearms during Reconstruction was not a novel application of the police power, but simply an example of the flexibility inherent in this accepted legal concept.

### Firearms and the Peace: Terror Enters the Modern Age

38.     With the dawn of a new century, changes in technology, consumer behavior, and society once again created a novel gun violence problem requiring state action.[88] Although breech loading rifles and repeating rifles emerged in the late nineteenth century these weapons did not achieve sufficient market penetration to impact gun violence which remained disproportionately an urban problem In fact, the marketing of these weapons focused on their utility in western and rural contexts, not the urban areas most plagued by crime.[89]  By contrast the emergence of fully automatic and semi-automatic weapons in the early decades of the twentieth century followed a different trajectory. These weapons did exacerbate urban crime prompting multiple legislatures to aggressively regulate them or prohibit their sale and possession. Fears about gangster weapons echoed pre-Civil War fears about weapons of "bravado, and affray" associated with earlier periods of intensive firearms regulation.[90]

39.     As was true for the first wave of state gun control laws, passed in response to the proliferation of handguns and a deadly assortment of edged weapons in the antebellum era, the new concern over "gangster weapons" did not emerge  simultaneously with the development of new firearms technology. Semi-automatic and fully automatic weapons did not immediately produce social problems requiring government action. The passage of new regulations governing firearms invariably has trailed technological developments in gun design, manufacture, and marketing. Legislation was only necessary once new weapons became popular enough to cause a problem that required government action. This well-established pattern repeated itself in the case of rapid-fire weapons, including semi-automatic and fully automatic guns. As these weapons proliferated and undermined public safety, new laws were crafted to mitigate their harms.[91]

---

[88] ERNST FREUND, THE POLICE POWER 246–47 (1904).
[89]  Pamela Haag, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).
[90] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017).
[91] *Id.*

40.      Nothing better illustrates this process than  popular concerns about "gun toting" and "gangster weapons," including the notorious "Tommy Gun," a machine gun that was popularly associated with the Saint Valentine's Day Massacre and criminals such as Machine Gun Kelly. Until the 1920s these weapons were not perceived to present a sufficient public safety concern to prompt regulation. Political scientist Robert Spitzer's overview of the history of firearms regulation underscores this point: "So, for example, fully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I. But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[92]

41.      Laws targeting fully automatic and semi-automatic rapid-fire weapons were a classic example of the flexibility of the police power. Michigan's law is illustrative of these laws:

> It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen (16) times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm. [93]

42.      In response to the rise of "gun toting" and "gangsterism" in the 1920s, a number of states passed new laws banning fully automatic machine guns and in some instances semi-automatic weapons.[94] It is important to note that the weapons singled out for prohibition were not simply those capable of fully automatic fire, but also included many semi-automatics as well.[95] By the early 1930s more than half the states had passed some type of prohibition on fully automatic or semi-automatic weapons.[96]  A number of states embraced the view that fully automatic and

---

[92] Id. at 68

[93] Michigan Pub. Acts 1929, Act No. 206, Section 3, Comp. Laws 1929, § 16751:

[94]  Adam Winkler: GUN FIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA (211)  at 191..

[95] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017).

[96]  Among the western and mountain states passing such laws: Act effective July 29, 1927, ch. 552, 1927 Cal. Stat. 938; Act of Mar. 9, 1931, ch. 178, 1931 N.D. Laws 305; Or. Laws 488, 489; 1933 S.D. Sess. Laws 245;Act of Mar. 6, 1933, ch. 64, 1933 Wash. Sess. Laws 335. There were also unprecedented efforts to coordinate such actions nationally, including the creation of model statutes for states to use for their own legislative efforts, see Patrick J. Charles, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY (2018). Charles, ARMED IN AMERICA at 193.

semi-automatic weapons ought to be classified as "machine guns" for legal purposes. [97]
Minnesota's 1933 law was among the most detailed drafted:

> Definitions. (a) Any firearm capable of loading or firing automatically, the
> magazine of which is capable of holding more than twelve cartridges, shall be a
> machine gun within the provisions of the Act. (b) Any firearm capable of
> automatically reloading after each shot is fired, whether firing singly by separate
> trigger pressure or firing continuously by continuous trigger pressure; which said
> firearm shall have been changed, altered or modified to increase the magazine from
> the original design as manufactured by the manufacturers thereof, or by the addition
> thereto of extra and/or longer grips or stocks to accommodate such extra capacity,
> or by the addition, modification and/or attachment thereto of any other device
> capable of increasing the magazine capacity thereof, shall be a machine gun within
> the provisions of this Act."[98]

Similarly, South Dakota defined machine guns as weapons "from which more than five shots or
bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine."[99]

**Assault Weapons Bans, the Police Power, and the  Latest Face of Terror**

43.      Another major inflection point in the debate over firearms regulation focused on
"assault weapons," and was closely connected to the rise of mass shootings in the last decades of
the twentieth century.[100] California led the way with its ban on assault weapons enacted after the
Stockton School Massacre in 1989.[101]  Proposals to ban  "assault weapons" are part of a larger
national movement to deal with the carnage caused by high capacity, high velocity weapons.  The

---

[97] *Report of Chairman of Section on Torts and Criminal Law*, 39 HANDBOOK OF THE NATIONAL
CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND PROCEEDINGS OF
THE ANNUAL CONFERENCE MEETING 346 (1920) at 350.
[98] 1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport
a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§
1-3.
[99] 1934 S.C. Acts 1288, An Act Regulating the use and Possession of Machine Guns: §§ 1 to 6.
[100] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L.
REV. 301 (2018); Jaclyn Schildkraut et.al *Mass Shootings, Legislative Responses, and Public Policy: An
Endless Cycle of Inaction* 68 EMORY L.J. 1043 (2020).
[101] Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115.

popularity of these weapons and accessories is a recent development in American gun culture. Simply put, there were no mass shootings in the Founding era.[102]

44.    Defining what types of weapons ought to be included under the category of "assault weapons" has become one of the most deeply contentious issue in the fraught political debate over gun regulation. Gun rights advocates have insisted that the term  "assault weapon" is an invention of gun control activists and that the term is essentially meaningless.[103]   For those in the  gun rights community these  "modern sporting rifles" share functions and features with many other guns including some  hunting rifles.[104] Much of the current controversy over bans or restrictions on dangerous or unusual weapons revolves around the AR-15 and similar types of weapons.[105]   The debates heavy focus technological factors obscures the  fact that legislative efforts to ban these weapons fit squarely within the long Anglo-American tradition of limiting public access to weapons capable of provoking terror.

45.    The  history of the AR- 15 clearly shows why legislatures have singled out this class of weapon. The development of the AR-15 was tied to the strategic requirements of the American military to find a replacement for heavier World War II era rifles. The military M-16 and the civilian AR-15 are closely related. In contrast to standard issue military weapons such as the M-16, the AR-15 and other similar civilian weapons are all semi-automatic, not selective fire weapons capable of firing in either fully automatic or semi-automatic modes.

46.    When they were first introduced military-style AR-15 types of weapons were not especially  popular.[106] Gun  makers  eventually  developed  a  more  effective  set  of  marketing strategies that linked these products to their origins in the military but did so in manner that made

---

[102]   Robert Spitzer, THE POLITICS OF GUN CONTROL (2012)14.
[103] For a good illustration of the gun rights point of view, Stephen P. Halbrook*, New Yorkers Not So "Safe" Act: The Second Amendment in an Alice-In-Wonderland World Where Words Have No Meaning* 78 ALBANY L. REV. 789 (2015).

[104]  On modern marketing of firearms, see Pamela Haag, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).
[105] James Jacobs, "Why Ban Assault Weapons?" 37 CARDOZO L. REV. 681 (2015) at 687. For a useful overview of the legal issues in regulating this class of weapons, see Vivian S. Chu *Federal Assault Weapons Ban: Legal Issues Congressional Research Service*, February 14, 2013.
[106] David M. Studdert et. al. *Testing the Immunity of the Firearm Industry to Tort Litigation* 177 JAMA INTERNAL MEDICINE 102  (2017) 102–5.

them avatars of  masculinity and libertarian ideology. [107]  When first marketed this  military connection was a liability because of lingering opposition to the Vietnam War slowed down early civilian interest in a weapon that was closely related to the M-16. [108]

47.    There is no doubt that the pragmatic and cosmetic features of AR-15 type weapons now account for their popularity among segments of the gun owning public. [109]   The weapons are lighter, produce less recoil, and are easier to fire than an older generation of hunting rifles. The fact that these weapons are also highly customizable has increased their appeal. Commentators have analogized them to other consumer products, describing them as an adult and hyper-masculine version of a "Barbie Doll."[110] Opponents of regulation of assault weapons insist that the targeted weapons are neither especially dangerous nor unusual. Moreover, gun rights advocates insist that the category is an invention of gun control advocates, who have targeted these weapons for  cosmetic features.[111]

48.    Dismissing marketing strategies tying these weapons to the military as simply cosmetic misses a crucial point about the history of firearms technology and government regulation. The history and tradition of arms regulation has always recognized that the ability to inspire *terrorem populi* is a legitimate justification for regulation. The perpetrator of the Newtown killings, used a Bushmaster AR-15-type weapon that was marketed with a slogan that traded on hyper-aggressive forms of toxic masculinity: "Consider Your Man Card Reissued."[112] There is little disputing  the fact that despite protestations that these are merely sporting rifles the marketing

---

[107] Joseph Blocher,  *Has the Constitution Fostered a Pathological Rights Culture? The Right to Bear Arms: Gun Rights Talk*, 94 B.U.L. Rev. 813 (2014) and Joseph Blocher, *Hunting and The Second Amendment* 91 NOTRE DAME L. REV. 133 (2015).

[108] On the insurrectionary tradition, see David C. Williams, *Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment* 74 TULANE L. REV. 387 (1999).

[109] Rachel A. Callcut et. al., *Effect Of Mass Shootings on Gun Sales-A 20-Year Perspective* 87 J. TRAUMA ACUTE CARE SUR. 531 (2019).

[110] Robert J. Spitzer, *Why Assault Rifles are Selling*, CHICAGO TRIBUNE, June 16, 2015.

[111] Stephen P. Halbrook, *Reality Check: The Assault Weapon Fantasy and Second Amendment Jurisprudence* 14 GEORGETOWN J. OF L. & PUBLIC POLICY  47 (2016). For a good example of this type of flawed technological determinist approach, see David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994). For a general discussion of the problems with technological determinism, see Merritt R. Smith, and Leo Marx, DOES TECHNOLOGY DRIVE HISTORY? THE DILEMMA OF TECHNOLOGICAL DETERMINISM (Cambridge, MA: MIT, 1994); Allan Dafoe , *On Technological Determinism: A Typology, Scope Conditions, and a Mechanism Science*, 40 TECHNOLOGY, & HUMAN VALUES 1047 (2015).

[112] *Supra* note  34.

campaigns used to sell these weapons evokes images of military assault capabilities.[113] The advertisement from  two popular arms manufacturers are  illustrative of these campaigns.[114]





49.    *Bruen* brushes past these technology focused arguments. From the perspective of text, history, and tradition the key legal fact is that  that these weapons are perceived by important segments of the public to weapons capable of provoking terror. Even if one accepted that some of the specified features on these weapons were simply cosmetic, a point hotly contested by proponents of stronger regulation, this does not negate the undeniable fact that these weapons are

---

[113]  Mark Berman and Todd C. Frankel , "Companies made more than $1B selling powerful guns to civilians, report says House oversight committee accused gun manufacturers of "manipulative marketing campaigns" and profiting off violence,", WASHINGTON POST,  July 27, 2022
[114] Carolyn Maloney, Supplemental Memorandum
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20M EMO%20for%20the%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%2FC%20Gun%20Manufacturer%20Hearing.pdf

capable of producing terror.[115]  Firearms manufacturers created a type of weapon and marketed it to distinct demographics,  stressing characteristics and cultural associations   that tied them to war and then used these associations to effectively market them.   The fact that a successful marketing strategy earned gun companies over a billion dollars contradicts the claims of  gun rights advocates these weapons are no different than other guns available to consumers. If that were true, then gun companies would have abandoned these marketing strategies long ago and replaced them with something more effective. It would be illogical and run counter to the most basic principles of Anglo-American law to argue that people themselves are powerless to regulate these weapons to mitigate the threats they pose to peace and public safety. The appeal of these weapons and their contribution to gun violence are two sides of the same coin.[116]  From a constitutional perspective the holding in *Bruen* makes issues about technology less relevant to evaluating the ability of these weapons to provoke terror.[117]

### *Bruen's* **Framework and  Modern Assault Weapons Bans**

50.     The power to regulate and  prohibit dangerous or unusual weapons has always been central to the police power authority of states and localities. At different moments in American history communities have deemed categories of weapons to be especially dangerous and have regulated them, and when it appeared  necessary enacted bans on  some types of weapons. Such determinations were not made based on technological features in isolation but reflected the  ancient common  law  tradition  of  singling  out  weapons  capable  of  producing  terror.  Such  weapons

---

[115] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018). There has been considerable debate over the category of assault weapons for over thirty years, see Franklin E. Zimring, *The Problem of Assault Firearms* 35 CRIME & DELINQUENCY 538 (1989). Mass shootings have been rendered more deadly by the proliferation of assault weapons, see John Donahue,  https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/. For the most recent assessment of the impact of assault weapons on the American gun violence problem, see Christopher S. Koper *et. al., Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources* 95 J. URBAN HEALTH 313 (2018).

[116] Polly Mosendz, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, June 20, 2018, BLOOMBERG,  https://www.bloomberg.com/news/articles/2018-06-20/why-gunmakers-would-rather-sell-ar-15s-than-handguns.Donohue,  *The Swerve*. Christopher S. Koper*, Assessing The Potential to Reduce Deaths And Injuries From Mass Shootings Through Restrictions on Assault Weapon and Other High-Capacity Semiautomatic 19 Firearms*  CRIMINOLOGY AND PUBLIC POLICY  147( 2020); Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings* 22 APPLIED ECONOMICS LETTERS 281 (2014).

[117] David Hemenway, and Eliot Nelson, *The Scope of the Problem: Gun Violence in the USA* 6 CURRENT TRAUMA REPORTS 29 (2020).

undermined  the peace and the constitutional imperative  embedded in the text of the Second Amendment to protect the security of a free state. Defining exactly which category of  weapons fall outside of the scope of constitutional protection has shifted over time as society has addressed new developments in firearms technology, evolving societal norms, and other  changes. In short, social and  economic  transformation  were  always  accompanied  by  legal  transformation.  Put another way, as times change, the law changes with them.[118]

      51.     Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a point about American law: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[119] The statutes at issue in this case are  analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day. The adaptability of state and local police power has always provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

---

[118] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017).
[119] *Id.*

Pursuant to 28 USC §1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 13, 2023, in  Redding, CT.

*Saul Cornell*

_____

Professor Saul Cornell