# EXHIBIT H

## Text of Historical Laws and Regulations

## HISTORICAL SOURCES

For the convenience of the Court, Defendants hereby respectfully submit copies of the following historical case decisions and statutes cited within their memorandum of law and supporting papers in opposition to Plaintiffs' motion for preliminary injunction.

### TABLE OF CONTENTS

I.   HISTORICAL SOURCE CITATIONS………………………………………………1

 A.    STATE LAWS……………………………………………………………....1

    1.   **1706-7 Mass. Acts ch. 4, reprinted in Acts and Resolves Passed by the General Court 588 (1869)…………………………………………………………….1**

    2.   **1784 NY Laws 627, *An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York or on Board of Vessels within the Harbour Thereof*, ch. 28…………………………………………………………….2**

    3.  **1786 N.H. Laws 383-84, *An Act to Prevent the Keeping of Large Quantities of Gun-Powder in private Houses in Portsmouth, and for Appointing a Keeper of the Magazine Belonging to Said Town*…………………………………………….5**

    4.   **1821 Me. Laws 98-99, *An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder*, ch. 25, § 5…………………………………………8**

    5.   **1832 Conn. Acts 391, *An Act Regulating the Mode of Keeping Of Gunpowder*, Chap. 25 § 1-2……………………………………………………………...10**

6. 1837 Ala. Acts 7, *An Act to Suppress the Use of Bowie Knives*, § 2. ("1837 Ala. Laws 7, No. 11 § 2.")……………………………………………………………………...12

7. 1837 Ga. Act 90, *An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons*, §§ 1–4. ("1837 Ga. Laws 90, § 1.")……………………………………………………………………14

8. 1837-38 Tenn. Pub. Acts 200-01, *An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State*, ch. 137, § 1. ("1937-1938 Tenn. Pub. Acts 200-01, § 1.")……………………………………………………………17

9. 1837-38 Tenn. Pub. Acts 200-01, *An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State*, ch. 137, § 2. ("1937-1938 Tenn. Pub. Acts 200-01, § 2.")……………………………………………………………19

10. No. 24. *An act in addition to An Act, (approved January 30th, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly*, § 1 (10 Feb., 1838). ("1838 Fla. Laws 36, No. 24, § 1.")……………………………………………………21

11. 1839 Ala. Acts 67, *An Act to Suppress the Evil practice of Carrying Weapons Secretly*, § 1. ("1839 Ala. Acts 67, ch. 77.")……………………………………………………24

12. 1850 Mass. Gen. Law, ch. 194 § 2, as codified in mass. Gen. Stat., chap. 164 (1873) § 11……………………………………………………………………………...26

13. 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, *An Act Entitled Revenue*, chap. 25, § 27, pt. 15. (1858-1859 N.C. Sess. Laws 34-36, Pub. Laws., ch. 25, § 27, pt. 15.")…..28

14. 1868 Fla. Laws 95, Of Offenses Against the Public Peace, ch. 7, § 11. ("1868 Fla. Laws 95, ch. 7, § 11.")……………………………………………………………30

15. *A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Government of that District*, Page 45-47, Image 48-50 (1832)……………………………………...32

16. Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76 § 1. ("1838 Va. Acts 76, ch. 101, § 1.")……………………………………35

17. Laws, Statutes, Ordinances, and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the inhabitants and Residents of the Said City Page 38, Image 40 (1763) ("*A Law for the Better Securing of the City of New York from the Danger of Gun Powder*.")………………………………………………………………………………….37

B. NATIONAL FIREARMS ACT……………………………………………………40

**1. 1934 National Firearms Act**…………………………………………………………………………**40**

**2. 1986 Firearms Owners Protection Act**…...…………………………………………………………**45**

**C.   CASES**…………………………………………………………………………...**58**

**1. *Brown v. State of Maryland*, 25 U.S. 419 (1827)**…………………………………………**58**

**2. *Aymette v. State*, 21 Tenn. 154 (1840)**…………………………………………...**81**

**3. *Cockrum v. State*, 24 Tex. 394 (1859)**…………………………………………...**86**

DEFENDANTS
Lamont, et al.

WILLIAM TONG
ATTORNEY GENERAL

BY:

/s/ *Janelle R. Medeiros*
Janelle R. Medeiros
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct30514
E-Mail: janelle.medeiros@ct.gov
Tel.: (860) 808-5450
Fax: (860) 808-5590

_____
James M. Belforti
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Tel: (860) 808-5450
Fax: (860) 808-5591
Federal Bar No. ct30449

E-Mail: james.belforti@ct.gov

## **CERTIFICATION**

I hereby certify that on June 2, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

 /s/ *Janelle R. Medeiros*
Janelle R. Medeiros
Assistant Attorney General

## CHAPTER 4.

### AN ACT FOR ERECTING OF A POWDER-HOUSE WITHIN THE TOWN OF BOSTON.

WHEREAS, for the better securing and safe keeping of the publick stock of gunpowder, and preventing the great loss and danger by casualties befalling the same, and considering the imminent hazard of keeping powder in storehouses with other goods and merchandises, or in or near to dwelling-houses, the government have thought it necessary to order the erecting and building of a publick magazine or powder-house on the common or training-field in Boston,—

*Be it therefore enacted by His Excellency the Governour, Council and Representatives in General Court assembled, and by the authority of the same,*

Penalty of lodg-ing powder in other place but the public pow-der-house.

[SECT. 1.]   That from and after the building and fitting the said house for the receiving and lodging of gunpowder, all gunpowder imported and landed at the port of Boston shall be brought to and lodged in the said magazine or store, and not elsewhere, on pain of confiscation of all powder put or kept in any other house or place, one moiety thereof to and for the use and supply of the publick store of the province, and the other moiety to the informer, to be recovered by bill, plaint or information in any of her majesty's courts of record within

Saving.

the same: *saving*, nevertheless, the ordinary town stocks of Boston and Charlestown from time to time, the fortifications and garrisons immediately under the governour's command, the quantity of fifty pounds at a time in a shop for sale, and such part of the publick stores as shall be directed by the governour and council, from time to time, to be lodged in other place or places.

*And be it further enacted by the authority aforesaid,*

Payment for merchants' powder.

[SECT. 2.]   That for all powder belonging to merchants or other private persons put into the said magazine, there shall be paid to the use of the province, one shilling per barrel at the receipt thereof, and sixpence per barrel per month for three months next after the first, and then fourpence per barrel per month during it's lying there, out of which (if there be sufficient to answer it), the charge of looking after the said house, and the powder lodged there, shall be defrayed, from time to

Governour and council to give instructions, &c.

time; the governour and council to give necessary instructions and orders from time to time, as they shall think fit, for regulating the keeping of all powder put into the said magazine, for the preserving thereof, and that it be turned once a month at the least.

Keeper of the house to at-tend.

[SECT. 3.]   And the keeper of the said house shall duely attend at proper hours to be assign'd by the governour and council, for the receiving and delivering out of merchants' powder.

How the charge of keeping the house is to be defrayed.

[SECT. 4.]   And if at any time the payment for merchants' powder (an accompt whereof shall be rendred on oath) will not defray the charge of looking after the said house, so much as is wanting shall be paid out of the publick treasury.   [*Passed July 9; published July 15.*]

## CHAPTER 5.

### AN ACT FOR THE BETTER PREVENTING OF CRIMINALS AVOIDING OF JUSTICE.

*Be it declared and enacted by His Excellency the Governour, Council and Representatives in General Court assembled, and by the authority of the same,*

That all warrants and summons's in criminal matters, issuing out of the clerk's office of the court of general sessions of the peace for any county, upon complaint, presentment or indictment lying before such court, shall run through the several counties within the province, and be duely executed by the officer or officers to whom they are directed, according to the tenour thereof, as is already by law provided for writts in civil causes.   [*Passed July 9; published July 15.*]

Warrants, &c., out of the clerk of the peace's office to run through the province.

## CHAPTER 6.

### AN ACT FOR APPORTIONING AND ASSESSING OF FOUR SEVERAL TAXES ON POLLS AND ESTATE, PURSUANT TO THE FUNDS AND GRANTS MADE TO HER MAJESTY BY THE GENERAL ASSEMBLY, IN THE YEARS 1704, 1705 AND 1706.

WHEREAS the great and general court or assembly of the province of the Massachusetts Bay in New England, at their sessions in the several years one thousand seven hundred and four, one thousand seven hundred and five, and one thousand seven hundred and six, did make and pass four several grants of taxes as funds and security for the repayment and drawing in of several sums in the bills of credit on this province ordered to be imprinted and issued out of the publick treasury; that is to say, at their session begun the twenty-first of February, one thousand seven hundred and four, a grant of eight thousand pounds;* and at their session begun the thirtieth day of May, one thousand seven hundred and five, a grant of ten thousand pounds;† at their session begun the twenty-fourth of October in the same year, a grant of ten thousand pounds‡ (onely four thousand pounds part thereof to be now apportioned); and at their session begun the tenth of April, one thousand seven hundred and six, another grant of four thousand pounds§ (in case); in all twenty-six thousand pounds, applyed to the ends and uses in the said several grants enumerated and expressed; the said four grants, respectively, to be assessed and levyed on polls and estates in the several towns and districts within this province according to such rules and in such proportion as should be agreed on and directed by this court in their present session;—and forasmuch as the grant of ten thousand pounds at the session in October past, was upon an emission of eight thousand pounds and no more, which two thousand pounds overplus, together with the dutys of impost and excise (made over also to secure the payment of the said bills), and the further additions of four hundred and twenty pounds granted in the last year's tax, and four hundred eighty-nine pounds ten shillings in this present tax, will make good the said funds; wherefore, for the perfecting of the four grants made unto her most excellent majesty as above recited, which are hereby unanimously approved, ratifyed and confirmed, we, her majesty's loyal and dutiful subjects, the representatives of her majesty's province aforesaid, in general court assembled, pray that it may be enacted,—

*And be it accordingly enacted by His Excellency the Governour, Council and Assembly, and by the authority of the same,*

[SECT. 1.]   That each town and district within this province shall be assessed and pay as its proportion of the said twenty-six thousand pounds the sum hereafter following; that is so say,—

### IN THE COUNTY OF SUFFOLK.

| | | |
|---|---|---|
| Boston, four thousand seventy-seven pounds six shillings and sevenpence, . . . . . | .£4,077 | 6s. 7d. |
| Roxbury, three hundred and twenty pounds, . . | . 320 | 0 0 |

* NOTES to 1704-5, resolve (d.)   † NOTES to 1705-6, resolve (a.)   ‡ *Ibid.*. resolve (b.)   § *Ibid.*, resolve (c.)

1784 N.Y. Laws 627, An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places withi...

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 7 of 94





| About | Blog |
|---|---|
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# 1784 N.Y. Laws 627, An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on

1784 N.Y. Laws 627, An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places withi...

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 8 of 94

# Board of Vessels within the Harbour Thereof, ch. 28.

**Subject(s):**

- Storage

**Jurisdiction(s):**

**Year(s):**

- New York

1784

. . . [F]rom and after the passing of this act, it shall not be lawfull [sic] for any merchant, shopkeeper, or retailer, or any other person, or persons whatsoever, to have or keep any quantity of gun powder exceeding twenty-eight pounds weight, in any one place, less than one mile to the northward of the city hall of the said city, except in the public magazine at the Fresh-water, and the said quantity of twenty-eight pounds weight, which shall be lawfull [sic] for any person to have and keep at any place within this city, shall be seperated [sic] into four stone jugs or tine canisters, which shall not contain more than seven pounds each, on pain of forfeiting all such gunpowder, and the sum of fifty pounds for every hundred weight, and in that proportion for a greater or lesser quantity, and upon pain of forfeiting such quantity which any person may lawfully keep as aforesaid, and which shall not be seperated [sic] as above directed, with full costs of suit to any person or persons, who will inform and sue for the same . . . as well for the recovery of the value of such gun powder in specie, as for the penalty aforesaid, besides costs, and to award, effectual execution thereon . . .



1784 N.Y. Laws 627, An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places withi...

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 9 of 94

Home | About | Blog | Videos | Events

Repository of Historical Gun Laws | Teaching Resources | Conferences

Duke Center for Firearms Law   |   210 Science Drive, Durham, NC 27708   |   firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

1786 N.H. Laws 383-84, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the M...

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 10 of 94





| About | Blog |
|---|---|
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# 1786 N.H. Laws 383-84, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the Magazine Belonging to Said Town.

1786 N.H. Laws 383-84, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the M...

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 11 of 94

**Subject(s):**

- Storage

**Jurisdiction(s):**                **Year(s):**

- New Hampshire              1786

That if any person or persons, shall keep in any dwelling-house, store or other buildings, on land, within the limits of said Portsmouth, except the magazine aforesaid, more than ten pounds of gun-powder at any one time, which ten pounds shall be kept in a tin canister properly secured for that purpose, such person or persons shall forfeit the powder so kept, to the firewards of said Portsmouth to be laid out by them in purchasing such utensils as they may judge proper for the extinguishing of the fire; and the said firewards are hereby directed and empowered to seize, and cause the same to be condemned in any Court of Law or Record proper to hear and try the same, to be disposed of for the purchase aforesaid. And the offender shall also forfeit and pay a fine for the use of the poor of said Portsmouth, equal to the value of the powder so kept in any store, dwelling-house, or building; which fine, shall be sued for and recovered by the overseers of the poor of said Portsmouth, for the use of said poor, in any Court of Law proper to try the same.



Home    |    About    |    Blog    |    Videos    |    Events    |

Repository of Historical Gun Laws    |    Teaching Resources    |    Conferences

Duke Center for Firearms Law    |    210 Science Drive, Durham, NC 27708    |    firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

1786 N.H. Laws 383-84, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the M...

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 12 of 94

1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5 | Duke Center for Firearms Law

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 13 of 94





| About | Blog |
|---|---|
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# 1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5

**Subject(s):**

- Storage

1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5 | Duke Center for Firearms Law

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 14 of 94

| Jurisdiction(s): | Year(s): |
|---|---|
| • Maine | 1821 |

Be it further enacted, That it shall, and may be lawful for any one or more of the Selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefor according to law.



Home    |    About    |    Blog    |    Videos    |    Events

Repository of Historical Gun Laws    |    Teaching Resources    |    Conferences

Duke Center for Firearms Law    |    210 Science Drive, Durham, NC 27708    |    firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

1832 Conn. Acts 391, An Act Regulating the Mode Of Keeping Of Gunpowder, Chap. 25, § 1-2. | Duke Center for Firearms Law

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 15 of 94





About

Blog

News

Events

Repository of Historical Gun Laws

Articles

Conferences

# 1832 Conn. Acts 391, An Act Regulating the Mode Of Keeping Of Gunpowder, Chap. 25, § 1-2.

**Subject(s):**

- Storage

**Jurisdiction(s):**          **Year(s):**

- Connecticut          1832

1832 Conn. Acts 391, An Act Regulating the Mode Of Keeping Of Gunpowder, Chap. 25, § 1-2. | Duke Center for Firearms Law

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 16 of 94

§ 1 . . . [I]t shall be lawful for the select-men of each and every town within this State, or a majority of them, by their order, in writing, directed to the owners or persons having charge of the same, to cause to be removed to some safe and convenient place within said town, and within such time, as in said order may be prescribed, and quantity of gunpowder so deposited or kept, within the limits of said town, as in the opinion of said select-men, or a majority of them, may endanger the persons or dwellings of any individuals whatsoever. Whereupon it shall become the duty of the persons thus notified, to remove the said gunpowder within the time, and to the place specified in said order. § 2. That in case the said gun powder shall not be removed pursuant to said order, as is hereinbefore prescribed the said select-men, or a majority of them, may remove or cause the same to be removed to such place within said town, as in their opinion shall be deemed safe and convenient. And they shall have and retain a lien upon the said powder for all necessary expenses in removing and keeping the same.



Home | About | Blog | Videos | Events

Repository of Historical Gun Laws | Teaching Resources | Conferences

Duke Center for Firearms Law   |   210 Science Drive, Durham, NC 27708   |   firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.





| About | Blog |
| --- | --- |
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# 1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, § 2.

**Subject(s):**

- Dangerous or Unusual Weapons

**Jurisdiction(s):**          **Year(s):**

- Alabama          1837

And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.



Home    |    About    |    Blog    |    Videos    |    Events    |

Repository of Historical Gun Laws    |    Teaching Resources    |    Conferences

Duke Center for Firearms Law    |    210 Science Drive, Durham, NC 27708    |    firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4. | Duke Cent...

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 19 of 94





About

Blog

News

Events

Repository of Historical Gun Laws

Articles

Conferences

# 1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.

**Subject(s):**

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4. | Duke Cent...

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 20 of 94

- Carrying Weapons

**Jurisdiction(s):**          **Year(s):**

- Georgia                      1837

§ 1 . . . it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.

§ 2. And be it further enacted by the authority aforesaid, That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

§ 3. And be it further enacted by the authority aforesaid, That it shall be the duty of all civil officers, to be vigilant in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

§4. And be it further enacted by the authority aforesaid, That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: Provided, nevertheless, that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: Provided, also, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: And provided, nevertheless, that the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4. | Duke Cent...

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 21 of 94



Home  |  About  |  Blog  |  Videos  |  Events  |

Repository of Historical Gun Laws  |  Teaching Resources  |  Conferences

Duke Center for Firearms Law    |    210 Science Drive, Durham, NC 27708    |    firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1. | Duke Center for Firear...

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 22 of 94





| About | Blog |
|---|---|
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# 1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1.

**Subject(s):**

- Dangerous or Unusual Weapons

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1. | Duke Center for Firearm...

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 23 of 94

**Jurisdiction(s):**          **Year(s):**

- [Tennessee](#)                1838

That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.



Home    |    About    |    Blog    |    Videos    |    Events

Repository of Historical Gun Laws    |    Teaching Resources    |    Conferences

Duke Center for Firearms Law    |    210 Science Drive, Durham, NC 27708    |    firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2. | Duke Center for Firear...

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 24 of 94





| About | Blog |
| --- | --- |
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# 1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2.

**Subject(s):**

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2. | Duke Center for Firear...

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 25 of 94

- Carrying Weapons

**Jurisdiction(s):**          **Year(s):**

- Tennessee                    1838

That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.



Home | About | Blog | Videos | Events

Repository of Historical Gun Laws | Teaching Resources | Conferences

Duke Center for Firearms Law    |    210 Science Drive, Durham, NC 27708    |    firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

No. 24. An act in addition to An Act, (approved January 30th, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly, §1 (10 Feb....

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 26 of 94





| About | Blog |
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# No. 24. An act in addition to An Act, (approved January 30th, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly, §1 (10 Feb., 1838).

No. 24. An act in addition to An Act, (approved January 30th, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly, §1 (10 Feb....

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 27 of 94

**Subject(s):**

- Dangerous or Unusual Weapons

- Registration and Taxation

**Jurisdiction(s):**          **Year(s):**

- Florida          1838

"Section 1. Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney."

1838, FL, An Act to prevent any person in this Territory from carrying arms secretly, §1

Acts of the Legislative Council, of the Territory of Florida, Passed at its Sixteenth Session, Commencing Monday January 1st, and Ending Sunday February 11th, 1838. With also the Resolutions of a Public or General Character Adopted by the Legislative Council (Tallahassee, FL: S. S. Sibley, Printer, 1838), 36. No. 24, § 1.



Home | About | Blog | Videos | Events

No. 24. An act in addition to An Act, (approved January 30th, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly, §1 (10 Feb....

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 28 of 94

Repository of Historical Gun Laws | Teaching Resources | Conferences

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1 | Duke Center for Firearms Law

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 29 of 94





| | |
|---|---|
| About | Blog |
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# 1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1

**Subject(s):**

- Carrying Weapons

**Jurisdiction(s):**        **Year(s):**

- Alabama                1839

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1 | Duke Center for Firearms Law

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 30 of 94

That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.



Home | About | Blog | Videos | Events

Repository of Historical Gun Laws | Teaching Resources | Conferences

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

1850 Mass. Gen. Law, ch. 194 § 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 11 | Duke Center for Firearms Law

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 31 of 94





| | |
|---|---|
| About | Blog |
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# 1850 Mass. Gen. Law, ch. 194 § 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 11

**Subject(s):**

- Dangerous or Unusual Weapons

**Jurisdiction(s):**          **Year(s):**

- Massachusetts          1850

1850 Mass. Gen. Law, ch. 194 § 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 11 | Duke Center for Firearms Law

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 32 of 94

Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, or expose for sale, any instrument or weapon of the kind usually known as slung shot, shall be punished therefor by a fine not less than fifty dollars, or by imprisonment in the common jail or house of correction, for a term not exceeding six months.



Home | About | Blog | Videos | Events

Repository of Historical Gun Laws | Teaching Resources | Conferences

Duke Center for Firearms Law    |    210 Science Drive, Durham, NC 27708    |    firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15. | Duke Center for Firearms Law

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 33 of 94





| About | Blog |
|---|---|
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15.

**Subject(s):**

- Registration and Taxation

**Jurisdiction(s):**          **Year(s):**

- North Carolina          1858

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15. | Duke Center for Firearms Law

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 34 of 94

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.



Home  |  About  |  Blog  |  Videos  |  Events

Repository of Historical Gun Laws  |  Teaching Resources  |  Conferences

Duke Center for Firearms Law    |    210 Science Drive, Durham, NC 27708    |    firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.





| About | Blog |
|---|---|
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# 1868 Fla. Laws 95, Of Offesnses Against the Public Peace, ch. 7, § 11.

**Subject(s):**

- Dangerous or Unusual Weapons

**Jurisdiction(s):**          **Year(s):**

- Florida          1868

Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the county jail not exceeding six months.



Home | About | Blog | Videos | Events

Repository of Historical Gun Laws | Teaching Resources | Conferences

Duke Center for Firearms Law    |    210 Science Drive, Durham, NC 27708    |    firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Governme...

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 37 of 94





About

Blog

News

Events

Repository of Historical Gun Laws

Articles

Conferences

# A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Government of that District Page

A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Governme...

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 38 of 94

45-47, Image 48-50 (1832) available at The Making of Modern Law: Primary Sources.

**Subject(s):**

- Storage

**Jurisdiction(s):**          **Year(s):**

- Pennsylvania          1787

[Ordinances of Kensington, Northern Liberties, An Act for Securing the City of Philadelphia and the Neighborhood Thereof from Damage by Gunpowder (1774), § 2. No person shall keep in any house, store, shop, cellar or other place within the city of Philadelphia, nor the country adjacent, within two miles of the said city, any greater quantity of gunpowder, at one time, than thirty pounds weight thereof, under the penalty of forfeiture of the whole quantity so over and above stored or kept, together with the sum of twenty pounds for every such offense. . . § 5. All gunpowder brought by land into the said city, or the adjacent country, within two miles of the said city, if above thirty pounds weight at one time, shall be immediately carried to the said magazine, and delivered to the superintendent thereof, or his deputy, within the hours hereinafter prescribed for his attendance at the said magazine, under the same penalties as if brought by water, and not delivered, as in such case is herein directed, at the said magazines. . . § 12. Any justice of the peace within the limits of the said city, and the adjacent country within two miles of the said city, on demand made by such superintendent or keeps of the said magazine, showing a reasonable cause, on oath or affirmation, may issue his warrant under his hand and seal empowering such superintendent or keeper of the said magazine to search, in the day time, any house, store, shop, cellar or other place, or any boat, ship or other vessels, for any quantity of gunpowder forbidden by this act to be kept in any place or places, and for that purpose to break open, in the day time, and such house, store, shop, cellar or other places aforesaid, or any boat, ship or other vessel, if

A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Governme...

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 39 of 94

there be occasion; and the said superintendent or keeper of the said magazine, on finding such gunpowder, may seize and remove the same, in twelve hours, from any such place or places, boats, ships or vessels, to the said magazine, and therein detain the same, until it be determined in the proper court, whether it be forfeited or not by virtue of this act; and the said superintendent or keeper of the said magazine shall not in the mean time be sued for seizing, keeping and detaining the same, nor shall any writ of replevin issue therefor, until such determination as aforesaid be made, but all such suits are hereby declared to be illegal, erroneous and abated.]



Home | About | Blog | Videos | Events |

Repository of Historical Gun Laws | Teaching Resources | Conferences

Duke Center for Firearms Law    |    210 Science Drive, Durham, NC 27708    |    firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76, § 1 | Duke Center for Firearms Law

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 40 of 94





| About | Blog |
|---|---|
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76, § 1

**Subject(s):**

- Carrying Weapons

**Jurisdiction(s):**          **Year(s):**

- Virginia          1838

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76, § 1 | Duke Center for Firearms Law

Case 3:22-cv-01223-JBA   Document 59-8   Filed 07/26/23   Page 41 of 94

Be it enacted by the general assembly, That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from this use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offense forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.



Home | About | Blog | Videos | Events

Repository of Historical Gun Laws | Teaching Resources | Conferences

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in ...

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 42 of 94





| About | Blog |
|---|---|
| News | Events |
| Repository of Historical Gun Laws | Articles |
| Conferences | |

# Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good

# Rule and Government of the Inhabitants and Residents of the Said City Page 39, Image 40 (1763) available at The Making of Modern Law: Primary Sources.

**Subject(s):**

- Storage

**Jurisdiction(s):**          **Year(s):**

- New York                    1763

A Law for the Better Securing of the City of New York from the Danger of Gun Powder. Be it therefore ordained by the Mayor, Aldermen and Commonality of the City of New York, convened in Common Council, and it is hereby ordained by the authority of the same, the from and after the publication hereof, no person or persons whatsoever inhabiting within the said city, within two miles of the city-hall of the said city, shall presume to keep in any house, shop, cellar, store-house, or other place within the said city (his majesty's garrison and magazine only excepted) any more or greater quantity of gunpowder at one time, than twenty-eight pounds weight (except in the magazines or powder house aforesaid) under the penalty of ten pounds current money of New York, for every offense.

Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in ...

Case 3:22-cv-01223-JBA    Document 59-8    Filed 07/26/23    Page 44 of 94



Home | About | Blog | Videos | Events

Repository of Historical Gun Laws | Teaching Resources | Conferences

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu.

Copyright © 2023. All rights reserved. Website designed by Addicott Web.

1236          73d CONGRESS.   SESS. II.   CHS. 756, 757.   JUNE 26, 1934.

available to pay claims on account of any check, the amount of which has been included in any balance so covered into the surplus fund.

**Advances for land surveys.**
**U.S.C., title 43, sec. 863.**
Sec. 22. So much of the Act of August 18, 1894 (U.S.C., title 43, sec. 863), as authorizes the Governors of the States therein named to advance money from time to time for the survey of certain townships located within such States, which money shall be reimbursable, is hereby repealed.

**Moneys in U.S. court registries.**
Sec. 23. Moneys in, or payable into, the registry of any United States court, in the discretion of the court, may be deposited in official checking accounts with the Treasurer of the United States, subject to disbursement on order approved by the court.

**Survey of certain accounts to be made by Comptroller General.**
Sec. 24. The Comptroller General of the United States shall cause a survey to be made of all inactive and permanent appropriations and/or funds on the books of the Government and also funds in the official custody of officers and employees of the United States, in which the Government is financially concerned, for which no accounting is rendered to the General Accounting Office; and he shall submit to the Congress annually, in a special report, his recommendations for such changes in existing law relating thereto as, in his judgment, may be in the public interest.

**Report to Congress.**

**Existing provisions not affected.**
Sec. 25. The provisions of this Act shall not be construed to alter or amend any existing authorization for an appropriation.

**Saving clause.**
Sec. 26. All Acts and/or parts of Acts inconsistent or in conflict with the provisions of this Act are hereby repealed to the extent of such inconsistency or conflict.

**Short title.**
Sec. 27. The short title of this Act shall be the "Permanent Appropriation Repeal Act, 1934."

Approved, June 26, 1934.

---

[CHAPTER 757.]

AN ACT

To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof.

**June 26, 1934.**
**[H.R. 9741.]**
**[Public, No. 474.]**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That for the purposes of this Act—

**National Firearms Act.**
**Limitation of terms for purposes of Act.**
**"Firearm."**
(a) The term "firearm" means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition.

**"Machine gun."**
(b) The term "machine gun" means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.

**"Person."**
(c) The term "person" includes a partnership, company, association, or corporation, as well as a natural person.

**"Continental United States."**
(d) The term "continental United States" means the States of the United States and the District of Columbia.

**"Importer."**
(e) The term "importer" means any person who imports or brings firearms into the continental United States for sale.

**"Manufacturer."**
(f) The term "manufacturer" means any person who is engaged within the continental United States in the manufacture of firearms, or who otherwise produces therein any firearm for sale or disposition.

(g) The term "dealer" means any person not a manufacturer or importer engaged within the continental United States in the business of selling firearms. The term "dealer" shall include wholesalers, pawnbrokers, and dealers in used firearms.

"Dealer."

Exceptions.

(h) The term "interstate commerce" means transportation from any State or Territory or District, or any insular possession of the United States (including the Philippine Islands), to any other State or to the District of Columbia.

"Interstate commerce."

(i) The term "Commissioner" means the Commissioner of Internal Revenue.

"Commissioner."

(j) The term "Secretary" means the Secretary of the Treasury.

"Secretary."

(k) The term "to transfer" or "transferred" shall include to sell, assign, pledge, lease, loan, give away, or otherwise dispose of.

"To transfer" or "transferred."

SEC. 2. (a) Within fifteen days after the effective date of this Act, or upon first engaging in business, and thereafter on or before the 1st day of July of each year, every importer, manufacturer, and dealer in firearms shall register with the collector of internal revenue for each district in which such business is to be carried on his name or style, principal place of business, and places of business in such district, and pay a special tax at the following rates: Importers or manufacturers, $500 a year; dealers, other than pawnbrokers, $200 a year; pawnbrokers, $300 a year. Where the tax is payable on the 1st day of July in any year it shall be computed for one year; where the tax is payable on any other day it shall be computed proportionately from the 1st day of the month in which the liability to the tax accrued to the 1st day of July following.

Registration requirements.

Taxes.

Fractional parts of year.

(b) It shall be unlawful for any person required to register under the provisions of this section to import, manufacture, or deal in firearms without having registered and paid the tax imposed by this section.

Failure to register and pay tax unlawful.

SEC. 3. (a) There shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 for each firearm, such tax to be paid by the transferor, and to be represented by appropriate stamps to be provided by the Commissioner, with the approval of the Secretary; and the stamps herein provided shall be affixed to the order for such firearm, hereinafter provided for. The tax imposed by this section shall be in addition to any import duty imposed on such firearm.

Transfer tax; stamps.

(b) All provisions of law (including those relating to special taxes, to the assessment, collection, remission, and refund of internal revenue taxes, to the engraving, issuance, sale, accountability, cancelation, and distribution of tax-paid stamps provided for in the internal-revenue laws, and to penalties) applicable with respect to the taxes imposed by section 1 of the Act of December 17, 1914, as amended (U.S.C., Supp. VII, title 26, secs. 1040 and 1383), and all other provisions of the internal-revenue laws shall, insofar as not inconsistent with the provisions of this Act, be applicable with respect to the taxes imposed by this Act.

Applicable administrative provisions of narcotic tax law to govern.

Vol. 38, p. 785; Vol. 44, p. 92.
U.S.C., Supp. VII, pp. 592, 644.

(c) Under such rules and regulations as the Commissioner, with the approval of the Secretary, may prescribe, and upon proof of the exportation of any firearm to any foreign country (whether exported as part of another article or not) with respect to which the transfer tax under this section has been paid by the manufacturer, the Commissioner shall refund to the manufacturer the amount of the tax so paid, or, if the manufacturer waives all claim for the amount to be refunded, the refund shall be made to the exporter.

Refund, if for exportation.

SEC. 4. (a) It shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in

Unlawful transfers.

**1238**          73d CONGRESS.   SESS. II.   CH. 757.   JUNE 26, 1934.

*Proviso.*
*Identification.*

*Preparation and distribution of forms.*

*Identifying marks, etc., to be indicated in orders.*

*Transferor to transfer stamp-affixed order for each prior transfer.*

*Notice to Commissioner of transfers exempted.*

*Registered importers, etc.*

*Possessors of firearms to register with collector within 60 days.*

*Proviso.*
*Acquisitions after effective date need not be registered.*

*Prosecutions.*
*Presumption raised by possession.*

*Unlawfully receiving or possessing.*

*Seizure and forfeiture.*

blank in duplicate for that purpose by the Commissioner. Such order shall identify the applicant by such means of identification as may be prescribed by regulations under this Act: *Provided,* That, if the applicant is an individual, such identification shall include fingerprints and a photograph thereof.

(b) The Commissioner, with the approval of the Secretary, shall cause suitable forms to be prepared for the purposes above mentioned, and shall cause the same to be distributed to collectors of internal revenue.

(c) Every person so transferring a firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the Commissioner. The original thereof with stamps affixed, shall be returned to the applicant.

(d) No person shall transfer a firearm which has previously been transferred on or after the effective date of this Act, unless such person, in addition to complying with subsection (c), transfers therewith the stamp-affixed order provided for in this section for each such prior transfer, in compliance with such regulations as may be prescribed under this Act for proof of payment of all taxes on such firearms.

(e) If the transfer of a firearm is exempted from the provisions of this Act as provided in section 13 hereof, the person transferring such firearm shall notify the Commissioner of the name and address of the applicant, the number or other mark identifying such firearm, and the date of its transfer, and shall file with the Commissioner such documents in proof thereof as the Commissioner may by regulations prescribe.

(f) Importers, manufacturers, and dealers who have registered and paid the tax as provided for in section 2(a) of this Act shall not be required to conform to the provisions of this section with respect to transactions in firearms with dealers or manufacturers if such dealers or manufacturers have registered and have paid such tax, but shall keep such records and make such reports regarding such transactions as may be prescribed by regulations under this Act.

SEC. 5. (a) Within sixty days after the effective date of this Act every person possessing a firearm shall register, with the collector of the district in which he resides, the number or other mark identifying such firearm, together with his name, address, place where such firearm is usually kept, and place of business or employment, and, if such person is other than a natural person, the name and home address of an executive officer thereof: *Provided,* That no person shall be required to register under this section with respect to any firearm acquired after the effective date of, and in conformity with the provisions of, this Act.

(b) Whenever on trial for a violation of section 6 hereof the defendant is shown to have or to have had possession of such firearm at any time after such period of sixty days without having registered as required by this section, such possession shall create a presumption that such firearm came into the possession of the defendant subsequent to the effective date of this Act, but this presumption shall not be conclusive.

SEC. 6. It shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of section 3 or 4 of this Act.

SEC. 7. (a) Any firearm which has at any time been transferred in violation of the provisions of this Act shall be subject to seizure and

forfeiture, and (except as provided in subsection (b)) all the provisions of internal-revenue laws relating to searches, seizures, and forfeiture of unstamped articles are extended to and made to apply to the articles taxed under this Act, and the persons to whom this Act applies.

*Provisions of internal-revenue laws extended.*

(b) In the case of the forfeiture of any firearm by reason of a violation of this Act: No notice of public sale shall be required; no such firearm shall be sold at public sale; if such firearm is in the possession of any officer of the United States except the Secretary, such officer shall deliver the firearm to the Secretary; and the Secretary may order such firearm destroyed or may sell such firearm to any State, Territory, or possession (including the Philippine Islands), or political subdivision thereof, or the District of Columbia, or retain it for the use of the Treasury Department or transfer it without charge to any Executive department or independent establishment of the Government for use by it.

*Sale, etc., forbidden.*

*Disposition of.*

SEC. 8. (a) Each manufacturer and importer of a firearm shall identify it with a number or other identification mark approved by the Commissioner, such number or mark to be stamped or otherwise placed thereon in a manner approved by the Commissioner.

*Identification marks.*

(b) It shall be unlawful for anyone to obliterate, remove, change, or alter such number or other identification mark. Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of any firearm upon which such number or mark shall have been obliterated, removed, changed, or altered, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

*Obliteration, etc., unlawful.*

*Possession of, deemed sufficient evidence for conviction.*

*Exception.*

SEC. 9. Importers, manufacturers, and dealers shall keep such books and records and render such returns in relation to the transactions in firearms specified in this Act as the Commissioner, with the approval of the Secretary, may by regulations require.

*Importers, manufacturers, etc., required to keep records.*

SEC. 10. (a) No firearm shall be imported or brought into the United States or any territory under its control or jurisdiction (including the Philippine Islands), except that, under regulations prescribed by the Secretary, any firearm may be so imported or brought in when (1) the purpose thereof is shown to be lawful and (2) such firearm is unique or of a type which cannot be obtained within the United States or such territory.

*Regulation of traffic in firearms in places under control of United States.*

(b) It shall be unlawful (1) fraudulently or knowingly to import or bring any firearm into the United States or any territory under its control or jurisdiction (including the Philippine Islands), in violation of the provisions of this Act; or (2) knowingly to assist in so doing; or (3) to receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of any such firearm after being imported or brought in, knowing the same to have been imported or brought in contrary to law. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains such possession to the satisfaction of the jury.

*Unlawful acts. Fraudulent importations, possession, etc.*

*Receiving, concealing, etc.*

*Possession deemed sufficient evidence for conviction; exception.*

SEC. 11. It shall be unlawful for any person who is required to register as provided in section 5 hereof and who shall not have so registered, or any other person who has not in his possession a stamp-affixed order as provided in section 4 hereof, to ship, carry, or deliver any firearm in interstate commerce.

*Transportation in interstate commerce.*

Rules, etc., to be prescribed.

SEC. 12. The Commissioner, with the approval of the Secretary, shall prescribe such rules and regulations as may be necessary for carrying the provisions of this Act into effect.

Transfers, when provisions not applicable.

SEC. 13. This Act shall not apply to the transfer of firearms (1) to the United States Government, any State, Territory, or possession of the United States, or to any political subdivision thereof, or to the District of Columbia; (2) to any peace officer or any Federal officer designated by regulations of the Commissioner; (3) to the transfer of any firearm which is unserviceable and which is transferred as a curiosity or ornament.

Penalty provision.

SEC. 14. Any person who violates or fails to comply with any of the requirements of this Act shall, upon conviction, be fined not more than $2,000 or be imprisoned for not more than five years, or both, in the discretion of the court.

Excise taxes.
Firearms herein defined exempt from.
Vol. 44, p. 93; Vol. 47, p. 264.
U.S.C., Supp. VII, p. 604.

SEC. 15. The taxes imposed by paragraph (a) of section 600 of the Revenue Act of 1926 (U.S.C., Supp. VII, title 26, sec. 1120) and by section 610 of the Revenue Act of 1932 (47 Stat. 169, 264), shall not apply to any firearm on which the tax provided by section 3 of this Act has been paid.

Saving clause.

SEC. 16. If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby.

Effective date.

SEC. 17. This Act shall take effect on the thirtieth day after the date of its enactment.

Citation of title.

SEC. 18. This Act may be cited as the "National Firearms Act."

Approved, June 26, 1934.

---

[CHAPTER 758.]

AN ACT

June 26, 1934.
[H.R. 9769.]
[Public, No. 475.]

To amend the Act of June 19, 1930 (46 Stat. 788), entitled "An Act providing for the sale of the remainder of the coal and asphalt deposits in the segregated mineral land in the Choctaw and Chickasaw Nations, Oklahoma, and for other purposes."

Choctaw and Chickasaw Indians, Okla.
Vol. 46, p. 788.
Sales of coal and asphalt deposits authorized.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Act of June 19, 1930 (46 Stat. 788), entitled "An Act providing for the sale of the remainder of the coal and asphalt deposits in the segregated mineral land in the Choctaw and Chickasaw Nations, Oklahoma, and for other purposes", is hereby amended so as to permit the Secretary of the Interior, in his discretion, to sell under the provisions of said Act the coal and asphalt deposits referred to therein in tracts of less than nine hundred and sixty acres where such smaller tract or acreage adjoins a developed tract on which active mining operations are being conducted and is needed by the operator in further developing the existing mine: *Provided*, That where the sale of such smaller tract or acreage is not deemed advisable, the Secretary of the Interior may in his discretion, lease said tract under the same terms and conditions as developed tracts are leased under the Act of April 21, 1932 (47 Stat. 88), with the exception that the minimum tonnage requirement contained therein is hereby waived as to leases on such small tracts.

*Proviso.*
Leases.

Vol. 47, p. 89.
Minimum tonnage requirement waived.

Approved, June 26, 1934.

PUBLIC LAW 99–308—MAY 19, 1986          100 STAT. 449

Public Law 99–308
99th Congress

An Act

To amend chapter 44 (relating to firearms) of title 18, United States Code, and for
other purposes.

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,*

SECTION 1. SHORT TITLE AND CONGRESSIONAL FINDINGS.

(a) SHORT TITLE.—This Act may be cited as the "Firearms Owners'
Protection Act".

(b) CONGRESSIONAL FINDINGS.—The Congress finds that—
(1) the rights of citizens—
(A) to keep and bear arms under the second amendment
to the United States Constitution;
(B) to security against illegal and unreasonable searches
and seizures under the fourth amendment;
(C) against uncompensated taking of property, double
jeopardy, and assurance of due process of law under the
fifth amendment; and
(D) against unconstitutional exercise of authority under
the ninth and tenth amendments;
require additional legislation to correct existing firearms stat-
utes and enforcement policies; and
(2) additional legislation is required to reaffirm the intent of
the Congress, as expressed in section 101 of the Gun Control Act
of 1968, that "it is not the purpose of this title to place any
undue or unnecessary Federal restrictions or burdens on law-
abiding citizens with respect to the acquisition, possession, or
use of firearms appropriate to the purpose of hunting, trap-
shooting, target shooting, personal protection, or any other
lawful activity, and that this title is not intended to discourage
or eliminate the private ownership or use of firearms by law-
abiding citizens for lawful purposes.".

SEC. 101. AMENDMENTS TO SECTION 921.

Section 921 of title 18, United States Code, is amended—
(1) in subsection (a)(10), by striking out "manufacture of" and
inserting in lieu thereof "business of manufacturing";
(2) in subsection (a)(11)(A), by striking out "or ammunition";
(3) in subsection (a)(12), by striking out "or ammunition";
(4) in subsection (a)(13), by striking out "or ammunition";
(5) by amending paragraph (20) of subsection (a) to read as
follows:
"(20) The term 'crime punishable by imprisonment for a term
exceeding one year' does not include—
"(A) any Federal or State offenses pertaining to antitrust
violations, unfair trade practices, restraints of trade, or other
similar offenses relating to the regulation of business practices,
or

May 19, 1986
[S. 49]

Firearms
Owners'
Protection Act.
18 USC 921 note.

18 USC 921 note.

Law
enforcement
and crime.



100 STAT. 450          PUBLIC LAW 99–308—MAY 19, 1986

"(B) any State offense classified by the laws of the State as a
misdemeanor and punishable by a term of imprisonment of two
years or less.

What constitutes a conviction of such a crime shall be determined in
accordance with the law of the jurisdiction in which the proceedings
were held. Any conviction which has been expunged, or set aside or
for which a person has been pardoned or has had civil rights
restored shall not be considered a conviction for purposes of this
chapter, unless such pardon, expungement, or restoration of civil
rights expressly provides that the person may not ship, transport,
possess, or receive firearms."; and

Business and
industry.

(6) in subsection (a), by inserting after paragraph (20) the
following new paragraphs:

"(21) The term 'engaged in the business' means—

"(A) as applied to a manufacturer of firearms, a person who
devotes time, attention, and labor to manufacturing firearms as
a regular course of trade or business with the principal objective
of livelihood and profit through the sale or distribution of the
firearms manufactured;

"(B) as applied to a manufacturer of ammunition, a person
who devotes time, attention, and labor to manufacturing
ammunition as a regular course of trade or business with the
principal objective of livelihood and profit through the sale or
distribution of the ammunition manufactured;

18 USC 921.

"(C) as applied to a dealer in firearms, as defined in section
921(a)(11)(A), a person who devotes time, attention, and labor to
dealing in firearms as a regular course of trade or business with
the principal objective of livelihood and profit through the
repetitive purchase and resale of firearms, but such term shall
not include a person who makes occasional sales, exchanges, or
purchases of firearms for the enhancement of a personal collec-
tion or for a hobby, or who sells all or part of his personal
collection of firearms;

"(D) as applied to a dealer in firearms, as defined in section
921(a)(11)(B), a person who devotes time, attention, and labor to
engaging in such activity as a regular course of trade or busi-
ness with the principal objective of livelihood and profit, but
such term shall not include a person who makes occasional
repairs of firearms, or who occasionally fits special barrels,
stocks, or trigger mechanisms to firearms;

Imports.

"(E) as applied to an importer of firearms, a person who
devotes time, attention, and labor to importing firearms as a
regular course of trade or business with the principal objective
of livelihood and profit through the sale or distribution of the
firearms imported; and

Imports.

"(F) as applied to an importer of ammunition, a person who
devotes time, attention, and labor to importing ammunition as a
regular course of trade or business with the principal objective
of livelihood and profit through the sale or distribution of the
ammunition imported.

"(22) The term 'with the principal objective of livelihood and
profit' means that the intent underlying the sale or disposition of
firearms is predominantly one of obtaining livelihood and pecuniary
gain, as opposed to other intents, such as improving or liquidating a
personal firearms collection.

"(23) The term 'machinegun' has the meaning given such term in
section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).

PUBLIC LAW 99–308—MAY 19, 1986        100 STAT. 451

"(24) The terms 'firearm silencer' and 'firearm muffler' mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.".

**SEC. 102. AMENDMENTS TO SECTION 922.**

Section 922 of title 18, United States Code, is amended—
  (1) so that paragraph (1) of subsection (a) reads as follows:
"(1) for any person—

Law
enforcement
and crime.
Commerce and
trade.

    "(A) except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce; or
    "(B) except a licensed importer or licensed manufacturer, to engage in the business of importing or manufacturing ammunition, or in the course of such business, to ship, transport, or receive any ammunition in interstate or foreign commerce;";
  (2) in subsection (a)(2)—
    (A) by striking out "or ammunition"; and
    (B) by striking out "or licensed dealer for the sole purpose of repair or customizing;" and inserting in lieu thereof "licensed dealer, or licensed collector;";
  (3) in subsection (a)(3), by striking out "(B)" and all that follows through "(b)(3) of this section," and inserting in lieu thereof the following: "(B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section,";
  (4) in subsection (b)—
    (A) in paragraph (2), by striking out "or ammunition" each place it appears;
    (B) in paragraph (3), by striking out "(A)" and all that follows through "intrastate transactions other than at the licensee's business premises," and inserting in lieu thereof "(A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States),";
    (C) in paragraph (3), by inserting "and" before "(B)";
    (D) in paragraph (3), by striking out ", and (C)" and all that follows through the end of such paragraph and inserting in lieu thereof a semicolon; and
    (E) in paragraph (5), by striking out "or ammunition except .22 caliber rimfire ammunition" and inserting "or armor-piercing ammunition" in lieu thereof;
  (5) in subsection (d)—

(A) by striking out "licensed importer, licensed manufacturer, licensed dealer, or licensed collector" the first place it appears and inserting in lieu thereof "person";

(B) by amending paragraph (3) to read as follows:

Drugs and drug abuse.

"(3) is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));";

(C) in paragraph (4), by striking out the period and inserting in lieu thereof a semicolon; and

(D) by inserting after paragraph (4) the following:

Aliens.

"(5) who, being an alien, is illegally or unlawfully in the United States;

"(6) who has been discharged from the Armed Forces under dishonorable conditions; or

"(7) who, having been a citizen of the United States, has renounced his citizenship.";

(6) in subsection (g)—

(A) in paragraph (1), by striking out "is under indictment for, or who";

(B) by amending paragraph (3) to read as follows:

Drugs and drug abuse.

"(3) is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));";

(C) by inserting after paragraph (4) the following new paragraphs:

Aliens.

"(5) who, being an alien, is illegally or unlawfully in the United States;

"(6) who has been discharged from the Armed Forces under dishonorable conditions; or

"(7) who, having been a citizen of the United States, has renounced his citizenship;"; and

(D) by striking out "to ship or transport any firearm or ammunition in interstate or foreign commerce." and inserting in lieu thereof "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.";

(7) so that subsection (h) reads as follows:

"(h) It shall be unlawful for any individual, who to that individual's knowledge and while being employed for any person described in any paragraph of subsection (g) of this section, in the course of such employment—

"(1) to receive, possess, or transport any firearm or ammunition in or affecting interstate or foreign commerce; or

"(2) to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.";

(8) by inserting after subsection (m) the following:

"(n) It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."; and

(9) by inserting after the subsection added by paragraph (8) of this section the following:

"(o)(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

"(2) This subsection does not apply with respect to—

"(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

"(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.".

### SEC. 103. AMENDMENTS TO SECTION 923.

Section 923 of title 18, United States Code, is amended—

(1) in subsection (a)—

    (A) by striking out the first sentence and inserting in lieu thereof "No person shall engage in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition, until he has filed an application with and received a license to do so from the Secretary."; and

    (B) by striking out "and contain such information", and inserting in lieu thereof "and contain only that information necessary to determine eligibility for licensing.";

(2) in subsection (a)(3)(B), by striking out "or ammunition for firearms other than destructive devices,";

(3) in subsection (b), by striking out "and contain such information" and inserting in lieu thereof "and contain only that information necessary to determine eligibility";

(4) in subsection (c), by adding at the end "Nothing in this chapter shall be construed to prohibit a licensed manufacturer, importer, or dealer from maintaining and disposing of a personal collection of firearms, subject only to such restrictions as apply in this chapter to dispositions by a person other than a licensed manufacturer, importer, or dealer. If any firearm is so disposed of by a licensee within one year after its transfer from his business inventory into such licensee's personal collection or if such disposition or any other acquisition is made for the purpose of willfully evading the restrictions placed upon licensees by this chapter, then such firearm shall be deemed part of such licensee's business inventory.";

(5) in subsection (e), by inserting "willfully" before "violated";

(6) in subsection (f)—

    (A) in paragraph (3)—

        (i) by inserting "de novo" before "judicial"; and

        (ii) by inserting "whether or not such evidence was considered at the hearing held under paragraph (2)." after "to the proceeding"; and

    (B) by adding at the end the following new paragraph:

"(4) If criminal proceedings are instituted against a licensee alleging any violation of this chapter or of rules or regulations prescribed under this chapter, and the licensee is acquitted of such charges, or such proceedings are terminated, other than upon motion of the Government before trial upon such charges, the Secretary shall be absolutely barred from denying or revoking any license granted under this chapter where such denial or revocation is based in whole or in part on the facts which form the basis of such criminal charges. No proceedings for the revocation of a license shall be

*Imports.*

*Law enforcement and crime.*

instituted by the Secretary more than one year after the filing of the indictment or information.";

(7) so that subsection (g) reads as follows:

Records.

"(g)(1)(A) Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Secretary may by regulations prescribe. Such importers, manufacturers, and dealers shall not be required to submit to the Secretary reports and information with respect to such records and the contents thereof, except as expressly required by this section. The Secretary, when he has reasonable cause to believe a violation of this chapter has occurred and that evidence thereof may be found on such premises, may, upon demonstrating such cause before a Federal magistrate and securing from such magistrate a warrant authorizing entry, enter during business hours the premises (including places of storage) of any licensed firearms importer, licensed manufacturer, licensed dealer, licensed collector, or any licensed importer or manufacturer of ammunition, for the purpose of inspecting or examining—

"(i) any records or documents required to be kept by such licensed importer, licensed manufacturer, licensed dealer, or licensed collector under this chapter or rules or regulations under this chapter, and

"(ii) any firearms or ammunition kept or stored by such licensed importer, licensed manufacturer, licensed dealer, or licensed collector, at such premises.

"(B) The Secretary may inspect or examine the inventory and records of a licensed importer, licensed manufacturer, or licensed dealer without such reasonable cause or warrant—

"(i) in the course of a reasonable inquiry during the course of a criminal investigation of a person or persons other than the licensee;

"(ii) for ensuring compliance with the record keeping requirements of this chapter not more than once during any twelve-month period; or

"(iii) when such inspection or examination may be required for determining the disposition of one or more particular firearms in the course of a bona fide criminal investigation.

"(C) The Secretary may inspect the inventory and records of a licensed collector without such reasonable cause or warrant—

"(i) for ensuring compliance with the record keeping requirements of this chapter not more than once during any twelve-month period; or

"(ii) when such inspection or examination may be required for determining the disposition of one or more particular firearms in the course of a bona fide criminal investigation.

"(D) At the election of a licensed collector, the annual inspection of records and inventory permitted under this paragraph shall be performed at the office of the Secretary designated for such inspections which is located in closest proximity to the premises where the inventory and records of such licensed collector are maintained. The inspection and examination authorized by this paragraph shall not be construed as authorizing the Secretary to seize any records or other documents other than those records or documents constituting material evidence of a violation of law. If the Secretary seizes such records or documents, copies shall be provided the licensee within a

reasonable time. The Secretary may make available to any Federal, State, or local law enforcement agency any information which he may obtain by reason of this chapter with respect to the identification of persons prohibited from purchasing or receiving firearms or ammunition who have purchased or received firearms or ammunition, together with a description of such firearms or ammunition, and he may provide information to the extent such information may be contained in the records required to be maintained by this chapter, when so requested by any Federal, State, or local law enforcement agency.

"(2) Each licensed collector shall maintain in a bound volume the nature of which the Secretary may by regulations prescribe, records of the receipt, sale, or other disposition of firearms. Such records shall include the name and address of any person to whom the collector sells or otherwise disposes of a firearm. Such collector shall not be required to submit to the Secretary reports and information with respect to such records and the contents thereof, except as expressly required by this section.

"(3) Each licensee shall prepare a report of multiple sales or other dispositions whenever the licensee sells or otherwise disposes of, at one time or during any five consecutive business days, two or more pistols, or revolvers, or any combination of pistols and revolvers totalling two or more, to an unlicensed person. The report shall be prepared on a form specified by the Secretary and forwarded to the office specified thereon not later than the close of business on the day that the multiple sale or other disposition occurs.

"(4) Where a firearms or ammunition business is discontinued and succeeded by a new licensee, the records required to be kept by this chapter shall appropriately reflect such facts and shall be delivered to the successor. Where discontinuance of the business is absolute, such records shall be delivered within thirty days after the business discontinuance to the Secretary. However, where State law or local ordinance requires the delivery of records to other responsible authority, the Secretary may arrange for the delivery of such records to such other responsible authority.

"(5)(A) Each licensee shall, when required by letter issued by the Secretary, and until notified to the contrary in writing by the Secretary, submit on a form specified by the Secretary, for periods and at the times specified in such letter, all record information required to be kept by this chapter or such lesser record information as the Secretary in such letter may specify.

"(B) The Secretary may authorize such record information to be submitted in a manner other than that prescribed in subparagraph (A) of this paragraph when it is shown by a licensee that an alternate method of reporting is reasonably necessary and will not unduly hinder the effective administration of this chapter. A licensee may use an alternate method of reporting if the licensee describes the proposed alternate method of reporting and the need therefor in a letter application submitted to the Secretary, and the Secretary approves such alternate method of reporting."; and

(8) so that subsection (j) reads as follows:

"(j) A licensed importer, licensed manufacturer, or licensed dealer may, under rules or regulations prescribed by the Secretary, conduct business temporarily at a location other than the location specified on the license if such temporary location is the location for a gun show or event sponsored by any national, State, or local organization, or any affiliate of any such organization devoted to the collec-

*Marginal notes:*

State and local governments.

Reports.

Business and industry.

100 STAT. 456       PUBLIC LAW 99–308—MAY 19, 1986

Records.

tion, competitive use, or other sporting use of firearms in the community, and such location is in the State which is specified on the license. Records of receipt and disposition of firearms transactions conducted at such temporary location shall include the location of the sale or other disposition and shall be entered in the permanent records of the licensee and retained on the location specified on the license. Nothing in this subsection shall authorize any licensee to conduct business in or from any motorized or towed vehicle. Notwithstanding the provisions of subsection (a) of this section, a separate fee shall not be required of a licensee with respect to business conducted under this subsection. Any inspection or examination of inventory or records under this chapter by the Secretary at such temporary location shall be limited to inventory consisting of, or records relating to, firearms held or disposed at such temporary location. Nothing in this subsection shall be construed to authorize the Secretary to inspect or examine the inventory or records of a licensed importer, licensed manufacturer, or licensed dealer at any location other than the location specified on the license. Nothing in this subsection shall be construed to diminish in any manner any right to display, sell, or otherwise dispose of firearms or ammunition, which is in effect before the date of the enactment of the Firearms Owners' Protection Act.".

Law enforcement and crime.

**SEC. 104. AMENDMENTS TO SECTION 924.**

(a) IN GENERAL.—Section 924 of title 18, United States Code, is amended—

(1) so that subsection (a) reads as follows:

18 USC 929.

"(a)(1) Except as otherwise provided in paragraph (2) of this subsection, subsection (b) or (c) of this section, or in section 929, whoever—

"(A) knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;

18 USC 922.

"(B) knowingly violates subsection (a)(4), (a)(6), (f), (g), (i), (j), or (k) of section 922;

"(C) knowingly imports or brings into the United States or any possession thereof any firearm or ammunition in violation of section 922(l); or

"(D) willfully violates any other provision of this chapter, shall be fined not more than $5,000, imprisoned not more than five years, or both, and shall become eligible for parole as the Parole Commission shall determine.

"(2) Any licensed dealer, licensed importer, licensed manufacturer, or licensed collector who knowingly—

"(A) makes any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, or

"(B) violates subsection (m) of section 922, shall be fined not more than $1,000, imprisoned not more than one year, or both, and shall become eligible for parole as the Parole Commission shall determine.";

(2) in subsection (c)—

(A) by inserting "(1)" before "Whoever,";

PUBLIC LAW 99–308—MAY 19, 1986          100 STAT. 457

(B) by striking out "violence" each place it appears and inserting in lieu thereof "violence or drug trafficking crime,";

(C) by inserting "or drug trafficking crime" before "in which the firearm was used or carried.";

(D) in the first sentence, by striking out the period at the end and inserting in lieu thereof ", and if the firearm is a machinegun, or is equipped with a firearm silencer or firearm muffler, to imprisonment for ten years.";

(E) in the second sentence, by striking out the period at the end and inserting in lieu thereof ", and if the firearm is a machinegun, or is equipped with a firearm silencer or firearm muffler, to imprisonment for twenty years."; and

(F) by adding at the end the following:

"(2) For purposes of this subsection, the term 'drug trafficking crime' means any felony violation of Federal law involving the distribution, manufacture, or importation of any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)).

"(3) For purposes of this subsection the term 'crime of violence' means an offense that is a felony and—

"(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

"(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.";

(3) by amending subsection (d) to read as follows:

"(d)(1) Any firearm or ammunition involved in or used in any knowing violation of subsection (a)(4), (a)(6), (f), (g), (h), (i), (j), or (k) of section 922, or knowing importation or bringing into the United States or any possession thereof any firearm or ammunition in violation of section 922(l), or knowing violation of section 924, or willful violation of any other provision of this chapter or any rule or regulation promulgated thereunder, or any violation of any other criminal law of the United States, or any firearm or ammunition intended to be used in any offense referred to in paragraph (3) of this subsection, where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure and forfeiture, and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5845(a) of that Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter: *Provided,* That upon acquittal of the owner or possessor, or dismissal of the charges against him other than upon motion of the Government prior to trial, the seized firearms or ammunition shall be returned forthwith to the owner or possessor or to a person delegated by the owner or possessor unless the return of the firearms or ammunition would place the owner or possessor or his delegate in violation of law. Any action or proceeding for the forfeiture of firearms or ammunition shall be commenced within one hundred and twenty days of such seizure.

"(2)(A) In any action or proceeding for the return of firearms or ammunition seized under the provisions of this chapter, the court shall allow the prevailing party, other than the United States, a reasonable attorney's fee, and the United States shall be liable therefor.

Imports.

18 USC 922.

26 USC 1 *et seq.*

26 USC 5845.

100 STAT. 458       PUBLIC LAW 99–308—MAY 19, 1986

"(B) In any other action or proceeding under the provisions of this chapter, the court, when it finds that such action was without foundation, or was initiated vexatiously, frivolously, or in bad faith, shall allow the prevailing party, other than the United States, a reasonable attorney's fee, and the United States shall be liable therefor.

"(C) Only those firearms or quantities of ammunition particularly named and individually identified as involved in or used in any violation of the provisions of this chapter or any rule or regulation issued thereunder, or any other criminal law of the United States or as intended to be used in any offense referred to in paragraph (3) of this subsection, where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure, forfeiture, and disposition.

"(D) The United States shall be liable for attorneys' fees under this paragraph only to the extent provided in advance by appropriation Acts.

"(3) The offenses referred to in paragraphs (1) and (2)(C) of this subsection are—

18 USC 924.

"(A) any crime of violence, as that term is defined in section 924(c)(3) of this title;

"(B) any offense punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.) or the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.);

18 USC 922.

"(C) any offense described in section 922(a)(1), 922(a)(3), 922(a)(5), or 922(b)(3) of this title, where the firearm or ammunition intended to be used in any such offense is involved in a pattern of activities which includes a violation of any offense described in section 922(a)(1), 922(a)(3), 922(a)(5), or 922(b)(3) of this title;

"(D) any offense described in section 922(d) of this title where the firearm or ammunition is intended to be used in such offense by the transferor of such firearm or ammunition;

"(E) any offense described in section 922(i), 922(j), 922(l), 922(n), or 924(b) of this title; and

"(F) any offense which may be prosecuted in a court of the United States which involves the exportation of firearms or ammunition."; and

(4) by adding at the end the following new subsection:

"(e)(1) In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for robbery or burglary, or both, such person shall be fined not more than $25,000 and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g), and such person shall not be eligible for parole with respect to the sentence imposed under this subsection.

"(2) As used in this subsection—

"(A) the term 'robbery' means any crime punishable by a term of imprisonment exceeding one year and consisting of the taking of the property of another from the person or presence of another by force or violence, or by threatening or placing another person in fear that any person will imminently be subjected to bodily harm; and

"(B) the term 'burglary' means any crime punishable by a term of imprisonment exceeding one year and consisting of

entering or remaining surreptitiously within a building that is the property of another with intent to engage in conduct constituting a Federal or State offense.".

(b) CONFORMING REPEAL.—Title VII of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. App. 1201 et seq.) is repealed.

**SEC. 105. AMENDMENTS TO SECTION 925.**

Section 925 of title 18, United States Code, is amended—
 (1) in subsection (c)—
  (A) by striking out "has been convicted of a crime punishable by imprisonment for a term exceeding one year (other than a crime involving the use of a firearm or other weapon or a violation of this chapter or of the National Firearms Act)" and inserting in lieu thereof "is prohibited from possessing, shipping, transporting, or receiving firearms or ammunition";   26 USC 5801.
  (B) by inserting "transportation," after "shipment,";
  (C) by striking out "and incurred by reason of such conviction"; and
  (D) by inserting "Any person whose application for relief from disabilities is denied by the Secretary may file a petition with the United States district court for the district in which he resides for a judicial review of such denial. The court may in its discretion admit additional evidence where failure to do so would result in a miscarriage of justice." after "the public interest."; and
 (2) in subsection (d)—
  (A) by striking out "may authorize" and inserting in lieu thereof "shall authorize";
  (B) by striking out "the person importing or bringing in the firearm or ammunition establishes to the satisfaction of the Secretary that";
  (C) in paragraph (3), by inserting before the semicolon ", except in any case where the Secretary has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled"; and
  (D) by striking out "may permit" and inserting in lieu thereof "shall permit".

**SEC. 106. AMENDMENTS TO SECTION 926.**

Section 926 of title 18 of the United States Code is amended—
 (1) by inserting "(a)" before "The Secretary" the first place it occurs;
 (2) by inserting "only" after "prescribe";
 (3) by striking out "as he deems reasonably" and inserting in lieu thereof "as are";
 (4) by striking out the last sentence and inserting in lieu thereof "No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established.

100 STAT. 460          PUBLIC LAW 99–308—MAY 19, 1986

Nothing in this section expands or restricts the Secretary's authority to inquire into the disposition of any firearm in the course of a criminal investigation."; and

(5) by adding at the end the following:

"(b) The Secretary shall give not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations.

18 USC 845.

"(c) The Secretary shall not prescribe rules or regulations that require purchasers of black powder under the exemption provided in section 845(a)(5) of this title to complete affidavits or forms attesting to that exemption.".

SEC. 107. TRANSPORTATION OF FIREARMS.

(a) IN GENERAL.—Chapter 44 of title 18, United States Code, is amended by inserting between section 926 and section 927 the following new section:

18 USC 926A.

"§ 926A. Interstate transportation of firearms

"Any person not prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport an unloaded, not readily accessible firearm in interstate commerce notwithstanding any provision of any legislation enacted, or any rule or regulation prescribed by any State or political subdivision thereof.".

(b) CLERICAL AMENDMENT.—The table of sections for chapter 44 of title 18, United States Code, is amended by inserting between the item relating to section 926 and the item relating to section 927 the following new item:

"926A. Interstate transportation of firearms.".

SEC. 108. AMENDMENTS TO SECTION 929.

Section 929(a) of title 18, United States Code, is amended—
(1) by inserting "(1)" before "Whoever,";
(2) by striking out "violence" each place it appears and inserting in lieu thereof "violence or drug trafficking crime,"; and
(3) by adding at the end the following:

"(2) For purposes of this subsection, the term 'drug trafficking crime' means any felony violation of Federal law involving the distribution, manufacture, or importation of any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)).".

SEC. 109. AMENDMENT OF NATIONAL FIREARMS ACT.

(a) Section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)) is amended by striking out "any combination of parts designed and intended for use in converting a weapon into a machinegun," and inserting in lieu thereof "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun,".

(b) CONFORMING AMENDMENT.—Section 5845(a)(7) of the National Firearms Act (26 U.S.C. 5845(a)(7)) is amended to read "(7) any silencer (as defined in section 921 of title 18, United States Code);".

18 USC 921 note.

SEC. 110. EFFECTIVE DATE.

(a) IN GENERAL.—The amendments made by this Act shall become effective one hundred and eighty days after the date of the enactment of this Act. Upon their becoming effective, the Secretary shall

publish and provide to all licensees a compilation of the State laws and published ordinances of which licensees are presumed to have knowledge pursuant to chapter 44 of title 18, United States Code, as amended by this Act. All amendments to such State laws and published ordinances as contained in the aforementioned compilation shall be published in the Federal Register, revised annually, and furnished to each person licensed under chapter 44 of title 18, United States Code, as amended by this Act.

18 USC 921 *et seq.*

Federal Register, publication.

(b) PENDING ACTIONS, PETITIONS, AND APPELLATE PROCEEDINGS.— The amendments made by sections 103(6)(B), 105, and 107 of this Act shall be applicable to any action, petition, or appellate proceeding pending on the date of the enactment of this Act.

(c) MACHINEGUN PROHIBITION.—Section 102(9) shall take effect on the date of the enactment of this Act.

Approved May 19, 1986.

---

LEGISLATIVE HISTORY—S. 49 (H.R. 4332):

HOUSE REPORTS: No. 99–495 accompanying H.R. 4332 (Comm. on the Judiciary).
CONGRESSIONAL RECORD:
    Vol. 131 (1985): June 24, July 9, considered and passed Senate.
    Vol. 132 (1986): Apr. 9, 10, H.R. 4332 considered and passed House; S. 49,
        amended, passed in lieu.
    May 6, Senate concurred in House amendments.

U.S.

# Brown v. State of Maryland

25 U.S. 419 (1827)
Decided Jan 1, 1827

JANUARY TERM, 1827.

An act of a State legislature, requiring all importers of foreign goods by the bale or package, c. and other persons selling the same by wholesale, bale, or package, c. to take out a license, for which they shall pay 50 dollars, and in case of neglect or refusal to take out such license, subjecting them to certain forfeitures and penalties, is repugnant to that provision of the constitution of the United States, which declares, that "no State shall, without the consent of Congress, lay any impost, or duty on imports or exports, except what may be absolutely necessary for executing its inspection laws;" and to that which declares that Congress shall have power "to regulate commerce with foreign nations, among the several States, and with the Indian tribes."

*Mr. Meredith*, for the plaintiffs in error, contended, than the law in question was an unconstitutional exercise of the taxing power of Maryland. He did not deny the existence of such a power. As a necessary incident to sovereignty, it belonged to the several States before the adoption of the constitution, and it still belongs to them, subject, however, to the restrictions imposed upon its exercise by the paramount authority of that instrument. With regard to these restrictions, he did not mean to contend, that the general grant contained in the eighth section of the first article of the constitution, vested in the national government any thing more than a concurrent power of taxation. He admitted the rule of construction, that a grant of power to Congress does not, of itself, imply a prohibition of its exercise by the States. The powers granted to the general government are never to be considered as exclusive, unless they are made so in express terms, or unless, from the nature of the power itself, its concurrent exercise must necessarily produce direct repugnancy or incompatibility. But he argued, that this was by no means the inevitable result from a concurrent exercise of the taxing power, because its peculiar nature rendered it often capable of being exercised by different authorities at the same time, and even upon the same subject, without actual collision or interference.

The restrictions which he had alluded to, were to 421 be found *421 in other provisions of the constitution; and they were both express and implied. The former were all comprised in the tenth section of the first article, by which the States are prohibited, unless with the consent of Congress, from laying any imposts or duties on imports or exports, except what may be absolutely necessary for executing their inspection laws; and are, also, without such consent, forbidden to impose any duty upon tonnage. The effect of this prohibition, coupled with the general grant of the taxing power before referred to, is to vest in the national government an exclusive right to the commercial imposts of the country. With the exception of these, however, the power to lay and collect taxes is a concurrent power.

But, like all the other concurrent powers of the States, this power of taxation is subject, in its exercise, to that general implied restriction which necessarily results from the supreme and paramount authority of the Union. This is a vital principle of the political system, and its direct

operation is to restrain the States from the exercise of any power repugnant to, or incompatible with, the constitution, or the constitutional laws of the national government. By which is to be understood, not merely a repugnancy growing out of a concurrent exercise of the same power by Congress and a State legislature, but that which may arise from the exercise of one power by a State, with reference to a different power, whether exclusive or concurrent, express or implied, residing in the general government.

Having stated and illustrated these as the constitutional limits of the taxing power of the States, he insisted, that they had been transgressed by the legislative act under consideration. The second section comprises all the provisions of the law which are material to the question. The true construction of this section is somewhat doubtful; upon any interpretation, however, it prohibits the importer from selling the imported merchandise without having first taken out a license to do so, for which he is required to pay a stipulated tax.

The question then is, whether this is such a law as the legislature of Maryland have a right to pass. Under colour of a license law he contended that 422 this statute was a palpable *422 evasion of the express restriction upon the States to "lay duties on imports;" an indirect attempt to do that which the constitution has explicitly inhibited. And he said this, because he thought it might be clearly shown, that a law, laying a tax on the importer for the privilege of selling the merchandise he has himself imported, which is this law, and this case, is equivalent, in all substantial respects, to a duty on imports, since, with a few slight and unimportant differences, it answers all the purposes, and produces all the effects of a concurrent power in the State to impose such a duty.

What are the apparent differences between this and a tax directly on imports? It may be said, in the first place, that the one is a tax for the privilege of bringing the foreign article into the country, and the other a tax for the privilege of selling it after it is so brought in. But these privileges are indissolubly connected; the right to sell is a necessary incident to the right of importing. The grant of a privilege to import would be of no value, unless it implies a right to sell. Prohibit sale, and importation necessarily ceases. He maintained that, on a fair and just construction of the whole revenue system, the implication was irresistible. That the duties exacted by the general government were paid, not for the privilege to import simply, but for the privilege of importing foreign commodities, and using them in the way of merchandise, might be incontestably proved, by showing that no goods were dutiable, unless imported with the intention, and for the purpose of traffic. With this view, he referred to various provisions of the act of March, 1799, (ch. 128. s. 30. 32. 45, 46. 60. and 107.) and to the case of the *Concord*.[a] This is the principle, also, of the English law of customs, from which our system is mainly borrowed.[b] It was likewise worthy of remark, that the legislation of Maryland, upon this subject, before the adoption of the constitution, was in strict accordance with the same principle, and carried it so far as to permit the merchant to try the market by an actual sale, and paying the 423 duties only on the *423 portion sold, to export the residue free of duty.[a] There is, then, no difference in this respect between these two modes of taxation.

[a] Page 422 9 *Cranch*, 388. See also 4 *Cranch*, 347.

[b] *Hale on the Customs*, Pt. 3. ch. 20. in *Hargr. Law Tracts*, 211

[a] *Hanson's Laws of Maryland*, Act of 1783, ch. 36. s. 34. Act of 1784, ch. 84 s. 5.

It may be said that these taxes are payable at different times; in the one case, at the time of importation, in the other, at the time of sale. But if they are both paid substantially for the same privilege, surely this is not a material difference. It is a matter that simply concerns the safety,

Brown v. State of Maryland    25 U.S. 419 (1827)

certainty, and convenience of collection; but it gives no distinctive character to the law. In point of fact, however, the duty imposed by the revenue system is not payable, except it is less than fifty dollars, until after the importation.

A third apparent difference may be said to consist in this: that the import duty is a charge upon the goods, the license upon the person; but the one is as much a charge upon the goods as the other, if by that is meant an increase of their actual cost. The import duty is, however, a personal charge upon the importer; it is not the bond that alone makes him personally liable; without having given a bond, he is still answerable for the duties.[a]

> [a]  Act of March 2, 1799, ch. 128. 1 *Mason's Rep*. 499. 4 *Wheat Rep*. 246.

These are the only differences in the operation of the two taxes, and they are apparent, but not substantial; they are the disguise thrown about the law to elude detection. The true test, however, is, to consider the effect of this law upon the exclusive grant to the general government, to raise revenue from imposts. The reasons for such a grant are obvious. The objects committed by the constitution to the general government are of immense magnitude, and require corresponding means. Of all species of taxation, that upon imports is most fruitful and least oppressive. It is sound policy, therefore, to cherish and extend this branch of the public revenue; because, whenever it fails, other modes of taxation must necessarily be resorted to of a more odious and oppressive nature. Now, the consequence of the right claimed by this law on the part of Maryland, is, to place this branch of the public revenue completely in her power; as entirely so, as if she had constitutionally

424 a concurrent right *424 to tax imports. It is to enable her, at her pleasure, by means of license laws, to annihilate, as it regards her own territory, the commercial revenues of the country. What is to prevent her from prohibiting altogether the importation of foreign merchandise into any of her ports? It is only to increase the price of the license

until the commodity will no longer bear the burden, and the end is accomplished. Importation must, in that case, necessarily cease, and with it revenue. It is not pretended that these consequences are produced by this particular law; it is not necessary that this should be the case. We are not to look at the particular exercise of power so much as at the principle upon which the power is asserted. We are not to judge of the constitutionality of this law by the amount of tax which it imposes; it is not the degree of taxation, in the particular instance, that determines the right to tax. That the public revenue is, to a certain degree, affected by the operation of this law, is incontestable. But if, on principle, Maryland has a right to demand fifty dollars as the price of a license to sell imported merchandise, she has a right to demand any sum for the same privilege. If, in other words, she is within the proper sphere of her taxing power, that power is, in its nature, unlimited, and she may carry it to what extent she pleases. A power to tax, this Court has emphatically said, is a power to destroy. In this case, it is a power to prohibit; a power to deprive the government of the means to accomplish its great objects, and conduct all its important operations; a power to defeat the intention of the exclusive grant of commercial revenue.

If Maryland has a right to enact laws of this description, she has a right to regulate her own foreign commerce, although, by the constitution, it is exclusively vested in Congress. The imposition of import duties is often resorted to, not for the purpose of revenue, but to regulate commercial intercourse with foreign countries. Discriminating duties, protecting duties, prohibitory duties, are so many commercial regulations. These may all be resorted to under the disguise of license laws. If Maryland has a right to pass general license laws, she may pass partial ones; she may select particular commodities, and burthen their sale with a license duty; she may establish a tariff of

425 discriminating *425 duties for herself, and affect, if not defeat, the commercial policy of the country.

In one word, she may exercise the same right to regulate commerce by means of license laws, which a concurrent power to tax imports would give her, and thus evade, in this respect also, the constitutional prohibition. It may be said, that this law looks to no such object; that it is simply a tax for revenue, and that there is no ground to apprehend that it will be used for any other purpose. But the motives for legislative acts are not fit subjects of judicial inquiry. If the power can be exercised for one purpose, it may be for another; the intention may always be effectually concealed. It is the principle of the law, and its capacity to be exerted for the attainment of other objects than that which it professes to aim at in the particular case, that it is proper and necessary to look to. If the States are authorized to pass laws of this description, the purposes which induced the prohibition are defeated, and it is rendered altogether nugatory.

Mr. *Taney* and Mr. *Johnson*, contra, insisted, that the law of Maryland did not lay a duty on imports, and was not repugnant to the constitution of the United States.

The act of assembly (they said) does not impose a tax on the importation of foreign goods, nor upon the trade and occupation of an importer. But the tax is imposed upon the trade and occupation of selling foreign goods by wholesale after they have been imported. It is a tax upon the profession or trade of the party, when that trade is carried on within the State. It is laid upon the same principle with the usual taxes on retailers, or innkeepers, or hawkers and pedlars, or upon any other trade exercised within the State. It is true, the importers of foreign goods are, by express words, made subject to the provisions of this law, provided they sell by wholesale; but it is the selling by wholesale which subjects the party to the tax; it is upon that trade that the tax is imposed.

Does that constitution of the United States forbid Maryland to impose such a tax? This is the only question presented by the record. *426

426

The plaintiffs in error insist, that the tax in question is virtually a duty on imports, and violates that clause in the constitution which declares that a State shall not lay duties on imports.

We answer, it is not, either directly or indirectly, a duty on imports. A duty on imports is a tribute paid to the sovereignty of the country for permission to introduce foreign goods. To import, and to bring in, mean the same thing.[a] A duty on imports is, therefore, a duty on the bringing in of foreign goods — on the act of importation. The duty is paid for the permission to introduce them; it is the consideration given for that privilege. The party buys the right to introduce the goods into the United States, and to place them under the protection of the laws of the country. He becomes liable to the whole duty by the very act of importation; and the amount is the same, whether he proposes to sell the goods, or to keep them for his own use, or to give them as a present to another.

[a]  M'Culloch v. Maryland, 4 *Wheat. Rep.* 316.

After the goods have been brought into a State, the importer has one peculiar relation to them by reason of his being the importer. He is known to the State laws in the character of owner, or as the party entitled to the custody of the goods, and he receives the same degree of protection whether he be the importer or not the importer. The property, when it has passed through the custom houses, is no longer under the exclusive protection of the United States. It is guarded by the laws of the State — must be transferred and otherwise dealt with, according to the laws of the State. It is, therefore, imported, or brought in, and the act of importation is completed. If, therefore, a duty on imports means a duty on the act of importation, or the permission to introduce, it is very clear, that the law in question is not, directly or indirectly, a duty on imports.

But, it is said, that the word "imports," as used in the constitution of the United States, does not mean *importation*, but means the *goods imported*.

If this interpretation be right, then the constitution

427   of the *427 United States must be expounded as if it had said, *"No State shall, without the consent of Congress, lay any imposts or duties on goods imported."* And if such be the true reading of the constitution, then no State can lay a tax upon any article of property which was imported from a foreign country. According to this construction, imported plate, imported furniture, imported property of every kind, would be privileged property, and exempt from taxation by the State. For, if the word *"imports,"* as used in the constitution, means "goods imported," or "imported goods," then the States, without the permission of Congress, cannot tax property within their dominion, and owned by their citizens, provided that property has been introduced from abroad. Such would be the inevitable consequence of expounding the word imports as if the words *"imported goods"* had been used. The uniform practice of the States, the principles of justice, the interests of the community, are all directly opposed to this construction.

But, it is said, that if "imports" means importation, and not the goods imported, yet the privilege of selling is inseparably incident to the importation, and is always implied in the privilege to import. This argument, like the one last replied to, will be found to prove too much, and to lead to results that can hardly be acquiesced in.

The right to import foreign goods is derived from the United States. The duties are imposed by the federal government, and are paid to that sovereignty. The permission to import is conferred by that government, and if the right to sell is implied in the permission to import, then the right to sell is derived from the United States, and becomes an absolute and vested right in the importer as soon as he acquires the privilege of introducing the goods; that is, as soon as he pays the duties, or secures them, according to the acts of Congress. And if the right to sell is a vested right, derived from the general government, then this right cannot be limited, restrained, regulated, or in any manner affected by State legislation. The importer, then, having an absolute and unconditional right to sell, may sell in any place, and in any manner he thinks proper. He may offer for sale large quantities of gunpowder in the heart

428   of a city, *428 and thus endanger the lives of the citizens; he may offer hides, fish, and articles of that description, in places offensive and inconvenient to the public, and dangerous to the health of the citizens; he may hold an auction at his own warehouse, and refuse to pay any tax to the State; he may sell at retail; he may sell as a hawker and pedlar; and the laws of the States which impose taxes on these trades, are unconstitutional and void, so far as the importer is concerned. These taxes have been always imposed by some of the States, and their right to derive a revenue from these sources has never before been questioned.

It may be said, that the right of the importer to sell, is a right to sell by wholesale only, and not by auction, or by retail. If, however, the right exists at all, it cannot be limited to sales by wholesale. It is said to be incident to the permission to import; and if it be annexed to that permission, then it must be an absolute and unconditional right; for where can we find the qualification? If the States are disabled from imposing a tax on the sales of foreign merchandise, when made by the bale or package, why are they not equally unable to impose a tax on the sales of such goods when made by auction, or retail, or in any other manner? The constitution gives no peculiar privilege to any particular mode of sale; and this Court, in expounding the instrument, will not introduce into it new limitations, and new divisions of power, not implied by its words.

In fine, the importer, by the payment of the duties, either acquires the right to sell, as well as the right to introduce the goods, or he acquires the right to bring in merely. In the first case, his right to sell would be beyond the reach of State control, and State regulation. In the second case, the goods would be subject to the laws and authority of the State. It can hardly be held, that an importer may sell in any place, and in any manner he pleases; and if he may not, it is because the disposition of the goods is subject to the regulations of the State authorities; and if they are so subject, they are, consequently, liable to such burthens as the State may impose on any particular mode of sale or transfer; and, therefore, liable to the tax in question.

The cases cited of goods wrecked on our shores, 429 can *429 hardly be supposed to bear on this argument. To import, implies an act of the *will*, a voluntary introduction of the goods. Besides, in those cases, the question is, are the goods liable to pay duty? not what rights will the payment of the duty procure? And when the questions are so different, it is not perceived how a decision of the one can in any degree affect the other.

But, it is insisted, on the other side, that if the law in question be not repugnant to that clause in the constitution which forbids a State to lay a duty on imports, yet it is in violation of that clause which gives Congress the power to regulate commerce with foreign nations. It must be observed, that this argument admits, *argumenti gratia*, that the tax in question is not, either directly or indirectly, a duty on imports. But the plaintiffs in error contend, that although it be not a duty on imports, still the tax in question is forbidden by the constitution of the United States. In other words, they maintain, that the tenth section in the constitution of the United States is not the only one which limits the taxing power of the States; and that this power is still further curtailed by the clause which gives Congress the power to regulate commerce.

It has been settled by the decisions of this Court, that the grant of a power to Congress, does not extinguish the right of the States to legislate on the same subject, unless Congress exercises the power granted. And when the power is exercised, the States may yet legislate, if the whole ground of legislation has not been covered by the laws of the United States; provided the State law be not repugnant to that of the federal government. Assuming these principles as settled, it would be a sufficient answer to this argument to say, that no law of Congress gives, or professes to give to the importer, the right to sell. The revenue laws referred to, charge duties in certain cases, where sales may be made. The laws are framed on the assumption that certain foreign goods will be permitted to be sold; but these laws do not give that permission generally, nor point out in what mode they may be sold. If, therefore, under this power to regulate commerce, Congress may give the importer a right to sell, yet the right is not 430 given; and until it is given by Congress, *430 the States may regulate and tax the sales without violating the constitution of the United States.

But this clause in the constitution does not give to Congress the power contended for. By the constitution of the United States, the power of taxation by the States is restrained, by express words, in certain cases.

It has always been supposed, that these limitations of State sovereignty, in matters of revenue, so carefully and particularly set down, excluded all inference and implication, and left with the States all the powers of taxation not expressly denied to them in the restraining section. It is very clear, that the men who framed the constitution, and the people who adopted the constitution, so understood it. The *Federalist* must be considered as expressing the opinions of the friends of the federal constitution, both in and out of the Convention; and in No. 33, and near the conclusion of that number, the commentary on the subject of the taxing power is thus concluded: "The inference from the whole is, that the

Brown v. State of Maryland   25 U.S. 419 (1827)

individual States would, under the proposed constitution, retain an independent and uncontrollable authority to raise revenue to any extent of which they may stand in need, *by every kind of taxation*, except duties on imports and exports." And, throughout No. 32 and No. 33 of the *Federalist*, the same principle is repeatedly asserted as a clear and indisputable one.

But, if Congress, under the power to regulate commerce, may authorize the importer to sell, then certain important powers of taxation, besides duties on imports and exports, have been surrendered by the States. For if Congress may give by law to the importer the right to sell, Congress may direct how the sale may be made, or may allow the importer to elect any mode he pleases; and, whenever this shall be done by the general government, the power of the States to regulate such sales is at an end, and, consequently, their power of taxation also. If this argument, then, be sustained by the Court, the authority of the States to regulate and to tax auctioneers and retailers is not *"an independent and uncontrollable authority,"* as was supposed by the distinguished writers in the *Federalist*, but is a mere dependent authority, and liable to the control of Congress, so far as foreign *431 goods are concerned. Congress, it is said, may give the importer the right to sell. If Congress may do so, then the States cannot tax any mode of sale which Congress may please to permit. Such powers were surely too important and valuable to have been surrendered in this loose and slovenly manner. If they were to have been given up by the States, they would have been given up in express terms, like the duties on imports, and not by vague and uncertain inferences. Besides, if Congress may give the right to sell in any manner, they may also give the right to sell in any place; and the police laws of the different States, made for their safety or health, exist only by the permission of Congress. And again, if Congress may not only prescribe the terms upon which foreign goods may be introduced into the country, but may direct how

431

they shall be sold, and thus exempt the sales from State taxation, why may not Congress, upon the same principle, exempt all foreign goods from taxation by the States? If Congress may exercise exclusive dominion over foreign goods, for one purpose, after they have been brought into a State, why may not the same exclusive power be exercised for any other purpose? Reasons of policy might, indeed, make a difference; but we are not now discussing the policy of introducing new provisions into the constitution, but endeavouring to ascertain the meaning of the words used in the instrument.

The last argument urged in behalf of the plaintiff in error, is founded on the supposed policy and objects of the constitution, rather than on the interpretation of any words used in the instrument itself. It is said, that if a State may impose the tax in question, it may increase it to any amount, and by that means the States may prevent importations altogether. And, hence it is inferred, that a power capable of being so much abused, was not intended to have been left with the States.

Nothing can be more fallacious than to urge the possible abuse of power by the States, for the purpose of proving that the power has been taken away. Such an argument goes to the destruction of all State power. Such a principle of construction would put an end to all State authority; for all power may possibly be abused. The States cannot and *432 ought not to be deemed more liable than the federal government to abuse the powers confided to them by the people; nor can any supposed and merely possible inconvenience, which might arise from an improper use of State power, furnish a ground for deciding against the existence of the power. We must be continually liable to this inconvenience from the complex character of our government. In the *Federalist*, No. 32, the rule of construction is thus stated: "It is not a mere possibility of inconvenience in the exercise of powers, but an immediate and constitutional repugnancy, that can, by implication, alienate and extinguish a pre-existing

432

right of sovereignty." The possibility of inconvenience from the improper use of this power by the States, is not, therefore, any argument against the existence of this power. It cannot, by implication, alienate and extinguish the power for which we are contending.

But, indeed, it is impossible that the power to lay the tax in question can lead to any inconvenience, or can be used to embarrass the regulations, or lessen the revenue of the federal government. If the tax on wholesale dealers should be so heavy as to prevent importations, the people of the State will be the principal sufferers. If it enhances the price of imported goods, the burthen is at least as heavy on the people of the State as it is on the citizens of other States, and this furnishes abundant security that no such tax will ever be vexatiously laid. The people of a State cannot be justly suspected of imposing heavy burthens upon themselves, for the purpose of thwarting or embarrassing the general government. If, indeed, the people of a State could be guilty of such folly, they might, by bounties and other facilities to manufacturers in their own State, effectually prevent the importation of foreign goods. Nobody would deny that the States possess this power; but nobody suspects them of being disposed to abuse it.

There is, indeed, no real danger of serious inconvenience from these conflicting powers. The good sense and good feelings of the people will always apply the remedy; and we may safely confide, that the State governments, and the general government, will never embark in the unprofitable contest of trying which shall do each 433 other the mostharm. But *433 if such a state of things should ever take place, it would matter very little how the boundaries of power had been marked out by judicial decision. The Union cannot be preserved by the mere strength and power of the federal government. It is dissolved as soon as it shall forfeit the affection and confidence of the States.

The *Attorney General*, for the plaintiffs in error, in reply stated the question to be, whether a State law, which rendered it criminal to import and sell foreign goods, without the permission of the State, which permission was only to be obtained by paying a tax to the State, was repugnant to the constitution, laws, and treaties of the Union. If the State of Maryland had the power to lay such a restraint on the importation and sale of foreign goods, every other State must have the same power; and the consequence would be, that this power of taxation would directly interfere, both with the power of regulating commerce, and with the taxing power of Congress. The quantum of tax imposed by the State could make no difference. The same principle would apply, as in the attempt of the same State to tax the Bank of the United States, where the Court held, that a power to tax, was a power to tax limited only by the pleasure of the State; and that it was, therefore, a power to destroy.[a]

  [a]   The *Federalist No.* 11.

In the present case, the power was denied upon two grounds; first, because the power exerted by the law in question is that of regulating commerce with foreign nations, and among the several States, which the Court has determined to be exclusively vested in Congress.[b] Secondly, because it was that of laying an impost, or duty on imports, without the consent of Congress.

  [b]   Page 423 1 *Mason's Rep.* 482.

In order to determine whether the present law interfered with the exercise of the power of regulating commerce, it was only necessary to see whether it undertook to prescribe the terms on which commerce may be carried on with foreign 434 *434 nations, and among the States. If it were a power to prescribe those terms, it was a power to prescribe the whole terms. After Congress, in the exercise of its exclusive power, has prescribed certain terms, it is incompetent for the States to add other terms. Could there be any doubt that the exclusive power of regulating foreign commerce

included that of prescribing to all the citizens of the Union the conditions, and the whole conditions, on which they shall be permitted to bring into the United States, for sale or consumption, the productions of foreign countries? This power does not stop with the permission to bring them in: for if the States may prohibit their sale, or restrain, or burthen it, in any mode, they may, in effect, prohibit their importation. If they may prevent their sale, they may prohibit their barter or exchange, or use and consumption in the country, in any and every mode; and thus effectually defeat the beneficial exercise of the permission to import The States might even confiscate the goods, or order them to be burnt and destroyed after they were landed; and this would no more interfere with the right of importation, according to the opposite argument, than the law now in question. And, it was asked, whether the sagacious statesmen who framed the constitution meant to confer upon Congress a power so idle and illusory? They looked to the exercise of this power of regulating commerce as a great source of national wealth and aggrandizement.[a] They looked to it as a great means of developing the agricultural and manufacturing resources of the country, and its general industry; as an instrument by which the nation should be enriched at home, and rendered capable of countervailing the commercial regulations of foreign and rival nations. But if the power of regulating commerce ceases on the landing of the goods, and the whole subject is then delivered over to the discretion of the respective States, with their various partial and discordant views of policy, its exclusive exercise by Congress will be utterly vain and useless. So that the very existence of that commerce, a power of regulating and preserving which is so studiously conferred on Congress, *435 is at last made to depend upon the caprice and pleasure of the States. What signifies the power of regulation, if the States may destroy the very substance of the thing to be regulated? Uniformity, or permanency of regulation, with a view to any purpose of policy, in regard to the

435

agricultural, manufacturing, or commercial interests of the nation, is, of course, as much out of the question, as if there were no Union, or as if it were still infected with all the debility of the former confederation. The same State power, exercised upon short sighted and narrow views, might be exerted so as to defeat the other branch of the power, that of regulating commerce among the States. The free intercommunication which now prevails between the States, may be effectually checked, by requiring a similar license to import into a particular State the productions of other States. So, also, what the State may do as to *imports*, it may do as to *exports*. It may require a license from the exporting merchant, and thus, in effect, lay a duty on exports, although both the States and Congress are expressly forbidden in the constitution from laying such a duty; and the whole power of regulating the commerce, both of exports and imports, is exclusively vested in Congress. By the joint exercise of these two usurped powers, the State may establish a total non-intercourse with other States, and with foreign nations, in direct violation of the laws, and treaties, and constitution of the Union. Or it may make a discrimination among foreign nations, or among the different States, with a view of discouraging their commerce, or of encouraging some branch of its own internal industry, in direct repugnancy to the policy of the Union, as exhibited in its laws and treaties. One of the avowed objects for conferring the power of regulating commerce upon Congress, was that of raising a revenue for the support of the national government. It was foreseen, that the prosperity of commerce would best be promoted by uniform regulations contained in the laws and treaties of the Union; and it was also foreseen, that an impost was that species of taxation best suited to the genius and habits of the American people.[fna] *436 But if the power now in question may be exercised by one State, it may be exercised by all; and the principal source from which the revenues of the Union were to be derived, will be dried up, or diverted to local purposes. In short, it was insisted,

436

that all the evils for which the constitution was intended to provide an effectual remedy, would be entailed upon the country, by confirming the validity of such State laws as the act now in question.

<sup>a</sup> The *Federalist*, No. 12.

ERROR to the Court of Appeals of Maryland.

This was an indictment in the City Court of Baltimore, against the plaintiffs in error, upon the second section of an act of the legislature of the State of Maryland, passed in 1821, entitled, "An act supplementary to the act laying duties on licenses to retailers of dry goods, and for other purposes." The second section of the act provides, "That all importers of foreign articles, or commodities, of dry goods, wares, or merchandises, by bail or package, or of wine, rum, brandy, whiskey, and other distilled spirituous liquors, c. and other persons selling the same by 420 wholesale, *420 bale, or package, hogshead, barrel, or tierce, shall, before they are authorized to sell, take out a license as by the original act is directed, for which they shall pay fifty dollars; and in case of neglect or refusal to take out such license, shall be subject to the same penalties and forfeitures as are prescribed by the original act, to which this is a supplement." The penalties and forfeitures prescribed by the original act, which was passed in 1819, were, a forfeiture on the amount of the license tax, and a fine of 100 dollars, to be recovered by indictment.

The defendants having demurred to the indictment, a judgment was rendered upon the demurrer against them, in the City Court, which was affirmed in the Court of Appeals, and the case was brought, by writ of error, to this Court.

Mr. Chief Justice MARSHALL delivered the opinion of the Court.

This is a writ of error to a judgment rendered in the Court of Appeals of Maryland, affirming a judgment of the City Court of Baltimore, on an indictment found in that Court against the plaintiffs in error, for violating an act of the legislature of Maryland. The indictment was founded on the second section of that act, which is in these words: "And be it enacted, that all importers of foreign articles or commodities, of dry goods, wares, or merchandise, by bale or package, or of wine, rum, brandy, whiskey and other distilled spiritous liquors, c. and other persons selling the same by wholesale, bale or package, hogshead, barrel, or tierce, shall, before they are authorized to sell, take out a license, as by the original act is directed, for which they shall pay fifty dollars; and in case of neglect or refusal to take out such license, shall be subject to the same penalties and forfeitures as are prescribed by the original act to which this is a supplement." The indictment charges the plaintiffs in error with having imported and sold one package of foreign drygoods without having license to do. A judgment was rendered against them on demurrer for the penalty which the act prescribes for the offence; and that judgment is now before this Court.

The cause depends entirely on the question, whether the legislature of a State can constitutionally require the importer of foreign articles to take out a license from the State, before he shall be permitted to sell a bale or package so imported.

It has been truly said, that the presumption is in favour of every legislative act, and that the whole burthen of proof lies on him who denies its 437 constitutionality. The plaintiffs *437 in error take the burthen upon themselves, and insist that the act under consideration is repugnant to two provisions in the constitution of the United States.

1. To that which declares that "no State shall, without the consent of Congress, lay any imposts, or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

2. To that which declares that Congress shall have power "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

1. The first inquiry is into the extent of the prohibition upon States "to lay any imposts or duties on imports or exports." The counsel for the State of Maryland would confine this prohibition to laws imposing duties on the act of importation or exportation. The counsel for the plaintiffs in error give them a much wider scope.

In performing the delicate and important duty of construing clauses in the constitution of our country, which involve conflicting powers of the government of the Union, and of the respective States, it is proper to take a view of the literal meaning of the words to be expounded, of their connexion with other words, and of the general objects to be accomplished by the prohibitory clause, or by the grant of power.

What, then, is the meaning of the words, "imposts, or duties on imports or exports?"

An impost, or duty on imports, is a custom or a tax levied on articles brought into a country, and is most usually secured before the importer is allowed to exercise his rights of ownership over them, because evasions of the law can be prevented more certainly by executing it while the articles are in its custody. It would not, however, be less an impost or duty on the articles, if it were to be levied on them after they were landed. The policy and consequent practice of levying or securing the duty before, or on entering the port, does not limit the power to that state of things, nor, consequently, the prohibition, unless the true meaning of the clause so confines it. What, then, are "imports?" The lexicons inform us, they are "things imported." If we appeal to usage for the meaning of the word, we shall receive the same answer. They are the articles themselves which are brought into the country. "A duty on imports," then, is not merely *438 a duty on the act of importation, but is a duty on the thing imported. It

438

is not, taken in its literal sense, confined to a duty levied while the article is entering the country, but extends to a duty levied after it has entered the country. The succeeding words of the sentence which limit the prohibition, show the extent in which it was understood. The limitation is, "except what may be absolutely necessary for executing its inspection laws." Now, the inspection laws, so far as they act upon articles for exportation, are generally executed on land, before the article is put on board the vessel; so far as they act upon importations, they are generally executed upon articles which are landed. The tax or duty of inspection, then, is a tax which is frequently, if not always paid for service performed on land, while the article is in the bosom of the country. Yet this tax is an exception to the prohibition on the States to lay duties on imports or exports. The exception was made because the tax would otherwise have been within the prohibition.

If it be a rule of interpretation to which all assent, that the exception of a particular thing from general words, proves that, in the opinion of the lawgiver, the thing excepted would be within the general clause had the exception not been made, we know no reason why this general rule should not be as applicable to the constitution as to other instruments. If it be applicable, then this exception in favour of duties for the support of inspection laws, goes far in proving that the framers of the constitution classed taxes of a similar character with those imposed for the purposes of inspection, with duties on imports and exports, and supposed them to be prohibited.

If we quit this narrow view of the subject, and passing from the literal interpretation of the words, look to the objects of the prohibition, we find no reason for withdrawing the act under consideration from its operation.

From the vast inequality between the different States of the confederacy, as to commercial advantages, few subjects were viewed with deeper interest, or excited more irritation, than the

manner in which the several States exercised, or seemed disposed to exercise, the power of laying duties on imports. From motives which were deemed sufficient by *439 the statesmen of that day, the general power of taxation, indispensably necessary as it was, and jealous as the States were of any encroachment on it, was so far abridged as to forbid them to touch imports or exports, with the single exception which has been noticed. Why are they restrained from imposing these duties? Plainly, because, in the general opinion, the interest of all would be best promoted by placing that whole subject under the control of Congress. Whether the prohibition to "lay imposts, or duties on imports or exports," proceeded from an apprehension that the power might be so exercised as to disturb that equality among the States which was generally advantageous, or that harmony between them which it was desirable to preserve, or to maintain unimpaired our commercial connexions with foreign nations, or to confer this source of revenue on the government of the Union, or whatever other motive might have induced the prohibition, it is plain, that the object would be as completely defeated by a power to tax the article in the hands of the importer the instant it was landed, as by a power to tax it while entering the port. There is no difference, in effect, between a power to prohibit the sale of an article, and a power to prohibit its introduction into the country. The one would be a necessary consequence of the other. No goods would be imported if none could be sold. No object of any description can be accomplished by laying a duty on importation, which may not be accomplished with equal certainty by laying a duty on the thing imported in the hands of the importer. It is obvious, that the same power which imposes a light duty, can impose a very heavy one, one which amounts to a prohibition. Questions of power do not depend on the degree to which it may be exercised. If it may be exercised at all, it must be exercised at the will of those in whose hands it is placed. If the tax may be levied in this form by a State, it may be levied to an extent which will defeat the revenue by impost, so far as it is drawn from importations into the particular State. We are told, that such wild and irrational abuse of power is not to be apprehended, and is not to be taken into view when discussing its existence. All power may be abused; and if the fear of its abuse is to constitute an argument against its *440 existence, it might be urged against the existence of that which is universally acknowledged, and which is indispensable to the general safety. The States will never be so mad as to destroy their own commerce, or even to lessen it.

We do not dissent from these general propositions. We do not suppose any State would act so unwisely. But we do not place the question on that ground.

These arguments apply with precisely the same force against the whole prohibition. It might, with the same reason be said, that no State would be so blind to its own interests as to lay duties on importation which would either prohibit or diminish its trade. Yet the framers of our constitution have thought this a power which no State ought to exercise. Conceding, to the full extent which is required, that every State would, in its legislation on this subject, provide judiciously for its own interests, it cannot be conceded, that each would respect the interests of others. A duty on imports is a tax on the article which is paid by the consumer. The great importing States would thus levy a tax on the non importing States, which would not be less a tax because their interest would afford ample security against its ever being so heavy as to expel commerce from their ports. This would necessarily produce countervailing measures on the part of those States whose situation was less favourable to importation. For this, among other reasons, the whole power of laying duties on imports was, with a single and slight exception, taken from the States. When we are inquiring whether a particular act is within this prohibition, the question is not, whether the State may so legislate as to hurt itself, but whether the

act is within the words and mischief of the prohibitory clause. It has already been shown, that a tax on the article in the hands of the importer, is within its words; and we think it too clear for controversy, that the same tax is within its mischief. We think it unquestionable, that such a tax has precisely the same tendency to enhance the price of the article, as if imposed upon it while entering the port.

The counsel for the State of Maryland insist, with great reason, that if the words of the prohibition be taken in their utmost latitude, they will abridge the 441 power of taxation *441 which all admit to be essential to the States, to an extent which has never yet been suspected, and will deprive them of resources which are necessary to supply revenue, and which they have heretofore been admitted to possess. These words must, therefore, be construed with some limitation; and, if this be admitted, they insist, that entering the country is the point of time when the prohibition ceases, and the power of the State to tax commences.

It may be conceded, that the words of the prohibition ought not to be pressed to their utmost extent; that in our complex system, the object of the powers conferred on the government of the Union, and the nature of the often conflicting powers which remain in the States, must always be taken into view, and may aid in expounding the words of any particular clause. But, while we admit that sound principles of construction ought to restrain all Courts from carrying the words of the prohibition beyond the object the constitution is intended to secure; that there must be a point of time when the prohibition ceases, and the power of the State to tax commences; we cannot admit that this point of time is the instant that the articles enter the country. It is, we think, obvious, that this construction would defeat the prohibition.

The constitutional prohibition on the States to lay a duty on imports, a prohibition which a vast majority of them must feel an interest in preserving, may certainly come in conflict with

their acknowledged power to tax persons and property within their territory. The power, and the restriction on it, though quite distinguishable when they do not approach each other, may yet, like the intervening colours between white and black, approach so nearly as to perplex the understanding, as colours perplex the vision in marking the distinction between them. Yet the distinction exists, and must be marked as the cases arise. Till they do arise, it might be premature to state any rule as being universal in its application. It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, 442 it has, *442 perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the State; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the constitution.

The counsel for the plaintiffs in error contend, that the importer purchases, by payment of the duty to the United States, a right to dispose of his merchandise, as well as to bring it into the country; and certainly the argument is supported by strong reason, as well as by the practice of nations, including our own. The object of importation is sale; it constitutes the motive for paying the duties; and if the United States possess the power of conferring the right to sell, as the consideration for which the duty is paid, every principle of fair dealing requires that they should be understood to confer it. The practice of the most commercial nations conforms to this idea. Duties, according to that practice, are charged on those articles only which are intended for sale or consumption in the country. Thus, sea stores, goods imported and re-exported in the same vessel, goods landed and carried over land for the purpose of being re-exported from some other port, goods forced in by stress of weather, and landed, but not for sale, are exempted from the

payment of duties. The whole course of legislation on the subject shows, that, in the opinion of the legislature, the right to sell is connected with the payment of duties.

The counsel for the defendant in error have endeavoured to illustrate their proposition, that the constitutional prohibition ceases the instant the goods enter the country, by an array of the consequences which they suppose must follow the denial of it. If the importer acquires the right to sell by the payment of duties, he may, they say, exert that right when, where, and as he pleases, and the State cannot regulate it. He may sell by retail, at auction, or as an itinerant pedlar. He may introduce articles, as gunpowder, which endanger a city, into the midst of its population; he may introduce articles which endanger the public health, and the power of self-preservation is 443 denied. An importer may *443 bring in goods, as plate, for his own use, and thus retain much valuable property exempt from taxation.

These objections to the principle, if well founded, would certainly be entitled to serious consideration. But, we think, they will be found, on examination, not to belong necessarily to the principle, and, consequently, not to prove, that it may not be resorted to with safety as a criterion by which to measure the extent of the prohibition.

This indictment is against the importer, for selling a package of dry goods in the form in which it was imported, without a license. This state of things is changed if he sells them, or otherwise mixes them with the general property of the State, by breaking up his packages, and travelling with them as an itinerant pedlar. In the first case, the tax intercepts the import, as an import, in its way to become incorporated with the general mass of property, and denies it the privilege of becoming so incorporated until it shall have contributed to the revenue of the State. It denies to the importer the right of using the privilege which he has purchased from the United States, until he shall have also purchased it from the State. In the last

cases, the tax finds the article already incorporated with the mass of property by the act of the importer. He has used the privilege he had purchased, and has himself mixed them up with the common mass, and the law may treat them as it finds them. The same observations apply to plate, or other furniture used by the importer.

So, if he sells by auction. Auctioneers are persons licensed by the State, and if the importer chooses to employ them, he can as little object to paying for this service, as for any other for which he may apply to an officer of the State. The right of sale may very well be annexed to importation, without annexing to it, also, the privilege of using the officers licensed by the State to make sales in a peculiar way.

The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States. If the possessor stores it himself out of town, the removal cannot be a duty on imports, because it contributes nothing to the revenue. If he prefers placing it in a public magazine, it is because he 444 stores *444 it there, in his own opinion, more advantageously than else where. We are not sure that this may not be classed among inspection laws. The removal or destruction of infectious or unsound articles is, undoubtedly, an exercise of that power, and forms an express exception to the prohibition we are considering. Indeed, the laws of the United States expressly sanction the health laws of a State.

The principle, then, for which the plaintiffs in error contend, that the importer acquires a right, not only to bring the articles into the country, but to mix them with the common mass of property, does not interfere with the necessary power of taxation which is acknowledged to reside in the States, to that dangerous extent which the counsel for the defendants in error seem to apprehend. It carries the prohibition in the constitution no

farther than to prevent the States from doing that which it was the great object of the constitution to prevent.

But if it should be proved, that a duty on the article itself would be repugnant to the constitution, it is still argued, that this is not a tax upon the article, but on the person. The State, it is said, may tax occupations, and this is nothing more.

It is impossible to conceal from ourselves, that this is varying the form, without varying the substance. It is treating a prohibition which is general, as if it were confined to a particular mode of doing the forbidden thing. All must perceive, that a tax on the sale of an article, imported only for sale, is a tax on the article itself. It is true, the State may tax occupations generally, but this tax must be paid by those who employ the individual, or is a tax on his business. The lawyer, the physician, or the mechanic, must either charge more on the article in which he deals, or the thing itself is taxed through his person. This the State has a right to do, because no constitutional prohibition extends to it. So, a tax on the occupation of an importer is, in like manner, a tax on importation. It must add to the price of the article, and be paid by the consumer, or by the importer himself, in like manner as a direct duty on the article itself would be made. This the State has not a right to do, 445 because it is prohibited by the constitution. *445

In support of the argument, that the prohibition ceases the instant the goods are brought into the country, a comparison has been drawn between the opposite words export and import. As, to export, it is said, means only to carry goods out of the country; so, to import, means only to bring them into it. But, suppose we extend this comparison to the two prohibitions. The States are forbidden to lay a duty on exports, and the United States are forbidden to lay a tax or duty on articles exported from any State. There is some diversity in language, but none is perceivable in the act which is prohibited. The United States have the same

right to tax occupations which is possessed by the States. Now, suppose the United States should require every exporter to take out a license, for which he should pay such tax as Congress might think proper to impose; would government be permitted to shield itself from the just censure to which this attempt to evade the prohibitions of the constitution would expose it, by saying, that this was a tax on the person, not on the article, and that the legislature had a right to tax occupations? Or, suppose revenue cutters were to be stationed off the coast for the purpose of levying a duty on all merchandise found in vessels which were leaving the United States for foreign countries; would it be received as an excuse for this outrage, were the government to say that exportation meant no more than carrying goods out of the country, and as the prohibition to lay a tax on imports, or things imported, ceased the instant they were brought into the country, so the prohibition to tax articles exported ceased when they were carried out of the country?

We think, then, that the act under which the plaintiffs in error were indicted, is repugnant to that article of the constitution which declares, that "no State shall lay any impost or duties on imports or exports."

2. Is it also repugnant to that clause in the constitution which empowers "Congress to regulate commerce with foreign nations, and among the several States, and with the Indian tribes?"

The oppressed and degraded state of commerce previous to the adoption of the constitution can scarcely be forgotten. It was regulated by foreign 446 nations with a single view to *446 their own interests; and our disunited efforts to counteract their restrictions were rendered impotent by want of combination. Congress, indeed, possessed the power of making treaties; but the inability of the federal government to enforce them had become so apparent as to render that power in a great degree useless. Those who felt the injury arising

Brown v. State of Maryland   25 U.S. 419 (1827)

from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the control over this important subject to a single government. It may be doubted whether any of the evils proceeding from the feebleness of the federal government, contributed more to that great revolution which introduced the present system, than the deep and general conviction, that commerce ought to be regulated by Congress. It is not, therefore, matter of surprise, that the grant should be as extensive as the mischief, and should comprehend all foreign commerce, and all commerce among the States. To construe the power so as to impair its efficacy, would tend to defeat an object, in the attainment of which the American public took, and justly took, that strong interest which arose from a full conviction of its necessity.

What, then, is the just extent of a power to regulate commerce with foreign nations, and among the several States?

This question was considered in the case of *Gibbons* v. *Ogden*, (9 *Wheat. Rep.* 1.) in which it was declared to be complete in itself, and to acknowledge no limitations other than are prescribed by the constitution. The power is co-extensive with the subject on which it acts, and cannot be stopped at the external boundary of a State, but must enter its interior.

We deem it unnecessary now to reason in support of these propositions. Their truth is proved by facts continually before our eyes, and was, we think, demonstrated, if they could require demonstration, in the case already mentioned.

If this power reaches the interior of a State, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse: one of its most ordinary ingredients is traffic. It is inconceivable, that the power to authorize this 447 traffic, *447 when given in the most comprehensive terms, with the intent that its

efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse, of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell.

If this be admitted, and we think it cannot be denied, what can be the meaning of an act of Congress which authorizes importation, and offers the privilege for sale at a fixed price to every person who chooses to become a purchaser? How is it to be construed, if an intent to deal honestly and fairly an intent as wise as it is moral, is to enter into the construction? What can be the use of the contract, what does the importer purchase, if he does not purchase the privilege to sell?

What would be the language of a foreign government, which should be informed that its merchants, after importing according to law, were forbidden to sell the merchandise imported? What answer would the United States give to the complaints and just reproaches to which such an extraordinary circumstance would expose them? No apology could be received, or even offered. Such a state of things would break up commerce. It will not meet this argument, to say, that this state of things will never be produced; that the good sense of the States is a sufficient security against it The constitution has not confided this subject to that good sense. It is placed elsewhere. The question is, where does the power reside? not, how far will it be probably abused? The power claimed by the State is, in its nature, in conflict with that given to Congress; and the greater or less extent in which it may be exercised does not enter 448 into the inquiry concerning its existence. *448

We think, then, that if the power to authorize a sale exists in Congress, the conclusion that the right to sell is connected with the law permitting importation, as an inseparable incident, is inevitable.

If the principles we have stated be correct, the result to which they conduct us cannot be mistaken. Any penalty inflicted on the importer for selling the article in his character of importer, must be in opposition to the act of Congress which authorizes importation. Any charge on the introduction and incorporation of the articles into and with the mass of property in the country, must be hostile to the power given to Congress to regulate commerce, since an essential part of that regulation, and principal object of it, is to prescribe the regular means for accomplishing that introduction and incorporation.

The distinction between a tax on the thing imported, and on the person of the importer, can have no influence on this part of the subject. It is too obvious for controversy, that they interfere equally with the power to regulate commerce.

It has been contended, that this construction of the power to regulate commerce, as was contended in construing the prohibition to lay duties on imports, would abridge the acknowledged power of a State to tax its own citizens, or their property within its territory.

We admit this power to be sacred; but cannot admit that it may be used so as to obstruct the free course of a power given to Congress. We cannot admit, that it may be used so as to obstruct or defeat the power to regulate commerce. It has been observed, that the powers remaining with the States may be so exercised as to come in conflict with those vested in Congress. When this happens, that which is not supreme must yield to that which is supreme. This great and universal truth is inseparable from the nature of things, and the constitution has applied it to the often interfering powers of the general and State governments, as a vital principle of perpetual operation. It results,

necessarily, from this principle, that the taxing power of the States must have some limits. It cannot reach and restrain the action of the national government within its proper sphere. It cannot 449 reach the administration of *449 justice in the Courts of the Union, or the collection of the taxes of the United States, or restrain the operation of any law which Congress may constitutionally pass. It cannot interfere with any regulation of commerce. If the States may tax all persons and property found on their territory, what shall restrain them from taxing goods in their transit through the State from one port to another, for the purpose of re-exportation? The laws of trade authorize this operation, and general convenience requires it. Or what should restrain a State from taxing any article passing through it from one State to another, for the purpose of traffic? or from taxing the transportation of articles passing from the State itself to another State, for commercial purposes? These cases are all within the sovereign power of taxation, but would obviously derange the measures of Congress to regulate commerce, and affect materially the purpose for which that power was given. We deem it unnecessary to press this argument farther, or to give additional illustrations of it, because the subject was taken up, and considered with great attention, in *M'Culloch* v. *The State of Maryland*, (4 *Wheat. Rep.* 316.) the decision in which case is, we think, entirely applicable to this.

It may be proper to add, that we suppose the principles laid down in this case, to apply equally to importations from a sister State. We do not mean to give any opinion on a tax discriminating between foreign and domestic articles.

We think there is error in the judgment of the Court of Appeals of the State of Maryland, in affirming the judgment of the Baltimore City Court, because the act of the legislature of Maryland, imposing the penalty for which the said judgment is rendered, is repugnant to the constitution of the United States, and, consequently, void. The judgment is to be

reversed, and the cause remanded to that Court, with instructions to enter judgment in favour of the appellants.

---

Mr. Justice THOMPSON dissented.

It is with some reluctance, and very considerable diffidence, that I have brought myself publicly to dissent from the opinion of the Court in this case; and did it not involve an important constitutional
450  *450  question relating to the relative powers of the general and State governments, I should silently acquiesce in the judgment of the Court, although my own opinion might not accord with theirs.

The case comes before this Court on a writ of error to the Court of Appeals of the State of Maryland, upon a judgment rendered in that Court against the defendants. The proceedings in the Court below were upon an indictment against the defendants, merchants in the city of Baltimore, trading under the firm of Alexander Brown Sons, and to recover against them the penalty alleged to have been incurred, for a violation of an act of the legislature of that State, by selling a package of foreign dry goods without having a license for that purpose, as required by said act; and the only question which has been made and argued is, whether the act referred to is in violation of the constitution of the United States.

The act in question was passed on the 23d of February, 1822, and is entitled "A supplement to the act laying duties on licenses to retailers of dry goods, and for other purposes." By the second section, under which the penalty has been recovered, it is enacted, "that all importers of foreign articles or commodities, of dry goods, wares, or merchandise, by bale or package, or of wine, rum, brandy, whiskey, and other distilled spiritous liquors, c. and *other persons* selling the same by wholesale, bale, or package, hogshead, barrel, or tierce, shall, before they are *authorized to sell*, take out a license as by the original act is directed, for which they shall pay fifty dollars; and, in case of neglect or refusal to take out such

license, shall be subject to the same penalties and forfeitures as are prescribed by the original act to which this is a supplement."

By the original act, passed in 1819, *retail dealers* in foreign merchandise are required to take out a license; and the supplemental act requires, that wholesale dealers should likewise take out a license to sell. These acts being *in pari materia*, are to be taken together, and their effect and operation manifestly is nothing more than to require retail and wholesale dealers in foreign merchandise, to take out a license before they should be authorized to sell such merchandise.
451  *451  The act does not require a license to *import*, or demand any thing more of the importer than is required of any other dealer in the article imported. The license is for selling, and is general, applying to all persons: that all importers, and other persons selling by wholesale, bale, or package, c. shall, before they are authorized to *sell*, take out a license, c.

I understand it to be admitted, that these laws, so far as they relate to retail dealers, are not in violation of the constitution of the United States: and, if so, the question resolves itself into the inquiry, whether a distinction in this respect between a retail and wholesale dealer in foreign merchandise, can exist under any sound construction of the constitution.

The parts of the constitution which have been drawn in question on the discussion at the bar, and with which the law in question is supposed to be in conflict, are, that which gives to Congress the power to regulate commerce with foreign nations, and among the several States, and that which declares that no State shall, without the consent of Congress, lay any imposts, or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws.

It is very obvious, that this law can, in no manner whatever, affect the commercial intercourse between the States; it applies purely to the internal trade of the State of Maryland. The defendants

were merchants, trading in the city of Baltimore. The indictment describes them as such, and alleges the sale to have been in that place; and nothing appears to warrant an inference, that the package of goods sold was not intended for consumption at that place; and the law has no relation whatever to goods intended for transportation to another State. It is proper here to notice, that although the indictment alleges, that the defendants did *import* and *sell*, yet the District Attorney, in framing the indictment, very properly considered the offence to consist in the selling, and not in the importation without a license. No one will pretend, that if the indictment had only alleged, that the defendants did import a package of foreign dry goods without a license, it could 452 have been sustained. The *452 act applies to the importer, and *other persons* selling by wholesale; and the allegation that the defendants did import, is merely descriptive of the double character in which they were dealing, both as importers and sellers. The indictment would, undoubtedly, have been good, had it merely alleged that the defendants sold the package without a license. So that neither the act, nor the form in which the complaint is presented, makes any discrimination between the importer and any other wholesale dealer in foreign merchandise, but requires both to take out a license to sell; nor does it appear to me, that this law, in any manner, infringes or conflicts with the power of Congress to regulate commerce with foreign nations. It is to be borne in mind, that this was a power possessed by the States respectively before the adoption of the constitution, and is not a powergrowing out of the establishment of the general government. It is to be viewed, therefore, as the surrender of a power antecedently possessed by the States, and the extent of the surrender must receive a fair and reasonable interpretation with reference to the object for which the surrender was made. This was principally with a view to the revenue, and extended only to the external commerce of the United States, and did not embrace any portion of the internal trade or commerce of the several

States. This is not only the plain and obvious interpretation of the terms used in the constitution, *commerce with foreign nations;* but such has been the construction adopted by this Court. In the case of *Gibbons* v. *Ogden*, (9 *Wheat. Rep.* 194.) the Court, in speaking of the grant of the power of Congress to regulate commerce, say, "It is not intended to comprehend that commerce which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to, or affect other States; such a power would be inconvenient, and is certainly unnecessary. The enumeration of the particular classes of commerce to which the power was to be extended, would not have been made had the intention been to extend the power to every description. The enumeration presupposes something not enumerated, and that something, if we regard the language on the subject of the sentence must be the exclusively 453 internal *453 commerce of a State. The genius and character of the whole government seems to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally, but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government. The completely internal commerce of a State, then, may be considered as reserved for the State itself." And, again, (208.) "the acknowledged power of a State to regulate its police, its domestic trade, and to govern its own citizens, may enable it to legislate on this subject (commerce) to a considerable extent."

If such be the division of power between the general and State governments in relation to commerce, where is the line to be drawn between internal and external commerce? It appears to me, that no other sound and practical rule can be adopted, than to consider the external commerce as ending with the *importation* of the foreign article; and the *importation is complete*, as soon as

the goods are introduced into the country, according to the provisions of the revenue laws, with the intention of being sold here for consumption, or for the purpose of internal and domestic trade, and the duties paid or secured. And this is the light in which this question has been considered by this and other Courts of the United States, (5 *Cranch*, 368. 9 *Cranch*, 104. 1 *Mason*, 499.) This, it will be perceived, does not embrace foreign merchandise intended for exportation, and not for consumption; nor articles intended for commerce between the States; but such as are intended for domestic trade within the State: and it is to such articles only that the law of Maryland extends. I cannot, therefore, think, that this law at all interferes with the power of Congress to regulate commerce; nor does it, according to my understanding of the constitution, violate that provision, with declares that no State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its

454 inspection laws. *454

The compensation required by this law to be paid for a license to sell, cannot be considered an impost or duty, within the sense and meaning of these terms, as used in the constitution. They refer to the foreign duty, and not to any charge that may grow out of the internal police of the States. It may indirectly fall on the imported articles, and enhance the price in the sale; but even this is not an expense imposed on the importer or other seller, but is borne ultimately by the consumer.

But the broad principle has been assumed on the argument that the payment of the foreign duty is a purchase of the right and privilege, not only of introducing the goods into the country, but of selling them free from any increased burden imposed by the States; and, unless this principle can be sustained, the law in question is not in violation of the constitution.

The counsel, however, aware that the principle thus broadly laid down, if practically carried out to its full extent, would lead to consequences so obviously untenable, that it would at once show the unsoundness of the principle itself, have limited its application to the first wholesale disposition of the merchandise. Can such a distinction, however, be sustained? There is nothing certainly in the letter of the constitution to support it; nor does it fall within any reasonable intendment growing out of the nature of the subject matter of the provision. The prohibition to the States is against laying any impost of duty on *imports*. It is the merchandise that is exempted from the imposition. The constitution no where gives any extraordinary protection to the importer. So that, if the law was confined to the importer only, he could find no exemption from the operation of State laws. Nor is there, according to my judgment, any rational grounds, upon which the constitution may be considered as extending such exemption to wholesale, and not to retail dealers. If the payment of the foreign duty is the purchase of the privilege to sell, as well as to introduce the article into the country, where can be the difference whether this privilege is exercised in the one way or the other? The retail merchant often imports his own goods; and why should he

455 be compelled to take out a license to sell *455 when his neighbour, who imports and sells by wholesale, is exempted. But the distinction is altogether fruitless, and does not effect the object supposed to have been intended, viz. to take from the States the power of imposing burdens upon foreign merchandise, that might tend to lessen or entirely prevent the importation, and thereby diminish the revenue of the United States. It is very evident that no such purpose can be accomplished; by limiting the protection to the first sale. It was admitted, that after the first sale, and the article becomes mixed and incorporated in the general mass of the property of the country, and to be applied to domestic use, it loses this pretended privilege. But every one knows, that whatever charge or burden is imposed upon the

Brown v. State of Maryland   25 U.S. 419 (1827)

retail sale, affects the wholesale indirectly, as much as if laid directly upon the wholesale. The retail dealer takes this charge into calculation in the purchase from the wholesale merchant, and which, of course, equally affects the importation. Suppose the fifty dollars required to be paid by the wholesale dealer, was imposed on the retail merchant, would it not equally affect the importation? It would equally increase the burden, and enhance the expense of the article when it comes into the hands of the consumer, and on whom all the charges ultimately fall. And if these charges are so increased by the State governments, in any stages of the internal trade, as to check their sale for consumption, it will necessarily affect the importation. So that nothing short of a total exemption from State charges or taxes, under all circumstances, will answer the supposed object of the constitution. And to push the principle to such lengths, would be a restriction upon State authority, not warranted by the constitution.

It certainly cannot be maintained, that the States have no authority to tax imported merchandise. But the same principle of discrimination between the wholesale and retail dealer, as to a license to sell, would seem to me, if well-founded, to extend to taxes of every description. And it would present a singular incongruity, to exempt a wholesale merchant from all taxes upon his stock of goods, and subject to taxation the like stock of his 456 neighbour who was selling by retail. *456

It is laid down in No. 32 of the *Federalist*, (and I believe universally admitted,) "that the States, with the sole exception of duties on imports and exports, retain authority to tax in the most absolute and unqualified sense; and any attempt on the part of the national government to abridge them in the exercise of it, would be a violent assumption of power, unwarranted by any article or clause in the constitution." Although an impost or duty may be considered a tax in its most enlarged sense, yet every tax cannot be understood to mean an impost or duty in the sense of the constitution. As here used, it evidently refers to the foreign duty imposed by revenue laws. It would be a singular use of the term *impost*, to apply it to a tax on real estate; and no one, I presume would contend, that all imported articles upon which the duties have been paid, are exempt from all State taxation in the hands of the consumer. And yet this would follow, if *duty* and *tax* are, in all respects, synonymous; for the constitution declares, that no State shall lay any *duty* on *imports*, viz. the article imported. To avoid these consequences, which are certainly inadmissible, the inhibition to the States must be understood as extending only to foreign duties, and not to taxes imposed by the States, after the imports become articles of internal trade, and for domestic use and consumption; they then become subject to State jurisdiction.

This law seems to have been treated as if it imposed a tax or duty upon the importer, or the importation. It certainly admits of no such construction. It is a charge upon the wholesale dealer, whoever he may be, and to operate upon the sale, and not upon the importation. It requires the purchase of a privilege to sell, and must stand on the same footing as a purchase of a privilege to sell in any other manner, as by retail, at auction, or as hawkers and pedlars, or in whatever way State policy may require. Whether such regulations are wise and politic, is not a question for this Court. If the broad principle contended for on the part of the plaintiffs in error, that the payment of the foreign duty is a purchase of the privilege of selling, be well founded, no limit can be set by the States to the exercise of this privilege. The first 457 sale may be made in defiance of all State *457 regulation; and all State laws regulating sales of foreign goods at auction, and imposing a duty thereupon, are unconstitutional, so far, at all events, as the sale may be by bale, package, hogshead, barrel or tierce, c. And, indeed, if the right to sell follows as an incident to the importation, it will take away all State control over infectious and noxious goods, whilst unsold,

in the hands of the importer. The principle, when carried out to its full extent, would inevitably lead to such consequences.

It has been urged with great earnestness upon the Court, that if the States are permitted to lay such charges and taxes upon imports, they may be so multiplied and increased as entirely to stop all importations. If this argument presents any serious objection to the law in question, the answer to it, in my judgment, has already been given: that the limitation, as contended for, of State power, will not effect the objects proposed. Whether this additional burden is imposed upon the wholesale or retail dealer, it will equally affect the importation; and nothing short of a total exemption from all taxation and charges of every description, will take from the States the power of legislating so as in some way may indirectly affect the importation.

But arguments drawn against the existence of a power from its supposed abuse are illogical, and generally lead to unsound conclusions. And this is emphatically, so when applied to our system of government. It supposes the interest of the people, under the general and State governments, to be in hostility with each other, instead of considering the two governments as parts only of the same system, and forming but one government for the same people, having for its object the same common interest and welfare of all.

If the supposed abuse of a power is a satisfactory objection to its existence, it will equally apply to many of the powers of the general government; and it is as reasonable to suppose that the people would wish to injure or destroy themselves, through the instrumentality of the one government as the other.

The doctrine of the Court in the case of *M'Culloch* v. *the State of Maryland*, (4 *Wheat. Rep.* 316.) has 458 been urged *458 as having a bearing upon this question unfavourable to the validity of the law. But it appears to me, that that case warrants no such conclusion. It is there admitted, that the

power of taxation is an incident of sovereignty, and is co-extensive with that to which it is an incident. And that all subjects, over which the sovereign power of a State extends, are objects of taxation. The bank of the United States could not be taxed by the States, because it was an instrument employed by the government in the execution of its powers. It was called into existence under the authority of the United States, and of course could not have previously existed as an object of taxation by the States. Not so, however, with respect to imports; they were in existence, and under the absolute jurisdiction and control of the States, before the adoption of the constitution. And it is, therefore, as to them, a question of surrender of power by the States, and to what extent this has been given up to the United States. And it is expressly admitted in that case, that the opinion did not deprive the States of any resources they originally possessed; nor to any tax paid by the real property of the bank in common with the other real property within the State; nor to a tax imposed on the interest which the citizens of Maryland may hold in the institution, in common with other property of the same description throughout the State. But the tax was held unconstitutional, because laid on the operations of the bank, and consequently a tax on the operation of an instrument employed by the government of the Union to carry its powers into execution; and this instrument, created by the government of the Union. But these objections do not apply to the law in question. The government of the Union found the States in the full exercise of sovereign power over imports. It was one of the sources of revenue originally possessed by the States. The law does not purport to act directly upon any thing which has been surrendered to the general government, viz. the external commerce of the State. It may operate indirectly upon it to some extent; but cannot be made essentially to impede or retard the operations of the government; not more so than might be effected by a tax on the stock held by individuals in the bank of the United 459 States. And, indeed, the power *459 of crippling

the operations of the government, in the former case, would not be so practicable as in the latter; for it has the whole range of the property of its citizens for taxation, and to provide the means for carrying on its measures. So that it would be beyond the reach of the States materially to affect the operations of the general government, by taxing foreign merchandise, should they be disposed so to do.

I am, accordingly, of opinion, that the judgment of the Court of Appeals of the State of Maryland ought to be affirmed.

JUDGMENT. This cause came on, c. On consideration whereof, this Court is of opinion, that there is error in the judgment rendered by the said Court of Appeals in this, that the judgment of the City Court of Baltimore, condemning the said Alexander Brown, George Brown, John. A. Brown, and James Brown, to pay the penalty therein mentioned ought not to have been so rendered against them, because the act of the legislature of the State of Maryland, entitled, "An act supplementary to the act laying duties on licenses to the retailers of dry goods, and for other purposes," on which the indictment on which the said judgment was rendered is founded, so far as it enacts, "that all importers of foreign articles, of dry goods, wares, or merchandise, by bale or package, or of wine, rum, brandy, whiskey, or other distilled spiritous liquors, c. selling the same by wholesale, bale, or package, hogshead, barrel, or tierce, shall, before they are authorized to sell, take out a license as by the original act is directed, for which they shall pay fifty dollars; and, in case of neglect or refusal to take out such license, shall be subject to the same penalties and forfeitures as are prescribed by the original act to which this is a supplement," is repugnant to the constitution of the United States, and void; wherefore the said Court of Appeals, before whom the said judgment of the said City Court of Baltimore was brought by appeal, ought not to have affirmed, but should have reversed, the same. Wherefore it is CONSIDERED by this Court, that the said judgment of the said Court of Appeals, affirming the said judgment of the City Court of Baltimore, 460 *460 be REVERSED and ANNULLED, and that the cause be remanded to the said Court of Appeals, with directions to reverse the same.



Supreme Court of Tennessee

# Aymette v. State

21 Tenn. 152 (Tenn. 1840)
Decided Dec 1, 1840

December, 1840

CONSTITUTIONAL LAW — ACT PROHIBITING THE WEARING OF A BOWIE-KNIFE. The Act of 1837, 137, 2 (Code, sec. 4746), making it a misdemeanor to carry a bowie-knife under the clothes, or concealed about the person, is not in violation of the constitution, article 1, sec. 26, securing to the citizen the right to keep and bear arms for the common defense. (Acc. Andrews v. State, 3 Heisk., 180, 184, 193, citing this case, and variously commenting on the language of the opinion. See also, Haynes v. State, 5 Humph., 120.) [Cites in: 1 Lea, 716.]

At the January term, 1840, of the circuit of Giles county, Judge Dillahunty presiding, an indictment was filed against William Aymette. This indictment charged 1st. That Aymette, on the [155] 26th day of June, 1839, in the county of Giles, "did wear a certain bowie-knife under his clothes, and keep the same concealed about his person, contrary to the form of the statute," etc.2d. "That on the same day," etc., "the said Aymette did wear a certain other knife and weapon, in form, shape, and size resembling a bowie-knife, and under the clothes of him, the said Aymette, and concealed about the person of him," etc.

The defendant pleaded not guilty, and the case was submitted to a jury at the October term, 1840, Judge Dillahunty presiding.

It appeared that Aymette, during the sitting of the circuit court in June 1839, at Pulaski, Giles county, had fallen out with on Hamilton, and that about ten o'clock, p.m., he went in search of him to a hotel, swearing he would have his heart's blood. He had a bowie-knife concealed under his vest and suspended to the waistband of his breeches, which he took out occasionally and 153 brandished *153 in his hand. [He was put out of the hotel, and proceeded from place to place in search of Hamilton, and occasionally exhibited] his knife.

The jury, under the charge of the court, returned a, verdict of guilty.

The defendant moved the court in arrest of judgment, but he motion was overruled and the defendant sentenced to three months' imprisonment in the common jail of Giles county, and to pay a fine of $200 to the State. From his judgment defendant appealed in error Washington and Ewing, for Aymette; Attorney General, for the State.

Green, J., delivered the opinion of the court.

The plaintiff in error was convicted in the Giles circuit court, for wearing a bowie-knife concealed under his clothes, under the act of 1837-1838, ch. 137, sec. 2, which provides "that, if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than sic months.

It is now insisted that the above act of the Legislature is unconstitutional, and therefore the judgment in this case should have been arrested.

In the 1st article of the constitution of this State, containing a declaration of rights, sec. 26, it is declared "that the free white men of this State have a right to keep and bear arms for their common defence."

This declaration, it is insisted, gives to every man the right to arm himself in any manner he may choose, however unusual or dangerous the weapons he may employ, and, thus armed, to appear wherever he may think proper, without molestation or hindrance, and that any law regulating his social conduct, by restraining the use of any weapon or regulating the manner in which it shall be carried, is beyond the legislative
154 competency to enact, and is void. *154

In order to have a just and precise idea of the meaning of the clause of the constitution under consideration, it will be useful to look at the state of things in the history of our ancestors, and thus comprehend the reason of its introduction into our constitution.

By the act of 22 23 Car. II, ch. 25, sec. 3, it is provided that no person who has not lands of the yearly value of ƒ 100, other than the son and heir apparent of an esquire, or other person of higher degree, etc., shall be allowed to keep a gun, etc. By this act, persons of a certain condition in life were allowed to keep arms, while a large proportion of the people were entirely disarmed. But King James II, by his own arbitrary power, and contrary to law, disarmed the Protestant population, and quartered his Catholic soldiers among the people. This, together with other abuses, produced the revolution by which he was compelled to abdicate the throne of England. William and Mary succeeded him, and, in the first year of their reign, Parliament passed an act recapitulating the abuses which existed during the former reign, and declared the existence of certain rights which they insisted upon as their undoubted

privilege. Among these abuses they say, in sec. 5, that he had kept a "standing army within the kingdom in time of peace, without the consent of parliament, and quartered soldiers contrary to law." Sec. 6. "By causing several good subjects, being Protestants, to be disarmed, at the same time when papists were both armed and employed contrary to law."

In the declaration of rights that follows, sec. 7 declares that "the subjects which are Protestant may have arms for their defence, [157] suitable to their condition and as allowed by law." This declaration, although it asserts the right of the Protestants to have arms, does not extend the privilege beyond the terms provided in the act of Charles II, before referred to. "They may have arms," says the Parliament. "suitable to other condition and as allowed by law." The law, we have seen, only allowed persons of certain rank to have arms, and consequently this declaration of right had reference to such only. It was in reference to these facts, and to this state of the English law, that the 2d section of the *155
155 amendments to the constitution of the United States was incorporated into that instrument. It declares that, "a well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."

In the same view the section under consideration of our own bill of rights was adopted.

The evil that was produced by disarming the people in the time of James II was that the king, by means of a standing army quartered among the people, was able to overawe them, and compel them to submit to the most arbitrary, cruel, and illegal measures. Whereas, if the people had retained their arms, they would have been able, by a just and proper resistance to those oppressive measures, either to have caused the king to respect their rights, or surrender (as he was eventually compelled to do) the government into other hands. No private defence was contemplated, or would

have availed anything. If the subjects have been armed, they could have resisted the payment of excessive fines, or the inflication of illegal and cruel punishments. When, therefore, Parliament says that "subjects which are Protestants may have arms for their defence, suitable to their condition, as allowed by law," it does not mean for private defence, but, being armed, they may as a body rise up to defend their just rights, and compel their rulers to respect the law. This declaration of right is made in reference to the fact before complained of, that the people had been disarmed, and soldiers had been quartered among them contrary to law. The complaint was against the government. The grievances to which they were thus forced to submit were for the most part of a public character, and could have been redressed only by the people rising up for their common defense, to vindicate their rights.

The section under consideration, in our bill of rights, was adopted [158] in reference to these historical facts, and in this point of view its language is most appropriate and expressive. Its words are, "the free white men of this state have a right to keep and bear arms for their common defence." It, to be sure, asserts the right much more broadly than the statute of 1 Williams Mary. 156 *156 For the right there asserted is subject to the disabilities contained in the act of Charles II. There, lords and esquires, and their sons, and persons whose yearly income from land amount to ƒ 100, were of suitable condition to keep arms. But, with us, every free white man is of suitable condition, and, therefore, every free white man may keep and bear arms. But to keep and bear arms for what? If the history of the subject had left in doubt the object for which the rights is secured, the words that are employed must completely remove the doubt. It is declared that they may keep and bear arms for thier common defence. The word "common," here used, means, according to Webster: 1. Belonging equally to more than one, or to many indefinitely. 2. Belonging equally to the public. 3. General. 4. Universal. 5. Public.

The object, then, for which the right of keeping and bearing arms is secured is the defence of the public. The free white men may keep arms to protect the public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution. The words "bear arms," too, have reference to their military use, and were not employed to mean wearing them about the person as part of the dress. As the object for which the right to keep and bear arms is secured is of general and public nature, to be exercised by the people in a body, for their common defence, so the arms the right to keep which is secured are such as are usually employed military equipment. If the citizens have these arms in their hands, they are prepared in the best possible manner to repel any encroachments upon their rights by those in authority. They need not, for such a purpose, the use of those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin. These weapons would be useless in war. They could not be employed advantageously in common defence of the citizens. The right to keep and bear them is not, therefore, secured by the constitution.

A thousand inventions for inflicting death may be imagined which might come under the appellation of an "arm," in the [159] figuartive use of that 157 term, and which *157 could by no possibility be rendered effectual in war, or in the least degree and in the common defence. Would it not be absurd to contend that a constitutional provision securing to the citizens the means of their common defence should be construed to extend to such weapons, although they manifestly would not contribute to that end, merely because, in the hands of an assassin, they might take away life?

The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence. The right to keep and bear arms for the common defence is a great political

right. It respects the citizens, on the one hand, and the rulers on the other. And, although this right must be inviolably preserved, yet it does no follow that the Legislature is prohibited altogether from passing laws regulating the manner in which these arms may be employed.

To hold that the Legislature could pass no law upon this subject by which to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms, would be to pervert a great political right to the worst of purposes, and to make it a social evil of infinitely greater extent to society than would result from abandoning the right itself.

Suppose it were to suit the whim of a set of ruffians to enter the theatre in the midst of the performance, with drawn swords, guns, and fixed bayonets, or to enter the church in the same manner, during service, to the terror of the audience, and this were to become habitual; can it be that it would be beyond the power of the Legislature to pass laws to remedy such an evil? Surely not. If the use of arms in this way can not be prohibited, it is in the power of fifty armed ruffians to break up the churches, and all other public assemblages, where they might lawfully come, and there would be no remedy. But we are perfectly satisfied that a remedy might be applied. The convention, in securing the public political 158 right in *158 question, did not intend to take away from the Legislature all power of regulating the social relations of the citizens upon this subject. It is true, it is somewhat difficult to draw the precise line where legislation must cease and where the political right begins, but it is not difficult to state a case where the right of legislation [160] would exist. The citizens have the unqualified right to keep the weapon, it being of the character before described as being intended by this provision. But the right to bear arms is not of that unqualified character, the citizens may bear them for the common defence; but it does not follow that they

may be borne by an individual, merely to terrify the people or for purposes of private assassination. And, as the manner in which they are worn and circumstances under which they are carried indicate to every man the purpose of the wearer, the Legislature may prohibit such manner of wearing as would never be resorted to by persons engaged in the common defence.

We are aware that the court of appeals of Kentucky, in the case of Bliss v. The Commonwealth, 2 Littell, 90, has decided that an act of their Legislature, similar to the one now under consideration, is unconstitutional and void. We have great respect for the court by whom that decision was made, but we can not concur in their reasoning. We think the view of the subject which the opinion of the court in that case take is far too limited for a just construction of the meaning of the clause of the constitution they had under consideration. It is not precisely in the words of our constitution, nevertheless it is of the same general import. The words are, that "the right of the citizens to bear arms in defence of themselves and the State shall not be questioned."

In the former part of this opinion we have recurred to the circumstances under which a similar provision was adopted in England, and have thence deduced the reason of its adoption, and consequently have seen the object in view when the right to keep and bear arms was secured. All these considerations are left out of view in the case referred to, and the court confine themselves entirely to the consideration of the distinction 159 between a law prohibiting *159 the right, and a law merely regulating the manner in which arms may be worn. They say there can be no difference between a law prohibiting the wearing concealed weapons and one prohibiting the wearing them openly.

We think there is a manifest distinction. In the nature of things, if they were not allowed to bear arms openly, they could not bear them in their defence of the State at all. To bear arms in defence

Aymette v. State    21 Tenn. 152 (Tenn. 1840)

of the State is to employ them in war, as arms are usually employed by civilized nations. The arms, consisting of swords, [161] muskets, rifles, etc., must necessarily be borne openly; so that a prohibition to bear them openly would be a denial of the right altogether. And, as in their constitution the right to bear arms in defence of themselves is coupled with the right to bear them in defence of the State, we must understand the expressions as meaning the same thing, and as relating to public, and not private, to the common, and not the individual, defence.

But a prohibition to wear a spear concealed in a cane would in no degree circumscribe the right to bear arms in defence of the State; for this weapon could in no degree contribute to its defence, and would be worse than useless in an army. And, if as is above suggested, the wearing arms in defence of the citizens is taken to mean the common defence, the same observations apply.

To make this view of the case still more clear, we may remark that the phrase, "bear arms," is used in the Kentucky constitution as well as in our own, and implies, as has already been suggested, their military use. The 28th section of our bill of rights provides "that no citizen of this State shall be compelled to bear arms provided he will pay an equivalent, to be ascertained by law." Here we know that the phrase has a military sense, and no other; and we must infer that it is used in the same sense in the 26th section, which secures to the citizen the right to bear arms. A man in the pursuit of deer, elk, and buffaloes might carry his rifle every day for forty years, and yet it would never be said of him that he had borne arms; much less could it be said that a private citizen bears arms because he had a dirk or pistol concealed under his clothes, or a spear in a cane. So that, *160 with deference, we think the argument of the court in the case referred to, even upon the question it has debated, is defective and inconclusive.

In the case of Simpson v. The State, 5 Yerg. 356, Judge White, in delivering the opinion of the court, makes use of the general expression that, "by this clause in the constitution, an express power is given and secured to all the free citizens in the State to keep and bear arms for their defence, without any qualification whatever as to their kind and nature."

But in that case no question as to the meaning of this provision in the constitution arose, or was decided by the court, and the expression is only an incidental remark of the judge who delivered the opinion, and, therefore, is entitled to no weight.

We think, therefore, that upon either of the grounds assumed in this [162] opinion the Legislature had the right to pass the law under which the plaintiff in error was convicted. Let the judgment be affirmed.

10   *10

casetext

[ <u>Back</u> | <u>Home</u> ]

[Cite as *Cockrum v. State, 24 Tex. 394 (1859)*. A discussion of the nature of the right to arms occurs in the <u>appeal</u> and part of the decision starting at page <u>401</u>.]

# JOHN COCKRUM V. THE STATE.

The discretion given to the jury, by *article 74 of the penal code*, to direct, when the penalty affixed is imprisonment in the penitentiary for life, that the confinement may be solitary, or in whole, or in part, to labor, is not in conflict with *article 612*, as originally adopted, which provided that murder might "be punished by death, solitary confinement in the penitentiary for life, confinement to labor for a term of years, not less," etc.

*Article 612* was so shaped, to define the extent of the power of the jury, when they should determine to adopt either one of the three modes of punishing murder.

*Solitary* confinement for life, is not mentioned in the code, as a specific class of punishment, but it is included under a part of the second division into which punishments are classified, viz., "2d, imprisonment in the penitentiary for life, or for a period of time."

And the jury may, in view of "the degree of atrocity, or circumstances of extenuation," of the case, increase the rigor of the confinement for life, by making it, in whole or in part, solitary.

Such construction should be given to the different articles of the code, as accords with its general objects and purpose, and which will give full effect to all its provisions, general as well as special, so that they may stand and operate in harmony, though a "special provision" may thereby be partially controlled, where otherwise a general one could have no effect.

A charge is erroneous which does not leave to the jury the discretion, when they affix the penalty of imprisonment in the penitentiary for life, to direct whether it should be solitary, or in whole, or in part, to labor.

The legislature is not constrained to affix the penalty of offenses that are committed with a view of the evil intent manifested in their commission, without regard to the means that may be used to carry the intent into effect.

The article of the code which provides that a homicide, which would otherwise be a case of manslaughter, if committed with a bowie-knife or dagger, shall be deemed murder and punished as such, is not in violation of the constitutional right of every citizen to bear arms in the lawful defense of himself or the state; but is in restraint of an abuse growing out of such right.

But the legislature could not affix such a punishment to the abuse, as, in its nature, must deter the citizen from its lawful exercise; for that would be tantamount to its prohibition.

The legislature may put all cases of manslaughter with deadly weapons upon the same footing with murder, and leave the jury to affix the degree of punishment, according to their opinion of its atrocity.

The amendment to the code establishing degrees in murder, and affixing its (p.395)punishment accordingly, limits the discretion of the jury, and is more often prejudicial than beneficial to a defendant; the court cannot, therefore, say that the punishment has been ameliorated by the amendments.

other object could the law have in view, but to prohibit this weapon? Upon what other principle can its enactment be <sub>(p.397)</sub>justified, than that the use of a bowie-knife is in itself wrong, and that it is a weapon to be prohibited? What is it, in effect, but an effort, indirectly, to prohibit the keeping, bearing, or use of such knives? It is believed, that there is no difference in principle, between a law, making the use of a bowie-knife criminal, and a law *discriminating* against the use of a bowie-knife, by affixing a higher penalty to its use, than to the same act committed with any other deadly weapon. Substantially, this is to affix a penalty to the use of that weapon. This discrimination is but a form of prohibition. The right to discriminate against, implies the right to prohibit. Both rights are based on the unconstitutional ground, that the legislature can control the keeping, bearing, and use of this weapon. But the legislature cannot do indirectly, that which it has no power to do directly. See *Thomas v. State, 9 Tex. 324*.

It is contended, that the *amendment of article 612 of the penal code*, is an amelioration of the punishment of murder; and that the defendant should have been put on his election, as to which penalty he would receive. *Penal Code, art. 14*. To ameliorate is to " make better," to" improve;" to mitigate, is to "render less rigorous," to "diminish," to "reduce the amount or severity of;" and it is clear that these words are used in the same sense in the code. The term murder, in the code, and in the amended code, embraces all the grades of murder. If the punishment of any of the grades of murder is mitigated by the amendment, the court should have given the defendant the benefit of the mitigation, unless he elected differently. Now, it is evident, that solitary confinement is a more rigorous punishment than confinement to labor. That it is so regarded by the law, is evident from the place assigned it in the scale of punishments. The amended code has obliterated this odious penalty from our statute books, and thereby increased the possibilities of diminished punishment, and reduced the amount or severity of the punishment for any but the highest grade of murder. Surely, a punishment is mitigated, when one species of punishment is wholly abolished. Had the legislature diminished the <sub>(p.398)</sub>minimum or maximum punishment, it would hardly be denied to be a mitigation. Or, had the amendment left the law on the subject just as it was, only reducing the maximum of solitary confinement to a period of ten years, it would clearly have mitigated the punishment, by reducing its amount.

*Attorney General*, for the appellee.

ROBERTS, J. The defendant was convicted of murder, and sentenced to solitary confinement, for life, in the penitentiary. The matters of error complained of, arise upon the charge and rulings of the court below. The offense was laid in the indictment, and proved on the trial, to have taken place after the code went into operation, and before the passage of the amendments to the code.

There is no evidence in the record, that the court put the defendant upon his election, whether he would be tried under the provisions of the code, as they originally stood, or under the amendments of the code. But the charge was evidently based on the code, as it was at the time the offense was committed.

In reference to the punishment, the court instructed the jury, that in the event they found the defendant guilty of murder, "they will say so, and assess the punishment at 'death,' or at 'solitary confinement in the penitentiary for life,' or at 'confinement in the penitentiary, to labor, for a term not less than three, nor more than fifteen years.'" This was intended to be in accordance with *article 612 of the code*, as originally passed, without taking into consideration the *74th article*, which reads as follows, to wit: "In cases where the penalty affixed, is imprisonment in the penitentiary for life, the jury may, in their discretion, direct that the confinement be solitary, or that the whole, or any portion of it, be to labor."

construed, so as to attain the objects intended by the legislature; the prevention, suppression and punishment of crime." *Art. 25*. The restriction upon the discretion of the jury, to impose solitary confinement in whole or in part, is found in the article conferring it, which makes it apply only "in cases where the penalty affixed is imprisonment in the penitentiary for life." *Art. 74*.(p.401)

As the case will be remanded for this error, it is important to notice some other grounds of error assigned, because the same questions will necessarily arise upon another trial.

After charging the law generally upon the subject of manslaughter, the court below added, that, "if, however, the jury believe that the defendant is guilty of manslaughter, as above defined, but that the act was done with a bowie-knife, or dagger, they will consider the act murder." This was given in compliance substantially with *article 610 of the code*: "If any person be killed with a *bowie-knife* or *dagger*, under circumstances which would otherwise render the homicide a case of manslaughter, the killing shall nevertheless be deemed murder, and punished accordingly."

It is contended, that this article of the code, is in violation of the constitution of the United States, and of this state. The clause in the constitution of the United States, that it is said to be in violation of, is the *2d article of the amendments*: "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." *O. & W. Dig. 7*. The clause in the constitution of this state, which it is said to violate, is the *13th section of the bill of rights*: "Every citizen shall have the right to keep and bear arms, in the lawful defense of himself or the state." *O. & W. Dig. 14*.

The object of the clause first cited, has reference to the perpetuation of free government, and is based on the idea, that the people cannot be effectually oppressed and enslaved, who are not first disarmed. The clause cited in our bill of rights, has the same broad object in relation to the government, and in addition thereto, secures a personal right to the citizen. The right of a citizen to bear arms, in the lawful defense of himself or the state, is absolute. He does not derive it from the state government, but directly from the sovereign convention of the people that framed the state government. It is one of the "high powers" delegated directly to the citizen, and "is excepted out of the general powers of government." A law cannot be passed (p.402) to infringe upon or impair it, because it is above the law, and independent of the law-making power.

The argument advanced against the constitutionality of this law is, that any discrimination made by the legislature, in punishing the abuse of this right, in regard to a particular weapon, is an impairing of the right of its lawful use. That proposition given a practical application, amounts to this, that the legislature cannot affix any higher punishment to an unlawful assault with one of the dangerous weapons, which it is lawful to carry, than with any other; because the effect of such discrimination against the unlawful use of such weapon would discourage the lawful use of it, and therefore the carrying of it. This proposition can hardly be maintained; for admitting that two persons make each an assault with like vicious intent, though with different weapons, one with a weapon not likely to produce death, but which is capable of it, and sometimes does it; and the other with a weapon so destructive in its character as to be almost certain to produce death, when used offensively; the act of the one, who has the more dangerous instrument, is much more likely to be seriously injurious to other people, than the act of the other, though the intent is the same in doing the acts. Now if the legislature can make no distinction in the punishment of the two cases supposed, it is forced to base its punishment upon the degree of evil intent, in total disregard of the means used to carry out that intent, and of the probable injurious results of the acts.

The right to carry a bowie-knife for lawful defense is secured, and must be admitted. It is an exceeding destructive weapon. It is difficult to defend against it, by any degree of bravery, or