# EXHIBIT I

## Deposition Transcript of Eddie Grant, Redacted

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

Eddie Grant, Jr. et. al.        )
                  Plaintiffs    )        Civil No.
                                )        3:22-CV-01223(JBA)
v                               )
                                )
Lamont, et. al.                 )
                  Defendants    )

DEPOSITION OF: EDDIE GRANT, JR.
DATE: July 10, 2023
HELD VIA:  Zoom

Reporter:  Emily Collette, CSR #502

# PLAINTIFF'S ATTORNEY NOTE

# CONTAINS MATERIAL DESIGNATED AS CONFIDENTIAL

```
1                          APPEARANCES:

2


3            Representing the Plaintiff:

4
                    Atkinson Law, LLC
5                   122 Litchfield Road
                    P.O. Box 340, Suite 2
6                   Harwinton, Connecticut 06791
                    By: Cameron Lee Atkinson, Esq.
7

8


9                   Fishbein Law Firm, LLC
                    100 South Main Street
10                  Wallingford, Connecticut 06492
                    By: Craig Fishbein, Esq.
11

12                  Doug Dubitsky
                    P.O. Box 70
13                  North Windham, Connecticut 06256
                    By: Doug Dubitsky, Esq.
14

15           Representing the Defendants:

16
                    Assistant Attorney General
17                  110 Sherman Street
                    Hartford, Connecticut  06105
18                  By:  Janelle Medeiros, Esq.
                    By:  James Belforti, Esq.
19                  By:  Terrence O'Neill, Esq.
                    james.belforti@ct.gov
20

21

22           Further Appearances:

23              Michael Stiefel

24              Jennifer Hamilton

25
```

1                  S T I P U L A T I O N S

2           It is stipulated by counsel for the

3   parties that all objections are reserved until the

4   time of trial, except those objections as are

5   directed to the form of the question.

6

7           It is stipulated and agreed between

8   counsel for the parties that the proof of the

9   authority of the Notary Public before whom this

10  deposition is taken is waived, and that any defects

11  in the notice are waived.

12

13          It is further stipulated that the reading

14  and signing of the deposition transcript by the

15  witness may be signed before any Notary Public.

16

17

18

19          T R A N S C R I P T   L E G E N D

20

21      (Sic)          - Exactly as said.
        (Phonetic)     - Exact spelling not provided.
22      ( -- )         - Break in speech continuity and/or
                         interrupted sentence.
23      (. . .)        - Indicates omission or word[s]
                         when reading OR trailing off and
24                       not finishing a sentence

25

```
 1                    I N D E X

 2    Examination                                Page

 3    EDDIE GRANT, JR.

 4    Direct Examination by Mr. Belforti          6

 5    Cross-Examination by Mr. Atkinson          99

 6    Redirect Examination by Mr. Belforti      100

 7

 8                  E X H I B I T S

 9    No.              Description              Page

10    Exhibit 1 -        Affidavit               30

11    Exhibit 2 -        Supplemental Affidavit   75

12      * Exhibits retained by Attorney James Belforti *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Deposition commenced at 1:00 p.m.)

 2              THE COURT REPORTER:  Usual stips?

 3              MR. ATKINSON:  Yes.

 4              THE COURT REPORTER:  In proceeding today,

 5      the parties agree and stipulate that the court

 6      reporter shall administer the oath and report

 7      the deposition stenographically from a remote

 8      location; that the witness is testifying under

 9      the penalty of perjury as if sworn in person;

10      That the deposition will be admissible in

11      court, and that counsel will not object to the

12      admissibility of the transcript based on

13      proceeding in this way

14              Before we proceed, I will ask counsel to

15      state their name and agreement to the above

16      stipulation or state if there is any objection.

17              MR. BELFORTI:  James Belforti Assistant

18      Attorney General for the defendants and we

19      agree.

20              MR. ATKINSON:  Cameron Atkinson for the

21      plaintiffs and we agree.

22      (EDDIE GRANT, having been duly sworn by Emily

23   Collette, Notary Public, was examined and testified

24              under oath as follows:)

25              THE COURT REPORTER:  Would you state your
```

1        name for the record?

2              THE WITNESS:  Eddie Grant.

3    DIRECT EXAMINATION
     BY MR. BELFORTI:

4        Q    Okay.  Good afternoon, Mr. Grant.

5        A    Good afternoon to you also.

6        Q    All right.  My name is Jaime Belforti, I

7    am an Assistant Attorney General and I represent the

8    defendants in your lawsuit.  I'm going to be asking

9    you just a couple questions today.  Have you ever

10   been deposed before?

11       A    No.

12       Q    Okay.  Other than the affidavits you

13   submitted in this case, have you ever provided an

14   affidavit in a Court case before?

15       A    Not that I can remember.

16       Q    Okay.  Have you ever been party to any

17   other lawsuits before?

18       A    Yes.

19       Q    How many?

20       A    At least one.

21       Q    At least one.  Can you describe just

22   generally what that lawsuit was about?

23       A    It was me versus the state from my -- it

24   was -- boy, it was over fifteen years ago.

25       Q    Okay.  Was it like an employment lawsuit

```
 1    or something like that?

 2        A    Correct.

 3        Q    Okay.  Have you ever testified in Court

 4    before?

 5        A    Yes.

 6        Q    Was it in relation to that lawsuit we just

 7    talked about?

 8        A    No.

 9        Q    When did you testify in Court?

10        A    It was over -- that one was close to

11    twenty years ago, if I can recall.

12        Q    Okay.  Do you remember anything about that

13    situation, what it was about?

14        A    It was employment, I believe.

15        Q    Okay.  So was it someone else's employment

16    lawsuit and you were just testifying in it?

17        A    Yes.

18        Q    Okay.  Were you testifying on behalf of

19    the plaintiff or the defendant, do you remember?

20        A    He was the plaintiff.

21        Q    Okay.  Was this in the state of

22    Connecticut?

23        A    Yes.

24        Q    So I just want to go over a couple of

25    ground rules before we get into the substance of the
```

```
 1   deposition here.  If I ask you a question and you
 2   don't understand the question because I phrase it in
 3   a confusing way or I use a term that you don't
 4   understand, that's fine.  If you could just tell me
 5   that you don't understand the question, I'll do my
 6   best to rephrase it in a way that you do understand
 7   the question.  I would just ask that if I do ask a
 8   question that you don't understand please just let
 9   me know and I'll do by best.  Is that fair?
10        A    Fair enough.  That would be yes.
11        Q    Okay.  And if I ask you a question and you
12   answer it, I'm going to assume that you understood
13   my question.  Is that fair?
14        A    Fair enough.  That would be yes.
15        Q    Okay.  Thank you.  If you need to take a
16   break or anything, that's absolutely fine.  I would
17   just ask that you let me know and that you answer
18   whatever question is pending at the time before you
19   take that break, is that fair?
20        A    Yes.
21        Q    Okay.  Since we have been speaking for a
22   couple minutes here I'm going to assume that English
23   is your first language and you read it, write it and
24   understand it fine?
25        A    Yes.
```

```
 1        Q    Okay.  Is there any reason why you won't

 2   be able to testify truthfully or fully in todays

 3   deposition?

 4        A    I can find no reason.

 5        Q    Okay.  Good.

 6        A    It would be to the best of my ability.

 7        Q    Thank you.  Looks like based on your

 8   affidavit that you worked for the Department of

 9   Correction, is that true?

10        A    That is true.

11        Q    How long did you work there?

12        A    Twenty-one years.

13        Q    Okay.  What was your rank when you

14   retired?

15        A    Correctional officer.

16        Q    How long have you lived in Connecticut?

17        A    Since 1965.

18        Q    1965, okay.  When did you become a DOC

19   employee?

20        A    1990.

21        Q    1990, okay.  So you say in your affidavit

22   that you have had a pistol permit for over thirty

23   years.  When did you get your pistol permit in the

24   state of Connecticut?

25        A    1992.
```

```
 1          Q    Okay.  Why did you get a pistol permit?

 2          A    I wanted to be able to transport my pistol

 3     from home into the range and back.

 4          Q    Okay.  So did you own a pistol prior to

 5     getting your pistol permit in Connecticut?

 6          A    I did have one revolver before I had a

 7     pistol permit.

 8          Q    Okay.  Did you own any other firearms

 9     prior to getting a pistol permit in the state of

10     Connecticut?

11          A    Not that I can recall.

12          Q    Okay.  I'm going to assume that when you

13     moved to the state of Connecticut in 1965 you were

14     under the age of 18, is that true?

15          MR. ATKINSON:  Objection to form.  You can

16     answer.

17          A    Yes.

18          Q    Okay.  So how long did it take you to get

19     your pistol permit when you applied in 1992?

20          A    From what I can remember, the process back

21     then was a very easy process and I...

22          Q    Do you remember --

23          A    I don't exactly remember the dates, you

24     know.

25          Q    Okay.
```

 1      A    How long, how many weeks or whatever.  I

 2  don't because that was thirty years ago.

 3      Q    Understood.  Did you have to go through

 4  any kind of firearms training prior to getting your

 5  pistol permit back in 1992?

 6      A    Yup.  Yes.

 7      Q    Okay.  Can you describe what kind of

 8  training that was?

 9      A    NRA.

10      Q    Through the National Rifle Association?

11      A    That is correct.

12      Q    Was it like a one day class or was it

13  multiple days?

14           MR. ATKINSON:  Objection to form.  You can

15      answer.

16      A    I cannot remember how many, was it a day

17  or days.  Again, it was thirty years ago.

18      Q    Understood.  Prior to applying for your

19  pistol permit in 1992 and going through that NRA

20  training, had you undergone any firearms training

21  prior to that?

22      A    Negative.

23      Q    Okay.

24      A    That I can recall.

25      Q    So around 1992 you owned a revolver, is

```
 1    that correct?

 2         A      Correct.

 3         Q      What was the specific kind of weapon?  Did

 4    it have a name?

 5               MR. ATKINSON:  Objection to form.  You can

 6         answer.

 7         A      It was a Smith & Wesson.

 8         Q      I'm assuming it was a six shooter?

 9               MR. ATKINSON:  Objection to form.  You can

10         answer.

11         A      I believe it was.

12         Q      Okay.  Do you still own that firearm?

13         A      No.

14         Q      How many firearms do you currently own?

15         A      I haven't been counting to be honest.  I

16    would say in the neighborhood of ██████

17         Q      About ██████ or so?

18         A      ██████

19         Q      Okay.

20         A      That's in the neighborhood.  Now I haven't

21    been counting.

22         Q      That's fair.  When is the last time you

23    purchased a firearm?

24         A      I purchased a receiver in January 2023.

25         Q      Okay.  Just to clarify, when you say
```

```
 1    receiver, what do you mean by that?
 2         A    It's a lower receiver.  It's not a
 3    fully -- it's just the lower receiver.
 4         Q    Okay.  So like you mean like the handle,
 5    the back end part of the firearm, and forgive any
 6    ignorance, I just...
 7         A    Yes.  And it didn't have a brace.
 8         Q    It did or did not have a brace?
 9         A    Did not.
10         Q    Did not have a brace, okay.
11         A    Not.
12         Q    Okay.  Of those ████ or so firearms that
13    you currently own could you, I guess how many of
14    them would you consider pistols?
15              MR. ATKINSON:  Objection to form.  You can
16         answer.
17         A    I'm trying to remember because like I said
18    before, I don't keep count, you know, exact count.
19    I would say in the neighborhood of ██████
20         Q    ██████ okay.  Of those remaining ████ or
21    so, and again I understand it's an estimate, are
22    those -- would you consider those remaining ████ or
23    so rifles?
24              MR. ATKINSON:  Objection to form.  You can
25         answer.
```

Eddie Grant, Jr.                                                    Job Date:7/10/2023

```
1        A     Can you define a rifle?

2        Q     So --

3        A     Because there's several different things.

4        Q     That's fair.  How would you describe those

5   remaining  [    ]  firearms then?

6        A     I'd describe them as others.

7        Q     Others, okay.  So that leads me to my next

8   question because I saw in your affidavit you use the

9   term others or classified as others.  How would you

10  define the term others?

11            MR. ATKINSON:  Objection to form.  You can

12       answer.

13       A     It has a pistol brace, detachable mag.

14       Q     Okay.  Pistol brace and a detachable

15  magazine?

16       A     Foregrip.

17       Q     Foregrip.  Anything else?

18       A     And it fires various projectiles.

19       Q     Okay.  How long is the barrel?

20       A     Fourteen and a half inches for some.

21       Q     Fourteen and a half inches for some.  Of

22  those [   ] or so remaining, how many have fourteen

23  and a half inch barrels?

24       A     I believe two.

25       Q     Two.  So of those three or so remaining
```

1    that don't have fourteen and a half inch barrels,

2    how long are those barrels?

3         A    To narrow it down, they're about twelve

4    inches.

5         Q    About twelve inches?

6         A    Uh-huh.

7         Q    Okay.  They probably vary in length, but

8    of those others that you own, how long are they from

9    end to end, approximately?

10        A    I cannot tell you that because I have

11   never really measured them that way.

12        Q    Okay.  Are those █████ or so others that

13   you own the longest firearms that you own?

14             MR. ATKINSON:  I'm going to object to

15        form.  I mean, you can answer.  Candidly I

16        think the question confused even us sitting at

17        the table Jaime, so you might want to rephrase

18        it.

19        Q    Okay.  I'll try my best to rephrase it.

20   My understanding Mr. Grant is that you own

21   approximately █████  or so firearms and that ██████

22   or so of those are pistols and that █████ or so of

23   the remainder are others.  And my understanding is,

24   maybe I'm wrong and please correct me if I am wrong,

25   is that pistols are typically shorter than others.

```
 1   So, I was trying to ask if the ▓▓▓▓ remaining

 2   weapons that you own, firearms that you own, that

 3   are others, ▓▓▓▓ or so, are all longer than the

 4   ▓▓▓▓ or so pistols that you own?

 5        A    Repeat that again?

 6        Q    Sure.

 7        A    Because you said a lot there.

 8        Q    Sure.  I'm just trying to clarify, right.

 9   So my understanding is that you own about ▓▓▓▓ or

10   so pistols?

11        A    Uh-huh.

12        Q    You own about ▓▓▓▓ or so firearms in

13   total and that of the ▓▓▓▓ or so remaining weapons,

14   firearms, those are others as you just described

15   them to me, and that others are typically longer in

16   length than pistols, am I correct in that

17   assumption?

18        A    That is correct.

19        Q    Okay.  So are those others, those ▓▓▓▓ or

20   so others that you own, the longest firearms that

21   you own?  In other words, those are longer than the

22   ▓▓▓▓ or so pistols?  See what I'm saying?

23        A    No, I'm not truly understanding.

24        Q    Are your pistols shorter in length than

25   your others?
```

```
 1        A    What do you mean by pistol?  Handguns?
 2        Q    You said before that of the [REDACTED] or so
 3   firearms that you own that you had about [REDACTED] or
 4   so pistols, right?
 5        A    Yes.
 6        Q    Okay.  Of those pistols, the ones that you
 7   identified, are those shorter in length that your
 8   others?
 9        A    Oh, yes.
10        Q    Okay.  That's all I was trying to get to.
11        A    I just wanted to make sure.
12        Q    No.  No.  I got you.  I got you.  Again,
13   if I say something wrong or use the wrong term,
14   please correct me.  I'll do my best.
15        A    Uh-huh.
16        Q    Okay.  All right.  So you purchased a
17   lower receiver in 2023.  Prior to that when is the
18   last time you purchased a firearm?
19        A    I purchased a few during wintertime.
20        Q    Wintertime, so would that be like between
21   November of 2022 and up to January of 2023?
22             MR. ATKINSON:  Objection to form.  You can
23        answer.
24        A    I don't recall.  I have to look at my
25   records.
```

Eddie Grant, Jr.                                                                    Job Date:7/10/2023

1      Q    Okay.  You have records of when you

2  purchased all your firearms?

3      A    Not here.

4      Q    Okay.  But you do have those somewhere?

5      A    If I have to dig around I probably could

6  find them.

7      Q    Okay.  So I know you currently own about

8  ▊▊▊▊or so firearms, have you ever purchased a

9  firearm that you do not currently own?  In other

10  words, did you purchase one and then give it away,

11  it was damaged, broken, something like that, that

12  you don't currently own any more?

13          MR. ATKINSON:  Objection to form.  You can

14     answer.

15      A    I'm not understanding.  What do you mean

16  by that?

17      Q    Sure.  You own  ▊▊▊▊  or so firearms,

18  correct?

19      A    Yes.

20      Q    You purchased all of those firearms,

21  correct?

22      A    Yes.

23      Q    Okay.  Have you ever purchased a firearm

24  that you have subsequently gotten rid of?  What I'm

25  trying to get at is, you started purchasing firearms

```
 1    in the early 90s, you have        or so, did you

 2    purchase        over that time period and have kept

 3    them all or have you purchased some and gotten rid

 4    of them and now you're currently at        firearms?

 5    Get what I'm saying?

 6          A     Not that I know of.  I...

 7          Q     Okay.

 8          A     During the time I have purchased and

 9    traded in or cashed them in and got some different

10    firearms, but not all in the same day.

11          Q     Okay.  So have you ever possessed or owned

12    more than        or so firearms at one time?

13                MR. ATKINSON:  Objection to form.  You can

14       answer.

15          A     As I stated before, I don't keep exact

16    count of what I got.

17          Q     Okay.  So is the answer to my question you

18    don't know?

19          A     I'm not sure.

20          Q     Okay.  Of the firearms that currently own

21    do they all accept detachable magazines?

22                MR. ATKINSON:  Objection to form.  You can

23       answer.

24          A     Yes.

25          Q     Okay.  How many detachable magazines do
```

Eddie Grant, Jr.                                                                                    Job Date: 7/10/2023

```
 1    you currently own?

 2         A    I don't know.

 3         Q    Could you give me an estimate?

 4         A    No because I would be lying if I did.

 5         Q    Would it be more than

 6         A    Yes.  Yeah, it would be more than

 7         Q    Okay.  More than 50?

 8         A    Not sure.

 9         Q    Not sure?

10         A    I don't keep track of that.

11         Q    Okay.  Have you ever had to register any

12    detachable magazines with any government

13    organization?

14              MR. ATKINSON:  Objection to form.  He can

15         answer.

16         A    No.

17         Q    No, okay.  Of the detachable magazines

18    that you currently own, do any of them have a

19    capacity of over ten rounds?

20              MR. ATKINSON:  Objection to form.  You can

21         answer.

22         A    No.

23         Q    Okay.  Have you ever owned a detachable

24    magazine that had a capacity exceeding ten rounds?

25              MR. ATKINSON:  Objection to form.  You can
```

1       answer.

2       A    In 2010.

3       Q    In 2010 you owned detachable magazines

4  that could carry more than ten rounds?

5       A    Yes.

6       Q    Okay.  What were the -- well, how many of

7  those magazines did you own?

8            MR. ATKINSON:  Objection to form.  You can

9       answer.

10      A    Again, that was thirteen years ago and

11  when that pistol got sold I put all the magazines

12  back that came with the pistol.

13      Q    What was the capacity of the magazines

14  that were associated with that pistol that you just

15  referenced?

16      A    I don't remember exact.

17      Q    Okay.  Was it more than seventeen rounds?

18      A    No.

19      Q    Okay.  So somewhere between ten and

20  seventeen rounds?

21      A    I can say more than ten.

22      Q    More than ten, but we know it was less

23  than or it was not exceeding seventeen?

24      A    I believe I answered that one before.

25  It's less than seventeen.

Eddie Grant, Jr.                                                        Job Date:7/10/2023

1      Q    Okay.  So like I said, between ten and

2   seventeen rounds?

3      A    Less than seventeen.

4      Q    Okay.  I think you answered this before

5   sir, but I just want to clarify.  You said that you

6   gave those magazines back, what do you mean by that?

7           MR. ATKINSON:  Objection to form.  You can

8       answer.

9      A    When I sold the pistol back to the gun

10  store I sell everything that comes with it.  And I

11  don't know exact count of magazines.  Like I said,

12  thirteen years ago, I don't remember but I bring

13  back everything that came with the original

14  manufacturing packaging.

15     Q    Okay.  Understood.  That would have been

16  some time in 2010?

17     A    Correct.

18     Q

20

21

22

23

24

25

Eddie Grant, Jr.           Job Date: 7/10/2023



```
 8      Q    Okay.  What do you -- let me ask you this.

 9   Why do you own          or so firearms?

10      A    I have          -- I have firearms, you

11   know, for many different reasons.

12      Q    Can you tell me what those reasons are?

13      A    Many different reasons.  You know, just

14   like when I have sneakers, I have them for many

15   different reasons, shoes.  I have, you know, it's,

16   you know, for winter versus summer.  It's a bunch of

17   different reasons, you know.

18      Q    Okay.

19      A    For different levels of self-defense.

20      Q    Okay.  So maybe I'll ask you different

21   question.  What do you use your firearms for?

22           MR. ATKINSON:  Objection to form.  You can

23      answer.

24      A    Primarily self-defense.

25      Q    Okay.  Primarily self-defense, okay.  Do
```

```
 1   you ever hunt with your firearms?

 2       A    Not in years, but I'd love to sometime.

 3       Q    When is the last time you went hunting?

 4       A    Years ago.

 5       Q    More than a decade?

 6       A    Correct.

 7       Q    Okay.  So you said primarily for

 8   self-defense you own the firearms.  Do you typically

 9   carry a firearm on your person when you're outside

10   the home I should say?

11       A    Yes, I do.

12       Q    How many firearms do you carry on your

13   person when you're outside the home, typically?

14            MR. ATKINSON:  Objection to form.  You can

15       answer.

16       A    I carry one.

17       Q    Carry one, okay.  Is there a particular

18   firearm that you carry typically when you're outside

19   the home?

20       A    What do you mean?  What do you mean?

21   Define that for me, please?

22       Q    What I mean is, you said you typically

23   carry a firearm on your person when you're outside

24   the home.  Is there a specific one of the

25    firearms or so that you own that you carry most
```

```
 1   often or does it constantly rotate?

 2        A    It depends on what occasion.

 3        Q    Okay.  Are you carrying a firearm on you

 4   right now?

 5        A    No.

 6        Q    Okay.  Are there ever times when you do

 7   not carrying a firearm on your person when you're

 8   outside the home?

 9        A    Yes.

10        Q    Can you tell me what kinds of situations

11   where you wouldn't carry a firearm on your person

12   when you're outside the home?

13        A    Courthouses.

14        Q    Okay.  Anywhere else?

15        A    And anywhere else where the state of

16   Connecticut doesn't -- it's illegal.

17        Q    I see.

18        A    Anywhere else, but that's the main one

19   right there.

20        Q    Okay.  So would it be fair to say that you

21   typically carry a firearm on your person when you're

22   outside the home except for places where it would

23   otherwise be illegal to do so?

24             MR. ATKINSON:  Objection to form.  You can

25        answer.
```

1      A    Yes, to the best of my knowledge.

2      Q    Okay.  Are there ever times where you do

3  not carry a firearm on your person when you're

4  outside the home when it wouldn't be illegal to do

5  so?

6           MR. ATKINSON:  Objection to form.  You can

7      answer.

8      A    No.  I -- no.

9      Q    Okay.  When you are carrying a firearm on

10 your person outside of the home do you typically

11 carry one of your pistols or one of your others?

12          MR. ATKINSON:  Objection to form.  You can

13     answer.

14     A    It depends where I'm going.

15     Q    Okay.  If you were to say one hundred

16 percent of the time that you are carrying a firearm

17 on your person when you're outside the home, what

18 percentage would you be carrying a pistol versus

19 carrying an other?

20          MR. ATKINSON:  Objection to the form.  You

21     can answer.

22     A    That I'm not sure because there's a lot of

23 days I go to the range.

24     Q    Okay.  How about days when you don't go to

25 the range, you're just going about regular business

```
 1   and you're not carrying a firearm to the range, do
 2   you typically carry a pistol or do you typically
 3   carry an other?
 4              MR. ATKINSON:  Objection to form.  You can
 5      answer.
 6      A    I carry a pistol.
 7      Q    Okay.  The pistols that you carry, do any
 8   of them have a magazine with a capacity of fewer
 9   than ten rounds?
10              MR. ATKINSON:  Objection to form.  You can
11      answer.
12      A    No.
13      Q    So in other words, if you're carrying a
14   pistol on your person outside of the home it always
15   has a magazine capable of carrying ten rounds?
16      A    That is correct.
17      Q    Okay.  Was there ever a time when you
18   would carry a pistol on your person outside of the
19   home with a magazine that had more than ten rounds
20   in it?
21              MR. ATKINSON:  Objection to form.  You can
22      answer.
23      A    You're going to have to define dates of
24   when is this.
25      Q    I'm saying is there ever a time in the
```

```
 1    past, prior to today, when you have carried a pistol

 2    on your person outside of the home that had a

 3    magazine in it that could carry more than ten rounds

 4    in it?

 5              MR. ATKINSON:  Same objection.

 6         A    Same objection.

 7              MR. ATKINSON:  No.  Well --

 8         A    Oh, goodness.  You're going to have to

 9    rephrase that.  You're not very clear.

10         Q    Okay.

11         A    Because I have been carrying for thirty

12    years.

13         Q    Okay.  So I'm saying in that span of

14    thirty years, has there ever been a time when you

15    have left the home carrying a weapon on you, a

16    firearm on you, that had a magazine in it that could

17    carry more than ten rounds?

18         A    Okay, I will answer it this way.  When it

19    was legal, I carried more than ten.

20         Q    Okay.  So around before 2013 or so?

21              MR. ATKINSON:  Objection to form.  You can

22         answer.

23         A    It was in 2010.

24         Q    2010 is when you used to carry that?

25         A    Yes.
```

1    Q    Okay.  After 2010 you have never carried a

2  firearm on your person outside the home that had a

3  magazine capable of carrying more than ten rounds in

4  it?

5          MR. ATKINSON:  Objection to form.  You can

6      answer.

7    A    That is correct.

8    Q    Okay.  So I believe in your declaration

9  you use the term AR-15-platform firearm.  Do you

10  recall using that term?

11   A    Yes, I do.

12   Q    Okay.  Could you define for me what an

13  AR-15-platform firearm is?

14   A    Yes.  It has a barrel, it has a detachable

15  magazine, forward stock, it has a pistol grip.

16  You're going to have to define AR-15.  Is it the

17  other platform or the pre-ban?

18   Q    What I am talking about sir is in a

19  declaration you filed in February of this year you

20  used the term AR-15-platform firearm.  And I just

21  want to know what you mean by that at the time you

22  used it in February of 2023.

23   A    Was that before -- was that with the

24  other?

25   Q    You know, why don't I do this.  I will

```
 1    pull up, I think I can share my screen.  I'll pull
 2    up a copy of your affidavit, that might be clearer
 3    so I apologize for the delay.  So I'm going to mark
 4    this as Exhibit 1.
 5             (Whereupon, Affidavit marked Defendant's
 6         Exhibit 1 for Identification.)
 7             MR. BELFORTI:  Let me see if I can share
 8         my screen.
 9             MR. ATKINSON:  Jaime, we might have a
10         paper copy of that affidavit here if that's
11         easier.
12             MR. BELFORTI:  Can you guys see the
13         screen?
14             MR. ATKINSON:  Yes.
15         Q    Is this your affidavit, Mr. Grant?
16         A    It appears to be.
17         Q    Okay.  Why don't I do this, I will go down
18    to the last page where you signed it.  Looking at
19    page -- I believe it's page four of the affidavit,
20    is that your signature in blue ink?
21         A    That's my chicken scratch.
22         Q    Better than mine.  I see the date the 3rd
23    of February 2023.
24         A    Correct.
25         Q    Okay.  That's when you signed this, right?
```

```
 1         A    Uh-huh.

 2         Q    Okay.  So let me go up and see if I can

 3   find the language I was just talking about.  I

 4   believe it's in paragraph 9 at the top of page

 5   three.  It says and I'm quoting, "I wish, and

 6   intend, to lawfully purchase, possess a modern

 7   sporting arm, such as an AR-15-platform firearm for

 8   defensive and recreational purposes in Connecticut."

 9   Did I read that correctly?

10         A    That is correct.

11         Q    That's the term I'm referring to when I

12   say AR-15-platform firearm.  Could you define that

13   for me, sir?

14         A    Okay.  An AR-15-platform from my best

15   recollection fires a 556 round, had a barrel,

16   forward grip, pistol brace, detachable magazine.

17   The one I'm looking to buy has a -- would have a

18   collapsible or folded stock.

19         Q    Okay.  Collapsible or foldable stock?

20         A    Yes.

21         Q    Okay.  Anything about -- you said

22   detachable magazine, anything about the capacity of

23   that magazine that differs from the AR-15-platform

24   firearm?

25              MR. ATKINSON:  Objection to form.  You can
```

```
 1        answer.

 2        A    Can you repeat that again?

 3        Q    Sure.  I think you mentioned before, and

 4   correct me if I am wrong, the features I have you

 5   say that it fires a 5.56 round, it has a barrel, it

 6   has a forward grip, a pistol brace, detachable

 7   magazine and a collapsible or foldable stock.  Did I

 8   get all those right?

 9        A    Correct.

10        Q    Okay.  What I wanted to ask about was the

11   detachable magazine.  Does the detachable magazine

12   for an AR-15-platform firearm have a particular

13   capacity to it?

14             MR. ATKINSON:  Objection to form.  You can

15        answer.

16        A    It would have ten as the maximum.

17        Q    Understood.  Ten is the maximum, okay.

18   One other question about that, you referred to a

19   pistol brace and also a collapsible or foldable

20   stock.  My understanding, and please correct me if

21   I'm wrong, because I am sure you know more about

22   this than I do, a pistol brace is something that

23   typically goes to the rear of the weapon and is used

24   to brace against the forearm for firing from the

25   arm.  Is that included on a weapon with a
```

1  collapsible or a foldable stock?

2          MR. ATKINSON:  Objection to form.  You can

3      answer.

4      A    Yes, that could be used as that.  The

5  particular model I want has either a collapsible

6  stock or a stock that folds.

7      Q    Okay.  But the model -- we'll start by

8  this.  What is the model that you want that we're

9  talking about?

10     A    There's so many out there.  I would, you

11 know, I could go for hours.

12     Q    Okay.  That's fine.  So you said that the

13 particular one that you want has a collapsible or

14 foldable stock.  What I'm trying to understand is,

15 are there pistol braces on firearms that also have

16 collapsible or foldable stocks?

17         MR. ATKINSON:  Objection to form.  You can

18     answer.

19     A    To the best of my ability, yes, there are

20 many different pistol braces out there.

21     Q    Okay.  The firearm that we have been

22 talking about, AR-15-platform firearm that you have

23 been describing, how would you fire such a firearm?

24 Would you fire it from the shoulder or would you

25 fire it like a handgun?

```
 1            MR. ATKINSON:  Objection to the form.  You

 2       can answer.

 3       A    Well right now I'm healthy so I feel I'd

 4  fire it from the shoulder.

 5       Q    From the shoulder, okay.  So would you

 6  intend to fire it from the shoulder if you were able

 7  to purchase the AR-15-platform firearm that we have

 8  been discussing?

 9       A    Yes.

10       Q    Of the others that we were talking about

11  before, that         or so others, how do you fire

12  those weapons, from the shoulder or like a handgun?

13            MR. ATKINSON:  Objection to form.  You can

14       answer.

15       A    It depends on how I train.

16       Q    Okay.  So are there times when you fire

17  your others from the shoulder?

18       A    Repeat that again?

19       Q    Have there ever -- have there ever been a

20  time when you fired your others from the shoulder?

21       A    Yes.

22       Q    Is that at the range?

23       A    Yes.

24       Q    Okay.  Of your        or so others I

25  believe, and correct me if I'm wrong, I believe that
```

1  the way you described them before is that they have

2  pistol braces, is that true?

3          MR. ATKINSON:  Objection to form.  You can

4      answer.

5      A    Yes.

6      Q    Okay.  Do those others have stocks on

7  them?

8          MR. ATKINSON:  Objection to form.  You can

9      answer.

10     A    Absolutely not.

11     Q    Okay.  So you would then fire an other

12  with a pistol brace from the shoulder, correct?

13     A    Correct.  It depends -- again, it depends

14  on whatever, you know, level of training I'm doing.

15     Q    I understand.  Have you ever fired any of

16  your others outside of a firing range?

17         MR. ATKINSON:  Objection to form.  You can

18     answer.

19     A    Never.

20     Q    Okay.  Have you ever fired any of your

21  pistols that you own outside of a firing range?

22         MR. ATKINSON:  Objection to form.  You can

23     answer.

24     A    Never.  And thank God.

25     Q    Thank God.  So I want to ask a question

1   and I think we still have the affidavit up here.

2   I'm looking specifically at paragraph 10.  You say,

3   I quote, "I believe that Connecticut's "assault

4   weapons" ban gives criminals and attackers a strong

5   tactical advantage over me, and my own heritage

6   makes me strongly desire an equal chance to defend

7   myself."  Did I read that correctly?

8        A    Yeah.  Correct.

9        Q    Okay.  Can you describe for me what the

10  strong tactical advantage that a criminal or an

11  attacker would have over you because you do not

12  currently own an AR-15-platform firearm?

13            MR. ATKINSON:  Objection to form.  You can

14       answer.

15       A    To my dealings with guys over twenty-one

16  years of dealing and how they talk about how they're

17  able to get anything they desire, normally what they

18  get is stuff that we can't get and it's also a

19  capacity that we don't have.  It's a thirty round

20  capacity that they're able to get and I'm stuck with

21  my ten rounds because I have to obey the law.

22       Q    I understand.  So is it fair to say that

23  the tactical advantage that a criminal or attacker

24  could have because of the assault weapons ban is

25  because they could have a magazine that has a larger

```
 1   capacity than you are legally allowed to own?

 2              MR. ATKINSON:  Objection to form.  You can

 3       answer.

 4       A     Yes.

 5       Q     Okay.  Is there any other tactical

 6   advantage that someone with an AR-15-platform

 7   firearm would have over, let's say a pistol or a

 8   handgun, apart from the capacity of the magazine?

 9       A     It depends on the scenario, outdoors

10   versus indoors.

11       Q     Okay.  So what I'm asking about is the

12   scenario that you anticipated in paragraph 10 of

13   your affidavit, right.  So you referred to the

14   strong tactical advantage that you believe criminals

15   and attackers have over you as a result of this law.

16   So what I'm asking is, as a result of this law is

17   there any other tactical advantage that a potential

18   criminal or attacker could have over you apart from

19   the differences in the capacity of the magazine that

20   we just discussed?

21              MR. ATKINSON:  Objection to form.  You can

22       answer.

23       A     Well again, being in corrections twenty

24   years, criminals are able to get shorter barrels

25   which gives them a tactical advantage which is
```

```
 1   illegal for me to own.
 2        Q    Can I ask, when you say shorter barrel,
 3   what do you mean by that?  What kind of length?
 4        A    They come in many different things.
 5        Q    Okay.  So then what is the tactical
 6   advantage one gets from a shorter barreled firearm
 7   than a longer barrel firearm?
 8        A    More --
 9             MR. ATKINSON:  Objection to form.  You can
10        answer.
11        A    More maneuverability.
12        Q    Okay.  So is it fair to say that typically
13   a firearm that is shorter or smaller is more
14   maneuverable and therefore more tactically
15   advantageous than a longer or larger firearm?
16             MR. ATKINSON:  Objection to form.  You can
17        answer.
18        A    In that situation, what I have described
19   being indoors in tight confined areas, absolutely
20   yes.
21        Q    Okay.  So are there any situations apart
22   from being indoors in a tight, confined space that
23   you mean when you're referring to the tactical
24   advantage in paragraph 10 of your affidavit?
25             MR. ATKINSON:  Objection to form.  You can
```

```
 1            answer.

 2        A    You know, in the world of self-defense we

 3   don't get the chance to pick what the situation is.

 4   We have to adapt to it.  So in that particular

 5   situation again, the shorter barrel would be --

 6   would be the best tactical advantage I would have

 7   that they could have over me.  Other situations, it

 8   changes.

 9        Q    Okay.  So would it be fair to say that

10   when one is indoors a shorter barrel firearm would

11   be more tactically advantageous, is that fair?

12            MR. ATKINSON:  Objection to form.  You can

13        answer.

14        A    I believe a shorter barrel and being able

15   to have thirty rounds or getting a drum magazine,

16   therefore it goes up in the count of ammunition that

17   they have.

18        Q    Okay.  So those -- so, Withdrawn.

19            So when you say strong tactical advantage,

20   that's what we're talking about, which is the

21   capacity of the magazine and the potential shortness

22   of the barrel?

23            MR. ATKINSON:  Objection to form.  You can

24        answer.

25        A    Yes.  When my life is on the line I would
```

Eddie Grant, Jr.                                                          Job Date:7/10/2023

```
 1   like to have, you know, whatever I need to, you

 2   know, for that God forbid moment of having to defend

 3   myself I would like to have, you know, the full

 4   tactical advantage of being able to have that, you

 5   know, those particular things.

 6        Q    Fair enough.  Are there any other tactical

 7   advantages that you feel you're -- well, Withdrawn.

 8             Is there anything else about the

 9   Connecticut assault weapons ban that you're

10   challenging in this lawsuit -- again, Withdraw.

11             Are there any other potential tactical

12   advantages that we haven't spoken about yet today

13   that you feel you are prevented from obtaining

14   because of this law?

15             MR. ATKINSON:  Objection to form.  You can

16        answer.

17        A    Choice.

18        Q    Choice?

19        A    Choice is the big one.

20        Q    Can you describe what you mean to me by

21   choice, sir?

22        A    Well, when I have the luxury of visiting

23   other state gun stores and I can see the choices.

24   You know, I just can look but I can't touch.  It's

25   just like having a candy behind a locked glass.
```

 1      Q    Do you consider a lack of choice to be, I

 2   suppose places you at a tactical disadvantage from a

 3   potential attacker or criminal?

 4           MR. ATKINSON:  Objection to form.  You can

 5      answer.

 6      A    Yes.  It's like just like when you go out,

 7   you want to put on your Stacy Adams when you're with

 8   your suit.  You don't want to put on Nike sneakers.

 9      Q    Okay.  But you would consider that a

10   tactical disadvantage?

11      A    Yes.

12      Q    Not just a preference --

13      A    Yeah.  Yes.  It is both.  Tactical and

14   disadvantage because you can get -- if you have more

15   choices you can get one that fits your personal

16   style because everybody has a different personal

17   style.

18      Q    Okay.  Is there a particular firearm out

19   there, I know we have been talking kind of in the

20   abstract, is there a particular firearm out there

21   that if you -- if there were no laws at all that you

22   could your purchase that you feel would place you at

23   as even a footing as you could be with a potential

24   criminal or attacker, what would that firearm be?

25      A    Well, you know, the thing is is there's so

```
1   many out there.  I would have to, you know, get out

2   there and be able to rent one, take it out to the

3   range and see what it's about and then, you know,

4   then make my choices.

5        Q    Okay.

6        A    But I would prefer the AR-15 with the

7   collapsible stock and the foldable stock.  That's my

8   preference.

9        Q    Okay.

10       A    That puts me out of that.

11       Q    Okay.  Can I ask, what is the tactical

12  advantage of a collapsible or a foldable stock?

13       A    That's the one I trained on.

14       Q    It's what you trained on when you were

15  with the Department of Correction?

16       A    Yes.

17       Q    Okay.  Again, forgive my ignorance, what

18  does a collapsible or folding stock allow the user

19  to do that a noncollapsible or non-folding stock

20  wouldn't allow a user to do?

21       A    Familiarity.

22       Q    What do you mean by that, sir?

23       A    It's just like breathing for me.

24       Q    So I still -- I'm sorry, I still don't

25  understand what you mean by that.  I understand what
```

Eddie Grant, Jr.                                                              Job Date: 7/10/2023

```
 1    you said familiarity and it's just like breathing,
 2    but what do you mean by familiarity?
 3         A    Familiarity is something that you do I
 4    wouldn't say without thinking, it just comes
 5    naturally after getting proficient in the use of it.
 6         Q    Okay.  So was there a particular -- let me
 7    try to ask it this way.  Withdrawn.
 8              What was the specific firearm that you
 9    trained on when you were with the Department of
10    Correction?
11         A    Again, the last time I handled a firearm
12    was I believe it was in 2003.
13         Q    I'm sorry, I don't -- so I cut you off.
14         A    That -- it was in 2003.  So I don't
15    remember the exact nomenclature of it.
16         Q    So just to clarify, you said the last time
17    you handled a firearm, was it 2003.
18         A    That particular.
19         Q    Okay.  And that's what I am just trying to
20    get at.  I didn't think that was the last time you
21    handled any firearms.
22         A    No.
23         Q    You're saying an AR-15-platform style
24    firearm was in 2003 --
25         A    That was -- that was legal in Connecticut.
```

Eddie Grant, Jr.                                                    Job Date:7/10/2023

```
 1        Q    Okay.
 2             MR. ATKINSON:  Jaime, at this point I'm
 3        going to just interpose a word here to
 4        Mr. Grant.  Please don't cross talk.  Let him
 5        finish the question and he'll let you finish
 6        your answer.
 7        A    Sorry about that.
 8        Q    I think that was more advice for me than
 9   you, but I appreciate it either way.
10             Okay.  So 2003 was the last time you have
11   handled an AR-15-platform style firearm, correct?
12        A    In 2015?
13        Q    I'm sorry, 2003.  Did I misspeak?  I'm
14   sorry.  In 2003 was the last time you handled an
15   AR-15 style firearm, is that correct?
16             MR. ATKINSON:  Objection to form.  You can
17        answer.
18        A    That was the last time I handled it at
19   work, yes, through my employment.
20        Q    Okay.  How about outside of your
21   employment, when is the last time you handled an
22   AR-15-platform firearm?
23             MR. ATKINSON:  Objection to form.  You can
24        answer.
25        A    Are we still on this platform or others?
```

1      Q    So you have handled an AR-15-platform

2   firearm as an other, is that correct?

3      A    Yes.

4      Q    When is the last time you have handled an

5   AR-15-platform firearm that is in an other

6   configuration?

7      A    A while.

8      Q    Today?

9      A    No.  No.  Absolutely not.  It's been a

10  while since I have been to the range.

11     Q    So when was --

12     A    It's months.

13     Q    Oh, months, okay.

14     A    Yes.

15     Q    Was it within the year of 2023?

16     A    Yes.

17     Q    So some time after between January 1, 2023

18  and today you have handled an AR-15-platform style

19  firearm in an other configuration?

20     A    Yes.

21     Q    Do you own an AR-15-platform firearm that

22  is in an other configuration?

23     A    Yes.

24     Q    When did you purchase that firearm?

25          MR. ATKINSON:  Objection to the form.  You

1       can answer.

2       A    I can't give you exact date.  So if I

3  tried to I would be factually incorrect.

4       Q    Okay.  Did you own that firearm prior to

5  2013?

6       A    No.

7       Q    Okay.  So it was some time after 2013 that

8  you purchased that firearm that we have been

9  discussing?

10       A    Yes.

11       Q    Okay.  Can I ask, and again forgive me if

12  this is an ignorant or a stupid question, but why

13  didn't you purchase an AR-15-platform firearm after

14  2003?

15            MR. ATKINSON:  Objection to form.  You can

16       answer.

17       A    I was doing a lot of traveling at that

18  point and so firearms at that point in my life was

19  not the top issue.

20       Q    Okay.  When did firearms, in your words,

21  become the top issue for you?

22       A    Okay.  Which firearm are we talking about

23  because that's a broad -- you got to narrow it down,

24  please.

25       Q    What I'm trying to ask sir is, you know,

1  you say you would like to purchase an AR-15-platform

2  fire if it weren't for the law that's in place right

3  now.  What I'm asking is, prior to the law being in

4  place, why didn't you buy an AR-15-platform firearm?

5      A    During that time it wasn't at the top of

6  my list.

7      Q    Okay.  When would you say it got to the

8  top of your list?

9      A    2020.

10     Q    2020, okay.  What was it about 2020 that

11 made it such a priority for you to have an

12 AR-15-platform firearm?

13         MR. ATKINSON:  Objection to form.  You can

14     answer.

15     A    I desired one.

16     Q    Okay.  Was there any -- were you

17 threatened in any way?

18     A    Not personally.

19     Q    Okay.  Did you feel like you were at more

20 risk in 2020 for some reason?

21         MR. ATKINSON:  Objection to the form.  You

22     can answer.

23     A    The newspaper headlines was screaming

24 different things and, you know, and I just decided,

25 you know, that I wanted to exercise my Second

1  Amendment right.

2       Q    Okay.  Did you feel that you were at a

3  tactical disadvantage from potential criminals or

4  attackers prior to 2020 because of the Connecticut

5  assault weapons ban?

6            MR. ATKINSON:  Objection to form.  You can

7       answer.

8       A    Repeat that again?

9       Q    Sure.  So prior to 2020, that is the time

10 frame we have been talking about, did you feel that

11 you were at a tactical disadvantage to potential

12 criminals or attackers because of Connecticut's

13 assault weapons ban?

14           MR. ATKINSON:  Same objection.

15      A    The advantage was always there that

16 criminals have.  That's never changed.

17      Q    Okay.  So despite feeling at a tactical

18 disadvantage to a potential criminal or attacker due

19 to your lack of an AR-15-platform firearm, it wasn't

20 until 2020 that you felt the need to have an

21 AR-15-platform firearm?

22           MR. ATKINSON:  Objection to form.  You can

23      answer.

24      A    I feel it shouldn't be a time, you know.

25 That's something that in my free will I should be

1   able to decide when I need one or I don't.  At that

2   point I said I felt I need one.

3        Q    Okay.  Prior to 2020, I think I know the

4   answer to this, but prior to 2020 did you own other

5   firearms?  Actually, withdrawn.  That's a little

6   misleading because I used the term other.

7            Did you own firearms that were not

8   AR-15-platform firearms prior to 2020?

9        A    No.

10       Q    You didn't own any other firearms, pistols

11  or handguns, anything like that prior to 2020?

12       A    No.

13       Q    Okay.  All right.  So I'm a little

14  confused.  You owned a revolved back in 1992, right?

15       A    Correct.

16       Q    Okay.  And then I guess let's start there,

17  1992 up until 2020.  Of those, and I know and I

18  realize it's a long time, but of those years, when

19  did you own firearms?

20       A    Wait a minute.  I own firearms -- okay,

21  boy, oh, boy.  I own firearms -- I believe I owned

22  one in '07.

23       Q    Okay.

24            MR. ATKINSON:  Can we have a break,

25       please?

```
1              MR. BELFORTI:  Sure.  Five minutes?
2              MR. ATKINSON:  Yes, please.
3              (Whereupon, Off the record at 2:02 p.m.)
4              (Whereupon, Back on the record at 2:10
5       p.m.)
6              MR.  BELFORTI:  What do we need to clarify
7       there, Cam?
8              MR. ATKINSON:  He wants to clarify about
9       the firearms he owned prior to 2020.  So I'll
10      let him give you his answer.
11  BY MR. BELFORTI:
12      Q    Sure.  Okay, Mr. Grant.
13      A    Yeah.  From, you know, from the early
14  2000s, you know, I carried up until I had -- I was
15  in possession of firearms until 2010.
16      Q    Okay.
17      A    And then --
18             MR. ATKINSON:  Okay.  Keep going.
19      A    Then from 2010 to 2020 I owned absolutely
20  no firearms.
21      Q    Okay.  So I will just -- if you wouldn't
22  mind Mr. Grant, I am just going to follow up a
23  little bit on that information.  So in the early
24  2000s until 2010 you owned firearms, correct?
25      A    Excuse me?
```

1      Q    From the early 2000s until 2010 you owned

2    firearms, correct?

3      A    Yes.

4      Q    What kinds of firearms did you own in that

5    time period?

6      A    I don't know.  I don't remember.

7      Q    Okay.  Did you -- I am just asking, I want

8    to clarify, previously I think you said you didn't

9    own an AR-15-platform firearm prior to 2010, right?

10          MR. ATKINSON:  Objection to form.  You can

11      answer.

12      A    That is correct.

13      Q    Okay.  And you have never owned an

14    AR-15-platform firearm as we discussed, as you

15    described from paragraph 9 of your affidavit, right?

16          MR. ATKINSON:  Objection to form.

17      A    Repeat that again?

18      Q    Sure.  It was kind of a bad question.  So

19    for the last couple of minutes before we went on the

20    break we were talking about your affidavit,

21    paragraph 9 where you use the phrase AR-15-platform

22    firearm.  Do you remember that?

23      A    Yes.

24      Q    Okay.  Have you ever owned an

25    AR-15-platform firearm as you described it from

```
 1    paragraph 9 of your affidavit?

 2            MR. ATKINSON:  Objection to form.  You can

 3        answer.

 4        A    No.

 5        Q    Okay.  From 2010 to 2020 you owned no

 6    firearms, correct?

 7        A    Correct.

 8        Q    Why is that?

 9        A    Life got in the way.  I was traveling.

10        Q    Okay.  Were you traveling out of the

11    country or traveling within the United States?

12        A    Both.

13        Q    Okay.  Was it a legal reason that you

14    didn't want to own firearms between 2010 and 2020?

15    And what I mean by that, just to clarify is, were

16    you concerned that you were going into a

17    jurisdiction where you wouldn't be allowed to

18    transport firearms or was it just a personal

19    preference?

20            MR. ATKINSON:  Objection to form.  You can

21        answer.

22        A    My firearms stayed in Connecticut.

23        Q    Okay.  But between 2010 and 2020 you

24    didn't own any firearms, correct?

25        A    Yes.
```

1    Q    Okay.  So again I'll ask the question, you

2  said life got in the way.  Was the reason that you

3  didn't want to own firearms between 2010 and 2020

4  because of your travel because you were concerned

5  about legal restrictions in other jurisdictions?

6    A    Nope.

7    Q    Okay.  That's fine.  So I believe you said

8  before, correct me if I'm wrong, that you currently

9  own an AR-15-platform firearm in an other

10 configuration, is that correct?

11   A    That is correct.

12   Q    Okay.  If I asked this question before I

13 apologize, when did you purchase that firearm?

14   A    Some time after 2020.  I don't know the

15 date.

16   Q    Some time after 2020, okay.  Can I ask

17 you, and this might get a little bit tricky because

18 of the terminology so I'm going to try as clear as I

19 can.  Well, let me start with this.

20        The AR-15-platform firearm you have in an

21 other configuration, does it have a particular name

22 that we can use to identify it?

23   A    One fires 223 and 5.56.

24   Q    Okay.  So you have more than one

25 AR-15-platform firearm in an other configuration?

1        A    The other fires 9 millimeter.

2        Q    Okay.  So I'm taking that to mean, and

3   please correct me if I am wrong, that you own at

4   least two AR-15-platform firearms that are in other

5   configurations?

6              MR. ATKINSON:  Objection to form.  You can

7        answer.

8        A    I own a bunch of receivers.

9        Q    Okay.  How many receivers do you own?

10       A    Quite a few.

11       Q    More than ten?

12       A    No.

13       Q    So less than ten?

14       A    Those are what you would call unfinished

15   projects.

16       Q    Unfinished projects.  So those are like

17   parts of a firearm that are not yet part of a fully

18   constructed firearm?

19       A    Correct.

20       Q    Okay.  Of the ____ or so others that we

21   have discussed before, are those all completed

22   firearms, meaning that they're capable of

23   discharging a projectile?

24             MR. ATKINSON:  Objection to form.  You can

25        answer.

```
 1        A    If they were completed, yes.
 2        Q    Are any of your others completed?
 3        A    The receivers, no.
 4        Q    Okay.  So let me start with this.  What
 5   would you mean by an uncompleted other configuration
 6   firearm?
 7        A    Just the receiver.
 8        Q    Just the receiver, okay.  I believe I
 9   asked you before if you had ever fired one of your
10   others, do you remember that?
11        A    Yes.
12        Q    Okay.  You have fired some of your others,
13   correct?
14        A    Correct.
15        Q    Okay.  So, is it fair to say that some of
16   your others are completed firearms?
17        A    Correct.
18        Q    How many of them are completed firearms?
19        A    I would believe ████  maybe ████
20        Q    ████  maybe ████  okay.  Of those ████  or
21   maybe████  completed others, how many of them are
22   AR-15-platform style weapons in an other
23   configuration?
24        A    ████  maybe ████
25        Q    ████  maybe ████  okay.  So that's the one
```

```
 1   I want to talk about right now, the ████ or ████ that
 2   are AR-15-platform in an other configuration that
 3   you own.  What would be the difference between one
 4   of those weapons that you currently own and an
 5   AR-15-platform firearm that you are describing in
 6   paragraph 9 of your declaration?
 7            MR. ATKINSON:  Objection to form.  You can
 8       answer.
 9       A    Repeat that, please?
10       Q    Sure.  You know what I think maybe it
11   would be helpful if I share the screen again, I'm
12   going to pull up your affidavit.  Can you see the
13   affidavit there, Mr. Grant?
14       A    Yes.
15       Q    Okay.  Just to clarify, we just talked
16   about your others, right, the ████ or ████ that are
17   in an AR-15 other configuration, right?  We just
18   talked about that, right?
19       A    Uh-huh.
20       Q    Is that a yes?
21       A    Yes.
22       Q    Okay.  Now I want to talk about this
23   paragraph 9 and I'm highlighting it.  Right, we have
24   the AR-15-platform firearm, right.  This is the
25   firearm that you talk about that you would like to
```

1    own or like to purchase but you can't, correct?

2        A    Correct.

3        Q    Okay.  What is the difference between the

4    AR-15-platform firearm that you reference in

5    paragraph 9 of your affidavit and the ▮▮▮▮ or ▮▮▮

6    AR-15-platforms in other configurations that you

7    currently own?

8            MR. ATKINSON:  Objection to form.  You can

9        answer.

10       A    The platform that I'm looking for in this

11   particular affidavit is one that's not legal in

12   Connecticut.

13       Q    So are there any other differences between

14   the weapon you're referencing in paragraph 9 and the

15   ▮▮▮▮ or ▮▮▮ others that are in AR-15 configuration

16   that we mentioned before?

17       A    Yes.

18       Q    What are those differences?

19       A    They're legal in Connecticut.

20       Q    I understand that.  Other than the

21   legality of these weapons, are there any other

22   differences between these two types of firearms?

23       A    Yes.

24       Q    What are those differences?

25       A    The one that's illegal, the one I wanted

```
 1   has a folded or collapsible stock, that's the one I
 2   desire and I can't get because it's illegal in
 3   Connecticut.  The ones that I do have are legal
 4   because they have a pistol brace on it.
 5        Q    Okay.  So I want to focus in on that then.
 6   I believe before you testified that you fired your
 7   others from the shoulder previously, is that
 8   correct?
 9        A    Not all the way complete.  I fired
10   different ways for training.
11        Q    Different ways for training, okay.  When
12   is the last time you fired one of your ████ or ████
13   others that are in an AR-15-platform configuration?
14        A    A few months ago.
15        Q    Okay.  That must have been at the firing
16   range, correct?
17        A    Yes.
18        Q    Okay.  That last time you were at the
19   firing range how did you fire that other?  Did you
20   fire it from the shoulder or did you fire it like a
21   handgun?
22             MR. ATKINSON:  Objection to form.  You can
23        answer.
24        A    I'm not understanding what you mean by
25   handgun.
```

Eddie Grant, Jr.                                                    Job Date:7/10/2023

1        Q    Okay.  So my understanding -- maybe we

2   start by this.  Before we were talking about firing

3   from the shoulder.  Why don't you explain to me what

4   you understand by the phrase firing from the

5   shoulder?

6        A    Firing from the shoulder means firing it

7   like a long gun.

8        Q    Like a long gun.  Does that mean that the

9   back end of the weapon, the pistol brace is up

10  against your shoulder while your hand is on the

11  trigger?

12       A    Yes.  I put it up to my shoulder, yes.

13       Q    Okay.  So that's what I mean by fire from

14  the shoulder then.  So the last time you were at the

15  range a few months ago and you were firing one of

16  your others, were you firing it from the shoulder?

17       A    Sometimes.

18       Q    Okay.  So you were sometimes?

19       A    As I said before, I fired different ways

20  for training purposes.

21       Q    Okay.  And I want -- you keep using the

22  term training, I just want to clarify that.  When

23  you say training I assume you mean your own training

24  that you do at the range currently, is that fair?

25            MR. ATKINSON:  Objection to form.  You can

```
 1        answer.
 2        A    Yes.  For many different, you know, we go
 3   through many different scenarios.
 4        Q    Okay.  When you say "we" are you part of
 5   like an organized group or a class or something like
 6   that?
 7        A    Nope, just a bunch of guys and gals.
 8        Q    Bunch of guys and gals.  So these are just
 9   social acquaintances that you go to the range with
10   and you act out different scenarios to train with
11   your firearms?
12        A    Yes.
13        Q    Okay.  How long have you been doing that
14   with that group of guys and gals?
15        A    A bunch months.
16        Q    A bunch of months, okay.  So since -- let
17   me ask you this.  All within 2023 or was it prior to
18   2023 as well?
19        A    It's been one time, I'm not exactly sure.
20   I know there was one time in 2022.
21        Q    Okay.  But mainly in 2023, is that true?
22        A    Correct.
23        Q    Okay.
24        A    Yeah.  Yup.
25        Q    Okay.  But is it fair to say that you have
```

Eddie Grant, Jr.                                                    Job Date:7/10/2023

 1   owned others in an AR-15 configuration prior to I

 2   suppose training with this group?

 3        A    Yes.

 4        Q    Okay.  Prior to training with this group

 5   had you ever fired one of your others in an AR-15

 6   configuration from the shoulder?

 7        A    No.

 8        Q    No, okay.  I think we have talked about

 9   what it is to fire from the shoulder.  I guess how

10   would one fire a firearm with a pistol brace on it

11   not from the shoulder, could you describe that for

12   me?

13             MR. ATKINSON:  Objection to form.  You can

14        answer.

15        A    We can fire it from the hip.

16        Q    Okay.  When you say fire from the hip,

17   does that mean, forgive my ignorance, does that mean

18   that the pistol brace is pressed up against ones hip

19   while the hand is on the trigger?

20        A    No.

21        Q    Okay.  So then what do you mean then by

22   fire from the hip?

23        A    It's a term that we use in particular law

24   enforcement that sometimes you're not going to have

25   time to get your firearm up to your shoulder, so

```
 1    you're going to have to fire in a way to defend your

 2    life.

 3        Q    Okay.  Does firing from the hip require

 4    or -- excuse me, Withdrawn.

 5             Does firing from the hip include placing

 6    two hands on the firearm?

 7             MR. ATKINSON:  Objection to form.  You can

 8        answer.

 9        A    In my -- yes, for me.

10        Q    Okay.  So one hand would be on the pistol

11    grip with your finger on the trigger, correct?  If

12    you're firing from the hip one hand would be on the

13    pistol grip with your finger on the trigger,

14    correct?

15        A    No.

16        Q    No?  Okay.

17        A    I am not sure what you're talking about.

18        Q    What I am trying to understand is the

19    various ways of firing the others that you own,

20    right.  So we have discussed firing from the

21    shoulder, right.  So when you're firing -- let's

22    start with this.

23             When you're firing from the shoulder do

24    you have both your hands on the firearm?

25             MR. ATKINSON:  Objection to the form.  You
```

```
 1        can answer.
 2        A    Yes, I have both hands on the firearm.
 3        Q    Okay.  Then the pistol brace is up against
 4   your shoulder, correct?
 5        A    In some instances, yes.
 6        Q    In some instances.  When you're firing
 7   from the shoulder though it's up against your
 8   shoulder, that's what we mean by fire from the
 9   shoulder, correct?
10        A    Correct.
11        Q    Okay.  So now I want to talk about the
12   other ways you could fire one of your others that
13   has a pistol brace on it.  You referenced hip
14   firing.  Could you describe to me what hip firing,
15   how your body would be positioned with the firearm
16   in hip firing?
17        A    It would be in a bladed position.
18        Q    A bladed position.  Could you describe --
19   I'm not familiar with that term, can you describe
20   that for me, sir?
21        A    90 degrees towards the target.
22        Q    So is the firearm at 90 degrees or you're
23   at 90 degrees?
24        A    My body is at 90 degrees.
25        Q    Okay.  Are you standing or are you
```

```
 1   kneeling?

 2        A    No, I'm standing.

 3        Q    Okay.  Where are your hands?

 4        A    Both of them are on the rifle.

 5        Q    Okay.  Both are on the rifle, okay.  Just

 6   clarify when you say rifle, we're talking about your

 7   others?

 8        A    Yeah, the others.

 9        Q    Okay.  So you have the one hand I am

10   assuming -- are you right handed, sir?

11        A    I shoot both ways.

12        Q    Okay.  So let's say when you're shooting

13   with your right hand, meaning when you're pulling

14   the trigger with your right hand, where is your left

15   hand?

16        A    It is usually on the forward stock -- the

17   forward grip.

18        Q    Forward grip, okay.  That's when we're hip

19   firing, correct?

20        A    Correct.

21        Q    Okay.  Other than hip firing and shoulder

22   firing are there any other ways to fire one of your

23   others, specifically the ones that are in the AR-15

24   configuration?

25             MR. ATKINSON:  Objection to form.  You can
```

```
 1        answer.

 2        A    No.

 3        Q    So I guess I'm a little confused because

 4   it -- well, withdrawn.

 5             So then it would be fair to say that hip

 6   firing and shoulder firing are the only two ways

 7   that you would fire your others that are in an AR-15

 8   configuration?

 9             MR. ATKINSON:  Objection to form.  You can

10        answer.

11        A    Yes.

12        Q    Okay.  So then the -- so then if you are

13   firing one of your others, one of your AR-15 others,

14   both of your hands are on the weapon whether you're

15   firing from the shoulder or from the hip?

16        A    Yes.

17        Q    Okay.  So what I want to understand is, I

18   think the one thing you identified in terms of

19   practical differences between the AR-15 firearm

20   we're talking about in paragraph 9 of your

21   declaration and the AR-15 others that you currently

22   own, is that the AR-15 platform firearm in paragraph

23   9 could have a collapsible or a folding stock, is

24   that correct?

25        A    That is correct.
```

Eddie Grant, Jr.                                                    Job Date:7/10/2023

```
 1        Q    Okay.  What is the tactical advantage or I
 2   guess what -- Withdrawn.
 3             What makes a collapsible or a folding
 4   stock preferable to the shooter from a pistol brace?
 5             MR. ATKINSON:  Objection to form.  You can
 6        answer.
 7        A    It's my desire to have it.
 8        Q    Your desire to have it?
 9        A    Yeah.
10        Q    Is there anything else that would make the
11   AR-15-platform firearm more effective than the
12   others you own other than just the preference?
13             MR. ATKINSON:  Objection to form.  You can
14        answer?
15        A    Well, what I remember, I had a familiarity
16   with that one.
17        Q    Okay.  Do you think you're at a
18   disadvantage with the others that you have because
19   of that lack of familiarity?
20        A    I feel that I am.
21        Q    Okay.  How often do you train on your
22   others?  And by train, I mean go to the range and
23   fire with your others.
24        A    I would train more, but I have caregiving
25   duties that I am currently doing so that limits my
```

1  time to get out there.  So it's not -- like I want

2  to, so it's not much.

3      Q    I understand.  Would you say that you have

4  become more familiar with your AR-15 others over

5  time?

6          MR. ATKINSON:  Objection to form.  You can

7      answer.

8      A    You know, handling a firearm there's

9  always something new you can learn.  It doesn't

10 matter what platform you use.  There's always

11 something new.

12     Q    Okay.  So there's always something new you

13 can learn from your AR-15 others, correct?

14     A    That's with any firearm.

15     Q    So if it's with any then it would also

16 apply to the AR-15-platform firearm you're talking

17 about in paragraph 9, right?

18     A    Yes.

19     Q    Okay.  When you filed this affidavit in

20 February of 2023 you were aware of a change in an

21 ATF rule, correct?

22         MR. ATKINSON:  Objection to form.  You can

23     answer.

24     A    I have heard about it.

25     Q    I am looking at paragraph 13.  I am going

```
 1   to read this out loud.  It says, "I am aware that

 2   the federal Bureau of Alcohol, Tobacco, Firearms,

 3   and Explosives, ("ATF") has promulgated and

 4   published a new rule which redesignates certain

 5   firearms, which had previously been considered "any

 6   other firearm" and "others" as either rifles or

 7   pistols."

 8          Did I read that correctly?

 9      A   Uh-huh.

10      Q   Is that a yes?

11      A   Yes.

12      Q   Okay.  So by February of 2023 you were

13   aware of this change to the ATF rule, correct?

14      A   Correct.

15      Q   Okay.  Since that rule has gone into

16   effect have you sought to register your others with

17   the ATF?

18      A   No.

19      Q   Okay.  Why not?

20      A   Because I'm a member of the Second

21   Amendment Foundation and we have an injunction on

22   that.

23      Q   You have an injunction against the ATF

24   rule?

25      A   Correct.
```

```
 1          Q    Out of what Court?

 2          A    I don't know exactly which one, but

 3     that's, you know, that's what was told to me.

 4          Q    Okay.  I'm going to ask you and if this

 5     is -- I am not asking you any questions about any

 6     conversations you have had with your lawyers.  But

 7     who told you about this injunction?

 8          A    It's been well known throughout the --

 9     throughout my membership with SAF.

10          Q    When did you first learn of this

11     injunction?

12          A    I can't remember.

13          Q    How long have you been a member of the

14     SAF?

15          A    I don't remember the exact date.

16          Q    Okay.  Was it as of 2020?

17          A    Yeah, we can -- yeah, we can say that.

18          Q    Okay.  Are you a member of any other

19     firearms organizations?

20          A    Yes, I am.

21          Q    Okay.  What are those?

22          A    FPC, which is Firearms Policy Coalition.

23          Q    Okay.  Any other ones?

24          A    Gun Owners of America.

25          Q    Okay.  Any others?
```

Eddie Grant, Jr.                                                    Job Date:7/10/2023

```
 1        A    And recently FRAC.

 2        Q    Recently -- I am sorry, did you say FRAC?

 3        A    And also --

 4        Q    Sorry, can you just give me the letters of

 5   that last one and just tell me what they stand for?

 6             MR. ATKINSON:  So FRAC, he's asking you

 7        about FRAC, what does it stand for?

 8        A    I don't have the -- I have it on my notes

 9   here.

10        Q    It's okay.  So it's F-R-A-C?

11        A    Yes.

12        Q    Okay.  Then I think you were about to say

13   something else sir and I cut you off.  Please,

14   finish your answer.

15        A    CCDL.

16        Q    Is that the Connecticut Citizens Defense

17   League?

18        A    That is correct.

19        Q    Okay.  Have you been a member of all these

20   organizations since around 2020 when you started

21   owning firearms again?

22             MR. ATKINSON:  Objection to form.  You can

23        answer.

24        A    No.

25        Q    No.
```

```
 1        A    It was some time after.

 2        Q    Some time after that, okay.  All right.

 3   So being apart of these organizations are you

 4   typically, I suppose up to date on recent gun laws

 5   or legislative proposals related to firearms?

 6        A    You hear things, you know.  But as being

 7   up to date on every single thing, I can't say that.

 8        Q    Okay.  Did you ever become -- we'll start

 9   with this.  I'm looking at paragraph 16 of your

10   affidavit from February of this year.  It says,

11   "Despite my efforts to inform myself on the issue, I

12   am unable to determine if this federal redesignation

13   changes the legal status of my firearms, as of

14   January 31, 2023, from perfectly legals "others" in

15   Connecticut, to banned illegal "assaults weapons"

16   under Connecticut General Statute Section 53-202a."

17   Did I read that correctly?

18        A    Yes.

19        Q    Okay.  So subsequent to you signing this

20   affidavit in February of 2023, did you ever get any

21   update as to whether or not others were legal in

22   Connecticut after the ATF rule?

23             MR. ATKINSON:  Objection to form.  You can

24        answer.

25        A    Like I said before, you hear things and it
```

```
1   said that, you know, that they won the injunction.

2        Q    Okay.  What I want to -- what I'm asking

3   about though is in this case in particular, you

4   sought a temporary restraining order in this case

5   trying to enjoin the defendants in this case from

6   enforcing the Connecticut assault weapons ban

7   against others.  Right?

8             MR. ATKINSON:  Jaime, I'm going to object

9         here because I think one of the difficulties

10        he's having is we're treading really close to

11        attorney/client privileged conversations.  So I

12        don't know if you can phrase this question in a

13        way that makes it easier for him to answer

14        without having that difficulty.

15       Q    Sure.  After -- well, what I tried before

16   was, after you signed this affidavit on February 3

17   of 2023, did you become aware that the Department of

18   Emergency Services and Public Protection and the

19   Chief State's Attorney represented that others were

20   legal under Connecticut law as it was currently

21   written?

22       A    I'm not sure.

23       Q    You're not sure, okay.  So no one ever

24   informed you about developments in this case with

25   regard to whether or not others were legal under
```

Eddie Grant, Jr.                                                                              Job Date: 7/10/2023

```
 1    Connecticut law despite the ATF rule?
 2            MR. ATKINSON:  I am going to object again
 3         Jaime because I don't know how this can be
 4         separated from conversations he's had with the
 5         lawyers on the case.  This is just going way
 6         too much towards our conversations with him, so
 7         I think it's frivolous.
 8            MR. BELFORTI:  I'm not asking about his
 9         conversations with you, counsel.  I'm asking
10         about his knowledge as to his legal status.
11         I'm just trying to understand if he was aware
12         of any of the representations that the
13         defendants made in this case after February of
14         2023.  I'm not asking for the source, I'm not
15         asking for any details of the conversations, I
16         just want to know if he has any knowledge of
17         that.
18            MR. ATKINSON:  All right.  Do you
19         understand what he's asking?
20            THE WITNESS:  No.
21            MR. ATKINSON:  Can you repeat it again,
22         Jaime?
23         Q    Sure.  So you're a plaintiff in this case,
24    correct?
25         A    Excuse me?
```

```
1        Q    You're a plaintiff in this case, Grant

2   versus Lamont, correct?

3        A    Yes.

4        Q    One of the things that you have sought in

5   this case, looking at paragraph 19, "I ask that the

6   Court issue a Temporary Restraining Order

7   restraining the Defendants in Grant v. Lamont, and

8   those working under them, from taking any action to

9   enforce the state's "assault weapon" ban against me

10  and the many thousands of people who own or would

11  like to own firearms that were previously designated

12  as "others"."

13            Did I read that correctly?

14       A    Yes.

15       Q    Okay.  That's what you were asking the

16  Court for, right?

17       A    Yes.

18       Q    So you're aware that this temporary

19  restraining order that you asked for was denied,

20  right?  Are you aware of that, sir?

21       A    Yes.

22       Q    Okay.  You're aware that the reason it was

23  denied is because the Court found that there wasn't

24  a credible threat that you would be prosecuted under

25  Connecticut law for owning others, right?
```

```
 1              MR. ATKINSON:  Objection to form.  You can

 2       answer.

 3       A    I'm not sure.

 4       Q    You're not sure.  Did you read that

 5  decision?

 6              MR. ATKINSON:  Objection to form.  You can

 7       answer.

 8       A    No.  I didn't read that decision.

 9       Q    Okay.  Fair enough.  I'm going to take

10  down this affidavit, Exhibit 1, and I am going to

11  pull up your supplemental affidavit, which I will

12  have marked as Exhibit 2.

13              (Whereupon, Supplemental Affidavit marked

14       Defendant's Exhibit 2 for Identification.)

15       Q    Can you see that up on the screen,

16  Mr. Grant?

17       A    Yes.

18       Q    Okay.  I'm going to go down to the last

19  page with your signature, okay.  I'm on page four of

20  Exhibit 2.  Is that your signature right there?

21       A    That's me.

22       Q    Okay.  This was signed on July 5 of this

23  year, correct?

24       A    Uh-huh.

25       Q    Is that a yes?
```

Eddie Grant, Jr.                                                                    Job Date:7/10/2023

```
 1        A     Yes.
 2        Q     I'm sorry I keep doing is that a yes, it's
 3   just the court reporter is taking this down and
 4   uh-huh sometimes it's unclear.  So I apologize.  I
 5   am not trying to be a jerk.
 6        A     No.  No.  I understand.
 7        Q     Yeah.  Okay.  So I'm looking at this
 8   affidavit here and I'm looking at page three and you
 9   say in paragraph 5, "It has been my intention to
10   acquire a .300 Blackout in a Connecticut "other"
11   configuration for quite sometime.  Specifically, it
12   has pistol grips and fore grips."  Did I read that
13   correctly?
14        A     That is correct.
15        Q     Okay.  How long had you intended to
16   acquire a .300 Blackout?
17        A     It's been on my list for quite a few
18   months.
19        Q     Quite a few months.  Would that be like
20   six months, seven months?
21             MR. ATKINSON:  Objection to form.  You can
22        answer.
23        A     I'm not sure.
24        Q     Okay.  I'm just -- so quite a few months
25   though, at least more than one, correct?
```

```
1        A    We can safely say that.

2        Q    Safely say that, okay.  When is the first

3   time you went to a firearms dealer in Connecticut

4   and asked about purchasing a .300 Blackout?

5        A    June 30, as my statement says.

6        Q    Okay.  You never tried prior to June 30 to

7   purchase a .300 Blackout?

8             MR. ATKINSON:  Objection to form.  You can

9        answer.

10       A    No.

11       Q    Why not?

12       A    Financial.

13       Q    Financial, okay.  So because you didn't

14  have the money?

15       A    That's correct.

16       Q    How much does a .300 Blackout cost?

17       A    I'm not sure.

18       Q    So if you're not sure how much it costs,

19  how could you know that you didn't have the money to

20  purchase it?

21            MR. ATKINSON:  Objection to form.  You can

22       answer.

23       A    Because there's many different types of

24  models and brands and, you know, and what you want

25   for attachments.
```

Eddie Grant, Jr.                                                    Job Date: 7/10/2023

```
1        Q    Okay.  Were you aware that there was
2   efforts by the Connecticut legislature to ban others
3   under Connecticut law during the early months of
4   2023?
5             MR. ATKINSON:  Objection to form.  You can
6        answer.
7        A    Yes, I have heard it.
8        Q    Okay.  You realize that under the current
9   law you're still allowed to possess the others that
10  you owned prior to the passage of the bill, right?
11            MR. ATKINSON:  Objection to the form.  You
12       can answer.
13       A    Yes.
14       Q    Okay.  So why didn't you try to purchase
15  the .300 Blackout prior to the law going into
16  effect?
17            MR. ATKINSON:  Objection to form.  You can
18       answer.
19       A    Again, I will state it was due to
20  financial reasons.
21       Q    Okay.  But we still don't know how much
22  the .300 Blackout actually costs though?
23            MR. ATKINSON:  Objection to form.
24       A    Again, I will state is that they come in
25  many different models, many different accessories
```

Eddie Grant, Jr.                                                    Job Date:7/10/2023

```
1   and I am just trying to lock down -- I was just

2   making an inquiry to it because of my interest and,

3   you know, with some extra money to the side I said

4   okay.

5        Q    Okay.  But you weren't concerned that may

6   be it would make sense to purchase this before a ban

7   went into effect and you'd be allowed to keep that

8   weapon?

9             MR. ATKINSON:  Objection to form.  You can

10       answer.

11       A    All I did was inquire because I had a

12  desire to own one.

13       Q    No, I understand that.  But you said you

14  had a desire to own one for several months, right?

15       A    Yes.

16       Q    And you said you were aware that the

17  Connecticut legislature was trying to ban these

18  weapons, right?

19       A    Yes.

20       Q    And you said you were aware that you're

21  able to possess the others that you already have,

22  correct?

23       A    Repeat that again?

24       Q    Yeah.  You said you were aware that you're

25  able to continue to possess the others that you
```

Eddie Grant, Jr.                                                    Job Date:7/10/2023

```
 1  already owned before the effective date of the new
 2  law, correct?
 3       A    Correct.
 4       Q    Okay.  So you could have purchased the
 5  .300 Blackout before this law went into effect and
 6  been able to keep it, but you didn't inquire about
 7  purchasing it until after this law went into effect,
 8  correct?
 9       A    Correct.
10       Q    Okay.  Is there anything about the .300
11  Blackout that is I suppose more effective than the
12  ▮▮▮▮ or ▮▮▮▮ others you have in the AR-15
13  configuration?
14            MR. ATKINSON:  Objection to form.  You can
15       answer.
16       A    I am not a firearm's expect.  It's a
17  curiosity of mine that I would like to have one.
18       Q    Okay.  Do you think that your inability to
19  own a .300 Blackout places you at any particular
20  risk of crime or violence or anything like that?
21            MR. ATKINSON:  Objection to form.  You can
22       answer.
23       A    Repeat that again, please?
24       Q    Sure.  Do you think that your inability to
25  currently own a .300 Blackout as you specify in
```

```
 1   paragraph 5 of your supplemental declaration does

 2   place you at any risk or at any heightened risk of

 3   either crime or violence or attack?

 4           MR. ATKINSON:  Objection to form.  You can

 5      answer.

 6      A    All I had was a want and a desire to have

 7   one.

 8      Q    Okay.  So is it fair to say that you are

 9   able to defend yourself with the firearms you

10   already have, you would just like to be able to

11   purchase additional firearms?

12           MR. ATKINSON:  Objection to form.  You can

13      answer.

14      A    I can't necessarily say that because we

15   don't -- we can't pick and choose what -- depends on

16   the situation that I am going to be in.

17      Q    Okay.  Please.

18      A    I would like to acquire a .300 Blackout

19   and, you know, just kick the tires on.

20      Q    What situation would the .300 Blackout be

21   useful for that the weapons you currently own are

22   not useful for?

23           MR. ATKINSON:  Objection to form.  You can

24      answer.

25      A    All I have is a desire to own one and take
```

```
 1   it out to the range, so that's why I went to my

 2   local gun store and inquired and asked about is it

 3   legally able to purchase one.

 4        Q    Okay.  But sitting here today, you can't

 5   think of a scenario where the .300 Blackout would be

 6   a superior firearm to the firearms that you

 7   currently own?

 8             MR. ATKINSON:  Objection to form.  You can

 9       answer.

10        A    From what I hear, and this is what I hear,

11   is it's -- it has better fire power.

12        Q    Okay.  What do you mean by fire power?

13        A    That's what I was told.  Again, I am not a

14   gun expert.

15        Q    I understand that.  But I guess what I'm

16   trying to understand is, by fire power do you mean

17   like the capacity of the magazine is larger or it

18   has more muzzle velocity?  What do you mean by fire

19   power?

20             MR. ATKINSON:  Objection to form.  You can

21       answer.

22        A    I haven't owned a .300 Blackout nor have I

23   looked at any .300 Blackout rounds to determine that

24   factor.

25        Q    Okay.  Have you done any research on the
```

1    internet or anything about .300 Blackout and it's

2    capabilities?

3         A    No.

4         Q    Okay.  Have you -- do you typically do

5    research on the capabilities of the firearms that

6    you're going to get before you purchase them?

7         A    No.

8         Q    Do you typically discuss the capabilities

9    of the firearms that you are going to get before you

10   purchase them?

11        A    Sometimes.

12        Q    Okay.  Do you discuss those with like

13   other people in the various organizations that you

14   identified before?

15             MR. ATKINSON:  Objection to form.  You can

16        answer.

17        A    I go to my local gun store and discuss

18   that.

19        Q    Okay.  Is that local gun store the Lock N'

20   Load Firearms in Plantsville?

21        A    Correct.

22        Q    Okay.  Is that where you have purchased

23   all of your -- the ▮▮▮▮▮ or so firearms that you

24   currently own?

25             MR. ATKINSON:  Objection to form.  You can

Eddie Grant, Jr.                                                    Job Date:7/10/2023

```
1        answer.

2        A     Negative.

3        Q     How many of the _____ or so firearms that

4   you currently own have you purchased at the Lock N'

5   Load Firearms in Plantsville, Connecticut?

6        A     I don't have that number.

7        Q     Do you have any -- when is the last time

8   you purchased a firearm from Lock N' Load Firearms

9   in Plantsville, Connecticut?

10        A     I don't remember.

11        Q     Okay.  When is the last time you purchased

12   any firearm, period?

13             MR. ATKINSON:  Objection to form.  You can

14        answer.

15        A     I purchased a receiver in January.

16        Q     Okay.  Was that at Lock N' Load in

17   Plantsville?

18        A     No.  I don't recall exactly where.

19        Q     Okay.  When you purchase firearms or I

20   guess receivers do you usually purchase them from an

21   actual store or do you purchase them at like gun

22   shows?

23        A     I would love to go to a gun store because

24   I have never been to one yet.

25        Q     You have never been to a gun store before?
```

 1      A    Nope.  I mean gun show.  Gun show -- okay.
 2  Let me retract that.
 3      Q    Sure.
 4      A    Yes, I have been to a gun store before.
 5      Q    Okay.  I'm just trying to determine if you
 6  purchased all your firearms from gun stores or if
 7  there's some other method by which you have
 8  purchased some of your firearms?  You see what I'm
 9  saying?
10      A    I have purchased one online, I can't
11  remember the website.
12      Q    Okay.  Would it be fair to say that you
13  purchased one online and the rest would have been
14  purchased in stores like Lock N' Load Firearms?
15          MR. ATKINSON:  Objection to form.  You can
16      answer.
17      A    I, you know, to be honest, I'm not sure.
18      Q    Okay.  Have you ever actually had to use
19  any of the firearms that you own or have ever owned
20  in self-defense?
21          MR. ATKINSON:  Objection to form.  You can
22      answer.
23      A    No.  And again, I will say thank God.
24      Q    Okay.  Have you ever had to brandish a
25  firearm to avoid a conflict with someone else?

```
 1              MR. ATKINSON:  Objection to form.  You can

 2       answer.

 3       A     No.  And I can say again, thank God.

 4       Q     Okay.  Have you ever been specifically

 5  threatened with a crime of violence?

 6              MR. ATKINSON:  Objection to form.  You can

 7       answer.

 8       A     Not a crime of violence, no.

 9       Q     Have you ever been specifically threatened

10  with any crime?

11              MR. ATKINSON:  Objection to form.  You can

12       answer.

13       A     No.

14       Q     Okay.  Have you ever had to use any of

15  your firearms to prevent a crime being committed

16  against a third-party?

17              MR. ATKINSON:  Objection to form.  You can

18       answer.

19       A     No.

20       Q     Have you ever carried one of your others

21  outside of the home?

22              MR. ATKINSON:  Objection to form.  You can

23       answer.

24       A     To the range.

25       Q     To the range, okay.  So just to clarify,
```

```
 1   when you're carrying it are you transporting it in
 2   your car and then taking it out of the car to the
 3   range?
 4        A    Correct.
 5        Q    Okay.  How do you, and forgive my
 6   ignorance, how do you transport your others?  Are
 7   they in like a case or something that you take into
 8   the range or do you just carry it out in your hands?
 9             MR. ATKINSON:  Objection to form.  You can
10        answer.
11        A    I carry it in a case.
12        Q    Okay.  So, is there ever a time where you
13   were carrying one of your others on your person
14   outside of the home apart from transporting it to or
15   from the range?
16             MR. ATKINSON:  Objection to form.  You can
17        answer.
18        A    Negative.
19        Q    Okay.  Is it fair to say that you have
20   never carried an AR-15-platform firearm like we
21   discussed from your previous affidavit on your
22   person outside of the home?
23             MR. ATKINSON:  Objection to form.  You can
24        answer.
25        A    Again, define AR-15.
```

1    Q    Sure.  I'll go back to, I'm going to take

2    down Exhibit 2 and go back to Exhibit 1.  Pull up to

3    page I think it's three, looking at paragraph 9.  So

4    where you use the term AR-15 firearm, one that you

5    would intend to lawfully purchase but for the

6    Connecticut assault weapons ban.  Have you ever

7    carried one of these weapons that you reference in

8    paragraph 9 on your person outside of the home apart

9    from transferring it to or from a firing range?

10   A    No.

11   Q    Okay.  Other than self-defense is there

12   anything else that you use your firearms for?

13   A    Strictly self-defense.

14        MR. BELFORTI:  Strictly self-defense.

15   Okay.  Cam, I don't have much more.  Would you

16   mind if we took a quick bathroom break and I'm

17   just going to confer with my colleague here and

18   I'll wrap up.

19        MR. ATKINSON:  Sure.  Five minutes?

20        MR. BELFORTI:  Can we make it ten?

21        MR. ATKINSON:  That's fine.

22        (Whereupon, Off the record at 3:01 p.m.)

23        (Whereupon, Back on the record at 3:12

24   p.m.)

25

```
 1    BY MR. BELFORTI:
 2         Q    Mr. Grant, your attorney just informed me
 3    that there was another gun organization that you
 4    forgot about that you wanted to put on the record.
 5    If you could you please do that now?
 6         A    Yeah.  It was Metacon Gun Club Simsbury.
 7         Q    Metacon Gun Club in Simsbury.
 8         A    Yes.
 9         Q    And do you remember around when you joined
10    that?
11         A    It was in 2022.
12         Q    2022, okay.  And I keep -- I should
13    probably be clear about this, I keep using the term
14    the range, is there a particular shooting range that
15    you go to when we have been talking about range?
16         A    Yes.
17         Q    Where is that?
18         A    Metacon Gun Club.
19         Q    There we go.  Have you been -- were there
20    any other firing ranges you have gone to other than
21    Metacon Gun Club for training as you have described
22    during this deposition?
23         A    It's been a while since I have been to a
24    range.
25         Q    Okay.  The reason I ask is because you
```

```
 1   said you joined Metacon Gun Club in 2022.  I'm
 2   assuming you have been going to firing ranges at
 3   least since 2020 when you started owning firearms
 4   again.  Is it fair -- is that a fair assumption or
 5   am I wrong?
 6              MR. ATKINSON:  Objection to the form.  You
 7      can answer.
 8      A    I do recall going to Wolf's one or two
 9   times.
10      Q    You said Wolf's?
11      A    Yeah, in Bristol.
12      Q    In Bristol, okay.  All right.  Anywhere
13   else?
14      A    There was one I went to and -- I went to
15   twice in Berlin.  I can't remember the name of it.
16   It's a long Indian name.  I can't remember the name
17   of it.
18      Q    Fair enough.  Okay.  Do you -- of all of
19   the firearms you own, do you keep them all in your
20   home or do you store any of them at the various
21   ranges that we have identified?
22              MR. ATKINSON:  Objection to form.  You can
23      answer.
24      A    Negative.
25      Q    I'm sorry, that was a bad question.  Do
```

1   you keep them all in the home?

2        A    Yes.

3        Q    Okay.  Thanks.  Mr. Grant, do you

4   currently have any concrete plans to purchase an

5   AR-15-platform firearm like in paragraph 9 of your

6   February 2023 affidavit?

7             MR. ATKINSON:  Objection to form.  You can

8        answer.

9        A    Yes.  When one comes available at my local

10  gun store.

11       Q    Okay.

12       A    And I can legally purchase.

13       Q    Okay.  How about with the Blackout, do you

14  have any concrete plans to purchase the Blackout

15  from your second affidavit filed in July of 2023?

16            MR. ATKINSON:  Objection to form.  You can

17       answer.

18       A    Yes.  When one becomes legally available.

19       Q    Okay.

20       A    At my local gun store.

21       Q    Understood.  Have you sought to register

22  the ▮▮▮▮ or ▮▮▮▮ others that you own with the state

23  of Connecticut so that you can continue to possess

24  them despite this new law that's going into effect?

25            MR. ATKINSON:  Objection to form.  You can

Eddie Grant, Jr.                                                          Job Date:7/10/2023

1        answer.

2        A     I will -- I will register them legally.

3        Q     Okay.  Have you sought to do that yet?

4        A     No.

5        Q     Okay.  But you plan to do so?

6        A     Yes.

7        Q     Are you aware of like the time limits for

8    you to register them?

9              MR. ATKINSON:  Objection to form.  You can

10       answer.

11       A     I'm quite sure I can look it up.

12       Q     Fair enough.  Of the ▓▓▓▓▓ or so firearms

13   that you currently own, are any of those registered

14   with the state of Connecticut?

15             MR. ATKINSON:  Objection to form.  You can

16       answer.

17       A     No.

18       Q     Okay.  Is that because they're not

19   required to be registered by law?

20             MR. ATKINSON:  Objection to form.  You can

21       answer.

22       A     All I can say is they were bought legally

23   and went through the necessary background checks.

24       Q     Okay.  And I apologize for my ignorance,

25   I'm wondering if the reason they're not registered

```
 1    is just because they're not required to be

 2    registered by law or if there's some other reason

 3    you have chosen not to register them?

 4           MR. ATKINSON:  Objection to form.  You can

 5       answer.

 6       A    As far as I know, you know, to the best of

 7    my ability, again I am not a lawyer, so if it were

 8    to become available I would do what is necessarily

 9    legal to do to make it legal.

10       Q    Okay.  But just again, of the firearms

11    that you currently own none of them are registered,

12    right?

13           MR. ATKINSON:  Objection to form.  You can

14       answer.

15       A    No.

16       Q    Okay.  Mr. Grant, I think I probably know

17    the answer to this already, but have you ever been

18    convicted of any crimes?

19       A    When and where?

20       Q    Ever?

21       A    Yes.

22       Q    Okay.  In what state?

23       A    Connecticut.

24       Q    When?

25       A    1982.
```

```
 1          Q    What was the criminal offense?

 2          A    Criminal trespassing.

 3          Q    Criminal trespassing, okay.  Do you know

 4     if that was a felony or a misdemeanor?

 5               MR. ATKINSON:  Objection to form.  You can

 6          answer.

 7          A    Misdemeanor.

 8          Q    Misdemeanor, okay.  Did you plead guilty

 9     to that offense or did you go to a trial?

10               MR. ATKINSON:  Objection to form.  You can

11          answer.

12          A    I pled guilty.

13          Q    Okay.  Do you remember what your sentence

14     was for that?

15               MR. ATKINSON:  Objection to form.  You can

16          answer.

17          A    All I can say is I didn't do any jail

18     time.

19          Q    Didn't do any jail time, okay.  Do you

20     remember if you had like a suspended jail sentence

21     or something?

22          A    That's -- that's forty years ago.

23          Q    Okay.  Other than that conviction in 1982

24     have you been convicted of any other crimes?

25          A    Not that I know of.
```

```
 1        Q    Okay.  Have you been charged with any
 2   other crimes?
 3        A    Not that I know of to the best of my
 4   recollection.
 5        Q    Okay.  Have you been, to the best of your
 6   recollection, arrested for any other criminal
 7   offenses?
 8        A    I think there was an arrest in 1985.
 9        Q    1985.  Do you know where that was?
10        A    That was down in New Haven.
11        Q    New Haven, okay.  Do you remember what it
12   was about?
13        A    Breach of peace, I believe.
14        Q    Breach of peace, okay.  I should have
15   asked this before, but do you remember anything
16   about the circumstances of the 1982 criminal
17   trespassing conviction?  Like what was it that you
18   did?
19        A    I entered a house.
20        Q    You entered a house.  Did you -- was it at
21   nighttime?
22        A    No.
23        Q    Okay.  Do you remember whose house it was?
24        A    I don't remember.  Forty years ago.  I
25   like to forget things like that.  It was a
```

```
 1   neighbor's house.

 2        Q    Did I pause?

 3             MR. ATKINSON:  Yeah.  We got stuck.

 4        Q    I'm sure it was a very exciting question.

 5   I said do you remember why you entered into that

 6   neighbor's house, Mr. Grant?

 7        A    Stupidity.

 8        Q    Stupidity.

 9        A    You want the honest answer.

10        Q    I appreciate it.  Mr. Grant, have you ever

11   been subject to a temporary restraining order or

12   protective order in civil Court?

13        A    Never.

14        Q    Okay.

15        A    No.

16        Q    When you applied to work for the

17   Department of Corrections did you have to disclose

18   those arrests and that criminal conviction we were

19   just talking about?

20        A    Yes.

21        Q    Okay.  Was it like on a form you had to

22   fill out?

23        A    Yes.

24        Q    Okay.  While you were with the DOC were

25   you ever disciplined in any way?
```

```
 1        MR. ATKINSON:  Objection to form.  You can
 2     answer.
 3     A     Twenty-one years, yeah.  I had a few
 4  disciplinary write ups.
 5     Q     Okay.  What kinds of disciplinary write
 6  ups did you have while you were in the DOC?
 7     A     A few.
 8     Q     Okay.  Any having to do with I guess
 9  dishonesty or anything like that, like lying in a
10  document?
11     A     No.
12     Q     Okay.  Anything about like withholding
13  information from an investigation?
14     A     I'm not sure on that one.
15     Q     Is it because you can't remember or you
16  don't understand the question?
17        MR. ATKINSON:  Objection to form.  You can
18     answer.
19     A     That was a few years back, I'm not sure
20  what the investigation, you know, what they said
21  was -- what the exact investigation was.
22     Q     Okay.  So I just want to clarify, sir.
23  Like so you had been disciplined for withholding
24  information during an investigation while you were
25  at the DOC?
```

```
 1            MR. ATKINSON:  Objection to form.  You can
 2       answer.
 3       A    I'm not sure.
 4       Q    Okay.  So then it's possible that you were
 5  disciplined for withholding information from an
 6  investigation while you worked at the DOC?
 7       A    I'm not sure.
 8       Q    Okay.
 9       A    I can't remember.
10       Q    Can't remember.  Fair enough.  Mr. Grant,
11  I probably should have said this before, in the room
12  with me is Attorney Medeiros who is also on the
13  case, I think her camera is off and then we have two
14  interns with us, Peter and John.  Is there anybody
15  else in the room besides you and Mr. Atkinson?  I
16  think Fishbein is there too.
17       A    Yes.
18       Q    Who else is in the room with you?
19       A    Attorney Dubitsky.
20       Q    Okay.  Anybody else?
21       A    We have Michael Steifel.
22       Q    Michael Steifel, he's one of the other
23  plaintiffs in the case, right?
24       A    One of the other plaintiffs and
25  Jennifer -- no, that's it.  Right now we got in the
```

1    room right now.

2         Q    Okay.  While we have been talking has

3    there been anybody else in the room?  I have seen

4    people coming and going, I am just curious.

5         A    Yes.  Jennifer, the other plaintiff.

6         Q    Jennifer Hamilton?

7         A    Yes.

8         Q    Okay.  Anybody else besides Jennifer

9    Hamilton?

10        A    That's it.

11             MR. BELFORTI:  All right.  Well Mr. Grant,

12        I don't have any other questions for you right

13        now.  Perhaps your attorney will have some, but

14        I thank you very much for answering my

15        questions.  I really appreciate it.

16             THE WITNESS:  And thank you too.

17             MR. ATKINSON:  Can we have a five minute

18        break, Jaime?

19             MR. BELFORTI:  Sure.

20             (Whereupon, Off the record at 3:25 p.m.)

21             (Whereupon, Back on the record at 3:29

22        p.m.)

23    CROSS-EXAMINATION
      BY MR. ATKINSON:
24        Q    Mr. Grant, you were asked, do you recall

25    being asked earlier about the tactical advantages of

1   an AR-15-platform firearm?

2       A    Yes.

3       Q    Is it your understanding that one of the

4   tactical advantages of an AR-15-platform firearm is

5   that it has a lower recoil?

6       A    Yes.

7       Q    Is it your understanding that one of the

8   advantages of a collapsible or folding stock for an

9   AR-15-platform firearm is that it allows you to

10  adjust the length of a firearm to your body type?

11      A    Yes.

12          MR. ATKINSON:  Nothing further.

13  REDIRECT EXAMINATION
    BY MR. BELFORTI:

14      Q    Really quick Mr. Grant, just a couple in

15  response to that.

16          The stuff about lower recoil, is there

17  anything about the firearms that you currently

18  own -- well, withdrawn.

19          Does the recoil on the firearms that you

20  currently own prevent you from firing them

21  accurately?

22          MR. ATKINSON:  Objection to form.  You can

23      answer.

24      A    I can't truthfully answer that.

25      Q    Why not?

```
1        A    Because I haven't had a chance to compare

2   and other to what I used to fire.

3        Q    Okay.  Are you concerned that the firearms

4   you currently own because of the -- well, Withdrawn.

5             Do you find the recoil in the firearms you

6   currently own to be an impediment to you firing as

7   accurately as you would like to?

8             MR. ATKINSON:  Objection to form.  You can

9        answer.

10       A    I can't truthfully answer that, you know,

11  that, you know, because I would like to be able to

12  compare the both and then I can make a comparison.

13       Q    So you don't know if the recoil on an

14  AR-15-platform firearm that you described in

15  paragraph 9 of your February 2023 affidavit has

16  greater or less recoil than the others you currently

17  own?

18       A    I don't know.

19       Q    Okay.  I have to ask the question about

20  how tall are you, sir?

21       A    5'7".

22       Q    About how much do you weigh?

23       A    325.

24       Q    Okay.  In terms of adjusting the length of

25  the stock, is there anything about the others that
```

```
 1   you currently own that makes them too long for your

 2   body type?

 3        A    I have no -- you know, I can't answer --

 4   no.  I don't -- I really don't know.

 5        Q    Okay.  What about, are they, the others

 6   that you own, are they too short for your body type?

 7        A    No.

 8        Q    No.  How many times, and this might be a

 9   silly question, can you estimate for me how many

10   times you have fired a round from one of your [REDACTED]

11   or [REDACTED] others?

12        A    It was in the winter room.

13        Q    I'm not asking about the timing.  I'm

14   saying total how many -- I'm trying to get an idea

15   of -- you talked about how often you go to the

16   range, how many rounds have you fired from one of

17   your [REDACTED]  or [REDACTED] others in your lifetime?

18             MR. ATKINSON:  Objection to form.  You can

19        answer.

20        A    I would say that particular day it was

21   five hundred plus.

22        Q    Okay.  I appreciate that answer on this

23   particular day.  I'm asking if you could in total,

24   right, because I'm trying to get an idea --

25        A    I have no way of knowing.
```

Eddie Grant, Jr.                                                                    Job Date:7/10/2023

```
 1        Q    Okay.  Can I ask you this, is five
 2   hundred -- sorry?
 3             MR. ATKINSON:  We were letting him know
 4        that he had to let you finish your question.
 5        Q    That's fine.
 6        A    Yes.
 7        Q    I'm doing the same thing, right.
 8        A    I apologize.
 9        Q    We're in the same boat, right.  So that
10   day you last fired when you said you estimated over
11   five hundred rounds, is that a typical amount of
12   rounds you would fire in a trip to the range?
13        A    It varies.
14        Q    Is it fair to say that you have fired
15   thousands of rounds at the range from one of your
16   ████ or ████ others in your lifetime?
17             MR. ATKINSON:  Objection to form.  You can
18        answer.
19        A    No.
20        Q    No?  Is that because that's too much or
21   too little?
22        A    No.  Neither.
23        Q    Okay.  Can you estimate for me how many
24   rounds you have fired in your lifetime from one of
25   your ████ or ████ others?
```

 1        A     I have no idea.

 2        Q     Okay.  But the last time you went you

 3   fired five hundred plus rounds?

 4        A     Yes.

 5        Q     Okay.  In since 2020 can you give me a

 6   rough estimate of how many times you have gone to

 7   the range?

 8        A     I went one time in 2022 to fire.  So I

 9   don't know exactly how many rounds, what the round

10   count was.

11        Q     Okay.

12        A     We spent quite a deal of time out there.

13        Q     Okay.  So since 2020 you have only been to

14   the firing range two times?

15        A     No.

16        Q     How many times would you say?

17        A     It depends on what type of firearms I was

18   bringing.

19        Q     Well, I'm not talking about the type of

20   firearms you're bringing.  I'm saying just total how

21   many times have you been to the range since 2020?

22        A     A few times.  Again, I can't -- I did say

23   twice in Berlin, once in Bristol.

24        Q     Okay.

25        A     And several times at Metacon.

Eddie Grant, Jr.                                                                Job Date:7/10/2023

```
1      Q    Okay.  Fair to say over ten times since
2   2020?
3      A    No.
4          MR. ATKINSON:  Objection to form.  You can
5      answer.
6      Q    Fewer than ten times?
7      A    Yes.
8          MR. BELFORTI:  Okay.  Thank you,
9   Mr. Grant.  I don't have anything else for you.
10          MR. ATKINSON:  Before we go off the record
11      Jaime, what we were looking to do under docket
12      number 8, the standing protective orders, I
13      believe there were questions asked about the
14      number, the types and number of firearms that
15      Mr. Grant owns, how he was storing them and the
16      location of that storage.  We're going to claim
17      those as confidential, particularly the
18      location of the safe and how he's storing them
19      because if that information was publically
20      available I don't think we would want potential
21      criminals getting ahold of that information.
22          MR. BELFORTI:  I agree.  What I would say
23      is I'm going to have to take a look at it Cam,
24      I don't have it at my fingertips, I could say
25      right now without having looked into it, I have
```

Eddie Grant, Jr.                                                    Job Date:7/10/2023

```
1    no problem making Mr. Grant's address
2    confidential.  I know that that came up earlier
3    in the deposition.  So I mean if we want to,
4    you know, make that protected information I
5    don't think there's any interest in saying
6    exactly where he lives on the record, we don't
7    have a problem with that.
8         In terms of the other stuff, I will have
9    to take a deeper look at it.  I think maybe the
10   best way to do it is if you can send me
11   something in an email or writing and then we
12   can take a look at it and then that way...
13        MR. ATKINSON:  I think we're both going to
14   get a quick turn around on this transcript, so
15   if we were -- I know your brief is due by the
16   26th, if we can get you designations of what
17   portions we want declared confidential
18   beforehand that might be best.
19        MR. BELFORTI:  Sure.  That's probably the
20   best way to do it.  We can do that -- we still
21   got a little bit of work here to do today, we
22   can probably do that offline.
23        MR. ATKINSON:  Yes.
24        MR. BELFORTI:  Okay.
25        MR. ATKINSON:  Can we declare the
```

```
1        deposition closed?

2              MR. BELFORTI:  Yeah.

3              (Whereupon, Deposition Concluded at 3:39

4        p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

JURAT

2

3　　　　　I, EDDIE GRANT, JR, do hereby certify that

4　the foregoing testimony taken on July 10, 2023, is

5　true and accurate, including any corrections noted

6　on the corrections page, to the best of my knowledge

7　and belief.

8

9　　　　　　　　　　　　_____

10　　　　　　　　　　　EDDIE GRANT, JR.

11

12

13

14　　　　At _Meriden___ in said county of

15　_New Haven_, this _23_ day of _July___, 2023,

16　personally appeared EDDIE GRANT JR. and he made an

17　oath to the truth of the foregoing corrections he

18　subscribed.

19

20

21　Before me, _Cameron L. Atkinson_____, Notary Public/

22　My commission expires: _____　Commissioner of

23　　　　　　　　　　　　　　　　Superior Court

24　　　　　　　　　　　　　　　　Juris: 443289

25

Eddie Grant, Jr.                                                    Job Date:7/10/2023

```
 1              TRANSCRIPT CORRECTIONS

 2    REPORTER:   Emily Collette

 3    CASE:       Eddie Grant, Jr. et. al.
                  vs.
 4                Lamont, et. al.

 5

 6    PAGE LINE        CORRECTION           REASON

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24              NAME:    _____

25              DATE:    _____
```

```
 1              CERTIFICATE OF REPORTER

 2              I, Emily Collette, a Certified Shorthand

 3    Reporter/Notary Public within and for the State of

 4    Connecticut, do hereby certify there came before me,

 5    on the 10th day of July, 2023, the following named

 6    person, to wit:  EDDIE GRANT, JR. who was by me duly

 7    sworn to testify to the truth and nothing but the

 8    truth; that he was thereupon carefully examined upon

 9    his oath and his examination reduced to writing

10    under my supervision; that this deposition is a true

11    record of the testimony given by the witness.

12              I further certify that I am neither

13    counsel for, related to, nor employed by any of the

14    parties to the action in which this deposition is

15    taken; and further, that I am not a relative or

16    employee of any attorney or counsel employed by the

17    parties hereto, nor financially or otherwise

18    interested in the outcome of the action.

19              WITNESS my hand and affixed my seal this

20    17th day of July 2023.

21

22

23                              Emily Collette, CSR

24         My commission expires:  April 30, 2026

25
```