# EXHIBIT K

**Deposition Transcript of Jennifer Hamilton, Redacted**

```
1              UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
2

3      - - - - - - - - - - - -X
       EDDIE GRANT, JR., et al) NO.:  3:22-CV-01223(JBA)
4               Plaintiffs,)
                           )
5      LAMONT, et al.,      )
                Defendants.)
6      - - - - - - - - - - - -X
       Confidential
7      Attorneys' Eyes Only
       subject to specific designations
8

9

10

11

12

13
                   DEPOSITION OF:  JENNIFER HAMILTON
14                 DATE:  July 10, 2023
                   HELD AT:  VIA WEB-BASED VIDEO CONFERENCE
15

16

17

18

19

20
       Reporter:  RENATE REID, RPR
21     BRANDON LEGAL TECH LLC
       37 Pinnacle Mountain Road
22     Simsbury, Connecticut 06070
            (860) 528-2244
23

24

25
```

```
 1   APPEARANCES:

 2

     WILLIAM TONG
 3   ATTORNEY GENERAL
     Attorney for Defendants
 4   110 Sherman Street
     Hartford, CT 06105
 5   BY:  JANELLE R. MEDEIROS, ESQ.
          JAMES BELFORTI, ESQ.
 6   PH:  (860) 808-5450
     EMAIL:  janelle.medeiros@ct.gov
 7           james.belforti@ct.cov

 8

     ATKINSON LAW, LLC
 9   Attorneys for Plaintiffs
     122 Litchfield Rd., Ste. 2
10   P.O. Box 340
     Harwinton, CT 06791
11   BY:  CAMERON L. ATKINSON, ESQ.
     PH:  1-203-677-0782

12

13   ALSO PRESENT:

14   Greg Fishbein, Esq. - Atkinson Law
     Eddie Grant
15   Michael Stiefel
     Doug Dubitsky - Atkinson Law

16

17

18

19

20

21

22

23

24

25
```

```
 1              I N D E X

 2    WITNESS              EXAMINED BY        PAGE

 3    Jennifer Hamilton Janelle Medeiros    6

 4

 5              E X H I B I T S

 6    DEFENDANT EXHIBIT
      FOR IDENTIFICATION                            PAGE
 7
       Exhibit A, Affidavit of Jennifer Hamilton    43
 8     signed on 2/3/2023
       Exhibit B, Affidavit of Jennifer Hamilton    104
 9     signed 7/5/2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# S T I P U L A T I O N S

It is stipulated by the attorneys for the Plaintiff and the Defendant that each party reserves the right to make specific objections in open court to each and every question asked and the answers given thereto by the witness, reserving the right to move to strike out where applicable, except as to such objections as are directed to the form of the question.

It is stipulated and agreed between counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

It is further stipulated that any defects in the notice are waived.

It is further stipulated that the reading and signing of the deposition transcript by the witness is not waived.

```
 1              (Deposition commenced at 6:13 p.m.)

 2         THE REPORTER:  Are we having usual

 3    stipulations?

 4         MS. MEDEIROS:  We're fine with that.

 5         Are you okay with that, Cam?

 6         MR. ATKINSON:  Yes.

 7         THE REPORTER:  Are you having the

 8    witness read and sign?

 9         MR. ATKINSON:  Yes.

10         THE REPORTER:  And are you ordering

11    a transcript, Mr. Atkinson?

12         MR. ATKINSON:  Yes.  Not the clock

13    format; the one-to-one format.  To clarify,

14    we want it electronically, not paper.

15         THE REPORTER:  All counsel

16    participating in this deposition proceeding

17    acknowledge that I am not present in the

18    deposition room, and further acknowledge

19    that in lieu of an in-person administration

20    of the oath, it will be administered

21    remotely.  The parties and all counsel

22    consent to this arrangement and waive any

23    objections to this method of reporting.

24         Counsel, kindly voice your

25    agreement, stating your name and agreement
```

```
 1   on the record.

 2         MS. MEDEIROS:  Assistant Attorney

 3   Janelle Medeiros.  I agree.

 4         MR. ATKINSON:  Cameron Atkinson, for

 5   the Plaintiffs.  I agree.

 6

 7   J E N N I F E R   H A M I L T O N, called as

 8   a witness, having been first duly sworn

 9   remotely by the Notary Public, was examined

10   and testified as follows:

11   EXAMINATION BY

12   MS. MEDEIROS:

13   Q.  Good afternoon, Ms. Hamilton.  My name is

14   Janelle Medeiros, and I, along with Attorney

15   Belforti, represent the Defendants in the lawsuit

16   that you have brought against them.

17         I apologize.  You've been listening to

18   Attorney Belforti for a little while, so now you

19   get to hear from me; so we'll get a little bit of a

20   break in the voices here.

21         So, I know you've had to listen to a lot of

22   questions, and you kind of heard how it's gone; but

23   before I discuss just a couple of the ground rules,

24   have you ever been deposed before?

25   A.  Not that I'm aware of.
```

Jennifer Hamilton                                                    Job Date:7/10/2023

```
 1  Q.  Okay.  So, even though you've listened to
 2  what's gone on so far, just for a couple of
 3  guideposts throughout the deposition, while we're
 4  talking, please just do your best to let me answer
 5  my -- or ask my entire question before you start
 6  answering, just so that our court reporter has, you
 7  know, a clear dialogue to put down on the record.
 8         Is that fair?
 9  A.  Yes.
10  Q.  And for the same reason -- and I will try to do
11  the same as well -- please give all verbal answers
12  to my questions; no mm-hmms, uh-huhs, like, shakes
13  of the head or nods or anything like that, because
14  we need to have a verbal answer for the transcript.
15         Does that make sense?
16  A.  Yes.
17  Q.  Okay.  And while I'm asking questions, I have a
18  tendency to speak quickly; so, if you don't hear a
19  question or it doesn't make sense, please let me
20  know and I will repeat or rephrase the question.
21         Is that fair?
22  A.  Yes.
23  Q.  And if you don't understand a question that I
24  ask, again, please just let me know and I will
25  rephrase the question, okay?
```

1  A.  Yes.

2  Q.  And if you don't tell me otherwise, I'm going

3  to presume that you understood and heard my

4  question.

5         Is that fair?

6  A.  Yes.

7  Q.  Okay.  And if, at any point, you want to take a

8  break, please just say so.  And the only thing that

9  I ask is that if there is a question pending, you

10  just answer that question before we take the break.

11        Is that fair?

12  A.  Yes.

13  Q.  And since we've been speaking back and forth, I

14  assume that you speak, read, and understand

15  English.

16        Is that right?

17  A.  Yes.

18  Q.  Is there any reason at all that you would not

19  be able to understand and answer my questions

20  truthfully today?

21  A.  No.

22  Q.  Okay.  So, I just want to ask you a little bit

23  about litigation history.

24        Other than the Affidavits that you signed

25  under oath in this case, have you ever signed

 1  another affidavit and submitted it under oath, in

 2  any circumstance?

 3  A.  Yes.

 4  Q.  What circumstances?

 5  A.  My divorce hearing.

 6  Q.  Okay.  Anything else?

 7  A.  Custody hearings.  That's all I can remember

 8  right now.

 9  Q.  Okay.  Other than your divorce hearing and your

10  custody hearings, any other time that you've

11  submitted an affidavit under oath?

12  A.  Not that I can recall.

13  Q.  Okay.  Have you ever had to testify under oath

14  before?

15  A.  Yes.

16  Q.  On what occasions?

17  A.  Criminal hearings and divorce hearing, custody

18  hearings.

19  Q.  So, let me start with the first one.

20          In what circumstance did you have to

21  testify in a criminal hearing?

22  A.  In the domestic-violence criminal hearings

23  against my ex-husband.

24  Q.  And how long ago was that?

25  A.  There's quite a few; so, starting in 2021.

```
1    Q.  Okay.  So, let me back up a little bit.

2            How many times did you have to testify

3    under oath in relation to those criminal

4    proceedings?

5    A.  I honestly don't know.

6    Q.  Would you say more than one?

7    A.  Yes.

8    Q.  More than five?

9    A.  I don't know.

10   Q.  Okay.  And were those times that you testified

11   under oath in relation to those criminal

12   proceedings in front of a judge, in a courtroom?

13   A.  Yes.

14   Q.  Were any of them informal, in front of a court

15   reporter, kind of like this?

16   A.  Not that I recall.

17   Q.  So, taking a step back, you mentioned a divorce

18   hearing and a custody hearing.

19           In relation to the divorce hearing, how

20   many times did you testify under oath?

21   A.  I don't know.

22   Q.  Would you say it was more than once?

23   A.  Yes.

24   Q.  More than five times?

25   A.  I don't know.
```

1   Q.  Okay.  And around what time would the testimony

2   under oath in relation to your divorce happen?

3   A.  2001.

4   Q.  And then, with regard to the custody hearing

5   that you mentioned, about how many times would you

6   say you testified under oath in relation to the

7   custody issue?

8   A.  I don't know.

9   Q.  Would you say more than once?

10  A.  Yes.

11  Q.  More than five times?

12  A.  I don't know.

13  Q.  Okay.  And around what time would that

14  testimony have been?

15  A.  About 2001.

16  Q.  And I just want to clarify, in case I heard

17  incorrectly.

18        So, you said the divorce and the custody

19  testimony was all around 2001; is that right?

20  A.  That's when they started.

21  Q.  Okay.  And how long did that proceed for?

22  A.  Can you clarify the question?

23  Q.  Sure.  Sorry.  That was a poor question.

24        So, you said that the divorce and custody

25  issues started in 2001; is that right?

1    A.   Yes.

2    Q.   And about how long before those court matters

3    were resolved?

4    A.   The divorce, in 2004.

5    Q.   Okay.

6    A.   Custody, 2018.

7    Q.   Okay.  And so, all the testimony that you

8    provided in relation to both the divorce and the

9    custody issues would have been between 2001 and

10   2018, overall?

11   A.   Yes.

12   Q.   And then, just to make sure I heard you

13   correctly, you said that the testimony that you

14   would have provided in relation to the criminal

15   matter would have been in 2021, about?

16   A.   Yes.

17   Q.   Was there any testimony in relation to the

18   criminal matter that was before 2021?

19   A.   No.

20   Q.   Okay.

21          (Discussion off the record)

22   BY MS. MEDEIROS:

23   Q.   So, how long have you lived in Connecticut?

24   A.   Since 1992.

25   Q.   And have you lived in Connecticut consecutively

```
 1   since 1992?

 2   A.  Yes.

 3   Q.  What's your highest level of education?

 4   A.  Some college.

 5   Q.  Some college.

 6           And while you attended college, were you

 7   studying anything in particular?

 8   A.  No.

 9   Q.  Okay.  And what do you currently do for

10   employment?

11   A.  I am a Nuisance Wildlife Control Operator.

12   Q.  And who is your employer?

13   A.  I am self-employed.  I have a company called

14   Lady and a Trap.

15   Q.  I like the name.

16           So, what does that job entail?

17   A.  I handle nuisance wildlife for -- any nuisance

18   wildlife in your home or in your property.

19   Q.  And are you licensed by any state organization

20   or agency to do that kind of work?

21   A.  I am.

22   Q.  What state, agency, or organization is that?

23   A.  The Department of Environmental Protection.

24   Q.  And what's the specific type of license you

25   hold for that?
```

```
 1   A.   Nuisance Wildlife Control Operator.

 2   Q.   How long have you been doing that for?

 3   A.   Two years.

 4   Q.   Okay.  What were you doing for employment

 5   before that?

 6   A.   I was a paraprofessional in the Enfield Public

 7   School System.

 8   Q.   In your current position as a nuisance wildlife

 9   control officer, do you own your own business?

10   A.   I do.

11   Q.   And how many employees do you have?

12   A.   I have no employees.

13   Q.   Just a lady and a trap?

14   A.   Yes.

15   Q.   I get it.

16        So, as a nuisance wildlife control officer,

17   do you use firearms to help control wildlife?

18   A.   I do.

19   Q.   What types of firearms do you use in your

20   position as a nuisance wildlife control officer?

21   A.   .22 long rifles.

22   Q.   Anything else?

23   A.   I use a 22-caliber handgun.

24   Q.   Anything else?

25   A.   No.
```

1   Q.  Do you have to -- other than the license that

2   you mentioned from DEP -- I'm just going to say DEP

3   as an acronym -- do you have to have any other

4   particular licenses or permits in order to utilize

5   those firearms as a nuisance wildlife control

6   officer?

7          MR. ATKINSON:  Objection to form.

8          You can answer.

9   A.  Yes.

10  BY MS. MEDEIROS:

11  Q.  And what do you have to have?

12  A.  I have to have a State trapping license, a

13  State of Connecticut hunting license, and a State

14  of Connecticut pistol permit.

15  Q.  Okay.  And for the trapping license, who issues

16  that?

17  A.  The State of Connecticut.

18  Q.  And I apologize.

19          What was the second one that you listed?

20  A.  The State of Connecticut hunting license, and

21  the State of Connecticut pistol permit.

22  Q.  Okay.  For the hunting license, is it any -- is

23  it just a broad, general hunting license, or is

24  there a specific type of hunting license that you

25  have to obtain to do what you do?

```
1   A.  Can you restate the question?

2   Q.  Sure.

3         Is the hunting license that you have just a

4   general hunting license, or is there a specific one

5   that you need for your type of work?

6   A.  It is a general hunting license.

7   Q.  Okay.  So, would that hunting license be

8   appropriate for anyone who wanted to do hunting in

9   Connecticut?

10  A.  Yes.

11        MR. ATKINSON:  Objection to form.

12  You can answer.

13  BY MS. MEDEIROS:

14  Q.  Okay.  So, just to be clear, you mentioned .22

15  long rifles and .22 handguns that you use in the

16  course of your employment.

17        Are there any other firearms that you use

18  in your role as a nuisance wildlife control

19  officer?

20  A.  Not at this time.

21  Q.  Are there any other firearms that you would

22  like to use in your position as a nuisance wildlife

23  control officer that you do not currently use?

24  A.  No.

25  Q.  Are you capable of performing your job as a
```

```
 1   nuisance wildlife control officer with the weapons

 2   that you currently use?

 3          MR. ATKINSON:  Objection to form.

 4          You can answer.

 5   A.  Yes.

 6   BY MS. MEDEIROS:

 7   Q.  Okay.  Are you a member of the Second Amendment

 8   Foundation?

 9   A.  Yes.

10   Q.  How long have you been a member of the Second

11   Amendment Foundation?

12   A.  I don't know.

13   Q.  Would you say at least a year?

14   A.  Yes.

15   Q.  More than five years?

16   A.  No.

17   Q.  Are you a member of CCDL?

18   A.  Yes.

19   Q.  And how long have you been a member of CCDL?

20   A.  I don't know.

21   Q.  Longer than a year?

22   A.  Yes.

23   Q.  Longer than five years?

24   A.  No.

25   Q.  Are you a member of any other firearms or
```

```
1    Second Amendment groups?

2            MR. ATKINSON:  Objection to form.

3            You can answer.

4    A.  I don't know.

5    BY MS. MEDEIROS:

6    Q.  Okay.  Are you a member of any other firearm

7    activist groups?

8            MR. ATKINSON:  Objection to form.

9            You can answer.

10   A.  I don't know.

11   BY MS. MEDEIROS:

12   Q.  Okay.  Is there something about my question

13   that's not making sense to you?

14   A.  No.

15   Q.  Okay.  The firearms that you mentioned that you

16   use as a nuisance wildlife control officer -- the

17   .22 long rifles or the .22 handguns -- would you be

18   able to possess and use those outside of your work

19   as a nuisance wildlife control officer?

20           MR. ATKINSON:  Objection to form,

21   but you can answer.

22   A.  Yes.

23   BY MS. MEDEIROS:

24   Q.  Okay.  Do you do anything outside of being a

25   nuisance wildlife control officer, for employment?
```

1          MR. ATKINSON:  Objection to form.

2          You can answer.

3     A.  Yes.

4     BY MS. MEDEIROS:

5     Q.  What is that?

6     A.  I am a firearms instructor.

7     Q.  And where -- what is your employer for being a

8     firearms instructor?

9     A.  Life Safe Training.

10    Q.  Where is Life Safe Training?

11    A.  East Granby.

12    Q.  About how often do you work as a firearms

13    instructor?

14    A.  A couple of times a month.

15    Q.  Do you have, like, a regular schedule, or do

16    you just kind of pick up classes when you can?

17         MR. ATKINSON:  Objection to form.

18         You can answer.

19    A.  I do private lessons when they're needed.  I do

20    a couple classes a month.

21    BY MS. MEDEIROS:

22    Q.  Okay.  Is that all through Life Safe Training,

23    East Granby?

24    A.  Yes.

25    Q.  Have you ever worked as a firearms instructor

1   anywhere else, other than Life Safe Training?

2   A.  No.

3   Q.  When did you start employment as a firearms

4   instructor?

5          MR. ATKINSON:  Objection to form.

6          You can answer.

7   A.  2002.

8   BY MS. MEDEIROS:

9   Q.  And have you worked as a firearms instructor

10  straight through since 2002 to the present day?

11  A.  Yes.

12         MR. ATKINSON:  Objection.

13  BY MS. MEDEIROS:

14  Q.  Was there ever a time --

15         MS. MEDEIROS:  I'm sorry.

16         Did you want to object, Cam?

17         MR. ATKINSON:  I'm just going to

18  take the opportunity to instruct the witness

19  to -- she's got to allow me a brief moment

20  in case I do want to interpose an objection.

21         MS. MEDEIROS:  No problem.

22  BY MS. MEDEIROS:

23  Q.  Okay.  So, you mentioned that, currently, as a

24  firearms instructor, you work about a couple of

25  times a month; is that right?

1   A.   Yes.

2   Q.   But you've been a firearms instructor since

3   approximately 2002; is that correct?

4   A.   Yes.

5   Q.   And has there ever been a time where you worked

6   as a firearms instructor full-time, more than just

7   a couple times a month.

8           MR. ATKINSON:   Objection to form.

9           You can answer.

10  A.   No.

11  BY MS. MEDEIROS:

12  Q.   So, straight through, since 2002, you've worked

13  as a firearms instructor a couple times a month or

14  so; is that fair?

15  A.   Yes.

16  Q.   Okay.   And have you always done that through

17  Life Safe Training, in East Granby?

18  A.   Yes.

19  Q.   What types of courses do you teach as a

20  firearms instructor at Life Safe Training?

21  A.   I teach permit classes, ladies' classes, and a

22  class called Pistol One.

23  Q.   So, anything else?

24  A.   Not that I can remember.

25  Q.   Have you ever taught any other classes as a

1  firearms instructor?

2        MR. ATKINSON:  Objection to form.

3        You can answer.

4  A.  Not that I know of.

5  BY MS. MEDEIROS:

6  Q.  So, for the first one that you said, you teach

7  permit classes; is that right?

8  A.  Yes.

9  Q.  What are permit classes?

10  A.  They're the required classes in the state of

11  Connecticut to get your pistol permit.

12  Q.  And then you also mentioned ladies' classes,

13  right?

14  A.  Yes.

15  Q.  What is a ladies' class?

16  A.  It can be anything from gun cleaning to basic

17  pistol to more advanced pistol class.

18  Q.  And based on the title, I'm going to assume it

19  is only for women; is that right?

20        MR. ATKINSON:  Objection to form.

21        You can answer.

22  A.  Yes.

23  BY MS. MEDEIROS:

24  Q.  And for those ladies' classes, you said basic

25  pistol, firearms cleaning, and at more advanced

 1   classes; is that right?

 2   A.  Yes.

 3   Q.  Anything else?

 4   A.  Not that I can think of.

 5   Q.  Okay.  And for the basic pistol classes, is

 6   that similar to the permit class, or is it totally

 7   different?

 8   A.  It's totally different.

 9   Q.  Okay.  What types of skills do you teach during

10   a basic pistol class?

11   A.  Range etiquette:  how do you take down your

12   firearm, proper grip, proper side alignment, proper

13   stance.

14   Q.  Okay.  And since you mentioned basic pistol,

15   are those classes exclusively using pistols as the

16   firearm?

17   A.  Yes.

18   Q.  And I should probably dial it back.  We talked

19   about the permit classes that are needed for

20   individuals to obtain their pistol permit.

21          What do those classes typically entail?

22   A.  Can you restate the question?

23   Q.  Sure.

24          So, for the permit classes that you teach,

25   what skills do you teach during those classes?

1  A.  So, there's an 8-hour classroom time, and then

2  shooting (inaudible) afterwards.

3  Q.  Okay.  And since those classes are required to

4  obtain a pistol permit, are the weapons that are

5  used in the permit classes also pistols?

6        MR. ATKINSON:  Objection to form.

7        You can answer.

8  A.  Yes.

9  BY MS. MEDEIROS:

10  Q.  And then, I think the last, you know, category

11  of class that you mentioned that you teach are

12  Pistol One classes; is that correct?

13  A.  Yes.

14  Q.  What's a Pistol One class?

15  A.  So, Pistol One gives you a little bit more of,

16  you know, proper side alignment, proper stance,

17  recoil control.

18  Q.  And, again, for the Pistol One classes, is that

19  typically taught with pistols?

20        MR. ATKINSON:  Objection to form.

21        You can answer.

22  A.  Yes.

23  BY MS. MEDEIROS:

24  Q.  You also mentioned, in your ladies' classes,

25  that you teach firearm cleaning; is that right?

1   A.   Yes.

2   Q.   What does that entail?

3   A.   It could be any firearm.   We had a carbine

4   class, shotguns, any guns that need to be -- any

5   firearms that need to be cleaned.

6   Q.   And then, lastly, you also mentioned, under the

7   ladies' classes, that you teach a more advanced

8   class as well; is that right?

9   A.   Yes.

10  Q.   What types of skills would you teach in the

11  more advanced classes for your women-only classes?

12  A.   That would be a carbine women's class; a

13  carbine shot -- or a shotgun women's class; more

14  advanced pistol, meaning shooting and moving.

15  Q.   Anything else?

16  A.   Not that I can think of right now.

17  Q.   Okay.   And if you think of anything or need to

18  clarify any of your answers, please just let me

19  know at any time.

20  A.   Okay.

21  Q.   So, I think -- okay.   I didn't ask you this.

22       So, you mentioned that you became a

23  firearms instructor back in around 2002; is that

24  right?

25  A.   Yes.

1   Q.   What is the process that you have to go through

2   to become a firearms instructor in Connecticut?

3          MR. ATKINSON:  Objection to form.

4          You can answer.

5   A.   I took an NRA instructor course and a USCCA

6   instructor course, and a girl-and-a-gun instructor

7   course.

8   BY MS. MEDEIROS:

9   Q.   I'm sorry.

10          What was the last one?  I didn't hear it.

11   A.   A girl-and-a-gun instructor course.

12   Q.   And where did you take all those courses?

13   A.   At the Hartford Gun Club, in East Granby.

14   Q.   And are all three of those courses required in

15   order for you to become a firearms instructor in

16   Connecticut?

17   A.   Only one of them is required.

18   Q.   But you did all three?

19   A.   Yes.

20   Q.   Did you do all of those before becoming a

21   firearms instructor or during the process?

22   A.   Before.

23   Q.   Okay.  Did you have to obtain any special

24   license or permit in order to be a firearms

25   instructor?

1        MR. ATKINSON:  Objection to form.

2        You can answer.

3   A.  Just the certificates from the instruction

4   classes.

5   BY MS. MEDEIROS:

6   Q.  Okay.  And is there any particular license or

7   permit issued by the State as a firearms

8   instructor?

9   A.  No.

10  Q.  How about federally?

11       MR. ATKINSON:  Objection to form.

12       You can answer.

13  A.  Not that I'm aware of.

14  BY MS. MEDEIROS:

15  Q.  So, you already mentioned this, but do you have

16  a Connecticut pistol permit?

17  A.  I do.

18  Q.  When did you obtain your Connecticut pistol

19  permit?

20  A.  2018, I believe.

21  Q.  So, you didn't obtain your Connecticut pistol

22  permit until after you had been a firearms

23  instructor for about 16 years?

24  A.  (No response.)

25  Q.  If I got that right.  Okay.  So, let me back

```
 1   up.
 2          So, you became a firearms instructor in
 3   about 2002?
 4   A.  2021.
 5   Q.  2021.  Okay.
 6   A.  2021.
 7   Q.  Okay.  I apologize.  I thought you said 2002.
 8   Okay.
 9          So, you became a firearms instructor in
10   about 2021, you just said; is that right?
11   A.  2021 or 2022.  It was either December or
12   January of those years.
13   Q.  Okay.  And you obtained your Connecticut pistol
14   permit back in 2018?
15   A.  I believe so.
16   Q.  Okay.  Do you have any pistol permits in any
17   other states?
18   A.  I do.
19   Q.  Which states?
20   A.  Massachusetts.
21   Q.  When did you obtain that?
22   A.  I don't know.
23   Q.  Would you say it was in the last five years?
24   A.  Yes.
25   Q.  Would you say it was in the last two years?
```

```
1   A.  I don't know.

2   Q.  Was it before or after you obtained your

3   Connecticut pistol permit?

4   A.  After.

5   Q.  After.  Okay.

6          Was it before or after you became a

7   firearms instructor?

8   A.  Before.

9   Q.  So, sometime between 2018 and 2022?

10  A.  Yes.

11  Q.  Are you a firearms instructor in Massachusetts

12  as well?

13  A.  Yes.

14  Q.  Do you teach courses in Massachusetts?

15  A.  Not at this time.

16  Q.  Do you plan to?

17  A.  Possibly.

18  Q.  Okay.  Why did you get your pistol permit in

19  Connecticut back in 2018?

20  A.  For self-defense.

21  Q.  Any particular reason you decided to get it

22  then, in 2018, rather than before that?

23  A.  I was taught at a very young age to not own or

24  have a firearm unless you were able to use it.

25  Being my domestic-violence background, there was a
```

```
 1   time where I would be paralyzed in fear if he was

 2   around, so I chose to wait until I'd been through

 3   the proper therapy to get myself to a place where I

 4   was able to work through that.

 5   Q.  Okay.  And that was in 2018 where you felt

 6   comfortable enough to get your pistol permit?

 7   A.  Yes.

 8   Q.  Okay.  Why did you become a firearms

 9   instructor?

10   A.  To help empower women; teach them, make them

11   comfortable with firearms.

12   Q.  Why did you become a nuisance wildlife control

13   officer?

14   A.  So, I've been a trapper for many years and

15   loved trapping, and there became a need in

16   Connecticut for nuisance wildlife, and there was no

17   female nuisance wildlife.  And I fell in love with

18   doing it.  So --

19   Q.  Before obtaining your pistol permit, did you

20   have a long-gun eligibility certificate?

21   A.  No.

22   Q.  Do you have a long-gun eligibility certificate

23   now?

24   A.  No.

25   Q.  Before obtaining your pistol permit, did you
```

```
1   have a trapping license?

2   A.  No.

3   Q.  Okay.  When did you become interested in

4   trapping?

5   A.  So, I didn't have it in Connecticut.

6   Q.  Okay.  Did you have a trapping license

7   elsewhere?

8   A.  Yes.

9   Q.  Where?

10  A.  Massachusetts.

11  Q.  Have you ever lived in Massachusetts?

12  A.  Not full-time, no.

13  Q.  When did you live there part-time?

14  A.  I've had property in Massachusetts since 2013.

15  Q.  Okay.  And did you primarily trap in

16  Massachusetts?

17  A.  Yes.

18  Q.  Did you have any type of permit, license, or

19  certificate that enabled you to purchase long guns

20  in Massachusetts before you obtained your pistol

21  permit in Connecticut?

22  A.  No.

23  Q.  Do you have such a permit, certificate, or

24  license today, in Massachusetts?

25          MR. ATKINSON:  Objection to form.  I
```

```
 1   think you -- even I'm struggling to

 2   comprehend that one, Janelle; so, perhaps

 3   rephrase it?

 4           MS. MEDEIROS:  Sure.

 5   BY MS. MEDEIROS:

 6   Q.  Do you have a permit, license, or certificate

 7   that allows you to purchase long guns in

 8   Massachusetts today?

 9   A.  No.

10   Q.  Okay.  But you do have a Massachusetts pistol

11   permit?

12   A.  Yes.

13   Q.  Prior to obtaining your pistol permit, did you

14   have hunting licenses in Connecticut?

15   A.  No.

16   Q.  I'm assuming the answer to this is yes, but do

17   you own any firearms?

18           MR. ATKINSON:  Objection to form.

19           You can answer.

20   A.  Yes.

21   BY MS. MEDEIROS:

22   Q.  How many firearms do you own, currently?

23   A.  I don't know.

24   Q.  You don't know.

25           More than one?
```

1    A.  Yes.

2    Q.  More than five?

3    A.  Yes.

4    Q.  More than ten?

5    A.  Yes.

6    Q.  More than 15?

7    A.  I don't know.

8    Q.  Okay.  So, would you estimate somewhere between

9    10 and 15?  Would that be fair?

10          MR. ATKINSON:  Objection to form.

11          You can answer.

12   A.  Yes.

13   BY MS. MEDEIROS:

14   Q.  Okay.  How many of your weapons or firearms

15   would you say are for personal use?

16          MR. ATKINSON:  Objection to the

17   form.

18          You can answer.

19   A.  All of them.

20   BY MS. MEDEIROS:

21   Q.  Are any of the firearms that you own used

22   exclusively for your professional use as a firearms

23   instructor?

24   A.  No.

25   Q.  Okay.  Of your 10 to 15 firearms that you

1   own in there, understanding that's an estimate, how

2   many of those firearms are pistols?

3          MR. ATKINSON:  Objection to form.

4          You can answer.

5   A.  I don't know.

6   BY MS. MEDEIROS:

7   Q.  How many of the 10 to 15 firearms that you own

8   are handguns?

9   A.  I don't know.

10  Q.  Would you say less than five?

11  A.  No.

12  Q.  Okay.  Would you say less than ten?

13  A.  Yes.

14  Q.  Okay.  Would you say more than seven are

15  handguns?

16  A.  I don't know.

17  Q.  So, of the five to ten handguns that you own,

18  how many are pistols?

19  A.  I don't know.

20  Q.  Are any of the handguns that you own revolvers?

21  A.  Yes.

22  Q.  How many?

23  A.  I don't know.

24  Q.  Okay.  Would you say you have less than five

25  revolvers?

```
 1   A.   Yes.

 2   Q.   How many firearms do you own that are not

 3   handguns?

 4   A.   I don't know.

 5   Q.   Less than five?

 6   A.   No.

 7   Q.   So, less than ten?

 8   A.   Yes.

 9   Q.   Okay.  So, somewhere in the range of five to

10   ten firearms that are not handguns; is that right?

11   A.   Yes.

12   Q.   Of those five to ten weapons that are not

13   handguns, how would you describe those weapons?

14   A.   Can you rephrase the question?

15   Q.   Okay.  Of the five to ten firearms that you own

16   that are not handguns, how would you describe the

17   type of those weapons?

18   A.   I don't understand the question.

19   Q.   Sure.

20        Are they shotguns?

21   A.   Yes.

22   Q.   How many?

23   A.   I don't know.

24   Q.   Less than -- more than one?

25   A.   Yes.
```

 1   Q.  More than two?

 2   A.  Yes.

 3   Q.  More than three?

 4   A.  Yes.

 5   Q.  More than four?

 6   A.  Yes.

 7   Q.  More than five?

 8   A.  I believe so.

 9   Q.  More than six?

10   A.  No.

11   Q.  Okay.  So, we'll say five or six shotguns, you

12   own.

13        How many of the firearms you own would you

14   say are rifles?

15   A.  I don't know.

16   Q.  More than one?

17   A.  Yes.

18   Q.  More than two?

19   A.  Yes.

20   Q.  More than three?

21   A.  Yes.

22   Q.  More than four?

23   A.  I don't think so.

24   Q.  So, we'll say four rifles.

25        Of the firearms that you own, how many

```
 1   would you say are revolvers?

 2   A.  I don't know.

 3   Q.  More than one?

 4   A.  Yes.

 5   Q.  More than two?

 6   A.  Yes.

 7   Q.  More than three?

 8   A.  I think so.

 9   Q.  More than four?

10   A.  I don't know.

11   Q.  Okay.  So, we'll say three or four revolvers.

12       Of the firearms that you own, how many

13   would you say are pistols?

14   A.  I don't understand the question.

15       What are you referring to as a pistol?

16   Q.  How would you define a pistol?

17   A.  I'm not an expert.  I don't have a definition

18   for it.

19   Q.  Okay.  Of your handguns that are not revolvers,

20   what are they?

21   A.  Those are -- those would be pistols.  Yes.

22   Q.  Okay.  How many of those do you own?

23   A.  I don't know.

24   Q.  More than one?

25   A.  Yes.
```

```
 1   Q.  More than two?

 2   A.  Yes.

 3   Q.  More than three?

 4   A.  Yes.

 5   Q.  More than four?

 6   A.  Yes.

 7   Q.  More than five?

 8   A.  Yes.

 9   Q.  More than six?

10   A.  I don't know.

11   Q.  Okay.  So, we'll say five or six pistols.

12   Okay.

13           So, by our math, we've got about four

14   rifles; is that right?

15           MR. ATKINSON:  Objection to form.  I

16   don't think she knows what your math is, so

17   I'm not sure she can answer that question.

18           MS. MEDEIROS:  Okay.  We'll go back.

19   BY MS. MEDEIROS:

20   Q.  You testified, after I asked you, more than

21   one, more than two, more than three, that you had

22   about four rifles; is that fair?

23   A.  Yes.

24   Q.  And same thing with shotguns.

25           After I asked you, more than one, more than
```

```
 1   two, more than three, more than four, more than
 2   five, you said you had about five to six shotguns;
 3   is that fair?
 4   A.  Yes.
 5   Q.  Okay.  And then we talked a little bit about
 6   handguns, pistols, and revolvers.
 7        When it came to pistols, after we went
 8   through more than one, more than two, more than
 9   three, more than four, you said you had about five
10   to six pistols; is that fair?
11   A.  Yes.
12   Q.  Okay.  And when it comes to revolvers, we did
13   the same thing, and we came to about three to four
14   revolvers; is that fair?
15   A.  Yes.
16   Q.  Okay.  Are there any other firearms that you
17   own that we haven't talked about, currently -- that
18   you own currently?
19   A.  Yes.
20   Q.  What are those?
21   A.  "Others."
22   Q.  Okay.  How would you define an "other"?
23        MR. ATKINSON:  Objection to form.
24        You can answer.
25   A.  An "other" is a -- it has a detachable
```

```
 1   magazine, a pistol brace, a forward handgrip, and
 2   an under-15-inch barrel.
 3   BY MS. MEDEIROS:
 4   Q.  Okay.  Just want to make sure I got all those
 5   down.
 6          You said an "other," by your definition,
 7   would be a firearm that has a detachable magazine,
 8   right?
 9   A.  Yes.
10   Q.  A forward handgrip, right?
11   A.  Yes.
12   Q.  And a barrel that's under 15 inches long; is
13   that correct?
14   A.  Yes.
15   Q.  Did I miss anything?
16   A.  Pistol brace.
17   Q.  A pistol brace.  Okay.
18          How many of those "others" do you currently
19   own?
20   A.  I think, two.
21   Q.  Okay.  You think, two.
22          And when I asked you earlier about rifles
23   and you said you own about four rifles, did you
24   include the "others" in that number?
25   A.  No.
```

1   Q.  So, the two "others" that we just talked about

2   are in addition to the rifles, shotguns, revolvers,

3   and pistols that we previously talked about?

4   A.  Yes.

5   Q.  Okay.  Do you own any detachable magazines?

6   A.  Yes.

7   Q.  About how many would you say you own?

8   A.  I don't know.

9   Q.  Would you say you own more than ten?

10  A.  Yes.

11  Q.  More than 20?

12  A.  Yes.

13  Q.  More than 30?

14  A.  No.

15  Q.  Okay.  So, somewhere between 20 and 30

16  detachable magazines?

17  A.  I believe so, yes.

18  Q.  And do any of those magazines have the capacity

19  to accept more than ten rounds?

20  A.  No.

21  Q.  Okay.  Have you ever owned a detachable

22  magazine that has the capacity to accept more than

23  ten rounds?

24  A.  No.

25  Q.  Of the rifles and "others" that you own, are

1  any of those weapons what you would describe as an

2  AR-15-platform firearm?

3  A.  Yes.

4  Q.  How many?

5  A.  Well, the "others" are AR-platform.

6  Q.  Okay.

7  A.  Legal AR-platform, I guess, yes.

8  Q.  Okay.  So --

9  A.  Actually, I don't know.  I don't know how I'd

10  clarify that.  I don't know.

11  Q.  Okay.  So, I just want to make sure I

12  understand.

13      So, the two "others" that you mentioned,

14  would you describe those as AR-15-platform

15  firearms?

16  A.  No.

17  Q.  No.  Okay.

18      Any of the rifles that you have, would you

19  describe those as AR-15-platform firearms?

20  A.  No.

21  Q.  Any of the firearms at all that you own, would

22  you consider them AR-15-platform firearms?

23  A.  No.

24  Q.  Okay.  I'm going to show you, just so we're all

25  talking about the same thing, an Affidavit that you

1    filed in this case.  I'm going to do share screen.

2    I'm going to mark this as Exhibit A.

3           (Exhibit A, Affidavit of Jennifer Hamilton

4    signed on 2/3/2023, was marked for identification)

5    Q.  Let me know if you can see this.  Okay.

6           Can you see my screen?

7    A.  Yes.

8    Q.  Do you recognize this document?

9    A.  Yes.

10   Q.  Okay.  And I'm just going to scroll all the way

11   down -- and is this an affidavit that you signed at

12   some point?

13   A.  Yes.

14   Q.  Okay.  And I'm going to scroll all the way down

15   to the fourth page of this document.

16           Is that your signature right there?

17   A.  Yes.

18   Q.  And it says here, Subscribed and sworn to

19   before me this 3rd day of February, 2023.

20           Is that the date that you signed this

21   document?

22   A.  Yes.

23   Q.  So, now, looking back to -- let's see here --

24   paragraph 9 of your Affidavit, do you see that on

25   the screen?

1   A.   Yes.

2   Q.   Do you see where you -- where it says -- okay.

3   I'll just read it out loud for you:   I would like

4   to be able to lawfully purchase one or more modern

5   sporting arms listed or described in Conn. Gen.

6   Stat., section 53-202a, likely an AR-15-platform

7   firearm.

8        Do you see that?

9   A.   Yes.

10  Q.   Did I read that correctly?

11  A.   Yes.

12  Q.   What's an AR-15-platform firearm?

13  A.   So, an AR-15-platform is very modular.   It's

14  usually under a 16-inch ferrule with a detachable

15  magazine, a pistol brace on it -- or -- not a

16  pistol brace -- I'm sorry.   It has a stock on it

17  instead of a pistol brace.

18  Q.   Okay.   Anything else about it that's important?

19  A.   No.   Not that I can remember right now.

20  Q.   Okay.

21        Have you ever owned an AR-15-platform

22  firearm, as you've used that term in paragraph 9 of

23  your affidavit?

24  A.   No.

25  Q.   Why not?

1  A.  I was not legally able to own one.

2  Q.  Okay.  Let's see here.

3       And then -- so, further down in the

4  Affidavit, down in paragraph 15, you wrote, I

5  currently own firearms that have previously been

6  classified as, quote, "others," in Connecticut,

7  which are subject to the ATF's new rule.

8       What is an "other" as you've used it in

9  this paragraph?

10      MR. ATKINSON:  Objection to form.

11      You can answer.

12 A.  An "other" is -- a Connecticut legal "other" is

13 a pistol brace, a foregrip, a detachable magazine,

14 and an under-15-inch barrel.

15 BY MS. MEDEIROS:

16 Q.  Is an "other," as you just described it to me,

17 better or superior for self-defense, compared to an

18 AR-15-platform firearm that we just talked about?

19      MR. ATKINSON:  Objection to form.

20      You can answer.

21 A.  Can you repeat the question?

22 BY MS. MEDEIROS:

23 Q.  Sure.

24      Is an "other," as we've just talked about,

25 better or superior for self-defense purposes,

```
 1   compared to an AR-15-platform firearm?

 2          MR. ATKINSON:  Same objection.

 3   A.  I think that they're both -- I don't think one

 4   is superior than the other, as far as self-defense.

 5   BY MS. MEDEIROS:

 6   Q.  Okay.

 7   A.  They both are what I would want for

 8   self-defense.

 9   Q.  Okay.  Compared to the "others" that you

10   currently own, is an AR-15-platform firearm better

11   or superior for self-defense in some way?

12          MR. ATKINSON:  Objection to form.

13          You can answer.

14   A.  It's better than the "others" I currently own,

15   yes.

16   BY MS. MEDEIROS:

17   Q.  Why is that?

18   A.  Having that stock, I can put it into my

19   shoulder and shoot from the shoulder, giving the

20   weapon to absorb the recoil instead of my body.

21   Q.  Okay.  So, I want to make sure I understand,

22   because we had a little bit of a different answer

23   to the previous question that we were talking

24   about.

25          So, I asked you, are "others," as you used
```

```
1   the phrase in paragraph 15, in some way better or
2   more superior for self-defense than an
3   AR-15-platform firearm?
4        Do you remember that?
5   A.  Yes.
6   Q.  And then I asked you whether an AR -- whether
7   the "others" that you currently own are better or
8   superior in some way to an AR-15-platform firearm,
9   right?
10  A.  Yes.
11  Q.  Okay.  Is there a difference between the
12  "others" as you phrased it in paragraph 15 here,
13  and the "others" that you currently own?
14        MR. ATKINSON:  Objection to form.
15        You can answer.
16  A.  No.
17  BY MS. MEDEIROS:
18  Q.  Okay.  Let's see.  So, I'm going to stop
19  sharing now.
20        Do all of the firearms that you currently
21  own accept detachable magazines?
22        MR. ATKINSON:  Objection to form.
23        You can answer.
24  A.  No.
25  BY MS. MEDEIROS:
```

```
 1   Q.  Which ones do not accept detachable magazines?

 2   A.  The revolvers, the shotguns, some of the

 3   rifles.

 4   Q.  How many of the rifles do not accept detachable

 5   magazines?

 6   A.  I don't know.

 7   Q.  Okay.  Of the four rifles, would you say more

 8   than half accepts detachable magazines?

 9           MR. ATKINSON:  Objection to form.

10           You can answer.

11   A.  No.

12   BY MS. MEDEIROS:

13   Q.  So, maybe one of the rifles that you own does

14   not accept detachable magazines; is that fair to

15   say?

16           MR. ATKINSON:  Objection to form.

17           You can answer.

18   A.  Yes.

19   BY MS. MEDEIROS:

20   Q.  Of the two "others" that you currently own, do

21   they both accept detachable magazines?

22   A.  Yes.

23   Q.  What size detachable magazines do you typically

24   use with your "others"?

25           MR. ATKINSON:  Objection to form.
```

```
 1          You can answer.
 2   A.  Can you rephrase the question?
 3   BY MS. MEDEIROS:
 4   Q.  Sure.  So, that was a poorly worded question.
 5   I apologize.
 6          What capacity magazines do you typically
 7   use with your two "others" that you currently own?
 8          MR. ATKINSON:  Same objection.
 9   A.  Ten rounds.
10   BY MS. MEDEIROS:
11   Q.  When you teach as a firearms instructor, which
12   firearms do you typically use?
13   A.  All of them.
14   Q.  All of your personally owned firearms?
15   A.  Yes.
16   Q.  Okay.  How often do you use an "other" when you
17   are teaching as a firearms instructor?
18   A.  Regularly.
19   Q.  Would you say every class?
20          MR. ATKINSON:  Objection to form.
21          You can answer.
22   A.  A couple times a month, maybe.  I don't know.
23   It's frequently.
24   BY MS. MEDEIROS:
25   Q.  Even though all the classes that you teach are
```

 1    primarily pistol classes, except for the

 2    gun-cleaning class?

 3           MR. ATKINSON:  Objection.  That's a

 4    mischaracterization.

 5           MS. MEDEIROS:  That's a speaking

 6    objection, but -- okay.

 7           MR. ATKINSON:  Can you rephrase it,

 8    I guess, is what I'm trying to say.

 9           MS. MEDEIROS:  We'll move on, Cam.

10    Thanks.

11    BY MS. MEDEIROS:

12    Q.  Of the two "others" that you currently own,

13    have you made any efforts to register those with

14    the Bureau of Alcohol, Tobacco, and Firearms and

15    obtain a tax stamp?

16    A.  Yes.

17    Q.  When did you do that?

18    A.  May 30th.

19    Q.  Of this year?

20    A.  Yes.

21    Q.  Have you obtained those tax stamps?

22    A.  I am still currently waiting on them.

23    Q.  Have you made any efforts to register or --

24    have you made any efforts to register your two

25    "others" with the State of Connecticut?

```
 1   A.  To my knowledge, there is no way to register

 2   them right now.

 3   Q.  Do you intend to do so if there is a process

 4   available?

 5           MR. ATKINSON:  Objection to form.

 6           You can answer.

 7   A.  Yes.

 8   BY MS. MEDEIROS:

 9   Q.  Other than the firearms that we've talked about

10   so far that you currently own, have you ever owned

11   any other firearms?

12   A.  Yes.

13   Q.  How many?

14   A.  I don't know.

15   Q.  Less than five?

16   A.  Yes.

17   Q.  More than one?

18   A.  Yes.

19   Q.  More than two?

20   A.  I don't know.

21   Q.  Okay.  So, of the maybe one or two firearms in

22   addition to the ones that you currently own, that

23   you have owned in the past, what were those

24   firearms?

25   A.  I don't know.
```

```
 1   Q.  Were they rifles?

 2   A.  No.

 3   Q.  Were they handguns?

 4   A.  Yes.

 5   Q.  What did you do with the handguns that you no

 6   longer currently own?

 7          MR. ATKINSON:  Objection to form.

 8          You can answer.

 9   A.  They were sold at gun stores.

10   BY MS. MEDEIROS:

11   Q.  How often do you carry a firearm?

12          MR. ATKINSON:  Objection to form.

13          You can answer.

14   A.  Every day.

15   BY MS. MEDEIROS:

16   Q.  Okay.  Are you currently carrying a firearm?

17   A.  No.

18   Q.  Why not?

19   A.  I was asked to put it in a locked box before I

20   came into the room.

21   Q.  What type of weapon are you -- would you have

22   carried into the room had you not been asked not to

23   do so?

24   A.  A handgun.

25   Q.  Is it a pistol or a revolver?
```

1    A.  Pistol.

2    Q.  What type of weapon do you typically carry on a

3    regular basis?

4           MR. ATKINSON:  Objection to form.

5           You can answer.

6    A.  Pistol and a rifle.

7    BY MS. MEDEIROS:

8    Q.  What type of rifle do you typically carry?

9    A.  .22 long rifle.

10   Q.  Do you typically carry that because you use it

11   as a nuisance wildlife control officer?

12   A.  Yes.

13   Q.  Do you ever use that .22 for any other purpose?

14   A.  Yes.

15          MR. ATKINSON:  Objection to form.

16          You can answer.

17   BY MS. MEDEIROS:

18   Q.  For what purpose?

19   A.  Practice, protection.

20   Q.  Anything else?

21   A.  Training.

22   Q.  Okay.  Anything else?

23   A.  Instructional.

24   Q.  Anything else?

25   A.  Not that I can think of.

1   Q.  So, you say "practice."

2          What do you mean by "practice"?

3   A.  Going to the range and practicing.

4   Q.  And then you said "protection."

5          What do you mean by "protection"?

6   A.  Animals, people, self-protection.

7   Q.  In what circumstance have you had to use your

8   .22 for any of those types of protection?

9          MR. ATKINSON:  Objection to form.

10          You can answer.

11  A.  Well, I've used it as a Nuisance Wildlife

12  Control Operator for rabid animals.

13  BY MS. MEDEIROS:

14  Q.  Okay.  So, outside of your employment, when

15  have you ever used your .22 for those types of

16  protection that you just mentioned?

17          MR. ATKINSON:  Objection to form.

18          You can answer.

19  A.  I have not.

20  BY MS. MEDEIROS:

21  Q.  Okay.  And then you said, instruction.

22          What do you mean by instruction?

23  A.  Teaching.

24  Q.  So, you use your .22 also for teaching, as a

25  firearms instructor?

```
 1   A.  I do.

 2   Q.  Okay.  You mentioned a pistol that you also

 3   typically carry.

 4           For what purposes do you typically carry

 5   that pistol?

 6           MR. ATKINSON:  Objection to form.

 7           You can answer.

 8   A.  Self-protection.

 9   BY MS. MEDEIROS:

10   Q.  Anything else?

11   A.  No.

12   Q.  Other than the .22 and the pistol that you

13   would have on you right now if you had not put it

14   in a safe, what other firearms do you carry most?

15           MR. ATKINSON:  Objection to form.

16           You can answer.

17   A.  It varies, depending on my outfit and where I'm

18   going.

19   BY MS. MEDEIROS:

20   Q.  Are there any that you use more frequently than

21   others?

22   A.  No.

23   Q.  Do you carry your two "others" on your person

24   on a daily basis?

25   A.  Not daily, no.
```

```
 1   Q.  How frequently do you carry your "others" on
 2   your person?
 3          MR. ATKINSON:  Objection to form.
 4          You can answer.
 5   A.  Whenever I'm hunting; during the hunting
 6   season.
 7   BY MS. MEDEIROS:
 8   Q.  Is it fair to say that you primarily use your
 9   "others" for hunting?
10   A.  No.
11   Q.  Okay.  What do you primarily use your "others"
12   for?
13   A.  They're used for multiple things:  training,
14   teaching, hunting, self-defense.
15   Q.  When was the last time that you carried an
16   "other" for the purpose of self-defense, outside
17   the home?
18   A.  I don't know.
19   Q.  Have you ever carried an "other" outside the
20   home for the purpose of self-defense?
21   A.  Yes.
22   Q.  When?
23          MR. ATKINSON:  Can we have a break?
24          MS. MEDEIROS:  Sure.
25          MR. ATKINSON:  Thank you.
```

1    MS. MEDEIROS:  How long do you want?

2    MR. ATKINSON:  Five minutes.

3    (Recess taken)

4  CONTINUED EXAMINATION

5  BY MS. MEDEIROS:

6  Q.  So, before the break, we were talking about

7  carrying your two "other" firearms.

8    Do you recall that?

9  A.  Yes.

10  Q.  So, I think I asked you, had you carried an

11  "other" -- one of the two "others" that you

12  currently own, on your person for self-defense.

13    Do you remember that?

14  A.  Yes.

15  Q.  When was the last time that you carried one of

16  your two "others" on your person for self-defense?

17  A.  I don't know the last time.

18  Q.  Okay.  So, you can't give me a single example

19  in the last five years during which you carried one

20  of your two "others" on your person for

21  self-defense?

22    MR. ATKINSON:  Objection to form.

23    You can answer.

24  A.  I have carried them in my home for

25  self-defense.

```
1   BY MS. MEDEIROS:

2   Q.  Okay.  Can you give me an example of a time

3   that you carried one of your "others" outside the

4   home for self-defense in the last five years?

5          MR. ATKINSON:  Objection to form.

6          You can answer.

7   A.  When I thought somebody was breaking into my

8   cars.

9   BY MS. MEDEIROS:

10  Q.  Okay.  When was that?

11  A.  I don't remember.

12  Q.  Was it within the last year?

13  A.  Yes.

14  Q.  Okay.  And where was that?

15  A.  Enfield.

16  Q.  And what's in Enfield?

17  A.  That's my home.

18  Q.  Okay.  So, when you say that you carried it

19  outside your home because you thought someone was

20  breaking into your cars, was that still on your own

21  property?

22  A.  Yes.

23  Q.  Okay.  Can you give me an example of a time

24  that you carried one of your two "others" not on

25  your own property, for self-defense within the last
```

Deposition of Jennifer Hamilton

```
 1   five years?
 2           MR. ATKINSON:  Objection to form.
 3           You can answer.
 4   A.  When I was hunting.
 5   BY MS. MEDEIROS:
 6   Q.  Okay.  Can you give me an example of a time
 7   that you have carried an "other" for self-defense
 8   outside of your own property within the last five
 9   years, not for hunting?
10           MR. ATKINSON:  Objection to form.
11           You can answer.
12   A.  No.
13   BY MS. MEDEIROS:
14   Q.  Okay.  What do you typically hunt with your
15   "others"?
16           MR. ATKINSON:  Objection to form.
17           You can answer.
18   A.  Deer.
19   BY MS. MEDEIROS:
20   Q.  Anything else?
21   A.  In the state -- in the state of Connecticut.
22   Here.
23   Q.  Do you hunt with your "others" outside the
24   state of Connecticut?
25           MR. ATKINSON:  Objection to form.
```

```
 1          You can answer.
 2   A.  No.
 3   BY MS. MEDEIROS:
 4   Q.  So, the only animal that you hunt with your
 5   "others" are deer; is that right?
 6          MR. ATKINSON:  Objection to form.
 7          You can answer.
 8   A.  At this time, yes.
 9   BY MS. MEDEIROS:
10   Q.  Do you intend to use your "others" to hunt any
11   other animals at any point in the future?
12          MR. ATKINSON:  Objection to form.
13          You can answer.
14   A.  Possibly.
15   BY MS. MEDEIROS:
16   Q.  And what animals would those be?
17   A.  Depends on what the State of Connecticut would
18   allow in future.
19   Q.  Is there a possibility that the State of
20   Connecticut may allow for hunting bears with
21   "others"?
22          MR. ATKINSON:  Objection to form.
23          You can answer.
24   BY MS. MEDEIROS:
25   Q.  If you know.
```

1   A.  I don't know.

2   Q.  Okay.  When you say it depends what the State

3   of Connecticut allows in the future, what are you

4   contemplating?

5          MR. ATKINSON:  Objection to form.

6          You can answer.

7   A.  Bears.

8   BY MS. MEDEIROS:

9   Q.  Okay.

10  A.  Can I go back and clarify?

11  Q.  Of course.  Yes.

12  A.  I also use the "others" when I'm -- coyotes.

13  Q.  Okay.  Have you hunted coyotes with your

14  "others"?

15  A.  Yes.

16  Q.  And would that be in the context of your

17  employment as a nuisance wildlife control officer?

18  A.  No.

19  Q.  That would just be on personal time?

20  A.  Yes.

21  Q.  Any other animals besides coyotes or deer that

22  you hunt with your "others"?

23  A.  No.

24  Q.  Do you feel that those "others" that you

25  currently possess are the most effective hunting

1 weapons for deer and coyotes?

2         MR. ATKINSON:  Objection to form.

3         You can answer.

4 A.  It depends on the season, the time.  It's just

5 like the clothes you wear; one can be better at

6 different times than others, the distance.

7 BY MS. MEDEIROS:

8 Q.  So, what would be a circumstance that an

9 "other" would be better for hunting coyote or deer

10 than a different weapon?

11         MR. ATKINSON:  Objection to form.

12         You can answer.

13 A.  At a longer distance.

14 BY MS. MEDEIROS:

15 Q.  And why is that?

16 A.  The rounds in the "others" go a further

17 distance.

18 Q.  Okay.  And I don't think I asked you this

19 before, but what size rounds do your two "others"

20 take?

21 A.  I currently have a 5.56 and a 9-millimeter, and

22 I'm hoping to get a 300 Blackout.

23 Q.  So, we talked about hunting and self-defense

24 for your "others."

25         Are there any other purposes that you carry

```
1    your two "others" for?

2           MR. ATKINSON:  Objection to form.

3           You can answer.

4    A.  No.

5    BY MS. MEDEIROS:

6    Q.  Have you ever had to discharge one of your

7    "others" in self-defense?

8    A.  No.

9    Q.  Have you ever had to brandish one of your

10   "others" in self-defense?

11          MR. ATKINSON:  Objection to form.

12          You can answer.

13   A.  No.

14   BY MS. MEDEIROS:

15   Q.  Do you understand what I mean by the word

16   "brandish"?

17          MR. ATKINSON:  Objection to form.

18          You can answer.

19   A.  No.

20   BY MS. MEDEIROS:

21   Q.  Okay.  Have you ever had to display one of your

22   "others" in order to deter or scare away an

23   attacker?

24          MR. ATKINSON:  Objection to form.

25          You can answer.
```

```
 1   A.  No.

 2   BY MS. MEDEIROS:

 3   Q.  How about any of the firearms that you

 4   currently own; have you ever had to discharge any

 5   of the firearms that you currently own, in

 6   self-defense?

 7           MR. ATKINSON:  Objection to form.

 8           You can answer.

 9   A.  Yes.

10   BY MS. MEDEIROS:

11   Q.  When?

12   A.  When I was working with a rabid animal.

13   Q.  Okay.  Which weapon was that?

14   A.  A .22 long rifle.

15   Q.  What kind of animal was it?

16   A.  Raccoon.

17   Q.  How many times has that happened?

18   A.  Can you rephrase the question?

19   Q.  Sure.

20           How many times have you had to discharge

21   any firearm in self-defense?

22   A.  Twice.

23   Q.  Twice.  Okay.

24           And we talked about one occasion that was

25   during the course of your employment, with a rabid
```

1   raccoon.

2          What was the second occasion?

3   A.  A coyote.

4   Q.  Was that also during the course of your

5   employment?

6   A.  Yes.

7   Q.  Was that animal rabid as well?

8   A.  No.

9          MR. ATKINSON:  Objection to form.

10         You can answer.

11  BY MS. MEDEIROS:

12  Q.  Around what date did the incident with the

13  rabid raccoon occur?

14  A.  January of 2023.

15  Q.  And what about the coyote incident?  When did

16  that occur?

17  A.  February of 2023.

18  Q.  Okay.  Other than the incident with the rabid

19  raccoon and the incident with the coyote, have you

20  ever had to discharge a firearm in self-defense?

21         MR. ATKINSON:  Objection to form.

22         You can answer.

23  A.  No.

24  BY MS. MEDEIROS:

25  Q.  And were both of those occasions with the .22?

1   A.   Yes.

2   Q.   Other than those two circumstances, which

3   occurred during the course of your employment, have

4   you ever had to discharge a firearm in

5   self-defense?

6   A.   No.

7   Q.   Have you ever displayed or -- have you ever

8   displayed a firearm in order to deter or scare away

9   an attacker of some kind?

10          MR. ATKINSON:  Objection to form.

11          You can answer.

12   A.   No.

13   BY MS. MEDEIROS:

14   Q.   Okay.  Have you ever had to use a firearm to

15   prevent an attack or a crime against a third

16   person?

17   A.   No.

18   Q.   What you would say the most typical use of your

19   firearms is?

20          MR. ATKINSON:  Objection to form.

21          You can answer.

22   A.   Practice.

23   BY MS. MEDEIROS:

24   Q.   And when you say "practice," I think, earlier,

25   you said practice would be practicing your skills

1   at the range; is that right?

2   A.  Yes.

3   Q.  And I know we talked about where you work as an

4   instructor.

5        Where do you typically go to practice your

6   skills at a range?

7        MR. ATKINSON:  Janelle, can you

8   rephrase that? because I think you might

9   have cut out; or can we have the court

10  reporter read that back?

11       MS. MEDEIROS:  I can repeat it.

12  That's fine.

13  BY MS. MEDEIROS:

14  Q.  So, we talked about where you work as a

15  firearms instructor in East Granby.

16       Where do you typically go to just practice

17  your skills at a range?

18  A.  So, I go to the Hartford Gun Club, in East

19  Granby; and Metacon, in Simsbury.

20  Q.  Anywhere else?

21  A.  I go to Deerfield Valley, in Vermont.

22  Q.  Okay.

23  A.  And there's a couple of others, but not as

24  frequent.

25  Q.  Okay.  Do you know the names of those others?

```
 1   A.  Academy, in Salem.  And, yeah, I think that's
 2   all I can remember right now.  Yeah.
 3   Q.  Do you have any type of permit or license to
 4   carry or possess firearms in Vermont?
 5          MR. ATKINSON:  Objection to form.
 6          You can answer.
 7   A.  No.
 8   BY MS. MEDEIROS:
 9   Q.  Do you know if you're required to under the law
10   of the State of Vermont?
11          MR. ATKINSON:  Objection to form.
12          You can answer.
13   A.  You are not required.
14   BY MS. MEDEIROS:
15   Q.  I may have asked you this earlier, so I
16   apologize if I did; but do you teach as a firearms
17   instructor in any other state besides Connecticut?
18   A.  Not at this time.
19   Q.  Okay.  Earlier, we were talking a little bit
20   about the differences between an AR-15-platform
21   firearm and the "others" that you currently own.
22   And you mentioned the benefits -- the pros and cons
23   of a stock versus a pistol brace.
24          Do you remember that?
25   A.  Yes.
```

1  Q.  What are the differences between a stock and a

2  pistol brace?

3  A.  So, the stock, you're able to put in your

4  shoulder and allow your body to handle the recoil.

5  The pistol brace has to be braced on your arm, and

6  it's a little harder to absorb the recoil with your

7  body.

8  Q.  Okay.  So, the benefit of the stock is that

9  you're shooting from the shoulder; is that fair to

10  say?

11  A.  Yes.

12  Q.  You also mentioned the length of the barrel,

13  when we were talking about the various types of

14  weapons.

15      What's the benefit of a shorter or a longer

16  barrel?

17  A.  So, the shorter barrel gives you an easier time

18  to maneuver.  The shorter barrel makes it easier to

19  move around.  It makes it easier to hold on to it.

20  I'm a small-framed person, so having a smaller gun

21  is easy for me to control -- easier for me to

22  control.

23  Q.  Okay.  So, a smaller gun is easier for you to

24  control.

25      You said, earlier, that an AR-15-platform

```
 1   firearm typically has a barrel that's under

 2   16 inches; is that right?

 3          MR. ATKINSON:  Objection to form.

 4          You can answer.

 5   A.  It's my understanding, yes.

 6   BY MS. MEDEIROS:

 7   Q.  What would you say the length of the barrel on

 8   the two "others" that you currently own is?

 9   A.  They're both 14 1/2.

10   Q.  Okay.  And I think you mentioned earlier that

11   you hoped to someday obtain a 300 Blackout; is that

12   right?

13   A.  Yes.

14   Q.  Would that -- what would be the length of the

15   barrel on a firearm like that?

16          MR. ATKINSON:  Objection to form.

17          You can answer.

18   A.  Twelve and a half inches.

19   BY MS. MEDEIROS:

20   Q.  Okay.  What's the difference between the two

21   inches of length that you have in the "others" that

22   you currently own and the 300 Blackout that you

23   would like to purchase?

24          MR. ATKINSON:  Objection to form.

25          You can answer.
```

1   A.  The twelve-and-a-half-inch makes it easier to

2   control it.  It makes it easier to absorb the

3   recoil on it.

4   BY MS. MEDEIROS:

5   Q.  Anything else that makes the 300 Blackout

6   better or superior in some way to the "others" that

7   you currently own?

8   A.  The 300 Blackout, in general, is a

9   easier-shooting gun for recoil.  It's much easier

10  for a smaller-statured person to control a 300

11  Blackout.

12  Q.  And why is it easier to control?

13  A.  The rounds, the build of the firearm.

14  Q.  Okay.  What about the rounds makes it easier to

15  control?

16  A.  The 300 Blackout itself is an easier round.

17  The projectile is easier -- I don't -- I don't

18  really know how to explain it.  I'm not an ammo

19  expert, so --

20  Q.  So, why is it that that ammo is just easier?

21  Is there something about the size, the shape?

22          MR. ATKINSON:  Objection to form.

23          You can answer.

24  A.  Yes.  But I can't explain it.  I don't -- I

25  don't know the technical terms to explain that.

1   BY MS. MEDEIROS:

2   Q.  Have you ever fired a 300 Blackout?

3   A.  Yes.

4   Q.  So, do you feel that it was easier to use than

5   the current weapons that you own?

6   A.  Yes.

7   Q.  Okay.  Have you ever fired an AR-15-platform

8   firearm?

9          MR. ATKINSON:  Objection to form.

10         You can answer.

11  A.  Yes.

12  BY MS. MEDEIROS:

13  Q.  An AR-15-platform firearm, compared to a 300

14  Blackout, which is easier to use, in your

15  experience?

16         MR. ATKINSON:  Objection to form.

17         You can answer.

18  A.  Depends on what you're using it for.  They both

19  have their purpose.

20  BY MS. MEDEIROS:

21  Q.  Okay.  In the circumstances that you've fired

22  both, which was easier for you to use?

23  A.  I don't really understand the question.

24  Q.  Sure.

25         So, you said, in your personal experience,

1   you have fired both a 300 Blackout and an

2   AR-15-platform firearm, correct?

3   A.  Yes.

4   Q.  What were the circumstances in which you fired

5   the AR-15-platform firearm?

6   A.  At the range.

7   Q.  At the range.  Okay.

8        Now, for the 300 Blackout, under what

9   circumstance did you fire a 300 Blackout?

10  A.  At the range.

11  Q.  Okay.  So, you fired them both in the same

12  circumstance.

13        Which was easier for you to use?

14  A.  They both had aspects of them that were easier.

15  The AR platform with the stock is just easier

16  because you can brace it up against your shoulder.

17  But the brace is just another way to use it.

18        So, they both have their -- I don't know if

19  that makes any -- I don't really know how to

20  explain that.

21  Q.  So, I just want to make sure I understand.

22        Does the 300 Blackout have a pistol brace?

23        MR. ATKINSON:  Objection to form.

24        You can answer.

25  A.  In the "other" configuration, yes.

```
 1   BY MS. MEDEIROS:

 2   Q.  Okay.  When you fired a 300 Blackout, was it in

 3   "other" configuration?

 4   A.  Yes.

 5   Q.  Okay.  So, was the pistol brace easier to use

 6   or the stock, on the AR-15 platform?

 7   A.  The stock is by far easier to use.

 8   Q.  Okay.  But the AR-15-platform firearm that you

 9   used was longer than the 300 Blackout.

10         Am I right on that?

11   A.  I don't know.  I don't know what the barrel

12   length was on that.

13   Q.  Okay.  But, typically, the AR-15-platform

14   firearms are about 16 inches; is that right?

15         MR. ATKINSON:  Objection to form.

16         You can answer.

17   A.  That is my understanding.

18   

19   

20   

21   

22   

23   

24   

25   
```









1

2

3   Q.  Do you own any weapons for self-defense, other

4   than firearms?

5           MR. ATKINSON:  Objection to form.

6           You can answer.

7   A.  Yes.

8   BY MS. MEDEIROS:

9   Q.  What are those?

10  A.  I have knives.

11  Q.  When did you purchase your two "others"?

12  A.  I don't know.  Over the past two years.

13  Q.  Over the past two years?

14  A.  Yes.

15  Q.  Okay.  What was the first firearm that you

16  purchased?

17          MR. ATKINSON:  Objection to form.

18          You can answer.

19  A.  A handgun.

20  BY MS. MEDEIROS:

21  Q.  Why did you first purchase a handgun?

22  A.  I needed something that I could carry on

23  myself.

24  Q.  Are there firearms that you currently own that

25  you have never carried on your person outside the

 1   home?

 2          MR. ATKINSON:  Objection to form.

 3          You can answer.

 4   A.  I don't think so.

 5   BY MS. MEDEIROS:

 6   Q.  Okay.  So, I'm going to show you your Affidavit

 7   again, just very quickly.  So, this is what I was

 8   showing you before, again, Exhibit A, that we

 9   previously marked.  And I'm just looking at

10   paragraph 7 here.

11          Do you see that on the screen?

12   A.  Yes.

13   Q.  So, I'm sorry to have to talk to you about

14   this; but you say, in the second paragraph, that

15   you've been a victim of domestic violence and that

16   you carry a defensive firearm to protect yourself

17   and your family from further attack.

18          Did I read that correctly?

19   A.  Yes.

20   Q.  Okay.  So, I'm going to stop sharing this,

21   really quickly.

22          So, can you tell me about that.

23          When were you a victim of domestic

24   violence?

25   A.  I don't know what you're asking.

```
 1          Years?  Like --
 2   Q.  Yep, yep.
 3          When did it start?
 4   A.  2000.
 5   Q.  Okay.  And who was the person that was your
 6   abuser?
 7   A.  My ex-husband.
 8   Q.  Your ex-husband.
 9          How long were you married?
10   A.  Four years.  But when I filed for divorce, a
11   year.
12   Q.  When did you get married?
13   A.  September of 2000.
14   Q.  Okay.  Do you have any children with your
15   ex-husband?
16   A.  I do.
17   Q.  How many?
18   A.  One.
19   Q.  Do you have any other children?
20   A.  I do.
21   Q.  How many?
22   A.  Other than the one?
23   Q.  Yes.
24   A.  Four.
25   Q.  Okay.  And I assume they are not with your
```

Jennifer Hamilton

1   ex-husband that we are talking about, that you

2   married in 2000; is that fair?

3   A.   Yes.

4   Q.   

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25







Exhibit 11 - Production Demonstrative



Jennifer Hamilton



Jennifer Hamilton



Jennifer Hamilton

Job Date:7/10/2023





Jennifer Hamilton







Jennifer Hamilton



1

2

3

4

5    Q.  Okay.  I'm going to stop sharing my screen for

6    one second.  Give me one moment.

7            MS. MEDEIROS:  Cam, can we take a

8    quick, like, two-minute break?

9            MR. ATKINSON:  Yes.

10           MS. MEDEIROS:  Thanks.

11           (Recess taken)

12   CONTINUED EXAMINATION

13   BY MS. MEDEIROS:

14   Q.  Are you all set to go, Ms. Hamilton?

15   A.  Yes.

16   Q.  Okay.  Hopefully, we don't have too much more

17   for you.

18           So, on the issue --

19

20

21

22

23

24

25

Exhibit 11, Ammunition, Filed

Jennifer Hamilton

Job Date:7/10/2023



www.brandonLT.com
Brandon Legal Tech, LLC

Jennifer Hamilton



Jennifer Hamilton



Exhibit 11 - Informant Files

Jennifer Hamilton





17          (Pause in proceedings)

18   BY MS. MEDEIROS:

19   Q.  So, I just wanted to circle back to one thing I

20   forgot to ask you earlier.  We were talking about

21   the two animals that you had to defend yourself

22   against in the course of your employment.

23          Do you remember that?

24   A.  Yes.

25   Q.  What happened with the raccoon?  Did you end up

1  having to fire at the animal?

2  A.  Yes.

3  Q.  Did it -- did you have to kill it?

4  A.  The animal was dispatched.  Yes.

5  Q.  And I assume "dispatched" is a much kinder way

6  of saying killed the animal?

7  A.  Yes.

8  Q.  Okay.  And as to the coyote, is that true as

9  well?  Did you have to dispatch the coyote?

10  A.  Yes.

11  Q.  Okay.  And you used a .22 to do that in both

12  circumstances?

13  A.  Yes.

14  Q.  How many rounds did it take to dispatch the

15  raccoon?

16  A.  One.

17  Q.  And for the coyote, how many rounds did it take

18  to dispatch the coyote?

19  A.  One.

20  Q.  You currently own two "others," correct?

21  A.  Yes.

22  Q.  Have you ever fired those weapons from the

23  shoulder?

24  A.  Yes.

25  Q.  Okay.  Have you ever fired them using a pistol

1  brace?

2  A.  Yes.

3  Q.  When did you become concerned about your

4  ability to purchase an "other" under Connecticut

5  state law?

6          MR. ATKINSON:  Objection to form.

7          You can answer.

8  A.  When Connecticut made it illegal for me to

9  purchase an "other."

10  BY MS. MEDEIROS:

11  Q.  So, the first time you became concerned about

12  your ability to legally purchase an "other" was

13  when the new, recent statute passed making that

14  illegal; is that right?

15          MR. ATKINSON:  Objection to form.

16          You can answer.

17  A.  Yes.

18  BY MS. MEDEIROS:

19  Q.  Okay.  So, just a few weeks ago; is that right?

20  A.  Yes.

21  Q.  Were you concerned about your ability to

22  purchase an "other" when the ATF came out with

23  their ruling regarding "others" in February --

24  January/February of 2023?

25  A.  Yes.

1    Q.  Why did you not purchase a 300 Blackout after

2    the ATF came out with that ruling?

3    A.  The 300 Blackout I was looking for was not

4    available at the time.

5    Q.  When did it become available?

6    A.  It became -- well, it's available now.  It's

7    just, I'm not able to purchase it.  I was waiting

8    for it to be manufactured.

9    Q.  When did you find out that it was being

10   manufactured?

11   A.  When I went to the gun store and asked to

12   purchase specific "others."

13   Q.  And when was that?

14   A.  That would have been in April.

15   Q.  Of this year?

16   A.  Yes.

17   Q.  Okay.  So, in April of this year, you went to a

18   gun store and specifically asked for a custom

19   300 Blackout to be manufactured; is that correct?

20   A.  I asked for a JP Firearm Corp.'s custom

21   "other," yes.

22   Q.  Why did you not purchase or try to purchase

23   that weapon before April of 2023?

24           MR. ATKINSON:  Objection to form.

25           You can answer.

```
 1   A.  I was waiting for my business to make enough

 2   money for me to make that purchase.

 3   BY MS. MEDEIROS:

 4   Q.  Okay.  So, before April of 2023, you would not

 5   have been able to make that purchase?

 6          MR. ATKINSON:  Objection to form.

 7          You can answer.

 8   A.  Yes.

 9   BY MS. MEDEIROS:

10   Q.  Okay.  How much would you say that that weapon

11   that you were attempting to purchase in April of

12   2023 cost?

13   A.  It's 2,495.

14   Q.  How much did the two "others" that you

15   currently own cost?

16          MR. ATKINSON:  Objection to form.

17          You can answer.

18   A.  I don't know.

19   BY MS. MEDEIROS:

20   Q.  Did either of them cost more than $2,495?

21   A.  Yes.

22   Q.  Did both of them cost more than $2,495?

23          MR. ATKINSON:  Objection to form.

24          You can answer.

25   A.  No.
```

```
 1   BY MS. MEDEIROS:

 2   Q.  Okay.  The one that cost more than $2,495, did

 3   it cost more than $3,000?

 4   A.  No.

 5   Q.  Okay.  So, the one that cost more than the

 6   Blackout, cost somewhere more than $2,495 and less

 7   than $3,000; is that fair?

 8   A.  Yes.

 9   Q.  Okay.  The other one, that cost less than

10   $2,495, did that cost less than $2,000?

11   A.  Yes.

12   Q.  Did it cost less than $1,500?

13   A.  No.

14   Q.  Okay.  So, the other -- so, one of your

15   "others" cost somewhere between $2,500 and $3,000,

16   and the other "other" cost somewhere between $1,500

17   and $2,000; is that fair?

18   A.  Yes.

19   Q.  Of the somewhere around 15 firearms that you

20   currently own, you purchased all of them in the

21   last five years; is that right?

22   A.  Yes.

23   Q.  Why did you not get a pistol permit before

24   2018?

25          MR. ATKINSON:  Objection to form.
```

Jennifer Hamilton                                                    Job Date:7/10/2023

```
 1          You can answer.
 2  A.  I believe I already stated this before, but I
 3  did not get a permit because I was raised believing
 4  and understanding that you should not have a
 5  firearm if you do not know how to use it and are
 6  able to use it.  And I had so much fear from my
 7  ex-husband that I would not have been able to use
 8  it.
 9  Q.  Okay.  How about before 2000?  Why didn't you
10  try to learn how to get a firearm and learn how to
11  properly use a firearm before 2000, before you got
12  involved with your ex-husband?
13          MR. ATKINSON:  Objection to form.
14          You can answer.
15  A.  I was a single mother and could not afford to
16  get a firearm in the -- or even get a permit in the
17  state of Connecticut.
18  BY MS. MEDEIROS:
19  Q.  Okay.  What's the cost to get a permit in the
20  state of Connecticut?
21          MR. ATKINSON:  Objection to form.
22          You can answer.
23  BY MS. MEDEIROS:
24  Q.  If you know.
25  A.  I don't know.
```

1  Q.  Okay.  And we've been talking about the

2  300 Blackout quite a bit.

3         And so, can you tell me, how is the

4  300 Blackout different from the "others" that you

5  currently own?

6         MR. ATKINSON:  Objection to form.

7         You can answer.

8  BY MS. MEDEIROS:

9  Q.  Actually, withdrawn.  Let me rephrase that.

10         So, the custom 300 Blackout that you wanted

11  to purchase in April of 2023, just so that I'm

12  being specific, how is that weapon different than

13  the ones -- the "others" that you currently own?

14  A.  It has a twelve-and-a-half-inch barrel.

15  Q.  And the two "others" that you currently have,

16  have a longer barrel; is that right?

17  A.  Yes.

18  Q.  Are there any other differences between the

19  300 Blackout and the "others" that you currently

20  own?

21  A.  It's a 300 Blackout.

22  Q.  Okay.  Obviously, that means the size of the

23  ammunition is different.

24         Is there anything else about that weapon

25  that's different than the ones that you currently

```
 1   have, materially different?

 2           MR. ATKINSON:  Objection to form.

 3           You can answer.

 4   A.  No.

 5   BY MS. MEDEIROS:

 6   Q.  Now I'm going to show you your Affidavit -- one

 7   other Affidavit here.  I'll share the screen.

 8   Okay.

 9           So, now, looking at -- this is a different

10   Affidavit.  I'm going to mark this as Exhibit B.

11           Do you see that document up on the screen,

12   Ms. Hamilton?

13   A.  Yes.

14   Q.  Do you recognize that as another Affidavit that

15   you signed in this lawsuit?

16   A.  Yes.

17   Q.  Okay.  I'm just going to scroll down to the

18   last page.

19           Is that your signature there on the last

20   page of Exhibit B?

21   A.  Yes.

22   Q.  And the date is July 5, 2023?

23   A.  Yes.

24           (Exhibit B, Affidavit of Jennifer Hamilton

25   signed 7/5/2023, was marked for identification)
```

```
1   Q.  So, I'm looking up at paragraph 5, and it says,

2   it has been my intention to acquire a JP Firearms

3   Corp. 300 Blackout in a Connecticut "other"

4   configuration for quite some time.

5        Did I read that correctly?

6   A.  Yes.

7   Q.  So, you say here, "for quite some time."

8        What does that mean?

9   A.  Well, I had wanted one for a while.  It was one

10  I intended to get.

11  Q.  Okay.  And you said you wanted it for a while.

12       How long is a while?

13       MR. ATKINSON:  Objection to form.

14       You can answer.

15  A.  Over a year.

16  BY MS. MEDEIROS:

17  Q.  And why, again, did you not purchase this

18  before April of 2023?

19  A.  I was waiting for my business that I started to

20  make enough money to purchase it.

21  Q.  Could you have chosen to purchase the

22  300 Blackout instead of the two "others" that you

23  currently have?

24       MR. ATKINSON:  Objection to form.

25       You can answer.
```

1   A.   There was not one available at the time.

2   BY MS. MEDEIROS:

3   Q.   Did you go to a gun manufacturer and inquire as

4   to whether one was available at that time?

5           MR. ATKINSON:   Objection to form.

6           You can answer.

7   A.   I did not speak with a manufacturer, no.

8   BY MS. MEDEIROS:

9   Q.   So, looking at your Affidavit again, in

10  paragraph 6, you say, on July 5, 2023, I contacted

11  Tobacco Valley Gun, in East Windsor, Connecticut,

12  to inquire whether I could purchase this firearm.

13          Did I read that correctly?

14  A.   Yes.

15  Q.   Okay.  So, we were talking about you going to a

16  gun store to talk about purchasing this

17  300 Blackout in April 2023.

18          Is that gun store that you went to in April

19  of 2023 the Tobacco Valley Gun Store, in East

20  Windsor?

21  A.   Yes.

22  Q.   Okay.  Who did you speak to in April of 2023

23  about obtaining this weapon?

24  A.   Krys Dibella, at Tobacco Valley Gun.

25  Q.   Okay.  And, at that time, did you place an

1    order for the weapon?

2            MR. ATKINSON:  Objection to form.

3            You can answer.

4    A.  I did not.

5    BY MS. MEDEIROS:

6    Q.  Why not?

7    A.  Because it was not available.

8    Q.  Okay.  So, when you say it's not available, do

9    you mean it had to be built specifically to your

10   specifications, or do you mean there just -- the

11   manufacturer just didn't have any?

12           MR. ATKINSON:  Objection to form.

13           You can answer.

14   A.  The manufacturer did not have the parts at the

15   time to build the "other" that I wanted.

16   BY MS. MEDEIROS:

17   Q.  Okay.  At any time between April of 2023 and

18   July 5th of 2023, did you attempt to purchase that

19   weapon again?

20   A.  No.

21   Q.  Why did you not try to purchase that weapon

22   again when you found out that Connecticut was

23   passing a statute to make "others" in Connecticut

24   illegal?

25           MR. ATKINSON:  Objection to form.

1        You can answer.

2   A.  Because it wasn't available.

3   BY MS. MEDEIROS:

4   Q.  I'm just -- my understanding is that you said

5   you did not inquire, between April of 2023 and

6   July 5th of 2023, as to whether that weapon was

7   available; is that right?

8        MR. ATKINSON:  Objection to form.

9        You can answer.

10  A.  Yes.  I was told, we will call you as soon as

11  it is available.

12  Q.  Okay.  And did you get a call like that?

13       MR. ATKINSON:  Objection to form.

14       You can answer.

15  A.  When I called to check on it, they explained

16  that they cannot legally sell me an "other," so it

17  doesn't matter if it's available at this time.

18  BY MS. MEDEIROS:

19  Q.  Okay.  Did you check with any other gun stores

20  besides the Tobacco Valley Gun in East Windsor, to

21  attempt to purchase that weapon at any time?

22  A.  No.

23       MR. ATKINSON:  Objection to form.

24       You can answer.

25  A.  No.

```
 1   BY MS. MEDEIROS:

 2   Q.  Okay.  I'm going to stop sharing my screen.

 3          Have you ever been convicted of any

 4   offense?

 5   A.  No.

 6          MR. ATKINSON:  Objection to form.

 7          You can answer.

 8   BY MS. MEDEIROS:

 9   Q.  I'm sorry.  I didn't get your answer,

10   Ms. Hamilton.

11   A.  No.

12   Q.  Have you ever been arrested?

13   A.  No.

14   Q.  Have you ever been charged with any crime?

15   A.  No.

16   Q.  Have you ever been the subject of a temporary

17   restraining order or protective order in civil

18   court, as in have you ever been the person who was

19   being restrained from contact with someone else?

20   A.  No.

21   Q.  Okay.

22          MS. MEDEIROS:  If I could just have

23   like two or three minutes, I think we're

24   ready to wrap up.

25          MR. ATKINSON:  Can we take five,
```

1    please.

2          MS. MEDEIROS:  Great.

3          MR. ATKINSON:  Thank you.

4          (Recess taken)

5    CONTINUED EXAMINATION

6    BY MS. MEDEIROS:

7    Q.  I just have, like -- promise -- like two more

8    questions for you.

9          So, first, the 300 Blackout that we've been

10   talking about that you inquired about back in April

11   of 2023, we've been talking about that.

12         Do you remember that?

13   A.  Yes.

14   Q.  So, you mentioned that it was custom; is that

15   right?

16         MR. ATKINSON:  Objection to form.

17         You can answer.

18   A.  I don't believe I said they were custom.

19   BY MS. MEDEIROS:

20   Q.  Okay.  Well, I think I'll share my screen.

21   Give me one second here.

22         I think you mentioned, when you were

23   testifying, that there were some features on it or

24   parts that were unavailable; is that right?

25         MR. ATKINSON:  Objection to form.

1          You can answer.

2   A.  Yes.

3   BY MS. MEDEIROS:

4   Q.  Is there anything about the 300 Blackout that

5   you wanted to order back in April of 2023 that is

6   different than just a normal Blackout that you

7   could just go and purchase anywhere?

8          MR. ATKINSON:  Objection to form.

9          You can answer.

10  A.  The company that makes it is the company that I

11  want, which is the JP Firearms.  They did not have

12  the 300 Blackout barrels available in 12 1/2 inches

13  at the time.

14  BY MS. MEDEIROS:

15  Q.  Is there anything about the specific

16  JP Firearms Corp. 300 Blackout that was different

17  than the standard Blackout that that company

18  manufactures for the one that you wanted?

19          MR. ATKINSON:  Objection to form.

20          You can answer.

21  A.  It's just like shoes.  Some companies are

22  better than others.  That's the company that I

23  wanted to purchase from.

24  BY MS. MEDEIROS:

25  Q.  So, what I'm trying to understand is -- so --

1  okay.  Let me give you an example.  You said shoes.

2         So, if we have a pair of heels from Steve

3  Madden, and we also have a pair of heels that you

4  could just buy, like, at Macy's.

5         So, JP Firearms is like the Steve Madden

6  brand name; is that right?

7         MR. ATKINSON:  Objection to form.

8         You can answer.

9  A.  Yes.

10  BY MS. MEDEIROS:

11  Q.  Okay.  What I'm trying to understand is, is

12  there some, like, particular feature of the

13  particular weapon that would be different than the

14  typical weapon in that model that JP Firearms

15  produces?  Does that make sense?

16         MR. ATKINSON:  Objection to form.

17         You can answer.

18  A.  No.  I don't understand what you mean.

19  BY MS. MEDEIROS:

20  Q.  Okay.  So, I'm thinking, like, I want this

21  particular heel from Steve Madden, right?

22  A.  Right.

23  Q.  And it only comes in pink, but I want it in

24  blue.  So I call Steve Madden, and I say, hey, can

25  you make this shoe in blue for me?

 1         I'm trying to understand, is the weapon

 2    that you were trying to purchase -- was there

 3    something unique or special about it that's

 4    different than the typical 300 Blackout that the

 5    JP Firearms Corporation produces normally?

 6         MR. ATKINSON:  Objection to form.

 7         You can answer.

 8    A.  It is the one that JP Firearms Corps produces.

 9    It's their only 300 Blackout, with the

10    twelve-and-a-half-inch barrel.

11    BY MS. MEDEIROS:

12    Q.  Okay.  So, what I'm trying to get at is, could

13    you go to the gun store and say, hey, that

14    JP Firearms Corp.'s 300 Blackout, I want it in

15    purple?  Like, can you do something like that?

16         MR. ATKINSON:  Objection to form.

17         You can answer.

18    A.  I'm sure you could customize it.  But you

19    wouldn't be able to, because the barrel in the

20    twelve-and-a-half-inch was not available,

21    regardless of what kind of customization you wanted

22    for it.

23    BY MS. MEDEIROS:

24    Q.  Got it.  Okay.

25         So, the one that you were going to

```
 1   purchase, did you want it to be customized, setting

 2   aside the issue of the barrel that was unavailable?

 3          MR. ATKINSON:  Objection to form.

 4          You can answer.

 5   A.  No.

 6   BY MS. MEDEIROS:

 7   Q.  Okay.  That's all I was trying to understand.

 8   Okay.

 9          And then, you mentioned earlier the person

10   that you spoke to at Tobacco Valley Gun East -- I'm

11   sorry, I didn't catch the name.

12          What was the name of the person you spoke

13   to?

14   A.  Krys Dibella.

15   Q.  Do you know how to spell that?

16   A.  No.

17   Q.  Okay.  Do you know if it's -- his last name is

18   spelled D-i-b-e-l-l-a?

19          MR. ATKINSON:  Objection to form.

20          You can answer.

21   A.  I don't know.

22   BY MS. MEDEIROS:

23   Q.  Okay.

24          MS. MEDEIROS:  I think that's all

25   that I have right now.  I thank you very
```

 1    much for your patience.  I understand this

 2    is long and late; so, thank you.

 3            MR. ATKINSON:  So, Janelle, same

 4    thing with the previous depositions.  We're

 5    going to claim both a "Confidential"

 6    designation and "Attorneys' Eyes Only"

 7    designation under the protective order.

 8    We'll designate those.

 9            We understand there's the

10    outstanding issue as to the portion that's

11    Attorneys' Eyes Only.  Obviously, we'll have

12    a meet-and-confer and then see if we need to

13    revisit this after we take it up with the

14    Court.

15            MS. MEDEIROS:  Sure.  Yeah.  We'll

16    keep the depo open for that limited issue at

17    this point.  And, I mean, we'll figure it

18    out.  We'll chat offline and see what we

19    have to do there.  It really would help not

20    to have to bring this back together, but

21    we'll see what we need.

22            MR. ATKINSON:  Yeah.  I don't have

23    questions, so I think we can call it a wrap

24    tonight, on that understanding.

25            MS. MEDEIROS:  Great.

 1          (Discussion off the record)

 2          THE REPORTER:  Who needs it

 3   expedite?

 4          MS. MEDEIROS:  We had talked about

 5   timely getting the transcripts as early as

 6   possible so that Attorney Atkinson can

 7   have -- we need to have the read-and-sign

 8   version back by the end of next week, the

 9   21st.

10          MR. ATKINSON:  I think, Renate,

11   we're looking to get it -- what's today,

12   Doug?

13          MR. DUBITSKY:  It's Monday.

14          MS. MEDEIROS:  The 10th.

15          MR. ATKINSON:  Renate, would it be

16   possible to get this by this Friday, because

17   I think there's going to be some litigation

18   or possible litigation over some of the

19   issues here, and I'd like to have the

20   transcript for purposes of that.

21          THE REPORTER:  Yes, I'll try to get

22   it to you by, latest, Friday.

23

24          (Time noted is 8:39 p.m.)

25

```
 1              C E R T I F I C A T E

 2         I, RENATE REID, a Notary Public duly

 3    commissioned and qualified in and for the State

 4    of Connecticut, do hereby certify that pursuant

 5    to notice there came before me on the 10th day of

 6    July, 2023 the following-named person to wit:

 7              JENNIFER HAMILTON, who was by me duly sworn

 8    to testify to the truth and nothing but the truth;

 9    that she was thereupon carefully examined upon her

10    oath and her examination reduced to writing by

11    me; that this deposition is a true record of

12    the testimony given by the witness.

13         I further certify that I am neither

14    attorney nor counsel for nor related to nor

15    employed by any of the parties to the action in

16    which this deposition is taken, and further that

17    I am not a relative or employee of any attorney

18    or counsel employed by the parties hereto, or

19    financially interested in this action.

20         IN WITNESS THEREOF, I have hereunto set my

21    hand this 13th day of July, 2023.

22

23    Renate Reid, RPR and Notary Public

24    My Commission Expires:

25    July 31, 2026
```

JURAT

I, JENNIFER HAMILTON, do hereby certify that the foregoing testimony given by me on July 10, 2023, is true and accurate, including any corrections noted on the corrections page, to the best of my knowledge and belief.

_____

JENNIFER HAMILTON

Subscribed to and sworn before me on this 23

day of July          2023.

Cameron L. Atkinson - Commissioner of Superior Court

My Commission Expires: _____.

Juris: 442289

```
 1                    CORRECTION SHEET

 2
        I, JENNIFER HAMILTON, do hereby certify that the
 3   following corrections and additions are true and
     accurate to the best of my knowledge and belief.
 4
     CORRECTION                    PAGE      LINE      REASON
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18
     DATE
19
     At,              in said County of_____
20   this day of          ,2023, personally
     appeared JENNIFER HAMILTON, and she made oath to the
21   truth of the foregoing corrections by her
     subscribed.
22
     Before me,                           , Notary
23   Public

24   My Commission Expires:_____.

25
```