UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GRANT, ET. AL | : | CIVIL NO. 3:22-CV-01223(JBA) |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, ET AL., | : | JULY 26, 2023 |
| *Defendant.* | | |

## TABLE OF CONTENTS

**I.  BACKGROUND** ................................................................................................................ **4**

**II.  ARGUMENT** ................................................................................................................... **7**

  **A.  Legal Standard.** ....................................................................................................... 7

  **B.  Plaintiffs cannot show a substantial likelihood of success on the merits.**................ 10

    **1.  Plaintiffs' facial challenge fails because some applications of the challenged statute plainly fall outside the Second Amendment's protections.** ........................................................ 11

    **2.  Plaintiffs are unlikely to succeed on the merits because they fail to show that the Second Amendment protects assault weapons.** ........................................................................ 13

      **a.  Plaintiffs do not show that assault weapons are not "dangerous and unusual" weapons that fall outside the protection of the Second Amendment.** ...................................... 17

      **b.  Plaintiffs fail to show that assault weapons are typically used by law-abiding citizens for self-defense.**......................................................................................................... 23

      **c.  Assault weapons are not even commonly *owned*.** ............................................ 29

    **3.  Even if the Second Amendment extends to assault weapons, Plaintiffs cannot show a substantial likelihood of success because Connecticut's laws are consistent with the American tradition of firearm regulation.**................................................................................. 31

      **a.  The historical analogue analysis is broader here because the challenged statute responds to unprecedented societal concerns and technological advancements.** .................. 32

      **b.  Plaintiffs cannot show a likelihood of success because Connecticut's regulations are relevantly similar to regulations throughout American history.** .............................. 37

      **ii.  Laws and regulations from both the Founding era and the nineteenth century demonstrate an historical tradition of restricting possession or regulating carry of specific types of dangerous new weapons.** ........................................................................... 42

      **iii.  Laws from the twentieth century regulating unprecedently powerful and dangerous weapons reinforce the enduring American tradition of regulating and prohibiting certain particularly dangerous weapons to protect public safety**.................... 44

**C. Plaintiffs cannot satisfy the remaining criteria for a mandatory preliminary injunction because their inability to purchase yet another firearm that they have never and almost certainly will never use for self-defense cannot outweigh the State's interest in protecting her citizens.**......47

**III. CONCLUSION** ..................................................................................................................... **51**

## <u>DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF # 51)</u>

Connecticut enacted common-sense gun safety laws almost a decade ago to protect its residents from mass murder, like the 2012 killing of 26 Connecticut students and teachers by a murderer armed with an AR-15 style rifle and large capacity magazines. Now Plaintiffs, without discovery and trial, seek a mandatory injunction that would force the State to immediately lift restrictions on people selling and owning those same military-style weapons—and some even more deadly ones, like grenade launchers. But Plaintiffs have not carried their heavy burden on any of the preliminary injunction factors, so they cannot prevail.

First: Plaintiffs' facial challenge fails because Connecticut's assault weapons ban covers some weapons—like grenade launchers—that the Second Amendment undisputedly does not reach. So Plaintiffs cannot show—as they must—that Connecticut's statutory scheme is unconstitutional in every application.

Second: Plaintiffs fail to show a substantial likelihood of success on the merits, because assault weapons do not meet the threshold criteria for constitutional protections under the Second Amendment. The regulated weapons are dangerous and unusual, military-style weapons outside the Second Amendment's scope. Plaintiffs have also not met their additional burden to demonstrate the regulated weapons are in common use. Further, assault weapons are not typically possessed by law-abiding individuals for lawful purposes like self-defense. And even if Plaintiffs could meet their burden of showing that all the regulated assault weapons were within the Second Amendment's scope, Plaintiffs still could not show a substantial likelihood of success on the merits because Connecticut's regulations are entirely consistent with historical tradition.

Third, and finally: Plaintiffs are not entitled to the extraordinary relief they seek because they fail to show irreparable injury or to explain how the balance of equities and public interest

favor immediate relief. These factors weigh heavily against Plaintiffs given the minute impact of the challenged statute on Plaintiffs and the extraordinary and potentially irreversible damage the requested injunction would do to public health and safety.

On this inadequate showing, Plaintiffs ask this Court to be the first to find Conn. Gen. Stat. §§ 53-202a-c unconstitutional. The Court should reject Plaintiffs' arguments, decline to provide the extraordinary relief they seek, and heed the Supreme Court's instruction that the Second Amendment's right to armed self-defense is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller (Heller I)*, 554 U.S. 570, 626 (2008)).

## I.  BACKGROUND

Connecticut has had some form of an assault weapons ban since 1993. Like other laws that have existed for decades at the federal, state, and local levels, the 1993 statute prohibited a small subset of dangerous military-style semiautomatic weapons. Alongside this commonsense law, Connecticut residents have continued to enjoy their constitutionally protected rights to possess firearms, including handguns, rifles, and shotguns.

In 2013, responding to the 2012 massacre at Sandy Hook Elementary School, the General Assembly passed the challenged statutes: Conn. Gen. Stat. §§ 53-202a-c. These statutes strengthened existing law by prohibiting a sub-category of semiautomatic[1] firearms with enumerated military-style features. Ex. A, Declaration of Detective Brindiana Warenda, ¶¶ 13-

---

[1] A semiautomatic weapon fires one round for each squeeze of the trigger. Ex. A ¶ 27. After each shot, the firearm automatically loads the next round in the chamber and arms the firing mechanism for the next shot, permitting a faster rate of fire as compared to manually operated guns. Id. Unlike semiautomatic weapons, fully automatic weapons, such as machine guns, fire continuously as long as the trigger is pressed. Id. ¶ 28.

14.[2] These statutes continue to recognize the rights of law-abiding citizens. Notwithstanding these statutes, Connecticut residents can purchase and possess more than one thousand different makes and models of firearms for responsible and lawful uses like self-defense. *Id.,* ¶ 73.

Assault weapons enumerated in the statutes are essentially civilian versions of military weapons used by armed forces around the world. *Id.* ¶¶ 29-30. Most of the prohibited weapons are semiautomatic adaptations of the original selective-fire AR-15/M-16 and the AK-47[3]—the most widely used military firearms in the world. *Id.* The AR-15 originally was manufactured as a selective-fire—capable of either semi-automatic or fully automatic firing—machine gun and was adopted by the United States military in the form of the M-16 during the Vietnam War. *Id.,* ¶ 41. Colt Manufacturing Company retained the AR-15 trademark for its semiautomatic version of the AR-15, which it began selling to civilians in the early 1960s. *Id.,* ¶ 42. The AR-15 is now the civilian commercial version of the M-16, without the fully automatic fire option. *Id.* Like other military weapons, the AR-15 and M-16 were designed expressly to kill large numbers of people as quickly as possible, and the M-16 has been called a "perfect killing machine." Ex. B, Declaration of John Donohue, ¶ 108.

The statutes also restrict firearms with certain features that either may be manufactured already attached to a weapon or manufactured separately and attached to enhance lethality. For

---

[2] The statutes allow a person who applied for a certificate of possession to continue possessing assault weapons that they lawfully possessed before the 2014 effective date. Conn. Gen. Stat. § 53-202d(a), (f). There are also exceptions to assault weapons restrictions for law enforcement and members of the military. *See* Conn. Gen. Stat. §§ 53-202b(b)(1), 53-202c(b), 53-202d(a)(1)(B), (2)(B), § 53-202d(d).

[3] The statutes list 49 assault rifles (as opposed to handguns or shotguns) by name. Of these, 20 are variants of the AK-47; 13 are variants of the AR-15/M-16; and 3 are variants of the HK 91 or FN type. Ex. A, ¶ 31-34. The statutes also ban certain semiautomatic pistols. *Id.,* ¶ 49. A pistol is defined under Connecticut law as any firearm that has a barrel under twelve inches long. Conn. Gen. Stat. § 29-27. Of the 22 assault pistols listed in the statutes, 6 are variants of the AK-47 and 7 are variants of the M-16/AR-15. *Id.,* ¶ 49.

example, the statutes prohibit semiautomatic weapons with telescoping stocks, shrouds, flash suppressors, or grenade launchers. None of these are weapons themselves. All are features—often detachable—that facilitate use of weapons for crimes or mass-killing. A folding or telescoping stock is a stock that makes it easier to conceal a firearm by reducing its length or size. Ex. A, ¶ 15. A flash suppressor attaches to a rifle's muzzle to reduce visible muzzle flash. *Id.*, ¶ 16.

On June 6, 2023, Governor Lamont signed Public Act 23-53 (Connecticut Substitute House Bill No. 6667 As Amended by House Amendment Schedules "A" and "B") into law which made extensive changes to the firearms laws. The "2023 Assault Weapon" ban was designed to close a loophole in the Connecticut assault weapons ban and is similar to a rule change enacted by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in January of 2023 in C.F.R. 479.11. Before Public Act 23-53, a "CT Other" did not meet the Connecticut statutory definition of either a pistol, a rifle, or a shotgun, and therefore did not meet the statutory definition of an "assault weapon" pursuant to Conn. Gen. Stat. § 53-202a-c. Under the new features test, such firearms may be assault weapons. Ex. A, ¶ 21. Conn. Gen. Stat. § 53a-3(16) defines a rifle, in part, as a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder. Firearms equipped with an arm or stabilizing brace instead of a traditional stock were deemed not to be a rifle since manufacturers claimed these devices were not intended to be shouldered. As such, firearms that had an arm or stabilizing brace were potentially excluded from the 1993 and 2013 Assault Weapons bans despite being functionally similar to firearms captured under the original ban. Public Act 23-53 now captures such firearms with arm or stabilizing braces. Id. ¶ 22.

The ban on 2023 assault weapons went into effect on June 6, 2023, but anyone who legally owned such weapons prior to the effective date of the Act may obtain a Certificate of Possession by May 1, 2024, to retain the firearms lawfully. Id. ¶ 23.

## II. ARGUMENT

### A. Legal Standard.

Plaintiffs seek to preliminarily enjoin state officials and a state statutory scheme on constitutional grounds. This is "an extraordinary and drastic remedy," requiring a "clear showing" of the "most compelling necessity." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007); *Cerilli v. Rell*, No. 3:08CV242(SRU), 2010 WL 1330998, at *1 (D. Conn. Mar. 31, 2010). Plaintiffs' burden is even higher than usual because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995).

Plaintiffs' burden is higher still because they seek a mandatory injunction that gives them all the relief they will ultimately seek at trial and they also seek to enjoin enforcement of an in-force statute that has been upheld as constitutional.[4] *See Consumer Directed Pers. Assistance Ass'n of N.Y. State v. Zucker*, No. 1:18-CV-746 (FJS/CFH), 2018 U.S. Dist. LEXIS 123988, at *6 n.2 (N.D.N.Y. July 25, 2018) (citing *Pankos Diner Corp. v. Nassau Cty. Legislature*, 321 F. Supp. 2d 520, 524 (E.D.N.Y. 2003)). Plaintiffs therefore, at least with regard to their overall challenge to the 2013 assault weapons ban, seek to change the status quo: "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). "[The] heightened standard also applies where the injunction 'will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Democratic*

---

[4] *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 269 (2d Cir. 2015) ("The core prohibitions by New York and Connecticut of assault weapons and large-capacity magazines do not violate the Second Amendment.").

7

*Cong. Campaign Comm. v. Kosinski*, No. 22-CV-1029 (RA), 2022 WL 2712882, 2022 U.S. Dist. LEXIS 124144, at *26 (S.D.N.Y. July 13, 2022) (quoting *People ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).

Because Plaintiffs seek both to alter the status quo and receive all the relief sought in this lawsuit via a preliminary injunction, they must "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Since Plaintiffs seek a mandatory injunction, they must "carry the burden of persuasion by a clear showing for each factor." *Bergamaschi v. Cuomo*, No. 20 CIV. 2817 (CM), 2020 U.S. Dist. LEXIS 68937, at *15 (S.D.N.Y. Apr. 20, 2020) (quoting *Abbott Labs. v. Adelphia Supply USA*, No. 15 CV 5826, 2015 WL 10906060, 2015 U.S. Dist. LEXIS 189555, at *45 (E.D.N.Y. Nov. 6, 2015), *aff'd sub nom. Abbott Labs. v. H&H Wholesale Servs., Inc.*, 670 Fed. Appx. 6 (2d Cir. 2016)).

The burden of persuasion for each factor is clear and convincing evidence. *Shenzhen Miracle Laptop Bags Co. v. Castillo*, No. 22-CV-7734 (HG), 2023 U.S. Dist. LEXIS 14405, *7 (E.D.N.Y. Jan. 27, 2023); *see also National Commodities Co. v. Viret*, 296 F. 664, 665 (2d Cir. 1924) ("It is also elementary that, to warrant the granting of a preliminary injunction, the showing must be clear and convincing as to the propriety of such relief.").  To win a mandatory injunction, a movant's "right to relief must be indisputably clear." *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972). "Thus, 'if there is doubt as to the probability of plaintiff's ultimate success, a request for preliminary mandatory relief must be denied.'" *Audio-Video Grp., LLC v. Green*, No. 1:14cv169 (JCC/TCB), 2014 U.S. Dist. LEXIS 25413, at *14 (E.D. Va. Feb. 26, 2014) (quoting *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 704 (E.D. Va. 2000)).

Plaintiffs can only meet their burden by "evidentiary submissions." *Thurman v. Bun Music*, No. 13-CV-5194 (CM) (MHD), 2015 U.S. Dist. LEXIS 61514, at *10 (S.D.N.Y. May 7, 2015) (denying preliminary injunction because Plaintiffs did not carry their burden to submit credible evidence in support of their application). "If Plaintiff's evidence is contested, the court cannot consider it in adjudicating the motion unless an evidentiary hearing is held." *Id.* (citing *Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003) ("The existence of factual disputes necessitates an evidentiary hearing. . . before a motion for a preliminary injunction may be decided.").

Plaintiffs mistakenly minimize their burden by suggesting they only "must establish '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." (ECF #51-1 at 13-14.) This is incorrect. *See Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("A difficult question is . . . of course, no reason to grant a preliminary injunction."); *Winter*, 555 U.S. at 19 (vacating preliminary injunction entered on the basis of lower court finding "serious question" regarding interpretation of environmental regulations). As support for this proposed standard, Plaintiffs cite to *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). (ECF #51-1 at 13.) But that case itself reveals the problem with Plaintiffs' argument.

In *Citigroup* the Second Circuit recognized there are three instances where the "serious question" standard does not apply. *Id*. at 35 n. 4. All three are present here: "the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme"; the requested "injunction (1) would provide the plaintiff with all the relief that is sought and (2) could not be undone by a judgment favorable to defendants on the merits at trial"; and the requested injunction "alter[s] the status quo by commanding some positive act, as opposed to a

prohibitory injunction seeking only to maintain the status quo." *Id*. (internal citations and quotations omitted). As the Second Circuit has said clearly, "[w]hen, as here, the preliminary injunction 'will affect government action taken in the public interest pursuant to a statutory or regulatory scheme,' it 'should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'" *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (quoting *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)). For this reason alone, the heightened standard applies here and this Court should decline Plaintiffs' invitation to apply a less rigorous, and incorrect, standard. Instead, this Court should apply the correct standard, as articulated *supra*.

**B.  Plaintiffs cannot show a substantial likelihood of success on the merits.**

Plaintiffs have not pointed to a single controlling case where an assault weapons ban has been struck down. To the contrary, the only case from the Second Circuit that considered such a ban was *Cuomo*, which upheld the Connecticut assault weapons ban under a pre-*Bruen* analysis. 804 F.3d 242, 269. Plaintiffs cite *Bruen, Caetano, McDonald,* and *Heller*, but none of these cases involved assault weapons bans, and the Supreme Court has never considered the constitutionality of any such law. Since *Bruen*, while no Circuit Court has yet weighed in, almost every district court to consider the issue has upheld the constitutionality of an assault weapons ban and denied a preliminary injunction. *Fitz v. Rosenblum,* No. 3:22-cv-01859-IM, 2022 U.S. Dist. LEXIS 219385, at *8 (D. Or. Dec. 6, 2022); *Or. Firearms Fed'n, Inc. v. Brown,* No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391, at *54 (D. Or. Dec. 6, 2022); *Bevis v. City of Naperville Ill*., 2023 U.S. Dist. LEXIS 27308, 2023 WL 2077392, at *11-12 (N.D. Ill. Feb. 17, 2023); *Del. State Sportsmen's Ass'n, Inc v. Del. Dep't of Safety & Homeland Sec.*, No. 22-951-RGA (Consolidated), 2023 U.S. Dist. LEXIS 51322, *12 (D. Del. Mar. 27, 2023), *appeal filed*, (3d Cir. Apr. 7, 2023); *Hanson v.*

*District of Columbia*, No. 22-2256 (RC), 2023 U.S. Dist. LEXIS 68782, at *2 (D.D.C. Apr. 20, 2023); *Herrera v. Raoul,* No. 23-CV-532 (LCJ), 2023 U.S. Dist. LEXIS 71756, 2023 WL 3074799, at *6 (N.D. Ill. Apr. 25, 2023); *Hartford v. Ferguson*, No. 3:23-cv-05364-RJB, 2023 U.S. Dist. LEXIS 98579, at *11 (W.D. Wash. June 6, 2023); *cf. Barnett v. Raoul*, No. 3:23-cv-00209-SPM, 2023 U.S. Dist. LEXIS 74756, at *11 (S.D. Ill. Apr. 28, 2023).

At the very least, there is certainly "doubt" as to Plaintiffs' likelihood of success, and for that reason alone their motion should be denied. Plaintiffs also fail to satisfy the first *Winter* factor because their facial challenge is deficient; they cannot demonstrate that the Second Amendment applies to the prohibited firearms; and even if they could, there are historical analogues that satisfy *Bruen*.

### 1. Plaintiffs' facial challenge fails because some applications of the challenged statute plainly fall outside the Second Amendment's protections.

Plaintiffs do not carry their burden of showing that any regulated weapons warrant Second Amendment protections. But their facial challenge fails even if this Court finds that some—but not all—weapons or features regulated by the challenged statutes are within the Amendment's scope.

Since Plaintiffs bring a facial challenge—seeking a blanket declaration that Conn. Gen. Stat. §§ 53-202a-f, Conn. Gen. Stat. §§ 53-202h-j, and Conn. Public Act 23-53, § 23—violate the Second Amendment, ECF # 48—they must show that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Cmty. Hous. Improvement Program v. City of New York,* 59 F.4th 540, 548 (2d Cir. 2023) (rejecting plaintiffs' attempt to lessen "the rigors of *Salerno*" and holding "[t]o prevail on a facial challenge, the plaintiff must establish that no set of circumstances exists under which the [challenged] Act would be valid. . . . In other words, the plaintiff must show that the statute is unconstitutional in all of its

applications.") (internal citations and quotations omitted). "The Second Circuit has upheld gun regulations after acknowledging *Salerno's* application to facial challenges in the Second Amendment context." *United States v. Jimenez*, No. 15 Cr. 496 (LGS), 2016 U.S. Dist. LEXIS 73169, at *4 (S.D.N.Y. June 3, 2016). Plaintiffs bear a "heavy burden" in bringing a facial challenge, and such challenges are "disfavored." *Salerno*, 481 U.S. at 745; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).

This distinction between facial and as-applied challenges is particularly important here where the challenged statutes restrict ownership and possession of a wide range of weapons and features. *See* Conn. Gen. Stat. § 53-202(a) (listing specific weapons, parts, and features which render a weapon prohibited). For example, some restricted weapons or parts include "grenade launcher[s]," types of "Uzis" and various types of shotguns, including "Street Sweepers." *Id.* Except to point to a specific weapon Plaintiffs claim they waited to attempt to purchase until after the 2023 amendment to the statute, Plaintiffs do not focus their claim on particular weapons or features, but rather argue the entire statute is unconstitutional. So they must show that every weapon and feature prohibited by the statute merits Second Amendment protection and that the challenged restrictions fail to meet the *Bruen* test.

Plaintiffs have not even tried to meet that exceptionally high burden. They do not claim, for instance, that a grenade launcher, an Uzi carbine, or other combat weapons are protected by the Second Amendment. That claim would be futile. *See, e.g., N.Y. State Rifle & Pistol Ass'n v. Cuomo,* 990 F. Supp. 2d 349, 369-70 (W.D.N.Y. 2013), *affirmed in relevant part by Cuomo*, 804 F.3d at 247 (noting certain "outlawed features" are "particularly unnecessary for lawful use" such as "a grenade launcher, bayonet mount, or a silencer" and that bans on such features "require no explanation."); *Hartford*, 2023 U.S. Dist. LEXIS 98579, at *9 (rejecting motion for preliminary

injunction on post-*Bruen* facial challenge to assault weapons ban because plaintiffs had not met their evidentiary burden to demonstrate that "**all** of the weapons regulated…are 'in common use'") (emphasis in original); *United States v. Fincher*, 538 F.3d 868, 870, 873-74 (8th Cir. 2008) (sawed-off shotgun is not protected by the Second Amendment because it is not in common use by law-abiding citizens for lawful purposes); *United States v. White*, No. 13-0440-01-CR-W-SRB, 2017 U.S. Dist. LEXIS 229493, at *8-9 (W.D. Mo. Oct. 13, 2017) ("[T]he Street Sweeper is both a 'dangerous and [un]usual weapon' and well within the 'historical tradition of prohibiting the carrying of dangerous and unusual weapons.'") (quoting *Heller I*, 554 U.S. at 627).

Plaintiffs' inability to support their facial challenge by showing that the law is unconstitutional in all applications is dispositive at this preliminary stage, and this Court should deny their Motion.

## 2. Plaintiffs are unlikely to succeed on the merits because they fail to show that the Second Amendment protects assault weapons.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This provision codified the pre-existing right of "ordinary, law-abiding," and "responsible" citizens to own and carry common firearms for self-defense and other lawful purposes. *Bruen,* 142 S. Ct. at 2122, 2131, 2135, 2156. It does not, however, entitle citizens "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller I*, 554 U.S. at 626).

Both before and after *Bruen*, Courts have applied a two-step inquiry for determining the constitutionality of firearms regulation. "First, [courts] consider whether the restriction burdens conduct protected by the Second Amendment. If the challenged restriction does not implicate

conduct within the scope of the Second Amendment, our analysis ends." *Cuomo,* 804 F.3d at 254.[5]
Before *Bruen,* the "second step" of the analysis involved a means-end test which *Bruen* struck
down. *Bruen,* 142 S.Ct. at 2129 ("The Courts of Appeals' second step is inconsistent with Heller's
historical approach and its rejection of means-end scrutiny") (emphasis added).

But *Bruen* did not alter the threshold showings a plaintiff must make under the first step of
the Second Amendment analysis. Though it did not evaluate step one inquiries in great depth,
*Bruen* did not displace the non-exhaustive limiting principles set out in *Miller*, *Heller*, and
*McDonald,* including that protection only extends to those weapons "in common use for self-
defense," and that weapons "not typically possessed by law-abiding citizens for lawful purposes"
or "dangerous and unusual" weapons are unprotected by the Second Amendment. *Heller I*, 554
U.S. at 625; *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, concurring); at 2157 (Alito, J., concurring)
(noting that *Bruen* "decides nothing about who may lawfully possess a firearm," "the requirements
that must be met to buy a gun," or "the kinds of weapons that people may possess," and "disturbed"
nothing from *Heller* or *McDonald* "about restrictions that may be imposed on the possession or
carrying of guns"). Since *Bruen*, courts have recognized that the Second Amendment only applies
when regulated weapons are in common use for self-defense, typically possessed by law-abiding
citizens for lawful purposes, and are not dangerous and unusual. *See, e.g., Fitz,* 2022 U.S. Dist.
LEXIS 219385 at *8; *Brown,* 2022 U.S. Dist. LEXIS 219391 at *54; *Bevis,* 2023 U.S. Dist. LEXIS
27308, at *11-12; *Del. State Sportsmen's Ass'n, Inc,* 2023 U.S. Dist. LEXIS 51322, at *12;

---

[5] While *Bruen* did away with the means-end test for Second Amendment claims as applied in
*Cuomo* (and nearly every Second Amendment challenge before *Bruen*), it did not eliminate the
threshold question of whether the challenged restrictions even address conduct protected by the
Second Amendment. Rather, *Bruen* altered "step two" of the framework. *See Bruen,* 142 S.Ct. at
2129 ("The Courts of Appeals' *second step* is inconsistent with *Heller*'s historical approach and
its rejection of means-end scrutiny") (emphasis added).

*Hanson,* 2023 U.S. Dist. LEXIS 68782, at \*2; *Herrera,* 2023 U.S. Dist. LEXIS 71756, at \*6 (N.D. Ill. Apr. 25, 2023); *Hartford,* 2023 U.S. Dist. LEXIS 98579, at \*11; *Barnett,* 2023 U.S. Dist. LEXIS 74756, at \*11; *Kotek*, 2023 U.S. Dist. LEXIS 121299, at \*88.

Neither before nor after *Bruen* has the Second Circuit considered a case that squarely addressed step one of the Second Amendment analysis. Rather, the Second Circuit has maintained a "practice… to assume that a given firearm restriction implicates rights guaranteed by the Second Amendment" and then moved to step two of the analysis. *United States v. Perez*, 6 F.4th 448, 453 (2d Cir. 2021); *see also United States v. Jimenez,* 895 F.3d 228, 233 (2d Cir. 2018) ("we have routinely assumed that the Second Amendment applies to a given application of firearms (or ammunition)" and move to step two, "proceeding with our usual caution…"); *Cuomo*, 804 F.3d at 257 (assuming without deciding that assault weapons are protected by the Second Amendment); *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.,* 883 F.3d 45, 61 (2d Cir. 2018) (assuming without deciding conduct protected by Second Amendment); *Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013) (same).[6] The Second Circuit has nevertheless reiterated three critical principles that determine whether a particular firearm regulation even implicates the Second Amendment: "first, the Second Amendment protects the sorts of weapons that were in common use," *Perez*, 6 F.4th at 451, second, such weapons must be "typically possessed by law-abiding citizens for lawful purposes" and third, that "dangerous and unusual weapons in the hands of law-abiding civilians…

---

[6] This is true not only of the Second Circuit, but of most courts, and particularly in assault weapon cases. *See, e.g., Worman v. Healey*, 922 F.3d 26, 35 (1st Cir. 2019) (assuming without deciding); *Heller v. D.C.,* 670 F.3d 1244, 1261 (D.C. Cir. 2011) (although magazines are numerous, "we cannot be certain whether" they are "used or are useful specifically for self-defense or hunting" and moving to means-end scrutiny); *Duncan v. Bonta*, 19 F.4th 1087, 1100, 1102-03 (9th Cir. 2021) (en banc), *vacated and remanded*, 142 S. Ct. 2895, 213 L. Ed. 2d 1109 (2022) (assuming without deciding Second Amendment applied); *Ass'n of N.J. Rifle & Pistol Clubs v. AG N.J.,* 910 F.3d 106, 117 (3d Cir. 2018) (same).

[are] weapons that could be banned without implicating the Second Amendment." *Cuomo*, 804 F.3d at 255.

Accordingly, Plaintiffs must make several threshold showings before they may invoke the Second Amendment's protections. First, they must prove that they are members of "the people" and that the regulated instrument is a "bearable arm" as those phrases are used in the Second Amendment. *Bruen*, 142 S. Ct. at 2132. Next, even if the instrument is an "arm," Plaintiffs must demonstrate that it is not a "dangerous and unusual" weapon that falls outside the Second Amendment's protection. *See Cuomo,* 804 F.3d at 256 (quoting *Heller I,* 554 U.S. at 627) (weapons that are "'dangerous and unusual' in the hands of law-abiding civilians... including 'weapons that are most useful in military service' such as the fully automatic M-16 rifle" fall outside Second Amendment protection). Further, Plaintiffs must prove that such weapons are in "common use" for "lawful purposes like self-defense." *Heller I*, 554 U.S. at 624. Lastly, Plaintiffs must show that such weapons are "typically owned by 'law-abiding citizens for lawful purposes.'" *Perez,* 6 F.4th at 451 (quoting *Heller I,* 554 U.S. at 624, 627). Unless a plaintiff makes all of these showings, any Second Amendment claim must fail on the threshold inquiry of whether the constitutional protection even applies.

Even assuming that Plaintiffs are all members of "the people" within the meaning of the Amendment they still cannot carry their threshold burden.[7] "If the challenged restriction does not

---

[7] Defendants make this assumption *arguendo*, and do not concede that all Plaintiffs are "law-abiding citizens" that fall within "the people" as that phrase is used in the Second Amendment. As the Second Circuit has recognized, "the Second Amendment does not protect [] unlawful purposes" and those who violate the law—even if simply being non-compliant with "established laws and procedures,"—are not "law-abiding, responsible citizens." *United States v. Bryant,* 711 F.3d 364, 370 (2d Cir. 2013); *Perez*, 6 F.4th at 454 (holding that someone who was unlawfully present in the United States and "continued to remain without complying with established laws and procedures" did not have the same interest in possessing guns as that of a "'law-abiding, responsible' person pursuing self-defense."). Here, Plaintiff Stiefel repeatedly admitted to owning

implicate conduct within the scope of the Second Amendment, our analysis ends." *Cuomo,* 804 F.3d at 254.

### a. Plaintiffs do not show that assault weapons are not "dangerous and unusual" weapons that fall outside the protection of the Second Amendment.

Connecticut's assault weapon regulations are constitutional because assault weapons are unusually dangerous and fall outside the scope of the Second Amendment. The Second Amendment "extends only to certain types of weapons," and does not encompass a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller I,* 554 U.S. at 623, 626 (citing *Miller,* 307 U.S. at 178-82). It does not protect "dangerous and unusual" weapons, which can include "weapons that are most useful in military service—M-16 rifles and the like—[that] may be banned." *Heller I,* 554 U.S. at 627. "[A]s the Supreme Court reiterated in *Bruen,* just as weapons that are commonly used for self-defense are presumptively covered by the Second Amendment, weapons that are 'dangerous and unusual' fall outside of the Second Amendment's protections." *Kotek,* 2023 U.S. Dist. LEXIS 121299, at *103.

Plaintiffs offer no evidence that assault weapons are anything other than "dangerous and unusual." But even if they had tried, they would fail. All the evidence shows that assault weapons are unusually and particularly dangerous and so are excluded from the Second Amendment's ambit. "To determine [whether a firearm is dangerous and unusual], we consider whether the weapon has uniquely dangerous propensities." *Fyock v. City of Sunnyvale,* 779 F.3d 991, 997 (9th Cir. 2015) (citation omitted). Further, the Second Circuit has stated that, even after examining statistics regarding common ownership and typical use, the Court must also "consider more

---

and possessing large capacity magazines, without registering them as required by law, and acknowledged he understood such behavior was unlawful. Ex. J., Deposition of Michael Stiefel, Pgs. 23-27; 45-47; 50-52.

broadly whether the weapon is 'dangerous and unusual' in the hands of law-abiding citizens." *Cuomo*, 804 F.3d at 256.

Assault weapons are not manufactured for self-defense in a home. Ex. B, ¶ 158 (Assault weapons are "less maneuverable" than handguns in "confined areas"). Instead, they are built for killing large numbers of people rapidly in open spaces. Id., ¶ 159. When used against others, assault weapons result in more shots fired, more victims wounded, and more wounds per victim. Id., ¶ 67. That means more injuries, more lethal injuries, and higher rates of death than incidents involving more conventional firearms. Ex. E, Declaration of Dr. Schreiber, ¶ 28.  "[S]emiautomatic assault weapons have been understood to pose unusual risks. When used, these weapons tend to result in more numerous wounds, more serious wounds, and more victims." *Cuomo*, 804 F.3d 242, 262. Indeed, Dr. Schreiber, a trauma surgeon and colonel in the U.S. Army who has treated both civilians wounded by gunshots and troops wounded in combat, notes that due to their unique features, assault weapons "result in maximum killing potential" and "injuries you would see in a war zone" inflicted in a matter of "mere seconds." Ex. E, ¶¶ 28-30. Further, Dr. Schreiber opines that wounds created by assault weapons are more lethal and "differ substantially from those caused by other firearms, notably handguns, both in impact on the body and their relative fatality and complication rates." Id., ¶ 33. Assault weapons are both unusually lethal and unusually dangerous compared to other firearms.

Most of the weapons restricted by the challenged statutes are adaptations of the M-16 or AK-47, the most commonly used military weapons in the world. Ex. A, 29; *see also Staples v. United States*, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon."). Like other military weapons, the M-16 was designed to kill large numbers of people as quickly as possible. Ex. B, ¶ 106. Precisely for

that reason, the Supreme Court highlighted the M-16 as exemplifying a "dangerous and unusual" weapon that falls outside the Second Amendment's protections. *Heller I*, 554 U.S. at 627; *see United States v. Zaleski*, 489 Fed. App'x 474, 475 (2d Cir. 2012). Similarly, the original, automatic AR-15 was designed for combat use, not for civilian use, due to its "phenomenal lethality" and was "engineered to generate maximum wound effect" as a "perfect killing machine." Ex. B, ¶¶ 106-108; Ex. C, Declaration of Professor Louis Klarevas, Pgs. 112-115.

The challenged statute regulates military-style features that enhance a weapon's offensive killing capacity and concealability, like silencers, flash suppressors, forward pistol grips, and grenade launchers. "The dangers posed by [these] military-style features prohibited by the statutes—such as grenade launchers and silencers—are manifest and incontrovertible." *Cuomo*, 804 F.3d at 262.

The unusual dangerousness and lethality of the restricted weapons is borne out by their undisputed ability to cause significantly more deaths, injuries, and severe injuries than other firearms. Attacks with assault weapons result in "more shots fired, persons wounded, and wounds per victim than do other gun attacks." *Heller II*, 670 F.3d at 1263 (internal quotations omitted); Ex. F, ¶ 56 ("[W]ith extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semi-automatic handguns").

Due to their design and lethal capabilities, assault weapons are often the weapons of choice of mass-murderers. *See* Ex. C, ¶ 12 ("[A]mong mass shooters, there is a growing preference for using assault weapons and LCMS to perpetrate their attacks"); Ex. B, ¶ 92 ("Unsurprisingly, a growing number of mass killers turn to these assault rifles when they launch their deadly onslaughts" and have been used in 80% of all massacres with 25 or more deaths); Ex. D,

Declaration of Lucy Allen ¶ 38 (assault weapons are often used in mass shootings). Examples—including the horrific slaughter of 26 students and teachers at Connecticut's Sandy Hook Elementary School—demonstrate the dangerousness and lethality of these weapons: "[The Sandy Hook Killer] was able to slaughter 26 in less than five minutes with his Bushmaster AR-15. [The Aurora Killer] used a Smith & Wesson 'Military & Police' (M&P) AR-15 fitted with a 100-round magazine to kill 12 and wound 58 in a Colorado movie theater. The ISIS-inspired San Bernardino, California, shooters used a pair of AR-15s to kill 14. [The Orlando Killer] unleashed Sig Sauer's concealable 'next-generation AR' to leave 49 dead and dozens more injured at the Pulse nightclub." Ex. B, ¶ 111.

For these reasons, courts have found assault weapons to be "dangerous and unusual" and outside the Second Amendment's scope. For example, the district court in *Heller II* noted that assault weapons are "military-style weapons of war, made for offensive military use," "disproportionately likely to be used by criminals," and "not generally recognized as particularly suitable or readily adaptable to sporting [or self-defense] purposes." The court further noted that such weapons "are unusually dangerous because they place law enforcement officers at a particularly grave risk due to their high firepower." *Heller v. District of Columbia*, 698 F. Supp. 2d 179, 193 (D.D.C. 2010), *affirmed in part and vacated in part by, Remanded by Heller II*, 670 F.3d 1244 (2011). Based on these findings, the court concluded that "assault weapons . . . constitute weapons that are not in common use, are not typically possessed by law-abiding citizens for lawful purposes and are 'dangerous and unusual' within the meaning of *Heller*." *Id.* at 194; *see also Kolbe*, 849 F.3d at 136 ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield" (quoting *Heller I*, 554 U.S. at 627)); *Kotek*,

2023 U.S. Dist. LEXIS 121299, at *105. Ultimately, as the Second Circuit found, the "net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." *Cuomo*, 804 F.3d at 262.

Plaintiffs argue that the question of whether a weapon is "dangerous and unusual" is the same inquiry as whether such weapons are "in common use." (ECF # 51-1, Pgs. 19; 23-24.)  They further claim that whether a firearm is dangerous is "irrelevant to a Second Amendment analysis if it is commonly used for lawful purposes," thus collapsing the multi-part step one inquiry into single statistical question of ownership. Id. But this analysis conflicts with long established caselaw separating the concepts of dangerousness, common ownership, and typical use, and makes little sense in light of historical evidence.

In *Heller*, the Supreme Court cited Blackstone as support for the historical tradition of prohibiting the carrying of "dangerous and unusual" weapons. 554 U.S. at 2817. As Professor Saul Cornell explains, in the original text, however, Blackstone employed the phrase "dangerous **or** unusual weapons" not "dangerous **and** unusual" weapons—a phrase which, at the time, would have meant "unusually dangerous." Ex. G, Declaration of Saul Cornell, ¶ 20. This historical evidence from the text relied upon in *Heller* demonstrates that the Founders would have understood that the Second Amendment's protections did not extend to particularly dangerous weapons. Id. This historical evidence also comports with numerous cases comparing the relative dangerousness of particular weapons, and finding that particularly dangerous, lethal weapons or military-style weapons fall outside the protection of the Second Amendment entirely, even if they are "common." *See, e.g., Cuomo*, 804 F.3d at 256 (after reviewing statistics about ownership and typical use, also noting that the court must consider whether assault weapons are nonetheless

21

"dangerous and unusual in the hands of law-abiding citizens."); *Kolbe*, 849 F.3d at 136; *Fyock*, 779 F.3d at 997; *Kotek*, 2023 U.S. Dist. LEXIS 121299, at *105.

Plaintiffs' argument that dangerousness is irrelevant directly conflicts with the holding of *Miller*—upheld in *Heller*—that the National Firearms Act ("NFA") of 1934, which restricts access to machine guns and other weapons, passed constitutional muster. As of 2021, there were over 741,000 registered machine guns in the United States—far more than the 200,000 benchmark for commonality Plaintiffs point to in their brief. U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives, Firearms Commerce in the United States: Annual Statistical Update, at 16 (2021) https://www.atf.gov/resource-center/data-statistics, last accessed July 19, 2023; (ECF # 51-1, Pgs. 24-25.)

Plaintiffs' proposed "common use" test—which hinges solely on ownership or production statistics without any inquiry into dangerousness—would render the NFA, and by extension both *Miller* and *Heller*, constitutionally suspect. When the NFA was passed, Thompson submachine guns or "Tommy Guns"—which were a large focus of the law—were quite common. *See Friedman v. City of Highland Park,* 784 F.3d 406, 408 (7th Cir. 2015) (noting Tommy guns were "all too common" before being federally prohibited and that the "popularity" of such dangerous military weapons does not mean they are protected). But the Supreme Court expressly reaffirmed the NFA's constitutionality in *Heller*, noting that striking down machine gun restrictions would be "startling." *Heller I*, 554 U.S. at 624. For these reasons, this Court should reject Plaintiffs' argument that the "dangerous and unusual" test is essentially nonexistent, which would require the Court to upend settled law.

All the evidence demonstrates that assault weapons are dangerous and unusual because of their extreme lethality. Assault weapons are therefore "categorically unprotected," and Plaintiffs' challenge fails. *Bruen*, 142 S. Ct. at 2126.

> **b.  Plaintiffs fail to show that assault weapons are typically used by law-abiding citizens for self-defense.**

The Second Amendment also does not protect the regulated weapons because they are unsuited to, and used vanishingly rarely in, self-defense. As *Heller* explained, "the right secured by the Second Amendment is not unlimited" and *Heller* emphasized that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller I*, 554 U.S. at 624. Rather, the Second Amendment only protects arms "'in common use at the time' for lawful purposes like self-defense." *Id.* (quoting *Miller,* 307 U.S. at 179); *see also id.* at 625 (asking whether the arms are "typically possessed by law-abiding citizens for lawful purposes."). Because Plaintiffs have not and cannot demonstrate the regulated weapons here meet this test, they fall outside the scope of the Second Amendment's protection.

This part of the threshold inquiry looks to suitability and purpose, not mere ownership.[8] Rather than ask solely how many people own the regulated weapons, as Plaintiffs urge, this prong

---

[8] Plaintiffs would reduce their threshold burden to a circular inquiry into whether the regulated weapons are commonly owned, without regard to their usage or purpose. Plaintiffs' test would make gun dealers the Second Amendment's gatekeepers, allowing them to manipulate the "common ownership" statistics by flooding the market with dangerous assault weapons. A gun dealer in South Carolina currently advertises:

> OUR MISSION IS TO MAXIMIZE FREEDOM, NOT OUR PROFITS. WE WANT TO SELL AS MANY AR-15 AND AK-47 RIFLES AS WE CAN AND PUT THEM INTO COMMON USE IN AMERICA TODAY. OUR FOCUS ISN'T TO MAKE MASSIVE AMOUNTS OF MONEY BUT TO SPREAD FREEDOM AS FAR AND WIDE AS POSSIBLE. OUR LEGACY WILL NOT BE ABOUT MONEY; WE WANT OUR LEGACY TO BE ABOUT MAXIMIZING AMERICAN FREEDOM. AND WE WORK EVERY DAY TO DO JUST THAT. WE MAKE HIGH-QUALITY FIREARMS AT

requires a court to determine how the regulated instrumentalities are actually designed and function—what they are "useful" for, *Heller I*, 554 U.S. at 627—and how they are actually "used." *Bruen*, 142 S. Ct. at 2138 (referring to "commonly *used* firearms for self-defense.") (emphasis added).[9] That is why *Heller* takes the time to look at the functionality of handguns—the "reasons that a citizen may prefer a handgun for home defense" 554 U.S. at 629 (listing, among other things, ease of accessible storage and design that accommodates one-handed use), and *Cuomo* noted that this inquiry—rather than simply asking who owns what—requires exploring "broad patterns of use and the subjective motivations of gun owners." *Cuomo*, 804 F. 3d, at 256; *and see Kotek*, 2023 U.S. Dist. LEXIS 121299, at *93 (looking both to "an individual's subjective intent in purchasing a firearm or firearm accessory" and to common patterns of firearm use). Plaintiffs have provided

---

AFFORDABLE PRICES FOR EVERYONE! THEN WE BACK THEM WITH A FULL LIFETIME WARRANTY.

See Palmetto State Armory, https://palmettostatearmory.com/about-psa.html, *last accessed on July 26, 2023*. Despite claims that this is "not about money," temporarily selling weapons at a reduced price in an attempt to prop up a "common ownership" argument and ensure these weapons are protected by the Constitution in perpetuity may be "penny foolish," but it is certainly "pound wise." These gun dealers will more than make up for whatever temporary financial losses they sustain in the long run.

[9] *See, also, Bruen*, 142 S. Ct. at 2138 (reiterating the phrase "commonly *used* firearms for *self-defense*") (emphasis added); *Heller I*, 554 U.S. at 629 (examining the "reasons" a handgun may be used for "home defense"); *see also Cuomo*, 804 F.3d at 256 (after reviewing statistics about ownership, also noting that the Court must consider whether assault weapons are nonetheless "dangerous and unusual in the hands of law-abiding citizens" and "typically possessed by law-abiding citizens for lawful purposes"); *Friedman*, 784 F.3d at 409 ("[R]elying on how common a weapon is at the time of litigation would be circular" and "popularity" of dangerous military weapons does not mean they are protected); *Worman*, 922 F.3d at 35 (measuring "common use" by the sheer number of weapons lawfully owned is "illogical"); *Heller II*, 670 F.3d at 1261 (numerosity is not enough where "we cannot be certain whether" the weapons are "used or useful specifically for self-defense or hunting."); *Kolbe*, 849 F.3d at 143-44 (finding large capacity magazines to be "most useful in military service" and therefore not protected by the Second Amendment, no matter their popularity).

no evidence about either "patterns of use" or "the subjective motivations of gun owners." *Cuomo*, 804 F. 3d, at 256.

In particular, the test considers a weapon's suitability and purpose for the core of the Second Amendment right: self-defense. The Supreme Court has repeatedly reiterated the centrality of self-defense in this analysis. *Heller* and *McDonald* held "that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for *self-defense*." *Bruen*, 142 S. Ct. at 2125 (emphasis added) (characterizing the holdings). In *Heller*, the Court repeatedly reiterated the importance of self-defense to the Second Amendment right, explaining that self-defense is the "core" of the right, the "*central component*" (emphasis in original), and the original motivation for the codification of the right. *Heller I*, 554 U.S. at 599, 630. Self-defense was so central and critical to the analysis in *Heller* that the Court used the phrase no fewer than thirty-seven times. And in *Bruen* itself, the Court tied the common-use analysis to self-defense. *Bruen*, 142 S. Ct. at 2138 (referring to "commonly used firearms for self-defense.").

Unlike the laws at issue in *Heller*, *McDonald*, and *Bruen*, the challenged Connecticut statutes do not prohibit an entire class of firearms like conventional handguns, which are the "quintessential self-defense weapon[s]." *Heller I*, 554 U.S. at 629. Nor do they even ban all semiautomatic firearms, long guns, rifles, or fully automatic firearms. Rather, the statutes regulate a small subset of unusually dangerous military-style weapons that "are designed to enhance [firearms'] capacity to shoot multiple human targets very rapidly." *Heller II*, 670 F.3d at 1262. Such weapons are not useful or used for any lawful self-defense purposes in practice.

Firearms of any kind are used defensively by the victims in fewer than 2% of all U.S. violent crimes. Ex. D, ¶¶ 6; Ex. B ¶ 150 (recent study showed victims of violent crime did not defend with any type of gun in 99.2 % of those incidents). And the overwhelming majority of

lawful defensive firearm shootings involve handguns, not assault weapons. Ex. D, ¶¶ 22-26 (handguns used in 90% of known self-defense incidents compared to 4% of rifles—which includes more than just assault weapons). Only a handful of anecdotal incidents of use of assault weapons for self-defense exist. Data about discharge of firearms in self-defense shows that assault weapons are rarely, if ever, discharged in self-defense, let alone brandished or carried for that purpose. Ex. D, ¶¶ 22-27. And there is no evidence that the federal assault weapons ban had any negative effect on the self-defense of average citizens. Ex. B, ¶¶ 147-149. None of the individual Plaintiffs here has ever discharged any weapon—let alone an assault weapon—in self-defense or has ever brandished or even carried such firearms in public for self-defense. Ex. I, Deposition of Eddie Grant, Pg. 35; 85-86; Ex. J, Pg. 63; Ex. K, Deposition of Jennifer Hamilton, Pgs. 63; 64-65. At most, Ms. Hamilton claimed she once carried a weapon to her driveway when she thought there was "somebody breaking into [her] cars." Id., Pgs. 57-59.

In contrast, significant data show that assault weapons are frequently used in mass shootings and unlawful violence. This trend has increased over time.  62% of all high fatality gun massacres—shootings resulting in six or more fatalities, not including the perpetrator, regardless of location or underlying motive—in the last four years were perpetrated with an assault weapon. Ex. C, ¶ 12. Their use is "particularly prominent in public mass shootings and those resulting in the highest casualty counts." *Id.*, Pgs. 169-170 (citing *Koper*). They are also used to "inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff." Ex. F, Declaration of Randall Roth, ¶ 51. The fact that assault weapons are typically used (outside the military context) for non-lawful purposes like gun massacres is underscored by the significant decrease in both fatalities and instances of mass shootings/gun massacres while the federal assault weapons ban was in place. *See* Ex. C, Pg. 169 (gun massacres decreased during the decade the ban

was in place, then skyrocketed after the ban was lifted); Ex. B, ¶ 72 (the decade after the ban was lifted showed an overall 266% increase in mass shootings and 347% increase in fatalities). Such weapons are also particularly popular with drug traffickers and gang members both in the U.S. and Mexico. Ex. B, ¶¶ 64-65.

AR-15s "have been the weapons of choice in many of the deadliest mass shootings in recent history, including horrific events in Pittsburgh (2018), Parkland (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and Aurora (2012)." *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019), *overruled in part by Bruen* 142 S. Ct. 2111. "These weapons are disproportionately used in crime, and particularly in criminal mass shootings like the attack in Newtown. They are also disproportionately used to kill law enforcement officers: one study shows that between 1998 and 2001, assault weapons were used to gun down at least twenty percent of officers killed in the line of duty." *Cuomo*, 804 F.3d at 262.

Manufacturers' advertising evidences assault weapons' intended purposes. Even manufactures do not tout assault weapons as "quintessential" self-defense weapons, like handguns. *Heller I*, 554 U.S. at 629. Instead, advertising campaigns for assault weapons "are hawked with explicit depictions of combat and phrases like 'the closest you can get without having to enlist.'" Ex. B, ¶ 91. Tragically, in the Newtown Sandy Hook massacre was perpetrated by a killer armed with an assault weapon that had been advertised under the slogan "Forces of opposition, bow down." *Id.* The typical purpose of these weapons is attack, domination, and death, not self-defense.

In contrast, even Plaintiffs could not credibly explain why an assault weapon is either needed or more useful for self-defense. To the contrary, all recognized that "shorter" barreled weapons were "more maneuverable" and thus better suited to self-defense. Ex. J, Pg. 53-55

Ex. K, Pg. 69; Ex. I: Pg. 38.  None could identify a situation where they believed an assault weapon would be better suited to self-defense. Rather, Mr. Stiefel acknowledged that a weapon that is "shorter" and therefore "easier to maneuver" is "better suited for self-defense" and also acknowledged that all of his pistols are shorter than this "others" and rifles. Ex. J, Pgs. 54-55; 60-61. Mr. Grant could not identify a reason to need assault weapons except that they were "like shoes" and he needed certain ones for certain seasons. Ex. I, Pg. 23. Ms. Hamilton, who already owns approximately ten to fifteen firearms, claimed that in a situation where "somebody [was] standing above [her]" when she woke up, the only weapon with which she could effectively defend herself would be an AR-15 style weapon or .300 blackout. Ex. K, Pgs. 33, 90; 93-96. When pressed as to why she could not defend herself with her other approximately fifteen firearms—including AR-15 style "others" she already owns—Ms. Hamilton claimed because of "the recoil." Id. Pg. 95. Yet (despite being a firearms instructor) she could not explain what this meant. Id. And indeed, such a claim is inexplicable in light of common sense and the testimony from all three Plaintiffs that shorter weapons—like handguns—that allow for more maneuverability are better for self-defense. *See Heller I*, 554 U.S. at 629 ("There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police.").

Similarly, courts have found little or no evidence of civilian use of assault weapons for home or self-defense. *See Hightower* v. *City of Boston*, 693 F.3d 61, 66, 71 & n.7 (1st Cir. 2012) ("[L]arge capacity weapons" with the capacity to carry more than ten rounds are not "of the type characteristically used to protect the home"); *Heller II*, 698 F. Supp. 2d at 193-94 (prohibited

weapons do not have "any legitimate use as self-defense weapons" and "in fact increase the danger to law-abiding users and innocent bystanders if kept in the home or used in self-defense situations") (internal quotation marks omitted).

Plaintiffs have not met their burden of showing that assault weapons are "typically possessed by law-abiding citizens" for self-defense, or that such weapons are even suitable for purposes like self-defense. The overwhelming evidence points the other way, and so the Second Amendment does not apply.

### c. Assault weapons are not even commonly *owned*.

Plaintiffs could not carry their burden even if "common" ownership were the end of the threshold inquiry. Their primary evidence of common ownership of the regulated weapons is provided by the claim of Salam Fatohi, a representative of the National Shooting Sports Foundation ("NSSF")—a firearms trade association—that "since 1990, approximately 24,446,000 modern sporting rifles have entered circulation in the United States." (ECF # 51-8.)  As noted by other courts, Mr. Fatohi "ha[s] a significant financial interest in the outcome of this case." *Kotek*, 2023 U.S. Dist. LEXIS 121299, at *25, fn. 18. Regardless, the assertion that there are "millions" of assault weapons in circulation does not tell us how many people actually possess those weapons, how many of those people are "law abiding citizens," or how many "use" these weapons for self-defense, which is the core of the Second Amendment's concern. *Heller I*, 554 U.S. at 625. Even an accurate raw number, which Plaintiffs do not provide, would shed no light on commonality absent analysis of how many individuals *could* possess such weapons. And even knowing a percentage would tell us nothing legally relevant without some authority on what "common" means as used in *Heller* and *Bruen*. Plaintiffs offer none.

Nationally, AR-15 platform rifles—which include the assault weapons regulated in Connecticut—make up approximately 5% of privately owned guns, compared to 50% for handguns. Ex. B, ¶¶ 27-28. So even among gun owners, such weapons are not commonly owned. Plaintiffs' 24 million number for AR-15 platform rifles represents not the number of individuals who own these weapons but the number of weapons that have been produced. And research has shown that the average assault weapons owner has "three or more of [these] guns." Ex. B, ¶ 92. Indeed, Plaintiffs here all own more than a dozen firearms and each own at least three "others" that functionally mimic assault weapons—with hopes to buy more. Ex. I, Pg. 12-18; Ex. J, Pg. 17-19; Ex. K, 32-33, 40. While the number of assault weapons produced is relatively small in the context of the overall gun stock of an estimated 461.9 million firearms in U.S. circulation, the number of individual owners of assault weapons is likely even smaller. Ex. C, ¶ 13. Even if 20 million individuals owned AR-15 style weapons (which they do not, as Plaintiffs seem to concede), that would still only be about 6% of the entire United States population. *Id.,* ¶ 27.

Put simply, AR-15 style weapons constitute a fraction of guns in existence today, and even a smaller slice of the entire American population actually owns them. These weapons are not in common use on a national level. In Connecticut, assault weapons and AR-15 style weapons are even rarer. Only 81,982 assault weapon certificates have been issued in Connecticut since the passage of the challenged statutes. Ex. A, ¶ 25. Thus, even if the inquiry were limited to common ownership, and even if we assume (baselessly) that each assault weapon is owned by a unique individual, at *most* 2% of the Connecticut population owns an AR-15 style weapon.[10] In actuality,

---

[10] Plaintiffs submit a misleading affidavit from Ray Bevis attempting in vain to establish that "4.1%" of all firearms in Connecticut are "assault weapons" and "6.8%" are classified as "others." See ECF # 51-3. But Plaintiffs cannot accurately calculate that rate, because nobody knows the denominator. Connecticut does not require all gun owners to register all firearms with the Department of Emergency Services and Public Protection. Ex. A, ¶ 84. None of the Plaintiffs, for

70% of adults nationwide do not own *any* firearms, let alone assault weapons. Ex. B, ¶ 28. Owning an assault weapon is both uncommon and unpopular, and the preferences of an extraordinarily small minority of the population cannot amount to commonality.

Plaintiffs have not established and cannot establish that assault weapons are commonly owned. So even if this question were the end of the inquiry, as they erroneously assert, Plaintiffs have not shown any likelihood of success on the merits of their claims.

**3.   Even if the Second Amendment extends to assault weapons, Plaintiffs cannot show a substantial likelihood of success because Connecticut's laws are consistent with the American tradition of firearm regulation.**

Because the Second Amendment does not protect the regulated weapons, Plaintiffs cannot show any likelihood of success on the merits, and their request for a mandatory injunction against Connecticut's assault weapons ban should be denied. *See Bruen*, 142 S. Ct. at 2126 (decreeing that the analysis can stop, and the state's regulations survive, if the threshold inquiry shows that the regulated conduct is beyond the scope of the Second Amendment protections). But even if they survived the threshold inquiry, Plaintiffs would still fail because Connecticut's regulations are entirely "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-2130.

If a plaintiff shows that they are entitled to the Second Amendment's protections, courts must consider whether "historical precedent from before, during, and even after the founding evinces a comparable tradition of regulation" as to that before the Court. *Id.* at 2131-32. As the Court noted in *Bruen*, "[i]n some cases, that inquiry will be fairly straightforward." *Id.* at 2131.

_____

instance, registered any of their dozens of firearms. Since the state's registry does not capture the total number of privately owned firearms, there is no reliable way to calculate the percentage of assault weapons. But it can safely be assumed that the number of privately owned firearms is far higher (and thus the percentage of assault weapons far lower) than those in the weapons registry.

Such cases include situations where states try to address "a general societal problem that has persisted since the founding" and where there may be previous attempts to enact "analogous regulations during the time frame" that would suggest a modern-day restriction's constitutionality. *Id.*

But Connecticut's assault weapon regulations are different. The *Bruen* Court recognized that regulations intended to address "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. So even when they trigger Second Amendment scrutiny, state gun safety regulations like Connecticut's assault weapons ban—motivated by unprecedented concerns and dramatic technological change that would have been "unimaginable at the founding," *id.*—are constitutional where a court can identify a "well-established and representative historical *analogue*, not a historical *twin*" for regulations. *Id.* (emphasis in original). To survive, the challenged regulation need only be "relevantly similar" to a historical regulation. *Id.* at 2133.

This Court should also deny the motion because Plaintiffs cannot demonstrate that the challenged statutes are inconsistent with historical tradition.

### a. The historical analogue analysis is broader here because the challenged statute responds to unprecedented societal concerns and technological advancements.

This case, unlike *Bruen* and *Heller*, does not address restrictions on handguns, and the statutes here were not designed to address a general societal concern that has remained relatively unchanged since the eighteenth century. Rather, Connecticut's General Assembly enacted the challenged statutes to address an unprecedented societal concern resulting from rapid and dramatic

technological advancements that have, tragically, facilitated a national epidemic of mass shootings.

The Connecticut legislature enacted the challenged statute in response to the horrific shooting that took 26 lives in Newtown in 2012. *See Cuomo*, 804 F.3d at 242 ("The legislation is also specifically targeted to prevent mass shootings like that in Newtown, in which the shooter used a semiautomatic assault weapon"); *Shew v. Malloy*, 994 F. Supp. 2d 234, 249 (D. Conn. 2014) ("Connecticut's General Assembly made its legislative judgment concerning assault weapon and LCM possession after the mass-shooting at Sandy Hook Elementary School").[11]

Mass shootings and gun massacres are not something that "the Founders themselves could [have] confront[ed]" and were not a "general societal problem" in the eighteenth century. *Bruen*, 142 S. C.t at 2132. Rather, such incidents are a modern phenomenon that have dramatically increased in frequency in the last 25 years. Ex. B, ¶ 35. There was simply no "comparable societal ill" to mass shootings in the eighteenth century. Ex. G, ¶ 14; Ex. F, ¶¶ 14-16. Even general gun violence was very low compared to the current day, particularly in New England. Ex. G, ¶ 14-15. As one expert concludes: guns were not the "weapon of choice for those with evil intent" during the Founding. Id, ¶ 15.

Founding and Reconstruction era firearms lacked the lethal potential of the modern assault weapons prohibited in Connecticut. *Id.*, ¶ 14-15; Ex. F, ¶ 56. The new generation of

---

[11] "At the end of that unimaginable day, we learned that we had lost 20 elementary school children and 6 teachers and administrators. They were killed with a weapon of war, a semi-automatic assault rifle, the platform of which - was originally designed for the battlefield and mass killings. . . The legislature recognized that access to guns is a big part of the public health challenges in our country today." *Shew*, 994 F. Supp. 2d at 249 n.50 (D. Conn. 2014) (citing Connecticut Senate Session Transcript for April 3, 2013).

unprecedentedly lethal weapons targeted by Connecticut's firearm safety laws emerged from technologies developed for military use during the Cold War. Ex. F, ¶ 49.

During the Founding Era and Reconstruction, America was not daily put at mortal risk by weapons that let a single person decimate an elementary school in under five minutes. There were no such weapons and no such incidents. *See* Ex. F. Rather, at the Founding, most arms were flintlock muzzleloaders capable of firing a single lead ball. *Id.*, ¶¶ 15-30. For example, the Boston Massacre—which drove Colonial America and particularly New England closer to revolution— resulted in *five* deaths from *nine* British soldiers firing into a crowd. *Id.*, ¶ 41. A single person murdering dozens of children within seconds with a single weapon would have been impossible given then-existing weaponry, and therefore unthinkable to the Founding generation.

The near-exponential increase in firearms' lethality is precisely the "dramatic technological change" that *Bruen* anticipated. The deadliness of the regulated weapons is evident in an index devised for the U.S. Army, which classifies the lethality of various weapons—defined as the number of people who could be killed in one hour by a particular weapon. *See* Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022). This index demonstrates that the lethality of a Founding-era flintlock muzzleloader was 43; that of a Civil War-era rifle capable of firing conoidal bullets was 102; and that of a 1903 bolt-action rifle equipped with a magazine was 495—"a ten-fold increase over the flintlock musket." *Id.* at 2507–08 (And that manually re-loaded rifle did not even have an LCM—it carried only a five-round clip-magazine. Classic Firearms, "U.S. Model 1903," https://tinyurl.com/2p8c74rj). In contrast, the Sandy Hook killer murdered 26 children and adults in five minutes. Ex. B, ¶ 111. Weapons at the time of the Founding and Reconstruction simply did not have the lethality potential as the weapons regulated by the challenged statute. Ex. C, ¶ 18; Ex. B, ¶¶ 172-182; See also, Ex.

G, ¶ 15 ("limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period").

It would be no surprise to the legislators at the Founding or the Reconstruction that their modern counterparts would try to address a thoroughly modern problem just as they themselves sought to address the problems of their day, albeit through sometimes different legislative approaches. But the problem of gun massacres by a single individual, facilitated by the lethality of a single weapon, was never before a major societal concern like it is today. *See* Ex. F, ¶ 41 (mass murder "has been a fact of life in the United States" but it was a "group activity" until technological advancements like advances in weaponry permitted otherwise). Before technological advancements in the twentieth century allowed individuals to create unthinkable carnage, "the only way to kill a large number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal" but simply did not have anywhere near the lethality of modern assault weapons. *Id.*

Dr. Schreiber's testimony demonstrates this clearly. Modern assault weapons are particularly dangerous because they can fire more rounds more quickly, creating a greater number of wounds that are also more devastating than those from a handgun. "The combination of high kinetic energy, the ability to fire rounds rapidly, deadly accuracy at great distance, a high degree of maneuverability, and low recoil results in maximum killing potential." Ex. E, ¶ 28. Any fair reading of the record results in a simple conclusion. Assault weapons are a dramatic technological change that allow single individuals, who previously could perhaps threaten one or two people at most by themselves, to potentially kills dozens of people in a few minutes. Such events were unheard of at the time of the Founding or even Reconstruction.

Mass killings of the past, even if they could be compared to events such as Sandy Hook, Las Vegas, Orlando, Highland Park or many others, were driven by ideology, but only accomplished by great numbers of people. Ex. F, ¶¶ 41-43. And Congress tried to respond, just as contemporary legislators do to our own crises. For instance: in the Reconstruction era, Congress responded to a crisis of domestic mass-murder events by deploying federal troops to prevent lynchings by the Ku Klux Klan. Id. Lawmakers during Reconstruction tried to regulate and address the conduct through enforcement of existing criminal laws. At the time, the United States Army and loyal state militias sought to prevent arms from reaching unlawful insurgent groups, using intelligence gathering to intercept arms shipments. *Id.* They targeted the perpetrators, rather than particular instrumentalities, since post-Civil War mass violence was perpetrated with a variety of weapons used by gangs of people, rather than with a specific, identifiable type of weapon. *Id.*

At the Founding, military style weapons were not as easily accessible and purchasable as today. Such weapons were expensive and had less utility in rural colonial society than other non-military weapons. Ex. G, ¶ 14 ("Nobody bayoneted turkeys…the most widely owned and desired weapons were fowling pieces and light hunting muskets"). Without technology that could allow one person to murder so many others in such a small time, it would have been incomprehensible to the Founders that mass shootings like those the statute attempts to address could ever become a societal problem.

It is unsurprising that legislators in the 1790s and 1860s did not regulate non-existent military-style firearms capable of killing hundreds in minutes. *See McCullen v. Coakley*, 573 U.S. 464, 481–82 (2014) (noting that the Constitution does not "require States to regulate for problems that do not exist."). This Court should uphold Connecticut's challenged regulations without looking for an "historical twin." Instead, as *Bruen* commands, it should look to the relevantly

similar historical analogues identified below and should deny Plaintiffs their extraordinary injunction.

> ### b. Plaintiffs cannot show a likelihood of success because Connecticut's regulations are relevantly similar to regulations throughout American history.

The *Bruen* Court held that defendants need only identify a "well-established and representative historical *analogue*, not a historical *twin*" for modern day regulations. *Bruen*, 142 S. Ct. at 2132. (emphasis in original). The Court did not specify how narrow or how similar this analogue must be, particularly in cases like this where an unprecedented societal concern and modern technological advancement is implicated. The Court did, however, identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.

Throughout American history, states' inherent police power—their sovereign prerogative to protect public safety—has included the power to regulate firearms and protect residents from interpersonal violence. Ex. G, ¶¶ 23-29. As societal and technological change brought new types of weapons that posed new social concerns and public safety threats, states responded with new regulations. This tradition of common-sense regulation offers multiple clear analogues to Connecticut's gun safety laws which, like their predecessors, target new weapons technologies used primarily for crime—and the novel crime of mass casualty shootings—while allowing multiple options for self-defense. Historical analogues from the Colonial and Founding eras, Reconstruction, and the twentieth century all demonstrate Connecticut's laws are in keeping with the American tradition of attempting to reduce mass casualty incidents and regulating unusually dangerous weapons.

i. **Historical regulations about the possession and storage of gunpowder are
relevantly similar to Connecticut's modern efforts to address gun safety.**

Because mass shootings are a modern problem and because there were no weapons at the
Founding or Reconstruction that contributed to mass casualty events the way assault weapons do
today, this Court should look to laws aimed at preventing other types of mass casualty events to
find similar historical analogues. Such analogues are relevantly similar to the challenged statute in
both the "how" and the "why" of the burden on citizens' right to armed self-defense.

In the Colonial and Founding eras, gunpowder was highly regulated. Individuals were not
free to stockpile as much gunpowder and ammunition as they wished or to store it as they wished.
*See, e.g.*, 1706-7 Mass. Acts ch. 4, reprinted in Acts and Resolves Passed by the General Court
588 (1869), available at https://tinyurl.com/27ubvvvn; A Law for the Better Securing of the City
of New York from the Danger of Gun Powder (1763), https://tinyurl.com/5273xd57; 1821 Me.
Laws 98, chap. 25, § 5, https://tinyurl.com/up948844.[12] Colonial era restrictions often limited how
much gunpowder could be stored in the home, and citizens would often have to store excess
gunpowder in the public "magazine." These gunpowder storage laws have been historically
regarded as appropriate exercises "of the police power." *Brown v. Maryland,* 25 U.S. 419, 443
(1827); Ex. G, ¶¶ 23-29. Since munitions, and particularly possession of excessive amounts of
munitions, posed a uniquely dangerous risk to society, the government could lawfully regulate
them. See *id.*

The historical analogues are many, if not necessarily uniform. For instance, some
jurisdictions placed a predetermined limit on the quantity of gunpowder a citizen could store in his
home: New York City (28 pounds) 1784 N.Y. Laws 627, *An Act to Prevent the Danger Arising*

---

[12] For ease of the Court, Defendants have provided copies of the text of any historical laws or
regulations inaccessible on Lexis, in Exhibit H.

*from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof*, ch. 28; Philadelphia (30 pounds) *A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Government of that District*, Pg. 45-47, Image 48-50 (1832) available at The Making of Modern Law: Primary Sources; Portsmouth, New Hampshire (10 pounds) 1786 N.H. Laws 383-84.

Other jurisdictions, like Connecticut, went further and empowered local officials to determine, based on their "opinion," whether a certain "quantity of gunpowder" in the possession of a private citizen "may endanger the persons or dwellings of any individuals whatsoever." 1832 Conn. Acts 391, *An Act Regulating the Mode Of Keeping Of Gunpowder,* Chap. 25, § 1-2.  If so, the officials could order the owner to move their gunpowder to "some safe and convenient place within said town" at a time and place of the officials' choosing. *Id*. If the citizen failed to do so, the officials could move it "to such place within said town, as in their opinion shall be deemed safe and convenient." *Id*. The officials even retained "a lien upon the said powder for all necessary expenses in removing and keeping the same." *Id*. In other words, the first selectman or mayor or town council of a locality had the right to determine how much stored gunpowder was "too much" for a private citizen and could force him to move it—or actually seize it.

Such a law placed a far greater burden on the right to "keep and bear arms" than Connecticut's restriction on possessing assault weapons, which leaves hundreds of types of firearms untouched by regulation. In 1832, if the mayor of New Haven decided an amount of gunpowder in excess of half a pound was "dangerous," he could order it removed to basically any

location he desired.[13] The only limit on this discretion was the official's "opinion." A citizen could therefore have been functionally prevented from possessing gunpowder, making it impossible to use any firearm at all.

It is not difficult to understand why such regulations were in place. Storing too much gunpowder in a private home could lead to an explosion or a fire that could threaten the community. *See Saul Cornell and Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 511-12 (2004) ("[T]he point of these statutes, was, as they themselves proclaimed, to protect communities from fire and explosion… [and] also provided a check on the creation of a private arsenal."). Boston's 1706 regulation explains the reasons for mandating that all gunpowder—with limited exceptions, none of which applied to private homes—be stored in the "publick magazine":

> [P]reventing the great loss and danger by casualties befalling the same, and considering the imminent hazard of keeping powder in storehouses with other goods and merchandises, or in or near to dwelling houses…

An explosion or fire caused by gunpowder was the mass casualty event of the Founding era. Legislators then understood that limiting the right to "keep," in the form of a restriction on the amount of gunpowder possessed, was a permissible limitation on the right of armed self-defense —a preexisting concept in English law later enshrined in the Second Amendment. *See Bruen,* 142 S. Ct. at 2127 (recognizing the Second Amendment "codified a pre-existing right . . . inherited from our English ancestors."). Such regulations, like the Boston one, existed for 70 years before the Founding of the United States and 85 years before the ratification of the Second Amendment.

---

[13] This would not have been an unusually small amount. Indeed, New Haven limited gun powder possession in the home to one pound only a few years earlier. *See* Charter and By-Laws of the City of New Haven, November, 1848 Page 48-49, Image 48-49 (1848).

Similar regulations continued to exist in various states and localities for decades after the Second Amendment was ratified.

As a district court in Oregon recently held, "[l]arge quantities of gunpowder posed a threat to public safety at the time of the Second Amendment's ratification in 1791. In the late-eighteenth century, colonies and states responded to this danger by regulating the amount of gunpowder that could be stored in a given area and placed restrictions on the manufacture, inspection, sale, and transport of gunpowder." *Kotek*, 2023 U.S. Dist. LEXIS 121299, at *51. Much like the challenged statute, such regulations did not deprive law-abiding citizens of their ability to defend themselves either in the home or in public.

The "why" of these regulations fits closely with the "why" of the assault weapons ban: to prevent or at least lessen mass casualty incidents. But the "how" of the gunpowder restrictions was far more onerous than the assault weapons ban is. Firearms of the Colonial and Founding era required gunpowder to be poured into the muzzle of a firearm before firing, either from a paper cartridge or powder horn. As *Kotek* put it, "[b]efore 1791, firearms could not fire without gunpowder." *Kotek*, 2023 U.S. Dist. LEXIS 121299, at *50. This means limitations on the storage or keeping of gunpowder limited the number of times a person could fire *any* weapon. Such a restriction in modern times would be like limiting the number of bullets a gun owner could possess. The challenged statute does not come close to this level of burden on the right of armed self-defense. Indeed, this right is not burdened at all by the challenged statute in the context of these Plaintiffs. The challenged law does not burden the right of armed self-defense. But even if it did, it is far less than the burden imposed by restrictions requiring excess bullets, firearms, or gunpowder to be stored in a communal location based on the opinion of a local official.

ii. **Laws and regulations from both the Founding era and the nineteenth century demonstrate an historical tradition of restricting possession or regulating carry of specific types of dangerous new weapons.**

Historically, states used their police powers to regulate new weapons that posed an unprecedented risk to public safety, though on a far less deadly scale than assault weapons today. *Id*. As technologies developed and new weapons emerged that were primarily used for attacking others rather than self-defense, states and territories regulated those weapons. Folding knives, dirk knives, and Bowie knives—newer inventions specifically designed for and primarily used in "an alarming proportion of the era's murders and serious assaults"—were banned in their entirety. Ex. F, ¶ 24. These weapons, just like assault weapons, were newer technologies that created a societal concern until then unmatched and were therefore regulated for the same purpose as the challenged statutes here—public safety and reducing ambush and attacks.[14] See *id.*, ¶ 25 ("Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants hands, and clip points to make it easier to cut or stab opponents."). These regulations did not entirely ban

---

[14] Relevant regulations included: *See, e.g.*, 1837 Ala. Laws 7, No. 11, § 2 (prohibitive tax on Bowie knives); 1837 Ga. Laws 90, § 1 (prohibiting sale and possession of Bowie and other kinds of knives as well as "pistols, dirks, sword canes, [and] spears"); 1837-1838 Tenn. Pub. Acts 200-01, §§ 1–2 (prohibiting sale and carrying of Bowie knives, Arkansas toothpicks, and other fighting knives); 1838 Fla. Laws 36, No. 24, § 1 (prohibitive tax on sale and possession of pocket pistols, sword canes, and Bowie knives); 1838 Va. Acts 76, ch. 101, § 1 (banning "keep[ing] or carry[ing]" Bowie knives and other deadly weapons); 1839 Ala. Acts 67, ch. 77 (banning the concealed carry of Bowie knives and other deadly weapons); 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws., ch. 25, § 27, pt. 15 (imposing $1.25 tax on "[e]very dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane," while exempting weapons "used for mustering"); 1868 Ala. Laws 11 (prohibiting the "carrying of hostile deadly weapons" known as "'rifle' walking canes" or "'gunshot' walking canes"); 1868 Fla. Laws 95, ch. 7, § 11 (prohibiting the manufacture or selling of slung shots or metallic knuckles). Bowie knives, like assault weapons used with an LCM, was considered "in its device and design . . . the instrument of *almost certain death*." *Cockrum v. State*, 24 Tex. 394, 402 (1859) (emphasis added); *see also Aymette v. State*, 21 Tenn. 154, 158 (1840) (explaining that Bowie knives "are efficient only in the hands of the robber and the assassin"). Massachusetts, Connecticut's neighbor, also passed a law banning "slungshots," a weapon like a slingshot with a large, heavy shot that was primarily used to attack others. See 1850 Mass. Gen. Law, ch. 194 § 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.

knives, or bladed weapons, or arms in general. They simply banned specific kinds of knives that were particularly dangerous, leaving the citizenry more than capable of defending itself with a myriad of other weapons. So too here.

These types of regulations on classes of unprecedentedly dangerous weapons also included some handguns. For example, during the Founding era, some areas in the country restricted newly developed percussion-cap pistols, which users could carry loaded for a long period without concern for corrosion—a concern that previously limited the use of weapons. These new kinds of handguns, thought to be "primary murder weapons," were restricted "during the lifetimes of Jefferson, Adams, Marshall, and Madison." Ex. F, ¶¶ 25-27. Even during the Reconstruction era, as behaviors and technologies changed, states "singled out weapons" that posed a new danger or concern and regulated them. Ex. G, ¶¶ 42.

Just as states and localities traditionally regulated weapons, including firearms, by banning possession of some particularly dangerous new weapons, they also regulated how some advanced new weapons—which posed new threats because they were readily concealable or could fire more quickly—could be carried. For example, after Reconstruction, Colt revolvers were more deadly than predecessor handguns because they could fire more shots in rapid succession. Ex. F, ¶¶ 31-35. Similarly, revolvers began to develop features which allowed shooters to shoot more quickly without having to reload, and were designed to be concealed, allowing for easier ability to murder. *Id*. As a result of these technological advancements, homicide and violence rates increased around the country. *Id.*, ¶ 34. States and territories tried to regulate this problem of ambushes, attacks, assaults, and rising homicide rates by prohibiting concealed carrying of such weapons—indeed, every state (including Connecticut) except one passed regulations restricting carrying certain concealable weapons. *Id.*, ¶¶ 35-40. In short, when faced with changes in technology, consumer

behavior, and faced with novel threats to public safety, individual states enacted laws to address these problems.

These regulations responded to changing technology and new societal threats. But, like the challenged statutes, they ultimately did not prevent citizens from defending themselves. Restrictions on concealed carrying certainly touched on the bearing of arms but were never considered anathema to the Second Amendment. So too with the challenged statutes—a contemporary equivalent of longstanding firearm regulation that addresses a newly-pressing problem.

### iii. Laws from the twentieth century regulating unprecedently powerful and dangerous weapons reinforce the enduring American tradition of regulating and prohibiting certain particularly dangerous weapons to protect public safety.

As technologies with high killing capacity developed and contributed to problems of violence or death, they were immediately regulated and banned. For example, dynamite and the submachine gun—which had much higher potential for lethality than any other weapons at the time, just like assault weapons do now—were quickly regulated. See Ex. F, ¶¶ 44-45 (dynamite and submachine guns were mainly used for attacking others and had unprecedented capacity for lethality and little utility in self-defense).

"States also responded to the proliferation of automatic and semi-automatic firearms in the early twentieth century." *Kotek*, 2023 U.S. Dist. LEXIS 121299, at *71. "Between 1925 and 1934, at least thirty-two states enacted laws restricting or, in many instances, prohibiting the possession of a fully-automatic firearms." *Id*. Indeed, the National Firearms Act, which was upheld as constitutional in both *Miller* and *Heller*, serves as a particularly compelling analogue to Connecticut's assault weapons ban.

As a district court in Delaware explained:

> After [World War I], one such firearm that had been developed for military use—the Thompson submachine gun, widely known as the Tommy gun—became available for civilian purchase. Initially, it was unregulated. Once the Tommy gun began to circulate in society, however, its uniquely destructive capabilities became clear, especially once it found favor among gangster organizations during Prohibition. Although the Tommy gun and like firearms were actually used relatively infrequently by criminals, when they were used, they exacted a devastating toll and garnered extensive national attention, such as their use in the infamous St. Valentine's Day massacre in Chicago in 1929. States reacted by passing anti-machine gun laws, as well as laws restricting ammunition feeding devices, or guns that could accommodate them, based on set limits on the number of rounds. Finally, in 1934, Congress enacted the National Firearms Act, which imposed strict regulations on the civilian acquisition and circulation of fully automatic weapons. The National Firearms Act also imposed strict requirements on the acquisition and circulation of short-barreled shotguns—shotguns with barrels less than 18 inches long—as these weapons widened the spray of fire and caused devastating effects when used at close range.

*Del. State Sportsmen's Ass'n, Inc*, 2023 U.S. Dist. LEXIS 51322, *33-34 (internal quotations and citation omitted); *see also Kotek*, 2023 U.S. Dist. LEXIS 121299, at *72.

In other words, a mass shooting occurred in 1929 effectuated by a relatively novel and particularly powerful weapon, a submachine gun, which was unregulated at the time. Five years later, the Congress passed a law heavily regulating machine guns and other firearms. This law was challenged and upheld as constitutional in 1939. This holding was affirmed in 2008 in *Heller*. The National Firearms Act is still in effect today and now regulates the "others" Plaintiffs possess. *See Miller v. Garland*, No. 1:23-cv-195 (RDA/JFA), 2023 U.S. Dist. LEXIS 93105, at *3-*6 (E.D. Va. May 26, 2023), *appeal filed*, (4th Cir. Jun. 06, 2023) (explaining NFA's applicability to weapons, such as Plaintiffs', that use "pistol braces" via the ATF's new rule and denying plaintiffs' motion for preliminary injunction to enjoin enforcement of that rule.).  As was the case with the gunpowder regulations and the weapons bans of the mid to late nineteenth century, the "how" and the "why" of these twentieth century laws parallel those of the challenged statute.

Twentieth century gun control enactments are important here. The *Bruen* Court stated that historical evidence from later eras "cannot provide much insight into the meaning of the Second

Amendment when it *contradicts* earlier evidence." *Bruen*, 142 S. Ct. at 2154 (emphasis added). But here there is no contradiction, only a consistent pattern of colonies, states, and localities—both before and after the Founding, through the Civil War, into the twentieth century and today— exercising their police powers to protect their citizens with reasonable firearms regulations that still allow the exercise of the right of armed self-defense.  As the Delaware district court correctly noted,

> the historical record that Defendants present, when viewed as a whole, illustrates a pattern: [F]irearms and accessories, along with other dangerous weapons, were subject to remarkably strict and wide-ranging regulation when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality. The analogous twentieth-century regulations do not depart from this pattern, and, indeed, reinforce it.

*Del. State Sportsmen's Ass'n, Inc*, 2023 U.S. Dist. LEXIS 51322, at *35 (internal punctuation and quotation marks omitted).

The right to keep and bear arms is not a "regulatory straightjacket." *Bruen*, 142 U.S. at 2133. It accommodates state and local variation in "devis[ing] solutions to social problems that suit local needs and values," *McDonald v. City of Chi.*, 561 U.S. 742, 784 (2010). Federalism permits variation among the states in protecting public safety, consistent with the Second Amendment. Indeed, in determining that the Second Amendment applies to the states, the Court explained that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *Id*. The regulations here are consistent with historical regulation of arms and are a permissible exercise of the long accepted and traditional police powers the states enjoy to promote public safety. Whether one views this through the lens of step one or step two of the *Bruen* test, Plaintiffs have failed to show a substantial likelihood of success on the merits, and this Court should deny their motion for this reason alone.

**C. Plaintiffs cannot satisfy the remaining criteria for a mandatory preliminary injunction because their inability to purchase yet another firearm that they have never and almost certainly will never use for self-defense cannot outweigh the State's interest in protecting her citizens.**

Plaintiffs' motion should be denied because they cannot show a substantial likelihood of success on the merits. They also cannot satisfy the other three *Winter* factors. They barely offer argument, evidence, or briefing on the factors of balance of the equities[15] or public interest. (ECF # 51-1.) They cannot have met their burden to demonstrate each factor by a clear showing. *See Abbott Labs. v. Adelphia Supply USA,* No. 15-CV-5826 (CBA)(MDG), 2015 U.S. Dist. LEXIS 189555, at *45 (E.D.N.Y. Nov. 6, 2015) ("Preliminary injunctive relief is an extraordinary remedy that requires the plaintiff to carry the burden of persuasion by a clear showing for each factor") (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). But even if they tried, they would ultimately prove unsuccessful.

Plaintiffs cannot show irreparable injury for the same reason they cannot show a substantial likelihood of success on the merits. Plaintiffs' entire argument for irreparable harm stems from their presumption that the prohibited assault weapons and features merit constitutional protection. But Plaintiffs fail to show any likelihood of success on the merits, so they also cannot show irreparable harm. In terms of balance of the equities and public interest, their arguments fall even further short.

---

[15] This is particularly problematic for Plaintiffs because if this Court were to apply the less rigorous preliminary injunction standard of *Citigroup*—which it should not for the reasons already articulated—the *Citigroup* Court still required that "the balance of hardships tips decidedly" in the favor of the moving party.  *Citigroup Global Mkts., Inc.*, 598 F.3d at 35.

As for the "hardships" created by the law, Plaintiffs offer only rhetoric:

Every day that passes where the Plaintiffs cannot purchase, keep, and bear modern sporting firearms places them at a disadvantage to violent criminals who have no regard for the law and who may target them. Every day that passes is a day the Plaintiffs' ability to exercise their constitutional rights is lost forever. The Court should decline to leave them so vulnerable.

(ECF 51-1 at 29.) The reality is far less grave. Each individual Plaintiff owns well over a dozen firearms,[16] including rifles, pistols, revolvers, shotguns, and "others" that functionally mimic otherwise banned assault weapons. Indeed, Plaintiff Grant owns approximately five "others" in "AR15 configurations" and even referred to one of his "others" as a "rifle" when describing how he fires it. Ex. I, Pgs. 63-65. No Plaintiff has ever once "used" any of their firearms for "self-defense" whether by actually discharging the weapon or brandishing the weapon. Ex. I, Pgs. 35; 85-86; Ex. J, Pg. 63; Ex. K, Pgs. 63; 64-65. The only instance any Plaintiff identified of actually using a firearm in any way even approaching "self-defense" was Plaintiff Hamilton, who testified that she once shot a coyote and a raccoon with a .22 caliber rifle in her capacity as an animal control officer. Ex. K, Pgs. 64-65. There is not a whisper of evidence that any Plaintiff's alleged inability to own more "modern sporting firearms" than they already own "places them at a disadvantage to violent criminals." It is hard to imagine why an inability to own "sporting firearms" would in any way impact self-defense. In any case, the suggestion that Plaintiffs— private individuals who have never fired a shot in self-defense and who each own over a dozen firearms—are in any kind of unique danger from "violent criminals" is downright silly.

Regarding the recent ban on others, Plaintiffs' arguments are even weaker. All Plaintiffs already own multiple "others." Each Plaintiff acknowledges that they were capable of legally

---

[16] The precise number of the firearms the various Plaintiffs own is unclear as all testified that they were not sure, could not remember, or did not "count" how many of firearms in general and each type of firearm they actually own. Ex. I, Pg. 12; Ex. J, Pgs. 17-20; Ex. K, Pgs. 32-41.

purchasing "others" up until the new law was signed by the Governor. And the law allows weapons previously lawfully purchased and owned to be retained. Nevertheless, each Plaintiff waited until the law was signed before supposedly asking about buying a ".300 Blackout" from local gun dealers. But Plaintiff Grant could not identify a reason why the ".300 Blackout" is more effective than the five or six "others" in AR15 configurations that he currently owns. Ex. I, Pg. 80. As to his reason for waiting, Plaintiff Grant claims it was "financial" despite not knowing how much a ".300 Blackout" costs. Id., Pg. 78. Plaintiff Stiefel also claims to want to purchase a .300 Blackout but concedes the reason he did not is that he chose to purchase another "other" firearm instead before the new law was signed. Ex. J, Pg. 70. Plaintiff Hamilton claims she could not purchase the .300 Blackout before the enactment of the new law because the precise model she wanted from the precise manufacturer she prefers was unavailable from her gun dealer of choice.[17] Ex. K, Pgs. 105-115.

In reality, Plaintiffs face no hardship from the challenged laws other than their inability to purchase and possess even more firearms than they already own. *See Hartford*, 2023 U.S. Dist. LEXIS 98579, *20 (holding plaintiffs did not satisfy irreparable harm, balance of the equities, or public interest prongs of the *Winter* test where they simply wanted to purchase more weapons when they already had "alternative weapons available, particularly for self-defense"). The organizational Plaintiffs have alleged even less hardship than the individuals. At best, CCDL and SAF claim they may need to simply continue to do more of the activities their members already expect them to do—answer questions and advocate on behalf of their members.

---

[17] Hamilton also claimed she did not attempt to purchase a .300 Blackout before this date for financial reasons, despite purchasing two additional "others" in the months before this—both of which cost in the range of three thousand dollars—which is more expensive than the .300 Blackout. Ex. K, Pgs. 98-100.

Ultimately, the "equities" Plaintiffs claim tip in their favor boil down to, as Plaintiff Grant candidly put it, "choice":

> Q Can you describe what you mean to me by choice, sir?
> A Well, when I have the luxury of visiting other state gun stores and I can see the choices. You know, I just can look but I can't touch. It's just like having a candy behind a locked glass.
> Q Do you consider a lack of choice to be, I suppose places you at a tactical disadvantage from a potential attacker or criminal?
> A Yes. It's like just like when you go out, you want to put on your Stacy Adams when you're with your suit. You don't want to put on Nike sneakers.

Ex. I, Pg. 41.

In contrast to the supposed harm the challenged law works on Plaintiffs' preferences, a mandatory injunction will work immediate and severe hardship on Defendants, the State of Connecticut, and the public. The public interest in avoiding mass shootings dramatically outweighs a single plaintiff's interest in owning one more gun that he or she is wildly unlikely to ever use for any legitimate self-defense purpose.

An injunction would cut directly against the public interest, striking down public safety legislation demanded by Connecticut citizens and enacted by their elected representatives in response to one of the worst mass shootings in American history. It would severely, negatively, and potentially irreversibly harm Connecticut and its citizens. Connecticut's gun safety laws protect every person in the state against "the ultra-lethal pathogen of mass murders—shootings in which multiple people are killed and, often, dozens of others injured." *Ocean State Tactical, LLC v. Rhode Island,* No. 22-CV-246 JJM-PAS, 2022 U.S. Dist. LEXIS 227097, *43 (D.R.I. Dec. 14, 2022), appeal filed, (1st Cir. Jan. 18, 2023).  Courts have found that governments have "a very strong interest in regulating the use of [firearms]. The threat to public safety posed by illegal and/or irresponsible [firearm] usage is well known." *Waltier v. N.Y. Police Dep't*, 856 F. Supp. 196, 200 (S.D.N.Y. 1994). "A State's most basic responsibility is to keep its people safe," *Caetano v.*

*Massachusetts,* 477 U.S. 411, 421 (2016) (Alito, J. concurring), and the "interest of public safety stemming from mass gun murders could not be more undeniably compelling." *Ocean State Tactical*, 2022 U.S. Dist. LEXIS 227097, at \*46.

This Court should deny Plaintiffs' extraordinary and dangerous request for mandatory injunctive relief. They have not met their heavy burden to demonstrate the balance of harms weigh in their favor or that the public interest would be best served by granting their Motion.

## III. CONCLUSION

For all these reasons the Defendants respectfully ask this Court to deny the Plaintiffs' Motion for Preliminary Injunction.

DEFENDANTS
Lamont, et al.

WILLIAM TONG
ATTORNEY GENERAL

BY:

/s/ *Janelle R. Medeiros*

Janelle R. Medeiros
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct30514
E-Mail: janelle.medeiros@ct.gov
Tel.: (860) 808-5450
Fax: (860) 808-5590

James M. Belforti
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Tel: (860) 808-5450

51

Fax: (860) 808-5591
Federal Bar No. ct30449
E-Mail: james.belforti@ct.gov

## **CERTIFICATION**

I hereby certify that on July 26, 2023, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.


  /s/ *Janelle R. Medeiros*
Janelle R. Medeiros
Assistant Attorney General